**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-11376 (___) |
| Debtor in a foreign proceeding. | |

**DECLARATION OF MARGOT MACINNIS IN SUPPORT OF**
**CHAPTER 15 PETITION FOR (I) RECOGNITION OF FOREIGN MAIN**
**PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III)**
**RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Margot MacInnis, pursuant to 28 U.S.C. § 1746, hereby declare (this "Declaration")

under penalty of perjury under the laws of the United States of America, that the following is true

and correct to the best of my knowledge and belief:

**A.     The Joint Official Liquidators and the Cayman Proceeding**

1.          My colleague, Sandipan Bhowmik, and I (the "Petitioners" or "JOLs") are the duly

appointed Joint Official Liquidators of Charitable DAF HoldCo, Ltd (in Official Liquidation)

("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the

Cayman Islands (the "Cayman Proceeding"), which was brought under the supervision of the

Grand Court of the Cayman Islands Financial Services Division (the "Cayman Court") by an order

dated May 6, 2025 (Cause No. FSD 116 of 2025)(JAJ) (the "Supervision Order").[2]

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company, and registered with registration number 53083. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] Ex. 1, Supervision Order in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

2.      I respectfully submit this Declaration in support of the Petitioners' Verified Petition dated July 21, 2025 (the "Verified Petition")[3] seeking the United States Bankruptcy Court for the District of Delaware's (this "Court") (a) recognition of the Cayman Proceeding as a "foreign main proceeding" pursuant to 11 U.S.C. § 1517(b)(1) of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") or in the alternative as a "foreign nonmain proceeding" pursuant to section 1517(b)(2) of the Bankruptcy Code; (b) recognition of the Petitioners as "foreign representatives" of HoldCo, pursuant to sections 1509 and 1517 of the Bankruptcy Code; and (c) granting relief pursuant to sections 105(a), 1502, 1507, 1510, 1520 and 1521 of the Bankruptcy Code.

3.      I am Managing Director of Grant Thornton Specialist Services (Cayman) Limited ("Grant Thornton"). I am one of the JOLs of HoldCo, alongside Mr. Bhowmik also of Grant Thornton. Mr. Bhowmik and I were appointed as JOLs of HoldCo by the Supervision Order.[4]

4.      I have been practicing in the field of insolvency and financial investigations for over 25 years and have been appointed as an official liquidator of numerous companies and investment funds over this period. I am the practice leader for Grant Thornton UK's investments in Grant Thornton's Specialist Services practice in the Cayman Islands and the British Virgin Islands ("BVI"), as well as the Offshore Group leader. My practice over the past 25 or so years has focused on asset tracing and recovery, insolvency, and corporate recovery assignments in the Cayman Islands and Offshore. Over that period, I have taken voluntary and compulsory appointments in connection with entities that were solvent, insolvent and in some cases of doubtful solvency both in the Cayman Islands and BVI. I have been appointed liquidator on some of the

---

[3] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Verified Petition.

[4] Ex. 1, Supervision Order in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

most complex, contentious and high-profile liquidations in the Cayman Islands and BVI, and in circumstances where the result and return to stakeholders were objectively successful. I am a Chartered Accountant, CPA, and hold professional certifications with ACAMS and CFE. I have been a board member of both RISA, IWIRC Cayman Islands and the international board of IWIRC, a member of ABI and INSOL, and in my various roles with these organizations over the years I have sat on technical committees responsible for the creating and delivering the technical content for conferences, seminars and roundtables.[5]

5.      I am duly authorized to make this Declaration on behalf of the JOLs. I am fully familiar with the facts of this matter. Unless otherwise indicated, all statements contained herein are true to the best of my knowledge and based upon my personal knowledge of HoldCo's operations and financial condition, my review of relevant documents and my conversations with relevant personnel. I am over the age of 18 and, if called to testify, would testify competently about the facts set forth herein.

6.      I am familiar with the Model Law on Cross-Border Insolvency, adopted by the United Nations Commission on International Trade Law (UNCITRAL), and approved by a resolution of the United Nations General Assembly on December 15, 1997. I also understand that the Model Law has been adopted in the United States as chapter 15 of the Bankruptcy Code.

7.      I make this Declaration in my statutory capacity as an officer of the Cayman Court and request an extension of comity for the benefit of all of HoldCo's creditors and investors, whose interests I represent. For the reasons discussed below, I submit that: (a) Mr. Bhowmik and I are duly appointed "foreign representatives" of HoldCo in the Cayman Proceeding and that the Cayman Proceeding constitutes a "foreign proceeding" within the meaning of sections 101(23)

---

[5] Ex. 2, Curriculum Vitae of Margot MacInnis.

and (24) of the Bankruptcy Code, respectively; (b) this case was properly commenced in accordance with the requirements of chapter 15 of the Bankruptcy Code; and (c) the Cayman Proceeding satisfies all of the requirements to be recognized as a "foreign main proceeding" pursuant to sections 1502(4) and 1517(b)(1) of the Bankruptcy Code or in the alternative as a "foreign nonmain proceeding" pursuant to sections 1502(5) and 1517(b)(2) of the Bankruptcy Code.

**B.      Overview of HoldCo and its Stakeholders**

8.      HoldCo is a Cayman Islands exempted company, incorporated on October 27, 2011.[6] Its registered office is at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.[7]

9.      HoldCo's share capital is divided into Participating Shares, which do not have voting rights but confer the right to participate in HoldCo's profits or assets including by way of the receipt of dividends, and Management Shares, which have voting rights but confer no other right to participate in HoldCo's profits or assets.[8]  Accordingly, Participating Shareholders have the entirety of the economic interest in HoldCo, whereas the Management Shareholder has the control rights.[9]

10.      Until recently, four nonprofit corporations collectively held 100% of HoldCo's Participating Shares: Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation, and CFNT.[10]

---

[6] Ex. 3, Certificate of Incorporation - Charitable DAF Holdco, Ltd; Ex. 4, Charitable DAF HoldCo Articles of Association.

[7] Previously, HoldCo maintained its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

[8] Ex. 5, Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd.

[9] Id.

[10] Ex. 6, Register of Members Charitable DAF Holdco Ltd.

11.     As of the date hereof, HoldCo has one Management Shareholder and five registered Participating Shareholders.[11]  The Management Shares in HoldCo are held entirely by Mr. Mark Eric Patrick, a U.S. resident, who is also a director of HoldCo.   Mr. Patrick acquired the Management Shares on March 25, 2021, upon taking assignment of the Management Shares previously held by Mr. Grant Scott.[12]  HoldCo's second director is Mr. Paul Murphy, a Cayman Islands resident.[13]

12.     As of the date hereof, the Participating Shareholders are:

(a)     Highland Dallas Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;[14]

(b)     Highland Kansas City Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 23, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;[15]

(c)     Highland Santa Barbara Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;[16]

(d)     CFNT for the Highland Capital Management, L.P. Charitable Fund at CFNT, a public charity exempt from federal income tax under § 501(c)(3) of the IRC

---

[11] Id.

[12] Ex. 7, Resolutions of the Sole Director (100 Management Shares); Ex. 8, Share Transfer (100 Management Shares) from Grant James Scott to Mark E. Patrick.

[13] Ex. 6, Register of Members Charitable DAF Holdco Ltd; Ex. 9, Director Resolutions - Appointment of Paul Murphy; Ex. 10, Director Report of Charitable DAF Holdco, Ltd.

[14] Ex. 11, IRS Determination Letter to Highland Dallas Foundation; Ex. 12, Share Transfer Form; Ex. 13, Highland Dallas Foundation Share Transfer.

[15] Ex. 12, Share Transfer Form; Ex. 14, IRS Determination Letter to Highland Kansas City Foundation; Ex. 15, Highland Kansas City Foundation Share Transfer.

[16] Ex. 12, Share Transfer Form; Ex. 16, IRS Determination Letter to Highland Santa Barbara; Ex. 17, Highland Santa Barbara Foundation Share Transfer.

incorporated in Texas, which was issued 5 Participating Shares in HoldCo on August 12, 2015;[17] and

(e)     DFW Charitable Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on December 9, 2024, which was issued 318 Participating Shares in HoldCo on February 7, 2025.[18]  Mr. Patrick is its registered director, president and sole member.

### i.     The Charitable Structure

13.     Four charities held the ultimate economic interest in HoldCo prior to the DFW Share Issuance and held Participating Shares, either directly or indirectly.  They are:

(a)     The Dallas Foundation (which controls Highland Dallas Foundation): a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets;

(b)     Greater Kansas City Community Foundation (which controls Highland Kansas Foundation): a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds;

(c)     Santa Barbara Foundation (which controls Highland Santa Barbara Foundation): a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million; and

(d)     CFNT is a charity established in 1981 which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023.  CFNT holds its Participating Shares in HoldCo directly (i.e., without interposing a supporting organization).  Prior to the DFW Share Issuance, CFNT held 1.639% of the Participating Shares.[19]

14.     Each of the Charities held its interests in HoldCo indirectly through Highland Dallas Foundation, Highland Kansas City Foundation, and Highland Santa Barbara Foundation

---

[17] Ex. 18, IRS Determination Letter to CFNT; Ex. 19, Share Transfer Form of CFNT.

