# EXHIBIT 48

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CDMCFAD, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

**December 18, 2024**

# TABLE OF CONTENTS

**Page**

Section 1 Definitions..................................................................................................1

    1.1    Specific Definitions ................................................................................1
    1.2    General Usage .......................................................................................5

Section 2 Formation .................................................................................................6

    2.1    Formation and Name .............................................................................6
    2.2    Term ......................................................................................................6
    2.3    Purpose and Scope ................................................................................6
    2.4    Principal Office .....................................................................................7
    2.5    Delaware Office and Agent ...................................................................7
    2.6    Admission of Members .........................................................................7
    2.7    Contact Information of the Members .....................................................7
    2.8    Additional Documents ..........................................................................7
    2.9    Title to Property ...................................................................................7

Section 3 Capitalization ...........................................................................................7

    3.1    Capital Contributions ...........................................................................7
    3.2    Limitation on Capital Contributions .....................................................8
    3.3    Withdrawal and Return of Capital ........................................................8
    3.4    Loans to the Company ...........................................................................8
    3.5    Interest on Capital ................................................................................8
    3.6    Limitation of Liability; Return/Withholding of Certain Distributions ...................8

Section 4 Profits and Losses .....................................................................................9

    4.1    Allocations of Company Profits and Losses .........................................9
    4.2    Allocation Adjustments Required to Comply With Section 704(b) of the Code ...................................................................................................9
    4.3    General Allocation and Capital Account Maintenance Provisions.......11
    4.4    Nonallocation of Distributions to Increases in Minimum Gain............12
    4.5    Allocation of Liabilities ......................................................................12
    4.6    Modifications to Preserve Underlying Economic Objectives................12
    4.7    Withholding Taxes...............................................................................12
    4.8    Intent of Allocations/Cash Savings Clause.........................................13

Section 5 Distributions ...........................................................................................14

    5.1    Distributions........................................................................................14
    5.2    Limitation on Distributions .................................................................15

Section 6 Administration; Management ...................................................................15

4937-0258-2788\4

6.1     Management Powers and Authority of the Manager ............................................15
6.2     Designation of Manager..................................................................................16
6.3     Manager's Power to Bind the Company ..........................................................16
6.4     Action by Members........................................................................................16
6.5     No Duties to the Company..............................................................................16
6.6     Manager and Member Expenses .....................................................................16
6.7     Tax Matters; Partnership Representative ........................................................17
6.8     Records and Financial Statements ...................................................................18
6.9     Valuation of Company Assets ........................................................................18
6.10    Officers. ........................................................................................................19

Section 7 Transfers and Resignations ...........................................................................19

7.1     Transfers of Interests.....................................................................................19
7.2     Resignation/Removal of a Member ................................................................19
7.3     Redemption ...................................................................................................19

Section 8 Dissolution and Liquidation ..........................................................................19

8.1     Dissolving Events .........................................................................................19
8.2     Winding Up and Liquidation .........................................................................20
8.3     Deficit Restoration/Liability ..........................................................................21

Section 9 Exculpation; Indemnification.........................................................................21

9.1     Exculpation ...................................................................................................21
9.2     Indemnification .............................................................................................21

Section 10 General Provisions .......................................................................................22

10.1    Meetings.......................................................................................................22
10.2    Action Without a Meeting .............................................................................22
10.3    Entire Agreement .........................................................................................22
10.4    Amendments ................................................................................................22
10.5    Counterparts; Binding upon Members............................................................22
10.6    No Third Party Beneficiaries .........................................................................22
10.7    Notices, Consents, Elections, Etc ..................................................................23
10.8    Severability..................................................................................................23
10.9    Governing Law .............................................................................................23
10.10   Status Under the Act .....................................................................................23
10.11   Partnership for Tax Purposes Only .................................................................23
10.12   Miscellaneous ..............................................................................................23

SCHEDULE A – Member Information

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CDMCFAD, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

This Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, is entered into as of December 18, 2024 and is hereby made effective as of the Effective Date (as defined below).

## SECTION 1

## DEFINITIONS

**1.1** *Specific Definitions*.  As used in this Agreement:

*Act* shall mean the Delaware Limited Liability Company Act, Title 6, Delaware Code, Section 18-101 *et seq*.

*Adjusted Capital Account Deficit* shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

      (a)     The Capital Account shall be increased by any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentences of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

      (b)     The Capital Account shall be decreased by the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

*Affiliate* shall mean, with respect to any Person, any other Person with regard to which the Person is controlling, controlled or commonly controlled.  For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of a Person, whether through ownership of voting Securities, by agreement, or otherwise.

*Agreement* shall mean this Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, including all schedules, appendices, and exhibits hereto, as amended in accordance with the terms hereof.

**Allocation Percentage** shall mean, for each Member, the percentage set forth on Schedule A, which shall be adjusted as necessary to reflect the Members' varying interests in the Company. For the avoidance of doubt, the aggregate Allocation Percentages of all Members shall at all times equal one hundred percent (100%).

**Capital Account** shall mean, for each Member, a separate account that is:

(a)    Increased by: (i) the amount of such Member's Capital Contribution and (ii) allocations of Profits to such Member pursuant to Section 4;

(b)    Decreased by: (i) the amount of cash distributed to such Member by the Company; (ii) the Fair Market Value of any other property distributed to such Member by the Company (determined as of the time of distribution and net of liabilities secured by such property that the Member assumes or to which the Member's ownership of the property is subject); and (iii) allocations of Losses to such Member pursuant to Section 4;

(c)    Otherwise adjusted in accordance with the provisions of this Agreement; and

(d)    Revalued in connection with any event described in paragraph (a) of the definition of "Gross Asset Value" to the extent the Manager determines that a revaluation is necessary to preserve the economic arrangement of the Members. In determining the amount of any liability for purposes of subparagraphs (a) and (b) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Treasury Regulations.

Capital Accounts shall be maintained in accordance with Treasury Regulations Section 1.704-1(b) and specifically in a manner consistent with the Member's interest in the Company and the provisions of this Agreement shall be interpreted and applied in a manner consistent with such regulations and intent.

