# EXHIBIT 50

**VALUATION ANALYSIS OF
CERTAIN PARTICIPATION SHARES OF
CHARITABLE DAF HOLDCO, LTD**

**AS OF
MARCH 25, 2025**

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group





March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

**RE: *Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[1]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value.  Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60.  These factors include:

1. The nature of the business and its history from inception.

---

[1]    Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

950 E. State Highway 114 • Suite 120 • Southlake • Texas 76092 • Tel: 817.481.4901 • Fax:  817.481.4905
*www.valuescopeinc.com*

PM-1/301

Mr. Bart F. Higgins
March 26, 2025
Page 2

2.  The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3.  The book value and the financial condition of the business.
4.  The earning capacity of the business.
5.  The dividend-paying capacity of the business.
6.  Whether the enterprise had goodwill or other intangible value.
7.  The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8.  The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the DAF will continue as a going concern.[2]  The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Participation Shares.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's management shareholder ("Management"). To understand the environment in which DAF operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry.  We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances.  Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

* Balance sheet for CLO HoldCo, Ltd. as of September 30, 2024

* The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd, amended and restated as of January 24, 2024

---

[2]  The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

Mr. Bart F. Higgins
March 26, 2025
Page 3

- Information regarding the Company's history and current operations

- Historical distributions paid to the holders of the Subject Interest

- The organizational structure chart for Charitable DAF HoldCo, Ltd

- Discussions with the Company's Management

- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024

- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date

- An interview with Management regarding expectations for future distributions

- An application of appropriate valuation techniques and procedures, including the income approach

- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

Mr. Bart F. Higgins
March 26, 2025
Page 4

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

*ValueScope*

ValueScope, LLC

**TABLE OF CONTENTS**

**ENGAGEMENT OVERVIEW** ...........................................................................................**1**

DESCRIPTION OF THE ASSIGNMENT ................................................................. 1
SCOPE............................................................................................................... 1
PROCEDURES.................................................................................................... 1

**DAF OVERVIEW**........................................................................................................**2**

COMPANY OVERVIEW ...................................................................................... 2
CAPITALIZATION TABLE ..................................................................................... 2
COMPANY STRUCTURE CHART ......................................................................... 3
FINANCIAL POSITION ........................................................................................ 3
SUBJECT INTEREST OVERVIEW.......................................................................... 6

**ECONOMIC AND INDUSTRY OVERVIEW**...........................................................**8**

OVERVIEW OF THE U.S. ECONOMY .................................................................. 8
OVERVIEW OF THE PRIVATE EQUITY... & INVESTMENT VEHICLES INDUSTRY................ 16

**VALUATION METHODOLOGY** ...............................................................................**17**

VALUATION APPROACHES................................................................................. 17
VALUATION METHODS ..................................................................................... 18
SUMMARY OF THE VALUATION APPROACHES AND METHODS ...................... 18

**VALUATION ANALYSIS** ...........................................................................................**20**

INCOME APPROACH ANALYSIS ........................................................................ 20

**CONCLUSION OF VALUE - SUBJECT INTEREST**.................................................**22**

DISCOUNT FOR LACK OF MARKETABILITY ....................................................... 22
PRE-IPO STUDIES.............................................................................................. 34
APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST................ 35
DISCOUNT ADJUSTMENT DISCUSSION............................................................ 36
SUBJECT INTEREST DISCOUNT CALCULATION................................................. 37
FAIR MARKET VALUE CONCLUSION................................................................. 38

**ASSUMPTIONS AND LIMITING CONDITIONS** .................................................**39**

**APPRAISAL CERTIFICATION** .................................................................................**44**

## TABLE OF SCHEDULES

**VALUATION SUMMARY** .................................................................... **SUMMARY SCHEDULE**

**HISTORICAL FINANCIAL ANALYSIS** ..................................................................................... **A**

HISTORICAL DISTRIBUTIONS TABLE ................................................................. A.1
HISTORICAL DISTRIBUTIONS CHARTS ............................................................. A.2
CLO HOLDCO, LTD - SUMMARY BALANCE SHEET .......................................... A.3

**INCOME APPROACH** ......................................................................................................... **B**

DISCOUNTED CASH FLOW (DCF) ANALYSIS .................................................... B.1
SENSITIVITY ANALYSIS – HYPOTHETICAL RISK-FREE BOND ........................... B.2

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS** ...................................... **C**

RESTRICTED STOCK STUDIES............................................................................. C.1
RESTRICTED STOCK STUDIES SUMMARY STATISTICS...................................... C.2
DLOM QUALITATIVE SCORING ......................................................................... C.3
CALCULATION OF MARKETABILITY DISCOUNT............................................... C.4
DLOM FOOTNOTES AND COMMENTS............................................................. C.5

## ENGAGEMENT OVERVIEW

**DESCRIPTION OF THE ASSIGNMENT**

We were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[3]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**SCOPE**

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Subject Interest. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion of the fair market value of the Subject Interest.

**PROCEDURES**

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

[3]   Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

**DAF OVERVIEW**

**COMPANY OVERVIEW[4]**

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011.  Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law").  As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.  In recent periods, however, the DAF's underlying assets have been allocated across a broader and more diverse range of asset classes, including but not limited to cash and cash equivalents, public equity, private equity, private credit, real estate, and other alternative investments.

**CAPITALIZATION TABLE**

On February 7, 2025, the Company issued 318 participation shares to *DFW Charitable Foundation*, increasing the total number of participation shares to 623, composed of:

- 318 participation shares held by *DFW Charitable Foundation*
- 100 participation shares held by *Highland Dallas Foundation, Inc.*
- 100 participation shares held by *Highland Kansas City Foundation, Inc.*
- 100 participation shares held by *Highland Santa Barbara Foundation, Inc.*
- 5 participation shares held by *The Community Foundation of North Texas*

All the Company's management shares are held by Mark Patrick.

---

[4]    Based on the Company's memorandum and articles of association and information from Management.

## COMPANY STRUCTURE CHART



## FINANCIAL POSITION

The Company's only asset stems from its indirect interest in CLO HoldCo, Ltd ("CLO HoldCo"). The Company provided an unaudited balance sheet (the "Balance Sheet") for CLO HoldCo as of September 30, 2024. Based on a review of the Balance Sheet, CLO HoldCo reported total assets of $316.3 million, including $138.4 million of cash & cash equivalents, $175.3 million of other investments, and $2.5 million of other assets. CLO HoldCo reported total liabilities of $47.2 million.  CLO HoldCo has net assets of $269.1 million on its books as of September 30, 2024.  The Balance Sheet is presented below and in Schedule A.3.

### CLO HoldCo, Ltd - Summary Balance Sheet

| | Balance Sheet as of: | |
| --- | --- | --- |
| | 9/30/2024 | |
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| | | |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| | | |
| **Total Assets** | 316,257,723 | 100.0% |
| | | |
| **Total Liabilities** | 47,204,916 | 14.9% |
| | | |
| **Total Equity** | 269,052,808 | 85.1% |
| | | |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

The Company paid distributions to the Participation Shareholders of $819,050 in 2019, $619,050 in 2020, $834,450 in 2021, $968,950 in 2022, $950,881 in 2023, and $317,796 in the first three quarters of 2024.  Fourth quarter distributions were historically larger than in the first three quarters.[5]  Historical Distributions are presented in the following charts and in Schedules A.1 and A.2.

---

[5]     Distributions are typically paid a few months following the end of a quarter.  As a result, fourth quarter distributions may be paid in the first or second quarter of the following calendar year.

DAF OVERVIEW



Note: Q4 2024 distributions have not yet been paid.



**SUBJECT INTEREST OVERVIEW**

The Subject Interest consists of participation shares, which from time to time may receive discretionary cash distributions intended to support the charitable and expense goals of the holders.  The rights and limitations of the participation shares are defined by the DAF Agreement and are directly influenced by the discretion and actions of the Company's Management and directors.

The DAF Agreement grants the directors substantial discretion over distributions, share issuances, governance, and financial transparency, leaving participation shareholders with little influence over corporate decisions.  They are subject to potential dilutions, transfer restrictions, and limited access to information, with limited voting rights and no ability to amend governing documents.   Given these extensive limitations, the participation shares represent a highly restricted and passive financial interest with limited control or enforceable rights.

*Limited Rights Over Distributions*

Participation shareholders do not have:

- The right to cause, vote on, or receive pro-rata distributions.
- The right to annual, timed, or guaranteed distributions.
- The right to receive notice of distributions made to other participation shareholders.
- The ability to amend the DAF Agreement to modify distribution rights.

