# EXHIBIT 72



Seyfarth Shaw LLP
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
T (310) 277-7200
F (310) 201-5219

dmancino@seyfarth.com
T (310) 201-5241

www.seyfarth.com

March 20, 2025

**FEDEX**

TEGE Referrals Group
Internal Revenue Service
1100 Commerce Street
MC 4910 DAL
Dallas, TX 75242-1027

Re:   Highland Dallas Foundation, Inc. (EIN: 45-3961755)

Dear Sir or Madam:

I am writing on behalf of my client, Charitable DAF Holdco, Ltd., a Cayman Islands exempt[1] company ("DAF Holdco"), concerning the deterioration of its relationship with one of its Participating Shareholders, Highland Dallas Foundation, Inc. ("Highland Dallas"). Highland Dallas is a supporting organization of the Dallas Foundation.[2]

The deterioration of this relationship is due directly to the undue influence and control exercised over Highland Dallas by James D. Dondero and his affiliates, as described in this Form 13909, *Tax-Exempt Organization Complaint (Referral)*. This disclosure letter supplements in detail and in exhibits the more general information described in the accompanying Form 13909 and is an integral part of that form (collectively, the Form 13909 and this letter are referred to as the "Referral").

We believe the information described in this Referral will demonstrate clearly that Mr. Dondero's influence and control is an inappropriate donor relationship with representatives of the Dallas Foundation who serve on the Board of Directors of and as officers of Highland Dallas. We believe this undue influence and control potentially jeopardizes the tax-exempt status of Highland Dallas as an organization described in section 501(c)(3) and, at a minimum, causes it to fail to remain a supporting organization described in section 509(a)(3) because of the

---

[1] To be clear, DAF Holdco is not a tax-exempt organization under U.S. tax law, notwithstanding the use of the term "DAF" in its corporate name.. However, under its Cayman Islands Articles of Association, a "Restricted Person," i.e., an entity that *cannot* own Participating Shares, is an organization that is *not* described in section 501(c)(3) of the Code. As a consequence, all Participating Shareholders of DAF Holdco must be and remain organizations described in section 501(c)(3).

[2] The Dallas Foundation is a tax-exempt community foundation described in sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code of 1986 (the "Code").

excessive influence of a disqualified person and substantial contributor, i.e., Mr. Dondero, under section 509(a)(3)(C).

This Referral is divided into three major parts, with multiple subparts.

Part I provides the Internal Revenue Service (the "IRS" or the "Service") with extensive factual information concerning Highland Dallas, its governance and control. As will be seen, Mr. Dondero exerts undue influence and control over Highland Dallas directly, as a director, President and substantial contributor, and indirectly through his and his associates' influence over Highland Dallas's supported organization representatives on the Highland Dallas Board of Directors, and the Dallas Foundation itself.

Part II provides the IRS with background information on DAF Holdco and Mr. Dondero's efforts to exert dominion and control over DAF Holdco and its assets. Because Highland Dallas is a Participating Shareholder of DAF Holdco, Mr. Dondero's efforts (both successful and unsuccessful) to control DAF Holdco for his personal gain directly affect Highland Dallas financially and provide him an additional amount of private benefit and private inurement from a donation where he once benefitted from a charitable contribution deduction to a charitable remainder trust ("CRT").

As will be discussed in Part III, the tax discussion section, Mr. Dondero's influence and control is pervasive and is exercised primarily for Mr. Dondero's financial benefit directly and for the financial benefit he derives indirectly through several entities owned or controlled by him. We believe he therefore derives more than insubstantial benefit form Highland Dallas and causes its net earnings to inure to his benefit, all in violation of section 501(c)(3)'s most basic operational requirements. Also, at a minimum, we believe his influence and control over Highland Dallas has caused it to become a private foundation, thereby subjecting Mr. Dondero to Chapter 42 excise tax exposure.

**I.     Background Concerning the Formation and Legal Structure of Highland Dallas, Highland Capital Management, L.P., and NexPoint Advisors, L.P.**

**A. Highland Dallas**

Highland Dallas was incorporated as a Delaware nonprofit nonstock corporation by Mr. Dondero in 2011 in connection with his desire to form three tax-exempt public charities to become the three remaindermen of a CRT of which he was the income beneficiary. Highland Dallas applied for and was recognized by the IRS as a charitable organization described in section 501(c)(3) of the Code and as a supporting organization of the Dallas Foundation described in section 509(a)(3) of the Code. Highland Dallas did not register as a foreign corporation to do business in Texas until 2020.

At the time of its formation, Mr. Dondero became the sole "individual" member of Highland Dallas, with the legal power to select one director. The Dallas Foundation became the sole "institutional" member of Highland Dallas, with the power to select two directors. Thus, in 2011, Highland Dallas satisfied the requirements for being classified as a Type I supporting organization of the Dallas Foundation.

In addition, Mr. Dondero, in 2011, became and remains today the President of Highland Dallas and a member of its Board of Directors.

The other two supporting organizations are the Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara") (EIN: 45-3962008) and the Highland Kansas City Foundation, Inc. ("Highland Kansas City") (EIN: 45-3961865). These two supporting organizations of the Santa Barbara Foundation and Greater Kansas City Community Foundation, respectively, also have the same legal structure as Highland Dallas and, like Highland Dallas, each owns 100 Participating Shares of DAF Holdco.

