# EXHIBIT 77



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 99 OF 2025 (IAJ)

IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD

## WINDING UP PETITION

TO:   The Grand Court of the Cayman Islands

**THE HUMBLE PETITION** of the **Supporting Organisations** (as defined below) (the **Petitioners**), in their capacity as members of Charitable DAF Holdco, Ltd (the **LP**) (and indirectly by way of separate petition the Charitable DAF Fund, LP (the **Fund**)) shows that:

**A      INTRODUCTION**

1. The Petitioners respectfully seek:

    (a)   an order pursuant to section 92(e) of the Companies Act (2025 Revision) (the **Act**) that the LP be wound up on the basis that it is just and equitable to do so; and

    (b)   the appointment of Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands as joint official liquidators (the **JOLs**) of the Fund; and/or

    (c)   such other orders as the Court considers to be appropriate.

B       **THE FUND**

2.   The Fund is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

3.   The Fund is governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the **ARLPA**).

4.   The Fund invests in securities for the purpose of benefiting, directly and indirectly, its Supporting Organisations (as defined below) which support various charitable causes in the U.S., including education, veteran and first responder welfare, medical research, economic and community initiatives, and youth and family programs.

5.   The LP is the sole limited partner of the Fund and is a Cayman Islands exempt company incorporated on 27 October 2011 (registration number 263805) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

6.   The LP is governed by the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (the **Articles**).

7.   The general partner of the Fund is (or at least was at the time of the Fund's formation and pursuant to the ARLPA) Charitable DAF GP, LLC (the **GP**), a Delaware company incorporated on 25 October 2011, whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

*Ownership and Management*

8.   The Fund was formed to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code (the **Code**) … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" (ARLPA, Recitals).

9.   The Petitioners understand that exempt entities under section 501(c)(3) of the Code, commonly referred to as charitable organisations, must be operated exclusively for charitable purposes and not for the benefit of private interests. 'Supporting organizations' under section 509(a)(3) of the Code must carry out such exempt purposes by supporting *other* charities.

10.  In this context:

     (a)   The LP holds ninety-nine percent (99%) of the economic interest in the Fund. The other one per cent (1%) in the Fund is held by the GP or its successor as GP.

    (b)    The LP issued 305 participation shares (the **Participation Shares**) that are held by four Delaware corporate entities, namely: The Highland Dallas Foundation, Inc. (**HDF**), The Highland Kansas City Foundation, Inc. (**HKCF**), The Highland Santa Barbara Foundation, Inc. (**HSBF**), and The HCMLP Charitable Fund (**HCMLP**) (together, the **Supporting Organisations**).

    (c)    Each Supporting Organisation provides funding to its respective U.S. charitable foundation (together, the **Charities**) which are the ultimate beneficial owners of the Fund's entire economic interest.

    (d)    The LP also issued 100 management shares (the **Management Shares**) which attach the only voting rights for all shareholders of the LP. The terms of the ARLPA and the Articles together grant complete management control of the Fund to the holder of the Management Shares, and the holder of the entire issued share capital in the GP (the **Membership Interest**).

11. The Management Shares and the Membership Interest have at all material times been held by a single individual who, as a result, has sole control of the Fund structure (the **Control Position**).

**C**    **THE PETITIONERS**

12. As stated above, the Petitioners (the Supporting Organisations) are non-profit charitable entities exempt from taxation under section 501(c)(3) of the \ Code and through the LP hold 99% of the economic interest in the Fund.

13. The Supporting Organisations provide funding directly to the Charities as follows:

    (a)    HDF holds 32.87% of the Participating Shares. HDF provides funding to The Dallas Foundation, a charitable entity established in Texas in 1929, which has awarded over $1 billion in grants and manages over $500 million in assets.

    (b)    HKCF holds 32.87% of the Participating Shares. HKCF provides funding to the Greater Kansas City Community Foundation, a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants and currently manages over $5 billion in assets.

    (c)    HSBF holds 32.787% of the Participating Shares. HSBF provides funding to the Santa Barbara Foundation, a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

    (d)    HCMLP holds 1.639% of the Participating Shares. HCMLP provides funding to the North Texas Community Foundation, which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023.

