# EXHIBIT 85

CAUSE NO. _____

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,** | |
| *Plaintiffs*, | **IN THE TEXAS BUSINESS COURT** |
| **v.** | **1ST DIVISION** |
| **MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd.,** | **DALLAS, TEXAS** |
| *Defendants.* | |

### PLAINTIFFS' ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER

**TO THE HONORABLE JUDGE OF SAID COURT:** The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (collectively, the "Plaintiffs" or "Supporting Organizations") file this Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Application for Appointment of Receiver, and in support thereof, respectfully show the Court as follows:

### I.    PRELIMINARY STATEMENT

1.1    Defendant, Mark Patrick, through a host of corporate manipulations, took over $270 million in cash and assets that supported some of the most important community-based

charities in the country. In Patrick's own testimony from just last Wednesday, June 25th, the Supporting Organizations, plaintiffs here, were left with "nothing."[1]

1.2     Through the mechanism of Charitable DAF GP, LLC (organized in Delaware) and later via a secretly incorporated entity, CDH GP, Ltd., Mark Patrick held the sole control position of what was a $270 million charitable fund (Charitable DAF Fund, LP) that four charities and the Supporting Organizations relied on to perform vital and sustained philanthropic work in specific communities in the United States.  Patrick flagrantly violated both his express and implied fiduciary duties to the Supporting Organizations. He did so in order to redirect the fund's beneficial ownership to a brand-new sham charitable organization controlled by him, DFW Charitable Foundation. These actions come against a backdrop and pattern of sustained self-aggrandizement by Patrick using the fund's resources and his technical authority over them.  If the Defendants here are not immediately prevented from taking further adverse actions, then placed into receivership and subjected to judicial scrutiny, the Plaintiffs will be cut off from the lifeblood of their charitable work by the very person whose duty was to act in their interests.  Accordingly, Plaintiffs seek a Temporary Restraining Order and Temporary Injunction freezing the funds, followed by the appointment of a Receiver over the funds and the organization holding them.

## II.     DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1     Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure.  Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

---

[1] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200)

2.2     Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

## III.    PARTIES

3.1     T**he Highland Dallas Foundation, Inc. ("HDF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HDF provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of public needs.

3.2     **The Highland Kansas City Foundation, Inc. ("HKCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HKCF provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $7 billion in in charitable grants that support a broad range of public needs.

3.3     **The Highland Santa Barbara Foundation, Inc. ("HSBF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HSBF provides funding to the Santa Barbara Foundation, established in 1928, that supports a broad range of public needs.

3.4     **DFW Charitable Foundation ("DFWCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.  It was organized on December 9, 2024, with Defendant Mark Patrick as DFWCF's sole member.  It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes.  DFWCF is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254.  DFWCF maintains a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, where it may be served with process.

3.5      **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Fund structure, as explained more thoroughly below. Patrick resides and may be served with process at 6716 Glenhurst Drive, Dallas, Texas 75254, or served anywhere he may be found.

3.6      **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at 6716 Glenhurst Drive, Dallas, Texas 75254.  It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

3.7      **CDH GP, Ltd**. is a Cayman Island limited company with its registered office at Campbells Corporate Services Limited, Floor 4 Willow House, Cricket Square, Grand Cayman Ky1-9010. It may be served with process through Patrick, its 100% owner and sole director, at 6716 Glenhurst Drive, Dallas, Texas 75254, or anywhere he may be found.

3.8      **CHARITABLE DAF GP, LLC** is a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

## IV.      JURISDICTION AND VENUE

4.1      Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and DAF HoldCo, Ltd;

- and is an action by an owner of an organization, namely the Supporting Organizations as participating and beneficial owners of DAF HoldCo, Ltd and thereby Charitable DAF, L.P., and is brought against a controlling person and managerial official of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFWCF, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF, GP, LLC's, and CDH GP, Ltd's obligations in the capacity of a controlling person and managerial official of DAF HoldCo, Ltd and Charitable DAF, L.P.;

- and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Supporting Organizations as a controlling owner of DAF HoldCo, Ltd, CDMCFAD, LLC, and Charitable DAF, L.P., DFW Charitable Foundation by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith.

