# EXHIBIT 92

# EXECUTIVE EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "**Agreement**") is made and entered into effective as of March 24, 2021 (the "**Effective Date**"), by and between MARK PATRICK ("**Executive**") and CHARITABLE DAF HOLDCO, LTD., a Cayman Islands company (the "**Company**"), as a "**Party**" or collectively as the "**Parties**".

**WHEREAS**, the Company has employed Executive on the terms and conditions set forth herein since March 24, 2021; and

**WHEREAS**, Executive agrees to be employed by the Company on such terms and conditions as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants, promises, and obligations set forth herein, the Parties agree as follows:

1. **Employment Term**. Executive's employment hereunder shall be effective as of the Effective Date and shall continue until terminated pursuant to Section 5 of this Agreement.

2. **Position and Duties**.

    2.1 **Position**. During the Employment Term, Executive shall serve as the President and CEO, Chief Investment Officer, Chief Financial Officer, and General Counsel of the Company, reporting to the Directors of the Company (the "**Directors**"). In such position, Executive shall have such duties, authority, and responsibilities as shall be determined from time to time by the Directors, which duties, authority, and responsibilities are consistent with Executive's position.

    2.2 **Duties**. During the Employment Term, Executive shall perform such duties, as are reasonably assigned to Executive and devote a reasonable amount of Executive's business time and attention to the performance of Executive's duties, including, without limitation, service as an officer for other affiliates and subsidiaries of the Company.

3. **Place of Performance**. The principal place of Executive's employment shall be the place as determined by the Parties; however, Executive shall be permitted to work remotely so long as doing so does not interfere with the Executive's responsibilities under this Agreement. Executive may also be required to travel on Company business during the Employment Term. The Company may provide a remote travel office, or transportation, to accommodate the Executive in his performance of his duties.

4. **Compensation**.

    4.1 **Base Salary**. Beginning with the 2023 calendar year, the Company shall pay Executive an annual base salary of $850,000 (the "**Base Salary**") in periodic installments in accordance with customary payroll practices and applicable wage payment laws. Notwithstanding the foregoing, the Executive's annual base salary may be advanced in one or more installments from time to time pursuant to a Director's resolution, but in such amounts not to exceed one year of Base Salary. The Base Salary may be adjusted within the first sixty

(60) days of any calendar year by an amendment to this Agreement in accordance with Section 14 below.

  **4.2** **Annual Bonus**. For each fiscal year of the Employment Term, Executive shall be eligible to earn an annual bonus (the "**Annual Bonus**"). The decision to provide an Annual Bonus and the amount and terms of such Annual Bonus shall be in the sole and absolute discretion of the Directors, which may be paid in advance of the close of any one year. The Directors may establish and approve written criteria or guidelines that may be taken into account when determining whether an Annual Bonus should be paid and the amount in which it is paid. In exercising their discretion, the Directors will take into account industry standards in relation to annual bonuses awarded to people employed in comparable positions to Executive.

  **4.3** **Discretionary Bonuses**. At any time and from time to time during the Employment Term, the Executive shall be eligible to earn discretionary bonuses (each a "**Discretionary Bonus**"). Such Discretionary Bonuses shall be at the sole and absolute discretion of the Directors.

  **4.4** **Long Term Incentive Plan**: Executive shall participate in the Long Term Incentive Plan ("**LTIP**"). The LTIP will cover a period of three (3) years. For purposes of this agreement, the LTIP will cover the period from March 24, 2021 through March 24, 2024 (the "**First LTIP**") and is awarded in the total amount of $4,759,000. The second LTIP period will cover the period from March 25, 2024 through March 24, 2027 (the "**Second LTIP**"). The Second LTIP may be awarded at the discretion of the Directors through a cash payment made at the end of 2027, or by periodic awards in the equity of investments of the Company, or a combination of both.

