**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | ) |
|  | ) Case No. 25-11376 (BLS) |
|  | ) |
| Debtor in a foreign proceeding. | ) **Re: Docket No. 21** |
|  | ) |
|  | ) |

**CDM PARTIES' (A) EMERGENCY CROSS MOTION FOR**
**ADJOURNMENT OF MOTION OF PETITIONERS FOR ENTRY OF**
**ORDER GRANTING PROVISIONAL RELIEF COMPELLING TURNOVER OF**
**THE DEBTOR'S BOOKS AND RECORDS PURSUANT TO BANKRUPTCY CODE**
**SECTIONS 105(A), 542, 1519 AND 1521 AND (B) LIMITED OBJECTION AND**
**RESERVATION OF RIGHTS WITH RESPECT THERETO**

DFW Charitable Foundation, a Delaware 501(c)(3) non-profit corporation ("**DFW**"), CDMCFAD, LLC, a Delaware limited liability company ("**CDM**"); CDH GP, Ltd., a Cayman Islands exempted limited company ("**CDH**"); Charitable DAF Fund, LP, a Cayman Islands limited partnership (the "**DAF**"); CLO HoldCo, Ltd., a Cayman Islands exempted limited company ("**CLO Holdco**"); Liberty CLO HoldCo, Ltd., a Cayman Islands exempted limited company; HCT Holdco 2, Ltd., a Cayman Islands exempted limited company; MGM Studios Holdco, Ltd., a Cayman Islands exempted limited company; CLO HoldCo, LLC, a Delaware limited liability company; Beacon Mountain, LLC, a Delaware limited liability company; Liberty CLO HoldCo, LLC, a Delaware limited liability company; Liberty Sub, Ltd., a Cayman Islands exempted limited company; Charitable DAF Holdings Corp., a Delaware corporation; Rand Advisors, LLC, a Delaware limited liability company; DST Investco, LLC, a Delaware limited

---

[1]  The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

liability company; Allanon Capital Management LLC, a Texas limited liability company; CDHC Royse City Land, LLC, a Texas limited liability company; Royse City Land Company, LLC, a Texas limited liability company; CDHC Assets, LLC, a Texas limited liability company; CDHC Fort Worth Land, LLC, a Texas limited liability company; CDHC Stewart Creek, LLC, a Texas limited liability company; BVP Property, LLC, a Delaware limited liability company; Hunter Mountain Investment Trust, a Delaware statutory trust; Rand PE Fund Management, LLC, a Delaware limited liability company; and Atlas IDF GP, LLC, a Delaware limited liability company (collectively, the "**CDM Entities**"), and Mark Patrick, an individual residing in the State of Texas (collectively with the CDM Entities, the "**CDM Parties**") hereby file this cross motion to adjourn and limited objection and reservation rights (the "**Cross-Motion and Limited Objection**") regarding the *Motion of Petitioners for Entry of Order Granting Provisional Relief Compelling Turnover of the Debtor's Books and Records Pursuant to Bankruptcy Code Sections 105(a), 542, 1519 and 1521* [Docket No. 21] (the "**Turnover Motion**"), and respectfully represent as follows:[2]

## **PRELIMINARY STATEMENT[3]**

1.      This Chapter 15 proceeding is the latest effort by James Dondero and other parties financed by him and under his influence and control to gain control of the CDM Entities' assets. The Verified Petition and other supporting documents, including the declaration in support of the Turnover Motion, that the JOLs have filed with the Court are one-sided, omit numerous unfavorable facts, and have left out more than twenty years of history that makes clear that this entire matter is a two-party governance dispute between James Dondero, the Highland Foundations, and the JOLs, on one side (collectively, the "**Dondero Affiliates**"), and Mr. Patrick,

---

[2]    Capitalized terms used but not otherwise defined in this Cross-Motion and Limited Objection shall have the same meaning ascribed to such terms in the Turnover Motion.

[3]    Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the same meanings ascribed to such terms in the body of the Cross-Motion and Limited Objection.

2

Paul Murphy and the CDM Entities on the other side.  While the CDM Parties will detail the history of this dispute in their forthcoming opposition to recognition, for now, it is enough to know that the CDM Parties will present voluminous evidence to contradict the false narrative advanced by the JOLs.[4]

2.      When the JOLs commenced this Chapter 15 proceeding on July 21, 2025, the Highland Foundations, the entities that sought the appointment of the JOLs in the Cayman Proceeding, had been engaged in discussions and disputes with Mr. Patrick regarding the governance of the DAF for months.  The Cayman Court appointed the JOLs with the CDM Parties' consent, and the CDM Parties engaged with the JOLs to provide extensive documents and information relating to the Debtor.