[18] Ex. 20, DFW Share Transfer; Ex. 21, Director Resolution (Share Issuance to DFW).

[19] Ex. 19, Share Transfer Form of CFNT.

respectively (i.e., TDF held its interest through the Participating Shares held by Highland Dallas Foundation, etc.).[20]

15.     The Supporting Organizations were incorporated by Mr. James Dondero in November 2011 for the purpose of making charitable donations to their respective charity from the proceeds received by the Supporting Organizations from HoldCo.[21]

16.     Each of the Supporting Organizations is "organized and operated exclusively to support and benefit" its relevant, supported Charity.[22]  For U.S. tax purposes, each Supporting Organization is classified as a Type I supporting organization of its respective Charity, which means that it is operated, supervised and controlled by that Charity.[23] Consistent with this classification, the governance arrangements of each of the Supporting Organizations affords each Charity two votes and two director-nominees, to the individual member's (Mr. Dondero or his designee's) one vote and one director-nominee.[24]

17.     HoldCo was formed for tax efficiency purposes to avoid a Charity or Supporting Organization becoming liable for UBTI with respect to investments it may wish to make in a hedge fund or private equity fund, here, the Fund, where substantial assets were held.[25]

18.     HoldCo was, between November 2011 and December 18, 2024, the sole limited partner of the Fund, a Cayman Islands exempted limited partnership formed to invest and manage

---

[20] Ex. 23 Highland Dallas Foundation SO Agreement; Ex. 24 Highland Kansas City Foundation SO Agreement; Ex. 25 Highland Santa Barbara Foundation SO Agreement.

[21] Ex. 26, Highland Dallas Foundation Certificate of Formation; Ex. 27, Highland Kansas City Foundation Certificate of Formation; Ex. 28, Highland Santa Barbara Foundation Certificate of Formation.

[22] Id.

[23] Ex. 23 Highland Dallas Foundation SO Agreement; Ex. 24 Highland Kansas City Foundation SO Agreement; Ex. 25 Highland Santa Barbara Foundation SO Agreement.

[24] Ex. 29 Highland Dallas Foundation By-Laws; Ex. 30 Highland Kansas City Foundation By-Laws; Ex. 31 Highland Santa Barbara Foundation By-Laws.

[25] Ex. 91, Haynes & Boone Memo.

assets for the benefit or ultimate benefit of certain registered charitable organizations in the United States, through which it indirectly owned the DAF Structure.

19. The role of HoldCo was to facilitate the making of discretionary cash distributions to Participating Shareholders, which would be drawn from the proceeds of investment returns made within asset-holding entities in the DAF Structure.[26]

## C. Overview of the Fund

20. The Fund is a Cayman Islands exempted limited partnership formed October 25, 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. The Fund is governed by the Second Amended and Restated Limited Partnership Agreement, dated March 11, 2024. Prior to the Relevant Transactions, HoldCo was the sole limited partner of the Fund.[27]

21. The Fund was formed and operates to "make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of [HoldCo] and its Indirect Charitable Owners".[28]

22. Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands which was, at the Fund's formation and until March 7, 2024, the general partner of the Fund, at which time it was replaced by CDH GP, LTD, a Cayman

---

[26] Ex. 32, Structure chart of the DAF Structure prior to the Relevant Transactions; Ex. 33, Structure chart of the DAF Structure after to the Relevant Transactions; Ex. 35, A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP; Ex. 36, Second A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP.

[27] Ex. 34, Certificate of Registration of Charitable DAF Fund LP; Ex. 35, A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP; Ex. 36, Second A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP.

[28] Ex. 5, Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd.

Islands exempt company incorporated on February 27, 2024, by Mr. Patrick, its sole director, at Mr. Patrick's instigation, without notice to the Original Participating Shareholders.[29]

23.     The Fund's sole asset is or was its ownership of 100% of the issued share capital, in CLO HoldCo Ltd.[30]    CLO Holdco is organized as a Cayman Islands exempt company incorporated with limited liability, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.[31]

24.     Based upon their initial research and investigation, the JOLs understand that the Fund's known subsidiaries, that it holds through CLO HoldCo (as listed in Schedule A of the proposed order accompanying the Injunction Application)[32], are mostly passive investment vehicles holding a mix of assets, including cash, promissory notes, shares in Nexpoint[33] entities, publicly traded stock, real estate, receivables/proceeds from litigation proceedings, receivable amounts from brokers, dividends due, and amounts due from affiliates.

25.     At all relevant times, the Fund had a net asset value of approximately $270 million.[34]

---

[29] Ex. 37, Charitable DAF GP LLC Managing Member Consent to Assignment to CDH GP Ltd; Ex. 38, Section 10-Replacement of Charitable DAF GP LLC; Ex. 39, Register of Members for CDH GP Ltd.; Ex. 94, Certificate of Incorporation - CDH GP, Ltd.

[30] Ex. 40, CLO HoldCo, Ltd Register of Members as of 5.19.2021; Ex. 32, Structure chart of the DAF Structure prior to the Relevant Transactions; Ex. 33, Structure chart of the DAF Structure after to the Relevant Transactions.

[31] Ex. 41, CLO HoldCo, Ltd CORIS Report; Ex. 42, CLO HoldCo, Ltd - Members & Articles of Association; Ex. 43, CLO HoldCo, Ltd Certificate of Incorporation.

[32] Ex. 82, Injunction Application.

[33] Nexpoint is an investment management firm registered with the U.S. Securities and Exchange Commission that was founded by Mr. Dondero, who currently serves as its President.

[34] Ex. 51, September 2024 ValueScope Valuation.

**D.    Key Transactions Precipitating the Debtor's Liquidation**

**i.    The Relevant Transactions**

26.        Beginning in 2024, HoldCo's Directors executed a series of complex, interrelated transactions without the knowledge or consent of the Original Participating Shareholders.  These transactions consisted of (a) HoldCo's contribution of its interest in the Fund to a newly formed entity organized in Delaware, CDM, controlled by Mr. Patrick, in exchange for membership interests in CDM that, unlike the Original Participating Shareholders Participating Shares in HoldCo, were redeemable and afforded HoldCo no fiduciary safeguards;[35] (b) the DFW Share Issuance, i.e., the purported issuance of 318 participating shares in HoldCo to DFW, a Delaware nonprofit corporation incorporated and controlled by Mr. Patrick, on February 7, 2025, sufficient to make it, rather than the Original Participating Shareholders, the majority owner of HoldCo's participating shares;[36] and (c) the purported redemption of HoldCo's interest in CDM in exchange for approximately $1.6 million on March 27, 2025.[37]

**1.    The LP/LLC Exchange**

27.        On December 12, 2024, CDM was incorporated as a limited liability company in Delaware.  Mr. Patrick was the sole member of CDM.[38]

28.        On December 18, 2024, without informing the Supporting Organizations or the Charities: (i) the Directors passed resolutions to transfer HoldCo's Fund Partnership Interest to CDM, in exchange for a contribution by CDM's sole member—Mr. Patrick—of 100% of the

---

[35] Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares; Ex. 45, Deed of Assignment & Assumption to CDM.

[36] Ex. 20, DFW Share Transfer; Ex. 21, Director Resolution (Share Issuance to DFW).

[37] Ex. 46, Director Resolutions - Redemption of CDM Shares.

[38] Ex. 47, CDM Certificate of Formation; Ex. 48, CDM LLC Agreement.

issued and outstanding membership interests in CDM;[39] and (ii) HoldCo, CDM, and the New GP

entered into a Deed of Assignment and Assumption, executed by Mr. Patrick in three capacities:

on behalf of: (x) HoldCo, as Director; (y) CDM, as manager; and (z) the New GP, as Director,

pursuant to which: (a) HoldCo assigned its Fund Partnership Interest to CDM; (b) the New GP

provided its written consent to the CDM Assignment and the admission of CDM as the new limited

partner, in accordance with the Fund LPA; and (c) CDM agreed to exercise its reasonable best

endeavors to ensure that the CDM Membership Interest would be transferred to HoldCo.[40]

29.       The LP/LLC Exchange occurred in at least two stages: (a) first, HoldCo transferred

its entire interest in the Fund to CDM; and (b) second, CDM procured the transfer of 100% of its

share capital to HoldCo, making HoldCo the sole membership interest holder of CDM rather than

the sole limited partner in the Fund. The effect of the LP/LLC Exchange was that: (a) CDM was

inserted into the corporate structure as a subsidiary of HoldCo and became the holder of the entire

interest in the Fund previously held by HoldCo;[41] and (b) HoldCo became the sole membership

interest holder in CDM, resulting in its sole asset—formerly its 100% limited partnership interest

in the Fund—being exchanged for the CDM Membership Interest.[42]

30.       The LP/LLC Exchange prejudiced the interests of HoldCo. The CDM Membership

Interest was less valuable than the Fund Partnership Interest because, among other reasons,

whereas the New GP had owed fiduciary duties to HoldCo in the Fund, the manager, Mr. Patrick,

did not owe any fiduciary duties to CDM; and, unlike the Fund Partnership Interest, the CDM

Membership Interest was susceptible to being redeemed by Mr. Patrick (as Manager) in his sole

---

[39] Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares.

[40] Ex. 45, Deed of Assignment & Assumption to CDM.