**Capital Contribution** shall mean, for any Member, the sum of the net amount of cash and the Fair Market Value of any other property (determined as of the time of contribution and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by such Member to the capital of the Company. For purposes of this Agreement, each Capital Contribution shall be deemed to have been made at the later of: (i) the Close of Business on the due date of such Capital Contribution as determined in accordance with this Agreement; or (ii) the Close of Business on the date on which such Capital Contribution is actually received by the Company.

**Certificate** shall mean the Certificate of Formation of the Company, as amended and/or restated from time to time.

**Close of Business** shall mean 5:00 p.m., local time, in New York, New York.

**Code** shall mean the United States Internal Revenue Code of 1986, as amended.

**Company** shall mean CDMCFAD, LLC, a Delaware limited liability company.

-2-

***Depreciation*** shall mean, for each Fiscal Year or other period, an amount equal to the federal income tax depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

***Fair Market Value*** shall have the meaning set forth in Section 6.9(b).

***Fiscal Period*** shall mean the Fiscal Year or such shorter period as necessary to take into account the Members' varying interests in the Company.

***Fiscal Year*** shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

***Gross Asset Value*** shall mean, with respect to any asset, such asset's adjusted basis for federal income tax purposes (except that the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of the asset on the date of contribution), except as follows:

(a)     The Gross Asset Value of all Company assets shall be adjusted to equal their respective fair market values upon the occurrence of any of the events listed in Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5); provided, however, that adjustments pursuant to this clause (a) (other than in a liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g)) shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(b)     The Gross Asset Value of any Company asset distributed to any Member shall be the Fair Market Value of such asset on the date of distribution.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a) or paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

***Interest*** shall mean, for each Member, the entirety of such Member's rights, duties and limited liability company interest in respect of the Company in such Member's capacity as such (as distinguished from any other capacity such as employee, debtor or creditor) and shall include such Member's right, if any, to vote on Company matters, bind the Company vis-à-vis third parties, or receive distributions as well as such Member's obligation under this Agreement, if any, to provide services, make Capital Contributions or take any other action.

*Manager* shall mean the Person designated as the Manager in Section 6.2.

*Member* shall mean those Persons admitted as members under this Agreement as shown on Schedule A as such schedule may be updated from time to time, each in such Person's capacity as a member of the Company.  Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members.

*Member Minimum Gain* has the same meaning as the term "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i)(2).

*Member Nonrecourse Deduction* shall mean an item of loss, expense or deduction attributable to a nonrecourse liability of the Company for which a Member bears the economic risk of loss within the meaning of Treasury Regulations Section 1.704-2(i).

*Minimum Gain* of the Company or *Company Minimum Gain* shall, as provided in Treasury Regulations Section 1.704-2, mean the total amount of gain the Company would realize for federal income tax purposes if it disposed of all assets subject to nonrecourse liability for no consideration other than full satisfaction thereof.

*Person* shall mean an individual, partnership, corporation, limited liability company, unincorporated organization, trust, joint venture, governmental agency, or other entity, whether domestic or foreign.

*Principal Office* shall have the meaning set forth in Section 2.4.

*Profits* and *Losses* shall mean, for each Fiscal Year or other Fiscal Period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other Fiscal Period, as applicable, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(a)     Any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to (or subtracted from, as the case may be) such taxable income or loss;

(b)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from (or added to, as the case may be) such taxable income or loss;

(c)     In the event that the Gross Asset Value of any Company asset is adjusted in accordance with paragraphs (a) or (b) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)     Gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed

-4-

by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e)    In lieu of the depreciation, amortization and other cost recovery deductions that would otherwise be taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other Fiscal Period, computed in accordance with the definition of "Depreciation" above; and

(f)    Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Sections 4.2 or 4.3 shall not be taken into account in computing Profits or Losses.

*Securities* shall mean debt, equity and synthetic securities of any type.

*Term* shall have the meaning set forth in Section 2.2. Where not capitalized, "term" shall mean the entire period of the Company's existence, including any period of winding-up and liquidation following the dissolution of the Company pursuant to Section 8.1.

*Title XI 2015 RBA* shall have the meaning set forth in Section 6.7(d).

*Transfer* shall mean any sale, exchange, transfer, gift, encumbrance, assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

*Treasury Regulations* shall mean the regulations issued by the United States Treasury Department and relating to a matter arising under the Code.

*Updated Capital Account* shall mean, with respect to a Member, such Member's Capital Account determined as if, immediately prior to the time of determination, all of the Company's assets had been sold for Fair Market Value and any previously unallocated Profits and Losses had been allocated pursuant to Section 4.

**1.2    *General Usage*.** The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Except where the context clearly requires to the contrary: (i) each reference in this Agreement to a designated "Section," "Schedule," "Exhibit," or "Appendix" is to the corresponding Section, Schedule, Exhibit, or Appendix of or to this Agreement; (ii) instances of gender or entity-specific usage (*e.g.*, "his," "her," "its," "person" or "individual") shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (iii) the word "or" shall not be applied in its exclusive sense; (iv) "including" shall mean "including, without limitation"; (v) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto; (vi) references to any specific statute or similar codification of law shall mean such statute or other codification as construed, modified, extended or enabled by any applicable binding governmental rules or regulations; (vii) references to "law" shall mean any applicable law, whether embodied in statute, governmental rule or regulation, case law or other legally binding format; (viii) references to "$" or "dollars" shall mean the lawful

currency of the United States; (ix) references to "federal" shall be to laws, agencies or other attributes of the United States (and not to any State or locality thereof); (x) the meaning of the terms "domestic" and "foreign" shall be determined by reference to the United States; (xi) references to "days" shall mean calendar days and references to "business days" shall mean all days other than Saturdays, Sundays and days that are legal holidays in the State of New York; (xii) references to months or years shall be to the actual calendar months or years at issue (taking into account the actual number of days in any such month or year); (xiii) days, business days and times of day shall be determined by reference to local time in New York, New York; and (xiv) the English language version of this Agreement shall govern all questions of interpretation relating to this Agreement, notwithstanding that this Agreement may have been translated into, and executed in, other languages.