*Governance and Voting Limitations*

Participation shareholders do not have:

- The right to remove or appoint directors.
- The right to vote on the issuance of additional participation shares, receive notice of such issuance, or exercise pre-emption rights.
- The right to vote on or receive notice of share redemptions.

The appointed directors and Management have full control over the management, operations, and affairs of the Company (subject to requiring a two-thirds majority of the participation shareholders for any material adverse variation or abrogation of rights attached to the participation shares), including the issuance and purchase of shares on terms they determine.  Since participation shareholders do not have voting or approval rights over further issuances, additional participation shares may be issued at any time, potentially impacting the economic interests associated with existing shares (noting that

the purchase of participation shares, or issuance of further shares ranking pari passu or subsequent to the participation shares, is not regarded as causing a material adverse variation or abrogation of the rights of the participation shareholders).  Additionally, the transfer of participation shares requires director approval, and directors may reject transfer at their discretion.

### Restrictions on Meetings and Information Access

Participation shareholders do not have:

- The right to receive notice of, attend, speak at, or vote at general meetings.
- The right to inspect company records, accounts, or documents, except at the director's sole discretion (or in the very limited circumstances conferred by law).
- The ability to modify or amend the DAF Agreement in any capacity.

### Restricted Persons Clause

Certain individuals or entities may be classified as Restricted Persons, including:

- Any holder of participation shares in breach of applicable laws.
- Any holder that is not exempt from taxation under Section 501(c)(3).
- Any holder whose participation, in the opinion of the directors, could cause the Company to incur tax, legal, regulatory, administrative, or pecuniary liabilities that it would not otherwise face.

If the directors become aware that any participation shares are held by a Restricted Person, they may, by written notice, require the transfer of such shares in accordance with the DAF Agreement.

For further details, refer to Appendix A for key provisions of the DAF Agreement.

## ECONOMIC AND INDUSTRY OVERVIEW

### OVERVIEW OF THE U.S. ECONOMY

In the third quarter of 2024, the US economy expanded at a faster pace than in the second quarter.  Inflation, which peaked at 8.99% in June 2022, declined to 2.73% by November 2024, reflecting progress toward the Federal Reserve's target.  After a prolonged period of elevated interest rates to curb inflation, signs of a cooling labor market and stable prices led the Fed to cut rates by 25 basis points in December.  The rate hikes that began in 2023 initially resulted in an inverted yield curve, signaling investor concerns about an economic slowdown, but the curve has since normalized following the presidential election.  Meanwhile, US equity markets gained momentum, with major indices ending the year higher, supported by easing inflation and expectations of further monetary policy accommodation.

### Gross Domestic Product[6]

Real gross domestic product (GDP) increased at an annual rate of 3.1 percent in the third quarter of 2024, following an increase of 3.0 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected accelerations in exports, consumer spending, and federal government spending.  These movements were partly offset by a downturn in private inventory investment and a larger decrease in residential fixed investment.



---

[6]    U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2024. (Release Date: 12/19/2024).

*Population*

Population growth is an important driver of long-term growth in an economy.  The total population increased from 335.9 million in November 2023 to 337.7 million in November 2024.[7]  The working-age population (15-64) increased from 208.9 million in November 2023 to 209.0 million in November 2024.[8]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic.  It partially recovered in just several months and has been trending upward/flat.   In November 2023, the civilian labor force participation rate was 62.8% and stands at 62.5% as of November 2024.[9]





---

7   U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

8   Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

9   U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

### *Employment*

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 227,000 in November 2024 and the unemployment rate changed little at 4.2 percent. Employment trended up in health care, leisure and hospitality, government, and social assistance. Retail trade lost jobs.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.0% in November 2023 to 7.7% in November 2024.[10]





Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 4.0 percent in 2024 to 4.3 percent in 2025 and then decrease to 4.1 percent in 2027.

---

[10]    U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

### *Inflation*

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.3 percent in November on a seasonally adjusted basis, after rising 0.2 percent in each of the following 4 months. Over the last 12 months, the all-items index increased 2.7 percent before seasonal adjustment.[11]

The index for shelter rose 0.3 percent in November and was the main factor in the all items increase. The food index increased 0.4 percent in November. The index for food away from home rose 0.5 percent over the month, while the index for food at home rose 0.3 percent. The energy index fell 0.2 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, November 2023, declining from 53.20% to 5.10% in November 2024[12].The forecasters predict current-quarter headline CPI inflation will average 2.2 percent at an annual rate, down from the prediction of 2.5 percent in the previous survey[13].



---

[11]  Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[12]  Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[13]  Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* November 15, 2024.

*Interest Rates*

The interest rate on the three-month Treasury bill declined from 5.20% as of December 29, 2023, to 4.23% as of December 31, 2024.[14]  The interest rate on the ten-year Treasury note increased from 3.88% as of December 29, 2023, to 4.58% as of December 31, 2024.[15]



The interest rate on Moody's Aaa-rated corporate bonds increased from 4.65% as of December 29, 2023, to 5.40% as of December 31, 2024.[16] The interest rate on the Moody's Baa-rated corporate bonds increased from 5.49% to 6.00% over the same time.[17]



---

14   Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

15   Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

16   Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

17   Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

In the last twelve months, the yield curve transitioned from being inverted to normal, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing between December 29, 2023, to December 31,2024 from -0.59% to a positive 0.70%.[18]



### Corporate Profits

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) decreased slightly by 15 billion in the third quarter of 2024 from the second quarter of 2024.



---

[18]    U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2025.

### Stock Markets[19]

The stock markets gained momentum from December 29, 2023, to December 31, 2024. The S&P 500 Index (SPY) closed at 475.31 on December 29, 2023, and closed higher at 586.08 on December 31, 2024.  The Dow Jones Industrial Average Index (DIA) closed at 376.87 on December 29, 2023, and closed higher at 425.50 on December 31, 2024.  The NASDAQ Composite Index (QQQ) closed at 409.52 on December 29, 2023, and closed higher at 511.23 on December 31, 2024.  In the graph below, the December 30, 2022, values were set to 100.



### Construction & Housing Starts

Construction spending and housing starts are two other important indicators for the economy.  Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment.  Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy.  Housing starts decreased from 1.510 million units in November 2023 to 1.289 million units in November 2024.[20]  Construction spending, a seasonally adjusted annual figure, increased from $2.09 trillion in November 2023 to $2.15 trillion in November 2024.[21]

---

[19]  CapIQ Database, last accessed January 10, 2025.

[20]  U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[21]  U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.



*Consumer Sentiment*

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has increased from 61.30 a year ago in November 2023 to 71.80 in November 2024. Although it has increased significantly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[22] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions.  The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S.  This is considered a leading indicator of future consumer expenditures and economic activity.



---

[22]    University of Michigan, *Surveys of Consumers*, November 2024

**OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[23]**

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles.  Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments.  This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

*Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite the challenges posed at the onset of the period. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated and businesses pivoted their strategies due to the unprecedented nature of the crisis. However, as inflation was rampant in the latter part of the period, the FED increased interest rates to control high inflation, although as inflationary pressures eased in 2024, the FED cut interest rates, which will increase liquidity in financial markets. The Fed is anticipated to cut rates further in 2025, increasing liquidity and driving the shift of investments into equities from fixed-income securities. Overall, over the past five years, industry revenue grew at a CAGR of 4.2% to $310.1 billion, including an increase of 2.5% in 2025 alone. Industry profit has climbed significantly and will comprise 49.6% of revenue in the current year.

Industry revenue will grow at a CAGR of 2.7% to $353.7 billion over the five years to 2030. The Federal Reserve is anticipated to cut interest rates as inflationary pressures continue to ease. These declining interest rates will increase liquidity in the markets. Private equity firms and hedge funds will have less difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

---

[23]    IBISWorld Industry Report 52599, March 2025, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

## VALUATION APPROACHES

### Income Approach

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### Market Approach

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### Asset-Based (Cost) Approach

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

**VALUATION METHODS**

The following are common valuation methods used under the three approaches:

  A. Income Approach
       1.  Discounted Cash Flow Method (multi-period model)
       2.  Direct Capitalization Method (single period model)
       3.  Excess Earnings Method

  B. Market Approach
       1.  Guideline Public Company Method
       2.  Merger and Acquisition Method

  C. Asset-Based Approach
       1.  Reproduction Cost Method
       2.  Replacement Cost Method
       3.  Net Asset Value Method

**SUMMARY OF THE VALUATION APPROACHES AND METHODS**

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used.  When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities).  The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

However, in the case of the participation shares under consideration, the asset-based approach is not applicable.  These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.  Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director.  As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality.[24]

Given the nature of the participation shares, the income approach, specifically the discounted cash flow (DCF) method, is the most appropriate valuation methodology.[25]

---

[24]  Previous valuations conducted by ValueScope did not account for the rights of the participation shares under the applicable law, specifically that these shares confer an extremely limited enforceable claim to the entity's underlying NAV.