We do not believe either Highland Santa Barbara or Highland Kansas City is as easily manipulated by Mr. Dondero and his affiliates as Highland Dallas because, according to their Forms 990 for 2023 (which is the last year those forms are available on Guidestar.com), Participating Shares of DAF Holdco are their only assets. By contrast, Mr. Dondero has made substantial additional contributions to Highland Dallas after 2011, either directly or through trusts or other entities owned or controlled by Mr. Dondero, some of which will be addressed later in this Referral. Thus, we believe Mr. Dondero is in a position to exert greater influence as a substantial contributor to Highland Dallas on the Directors of Highland Dallas appointed by the Dallas Foundation (including the Dallas Foundation's President & CEO, Julie Diaz).[3]

### B. Mr. Dondero and Highland Capital Management, L.P.

Highland Capital Management, L.P. ("HCM") is an investment management firm located in Dallas, Texas that was co-founded in 1993 and controlled by Mr. Dondero and individuals close to him. As described on page 7 of the *Special Turnover Petition* filed by UBS Securities LLC and UBS AG London Branch in the New York Supreme Court in 2023, a complete copy of which is enclosed with this Referral as Exhibit 1 (the "2023 UBS Petition"), before HCM filed for bankruptcy, "HCM was an investment management firm that managed billions of dollars of assets 'through its organizational structure of approximately 2,000 separate business entities.'" (citation omitted). It is estimated by a plaintiff in another action that, at its height, HCM managed as much as $40 billion in assets.

Mr. Dondero was not only HCM's co-founder with Mark Okada,[4] he served as HCM's President and Chief Executive Officer until he was removed by the bankruptcy trustee in 2020.

---

[3] By way of example, the consolidated financial statements of the Dallas Foundation for 2023 available on its website include the assets of seven supporting organization, including Highland Dallas. Page 22 of the statements disclose that approximately $163.4 million of its assets were held by supporting organizations. On page 19, it appears that approximately $92.3 million (almost 57%) represent Highland Dallas assets. Also, in 2023, Highland Dallas received almost $34 million in charitable contributions, presumably all from Mr. Dondero and entities affiliated with or controlled by him. Thus, it is understandable why the Dallas Foundation representatives who serve on the Highland Dallas Board would acquiesce to almost any request or demand made by Mr. Dondero or one of his associates such as Lucy Bannon.

[4] In the Dallas Foundation's 2022 Form 990, the most recent available on Guidestar.com, Mr. Okada was listed as a member of the Board of Governors of the Dallas Foundation. On its website, the Dallas Foundation identifies another confidant and employee of Mr. Dondero, Lucy Bannon, as an "Advisory Member" of the Board of Governors (last visited March 5, 2025). Thus, Mr. Dondero continues to exert substantial indirect influence over Highland Dallas's supported organization, the Dallas Foundation.

### C. Mr. Dondero, NexPoint Advisors, L.P., and NexPoint Hospitality Trust

In 2012, prior to his removal as President of HCM in 2020, Mr. Dondero formed NexPoint Advisors, L.P. ("NexPoint Advisors"), a Dallas-based portfolio real estate and investment firm. NexPoint Advisors is one of a vast array of entities operating under the "NexPoint" umbrella. After the HCM bankruptcy, Mr. Dondero and his affiliates seamlessly shifted their operations from HCM to NexPoint Advisors and its affiliates.

As alleged in another lawsuit filed in 2021 in the United States Bankruptcy Court of the Northern District of Texas by Marc S. Kirshner as a litigation trustee in the HCM bankruptcy case, "NexPoint [Advisors] was effectively a shell entity that Dondero created in March 2012 to siphon profits from [HCM] in order to evade [HCM's] creditors." See Complaint and Objection to Claims, in *Kirschner v. Dondero, et. Al.* Case No. 19-34054-sgj11, at pages 18-21, a copy of which is attached as Exhibit 2.

Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.

One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").

Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026. See the Dugaboy/REIT documents included as Exhibit 2.

The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,505,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy. We also assume that Highland Dallas signed a Form 8283, *Noncash Charitable Contributions*, form acknowledging it received the Units that would have been included with Mr. Dondero's 2019 Form 1040 along with a qualified appraisal of the Units (we have no actual knowledge of this, however).

On information and belief, we believe Mr. Dondero has used his influence and control over Highland Dallas to cause it defer exercising the Put Option at least through the effective time of the merger for at least three reasons.

- First, the forbearance to exercise the Put Option allows Mr. Dondero and Dugaboy to enjoy the benefits of an interest-free loan of $9,285,000 (the put exercise price ($6.19 x 1,500,000 units) while the Put Option remains outstanding and unexercised.

- Second, the forbearance to exercise the Put Option effectively has protected Mr. Dondero from the declining value of the REIT between December 2019 and November 2024. As of November 22, 2024, the reported fair value of the Units was $0.015 per Unit, so the fair value on that date of 1,500,000 Units was only $22,500, less than one percent of the Put Option value of $9,285,000.

- Third, most charitable organizations have a policy of immediately selling contributed shares that are listed for trading on a stock exchange in order both to diversify and to reinvest the sale proceeds in a manner that aligns more closely with the charity's investment policy. Had Highland Dallas sold the Units on the TSXV at any time within three years after their receipt, Highland Dallas would have been required to file a Form 8282, *Donee Information Return,* with the Service that would likely have reflected a much lower value of the original contribution amount claimed in 2019. Thus, in effect, Highland Dallas was acting to protect Mr. Dondero from having to address the precipitous fall in fair market value as the REIT Units plummeted in value beginning shortly after the gift was made.

Highland Dallas's failure to exercise the Put Option up until now becomes all the more significant because on November 25, 2024, the REIT announced the execution of a definitive agreement (the "Merger Agreement") pursuant to which the REIT will be dissolved and its subsidiary entities will be merged with and into entities owned or controlled, directly or indirectly, by NexPoint Diversified Real Estate Trust. Under the Merger Agreement, The proposed price per Unit is $0.36 per Unit. According to the press release issued by the REIT announcing the merger, "[t]he proposed price of US$0.36 per Unit represents a premium of approximately 2300% to the 30-day volume weighted average price per Unit on the TSXV ended November 22, 2024 of US$0.015."