14. Since the Fund's inception in 2011, through profits generated by the Fund the Supporting Organisations have granted over $42 million to charitable foundations and have funded $32 million in total commitments, including donations to 275 organisations, with average annual grant payments of $3.7 million.

**D      BACKGROUND**

15. The Fund was created in 2011 on the instructions of James Dondero. Mr Dondero is the President of NexPoint Advisors, L.P. (*NexPoint*), an alternative investment firm registered with the U.S. Securities and Exchange Commission (*SEC*), and the former President of Highland Capital Management, L.P. (*Highland*), also an SEC registered investment advisor which he founded in 1993. Mr Dondero is a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles he utilises to donate such funds to charitable organisations. Mr Dondero holds no ownership or control stake in the Fund or any related entities, although he sits on the boards of the Supporting Organisations.

16. From the Fund's formation until March 2021, the Control Position was held by Grant Scott. On 25 March 2021, Mr Scott: (i) resigned as director of the Fund and the LP, (ii) appointed Mark Patrick as director of the Fund and the LP, and (iii) transferred to Mr Patrick the Management Shares in the LP and Management Interest in the GP. Mr Patrick therefore assumed the Control Position from that date.

17. From 2008 to 2021, Mr Patrick was employed as tax counsel by Highland Capital Management, LP (*Highland*), an investment advisor founded by Mr Dondero. From March 2021 to October 2024, Mr Patrick was employed as tax counsel by Skyview Group (*Skyview*). In both positions, Mr Patrick acted as an advisor to Mr Dondero and entities owned or affiliated to him.

18. On 22 April 2021, Paul Murphy, a Cayman Islands resident, was appointed as director of the LP.

19. On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Northern District of Texas (the *Highland Bankruptcy*). The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

**E      EVENTS FOLLOWING MR PATRICK'S ASSUMPTION OF THE CONTROL POSITION**

20. Since assuming the Control Position, Mr Patrick has used that position to advance his own interests to the detriment of the LP, the Fund, the Supporting Organisations and the Charities.

*Non-disclosure of personal interest in grant*

21. In June 2023, Mr Patrick made a request that the Highland Dallas Foundation (i.e. the Supporting

Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, it was discovered that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

22. The grant payment was authorised on 5 September 2023, but Mr Patrick was informed that further payments were unlikely.

*Attempt to obtain secret profit*

23. In September 2023, Mr Dondero was contacted by Kevin Cronin of Fortaris Capital Advisors (**Fortaris**), a firm providing litigation support and investigative services which, at the time, was engaged by the Fund on an unrelated matter.

24. Mr Cronin disclosed to Mr Dondero that Mr Patrick had approached him with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between US$25,000 and US$50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation.

25. Mr Cronin refused Mr Patrick's proposal.

26. Mr Patrick's attempt to obtain a secret, undisclosed personal profit from the Fund would, if successful, have constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. It was otherwise a breach of Mr Patrick's duties to the LP and, through the LP, to the Fund.

*Unauthorised use of MNPI / Insider Trading*

27. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (**MNPI**) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities and other laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (the **Compliance Policy**). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing each quarter that they will not use MNPI while trading. Mr Patrick completed an annual 2023, Q4 2023, Q1 2024 and Q2 2024 certifications, among others.

28. In late August 2024, Mr Patrick contacted the attorneys to the Dallas Foundation to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to

exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

29. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick. The investigation concluded that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations and that Mr Patrick had attempted a serious breach of U.S. securities laws.

30. Mr Patrick resigned from Skyview immediately before the internal investigation was finalised. At the same time, he terminated the Fund's services agreement with Skyview. That termination was not in the interests of the Fund, was for Mr Patrick's own self-protection and was otherwise a breach of Mr Patrick's duties to the LP and, through the LP, to the Fund.

*Financial Irregularities in the Fund / Unexplained Expenditure*

31. A review of the Fund's financial records conducted by Skyview covering the calendar years ending 2018 to 2023 and the first half of 2024 showed significant increases in expenditures, notably:

    (a) **Directors' fees**, which increased from US$40,000 in 2022 to almost US$600,000 in 2023, and in the first half of 2024 alone, increased further to around US$2.25 million; and

    (b) **Expenses overall**, which for the first half of 2024 were around US$18.3 million, with a further US$18.6 million being spent in the calendar year 2023.