4.2    The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3    The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4    Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident,

Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition. Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas. Defendants have also consented to the jurisdiction of Texas courts.

4.5     Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas. On information and belief, DFWCF, CDH GP, Ltd. and CDMCFAD are headquartered in Dallas County. Dallas County is within the 1st Division of the Texas Business Court.

## V.     FACTUAL BACKGROUND

### A.  *The Fund Structure*

5.1     James Dondero was the President of Highland Capital Management, L.P. (“**Highland**”), an SEC registered investment advisor. At Mr. Dondero’s direction, in 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States.

5.2     To that end, in 2011, “Charitable DAF Fund, L.P. (“**Charitable DAF Fund**”) was formed to hold the donated assets.

5.3    The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4    At the same time the Charitable DAF Fund was created, Charitable DAF HoldCo, Ltd ("**Charitable DAF HoldCo**"), a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5    The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities and their supporting organizations in California, Kansas, and Texas. Participating shares in Charitable DAF HoldCo were therefore issued to four Supporting Organizations, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the four Supporting Organizations owned 100% of Charitable DAF HoldCo. The four Supporting Organization held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the four Supporting Organizations owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Supporting Organizations are the Plaintiffs in this Lawsuit.

5.6    In turn and as intended, the funds provided to the Plaintiff Supporting Organizations from the Charitable DAF Fund empowered them to provide funding directly to charitable foundations in three regions of the United States. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Supporting Organizations and receive regular grants for charitable work ultimately funded by Charitable DAF Fund.

5.7     Since the Charitable DAF Fund's inception, the Supporting Organizations have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Supporting Organizations and the charitable organizations perform irreplaceable philanthropic work in their respective communities, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

## B.  *Control of the Fund*

5.8     The founders of the Charitable DAF Fund and of Charitable DAF HoldCo wanted to ensure that the fund assets were professionally managed by experts. So, although the Supporting Organizations were the sole beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it, management control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with those organizations but rather in "Management Shares," with general partner status. These "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But they did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged solely to the Supporting Organizations.

5.9     So, the "Management Shares" exercised control over the assets and over the operations of Charitable DAF HoldCo, even though they conveyed no economic benefit. In the interest of efficient management, the Management Shares and general partner status in the Charitable DAF Fund were concentrated in one person, the "**Control Position**." The Control Position was therefore responsible to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of their economic beneficiaries—the "Supporting Organizations," which held their "Participating Shares." The Control Position therefore owed the

Supporting Organizations fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10    In essence, the governing documents of Charitable DAF HoldCo grant complete control of Charitable DAF Fund structure to the holder of the 100 Management Shares in Charitable DAF HoldCo. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Charitable DAF Fund structure.

5.11    The Charitable DAF Fund, however, is also expressly, separately controlled by the Control Position. Similar to control over Charitable DAF HoldCo, control over the Charitable DAF Fund is separate from the beneficial economic ownership of the Charitable DAF Fund (which belongs entirely to the Supporting Organizations). Control over the Charitable DAF Fund was reposited in the Control Position through its complete ownership of a Delaware entity named Charitable DAF GP, LLC[2] (the "**Delaware GP**"). The Delaware GP was the managing general partner in the Charitable DAF Fund.

5.12    The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund, dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. The ARLPA makes it clear the Control Position is to exercise his powers for the sole benefit of the Supporting Organizations.

5.13    For example, the Preamble to the ARLPA states:  "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code

---

[2] The Charitable DAF GP, LLC, held all the general partnership shares in Charitable DAF Fund, which provided all management control over the Charitable DAF Fund, but conveyed no beneficial economic interest.

of 1986, as amended and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein[.]"

5.14    Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.*"[3]

5.15    Section 1.6 (Powers) likewise emphasizes:  "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*"[4]

5.16    The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Indirect Charitable Owners" and contemplates the engagement of investment (and other service) advisors to achieve this. In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support. The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Supporting Organizations.

5.17    Grant Scott was initially selected for the Control Position. Mr. Scott was a longtime friend of Mr. Dondero's and a lawyer in North Carolina. Mr. Dondero knew and trusted Mr. Scott.

---

[3] Emphasis added.
[4] Emphasis added.