  **4.5** **Retirement Incentive Plan**. At the discretion of the Directors, the Company may authorize a "Retirement Incentive Plan" to be put into place on behalf of the Executive.

  **4.6** **Employee Benefits**. During the Employment Term, Executive shall be entitled to participate in an employee benefit plan, including but not limited to health insurance, disability benefits, and retirement plan or other benefit practices and programs as may be implemented from time to time by the Company (collectively, "**Employee Benefit Plans**"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

  **4.7** **Vacation; Paid Time Off**. During the Employment Term, Executive shall be entitled to forty (40) days of paid vacation per calendar year (prorated for partial years). Executive shall receive other paid time off in accordance with Company policies as may exist from time to time or as otherwise determined by the Directors.

  **4.8** **Business Expenses**. Executive shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment, and travel expenses incurred by Executive in connection with the performance of Executive's duties hereunder.

**4.9** **Indemnification**. In the event that Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**"), other than any Proceeding initiated by Executive or the Company related to any contest or dispute between Executive and the Company or any of its affiliates or subsidiaries with respect to this Agreement or Executive's employment hereunder, by reason of the fact that Executive is or was a director or officer of the Company, or any affiliate or subsidiary of the Company, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a partnership, joint venture, trust, or other enterprise, Executive shall be indemnified and held harmless by the Company from and against any liabilities, costs, claims, and expenses, including all costs and expenses incurred in defense of any Proceeding (including attorneys' fees).

**5.** **Employment Term and Termination of Employment**. The initial term of employment of Executive shall be the period from the Effective Date until December 31, 2021, and thereafter shall automatically renew from year-to-year for additional one (1) year periods, unless either Party provides written notice of non-renewal to the other Party within sixty (60) days prior to the expiration of the applicable Employment Term, or Executive's employment is otherwise terminated in accordance with this Section 5 below (the "**Employment Term**"). In the event of non-renewal of the Employment Term by either Party, Executive shall be entitled to payment of the Severance Payment Amount (as defined in Section 5.2(d) below). The Employment Term and Executive's employment hereunder may be terminated by either the Company or Executive at any time and for any reason; provided that, unless otherwise provided herein, either Party shall be required to give the other Party at least sixty (60) days advance written notice of any termination of Executive's employment. On termination of Executive's employment during the Employment Term, Executive shall be entitled to the compensation and benefits described in this Section 5 and shall have no further rights to any compensation or any other benefits from the Company or any of its affiliates.

      **5.1** **For Cause or Without Good Reason**.

      (a) Executive's employment hereunder may be terminated by the Company for Cause or by Executive without Good Reason. If Executive's employment is terminated by the Company for Cause or by Executive without Good Reason, Executive shall be entitled to receive:

      (i) any accrued but unpaid Base Salary and accrued but unused vacation which shall be paid on the Termination Date (as defined below);

      (ii) any earned but unpaid Annual Bonus with respect to any completed calendar year immediately preceding the Termination Date, which shall be paid on the otherwise applicable payment date; provided that, if Executive's employment is terminated by the Company for Cause, then any such accrued but unpaid Annual Bonus shall be forfeited;

      (iii) reimbursement for unreimbursed business expenses properly incurred by Executive in accordance with Section 4.8 of this Agreement; and

(iv)  such employee benefits, if any, to which Executive may be entitled under the Company's employee benefit plans as of the Termination Date; provided that, in no event shall Executive be entitled to any payments in the nature of severance or termination payments except as specifically provided herein; and

(v)  accrued and unpaid First or Second LTIP.

Items 5.1(a)(i) through 5.1(a)(v) are referred to herein collectively as the "**Accrued Amounts**". For the avoidance of doubt, any LTIP that has awarded any exposure to an investment such as equity shall be deemed vested if not vested already.