3.      As such, soon after the JOLs filed the Verified Petition, the CDM Parties engaged in discussions with the JOLs regarding the efficacy of the Chapter 15 proceeding. In recognizing their differences of opinion and appreciating that there was pending litigation in the Cayman Islands regarding the Injunction Summons, the CDM Parties and the JOLs negotiated a carefully crafted stipulated form of order [Docket No. 19] (the "**Stipulated Order**") that (i) approved an asset protection protocol, (ii) required monthly and regular reporting of transactions and financial statements, and (iii) scheduled a hearing for recognition at a future date to be determined after the Cayman Court considered the Injunction Summons. The net effect of the Stipulated Order was to preserve the status quo, so that if a recognition hearing (the "**Recognition Hearing**") needed to go forward before the Court, (i) during the interim period between the entry of the Stipulated Order and the Recognition Hearing, the JOLs would have certain oversight and informational rights, as

---

[4]    For example, the JOLs assert false claims that the DAF's expenses in the first half of 2024 were $18.3 million. *See* Verified Petition ¶ 42. But that claim purposefully omits offsetting income that lowers these expenses by approximately $6 million. *See* 1st Patrick Aff at ¶ 179.

3

applicable, over the CDM Parties, consistent with orders entered before the Cayman Court and the Texas Business Court, and (ii) the CDM Parties would have a full and fair opportunity to contest recognition, including briefing, propounding discovery, offering evidence and testing the evidence upon which the JOLs are relying in support of the Verified Petition.

4.      The Turnover Motion violates the spirit of the Stipulated Order for several reasons. First and critically, the Turnover Motion brings forward the merits arguments that should be made at the Recognition Hearing.  Indeed, the Turnover Motion requests highly prejudicial findings that could impact the CDM Parties' rights to dispute recognition at the Recognition Hearing, including, among other things, that there is a substantial likelihood that this Court will recognize the Cayman Proceeding as a "foreign main proceeding". The parties agreed to the Stipulated Order to prevent premature argument on the merits of recognition, and the Turnover Motion completely vitiates this agreement. Second, the Turnover Motion oversimplifies the records requests.  The DAF Structure is a complex structure where the Debtor was the former limited partner of the DAF. The Debtor had no voting, management, or any other control over the DAF, nor any rights to any information relating to the DAF. The Debtor's sole right with respect to the DAF was the right to receive distributions from it, if and when made. To the extent the Debtor received those discretionary distributions, it then had the ability to make distributions to its Participating Shareholders, which included the Highland Foundations. The Debtor's directors had the power to remove Participating Shareholders that were violating their tax-exempt status or causing financial harm to the Debtor. The DAF's general partner controlled distributions and all other rights with respect to the DAF. The DAF held, directly and indirectly, numerous other subsidiaries with assets and business operations. While the Debtor may be entitled to its own documents, it is not entitled to documents to which it was never entitled.  The JOLs' framing of the records request will almost certainly

4

result in documents being produced to the JOLs that they are not entitled to. Third, there are no proceedings scheduled in the Cayman Proceeding or in the Texas Business Court that warrant the immediate relief requested by the JOLs. Fourth and finally, DFW has moved the Cayman Court to disqualify and replace the JOLs as soon as possible – a fact buried in a footnote in the Turnover Motion.

5.      At bottom, the Turnover Motion is a manufactured emergency that provides the Dondero Affiliates a tactical advantage by prematurely bringing forward the merits arguments on recognition. For the reasons set forth herein, the Court should continue the hearing on the Turnover Motion; however, if the Court is inclined to consider the Turnover Motion on the merits, the Court should deny the relief requested in the Turnover Motion unless the scope of the requested relief is narrowed as set forth herein.

## BACKGROUND[5]

### I.      Brief Historical Overview

6.      Context explains this Chapter 15 proceeding. Mr. Dondero, the serial vexatious litigant behind Highland Capital Management, LP ("**Highland**"), whose own Chapter 11 proceedings before the United States Bankruptcy Court for the Northern District of Texas (the "**Texas Bankruptcy Court**") have been pending since 2019, is funding this Chapter 15 case. Mr. Dondero has spent the last twenty-plus years engaged in "astonishingly contentious[,]" "protracted, and unpleasant" litigation in courts all over the world. *In re Acis Capital Mgmt., L.P.*, 2019 WL 417149, at *2 (Bankr. N.D. Tex. Jan. 31, 2019); *In re Highland Capital Mgmt., L.P.*,

---

[5]   The CDM Parties reserve the right to supplement and expand on the background giving rise to this Chapter 15 proceeding in connection with their objection to recognition. Because of the relief requested in the Turnover Motion, and in particular the findings set forth in the proposed order approving the Turnover Motion (the "**Proposed Turnover Order**"), the CDM Parties believe it is necessary to provide the Court with certain background regarding this dispute.

5

2021 WL 2326350, at *1 (Bankr. N.D. Tex. June 7, 2021), aff'd *sub nom.  Matter of Highland Capital Mgmt., L.P.*, 105 F.4th 830 (5th Cir. 2024); *In re Highland Capital Mgmt. L.P.*, No. AP 24-03073-SGJ, 2025 WL 97738, at *3 (Bankr. N.D. Tex. Jan. 14, 2025).  The Texas Bankruptcy Court has described Mr. Dondero as "'transparently vexatious' and litigious" and has held him in contempt more than once. *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *1 (5th Cir. Apr. 16, 2025) (internal quotation omitted).[6]