[41] Ex. 32, Structure chart of the DAF Structure prior to the Relevant Transactions.

[42] Ex. 45, Deed of Assignment & Assumption to CDM; Ex. 46, Director Resolutions - Redemption of CDM Shares.

discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e., a "good faith determination of value."[43]

### 2.    DFW Share Issuance

31.    On December 9, 2024, DFW, a nonprofit non-stock corporation, was incorporated in Delaware exclusively for charitable purposes.[44]

32.    On February 7, 2025, without informing the Supporting Organizations or the Charities, the Directors passed resolutions for HoldCo to issue 318 Participating Shares to DFW, which, upon issuance, would allot DFW 51.04% of the Participating Shares of HoldCo. That same day, also without notice to the Supporting Organizations or the Charities, HoldCo issued and allotted 318 Participating Shares to DFW, resulting in DFW holding a 51.04% interest in HoldCo and diluting the Original Participating Shareholders' aggregate shareholding from 100% to 48.96%.[45]

### 3.    Redemption

33.    Following the LP/LLC Exchange, ValueScope was instructed without informing the Supporting Organizations or the Charities to prepare two valuation analyses: (a) the CDM Membership Interest;[46] and (b) certain Participating Shares of HoldCo as of March 25, 2025.[47] Historically, between December 2020 and September 2024, ValueScope conducted a series of valuation analyses of 100 Participating Shares on a NAV basis at HoldCo's request to determine their FMV.   The final NAV-based valuation prepared by ValueScope prior to the Relevant

---

[43] Ex. 48, CDM LLC Agreement.

[44] Ex. 49, Certificate of Incorporation of DFW Charitable Foundation.

[45] Ex. 20, DFW Share Transfer; Ex. 21, Director Resolution (Share Issuance to DFW).

[46] Ex. 93, March 2025 ValueScope Valuation of Membership Interests of CDM.

[47] Ex. 50, March 2025 ValueScope Valuation of Participation Shares of HoldCo.

Transactions was dated January 7, 2025, and gave a valuation of 100 Participating Shares as of September 30, 2024. ValueScope determined that, as of September 30, 2024, the NAV of the Fund was $269.05 million, NAV per share was $882,140, FMV per share was $759,614 and the FMV of 100 Participating shares was $75,961,370.[48]

34.     The March 2025 ValueScope Valuation, however: (a) applied a DCF methodology to estimate the present value of expected future distributions, rather than the NAV based approach used in at least the prior five annual valuations by ValueScope; (b) determined the FMV of 100 Participating Shares to be $536,784; (c) applied a 99.2% DLOC; and (d) applied a 20.00% DLOM.[49] The DCF model relied on projected future distributions to HoldCo, with those projections based on historical distributions that were also controlled by Mr. Patrick.[50]

35.     Accordingly, the FMV of 100 Participating Shares in HoldCo apparently declined from $75,961,370 on September 30, 2024, to $536,784 on March 25, 2025—a 99.29% reduction in less than six months, coinciding with the LP/LLC Exchange and attributable to the shift in valuation methodology from NAV to DCF.[51] Although the March 2025 ValueScope Valuation report identified "total equity" of approximately $269 million and concluded that all Participating Shares had a combined value of only approximately $1.6 million, the analysis did not address who benefited from the residual value of roughly $267.4 million.[52]

36.     On March 27, 2025, without informing the Supporting Organizations or the Charities, HoldCo entered into the Letter Agreement with CDM, pursuant to which HoldCo

---

[48] Ex. 51, September 2024 ValueScope Valuation.

[49] Ex. 50, March 2025 ValueScope Valuation of Participation Shares of HoldCo; Ex. 93, March 2025 ValueScope Valuation of Membership Interests of CDM.

[50] Id.

[51] Ex. 50, March 2025 ValueScope Valuation of Participation Shares of HoldCo.

[52] Id.

assigned to CDM various contracts and agreements to which it was a party.[53] On the same day, Mr. Patrick executed, in his capacity as manager of CDM and president of DFW, the following, again without notice to the Supporting Organizations or the Charities: (i) an Admission and Amendment No. 1 Agreement between CDM and DFW, under which DFW was admitted as a member of CDM in exchange for a capital contribution of $1,637,192;[54] and (ii) a Redemption and Amendment No. 2 Agreement under which CDM redeemed HoldCo's CDM shares for the same sum of $1,637,192.[55]

37.     Additionally, on March 27, 2025, Mr. Patrick, in his capacity as manager of CDM, executed the Manager Consent approving the Admission and Redemption.[56] The Manager Consent stated that the redemption of HoldCo's shares of CDM under the Letter Agreement was justified due to alleged attempts by the Supporting Organizations to exert control, and the potential loss of their nonprofit and tax-exempt status.[57]

38.     On April 2, 2025, the Directors, by written resolution: (a) noted the redemption of HoldCo's shareholding in CDM for the Redemption Sum; and (b) resolved to make a shareholder distribution totaling $1,612,192.01.[58]

39.     The substantive financial effect of the Redemption was that DFW paid the Redemption Sum to CDM, and HoldCo's shares in CDM were redeemed for that same amount— effectively transferring or selling HoldCo's interest in CDM to DFW for the Redemption Sum. As a result of the Redemption: (a) HoldCo realized its interest in the Fund, which had a NAV of

---

[53] Ex. 52, Letter Agreement.

[54] Ex. 53, CDM Redemption Agreement (Amendment #1).

[55] Ex. 54, CDM Redemption Agreement (Amendment #2).

[56] Ex. 55 CDM Manager Consent to Admission and Redemption.

[57] Id.

[58] Ex. 46, Director Resolutions - Redemption of CDM Shares.

approximately $269.1 million, for only around $1.6 million; (b) HoldCo purported to distribute

that approximately $1.6 million to accounts in the name of the Participating Shareholders; (c) the

Original Participating Shareholders, being the Supporting Organizations and CFNT were actually

or effectively divested of their indirect interest—subject to the discretion of the person holding the

Control Position—in the Fund and its underlying assets; and (d) the Original Participating

Shareholders, being the Supporting Organizations and CFNT, whose economic interest in HoldCo

had been diluted from 100% to 48.96% following the DFW Share Issuance, were entitled to their

proportionate share of distributions in the amount of 48.96% of the Redemption Sum.  As such,

HoldCo had no assets at that time.

### ii.    The Remuneration Transactions

40.      Following his appointment as director of HoldCo on March 25, 2021, Mr. Patrick

resolved to dramatically increase his remuneration.  Specifically (and among other things):

(a)    Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023.[59]

(b)    On September 13, 2024, the Directors resolved to increase Mr. Patrick's salary to $850,000 per annum and approve an LTI of 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).[60]

(c)    On or around October 1, 2024:

(i)    The Directors resolved that Mr. Patrick was to receive an LTI payment of $975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.[61]

(ii)   Mr. Patrick signed an "employment agreement" for his position at HoldCo, effective as of March 24, 2021, which provided, among other

---

[59] Ex. 56, Expenses.

[60] Ex. 57, 09.13.2024 Director Resolutions re. M. Patrick Compensation.

[61] Ex. 58, 10.01.2024 - Director Resolutions re. M. Patrick Compensation.

things, for a base salary of $850,000 and an LTI payment of $4,759,000 for the period from March 24, 2021 to March 24, 2024.[62]

41.     By way of contrast to the remuneration that Mr. Patrick resolved he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately $60,000 per annum.[63]

42.     As regards expenses, expenses overall for the first half of 2024 were around $18.3 million – almost the same amount spent over the entire course of 2023 (i.e., $18.6 million).[64]

**E.     Lack of Transparency and Misleading Disclosures Provided to Supporting Organizations**

43.     As more fully set forth in the Statement of Claim, prior to and during the time when the Directors were consummating the Relevant Transactions, the Directors persistently declined to disclose information regarding their actions and intentions notwithstanding the Supporting Organizations repeated requests.[65]

44.     In November 2023, the Directors sought legal advice under Cayman law regarding the rights and duties of HoldCo's controlling person in connection with various matters including, diluting Participating Shares, redeeming Participating Shares, liquidating HoldCo to distribute its assets elsewhere or otherwise render the Participating Shares worthless, each in the context of potential future disputes with the Original Participating Shareholders.

45.     In or around August 2024, the Supporting Organizations were provided with a financial analysis of the Fund's annual expenses, which showed—or appeared to show—a

---

[62] Ex. 92, Mark Patrick Employment Agreement.

[63] Ex. 83, Hr'g Tr. 132:10-11, *In re Highland Capital Management, L.P.*, No. 19-34054-sgj-11, Bankr. N.D. Tex. (Dallas Div.) Jun. 8, 2021, ECF No. 2440.

[64] Ex. 56, Expenses.

[65] Ex. 59, Statement of Claim.

significant increase in expenditures, as described above, both with respect to Directors fees and overall expenses.[66]

46.     In late October 2024, as a result of concerns from this additional expenditure, the Supporting Organizations requested that Mr. Patrick provide relevant financial information for the HoldCo and the Fund.  Mr. Patrick did not do so.