## SECTION 2

## FORMATION

**2.1** *Formation and Name*.

(a) The Members hereby enter into this Agreement and form the Company as a limited liability company in accordance with the Act. Mark Patrick is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware (such filing being hereby approved and ratified in all respects and the time at which the initial Certificate of Formation is filed with the Secretary of State of the State of Delaware, the "**Effective Date**"). Upon the filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, his powers as an "authorized person" of the Company ceased, and the Manager thereupon became the designated "authorized person" of the Company and shall continue as the designated "authorized person" of the Company within the meaning of the Act. The Manager, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware. The Member shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any other jurisdiction in which the Company may wish to conduct business.

(b) The name of the Company shall be "CDMCFAD, LLC."

**2.2** *Term*. The "Term" of the Company commenced as of the filing of the Certificate with the Secretary of State of the State of Delaware and shall continue until the Company is dissolved and then wound up pursuant to Section 8.1. Except as provided in Section 8.1, the Company shall not be dissolved.

**2.3** *Purpose and Scope*. Within the meaning and for purposes of the Act, the purpose and scope of the Company shall include any lawful action or activity permitted to a limited liability company under the Act, as determined by the Manager.

**2.4** *Principal Office*.  The Company shall have a single "Principal Office" which shall at all times be located within the United States.  The Principal Office shall be located at such location as may hereafter be determined by the Manager.

**2.5** *Delaware Office and Agent*.  The Company shall maintain a Delaware registered office and agent for service of process as required by the Act.  In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be, each in accordance with the Act.

**2.6** *Admission of Members*.  Each Person as of the date hereof that has executed this Agreement and whose name is listed under Name and Contact Information on Schedule A, as such Schedule A may be updated from time to time by the Manager, is hereby admitted as a member of the Company.  With the consent of the Manager, additional Members may be admitted to the Company from time to time upon each such Person's execution of a counterpart signature page to this Agreement or other joinder agreeing to be bound by the terms of this Agreement.

**2.7** *Contact Information of the Members*.  Set forth below the name of each Member on Schedule A shall be appropriate contact information for such Member.  Each Member shall promptly provide the Company with the information required to be set forth for such Member on Schedule A and shall thereafter promptly notify the Company of any change to such information.

**2.8** *Additional Documents*.  The Manager shall cause to be executed, filed, recorded, published, or amended any documents, as the Manager in its reasonable discretion determines to be necessary or advisable:  (x) in connection with the formation, operation, dissolution, winding-up, or termination of the Company pursuant to applicable law; or (y) to otherwise give effect to the terms of this Agreement.  The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

**2.9** *Title to Property*.  Title to all Company property shall be held in the name of the Company; provided, however, that publicly traded Securities may be held in "street name" or through a similar arrangement with a reputable financial institution.

## SECTION 3

## CAPITALIZATION

**3.1** *Capital Contributions*.

    (a) *Initial Capital Contributions*.  Each Member has contributed (or is deemed to have contributed) such capital to the Company as set forth on the books and records of the Company.  Except to the extent set forth on the books and records of the Company or agreed to by the Manager, all Capital Contributions shall be in cash and/or cash equivalents.

-7-

(b)     *Increased Capital Contributions*.  The Members may make additional Capital Contributions to the Company at such times and in such amounts as shall be determined by the Manager and the Member making such additional Capital Contribution.

(c)     *Adjustment of Member Allocation Percentages*.  Upon (i) the admission of a Member following the date hereof or (ii) the acceptance of Capital Contributions by the Company from a Member following contribution of such Member's initial Capital Contribution, the Manager shall adjust the Allocation Percentage of each Member, and shall accordingly update Schedule A hereto, so that the Allocation Percentages of the Members represent their Interest in the Company taking into account a revaluation of the Company's assets, if any, and in accordance with the economic arrangement of the Members.

**3.2**     *Limitation on Capital Contributions*.  Except as specifically provided in this Section 3, no Person shall be permitted or required to make a contribution to the capital of the Company.

**3.3**     *Withdrawal and Return of Capital*.  Except as provided in Section 5 and Section 8 or as otherwise agreed to by the Manager, no Member shall be entitled to the return of such Member's Capital Contribution, a distribution in respect of such Member's Capital Account balance, or any other distribution in respect of such Member's Interest.

**3.4**     *Loans to the Company*.  No Member shall be required to lend any money to the Company or to guaranty any Company indebtedness.

**3.5**     *Interest on Capital*.  No Member shall be entitled to interest on such Member's Capital Contribution, Capital Account balance, or share of unallocated Profits.

**3.6**     *Limitation of Liability; Return/Withholding of Certain Distributions*.

(a)     Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member or manager of the Company.

(b)     A Member that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Company under applicable law shall return such distribution within thirty (30) days after demand therefor by the Manager.  The Company may elect to withhold from any distributions otherwise payable to a Member amounts due to the Company from such Member.

(c)     Nothing in this Section 3.6 shall be applied to release any Member from (i) its obligation to make Capital Contributions or other payments specifically required under this Agreement or (ii) its obligations pursuant to any relationship between the Company and such Member acting in a capacity other than as a Member (including, for example, as a borrower, employee or independent contractor).

# SECTION 4

# PROFITS AND LOSSES

**4.1** *Allocations of Company Profits and Losses*.  Except as otherwise provided in this Agreement, Profits and Losses for each Fiscal Period shall be allocated as follows:

(a)    Profits shall be allocated among the Members in the following order of priority:

(i)    First, among the Members on a pro rata basis so as to reverse prior allocations of Losses for prior Fiscal Periods under Section 4.1(b)(ii) until cumulative Profit allocated under this Section 4.1(a)(i) equals the cumulative Losses allocated under Section 4.1(b)(ii); and

(ii)    Second, among the Members in proportion to their Allocation Percentages.