[25]  The market approach was considered but deemed inapplicable due to the absence of comparable transactions involving securities with characteristics similar to the participation shares.

This approach estimates the present value of expected future distributions, if any, based on reasonable assumptions regarding the manager's discretion in making such distributions. If no future distributions are expected, the value of the Subject Interest would be nominal. The DCF method captures the time value of money and the risk associated with the uncertainty of future distributions, providing a more accurate measure of the fair market value of the Participation Shares.

**VALUATION ANALYSIS**

**INCOME APPROACH ANALYSIS**

The income approach estimates the fair market value of an interest based on the present value of expected future economic benefits.  In the case of the Participation Shares, these economic benefits are exclusively tied to discretionary distributions made by the director, rather than earnings or cash flows of the DAF's underlying assets.  The approach involves forecasting expected future distributions and discounting them to present value using a rate of return that reflects the risk associated with the uncertainty and discretionary nature of these payments.  The resulting present value represents the fair market value of the Subject Interest.

### Discounted Cash Flow Method

We developed a DCF model to determine the fair market value of the Subject Interest as of the Valuation Date.  The DCF method projects the distributions that the Participation Shareholders are expected to receive.  Each projected distribution is discounted to present value using a rate that reflects the risk associated with the uncertainty and discretionary nature of these payments.

### Projected Distributions

Distributions to the holders of the Subject Interest were projected based on discussions with Management and a review of historical distributions.  Management indicated that the timing and size of future distributions will be discretionary, and that DAF does not intend to establish reserves for distributions.

Despite this discretion, Management currently intends to maintain distributions to the holders of the Subject Interest at levels consistent with those paid over the past 12 to 24 months.  We projected distributions to occur quarterly, with the next four quarters reflecting the average distribution of the corresponding quarters from the prior two years, totaling approximately $950,000.  Beyond this period, distributions were assumed to grow at an annual rate of 2.5%, consistent with expected inflation, in perpetuity.

### Cost of Equity

A cost of equity of 68.3% was applied to discount the expected discretionary distributions to the holders of the Subject Interest, reflecting their high-risk profile, extremely limited claim on underlying NAV, and absence of control over distributions.  This rate was selected based on the third quartile of required returns for pre-seed venture capital investments from the Pepperdine 2024 private capital markets report, aligning with the speculative nature of potential cash flows, significant legal and governance risks, and the

inability to force a sale or liquidity event.  The Subject Interest exhibits characteristics similar to early-stage equity investments, where cash flows are highly uncertain, illiquidity risks are substantial, and investor returns are largely dependent on discretionary managerial decisions.  Given these factors, a higher-end venture capital return benchmark was deemed appropriate.

### Conclusion – Income Approach Analysis

Based on the forecasts and methodologies presented in this analysis, the income approach indicated a minority and marketable value of the Subject Interest of $2,045,531 as of the Valuation Date.

This conclusion of value implies a discount for lack of control (DLOC) of 99.2%, calculated as the concluded marketable value of the Subject Interest divided by the NAV of CLO HoldCo.[26]

To assess the impact of the discount rate, a sensitivity analysis was performed under the hypothetical assumption that projected distributions followed the risk profile of a risk-free perpetual bond with identical expected cash flows.  In this scenario, a 4.65% discount rate, equivalent to the 30-year US Treasury yield as of the Valuation Date, was applied. Under this assumption, the minority, marketable value of the Subject Interest would be $44.7 million, resulting in an implied DLOC of 83.4%.  However, this analysis does not reflect the substantial risks associated with the Subject Interest.

---

[26]  Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls.  Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

## CONCLUSION OF VALUE - SUBJECT INTEREST

Based on the methodologies presented in this analysis, it is our opinion that the value of the Subject Interest on a minority and marketable basis, as of the Valuation Date, can reasonably be stated as $2,045,531.

## DISCOUNT FOR LACK OF MARKETABILITY

A discount for lack of marketability (DLOM) is necessary to determine the fair market value of the Subject Interest, as it cannot be readily sold or liquidated in an active market. The absence of a public exchange and transfer restrictions further constrain liquidity.  A review of restricted stock studies was conducted to support the DLOM, examining the price differences between freely traded shares and comparable shares with resale restrictions.  These studies provide empirical evidence of the impact of illiquidity on value, reinforcing the rationale for applying a marketability discount.

### *Restricted Stock Studies*

The restricted stock studies reviewed included data from 1966 through 2010.  The studies analyzed the difference in prices between publicly traded stock and restricted stocks of the same entity.  The restricted stocks were identical to the traded stock except for marketability.  A summary of the mean and median discounts of the restricted stock studies is presented in the following figure.

**Summary of Restricted Stock Studies**



### SEC Institutional Investor Study[27]

The SEC Institutional Investor Study is a comprehensive restricted stock study with 398 transactions from January 1, 1966, through October 22, 1969.  The study analyzed differences in discounts based on the following categories: trading market, type of institution purchasing the security, transaction size, sales of the issuer, and earnings of the issuer.  The study found significant differences in discounts for type of exchange, sales, and earnings of the issuer.  Stocks listed on the major exchanges had lower

---

27    U.S. Securities and Exchange Commission, "Institutional Investor Report," 92nd Congress, 1st Session, House Documents No. 92-4, Part 5, 1971.

discounts than smaller exchanges and over-the-counter stocks.  The study found higher discounts for companies with smaller sales and lower earnings.

### Johnson & Racette Study[28]

Richard Johnson and George Racette performed a study on restricted securities purchased by registered investment companies between 1967 and 1973.  The study included 86 observations sent from 75 investment companies that met the selection criteria.  Johnson and Racette's analysis indicated an average marketability discount of 34%, in line with the range with the most common observations of 30-40%.

### Gelman Study[29]

Milton Gelman of National Economic Research Associates, Inc. conducted a study of 89 restricted stock transactions executed by four investment companies from 1968 to 1970.  The investment companies were formed in 1968 to specialize in restricted securities.  A significant portion of the funds of the investment companies were invested in restricted stock transactions consisting of shares of large and small companies listed on large and small exchanges, over the counter, purchased directly from the companies, or from selling stockholders.   Gelman's analysis found mean and median discounts of approximately 33%.  In addition, 59% of the transactions had discounts of 30% or more and 36% of the transactions had discounts of 40% or more.

### Trout Study[30]

Robert R. Trout, a principal of Trout, Shulman & Associates, analyzed 60 transactions involving the purchase of restricted stock by mutual funds from 1968 to 1972.  Trout performed a regression analysis to determine the relationship between discounts and certain variables such as exchange listing, number of shares outstanding, and transaction size relative to total outstanding shares.  Trout's findings suggested an intercept or implied mean and median discount of 43.5%.

---

[28]   Richard D. Johnson and George A. Racette, "Discounts on Letter Stock Do Not Appear to Be a Good Base on Which to Estimate Discounts for Lack of Marketability on Closely Held Stocks," *Taxes—The Tax Magazine*, August 1981, 574-581.

[29]   Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company," "*The Journal of Taxation*, June 1972, 353-354.

[30]   Robert R. Trout, "Estimation of the Discount Associated With the Transfer of Restricted Securities," *Taxes—The Tax Magazine*, June 1977, 381-385.

**Moroney Study[31]**

Robert E. Moroney of Moroney, Beissner & Co. in Houston presented his restricted stock study to the Texas CPA Tax Institute in November 1972. The study was subsequently published in 1973. The analysis focused on 146 transactions in restricted securities by 10 registered investment companies. The discounts ranged from a 30% premium to a 90% discount with a mean and median discount of 35.8% and 32.8%, respectively.

**Maher Study[32]**

Michael Maher, a former estate and gift tax agent with the Internal Revenue Service, published his study results in 1976. The study observed discounts for 34 restricted stock transactions from 1966 to 1973. The results of his study suggested a mean discount for his total and adjusted analyses of 35.4% and 34.7%, respectively.

**Standard Research Consultants Study[33]**

A 1983 study by two Standard Research consultants, William F. Pittock and Charles H. Stryker, CPA, observed discounts relating to 28 private placements of common stock from October 1978 to June 1982. The discounts varied from 7% to 91% with a median of 45%. The results of the study tend to suggest higher discounts for companies with smaller revenues.

**Wruck Study[34]**

Karen Wruck's Harvard University study on firm value analyzed 83 sales of unregistered securities from 1979 to 1984, 37 of which were observable and included in the study's sample. On average, the offering price of the unregistered securities was set at 86.5% of the market price of the stock on the day before the announcement, indicating a discount of 13.5%. The median discount indicated was similar at 12.2%.