Last month, in a press release issued on February 21, 2025, it was announced that a majority of minority votes approved of the merger. Under Canadian law, when a person such as Mr. Dondero owns or controls a majority of a Canadian public company's voting shares, a transaction such as this merger must be approved by two-thirds of the minority shares, or in this instance the 5,131,020 Class B non-voting Units.

Based on public filings with the U.S. Securities and Exchange Commission, we believe the REIT had approximately 29,353,660 Units, of which 82.52% were owned by entities owned or controlled by Mr. Dondero.

We have to assume that Highland Dallas voted its 1,500,000 Units in favor of the merger at Mr. Dondero's request.[5] That suggests that the merger needed Highland Dallas's 29.2% (almost one-third of the two-thirds vote required) of minority Unit's approval. That also suggests that

---

[5] We understand that the Board of Directors of Highland Dallas usually acts by Unanimous Written Consent Without a Meeting, which means the Mr. Dondero along with the two Dallas Foundation Board appointees would have approved voting in favor of the merger. Presumably the same would be true if a decision were taken by the Board to refrain from exercising the Put Option.

March 20, 2025
Page 6

Highland Dallas chose not to exercise its Put Option to permit Mr. Dondero to retain control over the REIT even as its finances deteriorated.

We have no way of knowing whether Highland Dallas will exercise the Put Option before the REIT is dissolved (projected for the end of the first quarter of 2025, i.e., by the end of this month), but clearly if it fails to do so this will result in a $9 million inappropriate windfall to both Dugaboy and Mr. Dondero. Obtaining the answer to this question would only require the IRS to open an examination of Highland Dallas and issue an Information Document Request and/or issue a third-party subpoena to Dugaboy.[6]

### D. Highland Dallas's Assumed Name

In March 2024, Highland Dallas filed an Assumed Name certificate with the Texas Secretary of State to permit it to operate under the name "NexPoint Philanthropies Dallas, Inc." This is consistent with Mr. Dondero's current ownership and control of NexPoint Advisors and his loss of control of HCM in the bankruptcy and consistent with the goal of allowing a private company (NexPoint) and Mr. Dondero to take credit for and enjoy the halo effect from NexPoint Philanthropies Dallas's (really Highland Dallas's) charitable giving.

### E. Mr. Dondero's Firearms Contributions to Highland Dallas

Several years ago, Mr. Dondero (either directly or through entities owned and controlled by him) made contributions of a collection of firearms to Highland Dallas. Presumably, a Highland Dallas officer signed the donee acknowledgement on Form 8283, *Noncash Charitable Contributions*, and checked the box "No" asking whether the organization intended to use the property for an unrelated use, because checking "Yes" would limit Mr. Dondero's charitable contribution deduction to his adjusted basis and not its appraised fair market value. This in itself demonstrates Mr. Dondero's improper influence over the Dallas Foundation representatives serving as Board members and officers of Highland Dallas, especially as it is hard to believe a supporting organization of a community foundation could possibly use firearms in a related trade or business.

But to further demonstrate his abuse and diversions of assets for his own benefit, earlier this year in 2025 he diverted a substantial debt service payment of $1.3 million on a loan owed to one of DAF Holdco's subsidiaries to pay for a specially-designed and built vault for those firearms (shotguns). That diversion of assets has caused a default of that loan that has now landed in Texas State court, thereby depleting DAF Holdco's assets further because of legal fees. It is unknown whether the vault was requested by anyone associated with the Dallas Foundation serving as a director or officer of Highland Dallas, such as Julie Diaz, but we believe it likely was.

### F. Mr. Dondero's Character

Mr. Dondero has a demonstrated pattern of behavior of stealing assets from those he perceives as adversaries. What is also demonstrated by even a cursory reading of the 2023 UBS Petition

---

[6] We will be happy to provide the IRS with a copy of the S-4 filed with the SEC available on EDGAR and the REIT's press releases that were used to develop this data.

and the *First Amended Original Complaint* filed by Highland Employee Retention Assets LLC against Mr. Dondero and his affiliates on July 15, 2024 in the U.S. District Court for the Northern District of Texas, Dallas Division, a complete copy of which is enclosed as Exhibit 4 with this Referral (the "2024 Complaint"), Mr. Dondero, to put it mildly, has no respect for corporate formalities and is willing to engage in self-dealing to strip entities of their assets without regard to any fiduciary duty of care or loyalty to serve his personal needs and to benefit himself financially to the detriment of others, including his own former HCM employees.[7]

The 2023 UBS Petition outlines how Mr. Dondero, facing a $1 billion judgment, directed various entities he owned and controlled to shift substantially all of their assets offshore to a Cayman Islands insurance company for a fraudulent insurance policy. The 2023 UBS Petition is an attempt to collect on a 2020 $1 billion judgment in favor of the UBS entities. Mr. Dondero has been so successful at hiding assets that the UBS entities have not been paid.

The 2024 Complaint seeks recovery of hundreds of millions from Mr. Dondero. It describes how a former Mr. Dondero employee at HCM, Patrick Daugherty, had a falling out with Mr. Dondero. After the falling out, Mr. Dondero took extraordinary steps to ruin Mr. Daugherty's life—depriving him of assets, removing his long-term incentive plan, embroiling him in lawsuits, and the list goes on.

These are not isolated incidents. In the ACIS Capital Management, L.P. matter,[8] Mr. Dondero had a falling out with Josh Terry, a former employee of HCM, and took extraordinary steps to ruin Mr. Terry's life—the same playbook as above with Mr. Daugherty.