32. In October 2024, the Charities requested that Mr Patrick provide financial information about the Fund entities to seek to understand these increases in expenditures. This information was not provided.

33. In November 2024, Holland and Knight (**H&K**), the Charities' US attorneys, delivered a letter to Mr Murphy from the Charities advising that the Charities no longer had confidence in the governance of the Fund and considered that a reorganisation was required (the **No Confidence Letter**). No response to the No Confidence Letter was received.

34. In January 2025, further correspondence was sent to Mr Patrick and Mr Murphy advising that a better understanding of the Fund's asset position was needed and expressing serious concern that the Charities' requests for information continued to be disregarded, reflecting an ongoing lack of transparency on the part of Mr Patrick and Mr Murphy. Mr Murphy responded via email to this request noting that he and Mr Patrick would "*present directly to the foundations/supporting organisations*" to address some of the concerns in the No Confidence Letter.

35. H&K responded to Mr Murphy's email noting, *inter alia*, that the Supporting Organisations had legitimate concerns and highlighted that "*the last information they received from in July of 2024, before Mr Patrick shut down [communication] showed that legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022*" (a 300% increase, if annualized) and "*director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024*" (a 12,400% increase, if annualized).

36. In February 2025, further correspondence was sent between H&K and Douglas Mancino (**Mr Mancino**) of Seyfarth Shaw LLP (**Seyfarth**), US counsel purporting to act for the Fund, whereby Seyfarth rejected the reported increases in legal and directors' fees and provided a valuation of the Fund from 2020 to support the suggestion that similar information was provided to the Charities when Mr Scott was in the Control Position.  It is clear that Mr Patrick and/or Mr Murphy has instructed Seyfarth, purportedly on behalf of the Fund, to take a hostile, indignant and non-neutral stance when faced with reasonable requests on behalf of the Charities, as ultimate beneficiaries of the assets of the Fund.  Such conduct is a breach of their duties to the LP and, through the LP, to the Fund.

37. H&K responded to Seyfarth that the Charities were becoming frustrated by the ongoing lack of transparency and refusal to respond to simple inquiries about the financial position and governance of the Fund. Seyfarth sent an email to H&K requesting available dates for Mr Murphy to make the promised presentation to the Charities. The next day, H&K suggested three potential dates/times for such a call between 26 March and 3 April 2025, but did not receive any response. On 3 April 2025, Seyfarth sent an email to H&K stating that they had just learned that a call was scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the source of confusion. Seyfarth has made no further efforts to schedule the meeting, nor has it otherwise provided any of the requested financial information.

*Replacement of GP without notification*

38. In February 2025, H&K discovered that Mr Patrick had redomiciled and replaced the general partner of the Fund, without notice to the Charities, almost one year prior.

39. On 27 February 2024, CDH GP, Ltd (the **New GP**) was incorporated in the Cayman Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

40. Mr Patrick is the sole director of the New GP.

*Sale of assets*

41. Following Mr Patrick's resignation from Skyview and his termination of Skyview's services agreement with the Fund, the Petitioners have become aware that assets of the Fund have been

sold without explanation, at values which appear to be below-market.

*Hunter Mountain*

42. In February 2025, an individual associated with Mr Patrick, Shawn Raver, asked for the in-bound wire instructions for one of Mr Dondero's affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain is an indirect majority owned subsidiary of the Fund and owns the majority of the distribution rights of the equity position in the Highland Bankruptcy. The residual value of the Highland estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy.

43. According to Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value. After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold, at potentially a substantial undervalue, to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser.  In the absence of a further or better explanation, there is the inference of self-dealing, fair dealing, no profit or conflict rules

*Atlas IDF, L.P.*

44. Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the Fund.  The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company.  The majority annuity policyholder is Empower Dallas Foundation (**EDF**), a charitable foundation for which Mr Dondero serves as President whose purpose is to benefit the Dallas Foundation.

45. On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of:

    (a) concerns about the long-term availability and viability of back-office support;

    (b) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of Mr Donero's affiliates) dated 7 May 2014 in the amount of $2.3M and 27 May 2014 in the amount of $5M, held by the Partnership; and

    (c) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up.

46. At the time, the amounts outstanding on the two Notes, including accumulated interest, were in excess of $13M. The intention was to sell the Notes collectively for $500,000.  Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 and attempted sale of the Notes to

an affiliate.