Mr. Scott effectively served the Supporting Organizations' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of decade. During this time, the Supporting Organizations and their respective charitable foundations made great strides in creating philanthropic, and charitable, work that was efficient, that was steady and reliable, and that grew and built on their progress year after year.

C. *Mark Patrick's Assumption of Control*

5.18    Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

5.19    Mark Patrick, a tax attorney and employee of Mr. Dondero who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested to Mr. Scott and Mr. Dondero that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund.  At the time, Patrick was an employee of Mr. Dondero's enterprises and was serving as Mr. Dondero's attorney and Mr. Dondero had no objection to Mr. Scott transferring the Control Position to Patrick. As a result of his attorney and employee status, Mr. Patrick owed significant fiduciary duties to Mr. Dondero's entities and to the Charitable DAF Fund structure—fiduciary duties that he has violated in a series of self-serving and self-dealing transactions.

5.20    On March 25, 2021, Mr. Scott resigned and appointed Patrick as director of DAF HoldCo, transferring all his management shares and membership interest to Patrick for nominal consideration. Patrick therefore assumed the Control Position from that date. Patrick then hired

Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

5.21    At the time Patrick assumed the Control Position, he was employed at Skyview Partners, a service organization that provided support primarily to Mr. Dondero and entities in which Mr. Dondero had an interest. As an employee of Skyview, he owed fiduciary duties to his employer.

### D.   *Patrick's Breaches of Fiduciary Duty*

5.22    In 2023, while still employed by Dondero entities, and as the sole fiduciary for the Charitable DAF Fund and DAF HoldCo, Patrick initiated a two-year pattern of malfeasance all culminating in his current effort to abscond with $270 million. His initial small infidelities quickly blossomed into a brazen, fraudulent play for the Charitable DAF Fund and its $270 million in holdings, putting at risk the charitable works supported by the Supporting Organizations.

### E.   *Undisclosed Self-Dealing*

5.23    In June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity, which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

### F.   *Attempted Fraudulent Kickback Scheme*

5.24    In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that

the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.25    Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.26    Mr. Dondero ensured that Supporting Organizations were also informed about Patrick's kickback scheme. Despite significant concern, the Supporting Organizations had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

## G. *Insider Trading*

5.27    In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview to advise The Dallas Foundation to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

5.28    Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.29    Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

## H. *Financial Irregularities and Lack of Transparency*

5.30    After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Supporting Organizations were essentially cut off from any view into the financial transactions and soundness of the fund. As of September 2024, the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Supporting Organizations and ultimately their supported Charities.

5.31    But a review of the Charitable DAF Fund's last accessible financial records showed dramatic and unexplained increases in expenditures:

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).

- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).

- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.32    Despite repeated requests from the Supporting Organizations and their counsel and counsel for the Charitable DAF Fund, Patrick and Murphy have ignored and refused to provide requested financial information or explanations for these dramatic expenditure increases.

5.33    Patrick must have personally benefited from the dramatic increases in director's fees and, given Patrick's prior attempt to implement a kickback scheme through Mr. Cronin, the other remarkable increases in expenses raise deep concerns about potential self-dealing.

**I.    *Patrick Ignores the Supporting Organizations Concerns***

5.34    On November 11, 2024, given what the Supporting Organizations already knew, the three major Supporting Organizations drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[5]

5.35    The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."[6]

5.36    Patrick and Murphy never responded to the letter, other than a threat that if the Supporting Organizations did not withdraw it, then Patrick and Murphy would embark on an effort at the Internal Revenue Service to revoke the Supporting Organizations' charitable status.

5.37    In January 2025, the Supporting Organizations demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. Murphy responded via email to this request stating that he and Patrick would "present directly to the foundations/supporting organi[z]ations" to address some of the concerns in the No Confidence Letter. Murphy never did.[7]

---

[5] *See* Ex. 4-A, Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)
[6] *Id.*
[7] *See* Ex. 4-B, Email chain ending Jan. 23, 2025 (Appx. Pg. 171)

5.38    Counsel for the Supporting Organizations and for the Charitable DAF Fund exchanged further communications, but Patrick, Murphy, and the Charitable DAF Fund's counsel never provided answers and information in response to the Supporting Organizations' basic requests. Instead, they wrapped all their future communications in half-truths and subterfuge.[8] At the same time, they offered the Supporting Organizations vague assurances that all their maneuvers were to improve the structure, focus, and performance of the fund, for the benefit of the Supporting Organizations.

5.39    The Charitable DAF Fund's counsel promised a meeting to address the Supporting Organizations' concerns, but after the Supporting Organizations' counsel suggested dates, the Charitable DAF Fund and its counsel delayed and delayed until it eventually went silent.[9]

5.40    In the interim, Patrick accelerated his multi-year fraud.

### J.  *Dilution Scheme and Liquidation Maneuver*

5.41    Between December 2024 and the present, Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund, and alienate those same assets entirely away from them. The purpose and result of Patrick's moves was to entirely eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets. In short, he stole them.

5.42    In December 2024, Patrick formed new entities (as described below) with Patrick as the sole director. He then replaced the current entities holding and controlling the Charitable DAF Fund with his own entities, essentially transferring all ownership and control to himself in a brazen act of self-dealing. He never notified the Supporting Organizations of this massive

---

[8] *See* Exs. 4-A, Ltr. of Feb. 14, 2025 & Ex. 4-C Ltr. of Feb. 27, 2025 (Appx. Pg. 162-182).
[9] *See* Ex. 4-C, Email chain ending April 9, 2025 (Appx Pg. 179-182).

reorganization of the Charitable DAF Fund. Indeed, the Supporting Organizations found out about this monumental reorganization only when Patrick and his counsel had to admit it in a Cayman court as part of the Supporting Organization's successful effort to appoint Cayman Liquidators to unravel Patrick's fraud in that jurisdiction.

5.43    In a move that would make most fraudsters blanch, and certainly continued to violate all his fiduciary duties, on December 9, 2024, Patrick formed Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and its registered address was Patrick's home. Patrick then issued his charity a fifty-one percent (51%) interest in the charitable assets. In essence, Patrick awarded himself the ability to distribute over half of the Charitable DAF Fund's $270 million in economic interest to his own entity, from his living room in Dallas.

5.44    Three days later, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.45    In secret, and without notice to the Supporting Organizations, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100 percent of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100 percent of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick ensured a different and new entity (CDMCFAD) held Charitable DAF Fund.

5.46    Patrick's fraud continued to evolve in February 2025. On February 7, 2025, again without notice to the Supporting Organizations, DAF HoldCo (in an *ultra vires act)* allotted 318

participating shares to DFWCF, the Sham Charity controlled by Patrick. This sham dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[10] interest was diluted from 1.639% to 0.80%. Said another way, Patrick absconded with over half of the participating interest of the Supporting Organizations and other charitable funds. Before, during, and after this action—and at all times it was contemplated and executed—Patrick and Charitable DAF HoldCo still owed fiduciary duties to the Supporting Organizations.

5.47    In February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Patrick's complete control of the assets of Charitable DAF Fund.

5.48    On March 27, 2025, Patrick caused CDMCFAD (the holder of $270 million in assets) to issue shares to the Sham Charity, *and only to the Sham Charity*. He issued no shares in CDMCFAD to the Supporting Organizations. His fraudulent scam was nearly complete. Now, Patrick's Sham Charity controlled all the direct economic interest in the entity Patrick had inserted between Charitable DAF HoldCo and the assets in Charitable DAF Fund, and the Supporting Organizations were left out in the cold.

5.49    On April 2, 2025, Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6

---

[10] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

million, a ridiculous transaction bereft of reasonably equivalent value.[11] After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFWCF, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[12]

5.50    Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Patrick allegedly distributed a paltry portion of $1.6 million to the Supporting Organizations, receipt of those funds has yet to be verified. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Supporting Organizations' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Supporting Organizations.

### K. *The Cayman Island Proceedings*

5.51    On April 2, 2025, again unbeknownst to the Supporting Organizations, Patrick placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.52    But the Supporting Organizations already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Supporting Organizations well-

---

[11] *See* Ex. 3, p. 5, Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg.  102-103)
[12] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, CaseNo. 19-34054-sgj-11; (Appx. Pg. 200).

founded concerns including their expression of no-confidence; (3) engaged in a pattern of fraudulent self-dealing; (4) taken all participating ownership from the Supporting Organizations without any approval or appropriate compensation; and (5) and restructured the underlying funds. This was enough to convince the Supporting Organizations to take action.

5.53    The Supporting Organizations filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.*  Absent doing so, the Supporting Organizations would not have learned about Patrick's voluntary liquidation.

5.54    Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFWCF and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.55    The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[13]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

---

[13] Ex. 8, Supervision Order (Appx. Pg. 244-246)

6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.56    While the Cayman Islands-appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick, DFWCF, and CDMCFAD (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the Charitable DAF Fund and DAF HoldCo.  In the meantime, the rightful beneficial owners, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the Charitable DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that rely on funding from the Charitable DAF Fund.

## VI.    CAUSES OF ACTION

### Count I - Breach of Fiduciary Duty Against Patrick,  CDH GP, Ltd., and Charitable DAF GP, LLC

6.1    Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

6.2    In "a limited partnership, the general partner stands in the same fiduciary capacity to the limited  partners as a trustee stands to the beneficiaries of a trust."  *Hughes v. St. David's Support Corp.,* 944 S.W.2d 423, 425–26 (Tex. App.—Austin 1997, writ denied); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (There "has never been any serious doubt that

the general partner of a Delaware limited partnership owes fiduciary duties."). Likewise, under traditional principles of equity, and various statutes generally hold that a manager of an LLC would qualify as a fiduciary of that LLC and its members. *Auriga Capital Corp. v. Gatz Properties,* 40 A.3d 839, 850 (Del. Ch. 2012), judgment entered sub nom. *Auriga Capital Corp. v. Gatz Properties, LLC* (Del. Ch. 2012), aff'd, 59 A.3d 1206 (Del. 2012); *Davis v. Crawford*, 700 S.W.3d 438, 449 (Tex. App.—Eastland 2024, no pet.) ("[T]he relationship between a managing member of an LLC and a nonmanaging member is similar to that of a general partner/limited partner relationship, and that such an arrangement thereby creates a fiduciary obligation on the part of the managing member.").

6.3    By virtue of Patrick's Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, Patrick owed fiduciary duties to the Plaintiffs.

6.4    Patrick breached his fiduciary duties to the Plaintiffs by stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.5    Patrick breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.6    Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.

6.7    Patrick breached his fiduciary duty by successfully soliciting a charitable contribution ultimately from a Supporting Organization to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.8    The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support. Plaintiffs have suffered damages as a result of Patrick's breach of his fiduciary duties.

### Count II - Constructive Fraud Against Patrick

6.9    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.10    "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied).  "[I]n a claim for constructive fraud, the actor's intent is irrelevant." *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 879 (Tex. App.—El Paso 2021, pet. denied).  "[C]onstructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.*

6.11    As a fiduciary, Patrick's conduct in diluting the Plaintiffs' interests, selling assets at below-market values to undisclosed parties, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.12    Patrick injured public interests by his conduct. Plaintiffs have suffered damages as a result of Patrick's fraud.

### Count III - Unjust Enrichment Against Patrick, CDMCFAD, and DFWCF

6.13    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.14    A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.15    Patrick and DFWCF stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.16    Patrick and DFWCF took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with DFWCF.

6.17    Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.18    Patrick and DFWCF have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damages by Patrick's unjust enrichment.

### Count IV – Conversion Against Patrick, CDMCFAD, and DFWCF

6.19    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.20    Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the defendant refused the plaintiff's demand for return of the property. *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

6.21    The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.22    Patrick with DFWCF has unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted all the legal and beneficial economic interests to Patrick's controlled entity, DFWCF.

6.23    The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which Patrick and now, DFWCF, have ignored and refused. Plaintiffs have been damages as a result of these conversions.

**Count V – Imposition of Constructive Trust Against Patrick, CDMCFAD, and DFWCF**

6.24    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.25    "A constructive trust is considered a legal fiction and is a creation of equity to prevent a wrongdoer from profiting from his wrongful acts." *In re Harding*, 563 S.W.3d 366, 372 (Tex. App.—Texarkana 2018, no pet.). "[T]o obtain a constructive trust, [a party] must prove: (1) breach of a special trust, fiduciary relationship,   or actual   fraud;   (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." *Id.* (cleaned up).

6.26    Patrick through DFWCF has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of DFWCF and Patrick.

6.27    All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

## VII.    EMERGENCY APPLICATION FOR RECEIVERSHIP

7.1    Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

7.2    The Plaintiffs seek the immediate appointment of a receiver over Defendants DFWCF and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code §§ 64.001(a)(3), (7), Texas Business and Organizations Code § 11.410, and the Court's inherent equitable powers.

### A. *Texas Civil Practice & Remedies Code*

7.3    [U]nder section 64.001 of the Texas Civil Practice and Remedies Code ("**CPRC**"), a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," CPRC §§ 64.001(a)(3) or "in any case in which a receiver may be appointed under the rules of equity." CPRC §§ 64.001(a)(7); *Elliott v. Weatherman*, 396 S.W.3d 224, 228 (Tex. App.—Austin 2013, no pet.).

7.4    A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. CPRC § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5    A probable interest exists by statute in actions between partners and in actions between joint owners of property. CPRC § 64.001(a)(3).

7.6    One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM*

*Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App. – Dallas 2024, pet. denied, reh'g denied).

**B.  *Texas Business and Organizations Code***

7.7     Like CPRC § 64.001, a court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." Tex. Bus. & Orgs. Code § 11.403(a)(3).

7.8     Additionally, under Section 11.410 of the Texas Business and Organizations Code ("TBOC"), a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. TBOC § 11.410(a).

**C.  *Rules of Equity***

7.9     In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. The CPRC, § 64.004 makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision.

**D.  *Receivership Standards Under Texas Law and Equity***

7.10    "The appointment of a receiver lies within the sound discretion of the trial court." *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.). "The appointment of a receiver, either as authorized by statute or usages of equity, will not be disturbed on appeal unless the record reveals a clear abuse of discretion." *O & G Carriers, Inc. v. Smith Energy 1986-A P'ship*, 826 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1992, no writ).

7.11    The party submitting an application for appointment of a receiver bears the burden of proof to present evidence justifying the appointment. *Furgerson v. First Nat'l Bank*, 218 S.W.2d 1019, 1020 (Tex. Civ. App. – Texarkana 1949, no writ). The party can meet that burden by submitting a sworn verification supporting the claimed grounds for the appointment, *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App. – Corpus Christi 1999, no pet.), and a court may consider oral testimony as evidence in support of an application. *See Furgerson*, 218 S.W.2d at 1020.

7.12    An application seeking a receivership pursuant to a statutory provision must allege facts that meet the elements of the provision. *Associated Bankers Credit Co. v. Meis*, 456 S.W.2d 744, 748 (Tex. Civ. App. – Corpus Christi 1970, no writ). The facts alleged in the application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.], no writ).

7.13    Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

### E.    *The Supporting Organizations are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities*

7.14    The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.15    Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.16    Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure.  The Plaintiffs have not received any

just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.17    Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.18    Patrick dominates and controls the Receivership Entities.  As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes.  To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.19    The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.20    The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

7.21    The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.22    The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate

the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.23   Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

### Count VI – APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP

8.1.   Plaintiffs seek immediate injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund as of the instant date of this filing, regardless of where they are presently held.  If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.2.   A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." Tex. Civ. Prac. & Rem. Code § 65.011.  "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties.'" *Lometa Bancshares, Inc. v. Potts*, 952 S.W.2d 631, 633 (Tex. App.-Austin 1997) (*quoting Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966)). "In cases like the present, an applicant for the writ must show (1) a probable right to

recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued." *Lometa*, 952 S.W.2d at 633 (citing Tex. Civ. Prac. & Rem. Code Ann. § 65.011 (West 1997); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968)).

8.3.    Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending.  In other words, "the adequacy of an available legal remedy must be judged in the circumstances of the particular case[,]" and "[i]n such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety[.]"  *Lometa*, 952 S.W.2d at 633; *see also Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters.*, 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp.*, 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.4.    The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

8.5.    Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without

limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million

that can never be replaced because the Defendants will lack the means to do so.

8.6.    Plaintiffs will therefore suffer immediate and irreparable injury without adequate

remedy at law if a Temporary Restraining Order ("**TRO**") is not granted against the Defendants.

Accordingly, Plaintiffs request the Court issue a TRO that freeze:

(a)  all assets that were held in the Charitable DAF Fund as of the instant date of this filing,

and

(b)  prohibiting Patrick and the other Defendants, or anyone acting in concert with them

or at their direction, from any use, expenditure, transfer, dispersal, dilution,

encumbrance, or alienation of any of those funds pending resolution of Plaintiff's

Motion for Temporary Injunction.

8.7.    The harm to Plaintiffs is imminent, and if the Court does not issue a TRO and

injunctive relief, it will be irreparably injured, as set forth herein. Conversely, the granting of a

TRO will merely require Defendants to refrain from doing anything with the funds for two weeks.

If the Defendants prevail on the merits, the funds will still be available to them for their use in

future.  The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent

immediate injunctive relief—over Defendants, who will at most suffer a minor inconvenience if

they ultimately prevail.

8.8.    The issuance of injunctive relief will not disserve the public interest. Balancing the

equities and other factors, including the significant potential for irreparable harm to the Plaintiffs

and the lack of harm to Defendants due to the entry of a TRO, demonstrates that the relief will not

disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent

scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

8.9.     A temporary restraining order is necessary to maintain the *status quo* during the pendency of this action. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) ("defining the status quo as "the last, actual, peaceable, non-contested status which preceded the pending controversy.") The facts above establish the required elements for Plaintiffs to obtain a TRO against Defendant, specifically: (1) a cause of action against Defendants with a probable right to relief; (2) a probable, imminent, and irreparable injury to Plaintiffs in the interim; (3) the threatened injury outweighs any damage the injunction might cause the opposing party; and (4) the injunction will not disserve the public interest. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198. 204 (Tex. 2002).

**A.   *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.***

8.10.    Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 597 (Tex. App.— Amarillo 1995, no writ). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58; *see also Gryphon Master Fund, L.P. v. Path 1 Network Technologies, Inc.*, No. 3:06 CV 0107 D, 2007 WL 1723703, at *5 (N.D. Tex., Jun. 14, 2007) (citing *Metcalfe*).

8.11.    Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, constructive fraud, unjust enrichment, and conversion. As alleged in more detail

above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that forms the lifeblood of vital philanthropic efforts relied upon by key communities across the nation.   The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B.** ***Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.***

8.12.   Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above.   Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *Lometa*, 952 S.W.2d at 633; see also *Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters*., 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp*., 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.13.   Plaintiffs have no adequate remedy at law.   Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds.   These losses, as well as others which will inevitably occur if Defendants are not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14.   Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.

8.15.   Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16.   Plaintiffs further seeks a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17.   Plaintiffs is willing to post a bond in an amount directed by the Court.

## VIII.   PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A.   Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation and CDMCFAD, LLC;

B.   Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C.   Require the reversal of the dilution scheme and unauthorized asset transfers;

D.   Impose a constructive trust over the res of DAF HoldCo, CDMCFAD, LLC and the Charitable DAF Fund wrongfully taken from the Plaintiffs;

E.   Award actual damages in an amount to be proven at trial;

F.   Award exemplary damages as permitted by law;

G.   Award attorneys' fees and costs;

H.   Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**McCarty Law PLLC**

*/s/ Darren L. McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street
Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was served by electronic means on this day, July 1, 2025, on all counsel or parties of record.

*/s/ Darren L. McCarty*
Darren L. McCarty

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**          **PAGE 36**

## **VERIFICATION**

I, Julie Diaz, Vice President of Highland Dallas Foundation, Inc., and President of The Dallas

Foundation, have read the above and foregoing Petition and the facts stated therein are true and

correct to the best of my knowledge and belief.

_(signature)_

Julie Diaz

My name is Julie Diaz, my date of birth is _3/23/64_, and my address

is _5711 Prestwick Lane_ I declare under penalty of perjury that the foregoing is true and

_Dallas_

correct.

Executed in _Barnstable_ County, State of _MA_, on the _1_ day

of _July_, _2025_

_(signature)_

Julie Diaz