(b)  For purposes of this Agreement, "**Cause**" shall mean:

(i)  Executive's conviction of or plea of guilty or nolo contendere to a crime that constitutes a felony (or state law equivalent);

(ii)  Executive's material breach of the provisions of this Agreement in the course of performing Executive's duties that results in material harm to the Company; or

(iii)  Executive is deemed by a court of competent jurisdiction to have engaged in any act or omission constituting willful misconduct, gross negligence, or fraud in the course of performing Executive's duties.

Notwithstanding the foregoing, for subsections (i) to (iii), the Employment Term and Executive's employment shall not be deemed to have been terminated for Cause unless the Company shall have given Executive: (A) written notice setting forth the reasons for the Company's intention to terminate Executive's employment for Cause, and (B) a reasonable opportunity, not to exceed thirty (30) days, to cure such default.

(c)  For purposes of this Agreement, "**Good Reason**" shall mean the occurrence of any of the following, in each case during the Employment Term, without Executive's written consent:

(i)  a material reduction of, or failure to pay, Executive's Base Salary; or

(ii)  a material, adverse change in Executive's authority, duties, or responsibilities (other than (i) temporarily while Executive is physically or mentally incapacitated, (ii) where, if applicable, in Executive's capacity as a director, officer, managing member or other position to exert control or influence in the Company or subsidiary (**"Controlling Position"**), the Executive has directed or caused a material adverse change himself, (iii) where the Company's business has materially changed through no fault of the Company, (iv) or as required by applicable law); or

(iii)  Company's material breach of the provisions of this Agreement.

Executive cannot terminate employment for Good Reason unless: (i) Executive has provided written notice to the Company of the existence of the circumstances providing grounds for termination for Good Reason within fifteen (15) days of the initial existence of such grounds, and (ii) the Company has had at least thirty (30) days from the date on which such notice is provided to cure such circumstances. Executive agrees and acknowledges that if he holds a Controlling Position he is obliged to act in good faith and with all due diligence and expedition to help the Company cure any such grounds.

**5.2** **Without Cause or for Good Reason**. The Employment Term and Executive's employment hereunder may be terminated by Executive (i) for Good Reason, (ii) by the Company without Cause, or in the event of non-renewal of the Employment Term in accordance with Section 5. In the event of such termination, Executive shall be entitled to receive the Accrued Amounts and, subject to Executive's compliance with Section 6, Section 7, and Section 8 of this Agreement, Executive shall be entitled to receive the following:

(a) continued Base Salary for twelve (12) months following the Termination Date payable in equal installments, but no less frequently than monthly;

(b) a payment equal to the product of (i) the Annual Bonus, if any, that Executive would have earned for the fiscal year in which the Termination Date (as determined in accordance with Section 5.5) occurs based on achievement of the applicable performance goals for such year and (ii) a fraction, the numerator of which is the number of days Executive was employed by the Company during the year of termination and the denominator of which is the number of days in such year (the "**Pro-Rata Bonus**"), plus any accrued but unpaid Discretionary Bonuses as determined by the Directors. These amounts shall be paid on the date that Annual or Discretionary Bonuses are normally paid;

(c) If Executive timely and properly elects health continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), the Company shall reimburse Executive for the monthly COBRA premium paid by Executive for Executive and Executive's dependents. Such reimbursement shall be paid to Executive on the seventh (7th) day of the month immediately following the month in which Executive timely remits the premium payment. Executive shall be eligible to receive such reimbursement until the earliest of: (i) the date Executive is no longer eligible to receive COBRA continuation coverage; and (ii) the date on which Executive becomes eligible to receive substantially similar coverage from another employer or other source; and

(d) An early termination payment in the nature of a severance payment in the amount of $10,000,000 payable at termination (the "**Severance Payment Amount**").

**5.3** **Death or Disability**.

(a) Executive's employment hereunder shall terminate automatically on Executive's death during the Employment Term, and the Company may terminate Executive's employment on account of Executive's Disability.

(b) If Executive's employment is terminated during the Employment Term on account of Executive's death or Disability, Executive (or Executive's estate and/or beneficiaries, as the case may be) shall be entitled to receive the following:

(i) the Accrued Amounts; and,

(ii) a lump sum payment equal to the Pro-Rata Bonus, and any accrued but unpaid discretionary bonuses, if any, that Executive earned for the fiscal year in which the termination date occurs which shall be payable on the date that annual bonuses are normally paid to the Company's executives, but in no event later than three (3) months following the end of the fiscal year in which the termination date occurs; and,

(iii) in the event of the Executive's death or disability, the Company shall pay the Executive's estate an amount equal to the Severance Payment Amount.

Notwithstanding any other provision contained herein, all payments made in connection with Executive's Disability shall be provided in a manner which is consistent with federal and state law.

(c) For purposes of this Agreement, "**Disability**" shall mean a condition that entitles Executive to receive long-term disability benefits under the Company's long-term disability plan, or if there is no such plan, Executive's inability, due to physical or mental incapacity, to perform the essential functions of Executive's job, with or without reasonable accommodation, for a period of ninety (90) consecutive days or a period of ninety (90) days in any one hundred eighty (180) day period. Any question as to the existence of Executive's Disability as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of this Agreement.

**5.4** **Notice of Termination**. Any termination of Executive's employment hereunder by the Company or by Executive during the Employment Term (other than termination pursuant to Section 5.3(a) on account of Executive's death) shall be communicated by written notice of termination ("**Notice of Termination**") to the other party hereto in accordance with Section 20 herein. The Notice of Termination shall specify:

(a) The termination provision of this Agreement relied upon;

(b) To the extent applicable, the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated;

(c) To the extent applicable, the date notice of intention to terminate Executive's employment was provided or the date notice of existence of the circumstances providing grounds for termination for Good Reason was provided; and

(d) The applicable Termination Date.

**5.5** **Termination Date**. Executive's "**Termination Date**" shall be:

(a) If Executive's employment hereunder terminates on account of Executive's death, the date of Executive's death;

(b) If Executive's employment hereunder is terminated on account of Executive's Disability, the date that it is determined that Executive has a Disability;

(c) Unless otherwise indicated herein, if the Company terminates Executive's employment hereunder for Cause, the date the Notice of Termination is delivered to Executive. If the Company is required to give notice of intention to terminate Executive's employment and an opportunity to cure, and Executive fails to cure same, the date on which the cure period expires;

(d) If the Company terminates Executive's employment hereunder without Cause, the date specified in the Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered;

(e) If Executive terminates Executive's employment hereunder without Good Reason, the date specified in Executive's Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered;

(f) If Executive terminates Executive's employment hereunder with Good Reason, and subject to Executive providing written notice to Company of the existence of the circumstances providing grounds for termination for Good Reason within fifteen (15) days of the initial existence of such grounds, and (ii) the Company having had at least thirty (30) days from the date on which such notice is provided to cure such circumstances and fails to cure same, the date on which the cure period expires; and

(g) In the event of non-renewal of the Employment Term by either Party, the date specified in the Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered

**5.6** **Resignation of All Other Positions**. On termination of Executive's employment hereunder for any reason, Executive shall be deemed to have resigned from all positions that Executive holds as an officer or director of the Company or any of its affiliates or subsidiaries.

**6.     Cooperation**. The parties agree that certain matters in which Executive will be involved during the Employment Term may necessitate Executive's cooperation in the future. Accordingly, following the termination of Executive's employment for any reason, to the extent reasonably requested by the Directors, Executive shall cooperate with the Company, its affiliates and subsidiaries in connection with matters arising out of Executive's service to the Company; its affiliates or subsidiaries, provided that, the Company shall make reasonable efforts to minimize disruption of Executive's other activities. The Company shall reimburse Executive for reasonable expenses incurred in connection with such cooperation.

**7.     Confidential Information**. Executive understands and acknowledges that during the Employment Term, Executive will have access to and learn about Confidential Information, as defined below.

   **7.1     Confidential Information Defined**.

      (a)     Definition.

         For purposes of this Agreement, "**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, embedded data, compilations, metadata, technologies, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company, or its businesses including its affiliates and subsidiaries, or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company or its businesses including its affiliates and subsidiaries in confidence.

         Executive understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Executive understands and agrees that Confidential Information includes information developed by Executive in the course of employment by the Company, its affiliates or subsidiaries as if the Company, its affiliates or subsidiaries furnished the same Confidential Information to Executive in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to Executive; provided that, such disclosure is through no direct or indirect fault of Executive or person(s) acting on Executive's behalf.

(b)     <u>Disclosure and Use Restrictions</u>.

Executive agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company, its affiliates or subsidiaries) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company, its affiliates or subsidiaries and, in any event, not to anyone outside of the direct employ of the Company, its affiliates or subsidiaries, except as required in the performance of Executive's authorized employment duties to the Company or with the prior written consent of the Directors acting on behalf of the Company, its affiliates or subsidiaries, as applicable, in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company, its affiliates or subsidiaries except as required in the performance of Executive's authorized employment duties to the Company, its affiliates or subsidiaries or with the prior consent of the Directors acting on behalf of the Company, its affiliates or subsidiaries, as applicable, in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

(c)     <u>Permitted Disclosures</u>. Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Executive shall promptly provide written notice of any such order to the Directors.

(d)     <u>Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA")</u>. Notwithstanding any other provision of this Agreement:

(i)     Executive will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

    (A) is made (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

    (B) is made in a complaint or other document filed under seal in a lawsuit or other proceeding.

   (ii) If Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the Company's trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive:

    (A) files any document containing trade secrets under seal; and

    (B) does not disclose trade secrets, except pursuant to court order.

**8.**   **Restrictive Covenants**.

 **8.1**   **Acknowledgement**. Executive understands that the nature of Executive's position gives Executive access to and knowledge of Confidential Information and places Executive in a position of trust and confidence with the Company, its affiliates and subsidiaries. Executive understands and acknowledges that the services Executive provides to the Company, its affiliate and subsidiaries are unique, special, or extraordinary.

 Executive further understands and acknowledges that the Company's ability to reserve these for the exclusive knowledge and use of the Company, its affiliates and subsidiaries is of great competitive importance and commercial value to the Company, its affiliates and subsidiaries and that improper use or disclosure by Executive is likely to result in unfair or unlawful competitive activity.

 **8.2**   **Non-Competition**. Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to Executive, during the Employment Term and for a period of one (1) year, beginning on the last day of Executive's employment with the Company, Executive agrees and covenants not to engage in Prohibited Activity within the areas in which the Company has conducted business.

 For purposes of this Section 8.2, "**Prohibited Activity**" is activity in which Executive contributes Executive's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the same or similar business as the Company, or its affiliates. Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information.

Nothing herein shall prohibit Executive from purchasing or owning less than one percent (1%) of the publicly traded securities of any corporation, provided that such ownership represents a passive investment and that Executive is not a controlling person of, or a member of a group that controls, such corporation.

This Section 8 does not, in any way, restrict or impede Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. Executive shall promptly provide written notice of any such order to the Directors.

**8.3** **Non-Solicitation of Employees**. Executive agrees and covenants not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company, or attempt to do so, for a period of one (1) year, to run consecutively, beginning on the last day of Executive's employment with the Company.

**8.4** **Non-Solicitation of Customers**. Executive understands and acknowledges that because of Executive's experience with and relationship to the Company, its affiliates and subsidiaries, Executive will have access to and learn about the Company's, its affiliates' and subsidiaries' customer information. "**Customer Information**" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, decisionmakers, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to services.

Executive understands and acknowledges that loss of this customer relationship and/or goodwill will cause significant and irreparable harm.

Executive agrees and covenants, for a period of one (1) year, not to directly or indirectly solicit, contact (including but not limited to email, regular mail, express mail, telephone, fax, instant message, or social media), attempt to contact, or meet with the Company's, its affiliates' or its subsidiaries' customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company, its affiliates or subsidiaries.

**9.** **Acknowledgement**. Executive acknowledges and agrees that the services to be rendered by Executive to the Company, its affiliates and subsidiaries, are of a special and unique character; that Executive will obtain knowledge and skill relevant to the Company's, its affiliates' and subsidiaries' industries, their methods of doing business and marketing strategies by virtue of Executive's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interest of the Company, its affiliates and subsidiaries.

Executive further acknowledges that the benefits provided to Executive under this Agreement, including the amount of Executive's compensation, reflects, in part, Executive's obligations and the Company's rights under Section 7 and Section 8, of this Agreement; that

Executive has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and that Executive will not suffer undue hardship by reason of full compliance with the terms and conditions of Section 7 and Section 8 of this Agreement or the Company's enforcement thereof.

**10.** **Remedies**. In the event of a breach or threatened breach by Executive of Section 7 and Section 8 of this Agreement, Executive hereby consents and agrees that the Company, its affiliates and subsidiaries shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, and that money damages would not afford an adequate remedy, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**11.** **Proprietary Rights**.

**11.1** **Work Product**. Executive acknowledges and agrees that all right, title, and interest in and to all writings, works of authorship, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by Executive individually or jointly with others during the Employment Term and relate in any way to the business or contemplated business, products, activities, research, or development of the Company, its affiliates or subsidiaries or result from any work performed by Executive for the Company, its affiliates or subsidiaries (in each case, regardless of when or where prepared or whose equipment or other resources are used in preparing the same), all rights and claims related to the foregoing, and all printed, physical and electronic copies, and other tangible embodiments thereof (collectively, "**Work Product**"), as well as any and all rights in and to US and foreign (a) patents, patent disclosures and inventions (whether patentable or not), (b) trademarks, service marks, trade dress, trade names, logos, corporate names, and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (c) copyrights and copyrightable works (including computer programs), mask works, and rights in data and databases, (d) trade secrets, know-how, and other confidential information, and (e) all other intellectual property rights, in each case whether registered or unregistered and including all registrations and applications for, and renewals and extensions of, such rights, all improvements thereto and all similar or equivalent rights or forms of protection in any part of the world (collectively, "**Intellectual Property Rights**"), shall be the sole and exclusive property of the Company, its affiliates or subsidiaries, as applicable.

**11.2** **Work Made for Hire; Assignment**. Executive acknowledges that, by reason of being employed by the Company, its affiliates or subsidiaries, at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by the Company, its affiliates or subsidiaries, as applicable. To the extent that the foregoing does not apply, Executive hereby irrevocably assigns to the Company, its affiliates or subsidiaries, as applicable, for no additional consideration, Executive's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right

to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's, its affiliates' or subsidiaries' rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company, its affiliates, subsidiaries or assigns, would have had in the absence of this Agreement.

11.3 **Further Assurances; Power of Attorney**. During and after the Employment Term, Executive agrees to reasonably cooperate with the Company, its affiliates, subsidiaries and assigns to (a) apply for, obtain, perfect, and transfer to the Company, its affiliates or subsidiaries, as applicable, the Work Product as well as any and all Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (b) maintain, protect and enforce the same, including, without limitation, giving testimony and executing and delivering to the Company, its affiliates and subsidiaries, as the case may be, any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company, its affiliates or subsidiaries. Executive hereby irrevocably grants the Company, its affiliates or subsidiaries, as applicable, power of attorney to execute and deliver any such documents on Executive's behalf in Executive's name and to do all other lawfully permitted acts to transfer the Work Product to the Company, its affiliates or subsidiaries, as the case may be. The power of attorney is coupled with an interest and shall not be affected by Executive's subsequent incapacity.

11.4 **No License**. Executive understands that this Agreement does not, and shall not be construed to, grant Executive any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Executive by the Company.

12. **Security**.

12.1 **Security and Access**. Executive agrees and covenants (a) to comply with all security policies and procedures as in force from time to time including without limitation those regarding the Company's, its affiliates' or subsidiaries' facilities, IT resources and communication technologies ("**Facilities and Information Technology Resources**"); (b) not to access or use any Facilities and Information Technology Resources except as authorized by the Company, its affiliates or subsidiaries; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of Executive's employment by the Company, its affiliates or subsidiaries whether termination is voluntary or involuntary. Executive agrees to promptly notify the Company, its affiliates or subsidiaries, as applicable, in the event Executive learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with any Facilities and Information Technology Resources or other Company, affiliate or subsidiary property or materials by others.

13. **Entire Agreement**. Unless specifically provided herein, this Agreement contains all of the understandings and representations between Executive and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. The

parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

14. **Modification and Waiver**. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by Executive and the Director of the Company. No waiver by either of the parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

15. **Severability**. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

16. **Captions**. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

17. **Counterparts**. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

18. **Section 409A**.

    18.1 **General Compliance**. This Agreement is intended to comply with Section 409A or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from

service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

18.2   **Specified Employees**. Notwithstanding any other provision of this Agreement, if any payment or benefit provided to Executive in connection with Executive's termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and Executive is determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date following the six-month anniversary of the Termination Date or, if earlier, on Executive's death (the "**Specified Employee Payment Date**"). The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date and interest on such amounts calculated based on the applicable federal rate published by the Internal Revenue Service for the month in which Executive's separation from service occurs shall be paid to Executive in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

18.3   **Reimbursements**. To the extent required by Section 409A, each reimbursement or in-kind benefit provided under this Agreement shall be provided in accordance with the following:

(a)   the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year;

(b)   any reimbursement of an eligible expense shall be paid to Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and

(c)   any right to reimbursements or in-kind benefits under this Agreement shall not be subject to liquidation or exchange for another benefit.

18.4   **Tax Gross-ups**. Any tax gross-up payments provided under this Agreement shall be paid to Executive on or before December 31 of the calendar year immediately following the calendar year in which Executive remits the related taxes.

19.   **Successors and Assigns**. This Agreement is personal to Executive and shall not be assigned by Executive. Any purported assignment by Executive shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or

substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

20. **Notice**. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by overnight carrier to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

   If to the Company:

   CHARITABLE DAF HOLDCO, LTD.

   PAUL MURPHY
   paul@gkmanagement.com.ky

   If to Executive:

   MARK PATRICK
   Mpatricktax1040@gmail.com

21. **Representations of Executive**. Executive represents and warrants to the Company that:

   (a) Executive's acceptance of employment with the Company and the performance of duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which Executive is a party or is otherwise bound.

   (b) Executive's acceptance of employment with the Company and the performance of duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

22. **Withholding**. The Company shall have the right to withhold from any amount payable hereunder any Federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

23. **Survival**. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

24. **Governing Law and Jurisdiction.** This agreement is governed by and shall be construed in accordance with the laws of Cayman Islands. Each of the parties hereto irrevocably agrees that the courts of Cayman Islands shall have exclusive jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this agreement and, for such purposes, irrevocably submits to the exclusive jurisdiction of such courts.

25. **<u>Acknowledgement of Full Understanding</u>**. EXECUTIVE ACKNOWLEDGES AND AGREES THAT EXECUTIVE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. EXECUTIVE ACKNOWLEDGES AND AGREES THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

[*SIGNATURE PAGE FOLLOWS*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

CHARITABLE DAF HOLDCO, LTD.

By: _____
Name: Paul Murphy
Title: Director

**EXECUTIVE:**

_____
MARK PATRICK