7.      This Chapter 15 proceeding concerns only Charitable DAF Holdco, Ltd. (the "**Debtor**" or "**Holdco**"), yet the Dondero Affiliates do everything in their power to make it about the DAF, a Cayman Islands limited partnership that holds interests in a variety of subsidiaries with assets and/or operating businesses (collectively, the "**DAF Structure**").  The DAF Structure is intended to be a form of charitable trust, which provided significant tax benefits to a donor (*i.e.*, Mr. Dondero) while allowing the donor certain non-binding advisory rights regarding investments. Control over the DAF Structure exists at the DAF, not the Debtor. Under applicable tax law, to qualify for a charitable deduction, Mr. Dondero needed to cede dominion and control over assets transferred into the DAF Structure.  To facially satisfy the appearance of having ceded dominion and control over donated assets, Mr. Dondero named his once best friend, best man at his wedding, and college roommate, Grant Scott, as the holder of the management shares in the Debtor and the sole member of the DAF's general partner. *First Affidavit of Mark Eric Patrick* (the "**1st Patrick**

---

[6]   During the Highland bankruptcy, Mr. Dondero filed five motions to recuse Judge Jernigan with his latest motion being filed on August 15, 2025.  The Texas Bankruptcy Court has also gone so far as to state that Mr. Dondero's conduct is sufficient to warrant criminal referral. *See* Aug. 8, 2022 Hr'g Tr. At 130:25-132:6, *UBS Securities, LLC v. Highland Capital Mgmt., LP, (In re Highland Capital Mgmt. LP),* Case No. 19-34054-sgj-11, Adv. No. 21-3020-sgj [Adv. Docket No. 183].

**Aff**") at ¶¶ 101-02.[7] Thus, Mr. Scott had "control" over the DAF Structure and was known as its "Control Person". *Id.*

8.    This relationship benefitted Mr. Dondero for roughly a decade. *Id.* Mr. Dondero could donate and maintain non-binding advisory rights, while simultaneously obtaining significant tax benefits and having easy access to those donated assets for his personal gain or the gain of his affiliates, through Mr. Scott's rubber-stamping of Mr. Dondero-driven investment opportunities. *Id.* at ¶ 114. This practice was inconsistent with applicable tax law and jeopardized the tax status of certain non-profit shareholders in the Debtor. Eventually, after Mr. Dondero was ousted from Highland, Mr. Scott declined to take certain actions requested by Mr. Dondero. Mr. Dondero also believed that Mr. Scott took actions that benefitted Mr. Seery, Highland's CRO in the Highland bankruptcy, and this led to a falling out between Mr. Scott and Mr. Dondero. *Id.* As a result, Mr. Scott transitioned the Control Person Role to Mr. Patrick in March 2021. *Id.* at ¶ 108.

9.    Upon assuming the Control Person role, Mr. Patrick caused the appointment of Mr. Murphy as an independent director for Cayman Islands entities within the DAF Structure. *First Affidavit of Paul Murphy* (the "**1st Murphy Aff**") at ¶ 34.[8] In diligencing the DAF Structure's transactions and assets, Messrs. Patrick and Murphy became aware that Mr. Dondero was abusing the DAF for his benefit. *First Patrick Aff.* at ¶ 114. In addition, Mr. Patrick hired financial advisors and attorneys (which Mr. Scott had failed to do) to review new deals proposed to the DAF by Mr. Dondero or his affiliates and negotiated for better terms or declined bad deals for the DAF. *Id.* at

---

[7]    A copy of the 1st Patrick Aff is attached hereto as <u>Exhibit 1</u>. While the CDM Parties do not offer the 1st Patrick Aff for the truth of the matters asserted therein in connection with the instant dispute, the CDM Parties reserve the right present Mr. Patrick, and introduce any of his declarations submitted in the Cayman Court into evidence, at the Recognition Hearing.

[8]    A copy of the 1st Murphy Aff is attached hereto as <u>Exhibit 2</u>. While the CDM Parties do not offer the 1st Murphy Aff for the truth of the matters asserted therein in connection with the instant dispute, the CDM Parties reserve the right present Mr. Murphy, and introduce any of his declarations in the Cayman Court into evidence, at the Recognition Hearing.

RLF1 33616737v.4

¶¶ 110-19. This, among other things, frustrated Mr. Dondero so much that he attempted to buy Mr. Patrick out of the Control Person role, which Mr. Patrick declined. 1st Patrick Aff at ¶ 185; *First Affidavit of Mark Eric Patrick as Sole Holder of the Management Share* (the "**2nd Patrick Aff**") at ¶ 53.[9]

10.    In 2023 and 2024, Mr. Patrick became increasingly concerned that Mr. Dondero's historical and continued abuse of the DAF would expose the assets in the DAF Structure to Mr. Dondero's creditors. *Id.* at ¶ 150.  These issues came to the forefront when the Sub-Litigation Trustee in the Highland bankruptcy case commenced an action against, among others, Mr. Dondero and certain affiliates. *Id.* In addition, UBS, a judgment creditor of Mr. Dondero's affiliates, filed a special turnover proceeding (the "**Special Turnover Proceeding**") in the Supreme Court of New York seeking to hold Mr. Dondero personally liable (together with several of his affiliates and entities) for a $1.1 billion judgment as the judgement debtors' alter ego for concealing assets. *Id.* at ¶¶ 123 & 155. Mr. Dondero moved to dismiss the Special Turnover Proceeding, but that motion was denied, and the Special Turnover Proceeding remains pending. *Id.*

11.    As a result of Mr. Dondero's abusive relationship with the DAF Structure, direct business dealings with Mr. Dondero, and the litigation filed by the Sub-Trustee and UBS, it became apparent that Mr. Patrick needed to take action to protect the DAF Structure. *First Murphy Aff.* at ¶ 46. To protect the DAF Structure, Mr. Patrick and Mr. Murphy executed the DAF Restructuring, which resulted in the replacement of the Debtor by CDM at the top of the DAF Structure with the same rights as the Debtor (a right only to discretionary dividends and no control, voting, or other

---

[9]    A copy of the 2nd Patrick Aff is attached hereto as Exhibit 3. While the CDM Parties do not offer the 2nd Patrick Aff for the truth of the matters asserted therein in connection with the instant dispute, the CDM Parties reserve the right present Mr. Patrick, and introduce any of his declarations in the Cayman Court into evidence, at the Recognition Hearing.

RLF1 33616737v.4

rights) in an effort to protect the DAF's charitable mission and ensure that any discretionary distributions made from DAF went to bona fide non-profit charities. *Id.* at ¶¶ 47-48.

12.     In sum, Mr. Dondero lost control of the DAF Structure because Mr. Patrick refused to be willfully blind and violate his fiduciary duties, Mr. Dondero tried to buyoff Mr. Patrick but he failed, and, adding insult to injury, entities controlled by Mr. Patrick have acquired claims and causes against Mr. Dondero and his affiliates valued at $300 million in connection with the Highland bankruptcy.  The simple fact is Mr. Dondero wants the CDM Entities' assets and has chased the CDM Parties with litigation in courts throughout the world.

**II.       Certain Events Leading to the Turnover Motion**

13.     After the completion of the DAF Restructuring, in early April 2025, Mr. Patrick and Mr. Murphy caused the Debtor to commence a voluntary liquidation in the Cayman Islands. *First Murphy Aff.* at ¶ 119.  That voluntary liquidation was published in the Cayman Islands Gazette on April 14, 2025. *Id.* at ¶ 125. On April 24, 2025, the Highland Foundations, each of which is under the control and influence of Mr. Dondero,[10] served an application for the appointment of joint provisional liquidators (the "**JPL Application**") and an equitable winding up petition (the "**J&E Petition**") on the Debtor's registered office in the Cayman Islands. *Id.*  On April 29, 2025, the Cayman Court ordered that an application for court supervision be set for hearing on May 6, 2025 (the "**May 6 Hearing**").

14.     There were several issues with the filing of the JPL Application and the J&E Petition.  *Id.* at ¶¶ 136-40.  First, the JPL Application and J&E Petition were filed ***after*** the voluntary liquidation was commenced and ***after*** the voluntary liquidation was published, making

---

[10]    Mr. Dondero is the President, a Director (one of three) and an owner (the Individual Member) of each of the Highland Foundations.

RLF1 33616737v.4

it procedurally improper and frivolous. *Id.* Second, proper notice was not provided to DAF Holdco or its counsel. *Id.* Third, a summons of direction was not included. *Id.* And fourth, Mr. Patrick and Mr. Murphy were never made aware that they could have presented evidence at the May 6 Hearing to consider the JPL Application and J&E Petition. *Id.* at ¶ 149. On May 6, 2025, the Cayman Court entered an uncontested order bringing the voluntary liquidation under the supervision of the Cayman Court. *Id.* at ¶ 155.

15. On May 6, 2025, the same day the Cayman Court entered the supervision order, Mr. Murphy began receiving emails indicating that the JOLs were demanding the turnover of records from entities within the DAF Structure that *did not* commence any proceeding (voluntary nor involuntary) before the Cayman Court, including CLO Holdco and the DAF and that the JOLs purported to act on behalf of such entities. *Id.* at ¶ 156-57. On May 9, 2025, the JOLs sent a notice to Skyview Group, a Dondero-backed affiliated (the "**Skyview Notice**"), seeking books and records from Skyview regarding not just the Debtor, but also of other entities in the DAF Structure for which neither the JOLs nor the Debtor ever had any authority to act. *First Patrick Aff.* at ¶ 42. In addition, the JOLs, purporting to act on behalf of certain of the entities in the DAF Structure, caused the freezing of operating accounts and interfered with the DAF's ordinary course business. *Id.* Further, on May 7, 2025, the JOLs attempted to engage Johnstone Law, the lawyers that represented the Highland Foundations in filing the J&E Petition, as counsel, which created a conflict of interest.[11] *Id.*

16. Even though the JOLs attempted to exercise broader authority than what was granted by the Cayman Court, the CDM Parties still engaged in document production with the

---

[11] After the CDM Parties indicated that they would object to the JOLs' retention of Johnstone Law on May 6, 2025 and six full weeks of the JOLs insisting on using Johnstone Law, the JOLs finally agreed to engage different counsel on June 20, 2025 and have been ordered by the Cayman court to pay the CDM Parties' costs through June 20, 2025 for their insistence on Johnstone Law.

10

JOLs. Despite the productions, on July 1, 2025, the Highland Foundations–the entities that filed the underlying J&E Petition and each of which is under the control and influence of Mr. Dondero–commenced an action (the "**TRO Proceeding**") against defendants Mark Patrick, DFW, CDM, CDH, and the Charitable DAF GP, LLC (the "**TRO Defendants**") in the Texas Business Court, 1st Division (the "**Texas Business Court**") seeking, among other things, a temporary restraining order, temporary injunction and appointment of a receiver over CDM and DFW.  In connection with the TRO Proceeding, the Highland Foundations and the TRO Defendants entered into a "Rule 11 Agreement" under the Texas Rules of Civil Procedure (as amended, the "**Rule 11 Agreement**"). Under the Rule 11 Agreement, the TRO Defendants have agreed to certain restrictions on their actions pending the outcome of the Texas Proceeding consistent with the Stipulated Order.  The TRO Defendants have moved to dismiss the TRO Proceeding, and the motion to dismiss remains pending.

17.     On July 4, 2025, the JOLs applied to the Cayman Court on an *ex parte* basis to commence litigation by filing a Writ and Statement of Claim (the "**Statement of Claim**") against Mr. Patrick, Mr. Murphy, CDM, DFW, CDH and CLO Holdco (the "**Cayman Defendants**").  On July 14, 2025, the Cayman Court granted sanction for the JOLs to file and serve the Statement of Claim.  In addition, the JOLs also filed the Injunction Summons, which was scheduled to be heard on July 31, 2025 (the "**July 31 Hearing**").  Prior to the July 31 Hearing, the JOLs and the Cayman Defendants reached agreement on a consent order similar to the Rule 11 Agreement in the TRO Proceeding.  At the conclusion of the July 31 Hearing, the Cayman Court entered a consent order and scheduled an evidentiary hearing on the Injunction Summons for the first available date after September 18, 2025. As of now, parties do not expect that this proceeding will be scheduled until November or December 2025.

11

18.    On July 11, 2025, the JOLs sought *ex parte* approval of a funding agreement (the "**Funding Agreement**") from the Cayman Court. Most of the Funding Agreement is purposefully opaque: about one-quarter of the agreement, including most of its key terms, were redacted from the version filed with the Cayman Court, and the JOLs have refused to provide an unredacted version to the CDM Parties.  From what the CDM Parties can glean from the redacted Funding Agreement, the funding advanced thereunder is provided by Crossvine Litigation Funding LLC, an entity backed by the owner of Skyview and Mr. Dondero's long-time business associate Mr. Ellington. The JOLs readily admit this is an atypical funding agreement for the benefit of Mr. Dondero. *See Sixth Affidavit of Margot Macinnis* (July 11, 2025) at ¶ 11.  While the JOL's claim that Mr. Dondero has no control over any funded litigation, it appears that the Funding Agreement provides Crossvine—and by extension Mr. Dondero—with such rights. Finally, because the Debtor has limited cash, in the absence of the Funding Agreement, the JOLs have no way of getting their professionals' fees paid.  Thus, the CDM Parties believe that as a result of the Funding Agreement, the JOLs must choose to be beholden to Mr. Dondero or cease their litigation and funding.

19.    Since the filing of the J&E Petition, the CDM Parties have had concerns that Mr. Dondero is influencing and controlling the JOLs.  Among other things, the JOLs tried to retain the Highland Foundations' former counsel as their counsel in the Cayman Proceedings. In addition, the JOLs attempted to assert control over entities that were not the Debtor.  Finally, the JOLs are party to an atypical funding arrangement in which the JOLs are being funded by an entity affiliated with Mr. Dondero for his benefit.  To create transparency in the Cayman Proceeding and insulate the proceeding from Mr. Dondero, on August 19, 2025, DFW filed a summons in the Cayman Court seeking the removal of the JOLs and the appointment of replacement independent joint official liquidators (the "**Disqualification Summons**").  The hearing on the Disqualification

RLF1 33616737v.4

Summons is anticipated to be scheduled in November 2025. But as of today, it is not certain whether the current JOLs will remain as the Cayman Court appointed joint liquidators.

20.     On August 27, 2025, barely one week after DFW filed the Disqualification Summons and despite Mr. Patrick and Mr. Murphy's engagement in document production, the JOLs filed the Turnover Motion over a holiday weekend seeking documents from parties that will almost certainly include the CDM Parties' documents.[12]

### III.        The Turnover Motion

21.     The Turnover Motion requests overly broad authority to seek books and records from certain of the Debtor's historical professionals (the "**Turnover Targets**").  But the Turnover Motion oversimplifies the document requests and contradicts the relief requested in the Proposed Turnover Order.  Specifically, the Proposed Turnover Order requests "all books and in their possession belonging to, or *otherwise arising in connection with their engagement by*, Holdco." This provision is not merely a request for the Debtor's own documents but is a broad request for any documents related to the matter which may be books and records of the CDM Parties.  This is more than just "limited" relief as described in the Turnover Motion. It is a deliberate attempt by the Dondero Affiliates to obtain documents to which they are not otherwise entitled to under any law of any jurisdiction.

22.     Second, because the Debtor did not have business operations and there were other operating and controlling entities within the DAF Structure, advice from professionals was often directed to one or more entities in the DAF Structure simultaneously, with some advice and documents belonging solely to the Debtor, some solely to non-Debtor entities and some of which

---

[12]   Prior to filing, counsel for the CDM Entities contacted counsel for the JOLs requesting an adjournment of the hearing until the Recognition Hearing or, in the alternative, a brief adjournment of this hearing to allow the CDM Entities additional time to respond.  Counsel for the JOLs did not consent to the adjournment.

RLF1 33616737v.4

may include a mix of materials from the Debtor and non-Debtor entities within the DAF Structure. In addition, some advice may solely belong entities other than the Debtor, whose documents the Debtor is and never was entitled to. Further, because the Debtor was merely a non-controlling limited partner, the CDM Parties believe that the vast majority of advice provided was not to the Debtor. The Turnover Motion's broad mandate that all documents, including documents arising in connection with the engagement, be turned over without a review and without any qualifying language limiting the relief to solely the Debtor's documents is likely to lead to inadvertent production of non-Debtor documents, which may include attorney-client privileged materials, and goes too far.

23. Not only is the Turnover Motion too broad, but the Turnover Motion violates the spirit of the Stipulated Order. Hearing the Turnover Motion on the merits now brings forward merits arguments related to recognition, in violation of the Stipulated Order. And there is no urgent need for the JOLs to receive the requested documents because no merits hearings are scheduled before the Cayman Court or the Texas Business Court. Finally, DFW has moved to replace the JOLs, so the current JOLs may not have authority to act on behalf of the Debtor once the Cayman Court rules on the Disqualification Summons. Accordingly, for these reasons, as set forth more fully herein, the Court should continue the hearing on the Turnover Motion until the Recognition Hearing or otherwise deny the relief requested unless modified as set forth herein.

## ARGUMENT

### I. The Turnover Motion Is Premature and Should Be Continued

24. The Court has the inherent authority to manage hearing schedules. *See, e.g.*, *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 176 (3d Cir. 1991) (a court has "substantial discretion in managing its own docket"); *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1077 (3d Cir.

14

RLF1 33616737v.4

1983) (every court has inherent power to "schedule disposition of the cases on its docket so as to promote fair and efficient adjudication"). The Court also has the authority under section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). "Section 105 specifically codifies what are traditionally called 'inherent powers' to give the bankruptcy courts the necessary ability to manage the cases on their docket." *Copley Press, Inc. v. Peregrine Sys., Inc. (In re Peregrine Sys., Inc.)*, 311 B.R. 679, 690 (D. Del. 2004) (note omitted).

25.     The Court may use its equitable powers to adjourn the hearing on the Turnover Motion and should do so for at least three reasons. First, the Turnover Motion addresses recognition arguments that the parties agreed to defer consideration of under the Stipulated Order. Second, DFW has moved the Cayman Court to disqualify and replace the JOLs, who are funded, influenced, and possibly controlled by Mr. Dondero. Third, there are no proceedings scheduled in the Cayman Proceeding or Texas Business Court that warrant immediate provisional relief and the JOLs will not be prejudiced. As such, the Court should defer the hearing, if any, on the Turnover Motion until after the Recognition Hearing.

A.     **The Turnover Motion Brings Forward Merits Arguments on Recognition**

26.     As very briefly set forth above, and as will be detailed more thoroughly in the objection to recognition, the history of the DAF is lengthy, complex and colors the Chapter 15 proceeding, including the Turnover Motion. After the JOLs filed the Chapter 15 proceeding, the CDM Parties immediately engaged with the JOLs and agreed to the Stipulated Order, the import of which was to preserve certain oversight and informational rights in favor of the JOLs and the CDM Parties' ability to properly contest recognition, including through briefing and developing the evidentiary record.

15

27.     While the JOLs might attempt a technical argument that the Turnover Motion is consistent with the Stipulated Order, it is anything but that. In resolving the Turnover Motion, the JOLs ask the Court to make certain findings regarding the substantial likelihood of recognition. The JOLs specifically rely on the assertions made in the Verified Petition to support this relief.  In the Stipulated Order, the parties agreed to adjourn the dispute regarding recognition and the relief requested in Verified Petition until a later hearing, but the Turnover Motion now brings these issues to the Court without affording the CDM Parties the opportunity to fully respond as agreed between the parties.   Indeed, when the CDM Parties contest recognition, they expect that their briefing will be extensive, that multiple declarations in opposition will be submitted, and that discovery may be propounded. The JOLs have completely omitted the CDM Parties' side of the story and material facts, and requiring the CDM Parties to contest essentially the same issues as would be necessary to contest recognition on extremely limited notice is highly prejudicial to the CDM Parties and completely inconsistent with the spirit of the Stipulated Order. For that reason alone, the Court should continue the hearing on the Turnover Motion.

**B.     DFW Has Moved to Remove and Replace the JOLs in the Cayman Proceeding**

28.     As will be further explained in their forthcoming objection to recognition, the CDM Parties believe Mr. Dondero's funding of the JOLs is to the detriment of the DAF and its charitable mission. Indeed, as referenced above, Mr. Dondero is the JOLs' sole funding source.  As will be shown at the Recognition Hearing, as far as the CDM Parties can tell through the redactions in the Funding Agreement, Mr. Dondero has notice and some form of consent rights over certain of the JOLs' actions. To remove the influence of Mr. Dondero and ensure a fair and transparent process in the Cayman Proceeding, on August 19, 2025, DFW filed the Disqualification Summons. Thus, as of the filing of the Turnover Motion, the JOLs' authority to even bring the Turnover Motion has

16

been called into question before the Cayman Court. If the Court were inclined to hear the Turnover Motion before the Cayman Court considered the Disqualification Summons, that puts the cart before the horse and will lead to inefficient use of judicial resources because it is not certain whether these JOLs will be the Court appointed joint liquidators in place at the Recognition Hearing. The better course of action is to continue the Turnover Motion until the Recognition Hearing. In doing so, the Court will honor the spirit of the Stipulated Order, the Court will conserve its resources, and, as set forth below, the JOLs will not be prejudiced by any delay.

### C.   There In No Urgency and No Harm to the JOLs in Continuing the Turnover Motion

29.   While the JOLs assert that there is a need for immediate document production from certain parties, this is simply not the case. To start, the Stipulated Order provides ample protection to the JOLs in guarding against any dissipation of assets and provision of financial information and reporting. Similar orders have also been entered by the Cayman Court and the Texas Business Court. Second, neither the TRO Proceeding nor the Injunction Summons have been set for hearing. Coupled with the Disqualification Summons, each of these facts further supports continuing the Turnover Motion.

### 1.   The Stipulated Order Put Guardrails in Place

30.   This two-party dispute centers around, not the insolvency of the Debtor (which the JOLs readily admit is solvent), but control of the CDM Entities' assets (which were never subject to the Debtor's control). The Stipulated Order puts in place a framework that prohibits the CDM Parties from altering records, selling assets under certain circumstances, modifying corporate governance and transferring assets outside the ordinary course of business, in addition to providing the JOLs with certain notice and information rights with respect to certain transfers.

17

31.     The CDM Parties have also entered into consent orders with similar restrictions in the Texas Business Court as well as before the Cayman Court. Pending resolution of these proceedings, these agreements have given the JOLs strong oversight and inquiry rights over the CDM Parties and their use of assets.  Accordingly, continuing the Turnover Motion will not prejudice the JOLs because they are adequately protected by the Stipulated Order, in addition to similar orders in the Cayman Proceeding and the Texas Business Court.

### 2.     The TRO Proceeding and the Injunction Summons Have Not Been Scheduled

32.     Litigation against the CDM Parties is pending in two Courts, material hearings in each of which have not yet been scheduled. First, with respect to the Injunction Summons, the merits hearing on the Injunction Summons is not expected to be scheduled until November or December 2025 at the earliest, and is now anticipated to be scheduled after the Disqualification Summons. And with respect to the TRO Proceedings, that proceeding is still at the motion to dismiss stage and there are no merits hearings scheduled.  As such, there is no exigent need for the JOLs to request documents.  Further, all of the Turnover Targets are professionals so there is no risk that if recognition is granted without the Turnover Motion having been previously granted the documents would not otherwise be available.

33.     In sum, the JOLs do not have an urgent need for the relief requested in the Turnover Motion. The CDM Parties have been engaging in document production, the Stipulated Order, and similar orders entered by the Cayman Court and the Texas Business Court, provide ample oversight for the JOLs, and the proceedings for which the JOLs assert a need for these documents have not even been scheduled yet.  Accordingly, adjournment of the Turnover Motion is appropriate.

## II.     Limited Objection and Reservation of Rights

18

RLF1 33616737v.4

34.     While section 1519(a) of the Bankruptcy Code permits the Court to grant certain forms of provisional relief in the gap period between the Chapter 15 filing and recognition hearing, that relief must be urgently needed and necessary. *In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 180 (Bankr. S.D.N.Y. 2022).  Further, pursuant to Section 1522 of the Bankruptcy Code, provisional relief is only appropriate if the interests of all parties are sufficiently protected. *See SPhinX, Ltd.*, 351 B.R. 103 at 112-13 (Bankr. S.D.N.Y 2006).  Where the foreign proceeding is seriously and unjustifiably injuring United States creditors, provisional relief should be denied. *Andrade Gutierrez Engenharia S.A.*, 645 B.R. at 181 (citing H.R. Rep. No. 109-31, pt.1, at 116 (2005)).  The JOLs bear the burden in establishing the necessity of the relief requested by the Turnover Motion. The JOLs have failed to meet their burden, and their requests should be denied unless modified as set forth herein.

**A.     The Findings in the Proposed Turnover Order Are Overbroad and Prejudicial to the CDM Parties' Forthcoming Objection to Recognition**

35.     If the Court is inclined to hear the merits of the Turnover Motion, the Proposed Turnover Order must be significantly narrowed.  As the JOLs know, the CDM Parties do not believe that this Chapter 15 proceeding is appropriate and will oppose recognition of the Cayman Proceeding at the appropriate time, in accordance with the Stipulated Order. In light of this, when the CDM Parties engaged in discussions with the JOLs regarding the Stipulated Order, they insisted that the findings contained in the original order be removed, so that the CDM Parties' ability to contest recognition would not be prejudiced.  Many of the findings removed from the Stipulated Order, or findings of similar import, now appear in the Proposed Turnover Order. These contested findings must be removed.

36.     Findings E through K will have an adverse effect on the CDM Parties.  Among other things, the findings provide that (E) there is a substantial likelihood that the JOLs will

19

successfully demonstrate that the Cayman Proceeding constitutes a "foreign proceeding", (F) there is a proper purpose to this Chapter 15 proceeding, (H) in the absence of the relief requested, the JOLs will be irreparably harmed, (I), the provisional relief will not prejudice any parties, (j) the provisional relief is in the public interest, and (K) the CDM Parties are sufficiently protected. These findings are highly prejudicial and predetermine issues that will be used against the CDM Parties to their detriment. And these findings go to the heart of significant recognition issues for which the CDM Parties should not be forced to litigate now, in light of the scheduling in the Stipulated Order.

37. Further, the CDM Parties are not sufficiently protected. The DAF Structure is a complex corporate structure. As a result of the DAF Restructuring, the Debtor is no longer the limited partner of the DAF. The Debtor was never entitled to the books and records of the CDM Entities or any of the DAF subsidiaries. Due to the complex nature of documents and legal advice provided, prior to any turnover of documents, those documents must be reviewed by the appliable entities and professionals in the DAF Structure, to ensure that there is no inadvertent production of documents that the Debtor is not entitled to. The JOLs have completely glossed over this point, which masks the deleterious effect of the Turnover Motion on the CDM Parties. But the JOLs' oversimplification of the issue is not surprising. As referenced above, the JOLs have repeatedly exceeded their authority in the Cayman Proceeding, including by asserting alleged control over non-Debtor entities, serving the Skyview Notice in efforts to seek documents of non-Debtor entities, and interfering with the CDM Entities' operating accounts. Further, the JOLs are not engaging in reciprocal discovery and have concealed key terms in the Funding Agreement. Based upon the foregoing, the JOLs have failed to demonstrate that the CDM Parties are adequately protected.

RLF1 33616737v.4

38.     For these reasons, the Turnover Motion should be denied or otherwise modified to ameliorate any prejudicial effect of the findings contained in the Proposed Turnover Order.

**B.     The Relief Requested Is Overly Broad and Requests Documents that Go Beyond the Debtor**

39.     The JOLs frame their turnover requests as simple and straightforward, but the JOLs have failed to account for the complexity of document production. The DAF Structure involves a non-voting, non-controlling holding company at the top (once the Debtor and now CDM), a layer of control at the DAF and the DAF's general partner, and subsidiaries maintaining assets and/or business operations, for which the Debtor used to receive discretionary dividends from time to time.   In connection with obtaining legal and other advice, it was frequently the case that professionals would render advice to one or more entities in the DAF Structure simultaneously, including the Debtor. Because of the nature of the DAF Structure and the advice received, the CDM Parties believe that the Debtor's documents may be mixed with non-Debtor documents. In addition, as characterized by the Proposed Turnover Order, the JOLs are seeking all books and in the Turnover Targets' possession belonging to, or *otherwise arising in connection with their engagement by*, the Debtor. This request is expansive, not "limited" relief as framed by the JOLs, and is likely to lead to production of documents belonging to non-Debtors.

40.     In order to ensure that non-Debtor documents are not inadvertently produced to the JOLs, the Proposed Turnover Order must provide that the Debtor is entitled to only its documents and not the documents of non-Debtors. To effectuate this, a review of documents must be completed prior to production. Otherwise, there is a substantial likelihood that non-Debtor documents will be produced to their detriment.   The CDM Parties are willing to engage in discussions with the JOLs regarding a production protocol for the Debtor's documents. But in the

21

RLF1 33616737v.4

absence of clarifying language regarding which documents the JOLs are entitled to and a form of agreed upon review and production mechanic, the relief requested must be denied.

## RESERVATION OF RIGHTS

41.     The CDM Parties reserve all rights to supplement and/or amend this Cross-Motion and Limited Objection. Nothing set forth in this Cross-Motion and Limited Objection should be deemed a waiver of any objections or arguments that the CDM Parties may have with respect to recognition or any other motions filed by the JOLs in this Chapter 15 case.

## CONCLUSION

WHEREFORE, the CDM Parties respectfully request that the Court continue the hearing on the Turnover Motion until the Recognition Hearing or, if the Court determines the Turnover Motion on the merits, the Court should deny the relief requested unless such relief is modified consistent with this Cross-Motion and Limited Objection.

Dated: September 4, 2025
       Wilmington, Delaware

/s/ David T. Queroli
**RICHARDS, LAYTON & FINGER, P.A.**
Russell C. Silberglied (No. 3462)
Amanda R. Steele (No. 5530)
David T. Queroli (No. 6318)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email:  silberglied@rlf.com
        steele@rlf.com
        queroli@rlf.com

*Counsel for the CDM Parties*

22

RLF1 33616737v.4