47.     On November 11, 2024, H&K, U.S. attorneys for the Supporting Organizations, issued a letter to Mr. Murphy advising that the Supporting Organizations no longer had confidence in the governance of HoldCo and/or the Fund and considered that a reorganization of the governance structures was required to protect the charitable efforts of the Supporting Organizations.[67]

48.     On November 26, 2024, Mr. Patrick sought and obtained advice regarding whether HoldCo could issue further Participating Shares to a new nonprofit organization to dilute the Supporting Organizations so as to weaken any winding-up petition brought by the Supporting Organizations on just and equitable grounds.[68]  On November 27, 2024, Cayman Islands counsel responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition would be taken into consideration and would likely help.[69] Mr. Patrick incorporated DFW as a nonprofit, non-stock corporation in Delaware on December 9, 2024.[70]

49.     On December 11, 2024, Mr. Murphy and HoldCo's Cayman counsel gave a presentation to attorneys from H&K on behalf of the Supporting Organizations providing various

---

[66] Ex. 56, Expenses.

[67] Ex. 60, No Confidence Letter.

[68] Ex. 61, Email from Mr. Murphy to Mr. Patrick.

[69] Ex. 62, Email from Walkers to the Directors.

[70] Ex. 49, Certificate of Incorporation of DFW Charitable Foundation.

assurances regarding governance matters being addressed by the Directors.[71]  The meeting was, by all accounts, positively regarded.  The attorneys on behalf of the Supporting Organizations invited Mr. Murphy to make the same presentation directly to the Supporting Organizations.

50.     Nonetheless, the very next day, Mr. Patrick incorporated CDM and, on December 18, 2024, the Directors consummated the LP/LLC Exchange, each without disclosing the same to the Supporting Organizations.[72]

51.     On January 23, 2025, having received no follow-up to the December 11, 2024 meeting with Mr. Murphy, Julie Diaz, the CEO of The Dallas Foundation, sent Mr. Patrick an email advising that the Supporting Organizations needed to better understand HoldCo and the Fund's asset position, and requesting certain information be provided by February 10, 2025. [73]

52.     Having received no response, on January 28, 2025, Ms. Diaz sent a further email to the Directors expressing serious concern: (i) that the Supporting Organization's requests for information continued to be disregarded; and (ii) about the ongoing lack of transparency on the party of the Directors.[74]

53.     On January 30, 2025, Mr. Murphy replied to Ms. Diaz stating that the Directors: (i) had not received the January 23 email, but understood the next step was for the Directors to "present directly" to the Supporting Organizations to address the No-Confidence Letter; and (ii) are coopering with the Supporting Organizations to provide additional information – but "have no

---

[71] Ex. 63, Walkers Presentation - Participating Shareholder Rights Charitable DAF HoldCo Ltd.

[72] See ¶¶27-30, above.

[73] Ex. 64, Emails (Julie Diaz, Paul Murphy, Michael Stockham).

[74] Id.

legal obligation to do so" and such cooperation "should not be construed as an implicit acknowledgement of any duty to continue providing information to you." [75]

54.　　On January 31, 2025, Mr. Michael Stockham of H&K responded to Mr. Murphy noting that he and Mr. Patrick were fiduciaries, managing $270 million in assets for the benefit of charities that support the most vulnerable (i.e., the Charities) and: "[w]hatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions." [76]

55.　　On February 4, 2025, Mr. Murphy responded that while open to resolving the concerns, they (i.e., the Directors) were struggling to understand the Supporting Organization's change in position. [77]

56.　　On February 7, 2025, H&K responded that the Directors were fiduciaries in control of $270 million for the benefit of charities: "these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees." [78]

57.　　On the same date, without informing the Supporting Organizations, the Directors consummated the purported DFW Share Issuance. [79]

58.　　On February 14, 2025, H&K received a letter from Mr. Mancino, a partner in Seyfarth, a U.S. law firm apparently engaged by the Fund, which rejected the accuracy of the reported increases in expenditure. [80] On February 27, 2025, H&K responded that his clients were

---

[75] Id.

[76] Id.

[77] Id.

[78] Id.

[79] Ex. 21, Director Resolution (Share Issuance to DFW).

[80] Ex. 70, February 14, 2025 Seyfarth Letter.

frustrated by the lack of transparency and refusal to answer simple queries about the financial position.[81] In response, Seyfarth sought available dates for Mr. Murphy to make the promised presentation to the Supporting Organizations.[82] H&K responded the next day with three potential dates/times for the proposed call between March 26 and April 3, 2025. Mr. Mancino did not respond.[83]

59.    On March 20, 2025, Mr. Mancino sent a letter purportedly on behalf of HoldCo to the IRS about Mr. Dondero's alleged influence and control over the Supporting Organizations.[84] The letter makes serious and unsubstantiated allegations about the Supporting Organizations, absent evidentiary support, including that they each (i.e., all of them): "operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of [HoldCo] to wrest control of [HoldCo] and its assets. . ."[85]

60.    Commencing on March 27, 2025, the Directors initiated steps to effectuate the Redemption, which they consummated on April 2, 2025, without informing the Supporting Organizations.[86]   On that same day, the Directors resolved to place HoldCo into voluntary liquidation and appointed Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd as joint voluntary liquidators.[87]

---

[81] Ex. 71, February 27, 2025 H&K Letter.

[82] Ex. 75, March 2025 Emails (D. Mancion & D. Rosenberg).

[83] Id.

[84] Ex. 72, Seyfarth Letter to IRS.

[85] Id.

[86] Ex. 46, Director Resolutions - Redemption of CDM Shares; Ex. 55, CDM Manager Consent to Admission and Redemption; Ex. 73, Director Resolutions - Assignment of Contracts to CDM.

[87] Ex. 65, Charitable DAF Holdco Resolutions re Voluntary Liquidation; Ex. 74, Sole Voting Shareholder Resolutions (Voluntary Liquidation).

61.     Notwithstanding the consummation of the Redemption and the commencement of voluntary liquidation of HoldCo the day prior, on April 3, 2025, Mr. Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule.[88] H&K responded that no such call had been arranged and queried about the apparent source of confusion.[89]

## F.     The Cayman Proceeding

62.     Unaware of the Directors resolution to place HoldCo into voluntary liquidation, on April 23, 2025, the Supporting Organizations presented a petition seeking the winding up of HoldCo on a just and equitable basis under section 92(e) of the Companies Act.[90] It was only after filing the J&E Petition that the Directors disclosed they had consummated the Relevant Transactions and commenced a voluntary liquidation of HoldCo on April 2, 2025.[91]

63.     On May 2, 2025, the Supporting Organizations filed a petition seeking an order for the voluntary liquidation of HoldCo—now a debtor—to continue under the supervision of the Cayman Court pursuant to section 131 of the Companies Act.[92] Following a hearing and review of the Supervision Petition, supporting affidavits and affirmations with exhibits, and the documents filed in Cause No. FSD 116 of 2025 (JAJ)—including the J&E Petition and the affidavits of the JOLs confirming their consent to act—the Cayman Court issued the Supervision Order.[93] Pursuant to the Supervision Order, the voluntary liquidation of the Debtor was continued

---

[88] Ex. 76, April 2025 Emails (D. Mancion & D. Rosenberg).

[89] Id.

[90] Ex. 77, J&E Petition; Ex. 78, Companies Act.

[91] Ex. 66, Walkers Letter re Charitable DAF Holdco. Ltd in Voluntary Liquidation.

[92] Ex. 67, Supervision Petition in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

[93] Ex. 1, Supervision Order in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

under the supervision of the Cayman Court, and the JOLs were appointed under section 131 of the Companies Act and Order 15, rule 8 of the Winding Up Rules.[94]

64.     Also pursuant to the Supervision Order, the Petitioners were authorized to exercise the following powers, among others, under Part I of Schedule 3 to the Companies Act[95] without further Cayman Court sanction: (a) the power to commence legal proceedings in the name and on behalf of the Debtor to obtain information, documents, or the examination of individuals in the Cayman Islands or the United States; and (b) the power to apply in the Cayman Islands or the United States for the preservation, freezing, or attachment of assets to which the Debtor is or may arguably be entitled.[96] Moreover, the Petitioners were authorized to seek registration or recognition of themselves and/or the Cayman Proceeding in any U.S. state for any purpose related to the exercise of the above-described powers in the Supervision Order.[97]

### i.  Conduct of the Cayman Proceeding

65.     The JOLs have diligently performed their duties in progressing the Cayman Proceeding from and after their appointment.  The JOLs have taken steps to fulfil their statutory obligations: by filing notice of the winding up with the Cayman Islands Registrar of Companies; circulating notices of the winding up to known stakeholders, service providers of HoldCo, and known contributories of HoldCo; publishing their notice of appointment in the Cayman Islands Gazette and Cayman Compass Newspaper;[98] determining HoldCo should be treated as solvent for the purposes of Section 110(4) of the Companies Act, as well as Orders 8 & 9 of the Winding Up

---

[94] Id.; Ex. 78, Companies Act; Ex. 79, Winding Up Rules.

[95] Ex. 78, Companies Act.

[96] Id.

[97] Id.

[98] Ex. 68, Charitable DAF HoldCo - Gazette - Notice of Appointment JOL; Ex. 69, Charitable DAF HoldCo - Compass - Notice of First Meeting of Contributories.

Rules; determining the functional currency of the liquidation to be U.S. dollars pursuant to Order 16, Rule 13 of the Winding Up Rules; changing the registered office of HoldCo from Campbells Corporate Services Limited to HSM Corporate Services Ltd; publishing a Report to Contributories on July 2, 2025; and on July 3, 2025, convening the first meeting of contributories held on July 9, 2025.[99]

66.      Moreover, to identify, secure and recover HoldCo's books and records, the JOLs have: (a) issued formal correspondence to over 50 parties, including, directors, shareholders, banks, service providers, the prior appointed joint voluntary liquidators, notifying them of the JOLs appointment and requesting books and records; (b) issued requests to hold an interview with the directors; and (c) held discussions with various parties to discuss the history and financial affairs of HoldCo.

67.      The JOLs have engaged extensively with representatives of various interested parties in connection with, among other things, seeking and obtaining sanction of the Cayman Court to engage Cayman and U.S. counsel.[100]    In addition, the JOLs, through counsel, have engaged with representatives of CDM, New GP, and CLO HoldCo in relation to a potential protocol intended to allay the JOLs' concerns regarding asset dissipation, transparency and asset management while the JOLs progress their investigation.   The JOLs, however, do not believe the protocol proposed by CDM, the New GP, and CLO HoldCo would adequately protect HoldCo's position and, to date, the parties have been unable to reach terms of agreement with respect to any protocol.[101]

---

[99] Ex. 78, Companies Act; Ex. 79, Winding Up Rules; Ex. 80, Filed Resolutions re Change of Registered Office - Charitable DAF Holdco, Ltd.

[100] In respect of which, on June 24, 2025, the Cayman Court sanctioned the engagements of Cayman and U.S. counsel by the JOLs.

[101] Ex. 81, Various May & June 2025 Letters and Drafts of the Protocol.

68.     Since the date of their appointment, the JOLs have conducted an extensive and detailed investigation into HoldCo's affairs, albeit that those investigations are not yet complete. This has involved a review of HoldCo's books and records (to the extent that they have been able to obtain them and to the extent that they are complete) and numerous inquiries and requests for information directed to persons previously involved with HoldCo. There have, however, been several limitations on the JOLs' investigations in connection with the information requests made from those persons previously involved in the HoldCo, including certain U.S.-based service providers who have asserted that they do not recognize the JOLs authority under the Supervision Order, where the JOLs have not been able to obtain copies of the requested information. Notwithstanding these limitations, the JOLs investigation has progressed sufficiently to enable them to identify significant areas of concern.

### ii.     **Commencement of the Cayman Litigation**

69.     On July 4, 2025, the JOLs applied to the Cayman Court in the Cayman liquidation proceedings on an *ex parte* basis for sanction to commence litigation proceedings by way of filing the Statement of Claim[102] against the following defendants: (1) Mark Eric Patrick; (2) Paul Murphy; (3) CDM; (4) DFW; (5) CDH as general partner for and on behalf of the Fund, and in its capacity as New GP; and (6) CLO HoldCo.[103]

---

[102] Ex. 59, Statement of Claim; Ex. 85, Sanction to File Statement of Claim.

[103] In determining whether to commence the Cayman Litigation, the JOLs gave due regard to the Named Defendants' likely defenses with respect to the propriety of the Relevant Transactions and the Remuneration Transactions. At a high level, the JOLs understand that the Named Defendants will seek to justify the Relevant Transactions on three independent grounds: (1) on the basis that the Original Participating Shareholders did not have an economic interest in HoldCo, which was formed simply to act as a throughput for discretionary, charitable donations to qualifying recipients (which were not necessarily the Supporting Organizations, CFNT or the Charities), such that the Original Participating Shareholders did not lose any cognizable interest because of the Relevant Transactions; (2) the Relevant Transactions were necessary and appropriate to protect HoldCo and its Directors from attempts by Mr. Dondero and the Supporting Organizations to improperly exercise dominion and control over HoldCo's assets, which would (x) expose HoldCo (x) to breaches of US tax law and regulation and (y) claims from third parties that HoldCo and the Fund Entities were alter egos of Mr. Dondero in lawsuits against Mr. Dondero; and (3) on the basis that the Directors relied appropriately on third party valuation reports in effectuating the Redemption at FMV. The JOLs likewise

70.     A further description of each of the Named Defendants is as follows:

(a)   **Mr. Mark Patrick**. Mr. Patrick is a U.S. attorney and was employed as tax counsel by Highland Capital Management, L.P., an investment company founded by Mr. James Dondero, from 2008 – 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a d/b/a Skyview Group from March 2021 to October 2024.  He was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore "blocker" company. Mr. Patrick is one of two directors of HoldCo, having been appointed as director on March 25, 2021.  In that capacity, he was responsible for the supervision of the day-to-day operations of HoldCo.  As director, Mr. Patrick owed, and continues to owe, fiduciary duties to HoldCo.  Mr. Patrick was also: (i) the holder of all of the Management Shares in HoldCo; (ii) the manager of CDM; (iii) the sole member and sole director of DFW, which is now the sole member of CDM; (iv) the sole director and sole shareholder of CDH GP, Ltd, the New GP; and (v) a director of CLO HoldCo, the entity through which the Fund holds its assets.

(b)   **Mr. Paul Murphy**. Mr. Murphy was the other director of HoldCo, having been appointed so on April 22, 2021.  Mr. Murphy is also a director of CLO HoldCo.

(c)   **CDM**. A limited liability company incorporated in Delaware on December 12, 2024, Mr. Patrick is the Manager of CDM.  DFW has been the sole member of CDM since March 27, 2025.

(d)   **DFW**. A nonprofit non-stock corporation incorporated in Delaware on December 9, 2024, by Mr. Douglas Mancino, a partner in Seyfarth, a U.S. law firm apparently engaged by the Fund.  DFW is organized under the General Corporation Law of the State of Delaware exclusively for charitable purposes.  The JOLs understand that DFW is now the holder of the majority of the Participating Shares in HoldCo pursuant to the DFW Share issuance on February 7, 2025, and controlled by Mr. Patrick as its sole member.

(e)   **The New GP**. A Cayman Islands exempted limited company incorporated on February 27, 2024.  It replaced the Original GP as the Fund's current general partner on March 7, 2024, after Mr. Patrick sought advice from Walkers on forming a new entity to replace the Original GP.  On February 5, 2024, Shields Legal asked Mr. Patrick whether that entity should be a Cayman LLC or exempted company, to which he responded: "*Doesn't matter to me. Whatever from a strategic point of view – hard to find or track, or trace. Or find owners, etc. Generic name.  Strong litigation protection*."

---

understand that Mr. Patrick intends to rely on a third party report to justify the Remuneration Transactions. On the basis of the investigation conducted by the JOLs to date, the JOLs do not find these defenses and justifications to be availing or credible.

(f)   **CLO HoldCo**. A Cayman Islands exempted limited company.  CLO HoldCo is the Fund's only direct subsidiary.  The Fund held all of CLO HoldCo's issued shares.

71.     HoldCo's claims pleaded in the Statement of Claim arise as a result of the breaches by the Directors of their fiduciary duties owed to HoldCo, having caused HoldCo to have dissipated its assets through a combination of: (a) the Relevant Transactions; and (b) the Remuneration Transactions, all of which were for the benefit of entities controlled by Mr. Patrick or for his benefit, personally.[104]  In addition to asserting claims against the Directors for willful breaches of their fiduciary duties to HoldCo, the Statement of Claim asserts claims against: (i) the Named Defendants for unlawful means conspiracy based on the Named Defendants having conspired and combined together to injure HoldCo by unlawful means and HoldCo having suffered loss and damage as a result; (ii) CDM for knowing receipt of HoldCo's property, its partnership interest in the Fund, which had been misappropriated from HoldCo by virtue of the Directors breach of fiduciary duties; and (iii) CDM for unjust enrichment on the basis that it received HoldCo's interest in the Fund without there being a valid assignment or other justification for that receipt, such that it is liable to HoldCo in restitution.[105]

72.     At the hearing of the sanction proceeding on July 14, 2025, to obtain an order granting the JOLs sanction to commence the Cayman Proceeding, the JOLs were required to satisfy the Cayman Court in the Cayman liquidation proceedings that: (a) the Cayman Litigation had a reasonable prospect of success; and (b) the interests of HoldCo's stakeholders were best

---

[104] Ex. 59, Statement of Claim.

[105] Ex. 59, Statement of Claim.

served by the JOLs commencing the Cayman Litigation.[106] The Cayman Court granted sanction

for the JOLs to commence the Cayman Litigation.[107]

73.     On July 15, 2025, the Debtor proceeded to file the Statement of Claim with the

Cayman Court to commence the Cayman Litigation (which has the cause number FSD 201 of 2025

(RPJ)).[108]  At the same time the JOLs filed an application for: (a) a proprietary injunction to prevent

the Named Defendants from dealing with the assets of the Debtor that are held now held or

controlled by the Named Defendant together with disclosure orders; and (b) leave to serve the U.S.

based defendants with the Statement of Claim and Injunction Application.[109]

74.     Additionally, on July 15, 2025, the Debtor: (1) emailed copies of the Statement of

Claim and the Applications to the Cayman Islands attorneys for the Named Defendants and asked

them to accept service; and (2) served copies of the Statement of Claim at the Cayman Islands

registered addresses of CDH GP, Ltd. and CLO Holdco, Ltd. The Applications have been listed

for hearing on July 31, 2025.

75.     The Named Defendants are entitled to participate and be heard on that date.  In the

event the Named Defendants do not participate, the Cayman Court will hear the Injunction

Application on an *ex parte on notice* basis and, if the Injunction is granted, will schedule an *inter

partes* hearing for a later date.[110]

76.     Should the Cayman Court grant the Injunctive Relief Application following the

scheduled hearing on the Injunction Hearing date, and issue the Injunctive Relief Order, the JOLs

---

[106] *Re ICP Strategic Credit Income Fund* [2014] 1 CILR 314.

[107] Ex. 85, Sanction to File Statement of Claim.

[108] Ex. 59, Statement of Claim.

[109] Ex. 82, Injunction Application.

[110] Ex. 82, Injunction Application.

expect to seek recognition and enforcement of the Injunctive Relief Order against the Named

Defendants on a provisional basis pursuant to section 1519 of the Bankruptcy Code pending the

recognition of the Cayman Proceeding, at which time the JOLs will also seek recognition of the

Injunctive Relief Order in this Chapter 15 Case pursuant to sections 1507(a) and 1521(a) of the

Bankruptcy Code.[111]

### iii.    **Injunction Application**

77.    The Injunction Application seeks orders that:

(a)    the Named Defendants will: (i) preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest of (of whatsoever nature) whether held directly or indirectly, in the Fund, the Fund Entities, and/or any assets of the Fund; and (ii) procure that the Fund Entities and their wholly owned subsidiaries will not in any way dispose of, deal with, encumber, transfer or diminish the value of any of their assets;

(b)    the Named Defendants will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly): (i) by way of distribution, disposition, dividend, benefit, payment or other transfer from (as the case may be) HoldCo, the Fund, DFW, CDM, the New GP, the Fund Entities and/or their wholly owned subsidiaries; or (ii) from any assets of the Fund, the Fund Entities, and/or their wholly owned subsidiaries;

(c)    the Named Defendants shall not do anything to cause, procure, incite, promote or assist a breach by any other Named Defendant of the above sections (a) and (b); and

(d)    the Named Defendants shall make ancillary asset disclosures.[112]

78.    The basis for the injunctive relief sought is that the Named Defendants each own

and/or control assets that HoldCo has an equitable proprietary interest in (or at least a seriously

arguable case that it does):

---

[111] Ex. 82, Injunction Application.

[112] Ex. 82, Injunction Application.

(a)     Prior to the Relevant Transactions taking place, HoldCo held the Fund Partnership Interest, and thereby indirectly owned (99%) of all assets held by the Fund through its wholly owned subsidiary, CLO HoldCo (and its subsidiaries).[113]

(b)     After the Relevant Transactions took place, and by reason of the Directors' breaches of fiduciary duty – (i) CDM now holds the Fund Partnership Interest, which continues to hold its assets through CLO HoldCo (and its subsidiaries); (ii) DFW is the sole member of CDM; (iii) Mark Patrick is the sole member of DFW; and (iv) Mark Patrick has full control over DFW, CDM, the New GP (and thus the Fund), and (together with Mr. Murphy) CLO HoldCo.  Mr. Patrick therefore has the ability to control and/or deal with the Fund Partnership Interest and the Fund's assets, including any distributions of the Fund's assets received by CDM as its sole limited partner.  Mr. Patrick now exercises this control free from the oversight previously exercised by the Supporting Organizations and CFNT through their holding of Participating Shares in HoldCo.[114]

79.     Moreover, HoldCo has at least a seriously arguable case that CDM and DFW hold these assets through steps taken by the Directors that amounted to breaches of fiduciary duty, and therefore that these assets are subject to a constructive trust in favor of HoldCo, which is the necessary pre-requisite for the Cayman Court to grant a proprietary injunction restraining the disposition of that property.[115]

80.     Under Cayman law, to obtain proprietary injunctive relief, the Debtor must show: (1) the existence of a serious issue to be tried as to whether it has a proprietary interest in the assets (such that the claim would be capable of surviving summary judgment); (2) that the balance of convenience is in favor of granting the injunction; and (3) that it is otherwise just and convenient

---

[113] Ex. 40, CLO HoldCo, Ltd Register of Members as of 5.19.2021; Ex. 84, Charitable DAF Fund, LP Register of Members as of 5.19.2021.

[114] Ex. 6, Register of Members Charitable DAF Holdco Ltd; Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares; Ex. 45, Deed of Assignment & Assumption to CDM; Ex. 46, Director Resolutions - Redemption of CDM Shares; Ex. 47, CDM Certificate of Formation; Ex. 49, Certificate of Incorporation of DFW Charitable Foundation; Ex. 52, Letter Agreement; Ex. 53, CDM Redemption Agreement (Amendment #1); Ex. 54, CDM Redemption Agreement (Amendment #2); Ex. 55, CDM Manager Consent to Admission and Redemption.

[115] See Moran Decl. ¶¶ 40, 42-45.

to grant the injunction. Moreover, under Cayman law, a court may order defendants to disclose information if the Debtor demonstrates that it is just and convenient to do so.[116]

### 1.   Serious issues to be tried

81.     On July 14, 2025, the Cayman Court granted sanction for the JOLs to file the Statement of Claim and in doing so accepted that the merits of the JOLs' claims satisfied the relevant threshold for the sanction of commencement of claims by official liquidators.

82.     The Directors and DFW have put forward explanations as to why the transfer of the Fund Partnership Interest to CDM was legally justifiable, which the JOLs do not believe stand up to scrutiny as explained above.[117]

### 2.   Balance of convenience

83.     The JOLs do not believe that the proprietary injunctions they seek would hinder the operation of the Fund or the Fund Entities in any material way.[118] The Fund and the Fund Entities are mostly passive investment vehicles that hold shares or interests in other Fund Entities, cash, debt instruments, receivables, vacant land and/or stock in publicly traded companies. They are not, as far as the JOLs understand, engaged in the active trading of assets or the making of new investments on a frequent basis.

84.     Accordingly, the JOLs believe that there is no justification for any new investments or other transactions to be made by any of those entities, beyond payments needed to stay in good standing and comply with their statutory obligations.

---

[116] See Moran Decl. ¶¶ 42-45.

[117] Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares; Ex. 70, February 14, 2025 Seyfarth Letter; Ex. 72, Seyfarth Letter to IRS; Ex. 86, Paul Murphy 12.4.2024 Presentation Slides; Ex. 87, 12.18.2024 Carrington Coleman Email.

[118] Ex. 82, Injunction Application.

85.     Against that backdrop, the JOLs' position is that no dispositions of the assets of the Fund, the Fund Entities or any other subsidiaries above $10,000 need or should be made pending the determination of HoldCo's proprietary claim which, if successful, would see the Fund Partnership Interest returned to HoldCo and HoldCo would therefore wholly own (indirectly) all assets of the Fund, the Fund Entities and their wholly owned subsidiaries. Should any payments or dispositions be made by the Fund, the Fund Entities or any of their wholly owned subsidiaries that have the effect of harming the value of the Fund Partnership Interest, such payment or disposition would render the proprietary relief the JOLs are seeking much less effective.

86.     Notwithstanding the above, the JOLs recognize that there may become a need for certain payments or other dispositions of assets to be made to preserve, maintain or improve the value of existing assets held by the Named Defendants, the Fund Entities and/or their wholly owned subsidiaries. Accordingly, the JOLs' proposed order to the Injunctive Relief Application provides for:

(a)     The entity concerned to make a written request to the JOLs to make any such payments, together with full supporting information and documentation as well as an explanation of the rationale for the transaction; and

(b)     The JOLs to decide within 7 days whether to approve or disapprove the proposed transaction.[119]

87.     The JOLs also recognize that there will likely be a need for certain payments to be made by the Named Defendants, the Fund Entities or their wholly owned subsidiaries that are reasonably necessary in the ordinary course of business to keep the corporate Named Defendants, the Fund Entities or their wholly owned subsidiaries in good standing. The JOLs' proposed order to the Injunctive Relief Application allows for any such payments of $10,000 or less to be made.[120]

---

[119] Ex. 82, Injunction Application.

[120] Id.

88.     The JOLs are also unaware of any harm that would be caused to CDM by preserving the status quo in respect of the Fund Partnership Interest. By comparison, if a proprietary injunction is not granted and CDM were to transfer the Fund Partnership Interest to another party or otherwise deal with that interest in some way, HoldCo could be significantly prejudiced. Specifically, HoldCo's proprietary claim to the Fund Partnership Interest could be undermined or become more difficult to enforce.

89.     As to whether damages would be an adequate remedy for HoldCo in lieu of proprietary relief, as far as the JOLs' are aware, CDM has no other assets beyond the Fund Partnership Interest and therefore would likely be unable to meet any order for damages made against it. Only an order for CDM (and the other Named Defendants, to the extent they hold assets that derive from the Fund Partnership Interest) to restore HoldCo's property could return HoldCo to the position it would have been in had the improper transactions carried out by the Named Defendants not taken place. The JOLs' believe that the only way to ensure that such an order will be effective at the conclusion of these proceedings is for a proprietary injunction to be granted against the Named Defendants in respect of that property in the interim.

90.     Further, as explained above, HoldCo, its Supporting Organizations, the Charities and the Fund are part of a carefully constructed investment structure for (i) the tax efficient treatment of charitable donations; and (ii) investments to be made for the ultimate benefit of the Charities and CFNT.[121] Without the re-transfer of the Fund Partnership Interest to HoldCo, those parties may be unable to achieve their charitable objectives as effectively or at all. An award of damages in lieu of proprietary relief would mean that HoldCo would hold only cash and no other assets or investments, and the Charities and Supporting Organizations would effectively be back

---

[121] See ¶¶13-19, above.

to square one in terms of setting up a proper investment structure to carry out their investments and protect their tax-exempt status.

### 3.   Disclosure of assets

91.     The JOLs have only limited information as to what assets each of the Named Defendants, Fund Entities and their wholly owned subsidiaries hold. Even so, the JOLs have no way of verifying this information or knowing if it is completely up to date.

92.     In circumstances where, in the JOLs' case, a misappropriation of the HoldCo's sole and valuable asset has already occurred, the JOLs believe protection is needed to prevent any further dissipation of assets from occurring in breach of any injunction that is granted. The JOLs believe that this protection can be afforded by way of disclosure orders in support of the injunction requiring the Named Defendants to disclose what assets they each hold and their approximate value. Having that information in hand will allow the JOLs (and the Cayman Court) to effectively police the injunction (in terms of preventing dissipation of Fund assets and thereby preserving the value of the Fund Partnership Interest).

93.     In addition, the proposed order in support of the Injunctive Relief Application seeks confirmation as to:

(a)   All of the entities owned directly or indirectly by the Fund, including full details as to their owners, directors, officers or other controllers, and places and details of incorporation. This will allow the JOLs to have a complete picture of the Fund structure.[122]

(b)   All payments by way of salary, bonus, dividend, distribution or other compensation made to Mr. Patrick or Mr. Murphy by HoldCo, the Fund, DFW, CDM, the New GP, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.[123]

---

[122] Ex. 82, Injunction Application.

[123] Id.

(c)    All payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, made by HoldCo, the Fund, DFW, CDM, the New GP, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.[124]

### 4.    Cross undertaking in damages

94.    The Debtor is not offering to provide a cross-undertaking as to damages in the Injunction Application.  This is because in this case, the JOLs are not only acting in the Debtor's best interests, but also in a position analogous to the public interest based on the charitable or non-profit status of at least the underlying Charities, which are the intended recipients of donations made from the Debtor.  No cross-undertaking in damages should be required in such circumstances.

## G.    The Texas Proceeding

95.    On July 1, 2025, the Supporting Organizations commenced the TRO Action against defendants Mark Patrick, DFW, CDM, CDH, and the Original GP by filing *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver* in the Texas Business Court, 1st Division.[125]  Among other things, the TRO Action seeks: (1) a temporary restraining order; (2) a temporary injunction; and (3) the appointment of a receiver against some of the TRO Defendants arising from various breaches of fiduciary duties and related claims alleged to be owed to the Supporting Organizations directly.[126]

96.    On July 2, 2025, during the hearing for the TRO Action, in lieu of a decision rendered by the Texas Court, and at the direction of the Texas Court, the parties entered into a

---

[124] Id.

[125] Ex. 85, Supporting Organizations Texas Business Court TRO Petition.

[126] Id.

Rule 11 Agreement under the Texas Rules of Civil Procedure, which the JOLs understand is a binding contract among the parties.[127]   The key points of the Rule 11 Agreement are: (a) that the TRO Defendants shall not make any payments or disbursements other than those in the ordinary course of business; (b) investments and monies must be kept in the existing entities that currently hold those investments and monies, provided that, if any investment is monetized on its own terms, then the entity may prudently reinvest the resulting cash proceeds into liquid securities; and (c) there shall be no changes to the corporate structure of ownership of the TRO Defendants.[128]   The Texas Court scheduled a further hearing on the TRO Action on July 24 and 25, 2025.

97.    Following the hearing on July 2, 2025, the parties to the TRO Action amended and modified the Rule 11 Agreement to: (a) provide the TRO Defendants the opportunity to challenge the Texas Court's jurisdiction pursuant to a briefing schedule concluding on July 24, 2025; (b) clarify the parties' discovery rights with respect to the TRO Action; and (c) evidence the restrictions imposed upon the activities of the TRO Defendants and their subsidiaries pursuant to the Rule 11 Agreement pending a decision by the Texas Court of the TRO Action and the Plea.[129] On July 14, 2025, the TRO Defendants filed a jurisdictional challenge, asserting that: (1) the Texas Court lacks subject matter jurisdiction to hear the TRO Action; and (2) the Supporting Organizations lack standing, suggesting that the JOLs, on behalf of HoldCo, are the appropriate parties to assert the claims alleged in the TRO Action.[130]

98.    The JOLs support the Final Rule 11 Agreement in the near term in that it imposes restrictions on the covered entities regarding asset dissipation in the short term, pending the

---

[127] Ex. 88, Proposed Order (Rule 11 Agreement).

[128] Id.

[129] Ex. 89, Final Rule 11 Agreement.

[130] Ex. 90, Defendants' MTD & Plea to the Jurisdiction.

outcome of the Injunctive Relief Application filed by the JOLs in the Cayman Court and the recognition of relief as may be granted by the Cayman Court in this Chapter 15 Case.[131]  The JOLs believe that the Cayman Court is the appropriate forum to adjudicate causes of action that belong to HoldCo as asserted in the Cayman Litigation.[132]  The JOLs are also cognizant of the need for administrative efficiency in connection with the Cayman Proceeding and their duties to realize upon HoldCo's assets, and, accordingly, reserve rights with respect to coordination and management of the TRO Action, the Cayman Litigation and this Chapter 15 Case.

**H.**      **This Chapter 15 Case**

99.      On the Petition Date and in my capacity as one of the JOLs of the Debtor, I, alongside Mr. Bhowmik, filed a petition under chapter 15 of the Bankruptcy Code for recognition of the Cayman Proceeding, thereby commencing the Debtor's Chapter 15 Case.

100.      Consistent with the purpose of official liquidation under Part V of the Companies Act, section 110(2), the Petitioners are also empowered to investigate: (a) the causes for the failure of HoldCo, as necessary, and (b) generally, the promotion, business, dealings and financial affairs of HoldCo.[133]

101.      Section 97(1) of the Companies Act provides in relevant part that upon the entry of a winding up order against a company, no suit or other proceeding may be commenced or continued against the company except with leave of the Cayman Court and subject to such terms as the Cayman Court might impose.[134] This automatic stay mirrors the stay imposed in United

---

[131] Ex. 89, Final Rule 11 Agreement.

[132] Ex. 59, Statement of Claim.

[133] Ex. 78, Companies Act.

[134] Id.

States bankruptcy proceedings and serves to, *inter alia*, facilitate the Petitioners' ability to deal with claims and creditors collectively and comprehensively.

102.    A general principle underlying the Companies Act and the Cayman Proceeding is that creditors are treated on a *pari passu* basis, subject to certain exceptions.[135]

103.    Cayman liquidation proceedings are fair and equitable insofar as all creditors and interest holders have the opportunity to be heard by the Cayman Court and no creditors will be prejudiced on the sole basis that they are foreign based. All creditors are treated equally, regardless of where they are domiciled.

## I.    Qualifications for Recognition and Jurisdiction in the United States

104.    On the Petition Date and in my capacity as one of the JOLs of the Debtor, I, alongside Mr. Bhowmik, filed a petition under chapter 15 of the Bankruptcy Code for recognition of the Cayman Proceeding, thereby commencing the Debtor's Chapter 15 Cases.

105.    I was authorized pursuant to the Supervision Order to act as one of the JOLs of the Cayman Proceeding and to seek recognition and approval of the Cayman Proceeding as necessary, including as "foreign main proceedings" under the Bankruptcy Code. In light of the statutory presumption embodied in section 1516(a) of the Bankruptcy Code, the Bankruptcy Code's definition of "foreign representative," and the Supervision Order, I understand that I satisfy the requirements to serve as the "foreign representative" of the Cayman Proceeding.

106.    I have been advised that, in order to qualify for recognition under chapter 15, the Verified Petition must meet certain requirements. In particular, it must be brought by a "foreign representative" of a "foreign proceeding" that is pending before a "foreign court," all as defined in the Bankruptcy Code.

---

[135]  For example, see sections 140 and 141 of the Companies Act. Ex. 78, Companies Act.

107.     I am aware of the definition of "foreign representative," as referred to in 11 U.S.C. § 101(24), and I believe that the JOLs qualify as such. The JOLs were appointed by the Cayman Court pursuant to the Companies Act to act as the JOLs of HoldCo. Among other things, the JOLs are authorized to exercise the following powers under Part I of Schedule 3 to the Companies Act without further Cayman Court sanction: (a) the power to commence legal proceedings in the name and on behalf of HoldCo to obtain information, documents, or the examination of individuals in the Cayman Islands or the United States; and (b) the power to apply in the Cayman Islands or the United States for the preservation, freezing, or attachment of assets to which HoldCo is or may arguably be entitled. Moreover, the JOLs are authorized to seek registration or recognition of themselves and/or the Official Liquidation in any U.S. state for any purpose related to the exercise of the powers described in the Supervision Order.[136]  As such, the JOLs are the persons responsible for representing HoldCo in the Cayman Proceedings and in all related matters, including this matter, and are therefore "foreign representatives" of HoldCo within the meaning of section 101(24) of the Bankruptcy Code.[137]

108.     I also have been advised that a "foreign court" is defined in section 1502 of the Bankruptcy Code as "a judicial or other authority competent to control or supervise a foreign proceeding." I respectfully submit that the Cayman Court qualifies as a foreign court for the purposes of section 1502.

109.     I understand that a "foreign proceeding" is defined as "a collective judicial . . . proceeding in a foreign country . . . under a law relating to insolvency or the adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a

---

[136] Id.

[137] Ex. 1, Supervision Order.

foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23). I respectfully submit that the Cayman Proceeding qualifies as such, since, by definition, it is a liquidation proceeding pursuant to and governed by the Companies Act under the collective judicial supervision of the Cayman Court for the benefit of all of HoldCo's creditors, and parties in interest.[138]

110.    I am also aware that section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is "pending in the country where the debtor has the center of its main interests". I understand that section 1516(c) of the Bankruptcy Code provides that a debtor's "registered office" is presumed to be the debtor's COMI in the absence of evidence to the contrary. Since HoldCo was formed under the laws of the Cayman Islands and maintains its registered office there,[139] I believe that there is no basis for rebutting this statutory presumption that is afforded. In any case, the facts clearly indicate that HoldCo's COMI is the Cayman Islands. As demonstrated by the facts included herein, I further believe that HoldCo is engaged in non-transitory economic activity in the Cayman Islands.

111.    As JOLs, we have displaced the prior board of directors of HoldCo. No action with respect to HoldCo, whether transactional-related or litigation-related, may be taken without the express approval and consent of myself and Mr. Bhowmik. All of HoldCo's known assets and interests are under the sole and exclusive control of the JOLs from the Cayman Islands. Consistent

---

[138] Id.; Ex. 77, J&E Petition.

[139] Ex. 3, Certificate of Incorporation - Charitable DAF Holdco, Ltd; Ex. 5, Amended and Restated Memorandum and Articles of Association of Charitable DAF; Ex. 80, Filed Resolutions re Change of Registered Office - Charitable DAF Holdco, Ltd.

with the Companies Act, the Winding Up Rules and the Supervision Order, Mr. Bhowmik and I

have engaged in numerous activities to further HoldCo's liquidation.[140]

112.    Since our appointment by the Cayman Court, we have worked from our offices at

Grant Thornton in the Cayman Islands, from which all decisions are made, and have: (i) retained

Cayman Islands and U.S. legal counsel from our Cayman Islands offices and under Cayman

Islands law; (ii) obtained certain books and records of HoldCo in the Cayman Islands; (iii)

regularly communicated with creditors and shareholders from the Cayman Islands; and (iv)

commenced investigations into the affairs of HoldCo and its subsidiaries, including taking steps

to identify and seek discovery from potential parties in interest both within and outside the Cayman

Islands. All relevant inquiries from creditors and other parties-in-interest are now directed to the

JOLs.

113.    I have reviewed documentation issued by and to HoldCo prior to the Cayman

Proceeding, including the Amended and Restated Memorandum and Articles of Association of

HoldCo dated February 20, 2025, the Fund LPA, books and records of HoldCo, and various

shareholder and directors resolutions of HoldCo. In all such documentation which I have reviewed,

HoldCo is referred to and addressed as a Cayman Islands company. Thus, all parties-in-interest

were aware that HoldCo was a Cayman Islands company. No creditor or stakeholder objected to

the liquidation in the Cayman Islands and all major stakeholders are actively participating in the

Cayman Proceeding. All creditors of HoldCo must submit their claims in the Cayman Proceeding,

and stakeholders have the right to access the Cayman Court and appeal decisions of the JOLs.

114.    Based upon the above, I am confident that HoldCo's "nerve center" has been

established in the Cayman Islands with the JOLs. I also believe that all relevant creditors,

---

[140] Ex. 1, Supervision Order; Ex. 78, Companies Act; Ex. 79, Winding Up Rules.

stakeholders, and shareholders regard HoldCo to be a Cayman Islands company and the Cayman Islands to be HoldCo's current "nerve center." I further believe it is clear that since the commencement of the Cayman Proceeding, HoldCo has been engaged in non-transitory economic activity in the Cayman Islands.

115.    In accordance with 11 U.S.C. § 1515(c), I am aware of no other pending foreign insolvency proceedings, except the Cayman Proceeding, in which HoldCo is the subject of the proceeding.

116.    In accordance with Rule 1007-1(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), a schedule of known and pending actions in the United States in which HoldCo is named as a party is attached to the Form 401 Petition, together with the disclosures required under Bankruptcy Rule 7007.1, the JOLs are authorized under Cayman Islands law, subject to sanction of the Cayman Court, to act on behalf of HoldCo in staying, defending against, or prosecuting these actions, as applicable.

## J.    **Need for Broad Discovery Rights**

117.    I am aware that this Court can afford the JOLs broad discovery rights pursuant to sections 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code.

118.    I am of the belief that the JOLs must be afforded broad discovery rights in the United States to facilitate their investigations, particularly with respect to the Fund. First, this requires access to all documents relating to the Debtor's property or financial affairs, necessitating the need for section 542(e) relief. Second, the Petitioners must be able to broadly issue Rule 2004 examinations, as well as to be afforded all discovery rights under the Federal Rules of Civil Procedures, as incorporated by the Bankruptcy Rules. Only by affording the Petitioners the

necessary tools to complete their investigations will the JOLs be able to maximize distributions such that creditors and interested parties are sufficiently protected.

## K.      Need for Recognition of the Injunctive Relief Order

119.      I am aware that this Court can recognize the Injunctive Relief Order under section 1507(b) after considering certain equitable and practical considerations.  These include: (i) just treatment of all holders of claims against or interests in HoldCo's property; (ii) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims the Cayman Proceeding; (iii) prevention of preferential or fraudulent dispositions of property of HoldCo; (iv) distribution of proceeds of HoldCo's property substantially in accordance with the order prescribed under U.S. Bankruptcy law; and (v) if appropriate, the provision of an opportunity for a fresh start for HoldCo pursuant to the Cayman Proceeding.

120.      I am of the belief that the Injunctive Relief Order should be recognized by this Court under section 1507(b).  First, the relief promotes fair and equitable treatment of all creditors by preserving the value of HoldCo's estate for the benefit of all stakeholders, rather than potentially allowing the Named Defendants to obtain an unfair advantage through the dissipation or diversion of assets. Second, recognition ensures that U.S.-based creditors are not exposed to procedural disadvantage in the Cayman Proceeding, as the Injunctive Relief Order operates neutrally to safeguard HoldCo's property pending full adjudication of the claims, rather than favoring any specific jurisdiction or creditor group.[141] Third, the Injunctive Relief Order directly addresses and prevents improper transfers or dissipation of HoldCo's assets, which is essential to maintaining the status quo during the JOLs' ongoing investigation and the Cayman Litigation.[142] Finally, I have

---

[141] Ex. 82, Injunction Application.

[142] Id.

been advised that the relief sought supports a distribution framework that is aligned, in substance, with U.S. bankruptcy priorities by ensuring assets are preserved for collective resolution and eventual equitable distribution.

121.    Additionally, I have been advised that the Injunctive Relief Order can be recognized by this Court under section 1521(a)(7) of the Bankruptcy Code if such relief is otherwise available to a trustee in bankruptcy. The Cayman Court has already determined that: (a) the Cayman Litigation had a reasonable prospect of success; and (b) that the interests of the Debtor's stakeholders were best served by the JOLs commencing the Cayman Litigation.[143] Further, the Named Defendants have been afforded due process and given notice of the Injunctive Relief Application and the Injunction Hearing Date and will have the opportunity to appear at the hearing and respond to the Injunctive Relief Application before relief is granted by the Cayman Court.[144] Therefore, to the extent the Injuncitve Relief Order is entered in the Cayman Islands, I am of the belief it should be recognized by this Court in the interests of comity.

122.    For all of these reasons, I respectfully request that this Court enter an Order: (a) recognizing my colleague, Sandipan Bhowmik, and myself as duly authorized foreign representatives of HoldCo and the Cayman Proceeding as a foreign main proceeding, or in the alternative as a "foreign non main proceeding", under chapter 15 of the Bankruptcy Code; (b) granting relief pursuant to sections 105(a), 1502, 1507, 1510, 1520 and 1521 of the Bankruptcy Code; and (c) granting such other and further relief as this Court may deem just and proper.

*[Remainder of page intentionally left blank.]*

---

[143] Ex. 85, Sanction to File Statement of Claim.

[144] Ex. 82, Injunction Application.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 21, 2025
      Cayman Islands

   /s/ Margot MacInnis
MARGOT MACINNIS

*Joint Official Liquidator of*
*Charitable DAF HoldCo, Ltd*
*(in Official Liquidation)*