(b)    Losses shall be allocated among the Members in the following order of priority:

(i)    First, among the Members on a pro rata basis so as to reverse allocations of Profits for prior Fiscal Periods under Sections 4.1(a)(i) and 4.1(a)(ii), in reverse order, until Losses allocated under this Section 4.1(b)(i) equal the cumulative Profit previously allocated under Sections 4.1(a)(i) and 4.1(a)(ii); and

(ii)    Second, among the Members in proportion to their Allocation Percentages.

**4.2** *Allocation Adjustments Required to Comply With Section 704(b) of the Code*.

(a)    *Limitation on Allocation of Losses*.  If an item of Losses otherwise allocable to a Member under Section 4.1(b) would cause such Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year (or increase the amount of such Member Adjusted Capital Account Deficit), the item shall not be allocated to such Member, but shall instead be specially allocated as follows:

(i)    To the Members in proportion to their respective positive Capital Account balances, until the Capital Account balance of each Member has been reduced to (but not less than) zero; and

(ii)    Next, to the Members as a group in proportion to their respective Allocation Percentages as determined in the reasonable discretion of the Manager.

To the extent that there have been special allocations of Losses away from a Member under this Section 4.2(a) that have not subsequently been reversed pursuant to this sentence or Sections 4.2(f)

or 4.3(e), the next available items of Profits otherwise allocable to such Member pursuant to Section 4.1(a) shall be specially allocated to the Members to whom such items of Losses had been specially allocated under this Section 4.2(a) so as to first offset in reverse order such special allocations of Losses.

(b)     ***Qualified Income Offset***.  In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(b) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4 have been tentatively made as if this Section 4.2(b) were not in this Agreement.

(c)     ***Gross Income Allocation***.  In the event any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year, that Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4 have been made, as if Section 4.2(b) and this Section 4.2(c) were not in this Agreement.

(d)     ***Member Nonrecourse Deductions***.  In accordance with the provisions of Treasury Regulations Section 1.704-2(i), each item of Member Nonrecourse Deduction shall be allocated among the Members in proportion to the economic risk of loss that the Members bear with respect to the nonrecourse liability of the Company to which such item of Member Nonrecourse Deduction is attributable.

(e)     ***Minimum Gain Chargeback***.  This Section 4.2(e) hereby incorporates by reference the "minimum gain chargeback" provisions of Treasury Regulations Section 1.704-2.  In general, upon a reduction of Company Minimum Gain or Member Minimum Gain, the preceding sentence shall require that items of income and gain be allocated among the Members in a manner that reverses prior allocations of deductions attributable to liabilities giving rise to Company Minimum Gain or Member Nonrecourse Deductions as well as reductions in the Members' Capital Account balances resulting from distributions that, notwithstanding Section 4.4, are allocable to increases in the Company Minimum Gain.  Subject to the provisions of Section 704 of the Code and the Treasury Regulations thereunder, if the Manager determines in its reasonable discretion at any time that operation of such "minimum gain chargeback" provisions likely will not achieve such a reversal by the conclusion of the liquidation of the Company, the Manager shall adjust the allocation provisions of this Section 4 as necessary to accomplish that result.

(f)     ***Intent of Regulatory Allocations***.  The allocations set forth in Sections 4.2(a) through 4.2(e) are intended to comply with certain regulatory requirements under the Code.  The Members intend that, to the extent possible, all allocations made pursuant to such Sections will, over the term of the Company, be offset either with other allocations pursuant to Sections 4.2(a) through 4.2(e) or with special allocations of other items of Company income, gain,

loss or deduction pursuant to this Section 4.2(f). Accordingly, the Manager is hereby authorized and directed to make offsetting allocations of Company income, gain, loss or deduction under this Section 4.2(f) in whatever manner the Manager determines is appropriate so that, after such offsetting special allocations are made, the Capital Accounts of the Members are, to the extent possible, equal to the Capital Accounts each would have if the provisions of Sections 4.2(a) through 4.2(e) were not contained in this Agreement and all Company income, gain, loss, and deduction were instead allocated in accordance with the provisions of Section 4.1.

### 4.3    *General Allocation and Capital Account Maintenance Provisions*.

(a)    ***Book - Tax Accounting Disparities***.  If Company property is reflected in the Capital Accounts of the Members at a value that differs from the adjusted tax basis of such property (whether because such property was contributed to the Company by a Member or because of a revaluation of the Members' Capital Accounts under Treasury Regulations Section 1.704-1(b)), allocations of depreciation, amortization, income, gain or loss with respect to such property shall be made among the Members in a manner which takes such difference into account in accordance with Code Section 704(c) and the Treasury Regulations issued thereunder using a method determined in the reasonable discretion of the Manager.

(b)    ***Allocations in Event of Transfer***.  If an Interest in the Company is Transferred in accordance with this Agreement, allocations of Profits and Losses as between the transferor and transferee shall be made using any method selected by the Manager and permitted under Section 706 of the Code.

(c)    ***Adjustment to Capital Accounts for Distributions of Property***.  If property distributed in kind is reflected in the Capital Accounts of the Members at a value that differs from the Fair Market Value of such property at the time of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of Section 4.

(d)    ***Tax Credits and Similar Items***.  Any tax credits or similar items not allocable pursuant to Sections 4.1, 4.2 and 4.3(a) through 4.3(c) shall be allocated to the Members in proportion to their respective Allocation Percentages.  Notwithstanding the preceding sentence, if Company expenditures that give rise to tax credits also give rise to Member Nonrecourse Deductions, the tax credits attributable to such expenditures shall be allocated in accordance with Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)    ***Reallocation of Certain Losses***.  To the extent that:  (i) Losses which otherwise would have been allocated to a Member under this Section 4.3 were allocated to one or more other Members pursuant to Section 4.2(a) or any other provision of this Agreement that prohibits the allocation to a Member of Losses which would reduce such Member's Capital Account (or Updated Capital Account) balance below a specified amount; (ii) such allocation has not been reversed pursuant to the subsequent operation of Section 4.2(a) or this Section 4.3(e); and (iii) the Member thereafter returns a distributed amount as required under Section 3.6(b) or otherwise makes a contribution to the capital of the Company, the Capital Accounts of the Members shall be adjusted in connection with such return or contribution (to the extent of the value thereof) to effect a reallocation, in reverse order, of such Losses to the Member.

(f)    ***Tax Allocations***.  It is intended that items of Company income, gain, loss, deduction or credit recognized for federal income tax purposes shall be allocated among the Members for federal income tax purposes in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated pursuant to Sections 4.1 and 4.2 hereof, to the extent consistent with the requirements of the Code and the Treasury Regulations.

4.4    ***Nonallocation of Distributions to Increases in Minimum Gain***.  To the extent permitted under Treasury Regulations Section 1.704-2(h), distributions to Members shall not be allocable to increases in the Company Minimum Gain.  In general, and except as provided in such Treasury Regulations, the preceding sentence is intended to ensure that reductions in a Member's Capital Account balance resulting from distributions of money or other property to that Member are not reversed by the minimum gain chargeback provisions of Section 4.2(e).

4.5    ***Allocation of Liabilities***.  Solely for purposes of determining the Members' respective shares of the nonrecourse liabilities of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in Company Profits shall be equal to the ratio that such Member's Allocation Percentage bears to the aggregate Allocation Percentages of the Members.

4.6    ***Modifications to Preserve Underlying Economic Objectives***.  In the event that (i) there is a change in the federal income tax law, (ii) the Company borrows money or property, or (iii) the Company makes an election to adjust the basis of the Company's assets under Section 754 of the Code, the Manager, acting in his reasonable discretion after consultation with tax counsel to the Company, shall make the minimum modifications to the allocation provisions of this Agreement necessary to preserve the underlying economic objectives of the Members as reflected in this Agreement and, in the case of such a borrowing or election, to properly allocate the tax items relating to such borrowing or election in accordance with the Code and the Treasury Regulations.

4.7    ***Withholding Taxes***.

(a)    The Company shall be permitted to withhold taxes from distributions to, and allocations among, the Members to the extent required by law (as determined by the Manager in the Manager's sole discretion).  Except as otherwise provided in this Section 4.7, any amount so withheld by the Company with regard to a Member shall be treated for purposes of this Agreement as an amount actually distributed to such Member pursuant to Section 5.1.  An amount shall be considered withheld by the Company if, and at the time, remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Manager as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs.  Nothing in this Section 4.7(a) shall have any bearing on amounts withheld from a Member in respect of compensation paid or payable to such Member in such Member's capacity as an employee of the Company or pursuant to a bona fide written employment agreement between such Member and the Company.

(b)    If, pursuant to Section 4.7(a), an amount withheld with regard to a Member is treated for purposes of this Agreement as an amount distributed to such Member pursuant to

-12-

Section 5.1, subsequent actual distributions to such Member pursuant to Section 5.1 shall be reduced as necessary to, as quickly as possible, cause the aggregate distributions to such Member over the term of the Company (including actual distributions and distributions deemed to have occurred pursuant to Section 4.7(a)) to equal the actual distributions that would have been made to such Member if Section 4.7(a) were not part of this Agreement.

(c)     To the extent that operation of Section 4.7(a) would create a negative balance in a Member's Updated Capital Account or increase the amount by which such Updated Capital Account balance is negative, the amount of the deemed distribution shall instead be treated as a loan by the Company to such Member, which loan shall be payable upon demand by the Company and shall bear interest at a floating rate equal to the prime rate as announced from time to time by the Wall Street Journal, compounded daily.

(d)     In the event that the Manager determines in its discretion that the Company lacks sufficient cash available to pay withholding taxes in respect of a Member, the Manager may, in its sole and absolute discretion, make a loan to the Company to enable the Company to pay such taxes.  Any such loan shall be full-recourse to the Company and shall bear interest at a floating rate equal to the prime rate as published from time to time by The Wall Street Journal, compounded daily.  Notwithstanding any provision of this Agreement to the contrary, any loan (including interest accrued thereon) made to the Company by a Member or the Manager pursuant to this Section 4.7(d) shall be repaid or returned as promptly as is reasonably possible.

(e)     Each Member hereby agrees to indemnify the Company and the other Members for (i) any liability they may incur for failure to properly withhold taxes in respect of such Member, and (ii) any tax liabilities imposed on the Company with respect to such Member; moreover, each Member hereby agrees that neither the Company nor any other Member shall be liable for any excess taxes withheld in respect of such Member's Interest and that, in the event of overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.  The obligations of a Member set forth in this Section 4.7 shall survive the resignation of any Member from the Company or any Transfer of a Member's Interest.

**4.8     *Intent of Allocations/Cash Savings Clause*.**  The parties intend that the foregoing allocation provisions of this Section 4 shall produce final Capital Account balances of the Members that will permit liquidating distributions that are made in accordance with final Capital Account balances under Section 8.2(d) hereof to be made in a manner identical to the order of priorities set forth in Section 5.1(b).  To the extent that the allocation provisions of this Section 4 would fail to produce such final Capital Account balances, (i) such provisions shall be amended by the Manager without the consent of any Member or other Person, if and to the extent necessary to produce such result and (ii) income and loss of the Company for prior open years (including items of gross income and deduction of the Company for such years) shall be reallocated by the Manager among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years, as approved by the Manager.  This Section 4.8 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service ("**IRS**") or any other taxing authority.  The Manager shall have the power to amend this Agreement without the consent of the Members, as it reasonably considers advisable, to make the allocations and adjustments described in this Section 4.8.  To the extent that after making the allocations and

-13-

adjustments described in this Section 4.8, the distributions that any Member will receive under this Agreement are less than the amount of the distributions such Member would receive if all such distributions were made pursuant to the order of priority set forth in Section 5.1(b), the Company may make a guaranteed payment (within the meaning of Section 707(c) of the Code) to such Member (to be made at the time such Member would otherwise receive the distributions that have been reduced) to the extent such payment does not violate the requirements of Sections 704(b) and 514(c)(9)(E) of the Code or may take such other action as reasonably determined by the Manager to offset such reduction.

## SECTION 5

## DISTRIBUTIONS

**5.1** *Distributions*.

(a) ***General***. Except as otherwise provided in this Agreement, distributions prior to the dissolution of the Company shall be made in accordance with this Section 5.1 and each Member actually receiving amounts pursuant to a specific distribution by the Company shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share under this Agreement of the total amount to be included in such distribution).

(b) ***Discretionary Distributions***. The Manager may at any time in its sole discretion to the extent the Company has cash and any property available for distribution taking into account current and anticipated needs (including without limitation operating expenses, debt service, guaranteed payments and a reserve for future operating costs), distribute such excess cash and any property available for distributions to the Members in accordance with their respective Allocation Percentages.

(c) ***Tax Distributions.***

(i) Notwithstanding the foregoing, the Company shall distribute to each Member, not later than ninety (90) days after the close of each Fiscal Year, or as soon as reasonably practicable thereafter, an amount of cash equal to the product of the Tax Percentage for such Fiscal Year and such Member's allocated share of the Company's net taxable income and gain for such Fiscal Year as shown on the Company's federal income tax return. The Manager may, in its sole discretion and determination, make distributions pursuant to this Section 5.1(c) on a quarterly basis so as to permit the Members to make quarterly estimated tax payments.

(ii) For purposes of this Section 5.1(c), the "Tax Percentage" shall equal the highest combined federal, state and local marginal tax rate for an individual resident of the State of Texas with respect to net taxable income or net short term capital gains or with respect to net long term capital gains, as applicable. The Manager may adjust the determination of the Tax Percentage to reflect a change in law or rates.

(iii)    For purposes of determining whether the Company has satisfied its distribution obligation under Section 5.1(c)(i), all cash distributions made during a Fiscal Year shall be treated as distributions made to satisfy Section 5.1(c)(i) in respect of such Fiscal Year (except to the extent that such distributions were made to satisfy the obligations of the Company under Section 5.1(c)(i) in respect of one or more prior Fiscal Years, in which case such distributions shall be treated as having been made pursuant to Section 5.1(c)(i) in respect of such prior Fiscal Year(s)).  Further, distributions made in respect of this Section 5.1(c) during any Fiscal Year shall be treated as satisfying the distribution requirement of Section 5.1(b) hereof with respect to such Fiscal Year (except to the extent that such distributions were made in respect of a prior Fiscal Year, in which case such distribution shall be treated as having been made in respect of such prior Fiscal Year(s)).

(iv)    At the election of the Manager, no distribution shall be required pursuant to Section 5.1(c)(i) in respect of any Fiscal Year if the total net taxable income and gain of the Company for such Fiscal Year is less than or equal to One Hundred Thousand Dollars ($100,000).

(v)    No distribution shall be required to be made pursuant to this Section 5.1(c) to a Member to the extent such Member has a cumulative net loss with respect to such Member's allocable share of the taxable income or gain, as the case may be, after taking into account allocations for the current and all prior taxable periods.

(vi)    The Company shall not make a distribution under this Section 5.1(c) to a Member to the extent such Member is allocated net taxable income and gain solely in connection with (A) redemption of such Member's Interest or (B) a liquidation of the Company.

(d)    *Source of Items Available for Distribution*.  In the event that, at the time of a distribution, items available for distribution include items from more than one source, the source of those items actually distributed shall be determined by the Manager in its sole discretion.

**5.2    *Limitation on Distributions***.  No distribution shall be made to a Member pursuant to Section 5.1 if and to the extent that such distribution would:  (i) create a negative balance in the Updated Capital Account of such Member or increase the amount by which such Updated Capital Account balance is negative; (ii) cause the Company to be insolvent; or (iii) render the Member liable for a return of such distribution under applicable law.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to a Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

# SECTION 6

# ADMINISTRATION; MANAGEMENT

**6.1    *Management Powers and Authority of the Manager***.  Except as otherwise specifically provided in this Agreement, the Company and its business shall be managed, controlled and operated exclusively by the Manager, which shall be the "manager" of the Company

within the meaning of Section 18-101 of the Act and shall have all of the powers and authority in respect of the Company permitted to managers under the Act.

6.2    *Designation of Manager*.  The initial Manager shall be Mark Patrick.   In the event that Mark Patrick dies or is unable to serve as such, the will or other testamentary documentation for Mark Patrick shall designate a successor Manager.   To the extent that the will or other related documentation for Mark Patrick fails to provide for a successor Manager or if any such designated individual shall be unable or is unwilling to fill such position, the managing shareholder of Charitable DAF HoldCo, Ltd., shall appoint a successor Manager.   To the extent that Mark Patrick desires to resign as Manager, he shall appoint his successor.

6.3    *Manager's Power to Bind the Company*.

(a)    Notwithstanding any provision of this Agreement to the contrary, any contract agreement, deed, lease, note or other document or instrument executed on behalf of the Company by a Manager shall be deemed to have been duly executed by the Company; no Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Manager's power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied.

(b)    The Manager is hereby authorized to file with any governmental entity, on behalf of the Company and the Members, a certificate or similar instrument that evidences the Manager's power to bind the Company as set forth in the preceding paragraph (a).

(c)    To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard.

6.4    *Action by Members*.  Except as set forth in Section 6.2, no Member shall have any right to vote with respect to any Company action.

6.5    *No Duties to the Company*.  To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.

6.6    *Manager and Member Expenses*.

(a)    *General*.  Except as otherwise provided in this Section 6.6, no Manager or Member shall be reimbursed for expenses incurred on behalf of, or otherwise in connection with,

the Company. Any reimbursement paid by a third party for expenses actually reimbursed by the Company shall be retained by (or paid over by the recipient thereof to) the Company.

(b)    **Manager**.    The Manager shall be reimbursed by the Company for reasonable out-of-pocket expenses incurred by the Manager on behalf of the Company.

(c)    **Member**.    A Member shall be reimbursed for expenses incurred on behalf of the Company only with the approval of the Manager, which approval may be withheld by the Manager in its sole and absolute discretion.

6.7    *Tax Matters; Partnership Representative*.

(a)    ***Partnership Classification for Tax Purposes***.    Except to the extent otherwise required by applicable law (disregarding for this purpose any requirement that can be avoided through the filing of an election or similar administrative procedure), the Manager shall cause the Company to take the position that the Company is a "partnership" or disregarded entity, as applicable, for federal, state and local income tax purposes and shall cause to be filed with the appropriate tax authorities any elections or other documents necessary to give due legal effect to such position. A Member shall not file (and each Member hereby represents that it has not filed) any income tax election or other document that is inconsistent with the Company's position regarding its classification as a "partnership" for applicable federal, state and local income tax purposes.

(b)    ***Notice of Inconsistent Treatment of Company Item***.    No Member shall file a notice with the IRS under Section 6222(b) of the Code in connection with such Member's intention to treat an item on such Member's federal income tax return in a manner which is inconsistent with the treatment of such item on the Company's federal income tax return.

(c)    ***Notice of Settlement Agreement***.    Any Member entering into a settlement agreement with the United States Department of the Treasury which concerns a Company item shall notify the Manager of such settlement agreement and its terms within sixty (60) days after the date thereof.

(d)    ***Partnership Representative and Audits***.

(i)    The Manager shall be the "partnership representative" of the Company (the "**Partnership Representative**") pursuant to and to the extent permitted by Section 6223 of Title XI of the Bipartisan Budget Act of 2015 ("**Title XI 2015 BBA**"). In the event of any pending tax action, investigation, claim or controversy at the Company level that may result in a "partnership adjustment," within the meaning of Section 6241(2) of Title XI 2015 BBA (a "**Partnership Adjustment**"), to any item reported on a federal tax return of any Member(s), the Partnership Representative, shall keep such Member(s) fully and timely informed by written notice of any audit, administrative or judicial proceedings, meetings or conferences with the IRS or other similar material matters that come to its attention in its capacity as Partnership Representative. The Partnership Representative will give the Members not less than fifteen (15) days' prior written notice as to any action to be taken or of any decision not to take action with respect to any such material matter. The Partnership Representative shall act in any similar capacity under applicable state, local or foreign law, subject to similar restrictions and obligations.

-17-

The Company shall reimburse the Partnership Representative for its reasonable expenses in connection with the performance of his duties hereunder.

(ii)     For any Partnership Adjustment or proposed Partnership Adjustment to the federal income tax returns of the Company for which an "imputed underpayment," within the meaning of Section 6225(b) of Title XI 2015 BBA would arise, then either, (1) the Partnership Representative may require that the Member(s) affected by such Partnership Adjustment file amended returns that take into account such Partnership Adjustments and pay any additional tax due pursuant to Section 6225(c) of Title XI 2015 BBA or (2) if the Partnership Representative does not require the affected Member(s) to file such amended returns as provided in clause (1), and the affected Member(s) do not otherwise file such amended returns, the Partnership Representative may elect application of Section 6226 of Title XI 2015 BBA.  In any case, the affected Member(s) shall keep the Partnership Representative fully and timely informed by written notice of any administrative or judicial proceedings, meetings or conferences with the IRS or other similar matters with respect to the Partnership Adjustment, and the Partnership Representative shall have the right to review and comment on any submissions to the IRS, and attend and jointly participate in any meetings or conferences with the IRS.

(iii)     This Section 6.7(d) is intended to comply with certain provisions under Title XI 2015 BBA that may be subject to change or further interpretation by the U.S. Treasury or IRS.  In the event of such change or further interpretation, the Manager is hereby authorized to amend this Agreement consistent with the provisions of Sections 6.7(d)(i) and 6.7(d)(ii) above.

**6.8**     *Records and Financial Statements*.

(a)     The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company.  The Company shall also maintain all schedules to this Agreement and shall update such schedules promptly upon receipt of new information relating thereto. Notwithstanding anything in Section 18-305 of the Act, except as provided in Section 6.8(b), no Member shall have any right to review or inspect any of the books or records of the Company or receive any other Company information.

(b)     Within ninety (90) days after the end of each Fiscal Year, or as soon as reasonably practicable thereafter, the Company shall supply to each Member such Member's IRS Schedule K-1 for such Fiscal Year.

**6.9**     *Valuation of Company Assets*.

(a)     *General*.  The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.

(b)     *Binding Effect*.  The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.

**6.10**    *Officers*.  The Manager may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "**Officers**") and assign titles (including, without limitation, President, Vice President, Secretary, and Treasurer) to any such person.  Unless the Manager decides otherwise, if the title given to an Officer is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this Section 6.10 may be revoked at any time by the Manager.  An Officer may be removed with or without cause by the Manager.

## SECTION 7

## TRANSFERS AND RESIGNATIONS

**7.1**    *Transfers of Interests*.  To the fullest extent permitted by law, a Member shall not Transfer all or any portion of its Interest without the prior written consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.

**7.2**    *Resignation/Removal of a Member*.  No Member shall resign from the Company or otherwise cease to be a Member without the consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.

**7.3**    *Redemption*.  The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason.  Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion.  Such payment to the Member shall either be made in cash or pursuant to a promissory note.  Such promissory note shall:  (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion.

## SECTION 8

## DISSOLUTION AND LIQUIDATION

**8.1**    *Dissolving Events*.  The Company shall be Dissolved upon the occurrence of any of the following events:

(a)    An election in writing by the Manager to dissolve the Company;

(b)    Any time there are no members of the Company, unless the Company is continued in accordance with the Act; or

(c)     The entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

To the maximum extent permitted by the Act, the Members hereby waive their rights to seek a judicial dissolution of the Company.

**8.2     *Winding Up and Liquidation*.**

(a)     Upon dissolution of the Company, the Manager shall promptly wind up the affairs of, and liquidate the Company.  In furtherance thereof, the Manager, as the "liquidating trustee" of the Company within the meaning of the Act shall:  (i) continue to have all of the administrative and management rights and powers of the Manager (including the power to bind the Company); and (ii) be reimbursed for Company expenses it incurs.  Following dissolution, the Company shall sell or otherwise dispose of assets determined by the Manager to be unsuitable for distribution to the Members, but shall engage in no other business activities except as may be necessary to preserve the value of the Company's assets during the period of winding-up and liquidation.  At the conclusion of the winding-up and liquidation of the Company, the Manager shall:  (i) hold the books and records of the Company for not less than six years following the termination of the Company under the Act; and (ii) execute, file and record, as necessary, a certificate of cancellation or similar document to effect the termination of the Company under the Act and other applicable laws.

(b)     Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Manager.  Distributions in kind shall be valued at Fair Market Value as determined in accordance with the provisions of Section 6.9 and shall be subject to such conditions and restrictions as may be necessary or advisable to preserve the value of the property so distributed or to comply with applicable law.  Each Member actually receiving amounts pursuant to a specific distribution shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share of the total amount to be included in such distribution).

(c)     The Profits and Losses of the Company during the period of winding-up and liquidation shall be allocated among the Members in accordance with the provisions of Section 4.  If any property is to be distributed in kind, the Capital Accounts of the Members shall be adjusted with regard to such property in accordance with the provisions of Section 4.3(c).

(d)     The assets of the Company (including proceeds from the sale or other disposition of any assets during the period of winding-up and liquidation) shall be applied as follows:

(i)     First, to repay any claims and obligations of the Company, whether to third parties or the Members, in the order of priority required by law and to the creation of any reserves which the Manager, or the liquidating trustee, as applicable, reasonably deems necessary for all contingent, conditional or unmatured claims or obligations of the Company (which reserves when they become unnecessary in accordance with the Act, shall be distributed in accordance with the provisions of clause (i), below); and

(ii)    Next, to the Members in proportion to their respective positive Capital Account balances (after taking into account all adjustments to the Members' Capital Accounts required under Section 8.2(c)).

**8.3    *Deficit Restoration/Liability***.  Except as otherwise specifically provided in this Agreement, a Member shall have no obligation to restore a negative balance in such Member's Capital Account at the time of dissolution of the Company and no liability to the Company or to any other Member in respect of a negative balance in such Member's Capital Account during the term of the Company or at the conclusion of the Company's termination.

## SECTION 9

## EXCULPATION; INDEMNIFICATION

**9.1    *Exculpation***.  To the fullest extent permitted by applicable law, neither the Manager, Partnership Representative nor any Officer or Member nor any officer, director, employee, agent or Affiliate of the foregoing (collectively, the "**Covered Persons**"), shall be liable to the Company, or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Person's gross negligence or willful misconduct.

**9.2    *Indemnification***.

(a)    To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 9.2 by the Company shall be provided out of and to the extent of Company assets only, and no Member nor the Manager shall have personal liability on account thereof.

(b)    To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon the receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 9.2.

(c)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to

the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

(d)     The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Company or its members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(e)     The foregoing provisions of this Section 9.2 shall survive any termination of this Agreement.

## SECTION 10

## GENERAL PROVISIONS

**10.1    *Meetings*.**  There shall be no requirement of annual or periodic meetings of the Company's members or managers within the meaning of the Act.

**10.2    *Action Without a Meeting*.**  Any action of the Manager may be taken by written consent of the Manager.  Any consent or approval required by this Agreement to be "written" may also be made by the use of electronic transmission.

**10.3    *Entire Agreement*.**  This Agreement and the other agreements referred to herein, including any employment, services, granting or other similar agreements, contain the entire understanding among the Members, and supersede any prior written or oral agreement between them, with respect to the Company.  There are no representations, agreements, arrangements, or understandings, oral or written, among the Members relating to the Company which are not fully expressed in this Agreement (or any employment, services, granting or other similar agreements).

**10.4    *Amendments*.**  This Agreement may be amended, in whole or in part, only through a written amendment executed by the Manager.

**10.5    *Counterparts; Binding upon Members*.**  This Agreement may be executed in any number of counterparts and, when so executed, all of such counterparts shall constitute a single instrument binding upon all parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart.

**10.6    *No Third Party Beneficiaries*.**  The provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party and shall not give rise to a right on the part of any third party to require a Member to make a Capital Contribution, return distributions, or make other payments to the Company as set forth in this Agreement.

**10.7    *Notices, Consents, Elections, Etc*.**  All notices, consents, agreements, elections, amendments, demands and approvals provided for or permitted by this Agreement or otherwise relating to the Company shall be in writing and signed copies thereof shall be retained with the books of the Company.  For purposes of the following provisions of this Section 10.7, the term "notice" shall be deemed to include any notice, statement, report, consent or similar item required or permitted to be provided to one or more Persons under this Agreement or applicable law.

**10.8    *Severability*.**  In the event that any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

**10.9    *Governing Law*.**  The interpretation and enforceability of this Agreement and the rights and liabilities of the Members and the Manager as such shall be governed by the laws of the State of Delaware.  To the extent permitted by the Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Act or other applicable law.

**10.10    *Status Under the Act*.**  This Agreement is the "limited liability company agreement" of the Company within the meaning of Section 18-101 of the Act.

**10.11    *Partnership for Tax Purposes Only*.**  As set forth in Section 2.1, the Members hereby form the Company as a limited liability company under the Act.  The Members expressly do not intend hereby to form a partnership except insofar as the Company may be treated as a partnership solely for tax purposes.

**10.12    *Miscellaneous*.**  This Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective parties.  Each Member hereby specifically consents to the selection of all other Members admitted to the Company pursuant to the terms of this Agreement.

*[remainder of page intentionally left blank]*

4937-0258-2788\4

IN WITNESS WHEREOF, the parties have executed this Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, as of the date first above written.

**MEMBERS**:

CHARITABLE DAF HOLDCO, LTD.

By: _____
Name: Mark Patrick
Title: Director

**MANAGER**:

_____
Name: Mark Patrick

4937-0258-2788\4

**CDMCFAD, LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**<u>SCHEDULE A</u>**

**MEMBER INFORMATION**

**Revised:  December 18, 2024**

| Name and Contact Information | Allocation Percentage |
|---|---|
| Charitable DAF Holdco, Ltd.<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 100% |