---

[31]    Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes—The Tax Magazine*, March 1973, 144-155.

[32]    J. Michael Maher, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes—The Tax Magazine*, September 1976, 562-570.

[33]    William F. Pittock and Charles H. Stryker, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, 1-3, cited in Quantifying Marketability Discounts by Z. Christopher Mercer, 63.

[34]    Karen H. Wruck, "Equity Ownership Concentration and Firm Value, Evidence From Private Equity Financings," *Journal of Financial Economics*, Vol. 23. 1989, 3-1.

**FMV Opinions Study[35]**

The FMV Study included over 230 transactions from 1980 through April 1997, the date of the most recent amendment of Rule 144.  The mean and median discounts were 22.3% and 20.1%, respectively.   The authors of the study made the following generalization regarding their analysis:

- Companies with higher revenues resulted in lower discounts and vice versa
- Companies with unrestricted stock traded on exchanges exhibited lower discounts
- Discounts were higher for blocks exceeding 10% of ownership
- Discounts for companies with capitalization under $50 million ranged from 30% to 40%

**Barclay, Holderness, Sheehan Study[36]**

Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan's study observed private placements of large-percentage blocks of stock from 1980 to 1996.  Specifically, the study analyzed private placements to a variety of different types of investors, namely active investors, passive investors, and management.  Active investors were found to be willing to pay higher prices in their placements, indicating lower discounts, while management placements had the highest discounts, although they were found to not have a statistically significant difference from private placements.  In total, the average discount across all private placements was 18.7% while the median discount was 17.4%.

**Hertzel & Smith Study[37]**

A 1993 study by Michael Hertzel and Richard L. Smith analyzed private placements between 1980 between 1987.  The study's sample included private placements of 106 companies listed on the NYSE and AMEX exchanges as well as OTC firms.  While the mean and median indicated discounts were 20% and 13%, respectively, more than 35% of the private placements observed had discounts greater than 25%.

---

[35]  Hall, Lance S., and Timothy C. Polacek, "Strategies for Obtaining the Largest Valuation Discounts," *Estate Planning*, January/February 1994. pp. 38-44.

[36]  Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan, "Private Placements and Managerial Entrenchment," *The Journal of Corporate Finance*, 2007, Vol. 13, Issue 4, 461-484.

[37]  Michael Hertzel and Richard L. Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," *The Journal of Finance*, Vol. 48, No. 2. June 1993, 459-485.

**Management Planning Study[38]**

Management Planning, Inc.  published the results of a study performed from 1980-1996 by Robert P. Oliver, ASA and Roy H.  Meyers, ASA, CFA.  They started with a base on 231 transactions and looked at discounts from the total sample, discounts from 53 transactions without registration rights, and discounts from 27 transactions with registration rights.  A summary of the mean and median discounts from their study is presented in the following table.

**Results of Management Planning Study**

| Discount | Entire Sample of 231 Transactions | 53 Transactions without Registration Rights | 27 Transactions with Registration Rights |
|----------|-----------------------------------|---------------------------------------------|------------------------------------------|
| Low | N/A | 3.0% | N/A |
| Mean | 29.0% | 27.0% | 12.8% |
| Median | 28.0% | 25.0% | 9.1% |
| High | N/A | 58.0% | N/A |

The authors cite the difference between discounts with and without registration rights as evidence of the lack of marketability on an investment.  Certain factors were also cited by the authors as the most influential in determining discounts.  The factors include:

- Companies with higher revenues tend to have lower discounts
- Companies with higher earnings tend to have lower discounts
- Higher per share prices tend to have lower discounts
- Lower price volatility tends to result in lower discounts
- Block sizes representing a higher percentage of average trading volume tend to have higher discounts
- Large dollar blocks tend to have lower discounts

**Hertzel, Lemmon, Linck, Rees Study[39]**

A 2001 study by Michael Hertzel, Michael Lemmon, James Linck, and Lynn Rees analyzed private placements from 1980 to 1996.  A total of 619 private placements were ultimately selected for the sample, which primarily consisted of small-cap, technology companies as 79% of the sample companies were traded on the NASDAQ exchange and the mean market value of equity for the companies was $188 million.   Of the 619 private

---

[38]   A Study by Management Planning Inc. published in Z. Christopher Mercer, "Analysis of Restricted Stocks of Public Companies 1980-1995," *Quantifying Marketability Discounts*, Peabody Publishing, 1997, Chapter 12, 345-370.   Retrieved from John J. Stockdale Sr., *BVR's Guide to Discounts for Lack of Marketability*. 5th ed. Vol. 1. Portland, OR: Business Valuation Resources, LLC, 2013.

[39]   Michael Hertzel, Michael Lemmon, James S. Linck, and Lynn L. Rees, "Long-Run Performance Following Private Placements of Equity," workpaper, Dec. 21, 2001.

placements in the sample, 404 had sufficient information and disclosures to determine relevant discounts. The study indicated a mean discount of 16.5% and a median discount of 13.4%.

**Wruck & Wu Study[40]**

A study by Karen Wruck and YiLin Wu in 2008 supplemented Ms. Wruck's 1989 study and analyzed private placements of companies between 1980 and 1999. 1,976 private placements were selected in the sample. Of these, 1,854 had data for observed discounts. The study found a mean discount of 11.33% and a median discount of 10.96%.

**Angrist, Curtis, Kerrigan (MPI) Study[41]**

A study by Ezra Angrist, Harry Curtis, III, CFA, ASA, and Daniel Kerrigan, CFA in 2011 grouped a total of 402 transactions of unregistered stock into four groups based on the timing of the issuances in respect to the changes in holding period restrictions per Rule 144 as follows:

**Results of Angrist, Curtis, Kerrigan (MPI) Study**

| Period | Observations | Mean Discount | Median Discount |
|---|---|---|---|
| Pre-1990 | 79 | 30.5% | 32.3% |
| 1990 - Apr 1997 | 110 | 25.1% | 22.5% |
| May '97 - Feb '08 | 164 | 20.8% | 16.6% |
| Feb '08 - Dec '08 | 49 | 5.9% | 5.0% |
| Total | 402 | 22.1% | 19.6% |

Results of the study show that as restriction periods have declined, so have discounts.

**Willamette Management Associates Study[42]**

Willamette performed an analysis of 33 private placements of restricted stock from January 1, 1981 through May 27, 1984. There was a brief overlap in the latter part of the period included in the Standard Research Consultants Study. The Willamette study resulted in a mean discount of 31.2%.

---

[40] Karen H. Wruck and Yi Lin Wu, "Business Relationships, Corporate Governance, and Performance: Evidence From Private Placements of Common Stock," *Journal of Corporate Finance*, 15, 2009, 30-47.

[41] Ezra Angrist, Harry Curtis III, and Daniel Kerrigan, "Regression Analysis and Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 30, No. 1 Spring 2011, 36-48.

[42] Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business*, 2nd edition, 247.

**Silber Study[43]**

William L.  Silber, a professor of finance and economics at the Stern School of Business at New York University analyzed 69 private placements from 1981 through 1989.  Silber's study results ranged from a 12.7% premium to an 84% discount with a mean discount of 33.8%.  Silber also cited in his findings that discounts are larger when the block of restricted stock is large relative to the total shares outstanding and the dollar size is inversely related to the discount.

**Krishnamurthy, et al. Study[44]**

Srinivasan Krishnamurthy, Pual Spindt, Venkat Subramaniam, and Tracie Woidtke's 2001 study analyzed private placements from 1983 to 1992.  The study performed different discount calculations for the following classifications: 1) restricted shares, 2) shares with registration pending, 3) shares not known to be restricted, and 4) shares with pending registration or not known to be restricted (groups 2 and 3 combined).  The mean discounts for Groups 1-4 were 34.0%, 23.3%, 15.4%, and 16.0%, respectively.  The overall mean discount was 19.4%.

**Wu Study[45]**

YiLin Wu's study on private placements was published in the Journal of Financial Economics in 2004.  The study analyzed 301 private placements taking place from 1986 to 1997.  Mean and median discounts of 8.7% and 19.8%, respectively, were observed.

**Bajaj Study[46]**

The Bajaj study expands on previous restricted stock studies, namely by Wruck and by Hertzel and Smith.  This study analyzed 88 private placements occurring between 1990 and 1995.  The 88 observations revealed results ranging from a premium of approximately 14% to a discount of 68%, with mean and discounts of 22% and 21%, respectively.  The authors note four characteristics to consider regarding the target firm and private placement itself when analyzing discounts: the percentage of total shares offered, business risk, financial distress, and total proceeds.

---

[43]  William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, 60-64.

[44]  Srinivasan Krishnamurthy, Paul Spindt, Venkat Subramaniam, and Tracie Woidtke, "Does Investor Identity Matter in Equity Issues? Evidence From Private Placements," *Journal of Financial Intermediation*, 14, 2005, 210–238.

[45]  Yi Lin Wu, "The Choice of Equity Selling Mechanisms," *Journal of Financial Economics*, 74, 2004, 93-119.

[46]  Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law*, Vol. 27, Fall 2001, 89-115.

**Johnson Study (Business Valuation Review)**[47]

Bruce A. Johnson, ASA of Munroe, Park & Johnson conducted a restricted stock study from 1991 to 1995.  The study included 72 private placements with results varying from a 10% premium to a 60% discount with a mean discount of 20%.  Johnson also cited four important factors to consider when evaluating potential discounts: positive net income, sales volume, transaction value, and net income strength.

**Finnerty Study**[48]

John D. Finnerty, professor of finance at Fordham University, performed two studies to compare the impact of the changes in law regarding restriction periods for private placements that occurred in 1997 and 2008.  The first study focused on private placements from 1991 to 1997 and resulted in mean and median discounts of 26% and 20%, respectively.  The second study focused on private placements from 1997 to 2008 and resulted in mean and median discounts of 22% and 16%, respectively.

**Chaplinsky Purchase Discount and Warrant Study**[49]

Susan Chaplinsky's and David Haushalter's 2010 study analyzed private placements with a concentration on contract terms.  The study asserts that companies that are riskier and have poorer performance more commonly have private placement contracts with contingency terms rather than just offering a pure discount.  The indicated mean discount considering only the purchase discount was 19%, and the median was 15%.  The indicated mean discount considering purchase discounts as well as warrants was 17%, and the median was 14%.

**Brophy PIPE Study**[50]

David J. Brophy, Paige P. Ouimet, and Clemens Sialm of the University of Michigan performed a 2006 study that compared the effects of issuing private placements to hedge fund investors versus other investors.  The study indicated a mean discount of 14% when private placements were issued to hedge funds, but the mean discount when the issuance involved other investors was just 9%.

---

[47]   Bruce A. Johnson, "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 18, No. 4, December 1999, 152-155.

[48]   John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," *The Journal of Derivatives*, April 19, 2012, 53-69.

[49]   Susan Chaplinsky and David Haushalter, "Financing Under Extreme Risk: Contract Terms and Returns to Private Investments in Public Equity," *Review of Financial Studies*, 2010, 23 (7), 2,789-2,820.

[50]   David Brophy, Paige Ouimet, and Clemens Sialm, "Hedge Funds as Investors of Last Resort?" workpaper, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=782791.

**Columbia Financial Advisors Study[51]**

This study focused on the effect of the Rule 144 holding period reduction to one year. The study considered two periods: January 1, 1996, to April 30, 1997, and May 1, 1997, to December 31, 1998.  The one-year holding period became effective April 29, 1997.  A summary of the study results is presented in the following table.

**Summary of Columbia Financial Advisors Study**

|  | January 1, 1996 to April 30, 1997 | May 1, 1997 to December 31, 1998 |
|---|---|---|
| Number of Transactions | 23 | 15 |
| Low | 0.8% | 0.0% |
| Mean | 21.0% | 13.0% |
| Median | N/A | 9.0% |
| High | 67.5% | 30.0% |

**Meidan Study[52]**

Danny Meidan's 2006 study observed PIPE transactions between 1996 and 2003.  The study categorized a total of 1,726 total private placement transactions into three groups: placements issued at discounts greater than 30%, placements issued between a 30% discount and 5% premium, and placements issued at a premium greater than 5%.  The majority of these transactions fell into the 30% discount to 5% premium category at 1,278 placements, or roughly 74% of the total sample.  The weighted average of the mean discounts was calculated as 9.8%.

**Verdasca Study[53]**

Andrew Verdasca of the Leonard N. Stern School of Business of New York University performed a 2007 study on a sample of 771 private placement transactions.  The study found a discount range from a 78% discount to a 93% premium, but both the mean and median results indicated discounts of approximately 10%.

---

[51]  Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-Year Holding Period," *Shannon Pratt's Business Valuation Update*, Vol. 6, No. 5, May 2000, 1-5.

[52]  Danny Meidan , "The Informativeness of Offer Characteristics Versus Investor Identity in PIPE Transactions," April 2, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=894689.

[53]  Andrew Verdasca , "Common Stock PIPE Discounts and Long-Term Performance," April 2, 2007, www.stern.nyu.edu/cons/groups/content/documents/webasset/uat_024319.pdf.

**Billett & Floros Study[54]**

Matthew T. Billett and Ioannis V. Floros' 2012 study focuses on two key features of financial relationships, contract terms and investor identity, in regard to private placements between 2001 and 2008.  These factors were found to both complement and substitute for the other depending on individual circumstances.  By analyzing 12,004 transactions in the PlacementTracker and PrivateRaise databases, the study concluded a median discount of 26.7%.

**Stout Risius Ross Study[55]**

Aaron M. Stumpf, CPA/ABV, Robert L. Martinez, and Christopher T. Stallman of the valuation firm Stout Risius Ross performed a study of restricted stock transactions from September 2005 through May 2010, focusing on discounts associated with shorter holding periods.  The chosen time period includes transactions both before and after Rule 144 implementation.  The study found that for all transactions considered, the average and median discounts were 10.9% and 9.3%, respectively.  Stout Risius Ross also found that the most significant and reliable factors influencing discounts were subject company volatility, block size, dividends, profitability, growth, and size.

**Harris-Trugman Study[56]**

William Harris, AM of Trugman Valuation Associates, Inc.'s study was performed to analyze the impact of the economic recession on implied restricted stock discounts and the statistical relationships between implied restricted stock discounts and various company-specific variables.  The study originally included 80 transactions of restricted stock sales that took place in 2007-2008.  Due to the volatility of the Rule 144 holding period implementation, an additional 56 transactions were included in 2011.  For the 47 transactions that took place prior to Rule 144 implementation, the average and median discounts were 17.9% and 14.8%, respectively.  The 89 transactions analyzed after the rule implantation had average and median discounts of 15.9% and 14.3%, respectively.  The overall group indicated mean and median discounts of 16.6% and 14.3%, respectively.  The Harris-Trugman study noted that the only company-specific variable that had a notable statistical relationship with the implied discounts was volatility.

---

[54]    Matthew Billett and Ioannis Floros, "Do Investor Identity and Contract Terms Interact? Evidence From the Wealth Effects of Private Placements," workpaper, April 2012, papers.ssrn.com/sol3/papers.cfm?abstract_id=1784498.

[55]    Aaron Stumpf, Robert Martinez, and Christopher Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions From September 2005 Through May 2010," *Business Valuation Review*, Vol. 30, No. 1, Spring 2011, 36-48.

[56]    William Harris, "Trugman Associates, Inc. (TVA) Restricted Stock Study—An Update," *Business Valuation Review*, Vol. 30, No. 4, Winter 2011, 132-139.

**Summary of Restricted Stock Studies**

The restricted stock studies previously mentioned were performed based on data from 1966 to 2010.  Reported mean discounts range from 8.7% to 35.6%.  The average of reported mean discounts was 20.8%, while the median was 19.4%.   Reported median discounts range from 9.0% to 45.0%.  The average of reported median discounts was 19.9%, while the median was 15.3%.

Some of the variation in the studies has to do with the specific periods analyzed.  Prior to April 1997, the SEC-required holding period for restricted stocks was two years.  That was decreased to one year on April 29, 1997.  Similarly, the holding period was reduced from one year to six months effective February 15, 2008.

The following table shows the summary statistics for studies based upon the period studied.

**Analysis of Restricted Stock Studies for Different Periods**

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

The studies also cited several company and security specific factors in determining the estimated discount.

**PRE-IPO STUDIES**

In recent years, a number of pre-IPO studies were performed to support marketability discounts.  The methodology applied in these studies is based on the initial offering price (the price prior to public trading).  This price is reduced by the price per share at the time of the last private transaction (which must be less than five months prior to the initial offering to qualify for the study) and adjusted by an appropriate index to account for related market or sector movements over the five-month period.  The resulting amount is divided by the initial offering price to arrive at the appropriate discount.  The pre-IPO methodology of determining marketability discounts is a relevant method as private stockholders experience an inability to freely sell their stock in the open market, similar to restricted stockholders.  Furthermore, private stockholders differ from unrestricted public stockholders, much like restricted stockholders, because there is not a public forum in which investments can be easily liquidated (which is only one of the differences between private and public stockholders).

*Emory Studies*

John Emory, Sr., ASA began his pre-IPO studies with Baird & Co. and continued his studies with his own firm, Emory Business Valuation, LLC.  Emory has completed nine studies with the original published in June 1986.  The first eight studies eliminated development-stage companies, companies with historical operating losses and companies with IPO prices less than $5 per share.  The ninth study deviated from the previous studies as follows:

- Included only companies with "com" in their names

- Review period was increased from 18 months in the previous studies to 35 months

- All transactions were actual sales as opposed to the previous studies that included options

- Most of the companies did not have earnings

The study consisted of 53 transactions.  The mean and median discounts by study are presented in the following chart.

CONCLUSION OF VALUE - SUBJECT INTEREST



### Willamette Management Associates Pre-IPO Study

This study observed 556 companies and 1,007 transactions from 1975 through 1997. The adjusted mean discount[57] for each time period varied from 28.9% to 56.8%. The mean for the entire review period was 44.2%. The median discount range was from 31.8% to 73.1% with the overall median at 50.4%. The Willamette study found the standard mean discount was greater than 35% for all but three of the 14 periods in the study and that median discounts exceeded 40% in all but one year.

### Valuation Advisors Pre-IPO Study

Two studies were conducted by Valuation Advisors for the calendar years of 1999 and 2000. The mean discount of these studies was 48.9%. The key feature of this study was the inclusion of holding period based upon the length of time between the private transaction and the IPO. The study confirmed the author's initial hypothesis that higher discounts accompany longer holding periods.

### APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST

While there are potential application problems associated with various studies, especially the pre-IPO studies, a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest. The mean and median discounts from the restricted stock studies ranged from 9% to 45%. The findings of the restricted stock studies as well as additional private placement studies by Hertzel and Smith suggest discounts can vary greatly depending on size, profitability and other company or security specific factors.

---

[57]   Excluded highest and lowest deciles of indicated discounts

The latest restricted stock studies indicate mean and median marketability discounts in 14% range.  We view the latest restricted stock studies as shorter term and therefore have taken the full sample of restricted stock studies into account in our analysis.  Our analysis compares these interests to the comparable transactions and makes adjustments from the baseline discounts noted in the comparable transactions.  Since the latest one-year study does not measure restricted securities with similar hold periods relative to the vast majority of other discount studies and since it has a relatively small sample size, we relied upon all the restricted stock studies' findings as the basis for our comparison.

The pre-IPO studies may be less indicative of appropriate marketability discounts, as much of the differences in the transaction prices between pre-IPO and IPO may include event premiums, such as the securing of additional capital which promotes the viability of the company.  We did not use these studies for our analysis.

### *Factors Affecting Marketability*

Based on the SEC Study, we noticed that as company size and profitability decreases, the marketability discount associated with restricted stock in these companies increase.  We also note that various other factors affected discounts observed in the other studies.  Most notably, the following affect marketability discounts:

- Increase in dividend payment decreases marketability discounts
- Increase in the size of interest and amount of control decreases discounts
- Increase in financial strength of the company decreases discounts
- Increase in restrictions increases marketability discounts

Given the characteristics of size, lack of distribution history, etc., we concluded a 20.8% marketability discount, with a standard deviation of 8.2%, as the baseline observed from all the restricted stock studies we reviewed.

### DISCOUNT ADJUSTMENT DISCUSSION

In the following sections, we adjust the marketability discount to reflect the attributes of the Subject Interest.

The analysis originates with the baseline discount concluded in the previous section.  Then, our analysis reviews several factors that affect marketability for both the interests being valued and the comparable interest which provides the base of comparison.  Each interest is assigned a ranking from 1 to 5 (from Poor to Strong) based upon the respective feature.  Then, the feature ranking for the Subject Interest is subtracted from the feature ranking from the comparable interest.  This results in a range of outputs from -4 to +4

(from significantly worse to significantly better). The output is then multiplied by the standard deviation of the restricted stock studies (lack of marketability) to give an indication as to the adjustment necessary to the baseline discount based upon this feature. An importance factor (from low to high) is also attributed to each feature to provide a final scaling factor for the specific feature.

Once the individual feature scaling factors are computed, the baseline discounts are adjusted upward and downward by multiplying the baseline discount by the product of all relevant feature scaling factors.

## SUBJECT INTEREST DISCOUNT CALCULATION

### *Adjustment Analysis – Marketability*

The Subject Interest is characterized by a lack of rights and, is therefore, somewhat riskier and more volatile. The Participation Shares have restrictions on the transfer of their shares and only have a claim in respect of the underlying assets in a winding up.

The 20.8% baseline lack of marketability discount of the comparable investments reflects the discount that would apply to the Subject Interest if it had illiquidity features similar to restricted stock. Since the Subject Interest did not exhibit these exact characteristics, further adjustments were necessary to conclude fair market value.

Schedule C.3 summarizes the differences between the Subject Interest and the comparable investments used in our analysis. Overall, these factors resulted in a modest decrease in the discount from the baseline.

Based on the analyses and procedures outlined herein, we concluded that a lack of marketability discount of 20.0% is appropriate for the Subject Interest.

**FAIR MARKET VALUE CONCLUSION**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

Our conclusion of value implies an expected payback period of 1.27 years for the Subject Interest. Our conclusion of value is presented in the Summary Schedule as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, LLC is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated.  They should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever.  Notwithstanding the foregoing, the valuation report and its contents may be disclosed to third parties, including potential investors, acquirers, and advisors, to establish the fair market value of the Company or in connection with transactions involving the Company, without requiring prior written consent from ValueScope, LLC.  Additionally, the Company may distribute this report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, LLC, and we shall have no responsibility for any such unauthorized change.

The valuation report has been prepared based on specific assumptions, methodologies, and data outlined herein.  This report may be used alongside other appraisals or studies for comparative or analytical purposes.  The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts.  The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, other than as expressly permitted herein, without the express written consent of ValueScope, LLC.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership.  This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement.  If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, LLC must be made in advance. ValueScope, LLC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s).  We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title.  No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated.  We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks.  We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted.  Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA).  We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

**REGULATORY AND ENVIRONMENTAL CONSIDERATIONS**

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities.  Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount.  Such matters, if any, are noted in the report.  To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

**POTENTIAL FUTURE SALES**

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided.  An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time.  Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement.  Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement.  In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

**APPRAISAL CERTIFICATION**

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.

2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.

5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

8. This report and analysis were prepared under the direction of Steven C. Hastings.

9. I am in compliance with all professional appraisal certifications and licensing.

10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.


By:    ValueScope, LLC


Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, LLC

**APPENDIX A**
**KEY DAF AGREEMENT PROVISIONS**

1. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restriction whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided. [Paragraph 7, Memorandum]

2. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   a. issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

   b. and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued. [Article 7]

3. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, establishing and designated (or re-designated as the case may be) and the variations in the relative rights (including without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligation as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution. [Article 8]

4. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether

absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerages as may be lawful on any issue of Shares. [Article 9]

5.  The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason. [Article 10]

6.  Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote in general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles. [Article 12]

7.  Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes. [Article 13]

8. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares raking *pari passu* with or subsequent to them or the redemption of purchase of any Participating Shares of any Class by the Company. [Article 14]

9. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws. [Article 18]

10. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles. [Article 21]

11. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution. [Article 65]

12. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed. [Article 72]

13. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article. [Article 77]

14. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor. [Article 100]

15. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors. [Article 101]

APPENDIX A:  KEY DAF AGREEMENT PROVISIONS

16. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rate basis as to the paid-up or par value of the Shares. [Article 105]

17. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions and regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors of by Ordinary Resolution. [Article 110]

## APPENDIX B
## QUALIFICATIONS OF THE APPRAISER

### Steven C.  Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA
### Principal
### shastings@valuescopeinc.com, 817-481-4901

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

## EMPLOYMENT HISTORY

*2006 – Present*                                                                        *ValueScope, LLC*

*Principal*
Mr.  Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis.  As a CPA with significant valuation and financial reporting experience, Mr.  Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

*2001 – 2006*                                                                           *Value Capital, LLC*

*Principal*
Mr.  Hastings served as a principal with Value Capital, LLC.  During his tenure at Value Capital Mr.  Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries.  He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions.  His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000*                                        *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner.  As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets.  Mr.  Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations.   He was

instrumental in assisting the Savings and Loan Department in writing new Mortgage Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001*                                                        *MedCare Financial Solutions, Inc.*

*President*

Mr.  Hastings served as an officer of MedCare Financial Solutions, Inc.  and MedCapital Funding Corporation.   MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers.  MedCare Financial Solutions provided other financial and operational services to health care providers.   These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending.  Mr.  Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

*1986 – 1994*                                                        *H.D.  Vest Financial Services*

*Executive Vice President and CFO*

As executive vice president and CFO of H.D.  Vest Financial Services, Mr.  Hastings assisted in placing over $1.5 billion annually in investment.  Responsible for day-to-day financial operations and capital structuring, Mr.  Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers.  Mr.  Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr.  Hastings supervised stockbrokers' and investment advisors' day-to-day activities.  As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies.  Being licensed in life, disability, health, property and casualty insurance, Mr.  Hasting was instrumental in implementing this line of business at HD Vest.

*1979 – 1986*                                                        *Arthur Andersen & Co.*

*Senior Manager*

Mr.  Hastings served as a senior manager with significant responsibilities in the several industries.  He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona

Bachelor of Science - Indiana University, Bloomington, Indiana
**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.
- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C.  Docket No.  30515-09, Nancy Sue Hawk, Transferee, Petitioner v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C.  Docket No.  3030-14, Red River Ventures, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C.  Docket No.  1045-13, Estate of Jinana M.  Bowey, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C.  Docket No.  8401-13, Estate of Edward S.  Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Economic interest in a corporation for gift tax purposes.
- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C.  Docket No.  223630-12, Michael Tricarichi, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C.  Docket No.  6936-10, et al, John M.  Alterman, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No.  8097-13, *Sumner Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Economic interest in a corporation for gift tax purposes.*
- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No.  20177-11, *Richard H.  Cullifer, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.*
- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.
- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.
- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.
- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.
- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America.  Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No.  4:16-cv-03302, ALPC Services of Texas, Inc.  v.  United States of America and Internal Revenue Service.  Valuation issues report, 2017.
- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No.  12-844, *The Estate of David W.  Longaberger v. The United States.*  Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al.  Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.
- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al.  Fraudulent transfer, solvency and economic damages.
- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.
- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No.  CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al.  Economic damages related to lost wages.
- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No.  2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.
- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No.  14-671C.  Always at Market, Inc.  v.  United States of America (DOD/DOJ).  Army & Air Force Exchange Service economic damages.
- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No.  CV-05-1483, General Medicine, PC v.  Healthsouth Corporation v.  General Medicine, PC.  Economic damages related to contract dispute.
- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International


**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v.  Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

**SCHEDULES**

**Charitable DAF HoldCo, Ltd**
**Table of Contents**

**Valuation Date: March 25, 2025**

## Table of Contents

| Schedule Name | Schedule |
|---|---|
| **Valuation Summary and Conclusion** | Summary Schedule |
| | |
| **Historical Financial Analysis** | |
| Historical Distributions Table | Schedule A.1 |
| Historical Distributions Charts | Schedule A.2 |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.3 |
| | |
| **Income Approach** | |
| Discounted Cash Flow (DCF) Analysis | Schedule B.1 |
| Sensitivity Analysis - Hypothetical Risk-Free Bond | Schedule B.2 |
| | |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Restricted Stock Studies | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.2 |
| DLOM Qualitative Scoring | Schedule C.3 |
| Calculation of Marketability Discount | Schedule C.4 |
| DLOM Footnotes and Comments | Schedule C.5 |

**Charitable DAF HoldCo, Ltd**
**Valuation Summary and Conclusion**

**Summary Schedule**
**Valuation Date: March 25, 2025**

*Synthesis of Fair Market Value*

| Fair Market Value Summary | | |
| --- | --- | --- |
| | Value | Reference |
| **Income Approach** | | |
| Value of Subject Interest, Minority, Marketable | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability        20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | $1,637,192 | |
| Total Subject Interest Shares | 305 | |
| **Fair Market Value per Share** | **$5,368** | |

| Subject Interest Valuation Breakout | | |
| --- | --- | --- |
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

Schedule A.1
Valuation Date: March 25, 2025

*Historical Distributions Table*

| | Quarterly Distributions - Previous 5 Years | | | | |
|---|---|---|---|---|---|
| Organization | Highland Dallas Foundation, Inc. | Highland Kansas City Foundation, Inc. | Highland Santa Barbara Foundation, Inc. | The Community Foundation of North Texas | Total |
| Holding | 100 Participation Shares | 100 Participation Shares | 100 Participation Shares | 5 Participation Shares | 305 Participation Shares |
| 31-Mar-19 | 39,750 | - | 51,000 | - | $90,750 |
| 30-Jun-19 | 39,438 | - | 50,688 | - | 90,125 |
| 30-Sep-19 | 36,813 | - | 48,063 | - | 84,875 |
| 31-Dec-19 | 231,738 | - | 53,313 | - | 553,300 |
| 2019 Subtotal | $347,738 | $168,250 | $203,063 | $100,000 | $819,050 |
| 31-Mar-20 | 25,750 | - | 37,000 | - | 62,750 |
| 30-Jun-20 | 27,625 | - | 38,875 | - | 66,500 |
| 30-Sep-20 | 27,125 | - | 38,375 | - | 65,500 |
| 31-Dec-20 | 162,738 | 120,250 | 41,313 | 100,000 | 424,300 |
| 2020 Subtotal | $243,238 | $120,250 | $155,563 | $100,000 | $619,050 |
| 31-Mar-21 | 33,188 | - | 44,438 | - | 77,625 |
| 30-Jun-21 | 40,063 | - | 51,313 | - | 91,375 |
| 30-Sep-21 | 43,063 | - | 54,313 | - | 97,375 |
| 31-Dec-21 | 236,513 | 176,250 | 55,313 | 100,000 | 568,075 |
| 2021 Subtotal | $352,825 | $176,250 | $205,375 | $100,000 | $834,450 |
| 31-Mar-22 | 46,438 | - | 57,688 | - | 104,125 |
| 30-Jun-22 | 52,438 | - | 63,688 | - | 116,125 |
| 30-Sep-22 | 50,750 | - | 62,000 | - | 112,750 |
| 31-Dec-22 | 285,013 | 191,750 | 59,188 | 100,000 | 635,950 |
| 2022 Subtotal | $434,638 | $191,750 | $242,563 | $100,000 | $968,950 |
| 31-Mar-23 | 48,313 | - | 59,563 | - | 107,875 |
| 30-Jun-23 | 45,750 | - | 57,000 | - | 102,750 |
| 30-Sep-23 | 47,688 | - | 58,938 | - | 106,625 |
| 31-Dec-23 | 277,741 | 195,712 | 60,178 | 100,000 | 633,631 |
| 2023 Subtotal | $419,491 | $195,712 | $235,678 | $100,000 | $950,881 |
| 31-Mar-24 | 47,608 | - | 58,858 | - | 106,467 |
| 30-Jun-24 | 46,939 | - | 58,189 | - | 105,127 |
| 30-Sep-24 | 47,476 | - | 58,726 | - | 106,202 |
| 31-Dec-24 | TBD | TBD | TBD | TBD | TBD |
| 2024 Subtotal | $142,023 | $0 | $175,773 | $0 | $317,796 |
| Grand Total (2019 - 2024) | $1,939,952 | $852,212 | $1,218,013 | $500,000 | $4,510,177 |

Note: Payments are typically made a few months following the end of each period.



*Historical Distributions Charts*





Note: Q4 2024 distributions have not yet been paid.

**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

Schedule A.3
Valuation Date: March 25, 2025

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
|---|---|---|
| | 9/30/2024 | |
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| | | |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| | | |
| **Total Assets** | 316,257,723 | 100.0% |
| | | |
| **Total Liabilities** | 47,204,916 | 14.9% |
| | | |
| **Total Equity** | 269,052,808 | 85.1% |
| | | |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

PM-1/368

**Charitable DAF HoldCo, Ltd**
**Income Approach**

Schedule B.1
Valuation Date: March 25, 2025

*Discounted Cash Flow (DCF) Analysis*

| | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | For the Projected Period Ending: | | | | | | |
| Projected Distributions | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ WACC = 68.3% | 0.9663 | 0.8484 | 0.7469 | 0.6540 | 0.5742 | 0.5041 | 0.4426 | 0.3886 | 0.3412 | 0.2995 | 0.2630 | 0.2309 | |
| **Present Value (PV) Net Cash Flow** | **$613,430** | **$90,926** | **$77,423** | **$69,593** | **$373,598** | **$55,377** | **$47,153** | **$42,384** | **$227,533** | **$33,726** | **$28,718** | **$25,813** | |

PV net cash flow: $1,685,675
PV residual value: $359,856

**Value of Subject Interest, Minority, Marketable** $2,045,531

Less: Discount for Lack of Marketability
*(see schedule C.4)* 20.0%

**Value of Subject Interest, Minority, Non-Marketable** $1,637,192

Number of Subject Interest Participation Shares 305

**Value per Share, Minority, Non-Marketable** $5,368

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 68.3% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 1.5x |
| Residual value : | $1,558,568 |
| x PV factor : | 0.2309 |
| PV residual value : | $359,856 |

**Key Valuation Statistics**

| | |
|---|---|
| CLO HoldCo Net Asset Value | $369,052,808 |
| Implied Discount for Lack of Control | 99.2% |
| Valuation as a % of NAV | 0.6% |
| Estimated Payback Period (Years) | 1.27 |

**Charitable DAF HoldCo, Ltd**
**Income Approach**
*Sensitivity Analysis - Hypothetical Risk-Free Bond*

**Schedule 8.2**
**Valuation Date: March 25, 2025**

| | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Projected Period Ending: | | | | | | | |
| Projected Distributions | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ Risk Free Rate = 4.7% | 0.9970 | 0.9858 | 0.9746 | 0.9636 | 0.9527 | 0.9420 | 0.9313 | 0.9208 | 0.9104 | 0.9001 | 0.8899 | 0.8799 | |
| Present Value (PV) Net Cash Flow | $632,896 | $105,644 | $101,300 | $102,540 | $619,894 | $103,473 | $99,219 | $100,433 | $607,158 | $101,348 | $97,180 | $98,370 | |

PV net cash flow: $2,769,456
PV residual value: $41,969,350

**Value of Subject Interest, Minority, Marketable**   $44,738,806

Less: Discount for Lack of Marketability
*(see schedule C.4)*   20.0%

**Value of Subject Interest, Minority, Non-Marketable**   $35,807,821

Number of Subject Interest Participation Shares   305

**Value per Share, Minority, Non-Marketable**   $117,403

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 4.7% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 46.5x |
| Residual value : | $47,699,415 |
| x PV factor : | 0.8799 |
| PV residual value : | $41,969,350 |

**Key Valuation Statistics**

| | |
|---|---|
| CLO HoldCo Net Asset Value | $29,910,252,808 |
| Implied Discount for Lack of Control | 83.4% |
| Valuation as a % of NAV | 13.3% |
| Estimated Payback Period (Years) | 26.53 |

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

**Schedule C.1**
**Valuation Date: March 25, 2025**

*DLOM Determination - Restricted Stock Studies*

### Restricted Stock Studies

| # | Name of Study | Study Date | Period Covered From | Period Covered To | Period Covered Sub-Sample | Observations | Reported Mean | Reported Median |
|---|---|---|---|---|---|---|---|---|
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramaniam, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | | 2000 | | | | |
| | *Purchase Discount Only* | | 1995 | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPES* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPES* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | Prior to Feb 1997 | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | 9.7% | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

**Schedule C.2**
**Valuation Date: March 25, 2025**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | Mean | Median |
|---|---|---|
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

**Schedule C.3**
**Valuation Date: March 25, 2025**

*DLOM Qualitative Scoring*

| Feature | Restricted Stock | Rating | Discount for Lack of Marketability (DLOM) Analysis | Rating | Advantage |
|---|---|---|---|---|---|
| Asset liquidity | Securities examined in marketability studies often are of smaller industrial operating companies, often with poor cash flows. | Fair | A majority of investments are in illiquid securities with poor cash flows. However, CLO HoldCo has approximately $91 million in net cash, representing approximately 34% of net asset value. | Strong | Better |
| Cash flow expectations | Restricted securities typically have a lower likelihood of paying dividends since they are associated with emerging companies. | Fair | Distributions are entirely dependent on director discretion as to the timing and amount. Distributions are not required. However, regular distributions have been made over the last five years. | Good | Slightly better |
| Contingent liabilities | Moderate probability of contingent liabilities depending on type of company and size. Smaller companies can fall prey to securities litigation. | Fair | Higher probability of contingent liabilities. The Company and CLO HoldCo has been engaged in numerous litigation matters. | Weak | Slightly worse |
| Debt capacity | Company leverage is usually on the higher side, as they are typically in the emerging stage. | Weak | CLO HoldCo has a small amount of debt representing 15% of net asset value. | Good | Better |
| Redemption/ withdrawal | No redemption rights. | Poor | No redemption rights. | Poor | Equal |
| Transfer restrictions | Transfer restrictions are limited to securities laws, with holding periods of two years. Holding period was shortened to one year in 1997, but studies generally relate to two year holds. Once the restriction time period is complete, no restrictions on transfer exist. Markets are liquid for non-restricted shares. | Fair | Transfers must be approved by the directors. | Poor | Worse |
| Value of entity | Companies range in size, however, restricted securities are more commonly utilized by smaller companies in the development stage. Approximately 50 percent of the companies issuing restricted stock included in the Silber study had sales less than $40 million. | Fair | Participating shareholders have no direct rights to the underlying net asset value other than in a winding up. CLO HoldCo is expected to generate revenue well in excess of the expected distributions. | Good | Slightly better |
| Value of interest | Purchasers of restricted securities tend to be institutional or private investors that are active in the public markets. The analysis associated with these types of securities precludes small holders from purchasing. Size of interests tend to be moderate. | Fair | Participation shareholders are small, private foundations. The foundations must be 501c3 non-profit organizations. At the director's discretion, participating shareholders may be diluted through the issuance of additional participation shares to non-existing participating shareholders. | Poor | Worse |

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.4
Valuation Date: March 25, 2025

*Calculation of Marketability Discount*

| Feature | Net Advantage | Gross Adjustment | Importance | Weight | Adjustment | Scaling Adjustment | Final Adjustment |
|---|---|---|---|---|---|---|---|
| | A (Schedules B) | B = F(A) | C | D = F(C) | E = B x D | F = 1+E or 1/(1-E) | |
| **Marketability Factors** | | | | | | | |
| Asset liquidity | Better | -16% | High | 100% | -16% | 86% | -2.9% |
| Cash flow expectations | Slightly better | -8% | High | 100% | -8% | 92% | -1.4% |
| Contingent liabilities | Slightly worse | 8% | High | 100% | 8% | 108% | 1.4% |
| Debt capacity | Better | -16% | Low | 25% | -4% | 96% | -0.7% |
| Redemption/ withdrawal | Equal | 0% | High | 100% | 0% | 100% | 0.0% |
| Transfer restrictions | Worse | 16% | High | 100% | 16% | 116% | 2.8% |
| Value of entity | Slightly better | -8% | Medium | 50% | -4% | 96% | -0.8% |
| Value of interest | Worse | 16% | Low | 25% | 4% | 104% | 0.8% |
| **Net Scaling Adjustment** | G = Product (F), i = 1 to n | | | | | 96% | **-0.8%** |

**Marketability Discount**
| | | |
|---|---|---|
| Unadjusted discount | I (See Report) | 20.8% |
| Scaling adjustment | G (See above) | 96% |
| **Concluded Marketability Discount** | J = G x I | **20.0%** |

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

**Schedule C.5**
**Valuation Date: March 25, 2025**

*DLOM Footnotes and Comments*

**A)** Our comparison matrix ranks the features of the Subject Interest and the comparable interests on a scale from 1 to 5.

1 = Poor   2 = Weak   3 = Fair   4 = Good   5 = Excellent

We then subtract the Subject Interest feature score from the comparable feature score to determine the advantage.

0 = Equal   1 = Slightly Better   2 = Better   3 = Much Better   4 = Significantly Better
  -1 = Slightly Worse   -2 = Worse   -3 = Much Worse   -4 = Significantly Worse

**B)** B is calculated as the weighted average standard deviation of the comparable investments in closed end funds multiplied by the Advantage Score.

**C)** The importance of the feature is assessed.
1 = Low   2 = Medium   3 = High

**D)** Weights are allocated as follows:
Low = 25%   Medium = 50%   High = 100%

**E)** To compute the adjustment, B is multiplied by D.

**F)** The scaling adjustment is computed as 1+E if E > 0 or 1/(1-E) if E < 0 for the particular feature.

**G)** The net scaling adjustment for marketability factors is the product of all marketability features' scaling adjustments.

**H)** The net scaling adjustment for control factors is the product of all control features' scaling adjustments.

**I)** This is the concluded baseline marketability discount determined for comparable investments.

**J)** This is the baseline marketability discount multiplied by the scaling factor.

**K)** This is the concluded baseline minority interest discount determined for comparable investments.

**L)** This is the baseline minority interest discount multiplied by the scaling factor.

**M)** This is the combined discount of both marketability and minority interest discounts.