In fact, Mr. Dondero and his litigiousness is widely known in the Dallas/Fort Worth area. Mr. Dondero is variously described as "Highland Capital's Giraffe-Eating Hedge Fund Manager" (Dallas Observer June 1, 2012), and "the distressed debt investor who was once a scourge to private equity. . . " (Financial Times March 10, 2023).

As it relates to this Referral more specifically, in a May 3, 2023 post entitled "James Dondero: Dallas's Surprising Philanthropy Hero," the post states: "Most gifts are made through the Highland Dallas Foundation, Inc., the philanthropic arm of Highland Capital Management." Note that this post appears to have been prepared by Mr. Dondero himself and appeared three years after he was ousted as HCM's President. What's more to the point is that it outlines in Mr. Dondero's own words the likely failures of Highland Dallas to comply with the section 509(a)(3) operational test discussed below. A copy of that post is included as Exhibit 6.

### G. Skyview Group

Skyview Group is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or controlled by Mr. Dondero. Mr. Mark Patrick was engaged as a tax

---

[7] *See also In Re: Highland Capital Management L.P. v. Dondero*, Case No. 19-34054-sgj11 (June 6, 2021), a decision by the U.S. Bankruptcy Court for the Northern District of Dallas. In that opinion, the Bankruptcy Judge found Mr. Dondero to be in contempt for violating a temporary restraining order. A copy of that opinion is enclosed as Exhibit 5.

[8] We can provide the IRS with a copy of this complaint if that would be of interest.

consultant by Skyview Group until Mr. Patrick resigned in October 2024 on the advice of the undersigned counsel. Skyview Group charged DAF Holdco management fees for its services.

Skyview Group is nominally owned and controlled by Scott Ellington, who was HCM's Chief Legal Officer and General Counsel until his removal by the bankruptcy trustee in 2021. Despite this nominal ownership and control by Mr. Ellington, Mr. Dondero controls all compensation decisions, including decisions relating to Mr. Ellington's compensation, and thus dominates Skyview Group as if he owned it himself.

Since Mr. Patrick's resignation from Skyview Group, Mr. Patrick has been directly employed and compensated by DAF Holdco rather than Skyview Group. In addition, Mr. Patrick, again acting on advice of counsel, caused DAF Holdco to give six-months' notice in October 2024 to Skyview Group that it was terminating its contract with Skyview Group.

Mr. Dondero became furious when he learned of these actions, and that is when (for the first time in over a decade) Highland Dallas and Dallas Foundation executives and attorneys started raising questions about DAF Holdco's investments and management. In addition, this is when Highland Dallas, and Julie Diaz (who serves as both the President of the Dallas Foundation and as a Director and Vice President of Highland Dallas), began voicing concerns over DAF Holdco's investment performance, concerns that were never raised when Mr. Dondero's lackey, Grant Scott was rubber-stamping NexPoint and other Dondero-related investments and that were never raised prior to Mr. Patrick's resignation from Skyview Group.

## II. DAF Holdco

### A. The Grant Scott Control Era

Back in 2011, when Highland Dallas and the two other supporting organizations were being formed, one of the highly successful types of investments designed and marketed by HCM through investment partnerships were collateralized loan obligations, or CLOs.

A CLO is a single security backed by a pool of corporate debt issued by corporate borrowers with low credit ratings or loans taken out by private equity firms to conduct leveraged buyouts. With a CLO, the investor receives scheduled debt payments from the underlying loans, assuming most of the risk in the event of a default. In exchange for taking on that default risk, the investor is offered greater diversity and the potential for higher-than-average investment returns. DAF Holdco was formed initially in 2011 to hold partnership interests in partnerships that held CLOs.

Mr. Dondero caused DAF Holdco to be formed to have a structure through which he could have his CRT make remainder interest distributions of the Participating Shares of DAF Holdco to Highland Dallas and to the other two supporting organizations.[9] How CLOs work is not relevant

---

[9] This is documented in Part III, Line 4a of each of the three supporting organizations' Form 990, *Return of Organization Exempt From Income Tax*, for 2023 (the last year for which a Form 990 for the organizations was posted on Guidestar.com).

to this Referral except to the extent that Management Shares of DAF Holdco were initially issued to Mr. Dondero's college roommate and long-time close friend, Grant Scott.[10]

Grant Scott's ownership of the Management Shares from 2011 to 2021 effectively allowed Mr. Dondero to retain control of DAF Holdco and, thereby, use DAF Holdco's assets as a piggybank for other investments described below. Management Shares have no economic right to distributions; the value for Mr. Dondero is in their control over DAF Holdco and the ability to utilize its assets either to make dividend distributions to the Participating Shareholders (i.e., the supporting organizations) or to fund Dondero-managed investments on non-market terms and with below-market returns on investment.

NexPoint Advisors repeatedly reached out to DAF Holdco for investment-backing with below market terms and rates of returns while under the control of Grant Scott. Grant Scott consummated these transactions without hiring outside counsel or valuation experts for DAF Holdco. The lack of ams'-lenggth dealing inder Grant Scott's control is made patently obvious in the ValueScope November 18, 2024 presentation materials included as Exhibit 7. The economics of these transactions clearly show that Mr. Dondero was directing Grant Scott to cause DAF Holdco to enter into below-market deals for DAF Holdco that redirected the profits to Mr. Dondero and entities he owns. In other words, Mr. Dondero was stealing from DAF Holdco and, in turn, the supporting organizations.

Mr. Dondero's theft was not limited to below-market transactions. In March 2020, Mr. Dondero and his affiliates directed Grant Scott to make a $1 million payment to an entity called Tall Pine Group, LLC. The payment was allegedly for professional services rendered, but no such services were rendered to DAF Holdco. In subsequent court filings, it became clear that the $1 million went to pay Mr. Dondero's affiliates' employment compensation bonuses, which could not be paid in the normal course because HCM was subject to various bankruptcy restrictions at the time. Further detail is available in the *Kirschner* Complaint, at page 61, a copy of which is attached hereto as Exhibit 2.

### B. The Mark Patrick Control Era (including present day)

Grant Scott assigned the Management Shares to Mark Patrick in March 2021. Mr. Patrick now controls DAF Holdco and the timing of distributions to the supporting organizations, including Highland Dallas. Mr. Patrick also controls the negotiations and approvals of the terms and conditions of all investments since he assumed control. Since then, under Mark Patrick's leadership DAF Holdco has begun to diversify away from Dondero-managed investments.

Total DAF Holdco (including its subsidiaries) exposure to Dondero-managed investments was over $100 million in June 2023. Because of the formation history of DAF Holdco and the various transactions between DAF Holdco and Dondero-managed investments, DAF Holdco has been named as a defendant in numerous lawsuits claiming it is an alter ego of Mr. Dondero and his

---

[10] On pages 7 and 8 of the litigation trustee's Complaint and Objection to Claims in *Kirschner v. Dondero* included as Exhibit 2, the trustee described Grant Scott as follows: "Dondero personally selected Scott as his successor to run the Charitable DAF Fund. . . . Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and [HCM's] directives without asking questions or requesting additional information."

entities and that the initial funds transferred to DAF Holdco from the CRT were fraudulent transfers. These lawsuits have been very expensive and time-consuming for DAF Holdco, which disadvantages Highland Dallas and the other Participating Shareholders because the payment of legal fees depletes available cash.

Because Mr. Patrick viewed the $100 million exposure to Dondero-related and the lawsuits as a risk to DAF Holdco (and therefore the Participating Shareholders), he has taken steps to create layers of independence between DAF Holdco and Mr. Dondero. As documented by an independent valuation consultant, ValueScope, LLC (a copy of the ValueScope report is enclosed as Exhibit 7), upon assuming control of DAF Holdco, Mr. Patrick engaged independent counsel to assist him in negotiating "market" terms and returns on investment for investments with all outside parties, especially those controlled by or affiliated with Mr. Dondero, such as NexPoint Advisors. Neither Mr. Dondero nor his associates expected this because no market discipline was exercised by DAF Holdco when it was controlled by Mr. Dondero's college roommate and close friend Grant Scott.

Outside counsel and valuation experts frequently either negotiated more market-standard (and more favorable to DAF Holdco) terms for Dondero-managed investments or advised against the transactions on the terms proposed by Mr. Dondero (via his various entities, including NexPoint Advisors). And, because Mr. Patrick refused to simply rubber-stamp Dondero-related investment asks, Mr. Dondero became upset with Mr. Patrick and demanded that Mr. Patrick provide him with increased levels of control over DAF Holdco, including meetings between Mr. Patrick and Mr. Dondero three times per week when he was still a consultant with Skyview Group and permitting one of Mr. Dondero's affiliates increased access to DAF Holdco information and finances. Mr. Patrick refused these requests.

Mr. Patrick also hired an independent director for DAF Holdco, Paul Murphy. During Mr. Scott's control, Mr. Scott served as sole director and sole person in control. There was no requirement under Cayman law to hire an independent director; Mr. Patrick did so for the benefit of DAF Holdco (and, indirectly, Highland Dallas and the other Participating Shareholders).

Mark Patrick also resigned from Skyview Group in October 2024. As noted above, Mr. Dondero effectively controls Skyview Group, and it is nominally owned by one of his affiliates, Scott Ellington. Mr. Dondero viewed this as the last straw—he viewed this as his final loss of control over DAF Holdco and its assets. On the same day, in order to complete the separation, Mr. Patrick directed DAF Holdco to terminate a services agreement with Skyview Group.

Mr. Patrick's resignation from Skyview Group was recommended by outside counsel, including this firm. Mr. Patrick recognizes he has fiduciary duties to DAF Holdco and its subsidiaries. Mr. Dondero created tension with these duties by demanding that Mr. Patrick rubber-stamp Dondero-managed investments, as did Grant Scott. For example, in September 2024, Mr. Dondero recommended that DAF Holdco consummate a real property acquisition on The Campus at Legacy (described in Exhibit 7) for $45 million and provide one of Mr. Dondero's entities a repurchase option if the price were to appreciate. In no uncertain terms, DAF Holdco would take all the downside financial and real estate risk and transfer the upside financial benefit to Mr. Dondero if this proposal had been accepted. This was typical for Dondero-managed investments.

March 20, 2025
Page 11

Mr. Dondero also demanded that Mr. Patrick cause DAF Holdco to wire one of Mr. Dondero's offshore entities, Sentinel, $1.5 million in November 2023. Mr. Patrick sought the advice of outside counsel, who told Mr. Patrick the payment would be "impermissible and illegal for a number of reasons". Mr. Patrick accordingly refused the payment (i.e., embezzlement) request.

Mr. Dondero's behavior and attitude toward DAF Holdco is nothing if not consistent. Whether Mr. Scott or Mr. Patrick was in control, Mr. Dondero never abandoned the belief that the assets he caused his CRT to distribute to DAF Holdco remained his own. Mr. Patrick's steps toward independence and then resigning from Skyview Group in October 2024 led to Mr. Dondero exerting his influence over Highland Dallas in a manner we believe results in improper private benefit accruing to him as discussed in the tax aspects portion of this disclosure letter.

Following Mr. Patrick's resignation from Skyview Group, Mr. Dondero directed his entities to cease all principal and interest payments owed on Dondero-managed investments to DAF Holdco and its subsidiaries, which has led to several ongoing lawsuits discussed below and outlined in Exhibit 7. It is inevitable that Mr. Patrick will receive the same treatment as Mr. Daugherty and Mr. Terry (described above)—he will be subject to frivolous, vexatious lawsuits and harassment because he is Mr. Dondero's newest villain.

### C. October 2024 to Present

The events that have unfolded show Mr. Dondero's anger at his loss of control of DAF Holdco's assets. Mr. Patrick met with Highland Dallas shortly after his resignation from Skyview Group and assured Julie Diaz of Highland Dallas and the Dallas Foundation that his resignation would not modify management of distributions to the Dallas Foundation. Mr. Patrick believed the meeting went well; Ms. Diaz voiced no concerns and actually requested additional distributions.

Shortly thereafter, Highland Dallas and the two other Participating Shareholders hired the law firm Holland & Knight (which had already represented the Dallas Foundation for years) to represent them and to send a "no confidence" letter to DAF Holdco. This purported lack of confidence was a new sentiment by Highland Dallas, which had never previously expressed any concern when it received ValueScope reports from Grant Scott. The "no confidence" letter came out of the blue—there were no calls, emails, or other communications that expressed a lack of confidence or requested any information whatsoever.

DAF Holdco subsequently learned that Mr. Dondero directed his subordinates at Skyview Group and NexPoint Advisors to provide false and misleading financial information to Highland Dallas and to the other Participating Shareholders. Rather than contact DAF Holdco or Mr. Patrick to question this information (especially given the questionable source), Highland Dallas sent the "no confidence" letter without any attempt to verify it. (As a post-script, DAF Holdco has refuted the false and misleading information, but the dispute continues because it was never really about that.)

Despite the November 11, 2024 date on the "no confidence" letter, DAF Holdco did not receive it until December 6, 2024, after the November 18, 2024 presentation to the supporting organizations' attorneys, Holland &Knight. In addition, DAF Holdco received the "no confidence letter from Mr. Dondero's personal attorneys, who do not represent Highland Dallas or the other Participating Shareholders.

DAF Holdco responded and voiced its concerns that Mr. Dondero was directing Highland Dallas to take these actions. Recall that Mr. Dondero is a Director and President of Highland Dallas. Holland & Knight ignored the accusations that Mr. Dondero was calling the shots and began sending acrimonious (but toothless) emails to DAF Holdco. Finally, Julie Diaz, a Director and Vice President of Highland Dallas (and President of the Dallas Foundation), sent an email requesting a winding up of DAF Holdco and distribution of all of its assets to Highland Dallas and the other Participating Shareholders.

Paul Murphy, an independent Director of DAF Holdco, made a presentation to the supporting organizations' attorneys from Holland & Knight in which he reviewed all of the governance and management improvements that have already been made, but they persist behind the scenes to facilitate Mr. Dondero's attempts to undermine Mr. Patrick and regain control over DAF Holdco's assets for use by NexPoint for investments.

DAF Holdco was contacted in February 2025 by Cayman Islands counsel stating they represent "DAF 2." DAF Holdco believes this "DAF 2" is an attempt by Mr. Dondero and his affiliates to fraudulently obtain DAF's assets.

In February 2025, DAF Holdco subsidiaries filed two lawsuits against Mr. Dondero's entities for non-payment on Dondero-managed investments. Mr. Patrick also directed a non-DAF entity he controls to file a third lawsuit against Mr. Dondero's entities for non-payment. These lawsuits are fundamentally the same as other lawsuits where creditors have sued Mr. Dondero and his entities for nonpayment. Mr. Dondero has not changed—he refuses to pay his debts and he believes he is the rightful owner of DAF Holdco's assets. Mr. Dondero's instrument is Highland Dallas. He controls Highland Dallas and will cause it to continue its crusade against DAF Holdco. As noted by James Seery, the HCM bankruptcy trustee who removed Mr. Dondero from HCM, Mr. Dondero will "burn the place down" if he does not get his way.

### III. Discussion of Tax Exemption-Related Lack of Compliance and Outright Avoidance

In order for an organization to qualify for tax-exempt status under section 501(a) of the Code as a charitable organization described in section 501(c)(3) of the Code, it must be organized and operated exclusively for one or more charitable purposes described in section 501(c)(3) and the Treasury Regulations promulgated thereunder. We do not question whether Highland Dallas is organized for charitable purposes, nor do we question whether Highland Dallas's grantmaking to the Dallas Foundation and other bona-fide charitable organizations is consistent with its charitable purposes.

We do question whether Mr. Dondero's influence and control over at least Highland Dallas has allowed some portion of their net earnings to indirectly inure to Mr. Dondero's benefit as a result of his historic access to DAF Holdco's assets at below market rates and terms that appear to have been acquiesced to by each supporting organization. As we discuss below, Mr. Dondero's influence and control over DAF Holdco when Grant Scott was the Management Shareholder was never of concern, especially to Highland Dallas, even as each supporting organization received periodic valuation reports prepared by ValueScope detaining DAF Holdco's NexPoint investments. See report prepared for Grant Scott by ValueScope, attached hereto as Exhibit 8. In fact, we believe those valuation reports were used by each of them to prepare their Forms 990 and to prepare consolidated financial statements.

We also believe that each of the supporting organizations operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets now that Mr. Patrick declined NexPoint investment requests that are both on non-market proposed terms and provide below market returns on investment.

If Highland Dallas elects not to exercise the Put Option before the REIT dissolves, we believe that would be an excess benefit transaction under section 4958 of the Code in which the organization managers had to have knowingly participated.

We also believe Mr. Dondero exercises such control as a substantial contributor of Highland Dallas, resulting from gifts he has made since the initial gift of Participating Shares were made by the CRT in 2011, that Highland Dallas should no longer satisfy the requirement in section 509(a)(3)(C) that there be no control by disqualified persons.

Finally, as discussed briefly below, we believe the donor advised fund rules in section 4966 and 4967 may be implicated, but have insufficient knowledge of the facts to assert conclusively that they do apply.

### A. Private Benefit

We respectfully submit that Highland Dallas in particular no longer satisfies the operational test of section 501(c)(3) because its actions taken at Mr. Dondero's direction serve his private interests more than incidentally as prohibited by Treasury Regulation § 1.501(c)(3)-1(d)(*1*)(ii).

As we have outlined above, Mr. Dondero and affiliates such as NexPoint Advisors used DAF Holdco, when it was controlled by Grant Scott, as his personal piggybank. And, when Grant Scott controlled DAF Holdco, neither Julie Diaz (in her capacity as Director and Vice President of Highland Dallas) nor the Dallas Foundation questioned whether DAF Holdco's investment were prudent or generated market returns. Rather, even as they received and used for tax and financial reporting purposes the ValueScope valuation opinions which disclosed DAF Holdco's NexPoint and other Dondero-related investments, they never questioned whether the terms were market terms or whether the asset allocations were prudent. It was only **after** Mr. Patrick took over as Management Shareholder of DAF Holdco and (a) started declining NexPoint investment asks—really demands, (b) started diversifying DAF Holdco's investments away from NexPoint investments, (c) began demanding repayment of amounts owed with respect to NexPoint investments, and (d) Mr. Patrick resigned from Skyview Group and terminated its contract for back office and other services, that the supporting organizations collectively hired outside counsel and, under the lead of Julie Diaz, a Director and Vice President of Highland Dallas began sending no-confidence emails to DAF Holdco Directors (including Mr. Patrick and Mr. Murphy) demanding information to which they were not even legally entitled (a fact that their attorneys openly acknowledged in a Zoom call) and a complete restructuring of DAF Holdco to bring it back under Mr. Dondero's control.

In the seminal decision, *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the Tax Court concluded that the absence of private inurement to the benefit of a private shareholder or individual does not end the analysis of whether an organization satisfies the operational test of exemption under section 501(c)(3). it went on to state: "when the Court concludes that no prohibited inurement of net earnings exists, it cannot stop there but must

inquire further and determine whether a prohibited private benefit is conferred."(citations omitted) *Id.* at 1070. It concluded that "an organization's conferral of benefits on disinterested persons may cause it to serve 'a private interest' within the meaning of section 1.501(c)(3)-1(d)(1)(ii)." *Id.* at 1070.

Finally, after looking at the organization's exclusive source of funding (much the same as Mr. Dondero's exclusive funding of Highland Dallas), control of a majority of the Board by members of the Republican Party (analogous to Mr. Dondero's role as President and Director of Highland Dallas and his substantial influence over the two Dallas Foundation directors evidenced by their epiphany that something has to be done since Mr. Dondero no longer controls DAF Holdco), and several other factors, "we conclude that petitioner is operated for the benefit of private interests, a nonexempt purpose." *Id.* at 1080.

In another case, *Airlie Foundation, Inc. v. United States,* 55 F.3d 684 (D.C. Cir. 1995), the relationship between the founder and executive director of the foundation bears a strong resemblance to the relationship between Mr. Dondero and Highland Dallas and served as a basis for sustain the Service's revocation of its section 501(c)(3) exemption on the ground that it provided more than incidental private benefit to the founder. Although the actual basis for revocation of exemption was a finding of inurement of net earnings, the pervasive control of the founder clearly influenced the D.C. Circuit to affirm the District Court and, equally important, the court cited *American Campaign Academy* for the proposition that an organization does not operate exclusively for tax-exempt purpose if it serves a private interest rather than a public interest and "[t]his requirement applies to the organization's actual, not purported purposes." *Id.* at 75 AFTR 2d 95-2068, 95-2071.

### B. Potential Inurement

Section 501(c)( also requires that "no part of the net earnings " of the organization may "inure to the benefit of any private shareholder or individual." As observed in the *Airlie Foundation* case, "the extent of the inurement is immaterial." *Id.* As noted in that case, and as is the case with Mr. Dondero, the founder of Airlie Foundation, Inc. "established and controlled a network of taxable and tax-exempt entities. The transactions that took place within the network organizations formed the basis for the IRS's revocation of AFI's tax-exempt status, as discussed at length by the district court."

We respectfully submit that if the Service audits Highland Dallas it will identify many more instances of inurement, beyond the single instance of forgiving $33,672 by Airlie Foundation, Inc. owed by one of the founder's affiliated entities. The Dugaboy effective interest-free loan and potential windfall if Highland Dallas fails to exercise its Put Option should be enough, but we believe there will be many other transactions such as management and administrative fees that generate income for Dondero-related entities.

As discussed above in Section II.A., during the Grant Scott control era of DAF Holdco, Mr. Dondero's effective control of DAF Holdco led DAF Holdco to make investments that benefitted him personally. These investment deprived DAF Holdco of assets that could be distributed to Participating Shareholders, including Highland Dallas.

### C. The Failure to Exercise the Put Option as an Excess Benefit Transaction

As you know, section 4958 treats as excess benefit transactions between a public charity such as Highland Dallas and a disqualified person such as Mr. Dondero economic arrangements that are above or below market between them. Section 4958(c)(3)(A) also treats as "automatic" excess benefit transactions "any grant, loan, compensation or other similar payment to" a disqualified person such as a substantial contributor.

We believe, upon examination, the Service will find that Highland Dallas has engaged in multiple automatic excess benefit transactions with Mr. Dondero or entities owed and controlled by him such as NextPoint Advisors.

First, the forbearance to exercise the Put Option effectively created an interest free loan to Dugaboy, a disqualified person. Thus, the mere fact it has remained outstanding for years means it is an automatic excess benefit transaction that requires not only the payment of the 25% excise tax by Dugaboy but also the correction of it through the payment of the full $9,250,000 plus interest.

Second, if NexPoint Advisors performs investment management services for a fee, that would be an automatic excess benefit transaction requiring not only correction but also payment of the 25% excise tax. In fact, we know from public SEC filings that NexPoint Advisors or one of its affiliates does perform investment management services for the REIT, which may itself be an excess benefit transaction requiring correction.

Finally, while other excess benefit transactions may be identified during an examination of Highland Dallas, any forbearance to exercise the Put Option to benefit Dugaboy should be regarded, at a minimum, as a "similar payment" given the fact that Mr. Dondero benefits economically in a substantial way from that forbearance.

Given that the other two directors must act to approve these actions, it is likely they have done so knowingly and willfully.

### D. Potential Non-Compliance with Section 509(a)(3) Operational Test Sufficient to Cause Highland Dallas to be Reclassified as a Private Foundation and Thus Subject to Chapter 42 Rules

In Mr. Dondero's article entitled "James Dondero: Dallas's Surprising Philanthropy Hero" (May 3, 2023, copy enclosed as Exhibit 6), Mr. Dondero said as follows:

> "Mr. Dondero and his firm have supported The Family Place, The Dallas Zoo, SMU's Tower Scholars program, The Perot Museum of Nature and Science, Education Is Freedom, and many more local charity organizations. Most gift are made through the philanthropic arm of Highland Capital Management."

Thus, in his own words, Mr. Dondero has acknowledged Highland Dallas has violated the section 509(a)(3) operational test in Treasury Regulation § 1.509(a)-4(e)(1) concerning permissible beneficiaries of a supporting organization and should be re-classified as a private foundation. That would mean that all dealings between Highland Dallas and entities owned or controlled by Mr. Dondero should be scrutinized to determine whether they constitute acts of

self-dealing described in section 4941 of the Code or violate other provisions of Chapter 42 of the Code, such as the taxable expenditure rules in section 4945.

Under Treasury Regulation § 1.509(a)(-4(e)(1), "[a] supporting organization will be regarded as 'operated exclusively' to support one or more specified publicly supported organizations . . . **only if it engages solely in activities which support or benefit the specified publicly supported organizations.**" (emphasis supplied)

The only exception to the requirement that a supporting organization benefit the supported organization "solely" is when the supporting organization provides benefits to individual members of the charitable class benefitted by the supported organization, such as by granting scholarships to graduates of a particular high school for college. *See, e.g., Nellie Callahan Scholarship Fund v. Commissioner,* 73 T.C. 626 (1980). The word "solely" is unambiguous; therefore, Mr. Dondero's own acknowledgement that Highland Dallas is the source of his funding of other admittedly charitable organizations provides conclusive evidence that Highland Dallas fails the operational test of section 509(a)(3).

Furthermore, section 509(a)(3)(C) provides that a supporting organization may not be controlled directly or indirectly by a disqualified person. A substantial contributor to a supporting organization is a disqualified person under section 4946(a)(1)(A). Thus, Mr. Donero's Dugaboy gift of the REIT Units to Highland Dallas made him a disqualified person and his effective veto power places him in control of Highland Dallas.

Therefore, we respectfully submit that that the Service should examine Highland Dallas to determine if it should be reclassified as a private foundation for the foregoing reasons and, if it is so-reclassified, all transactions between Mr. Dondero and his related or controlled entities should be evaluated to determine whether any constitute acts of self-dealing under section 4941. This should include the failure on the part of Highland Dallas to exercise its Put Option

### E. Potential Non-Compliance with Section 4966/4967 Rules Applicable to Donor Advised Funds

Finally, we respectfully submit that the Service should examine Highland Dallas to determine whether it, in effect, functions as a donor advised fund of Mr. Dondero given the fact he provided substantially all of its funding, effectively controls it and may personally benefit financially more than incidentally through entities he owns or controls from management fees, charity special events such as banquets and other means.

\*          \*          \*          \*

Representatives of DAF Holdco will be available to be interviewed by the Service in a manner that will not result in compromising confidentiality under section 6103 and without the need for an administrative summons.

Very truly yours,

SEYFARTH SHAW LLP

*Douglas M. Mancino*

Douglas M. Mancino

cc. Mark Patrick, Paul Murphy and Texas, California and Missouri Offices of the Attorney General (Charitable Trusts Sections)

DMM

## LIST OF EXHIBITS

1. Special Turnover Petition filed in March 2023 in *UBS Securities LLC and UBS AG London Branch v. James Dondero et. al.*, in the Supreme Court of the State of New York
2. Complaint and Objection to Claims filed in October 2021 in *Kirschner v. Dondero et.al.*, Case No. 19-34054-sgj11 in U.S. Bankruptcy Court, Northern District of Texas
3. Documents pertaining to The Dugaboy Investment Trust charitable contribution of 1,500,000 Class Units of NexPoint Hospitality Trust to Highland Dallas
4. Plaintiff's First Amended Complaint filed in July 2024 in *Highland Employee Retention LLC v James Dondero et.al.*, Case No. 3:24-cv-00498-K, in the U.S. District Court for the Northern District of Texas
5. Bankruptcy Court Memorandum Opinion issued in June 2021 in *In Re: Highland Capital Management, L.P. v. James Dondero,* Case No. 19-34054-sgj11
6. Post dated May 3, 2023 by James Dondero entitled: "James Dondero: Dallas's Surprising Philanthropy Hero"
7. ValueScope, LLC Slide Deck presented to Supporting Organizations' legal counsel in a Zoom call on November 18, 2024
8. Example of ValueScope, Inc. Valuation Analysis prepared for Grant Scott when he was in control of DAF Holdco

316700053v.11