47. On 27 February 2025, H&K as counsel for EDF (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes.

48. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and further noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP*." The initial zero valuation and proposed $500,000 sale price is commercially unjustifiable.

*Attorney General Investigation*

49. The Petitioners have been informed that on 14 March 2025, the Texas Attorney General (**Texas AG**) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organisation, conduct and management of Charitable DAF GP, LLC, and its related entities.

50. It is understood that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

51. The Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

**F      GROUNDS FOR WINDING UP**

52. The Supporting Organizations bring this Petition based on the multiple concerns identified above about the governance of the LP and the Fund, including potential mismanagement of assets and/or use of assets for purposes other than to benefit and support the Charities, as the ultimate beneficial owners of the Fund's interest, in carrying out their charitable purposes, in accordance with the terms of the ARLPA, on the basis of a complete breakdown in confidence in the person in the Control Position.

53. Accordingly, the Petitioners seek a winding up of the LP on a just and equitable basis and in particular, without limitation, on the following grounds (each discussed in detail below):

(a)   governance issues and mismanagement; and

(b)   the need for an investigation into the recent activities and expenditure of the Fund; and

(c)   justifiable loss of faith and confidence in the management of the Fund.

F    **APPLICATION**

54. Given the above, the Petitioners seek an order that the LP be wound up pursuant to section 92(e) of the Act.

55. The Petitioners also seek an order appointing Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands, as the joint official liquidators (*JOLs*) of the LP.

56. Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd:

    (a) are "qualified insolvency practitioners" as defined in section 89 of the Act and as prescribed by Regulation 4 of the Insolvency Practitioners' Regulations (2023 Consolidation) (*IPR*);

    (b) meet the residency requirements contained in Regulation 5 of the IPR;

    (c) meet the independence requirements prescribed by Regulation 6 of the IPR;

    (d) meet the insurance requirements prescribed by Regulation 7 of the IPR and A&M holds a trade licence which authorises its staff to carry on business as professional insolvency practitioners; and

    (e) consent to their appointment as official liquidators of the LP, if so appointed by the Court.

**YOUR PETITIONERS THEREFORE HUMBLY PRAY THAT** –

1. The LP be wound up by the Court in accordance with section 92(e) of the Act.

2. Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands be appointed as the joint official liquidators (the *JOLs*) of the LP.

3. The JOLs be authorized to act jointly and severally in their capacity as liquidators of the LP.

4. The JOLs shall not be required to give security for their appointment.

5. In addition to their powers prescribed in Part II of the Third Schedule to the Act, which are exercisable without sanction of this Honourable Court, the JOLs may also without further sanction or intervention from this Honourable Court exercise the following powers set out in Part I of the Third Schedule to the Act:

    (a) The power to engage staff, agents and/or consultants (whether or not as employees of the LP) in the Cayman Islands and elsewhere to assist the JOLs in the performance of their

        functions; and

(b)     The power to engage attorneys and other professionally qualified persons in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions.

6.     The JOLs be authorised to do any act or thing considered by them to be necessary or desirable in connection with the liquidation of the LP.

7.     The JOLs' remuneration and expenses be paid out of the assets of the LP in accordance with section 109 of the Act, Part III of the Regulations, and CWR Order 20.

8.     The costs of this Petition shall be paid out of the assets of the LP as an expense in the liquidation, such costs to be taxed if not agreed with the JOLs.

9.     The JOLs shall be at liberty to apply to further directions concerning their functions and the exercise or the proposed exercise of their powers.

10.     Such further or other orders and directions be made as the Court shall deem fit.

**AND** your Petitioners will ever pray etc.

Dated 10 April 2025

*Johnstone Law*
_____
**Johnstone Law Ltd.**

          **NOTE:** This Petition is intended to be served on:

      **CHARITABLE DAF HOLDCO, LTD** at its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

**THIS PETITION** was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/00016**)

## NOTICE OF HEARING

**TAKE NOTICE THAT** the hearing of this Petition will take place at the Law Courts, George Town, Grand Cayman, Cayman Islands on  April 29 2025   at 2:00pm ~~am~~

Any correspondence or communication with the Court related to the hearing of this Petition should be addresses to the Registrar of the Financial Services Division of the Grand Court at PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands.