**Exhibit 1**



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO.: FSD 116 of 2025 (JAJ)**

**IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**FIRST AFFIDAVIT OF MARK ERIC PATRICK**

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1. I am a registered director, president and sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation (**DFW**). DFW is the majority Participating Shareholder of Charitable DAF Holdco, Ltd. (**Holdco** or **Company**) of which I am both a director and the sole Management Shareholder. The remaining Participating Shareholders of Holdco are Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., and HCMLP Charitable Fund (collectively, **Highland Foundations** and also referred to as the **Supporting Organisations**).

2. In addition, I am the sole director of CDH GP Ltd. (**GP**), a Cayman Islands limited company incorporated in or around 7 February 2024 which is the general partner of Charitable DAF Fund LP (**DAF**).

3. This affidavit is provided pursuant to the Orders of Justice Asif KC handed down at the directions hearing on 23 May 2025 (**Directions Order**) made with respect to an

application of the joint official liquidators (**JOLs**) of Holdco issued by Summons dated 22 May 2025 (**JOLs Summons**), and amended as of 30 May 2025 seeking sanction from the Court for the engagement of Cayman attorneys, Cayman conflict counsel and US legal counsel (**Application**).

4. I am duly authorized to provide this affidavit for and on behalf of DFW to:

   (a) Oppose the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest;

   (b) Address the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs; and

   (c) Oppose the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 herein.

5. In this affidavit I refer to the supervision hearing on 6 May 2025 (**Supervision Hearing**) at which this Honourable Court brought the voluntary liquidation of Holdco under its supervision on uncontested basis and refer to the order appointing the JOLs on 6 May 2025 as the **Appointment Order**.

6. The contents of this affidavit are, save where stated otherwise, within my own knowledge and are true. Where the contents of this statement are not within my own knowledge, they are true to the best of my knowledge and belief and I have indicated the source of my information. In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

7. There is now produced and shown to me a paginated bundle of documents marked "**MP1**". References in this affidavit are to pages in MP1 are in the form [**MP1/page number**]. The majority of the documents comprised in MP1 are materials that I and Mr Paul Murphy requested that our US attorneys compiled and made available in a data room to the JOLs following their appointment. As such, much of the material referred to in this affidavit is already and has been available since around

9 May 2025 to the JOLs.  To illustrate this fact, I exhibit an index to the documents in the data room that was made available to the JOLs (**MP1/ page 1 - 3**).

8.    I respond in this affidavit to the Second and Third Affidavits of Ms MacInnes dated 13 and 26 May 2025 respectively (**MacInnes 2** and **MacInnes 3** respectively), that were filed by the JOLs in support of the Application which I have reviewed.  I have also reviewed the unsworn, undated and unsealed affidavit of Mr Andrew Johnstone of Johnstone Law (**Johnstone 1**) which was served on Baker and Partners (Cayman) Limited (**Baker & Partners**) as legal counsel to DFW on 26 May 2025.  To the extent that any assertion made in Johnstone 1, MacInnes 2 or 3 go unanswered in this my first affidavit in these proceedings, that should not be taken as my agreement, acceptance or acquiescence of the position asserted by Ms MacInnes or Mr Johnstone.

9.    There will be matters in this affidavit which relate to certain decisions and actions Mr Murphy and I have taken as directors of Holdco. I have noted that certain critical remarks have been made by Johnstone Law about the fact that I have a played a central role in controlling and managing several entities within the charitable structure of which the Company previously formed part. These remarks are unfounded in circumstances where the DAF Structure and the entities within it have always operated through a single human agent. This was by design so that Mr Dondero was able to draw on the economies of having a single point of contact across the entire structure. My role was exactly the same as that occupied by my predecessor, Mr Grant Scott, however my approach was and remains to ensure that each entity's role in the DAF Structure was professionally managed.

10.   In light of the foregoing insofar as this affidavit deals with matters relating to my role in managing Holdco with Mr Murphy as well as other entities within the structure that is because of the architecture of the structure itself.

11.   In light of the wider context in which the position of DFW should be considered, I have reviewed the evidence prepared by Johnstone Law in connection with the winding up of Holdco and filed on behalf of the Highland Foundations namely the

First Affidavit of Mr James Dondero filed on 16 April 2025 (**Dondero 1**), the First Affidavit of Ms Julie Diaz (**Ms Diaz**) filed on 16 April 2025 (**Diaz 1**) and the Second Affidavit of Ms Diaz filed on 29 April 2025 (**Diaz 2**), which was relied on by the Highland Foundations for the purposes of the Supervision Hearing. On my review I note there are a number of mischaracterisations and inaccuracies in the evidence relied on by the Highland Foundations.

12. These create an inaccurate picture of DAF, the DAF Structure (as defined below) and Mr Dondero's dealings with the same. To ensure the facts are accurately before the Court on these matters, and where not otherwise addressed in the content of my affidavit, I include in Sections E and F below specific responses to the inaccuracies set out in Dondero 1 and Diaz 1. I realise that the purpose of the Application is not to resolve complex issues of law or fact. However, I believe it is critical for this Honourable Court to have an understanding of the relevant contextual issues, even if disputed, in order to determine both the question of whether the proposed engagement of Johnstone Law will at the very least undermine the appearance of neutrality in dealing with these issues.

13. Equally, the objection of DFW to the engagement by the JOLs of US legal counsel at this juncture requires the Court to appreciate the facts and circumstances which required Mr Murphy and I to implement the DAF Restructuring (defined at paragraph 18 below).

14. This affidavit proceeds as follows:

    (a)    Objections to the JOLs' Summons

    (b)    Professional background and dealings with Holdco / DAF

    (c)    Function of Holdco and DAF Structure

    (d)    DAF as alter ego of Mr Dondero

    (e)    Responses to First Affidavit of Ms Diaz

    (f)    Responses to First Affidavit of Mr Dondero

### A. OBJECTION TO JOLS' SUMMONS

15. In summary, DFW:

   (a)  Opposes the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest.

   (b)  Does not object to the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs, subject to the conflict committee of Maples confirming that on considering the ability of Maples to act for the JOLs they gave specific consideration to the prospect that Maples would need to review and opine on the issuance

   (c)  Opposes the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 below.

16. DFW objects to the appointment of Johnstone Law as Cayman Islands legal counsel to the JOLs. This opposition is based on Johnstone Law's immediately prior engagement by the Highland Foundations in seeking the just and equitable winding up of Holdco and the appointment of provisional liquidators, on the erroneous basis that the DAF Restructuring was a fraudulent scheme which resulted in assets in excess of US$250 million in value being misappropriated from the Company, to the detriment of the Highland Foundations. For the avoidance of doubt and as explained in Section C of my confirmatory affidavit, the Highland Foundations never had a traditional ownership economic interest in the DAF and its assets; they only had a right to discretionary dividends if and when paid.

17. The Highland Foundations are companies that are owned and controlled by Mr Dondero who is the President, Individual Member and Director of each of the Highland Foundations. The complaints and allegations made by the Highland

Foundations and the arguments advanced on their behalf by Johnstone Law ignore the real prospect that it is Holdco which may have causes of action against the Highland Foundations and/or Mr Dondero, for the reasons articulated below (see also Section D).

18. At the Supervision Hearing the Highland Foundations, through Johnstone Law characterised the following steps as a fraudulent scheme:

    (a) The allotment of 318 Participating Shares in Holdco to DFW on 7 February 2025 which constituted DFW the single majority Participating Shareholder of Holdco.

    (b) On 27 March 2025, redeeming Holdco's interest in CDMCFAD LLC.

    (c) On 2 April 2025, distributing the proceeds of the aforementioned redemption to the Highland Foundations in their capacity as Participating Shareholders.

19. I refer to these steps collectively as the **DAF Restructuring**.

20. I reject any suggestion that the DAF Restructuring was improper, inappropriate or fraudulent.  As I explain in further detail below, the DAF Restructuring was necessary to protect the DAF and its charitable intent from the retaliatory actions that can be traced back to Mr Murphy's and my refusal to accept Mr Dondero's demands to use the DAF's assets to invest in several opportunities that were inappropriate, arguably unlawful and to his personal benefit. I also discuss Mr Dondero's attempts to influence me to transfer approximately US $1.5 million to an offshore firm owned by Mr Dondero to settle outstanding legal fees which were not related to the DAF at paragraph 116(a) below.

21. For the avoidance of doubt and without waiving legal privilege, the DAF Restructuring and each of the steps forming that transaction, was / were undertaken with the benefit of thorough and extensive legal, tax and financial advice from third-party professionals and for the principal purposes of: (i) ensuring the DAF structure continues to fulfill its charitable purpose of supporting

community-focused, non-profit foundations; and (ii) protecting DAF and the DAF Structure from being used by Mr Dondero or attacked by his creditors as his *alter ego*.

22. As a result of Mr Dondero's conduct, the Highland Foundations may not retain their non-profit status under the laws of the US. According to tax advice I sought for and on behalf of Holdco, the Highland Foundations were susceptible to being found as the *alter ego* of Mr Dondero or facilitating other claims against entities within the DAF Structure based on *alter ego* theories which are set out further at Section D, paragraph 78 onwards and paragraphs 145 onwards of this affidavit. Significantly, the Highland Foundations may also have liability as co-conspirators if Mr Dondero is found to have used them in a way which contravenes the US Internal Revenue Code (**IRC**). It was in recognition of this risk that Participating Shares were issued to DFW. As stated in the resolutions authorizing the issuance and allotment to DFW, this was necessary to ensure that DAF could continue to further its charitable mission where, upon advice, it seemed the Highland Foundations could not. I refer to the first affidavit of My Murphy and to Section V(ii) which addresses the DWF share issuance.

   *(i)   Objections to Johnstone Law on the basis of a conflict of interest*

23. The question of Johnstone Law's ability to advise the JOLs independently and impartially was a matter I instructed counsel for DFW to raise at the Supervision Hearing. While I had not opposed the making of a supervision order, nor found at that stage there was a need to object to the appointment of Ms MacInnes or Mr Bhowmik as JOLs, it was my firm belief that due to Mr Johnstone's prior engagement for the Highland Foundations he and his firm would not be sufficiently independent to act as legal counsel to the JOLs. My reasonable belief was founded on both my prior experience of how Mr Dondero conducts his arrangements and litigates aggressively (I refer the Court to the examples of such behaviour in Section D *DAF As Alter Ego of Dondero* (below) and to Section IV of Mr Murphy's affidavit); and on the allegations of fraud and misconduct which have been central to the

applications persuade by the Dondero controlled and managed Highland Foundations.

24. At the Supervision Hearing, and as is set out in the letter from Baker & Partners to the JOLs dated 14 May 2025 and exhibited at **MP1/ pages 4 – 7** (**14 May Letter**), the pleadings before the Court charcterised the DAF Restructuring as a *"fraudulent Scheme"* and that the former directors (myself and Mr Murphy) appeared to be *"implementing a calculated and ultimately fraudulent scheme to dissipate the Company's assets to prevent thorough independent investigation"*.

25. The pleadings prepared by Johnstone Law characterise the Highland Foundations as *"victims of the apparent fraud"* and, with specific regard to the skeleton argument that Johnstone Law filed in support of the *ex parte* application for the appointment of provisional liquidators,  Johnstone Law addressed the proposition that *"There is no  hard evidence of fraud or defalcation"* by clearly refuting that suggestion as *"not true"* and that *"it will not take the Court long to see that Mr Patrick and Mr Murphy's blocking tactics hide more nefarious conduct"* (see 14 May Letter at **MP1/ pages 4 - 7**).

26. Johnstone Law also prepared and filed Diaz 2 which was given in support of the Highland Foundations application for the voluntary liquidation of the Company to be brought under the supervision of the Grand Court.  In this respect, the terms of relief and basis for the need for supervision was allegedly due to a *"cloud hanging over Mr Patrick and Mr Murphy, as directors of Holdco"* (**Diaz 2, para 15(b)**).  Ms Diaz goes on to incorrectly described the Highland Foundations / Supporting Organisations as *"the owners of 100% of the economic interest in the Company"* and that the need for supervision of the Grand Court is primarily for a *"(a) proper investigation"*  *"...(e) into the allegations of misconduct on the part of the management of the company"* (**Diaz 2, para 15.(a), (e)**).  Ultimately and as I consider to be indicated by the terms of the **Diaz 2 (paragraph (f)**, the  case advanced by Johnstone Law for the Highland Foundations envisaged and anticipated that transactions undertaken by Holdco would likely need to be set aside.

**Page 9 of 64**

27. While I was not present at the Supervision Hearing I am informed by and understand that in accordance with my instructions, counsel for DFW foreshadowed the potential conflict of interest at the Supervision Hearing.   After the DAF Restructuring, and subject any claims accruing to the Company, Holdco has no or de minimis assets.  The central issue in the liquidation of Holdco is whether the DAF Restructuring was lawfully carried out by myself and Mr Murphy acting in the best interests of Holdco and exercising our powers as directors for a proper purpose.  It simply cannot be the case that Mr Johnstone can review the DAF Restructuring impartially and with a fair-mind having already formed the view that that transaction amounted to a calculated and fraudulent scheme.

28. From my consideration of **Johnstone 1 (paragraphs 14,15 and 17)** I understand that:

   (a)   Mr Johnstone appeared as legal counsel to the Highland Foundations at the Supervision Hearing,

   (b)   After Justice Asif KC made the Supervision Order the engagement of Johnstone Law was terminated and at the same time the Highland Foundations consented to the engagement of Johnstone Law by the JOLs.

   (c)   I understand that the engagement with the JOLs is dated 7 May 2025. Having read MacInnes 2 I understand that the letter of engagement was executed by the JOLs on 13 May 2025 (see **MM2/ page 4**).

   (d)   Mr Johnstone asserts that he *"no longer [has] obligations to the SOs (save for my ongoing duties of confidentiality), and as former client, rather than current clients"* (**Johnstone 1, paragraph 39**) and that there is no *"suggestion that in my capacity as attorney to the SOs, I obtained confidential information that would make it unfair for me to know represent the JOLs"* (**Johnstone 1, paragraph 40**).

9

29. As is discussed in detail in Section IV of Mr Murphy's affidavit and Section D below, it was necessary for Mr Murphy and I to implement the DAF Restructuring so as to preserve the DAF assets and charitable standing of the DAF Structure. Given the potential civil and criminal consequences which may befall Holdco, DAF and its assets there is a real possibility that on investigation into the restructuring claims of Holdco are identified against the Highland Foundations and / or Mr Dondero.

30. I believe it is highly likely that Mr Johnstone holds confidential information relating to the operations of the Highland Foundations (being owned and controlled entities of Mr Dondero) that are highly relevant to the central issue in the liquidation, as presented by the Highland Foundations themselves.

31. It appears that the very real potential for Mr Johnstone and his firm's duty of confidentiality to the Highland Foundations as former clients, to conflict with the obligations to their current clients the JOLs has not been addressed in the discussions between Johnstone Law and the Highland Foundations; nor between Johnstone Law and the JOLs.

32. Significantly Mr Johnstone is *"happy to confirm I have never been instructed by James Dondero and/or JP Seville"*. This statement itself may refer to the specific terms of any engagement letters entered into by Mr Johnstone and/or his law firm, however, Johnstone Law has recently been engaged by the Highland Foundations who are under the ownership and control of Mr Dondero in his capacities as the individual member, president, and director of each, not to mention the influence he may wield by promising additional donations. Furthermore, Mr Dondero has put in evidence for and on behalf of the Highland Foundations in support of the petition to wind up Holdco and it was in that engagement and in part on the evidence of Mr Dondero that Mr Johnstone formed the view that *"it appeared on the evidence available that a fraud had been perpetrated"* (**Johnstone 1, paragraph 35**). Furthermore, as I refer to in paragraph 187 below, there is reason to be concerned that Johnstone Law has been engaged by entities likely to be controlled, owned or associated with Mr Dondero.

33. Insofar as the question of Johnstone Law / Mr Johnstone's independence is addressed in MacInnes 2, Ms MacInnes does not confirm that the JOLs have made independent enquiry or sought the views of legal counsel on the issue of conflict, save for relying on the view of Mr Johnstone.

34. **Johnstone 1, paragraph 41** notes that Mr Johnstone is *"surprised"* that the engagement of his law firm has elicited such opposition from DFW because it is usual for attorneys who have previously acted for the petitioners to take on the role of advising the liquidators. Mr Johnstone explains *"This has the advantage that the attorneys already have considerable understanding of the case, and so do not approach the task from a 'standing start', which saves time and costs"*. This point is also supported at **paragraph 11(a) of MacInnes 2** where Ms MacInnes states it to be her professional experience that liquidators frequently engage the firm of attorneys who acted for the petitioner upon their appointment, and the mere fact that a firm has previously acted for a petitioner does not of itself provide a basis for asserting that a firm lacks independence.

35. I do not accept this is correct in the context of liquidations arising from the breakdown of a shareholder relationship as is the case with Holdco. This evidence disregards the complex issues which arise in the context of this matter. I am informed by Cayman counsel and understand this issue will be addressed in submissions that while that general position as stated in Johnstone 1 and MacInnes 2 may be true where the winding up petition is premised on an undisputed debt, the position here is markedly different. There is a clear and contentious dispute brought by the Highland Foundations in the terms of the just and equitable petition that was filed against Holdco.

36. Insofar as MacInnes 2 asserts that the JOLs have concluded that Johnstone Law is independent and that the position of DFW in objecting to their appointment is without substance I note that:

(a) It is Mr Johnstone himself who has informed the JOLs that his prior engagement by the Highland Foundations and that his own law firm had

no conflict in acting. The JOLs do not appear to have made independent enquiry into the potential conflict nor taken independent advice on the point (**Paragraphs 11(b)-(d) of MacInnes 2**).

(b) Johnstone Law has also confirmed that they *"have no preconceptions before accepting an engagement by the JOLS, and are not subject to any external pressure or influence"* (**paragraph 11(c) MacInnes 2**). However, it remains the case as per Mr Johnstone's own evidence that he is of the view that a fraud has been perpetrated and *that "that does appear to be an obvious explanation for what has occurred, and because those were my instructions"* (**Johnstone 1, paragraph 35**). I do not accept that fraud was the *"obvious explanation"* let alone a reasonable one had Mr Johnstone considered whether any underlying factual basis was reasonably credible. He does not appear to have considered the extraordinary legacy of the very person behind the Highland Foundations or the person funding his engagement, here Mr Dondero.

37. In the circumstances I fail to see how it could be considered reasonable or fair-minded (as **Johnstone 1 s**uggests at **paragraph 42**) for Johnstone Law's engagement to be sanctioned.

38. I am further informed by the Cayman attorneys to DFW that during the Supervision Hearing, Mr Johnstone submitted to the Court that the submissions of Baker & Partners with regard to the terms of Order ought not to be given weight because DFW is controlled by a person subject to investigation – that person being myself - and suggested I would seek to limit the powers of the liquidators. I refute the negative assertions that have been cast on my character advanced by Johnstone Law in written argument, and further at the Supervision Hearing. Additionally, recognizing that there is an investigation which needs to be conducted into the DAF Restructuring and its propriety, the conclusory view of Mr Johnstone that DFW's views should not be given weight because of that investigation itself indicates a

position of partiality which DFW believes requires that the JOLs have the benefit of independent, unconnected legal counsel.

39. The engagement of Johnstone Law specifically was not a matter that was before the Court at the Supervision Hearing.  I understand from legal counsel to DFW that it was submitted at the Supervision Hearing that the identity of Cayman Islands attorneys for the JOLs was not then known, and that Reed Smith were identified during the Supervision Hearing as US legal counsel.

40. However, the terms of the Draft Supervision Order provided to the Court on 6 May 2025 did seek sanction for the JOLs to engage attorneys.  I exhibit at **MP1/ page 9 - 11** a copy of the original draft order that was circulated on 6 May.  It was this general sanction to engage attorneys that was denied and for which this Honourable Court directed the JOLs to make a sanction application for the specific firms to be engaged and the terms on which that engagement would proceed. Neither Johnstone 1 nor MacInnes 2 or 3 address the non-disclosure of Johnstone Law as proposed Cayman counsel to the JOLs.  However, in the absence of independent legal counsel being identified I understand that (i) Johnstone Law's engagement with the Highland Foundations terminated after Supervision Hearing and (ii) Johnstone Law had issued a letter of engagement dated 7 May 2025 to Grant Thornton.  There is a necessary inference that at the time of the Supervision Hearing Johnstone Law had been selected to act as Cayman legal counsel to the JOLs.

41. The concerns of DFW have been further compounded by steps immediately taken by the JOLs following their appointment.

42. Firstly, the clear overreach of their powers under the Appointment Order, insofar as the JOLs have sought to exercise authority and jurisdiction over entities which are neither Holdco, nor entities that are owned or controlled by Holdco.  In this regard I refer to correspondence issued by the JOLs to Skyview Group (**Skyview,** legally incorporated as Highgate Consulting Group, Inc. and doing business as Skyview Group) dated 9 May 2025, in which the JOLs purported to have authority to request books and records from Skyview not only of Holdco but also to its current and

former subsidiaries (**Skyview Notice**). In doing so the JOLs also sought to exercise their powers in the jurisdiction of the United States where, I am informed by legal counsel, the JOLs have no legal standing or authority. A copy of the notice and correspondence issued to Skyview is exhibited at **MP1/ page 12 - 18**.

43. These steps are value destructive to DAF and its direct and indirect subsidiaries (**DAF Structure**) insofar as the JOLs have caused banks and other service providers to the DAF and related entities to freeze the operative accounts of the DAF. As an example, email correspondence from Hancock Whitney is exhibited at **MP1/ page 19 - 26**. In turn, this prevents DAF from operating its business (i) making (and receiving payments on) investments and (ii) carrying out its charitable purpose and fulfilling obligations which DAF has assumed to support selected charities.

44. Second, on 12 May 2025 Baker & Partners issued a letter to the JOLs identifying the impropriety and overreach of the requests set out in the Skyview Notice. No response to that correspondence has been received. I exhibit at **MP1/ page 27 – 29** a copy of the correspondence issued to the JOLs in response to the Skyview Notice.

45. Following the Supervision Hearing Mr Doug Mancino, a leading US tax attorney whose CV is exhibited at **MP1/ page 30 - 41**, informed me that he had agreed to a meeting with the JOLs. That meeting took place virtually on 12 May 2025 (**12 May Meeting**). I understand from Mr Mancino that Mr Johnstone of Johnstone Law was present at the virtual meeting. Mr Mancino also informed me that he was not informed during the call who Mr Johnstone was or in what capacity he was attending, that Mr Johnstone had represented (or was representing) the Highland Foundations, or that the JOLs had purported to engage Mr Johnstone as their counsel pursuant to a letter of engagement dated 7 May 2025 (despite the court requiring the JOLs to seek court approval for the appointment of legal counsel). I understand there to be a factual dispute relating to the 12 May Meeting and that Mr Mancino will directly address the assertion made in **MacInnes 3 (paragraph 12)** that at that meeting Mr Macino was informed that Mr Johnstone attended in his capacity as the JOLs' attorney.

46.   On 14 May 2025, Baker & Partners wrote to ask who Mr Johnstone acted for while attending the 12 May Meeting.  That same letter outlined to the JOLs the concern of DFW which arose from the representations made during the course of these proceedings by Mr Johnstone (see **MP1/ page 4 - 7**).  As the letter of 12 May 2025 to the JOLs makes clear, DFW has serious and justifiable concerns that where conduct which Mr Johnstone has described as a fraudulent scheme are the very actions that will inevitably be investigated and considered by the JOLs, there is not only the appearance of a conflict but a serious question over the ability of Johnstone Law to impartially advise the JOLs on matters concerning the legality and propriety of the DAF Restructuring.

47.   This extends to the very real possibility that on an independent and thorough investigation into the DAF Restructuring, causes of action may have accrued to HoldCo against the Highland Foundations and potentially Mr Dondero.  DFW's position will be deeply prejudiced if the JOLs are unable or unwilling to act or even unable or unwilling to consider acting against the Highland Foundations and Mr Dondero. The timing of Johnstone Law's termination as counsel for the Highland Foundations as of 6 May, and appointment by the JOLs pursuant to a letter of engagement dated 7 May, in circumstances where Johnstone Law had already made accusations of fraud makes it difficult, if not impossible, to believe that Johnstone Law can advise the JOLs with a view to ensuring they investigate the affairs of Holdco fairly and independently.

48.   Following the 12 May Meeting and the correspondence that was issued by Baker & Partners for DFW and on behalf of the Management Shareholder and directors by Kobre & Kim issued on 14 May 2025 (see **MP1/ page 42 - 44**) Johnstone Law made the Letter Application seeking the sanction of their appointment as legal counsel to the JOLs, without first seeking the formal views of DFW.  I do not know if the Highland Foundations who are also participating shareholders of Holdco were notified.

49.   I am informed by my legal counsel, without waiving privilege, that the usual course in making a sanction application is for the stakeholders of the liquidation to be

consulted with, and for a hearing to be set down for that application to be heard, including the views of stakeholders. While I also understand that there may be circumstances in which it may be appropriate to seek to have a sanction application determined on the papers, the views of the stakeholders interested in the application should provide their consent to proceeding with an application without sanction.  The fact that the Court properly directed that DFW and all relevant stakeholders be given notice of the application and a hearing set down only indicates that this sanction application was not one suitable to be determined on the papers.

50.   I note at **paragraph 20 of Johnstone 1** that the application for sanction of Johnstone Law was initially *"made by letter to the Court dated 14 May 2025 (**Letter Application**)"*.  At the time of swearing this affidavit I understand that a copy of the Letter Application has been requested from Johnstone Law but not yet provided to DFW.  I refer the Court to **MP1/ page 49 - 47** being a letter from Baker & Partners dated 20 May 2025 (**20 May Letter**) relating to the sanction application made by the JOLs and making specific requests for *"copies of all correspondence between Johnstone Law and the Grand Court regarding the proposed sanction application"*.

51.   I note that **Johnstone 1 (at paragraph 55)** outlines requests for documents and information that were made by Baker & Partners in the 20 May Letter but lists only 3 or the 4 categories that were requested.  Johnstone 1 makes no reference to the request that was made by Cayman counsel for DFW for a copy of Johnstone Law's correspondence with the Court, which would necessarily include the Letter Application.

52.   Significantly, if the concerns of myself and Mr Murphy regarding Mr Dondero's dealings with DAF are found on an independent investigation to have been well founded, there is a real prospect that Holdco would have actions against the Petitioners in respect of distributions that were made which did not actually comply with the charitable purpose for which the assets of DAF ought to have been deployed.  Even in the absence of such causes of action, if my concerns about Mr Dondero, the Highland Foundations are vindicated through an independent

investigation, the JOLs will be required to reach adverse conclusions about Johnstone Law's former clients. Given Johnstone Law at the very least holds confidential information about those parties, it is reasonable to infer that Johnstone Law will be strongly predisposed (or have the appearance of being strongly predisposed) towards their former clients. Indeed, Johnstone Law has already characterised his former clients as the *"victims of fraud."* (**Supplementary Skeleton Argument, 28 April 2025, para, 17**).

53. Once again, this raises a justifiable concern that Johnstone Law is not in a position to act independently in advising the JOLs to commence proceedings against the former clients of Johnstone Law or take adverse positions against them. Given the pervasive nature of the required investigation into the history of the DAF Structure, its connection with Mr Dondero and indeed DAF Restructuring, I do not see how the issue can be cured by the appointment of Maples as *ad hoc* conflict lawyers.

54. As I explain in further detail below a serious underlying concern of DFW as well as a concern Mr Murphy and I have held as directors appointed by the Management Shareholder to exercise its entitlements and functions, is that Mr Dondero historically misused DAF, the DAF Structure, and its assets for his own personal U.S. tax advantages and gain and intends to leverage the liquidation of Holdco to ultimately wrongfully require the DAF Structure and its assets.

55. Furthermore, I understand from the evidence filed by the Highland Foundations that Mr Dondero is funding the JOLs' fees and is privately financing these proceedings including meeting the fees of the Highland Foundations. In circumstances where Johnstone Law has been remunerated by Mr Dondero and indeed where they appear to have acted with certain entities associated with him, this inevitably gives rise to the real prospect that without instructing independent counsel, Johnstone Law and by extension the JOLs may not be in a position to reach fair and impartial findings against Mr Dondero or indeed the Highland Foundations with respect to any investigations of misuse or attempted misuse of the DAF Structure. Such findings would almost certainly be contrary to the position adopted by Johnstone Law on behalf of the Highland Foundations (and ultimately Mr Dondero).

56.   Mr Dondero is a serial litigant. Since 2007 he has been locked in substantial litigation with UBS and since 2019 has been pervasively involved in the now infamous "Highland Bankruptcy" Chapter 11 proceeding in Texas. Mr Dondero is currently exposed to a summary judgment determination from the Southern District of New York which may imminently result in an award against him in the amount of US$1.2 billion (as more fully discussed below in paragraph 153).  I believe the prospect of such a significant adverse judgment against Mr Dondero provides ample reason for him to seek to have the DAF Restructuring unwound and seek to control – directly or indirectly – that process. In simple terms Mr Dondero may need access to significant liquidity in the short term.

*(ii) Engagement of Maples*

57.   I note from the Amended Summons provided by Johnstone Law on 26 May that the JOLs now seek sanction for the appointment of Maples as conflict legal counsel to the JOLs. As noted in **MacInnes 3 (paragraph 19-24)**, Maples were previously retained by the Company to provide advice in connection with the power and ability of the directors of Holdco to issue and allot shares in Holdco to DFW.

58.   Given the centrality of the DAF Restructuring and the DFW share issuance to the liquidation of Holdco, I was concerned that Maples would be in a position of conflict to the extent that Maples were instructed by the JOLs to assess or impunge the validity and propriety of the issuance of shares from Holdco to DFW.  However, I also understand from both the terms of MacInnes 3 that Maples have cleared conflicts and do not regard the previous, advice provided to the Company as presenting a conflict of interest.

59.   In the circumstances, I on behalf of DFW would not object to the engagement of Maples by the JOLs providing confirmation could be provided that the conflict committee had, on considering the engagement for the JOLs, specifically addressed the ability of Maples to advise on the validity and propriety of the share issuance to DFW by Holdco.

*(iii) No requirement for US Counsel at this stage*

60.    DFW objects to the application for sanction by the JOLs to engage US counsel at this juncture. As is accepted by the JOLs, Holdco presently holds no assets in Cayman or anywhere else.

61.    The issues that are raised by the Highland Foundations and which have been assumed by the JOLs, concern the validity and potential ability to unwind the DAF Restructuring.

62.    In due course DFW intends to seek a declaration as to the validity of the DAF Restructuring from this Honorable Court and to make that application within the liquidation.  Until such time as a determination has been made that would result in assets being conveyed to the Holdco estate, DFW objects to the sanction and engagement of US counsel for the reason that it is neither proportionate nor necessary.

## B.  PROFESSIONAL BACKGROUND AND DEALINGS WITH HOLDCO /DAF

63.    I am a US tax attorney and have practiced as US tax counsel from 1998 until 2008. I hold a bachelors degree from the University of Miami Herbert Business School (BBA, Finance, Cum Laude); an LLM in Taxation from the New York University School of Law and am a Juris Doctor from the Boston University (Cum Laude).

64.    For a significant part of my career through until October 2024 I have been employed by companies connected with or controlled by Mr Dondero. From January 2008 to February 2021 I was employed as Tax Counsel by Highland Capital Management, L.P. (**Highland**).  During my employment with Highland, I provided tax consulting advice to Highland and engaged outside tax lawyers to provide legal advice to Highland relating to the management of its tax liabilities and the ability to make use of tax efficient structures.

65.    Contrary to the assertion made by Mr Dondero (**Dondero 1, paragraph 17**) I have not and did not represent Mr Dondero as his personal tax counsel while employed at Highland or at any time thereafter.  During this time, I held a license to practice

law but my role within Highland was as a tax professional and not as an attorney and I was assigned to the tax department, not the legal department. To the extent that Mr Dondero required tax or trust advice in respect of his assets, external tax counsel were hired to fulfil that role. It is well understood in the U.S. that attorneys who are employed by a company represent the company and not its officers or directors.

66.    Highland was an entity formerly owned and controlled by Mr Dondero, which was later placed into Chapter 11 Bankruptcy in the United States (**Highland Bankruptcy**).  It is my understanding that the bankruptcy of Highland in 2019 was precipitated by Highland incurring significant exposure in what has been characterised as vexatious and oppressive litigation which Mr Dondero was instrumental in prosecuting.  In particular in 2019 it was expected that a judgment would be made against Highland in favour of certain of its investors in the amount of US$189.3m.  Highland was not in a position to satisfy this judgment and Mr Dondero placed the Company into Chapter 11.  Following the collapse of Highland, Mr Dondero set up a new investment manager under the name NexPoint. Skyview was formed to provide back-office services to NexPoint and its managed funds.

67.    I was employed by Skyview from March 2021 to October 2024.

68.    I note that Mr Dondero refers to many of the former back-office employees of Highland becoming employees of the newly formed Skyview (**Dondero 1, paragraph 7**), Mr Dondero does not accurately describe the business of Skyview. From my time employed by Skyview I understand that almost all the clients of Skyview are entities owned and controlled by Mr Dondero.

69.    Further, the Chief Executive Officer and owner of Skyview is Mr Scott Ellington, a longtime business associate of Mr Dondero and former General Counsel of Highland.  During my employment at Skyview it was well understood by those working there including myself, that Mr Dondero had actual control of Skyview.  By way of example, the compensation determination for all of Mr Dondero's companies' employees is carried out in January-to February.  During this time the

Head of Human Resources and a member of the Executive Board of Skyview would attend Mr Dondero's office at the Crescent where he would set the pay of every Skyview employee.

70.    I provided tax advice to Skyview.  In September 2021 my title was formally changed from "Tax Counsel" to "Managing Director, Tax". I requested this title change to make it objectively clear that I was not providing any legal services for Skyview, Mr Dondero, nor any of Mr Dondero's companies, which met no resistance from Skyview.

71.    Contrary to the assertions made in **Diaz 1, para 25(b)**) and **Dondero 1, para 18**, at no point during my tenure at Skyview was I retained by Mr Dondero to advise in respect of his personal tax liability.  As with my employment at Highland, external legal counsel was engaged to advise Mr Dondero in respect of his personal tax affairs and trusts.  I submitted my resignation to Skyview by letter dated 2 October 2024, a copy of which I exhibit at **MP1/ page 48**. The significance of my resignation which I explain in further detail below has a direct correlation to the rapid deterioration of the ensuing interactions with the Highland Foundations.

72.    During the course of my employment with Highland I, along with outside advisor Mr Douglas Mancino (**Mr Mancino**), was instrumental in the establishment of Holdco, DAF and the DAF Structure. Mr Mancino and I exchanged a series of letters exhibited at **MP1/ pages 49 – 52, 53 – 55,  56 – 58  and 59 - 61** commissioned a memorandum exhibited at **MP1/ page 62 - 66** and had in-depth discussions regarding the most advantageous structures, compliance implications, and outreach to potential recipients of the Participating Shares. This runs contrary to **paragraph 9 of Dondero 1**, where Mr Dondero over-states his involvement in establishing the DAF.

73.    Contrary to the assertions made at **paragraphs 8 and 9 of Dondero 1**, Mr Dondero does not have the ability to use or influence the DAF to donate to charitable organizations. Furthermore, DAF entities are all for-profit entities and to the best of my knowledge and belief, Mr Dondero has never donated to.

74.    At best, Mr Dondero is an indirect donor to DAF.  Specifically, Mr Dondero donated assets to Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"), which was a charitable remainder trust and was required by law to donate all its assets to a charity by a certain date. My understanding is that a few years later, Trust #2 placed all its assets to an entity it owned called CLO HoldCo, Ltd. Trust #2 then contributed CLO HoldCo, Ltd. to Charitable DAF HoldCo, Ltd. in exchange for 300 participating shares in Charitable DAF HoldCo, Ltd. Trust #2 in turn gifted these 300 participating shares to the Highland Foundations. Mr Dondero's "donation" was in fact to Trust #2[1]. I am also aware that Mr Dondero or his trusts have made other donations to Highland Dallas Foundation from my work at Highland and Skyview.

## C.  FUNCTION OF HOLDCO AND DAF STRUCTURE

75.    The DAF Structure was established in late October 2011 to provide a permanent capital offshore structure that would manage assets on a long-term basis, during which it would make discretionary distributions to the benefit of various charitable entities and their charitable endeavors. The structure was established for the purpose of reorganizing investment assets from Trust#2 and distributing such assets to non-profits when the trust expired per its term, and reducing the burden to pay US federal tax. It was never an investment fund.

76.    In my experience these structures serve to mitigate the tax exposure of assets under management, while also permitting any donors of assets to have non-binding input on the investment of such donations and charitable contributions to charitable entities.  It is important to stress that these arrangements, to avoid material tax liability and violations of criminal tax laws, must be conducted at arm's length and with strict adherence to the principle that the donor must totally relinquish dominion and control over the contributed assets.

---

[1]    In 2011, Mr Dondero also owned and controlled Charitable DAF GP, LLC, a Delaware limited liability company, which was the General Partner of Charitable DAF Fund, LP and effectively had control over the DAF Structure (other than Charitable DAF HoldCo, Ltd.). Mr Dondero could not maintain control of the General Partner because, in order for his charitable deduction that he obtained when he donated assets to Trust #2 to remain legally valid, he had to cede dominion and control of the transferred assets.

**Page 23 of 64**

77. From my background as a tax professional advisor I am aware of the importance of avoiding inferences of "dominion and control". These derive from the fact that under U.S. tax law, when someone donates to charity, they must forfeit "dominion and control" of the donated assets, meaning the donor must completely and irrevocably transfer ownership and control of the property to the charity. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used, directly or indirectly (such as with the DAF Structure). This includes relinquishing any power to change the use or disposition of the donated assets.

78. Furthermore, for the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. I exhibit at **MP1/ page 16 - 83** a memorandum of advice prepared by Corrington for Holdco addressing the issue of dominon and control of assets provided to charity (**Carrington Memo**).

79. The charitable distributions to DAF were to be made through the Highland Foundations as the Supporting Organisations of the DAF Structure. I know from my involvement in establishing the DAF Structure that Mr Dondero is the President, Director, and Individual Member of each Supporting Organisation and wields further influence as a purported donor to the Highland Foundations. If, for example, the IRS were to make a finding that Mr Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he has benefited from and impose civil penalties, as outline in the Carrington Memo (ref to page in exhibit).

80. The charitable distributions made would be from the DAF through Supporting Organisations exempt from federal taxation under Section 501(c)(3) of the US IRC providing the DAF structure was administered and managed independently of any donor (including Mr Dondero's in his capacity as an indirect donor through the charitable remainder trust). At the time Mr Dondero and I discussed the establishment of the DAF Structure, I informed Mr Dondero that the structure required the complete divestiture of assets and that the terms of the DAF and its

related entities could not provide Mr Dondero with any dominion or control over the structure or the distributions made by DAF.

81.   For example, when I articulated to Mr Dondero that the investment income reported to each of the foundations which held the DAF was US $22,875,944 to Highland Dallas Foundation, Inc.; US $22,961,382 to Highland Santa Barbara Foundation, Inc.; and US $22,883,319 to Highland Kansas City Foundation, Inc., Mr Dondero's response was "*They don't think of that money as their own do they???*". In fact, the Highland Foundations as Participating Shareholders were only entitled to cash distributions, if and when made.  Following my review of this correspondence I was concerned that Mr Dondero had evaluated the prospects of DAF to advance financing to his current and future projects in a way which may be contrary to Mr Dondero relinquishing dominion and control in respect of the DAF Structure.  A copy of this email exchange is exhibited at **MP1/ page 84 - 85**.

82.   In fact, the Carrington Memo at **MP1/ page 76** advised that there was a "*significantly heightened risk that the IRS could severely penalize and/or revoke the tax-exempt status of one of more*" of the Supporting Organisations which could in turn imperil the status and assets of the DAF, for the reasons which I explain below.

83.   My concerns which arose at a later date (again, the justifications for which are articulated more fully below) were that should Mr Dondero attempt, through his control of the Highland Foundations, to exert dominion and control over the cash and property that he previously (indirectly) donated to DAF (and for which I understand he claimed personal charitable deductions for U.S. tax purposes) and the IRS  were to make that determination, then the IRS would likely disallow the income and gift tax deductions that Mr Dondero took, and impose civil penalties, such as, a penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663, as referred to in the Carrington Memo (insert page ref from exhibit).

84.   In addition and as mentioned above, I understand that significant penalties can be imposed on self-dealings between a private foundation (such as each of the

Highland Foundations) and a "disqualified person". The term disqualified person" includes an officer, director, or trustee of a foundation.  Given Mr Dondero's involvement with the Highland Foundations, and further to the evidence which I give below, by late 2024 I harbored concerns that the IRS may consider Mr Dondero to be a "disqualified person" with respect to each and every Highland Foundation, which could expose each of those entities to revocation by the IRS of its tax-exempt status and possible criminal prosecution.

85.   To the extent that the DAF's assets could have been used in such a way, my further concern was that creditors of Mr Dondero could view the DAF as Mr Dondero's financial alter ego under U.S. law.  In tun that could expose DAF and its assets to creditor claims unrelated to the DAF Structure. Such claims could risk depleting the pool of assets held by DAF, which would result in depriving current and future charities from the benefit of those assets.  I note that significant amounts of DAF's liquid assets are held in the U.S. and whilst I understand (without waiving privilege) that concepts of alter ego are different under Cayman Islands law, that would not prevent attachment of DAF's assets held in the U.S.

86.   Quite simply, the assertions made on behalf of the Highland Foundations by the evidence of Ms Diaz show a fundamental misunderstanding of the corporate structure and charitable purpose of DAF.  Primarily, the Highland Foundations assume that DAF was a "consolidated entity" when in fact the fundamental scheme of the corporate group intentionally, and necessarily, delineated between control of and economic interest in the DAF Structure.

87.   In this regard, Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011 with registration number 263805 (see **MP1/ page 86**).  Since its incorporation and until the DAF Restructuring in March 2025 (discussed below) Holdco was the Limited Partner of DAF through which it indirectly owned the entities in the DAF Structure.  However, Holdco did not hold voting, control, or management rights in respect of DAF. Its sole purpose was to act as a conduit through which discretionary, charitable donations would pass.

88. DAF, an exempted Cayman Islands limited partnership was controlled and operated by its former general partner, Charitable DAF GP, LLC (**Original GP**) between October 2011 through to the Restructuring. From February 2024 DAF has been operated by the GP. The Original GP was arranged in Delaware and also registered in the Cayman Islands under Part IX of the Companies Act (as revised). The control of the Original GP and the Replacement GP are also explained below.

89. The characterization by the Highland Foundations through the evidence of Ms Diaz of DAF as a 'Fund' (**Diaz 1, paragraph 12**) is therefore misleading and liable to create confusion. DAF is not an investment fund but is a charitable vehicle and properly understood, DAF:

   (a)    Did not solicit capital from investors;

   (b)    Had / has no subscription agreements through which interests are taken up. Notably, the Highland Foundations did not "subscribe" to DAF in the way, I am informed by counsel (without waiving privilege), commonly used by investment funds in the Cayman Islands, but were granted Participating Shares in Holdco by way of a gift at the inception of the DAF Structure.

   (c)    Holdco as Limited Partner had restrictive rights in its participation and management of DAF, including restricted rights to information.

   (d)    Had no entitlement to make capital calls against the Supporting Organisations or indeed against Holdco;

   (e)    Does not have a registered investment advisor;

   (f)    There are no investment hurdles or reporting requirements;

   (g)    There are no marketing brochures, private placement memorandums or other materials relating to solicitation for investments;

   (h)    The economic substance filing lists business of Holdco; and

(i)    There is no wind down date or term within which shareholders are entitled as of right to distributions.

90.    Accordingly, to describe DAF as a fund, as the JOLs, Mr Johnstone, Mr Dondero and MS Diaz assert, is incorrect.  Holdco was a passive holder and would receive cash distributions from time to time but purposefully did not enjoy any governance or fixed economic rights over the entities comprising the DAF Structure.

91.    The constitutional documents of Holdco and DAF maintained the necessary distinction between the economic interest in the DAF Structure and control over the same.  In the evidence of Ms Diaz the Highland Foundations incorrectly rely on the Amended and Restated Memorandum and Articles of Association of Holdco dated 19 January 2015 (**2015 Articles**) (**Diaz 1, paragraph 15**).  The Articles have been amended and restated twice since the 2015 Articles both as of 24 January 2024 and again since 20 February 2025 (**2025 Articles**).  It is the 2025 Articles which regulate the affairs of Holdco and are exhibited at **MP1/ page 87 - 123**.

92.    Notwithstanding that the Holdco constitution has been amended, the provisions relating to the rights and interest of the shareholders of Holdco have not been modified.  Holdco has issued both Participating Shares and Management Shares.  The interests and rights conferred by these shares maintain a distinction between control of Holdco and an economic interest in Holdco.

93.    Management Shares are *"voting, non-participating share in the capital of"* Holdco *"that shall be non-redeemable at the option of the holder but redeemable by"* Holdco.  As stipulated in Art. 11 of the 2025 Articles, the Management Shares *"shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of"* Holdco.  Notably, Management Shares *"confer no other right to participate in the profits or assets of"* Holdco.

94.    In contrast Participating Shares, being those held by the Highland Foundations, are *"a non-voting, participating non-redeemable share in the capital of"* Holdco.  Specifically, Participating Shares confer the right upon the Participating Shareholders to participate in the profits or assets of Holdco in accordance with

the terms of the 2025 Articles (**Art. 12, 2025 Articles**), which is subject to the sole discretion of the Directors of Holdco.

95.  The distinction between Management and Participating Shareholder rights is evident throughout the 2025 Articles:

    (a)  it is for the Directors of Holdco to exercise their sole discretion to consider if a dividend ought to be paid to the Participating Shareholders, or whether the available funds ought to be set aside as a reserve.  The Participating Shareholders have no ability to vote on whether a distribution would be made from Holdco (**Arts 102, 105, 2025 Articles**).

    (b)  Participating Shares do not confer the right to remove or appoint directors to Holdco.  The right to appoint Directors to Holdco is reserved for the Management Shareholder and Directors, whereas the ability to remove Directors of Holdco is limited solely to the Management Shareholder (**Arts 64, 65, 69, 2025 Articles**).

    (c)  The Directors of Holdco have discretion to issue further shares in Holdco, and by the 2025 Articles the dilution of the Participating Shares *"shall not be deemed to be materially adversely varied or abrogated by [the]…issue of further Participating Shares"* (**Arts 7, 14, 2025 Articles**).

    (d)  Participating Shares do not confer a general right to inspect any account or book or document of Holdco, except in very limited circumstances being if such a right is granted by law or the Directors of Holdco otherwise authorize such inspection (**Art 111, 2025 Articles**).

96.  At the time the DAF Structure was being established the limited nature of the Participating Shareholders' rights caused some charities who may have benefitted from the structure to reject the proposed gift of Participating Shares. I travelled and met with various charities, including the Greater Houston Community Foundation and Communities Foundation of Texas.  These charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These

charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point.

97.   In contrast, the Dallas Foundation, the Great Kansas City Community Foundation and the Santa Barbara Foundation also undertook extensive due diligence and, through the Highland Foundations, accepted the Participating Shares by way of a gift in full knowledge of the very limited rights conferred by these shares. Having regard to **paragraph 20(b) of Diaz 1**, it appears that the Highland Foundations are seeking to assert some form of fixed or proprietary economic interests in DAF which they knew were at best (i) discretionary; (ii) subject to dilution; and (iii) not controlling rights. The assertion of the Highland Foundations in these respects are refuted. The Highland Foundations were cognizant of these limitations when they accepted the gift of Participating Shares. For example, I recall meeting with Mary Jalonick (now-retired former president of The Dallas Foundation, which is supported by the Highland Dallas Foundation, Inc.), who understood the limitations. The current effort by the Supporting Organisations therefore subverts the intention, understanding and terms of the agreement of the parties at the time the Particiapating Shares were gifted by the Company.

98.   The Highland Foundations, Ms Diaz and Mr Dondero were and/or should each have been well aware of the ability of Holdco to issue new Participating Shares. In July 2015, I understand that Mr Dondero had encouraged Grant Scott to cause Holdco to issue 5 Participating Shares to Community Foundation of North Texas (now known as North Texas Community Foundation) in exchange for US$.05. A copy of the correspondence admitting North Texas Community Foundation as a Participating Shareholder is attached at **MP1/ page 120 - 128**. I am aware that Mr Dondero was frustrated with (what he considered to be) the "woke", liberal, California-based Santa Barbara Foundation and their priorities, so Mr Dondero and Lane Britian requested that I find a replacement charity. At the time, I spoke with the El Paso Foundation and the Miami Foundation, who both rejected the gift of Participating Shares. North Texas Community Foundation was willing to accept a modest number of shares (5) to be held in a donor-advised fund account.

99. I explained to Mr Dondero in November 2014 that the Highland Foundations did not think of DAF's assets as their own and understood they were only entitled to discretionary cash distributions, if and when made. A copy of the email correspondence is exhibited at **MP1/ page 84 - 85**.

100. The operations of DAF are regulated by the Second Amended and Restated Exempted Limited Partnership Agreement of DAF, dated 11 March 2024 (**Amended LPA**). Again, the Highland Foundations rely on an outdated version of the governance document for the DAF. A copy of the Amended LPA is exhibited at **MP1/ page 129 - 146**.

### D. DAF AS ALTER EGO OF JAMES DONDERO

101. From October 2011 until March 2021, Mr Scott was Managing Member and Sole Member of the Original GP and was the holder of the Management Shares issued in Holdco. As such Mr Scott was the control person over DAF and the related structure (**Control Person**). The function of the Control Person was and is to ensure DAF made independent investment decisions for the ultimate benefit of charitable beneficiaries and the charities they support. From my professional experience and expertise I understood that if the Control Person fails to act independently, the charitable and tax-exempt status of the supporting organisations would be compromised. The mere illusion of lack of independence could also expose DAF and its assets to adverse tax treatment and penalties from the Internal Revenue Service as well as creditors and other adverse parties if independence were not maintained.

102. Prior to 2021 Mr Scott and Mr Dondero were longstanding friends and acquaintances. I am aware from my associations with both Mr Scott and Mr Dondero that they were college roommates and that Mr Scott acted as Best Man at Mr Dondero's wedding with Rebecca (Becky) Dondero in 2005, which ended in divorce and extensive public litigation all the way to the Supreme Court of Texas. Mr Scott and Mr Dondero continued to be friends following the divorce litigation.

103.  In or around March 2021 I approached Mr Scott to assume the role as Control Person of the DAF.  This required me to take on the directorship of the Original GP and be registered as holder of the Management Shares issued by Holdco. I assumed the role of Control Person as of 24 March 2021.  Therefore, the concept of their being a sole human agent in control of the DAF is one that has represented the status quo since its inception in 2011. The aspersions and innuendos cast by Johnstone Law on behalf of the Highland Foundations and more recently the JOLs are therefore inappropriate and are also consistent with their prevailing inaccurate view that DAF should be regarded as a "consolidated entity."

104.  At this time I understood from my conversations with Mr Scott that he and Mr Dondero had suffered a falling out because Mr Scott refused to take a step at the request of Mr Dondero which would have caused him to breach his fiduciary duties to DAF.

105.  It is my understanding and belief that Mr Scott's refusal to act at the direction of Mr Dondero angered him and that, as a result of Mr Scott's opposition to Mr Dondero's instructions, Mr Dondero wanted Mr Scott to resign. I exhibit an email from Mr Scott to John Kane on 30 January 2021 at **MP1/ page 147** which, contrary to the assertion made by Mr Dondero at **paragraph 20** of **Dondero 1** that Mr Scott informed him that he wished to resign in March 2021, Mr Dondero and Mr Scott reached a mutual agreement on a call on 30 January 2021 that Mr Scott would resign as a result of being at a "*cross-roads*" with Mr Dondero. In fact, Mr Dondero had stated to Mr Scott that *"The releases and non objection to the plan was all Seery cared about ... accusations of non independence was tweaking and always alleged against all trustees, very hard to prove ... not a real threat but Seery got a lot for it, look what you signed"*.  Mr Scott is not prepared to provide me with a copy of the unredacted email due to privilege but has intimated that he would be prepared to give evidence in these proceedings.  My understanding is that Mr Dondero did not have the power to remove Mr Scott from his position, but he nonetheless encouraged Mr Scott to resign because he was displeased that Mr Scott had done something to benefit Seery as outlined above (the Highland Capital Management, L.P. chief restructuring officer after Mr Dondero was ousted from Highland Capital Management).

**Page 32 of 64**

106. The appointment and subsequent resignation of Mr Scott as described by Mr Dondero in **paragraphs 14 and 20-21** of **Dondero 1** is misleading. Contrary to the impression conveyed at **paragraph 14, Dondero 1** while Mr Dondero may have known and regarded Mr Scott for many years as a person of *"great integrity"* Mr Dondero did not select and nor could he select the Control Person of the DAF. To have such a level of decision-making in respect of the DAF Structure would have compromised the charitable standing and purpose of the structure from the outset.

107. At **paragraphs 20-21** of **Dondero 1**, Mr Dondero deposes that Mr Scott volunteered his resignation due to the fact that he was ill-equipped to handle various disputes which had arisen in connection with the Highland Bankruptcy proceedings on foot in the United States. Mr Dondero further and wrongly deposes to the effect that he was consulted on the transfer of Control Person from Mr Scott to myself, and that he was *"happy for Mr Scott to pass the Control Position"* to me.

108. For the avoidance of doubt, Mr Dondero was not consulted regarding my assumption as Control Person. This was a matter communicated by email between Mr Scott and myself. Mr Dondero learnt that I had been appointed as the Control Person on or after the relevant corporate transfers as of 25 March 2021. Once again, the impression wrongly conveyed by Mr Dondero is that the DAF and DAF Structure are subject to or under his control.

109. Mr Dondero's account of how I came to act as the Control Person in these proceedings directly contradicts testimony he gave under oath on June 1, 2021. In that testimony Mr Dondero testified to the fact that I had replaced Mr Scott a month after it happened and Mr Dondero did not know beforehand (see extracts from Mr Dondero's deposition dated 1 June 2021 at **MP1/ page 148 - 158**). Mr Dondero was clear that he learned of my appointment after the fact and that I was the one who told him. As set out in the transcript exhibited at **MP1/ page 149 - 150** Mr Dondero says, "*And unbeknownst to me, [Mark and Grant] agreed, and [Grant] sent over the appropriate documentation...and Grant signed it, and Mark Patrick became the trustee.*" Mr Dondero goes on to say that, prior to learning about me taking over for

Grant Scott, Dondero had no knowledge discussions were underway pursuant to which that would occur.

110. After assuming the role of Control Person I quickly formed the belief that Mr Scott had created potential liabilities for DAF and the DAF Structure as a result of failing to manage DAF and its assets independently of Mr Dondero, particularly where I suspected that Mr Scott had simply been authorizing investments proposed by Mr Dondero without due consideration for their appropriateness or any financial due diligence.

111. As set out in my evidence below, I have good reason to consider these investments may in fact have been for Mr Dondero's personal benefit and/or to further Mr Dondero's commercial interests, which were not aligned with the best interests of DAF, or the charitable purposes it was intended to serve. In effect, during Mr Scott's tenure as Control Person both the Highland Foundations and DAF were in effect under the common control of Mr Dondero which enabled Mr Dondero to utilize DAF and its assets as a private line of credit. As examples, (i) NexBank Capital Inc. (**NexBank**), which is a privately held bank where Mr Dondero has a significant ownership interest, sold land to DAF for tax benefits to NexBank, emails of which are exhibited at **MP1/ PAGE 159 - 162** and (ii) Highland (then under the control of Mr Dondero) sold or caused to be sold so many assets to DAF that DAF had no money to fund other proposed Highland investments, emails of which are exhibited at **MP1/ page 163 - 168**.

112. I knew that should this be the case, this would have profound legal, compliance, and tax consequences for DAF and DAF's assets. I also became aware that Mr Scott's compensation for DAF was determined by Mr Dondero without consulting any compensation study or expert advice, a copy of which communication is exhibited at **MP1/ page 169 - 170**.

113. My concerns that Mr Scott may have come under pressure to authorize transactions which may not have been in the best interest of the DAF (but rather Mr Dondero) were duly reinforced when I was unduly pressured by Mr Dondero. In mid-

2024, Mr Dondero (via his employees at NexPoint) proposed various investment opportunities that involved using DAF's assets, which would have been to the benefit of Mr Dondero and/or his affiliates but which in my opinion were not suitable investment opportunities for DAF. These unsuitable investment opportunities included rescue financing for a NexPoint fund in connection with an SASB refinancing and a NexPoint-led Delaware Statutory Trust investment regarding storage facilities. In response to DAF turning down these investment opportunities, Mr Dondero (through his assistant) demanded in August 2024 that I meet him three times per week to discuss DAF management and investments. In accordance with my fiduciary duties to DAF, I refused these demands but strongly suspected Mr Dondero sought to exert control over DAF, contrary to its tax compliance requirements and charitable purpose.

114. My review of the investments and dispositions from DAF revealed that Mr Scott had historically approved every related party transaction between DAF and entities owned or controlled by Mr Dondero. If I were to characterise the history of the way in which Mr Dondero treated DAF and the DAF Structure from 2011 until my appointment in March 2021, Mr Dondero used DAF through influencing Mr Scott's position as Control Person to (i) generate income for Mr Dondero's commercial gain; (ii) provide liquidity to Mr Dondero and his affiliate entities to advance his commercial interests and/or to reduce the tax exposure of Mr Dondero affiliated entities; and (iii) take high risk positions for below market returns in order to generate significant profit for his affiliate entities whilst retaining the upside for Mr Dondero's affiliate entities and continuing to enjoy significant personal tax benefits.

115. With respect to point (i) above:

(a) I understand that Highland had previously charged investment manager fees to DAF. From my review of the investment management arrangement it does not appear that Mr Scott took any step during tenure as DAF's Control Person to independently review or assess the fees that were being charged to DAF.

(b)    As mentioned above, NexPoint is an alternative investment firm founded by Mr Dondero in 2012 and in which Mr Dondero admits he holds an interest (**Dondero 1, paragraph 7**). I also recall in the first month of my tenure as DAF's Control Person, that Mr DC Sauter (general counsel of NexPoint) and Mr Isaac Leventon demanded DAF pay NexPoint a 2% base fee and 20% upside for managing DAF investments. I rejected this demand whilst fully appreciating that paying management fees would be a way for Mr Dondero to circumvent the "dominion and control" issues which would otherwise arise from a tax perspective. I was clear that my role as the DAF's Control Person was not to rubber-stamp Mr Dondero's proposals but rather to advocate for the DAF and its charitable purposes.

(c)    When Mr Dondero or his entities needed capital and wanted to offload an illiquid or undesirable investment at a premium rate, such assets have been sold or donated to the DAF. By way of an example, the DAF currently has exposure of US $85 million to a syndicated debt facility where the borrower's sole investment is two wavelength spectrum licenses issued by the Federal Communications Commission. Such licenses are illiquid and speculative. In this case, I believe Mr Dondero (through both Highland and NexPoint entities) and his affiliates realised they were overleveraged in that investment and required DAF to buy it at par. I do not believe that DAF would be able to sell it at par because a maturity date extension signed in January 2025 required the borrower to pay steep fees and provide an increased interest rate, which are characteristic of troubled debt holdings.

116.  With respect to point (ii) above:

(a)    I recall that in November 2023, Mr Dondero attempted to exert influence over me as the Control Person, by asking me to transfer (on behalf of DAF) approximately US$1.5 million to offshore entities owned by Mr Dondero which I believed would be provided to Sentinel Reinsurance,

Ltd., a Cayman Islands limited company, (Sentinel) (or another entity above it in the Sentinel Structure) which I believe was then majority owned by Mr Dondero. I understand that the transfer was to settle the payment of outstanding legal fees which were wholly unrelated to DAF and its charitable purposes. The effect of this request would have meant that funds would be diverted from DAF and its charitable beneficiaries to further Mr Dondero's unrelated commercial interests.  On the basis of advice received from Parsons McEntire McCleary PLLC and without waiving privilege, I determined the proposed transfer would be "impermissible and illegal" (as stated in the Carrington Memo at pages **MP1/ page 68**).  It is important to note that at this time there were a number of outstanding lawsuits being conducted in the US in which the DAF Structure was being characterized as the alter ego of Mr Dondero. In accordance with my fiduciary obligations to DAF and in light of the real risk posed to the integrity of the DAF Structure by Mr Dondero's attempts to exert control, I refused to effect the transfer as directed.

(b)    Similarly in the fiscal year 2024, I noted that Mr Dondero was experiencing liquidity issues and did not want Skyview Group to pay my bonus compensation.  As such, Mr Dondero directed human resources at Skyview to email Shawn Raver (at the time, an independent consultant who helped me with DAF matters) and instruct him to have the DAF advance 90% of my bonus with Skyview paying the remaining 10%.  Under this arrangement, such payments were likely characterized as director fees and is yet another example of how DAF was used by Mr Dondero to resolve third party liquidity issues.

(c)    I understand that NexPoint (and other Dondero entities) had at various intervals sold to DAF its undesirable land situated in flood plains land and directed that investment funds related to Mr Dondero would sell other under or non-performing assets to the DAF to generate liquidity for Mr Dondero's entities.   Again, the viability of these transactions does not appear to have been independently evaluated by Mr Scott in his

capacity as the Control Person. As a general matter, DAF's balance sheet was full of former NexPoint and other Mr Dondero-affiliated investments.

117. I also understand that Mr Dondero directed Mr Scott to send US $1 million of DAF funds to the Tall Pine Group, in order to pay Mr Dondero's affiliates (such as Mr Ellington and Isaac Leventon) their bonuses at a time when paying those bonuses was blocked by the US Courts in the Highland Bankruptcy (see an invoice issued by Tall Pine Group LLC issued on 3 April 2020 at **MP1/ page 171**). Mr Scott caused DAF to make the US $1 million payment, which was flagged in the Highland bankruptcy proceedings as part of a larger US $17 million fraudulent transfer (see **MP1/ page 172 - 305**). With respect to point (iii) above, examples of the value destructive dealings and transactions that were imposed on DAF are set out in a report prepared by ValueScope dated 20 November 2024 (**ValueScope Report**). The ValueScope Report is exhibited at **MP1/ page 307 - 315**.

118. In summary, I observed that NexPoint would devise a scheme whereby it needed capital to consummate an initial investment and would engage DAF to provide bridge financing in exchange for a fixed rate of return with no upside beyond the fixed rate of return or repayment timeline. Under this arrangement, NexPoint would retain the upside (typically the common equity interests) and DAF would receive a preferred equity that would be extinguished upon repayment with a fixed interest rate. From industry experience, I do not believe that other lenders would agree to transactions on these terms, which is why I believe NexPoint would attempt to solicit funding from DAF. In effect, the DAF provided access to millions of dollars of its own assets to support NexPoint's (and by extension Mr Dondero's) commercial ventures.

119. The ValueScope Report also provides an overview of transactions and events (in terms similar to those described above) concerning DAF, which includes reference to the:

**(a) The Campus at Legacy (TCAL) transaction** - This was characterised in the ValueScope Report as "NexPoint's request to DAF shifted US $45 million of downside risk to DAF, while NexPoint retained full upside.  Development of TCAL would accrue significant benefits to NexPoint and Dondero by enhancing their adjacent Texas Research Quarter...project" (**TRQ**) (**MP1/ page 308**).  By way of background:

(a)   In September 2024, NexPoint requested that DAF acquire the TCAL property, which was advertised primarily as a land investment comprising approximately 80 acres, and featuring two office buildings generating approximately US $800,000 in annual net operating income at 59.4% occupancy.

(b)   NexPoint had TCAL under contract for US $45 million and it was anticipated that the acquisition would close in November 2024. After closing, I understand (see **MP1/ page 308**) that NexPoint intended to control the TCAL property and gradually wind down the tenant leases, with a view to demolishing the site to construct new life science manufacturing facilities.

(c)   TCAL would also be integrated into TRQ, a planned 135-acre life sciences innovation district centered around the former Electronic Data Systems campus in Plano, Texas, United States, which borders the TCAL property.

(d)   I understand that NexPoint and its related entities owned substantial debt and equity interests in the TRQ properties.

(e)   Due to insufficient cash flows generated from the office buildings on the TCAL property, DAF requested a two-year ground lease with NexPoint as the master tenant as part of the property acquisition.  Additionally, DAF required that NexPoint be contractually obligated to purchase TCAL from DAF at the end of the ground lease and requested a security interest.

(f)     However, NexPoint declined, which would have left DAF with full downside exposure and limited upside potential.

(b) **Preferred Dividend Financing**

(a)     In August 2024, NexPoint approached DAF to provide NexPoint Storage Partners (**NSP**), which was managed by NexPoint Advisors, with US $11 million in unsecured financing. DAF was told that the funds were required as a bridge loan for the sale and refinancing of NSP properties. However, DAF learned after conducting some due diligence that the real use was to make a US $6.4 million payment on an upcoming preferred equity dividend payment NSP owed to an investor, Extra Space Storage. DAF ultimately turned down the deal, but this is another example of how Mr Dondero tried to use DAF as a personal banking facility to support his commercial ventures whilst I was the Control Person.

(b)     I also understand from the ValueScope Report that there was a failure to reduce risk in the deal by providing collateral, reducing outstanding NexPoint DST exposure, or by providing any put options.

(c)     The deal structure and the purpose for the funds also changed several times during the 2-week negotiation period.

(c) **Small Bay II DST bridge loan** – with respect to DST investments, the ValueScope Report states that: *"all three DST Investment made under prior leadership failed to be repaid from DST equity raise proceeds after full syndication, as opposed to full repayment on all new DST bridge loans that have been syndicated since Mark Patrick become the control person"* (see **MP1/ page 311**). By way of background and in relation to the Small Bay II DST bridge loan:

(a)     In or around June 2024, Mr Dondero caused NexPoint to demand that DAF roll over its equity from a prior transaction while, simultaneously, Mr Dondero's trust, The Dugaboy Investment Trust (**Dugaboy**), (of which

Mr Dondero's family are the income beneficiaries and his sister, Nancy Dondero, is the trustee) which held a subordinate class of equity in the prior transaction, was paid at closing in full. In other words, Dugaboy received a payment in full despite being at a lower position in the payment waterfall, and DAF rolled over its investment. The return to Dugaboy was listed at US $13,650,280 and DAF rolled over two classes of equity totaling $6,404,958.

(b) As seen from the ValueScope Report, across the various investments DAF has made in NexPoint entities or NexPoint-related deals, DAF has also faced challenges in obtaining various repayments from NexPoint.

(c) These DST investments followed a similar pattern: DAF provided a DST bridge loan to ensure that the Delaware Statutory Trusts were adequately capitalised from inception, and DAF was to be repaid through the sale of trust equity interests to DST investors.

(d) However, NexPoint would regularly fall behind on these repayments to DAF by several months at a time (which were funds raised from investors). As a result, I negotiated a clause in the Small Bay II DST bridging loan agreement, which required NexPoint to pay DAF the funds that were raised within 5 business days (see an LLC Agreement of NREA SB II Holdings LLC dated 13 June 2024, exhibited at **MP1/ page 316 – 350, and page 319** which provides for the five business day window). Ultimately, Mr Dondero was upset over my handling of the transaction and exercising independence to act for the DAF, as DAF obtained multiple benefits and protections by fighting NexPoint on Small Bay II, as outlined in the ValueScope Report.

(e) At the date of the ValueScope Report, NexPoint had not made any repayments and had retained at least US $8.26 million in funds with respect to Small Bay II and US $0.7 million in funds with respect to Polo Glen DST (described below) that it was contractually obligated to pay to

DAF. In a settlement related to the Highland bankruptcy, I negotiated with Mr Dondero to cause Mr Dondero to release the US $8.26 million (as detailed further in HCLOM Claim Narrative at **MP1/ page 351 – 354)**.

**(d) Polo Glen DST**

(a)    DAF made another bridge loan (which I refer to as the Polo Glen DST bridge loan) in December 2019 part of which, has remained unpaid for approximately five years.

(b)    As far as I am aware, there remains about US $0.7 million which NexPoint has refused to repay to DAF, despite having collected enough in asset management and various other fees to honour the repayment.

(c)    As further stated in the ValueScope Report, I also negotiated a put option to NexPoint and related parties in June 2024 as an option to reclaim the outstanding balance, which NexPoint failed to honour when it was exercised.

120.   In this respect, and contrary to the perception which Mr Dondero seeks to convey in **Dondero 1**, Mr Dondero frequently sought to utilize DAF as a means of generating liquidity for his other commercial ventures which placed DAF and the DAF Structure at risk of being characterized as the alter ego of Mr Dondero. Not only does Mr Dondero seem to be ignorant of the risks he was creating for DAF and the untenable position he was creating for anyone occupying the Control Position, but to compound his flawed thinking, once I pushed back (with the approval of Mr Muphy as independent/oversight director) on his demands, he has proceeded to retaliate by actively taking adversarial position against me and Mr Murphy through the Highland Foundations. The JOLs do not seem to be remotely attuned to what is happening and have unconditionally adopted a position that can easily be traced back to Mr Dondero through the Highland Foundations for whom Johnstone Law has acted. DAF is further at risk of being found to be the alter ego of Mr Dondero's *alter ego* given how it has been utilised in legal proceedings arising from Mr Dondero's actions. As observed in the ValueScope Report: *"All DAF litigation arises*

*from Dondero.  Dondero adversaries have sued DAF, claiming that DAF is an alter ego of Dondero and his various entities.  Certain causes place all of DAF's assets at risk to Dondero creditors and aggrieved parties.  DAF must vigorously defend itself and its assets, which can be costly and time-consuming"*.  The extensive suits in which the DAF has been caught up are divided between those that are cases brought or initiated by adversaries of Dondero and those that were actions at the recommendation of Dondero (see **MP1/ page 313**).

121. DAF's participation in numerous litigious proceedings will also inevitably result in the depletion of DAF's assets, which is to the detriment of the charitable purposes that DAF is meant to support.  Mr Dondero has also been described as a "vexatious litigant" due to numerous and frivolous lawsuits brought by him either directly or indirectly, as discussed further in Mr Murphy's First Affidavit filed which is also being filed in opposition to this sanction application.

122. For the Court's benefit, a summary of these proceedings are as follows:

***Turnover Proceedings - New York County Supreme Court (Index No 650744/23)***

123. This claim was brought by UBS Securities LLC and UBS AG London Branch (collectively, **UBS**) to collect on a $1.1 billion judgment UBS had obtained against various Dondero entities. The UBS claim against DAF related to assets acquired by CLO Holdco in December 2010. Mr Dondero is a defendant in these proceedings.

124. Only DAF was dismissed as a defendant in these proceedings by the New York Supreme Court for lack of personal jurisdiction over CLO Holdco. The lawsuit proceeds against the other defendants. Whilst that outcome was positive for DAF, as I have alluded to above insofar as DAF's assets are within the U.S. I understand that if DAF is found to be the alter ego of Mr Dondero, those assets may be at risk of attachment by UBS (see further below).

125. With respect to **paragraph 54** of **Diaz 1**, Ms Diaz omits the fact that Mr Dondero, together with various entities he owns, are being sued by UBS in this action for US $1.1 billion for, among other things, a Cayman Islands Monetary Authority-

regulated company issuing a fraudulent after-the-event insurance policy in order to move assets from an advised fund of Mr Dondero to his company, Sentinel. Mr Dondero's motion to dismiss and motion for discovery in that action were both recently denied, and proceedings have been fast tracked for summary judgment[2].

126. As such, Mr Dondero will soon face the prospect of having to find and possibly liquidate the necessary assets in order to satisfy a potential billion dollar judgment. This is an important fact to omit, especially where DAF has a significant value of assets under management, which Mr Dondero has repeatedly exploited or tried to exploit in the past, to DAF's actual or potential commercial detriment.

127. Should a judgment be made against Mr Dondero, there is a risk that DAF's assets could be paid for distribution to creditors and/or UBS, if (a) Mr Dondero assumes control of the DAF; or (b) should creditors successfully argue that the DAF is in fact Mr Dondero's financial alter ego. It is for these additional reasons that establishing independence between DAF and Mr Dondero was critically important to obtain.

### Turnover Proceedings - Bankruptcy Court, Northern District of Texas (Index No 20-03060)

128. These proceedings were brought by Acis Capital Management (**Acis**) and Josh Terry (**Mr Terry**) as part of Acis Bankruptcy (**Acis Bankruptcy**).

129. An action against Mr Scott was also brought in the Acis Bankruptcy, and Mr Scott was indemnified by DAF as former Control Person.

### Declaratory Judgment - District Court, Southern District of New York (Index No 5. 21-11059)

130. This action was brought by  Mr Terry, a former business partner of Mr Dondero, alleging that DAF and CLO Holdco did not have standing to bring claims related to

---

[2]   Please note that summary judgment in these proceedings could result in three different outcomes: (1) the Turnover Petition is granted and the property is delivered up to UBS; (2) the Turnover Petition is declined; or (3) the Court finds that there are facts at issue which would result in discovery being ordered and a hearing is listed.

Acis's management of assets held by Highland CLO Funding, Ltd. (of which CLO Holdco held a 49.015% interest).

131. Acis and Mr Terry sought this relief on the basis that, prior to my accession as DAF's Control Person, DAF had fallen into a pattern of commencing multiple lawsuits and then dismissing them before discovery commenced.

132. Notably, I understand that attempts to settle this litigation were hindered by Mr Dondero and / or NexPoint's involvement each of which was against any settlement because I believe they wanted the litigation against Mr Terry to continue.

### *Derivative Action - Royal Court of Guernsey (Civil Number 2479)*

133. These proceedings were brought on behalf of a Guernsey domiciled entity called HCLOF seeking the distribution of cash being withheld from HCLOF by Acis , Mr Terry and U.S. Bank**, National Association.**

### *Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03073)*

134. The purpose of these proceedings was to seek an Order to reverse the cancellation of DAF's ownership interest in Highland Crusader Fund II, Ltd.

### *Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03076)*

135. In these proceedings, DAF was sued by the Litigation Trustee of the Chapter 11 Proceedings of Highland (**Highland Bankruptcy**) in connection with certain contributions received by DAF in 2016.

### *Bankruptcy Litigation -  Bankruptcy Court, Northern District of Texas (19-34054)*

136. These proceedings concerned general matters related to the Highland Bankruptcy, including recovery of redemptions payable that were withheld by Highland.

### *General Litigation - District Court, Northern District of Texas (24-00498)*

137. This action (styled Highland Employee Retention Assets LLC v. James Dondero et. al.) was brought by Patrick Daugherty (former partner of Highland), who sued

Hunter Mountain Investment Trust, an entity managed by Rand Advisors, LLC, which is a DAF subsidiary, related to actions undertaken by Mr. Dondero.

***The Business Court of Texas First Division (25-BC01B-0004)***

138.  Separately, Atlas IDF, LP, a Delaware limited partnership and, a DAF controlled entity, is suing an entity affiliated with Mr Dondero (NexPoint Real Estate Partners, LLC) and Dugaboy to collect on US $13 million in demand notes, which were guaranteed by Dugaboy (the validity of these guarantees is now being contested in litigation). I understand that through Deborah Dietsch-Perez (Mr Dondero's counsel), Mr Dondero has attempted to delay the hearing in that matter on the basis that he anticipates gaining control of DAF as a result of these Cayman liquidation proceedings (which would enable him to control Atlas in those proceedings). DAF performed a valuation study and discovered that the notes have a heavy discount due to concerns with collectability. In other words, the valuation experts were concerned that Mr Dondero would not pay his debts. Upon demand (with ten days' grace provided), they were not paid; given they are demand notes, that was a default.

139. Mr Dondero has since tried to acquire Atlas's demand notes for US $600,000 (see **MP1/ page 355 to 356**).

140. Atlas will continue to litigate against Mr Dondero for the collection of the demand notes in full.

***United States District Court for the Northern District of Texas, Dallas Division (3:25-cv-477)***

141.  I am also aware of another example whereby Mr Dondero is utilising these Cayman liquidation proceedings in an attempt to delay collection efforts by DAF. In this case DAF is suing another entity affiliated with Mr Dondero to collect on a $1 million debt obligation. Mr Dondero controls an entity, Highland Capital Management Services, Inc., that defaulted on an approximately $1 million promissory note because Mr Dondero directed payment to a personal friend of his, Patrick McCabe (**Mr

**McCabe**), who Mr Dondero may have believed that DAF owed money to, although I am not aware of any DAF obligation to or demand for payment from McCabe.

142. Broadly speaking, if Mr Dondero is successful at controlling the proceedings brought by DAF, I harbour concerns that he will direct the Highland Foundations to cease litigation and enter into settlements on terms that favour him. As a result, the Highland Foundations would provide Mr Dondero with an improper "private benefit" to the detriment of DAF.

143. Otherwise, I believe DAF has actively settled the other cases it had involvement with in 2025, and that its litigation expenses only relate to those cases mentioned above.

144. Shortly after my appointment as Control Person, Mr Dondero encouraged me to cause DAF to enter into litigation relating to Dondero's former company (Highland - in bankruptcy), which led to me being found liable for sanctions for breaching a gatekeeper order for filing a lawsuit recommended by Mr Dondero. This was later overturned by the U.S. 5th Circuit Court of Appeals.  DAF and I were  frequently referred to as:

    (a)    as an alter ego of Dondero,

    (b)    part of Dondero's web of entities, and

    (c)    under the direct control and influence of Dondero.

145. I also exhibit a letter from Seyfarth Shaw LLP to the IRS dated 20 March 2025 at **MP1/ page 357 - 374** (**Seyfarth Letter**), which notifies the IRS that Mr Dondero has an inappropriate donor relationship with representatives of the Highland Dallas Foundation (**HDF**), which is the Supporting Organization of the Dallas Foundation (which is a tax-exempt community foundation under US law, and whose president is Julie Diaz), which potentially jeopardizes the tax exempt status of HDF. Specifically, the Seyfarth Letter drew the IRS' attention to the fact that Mr Dondero

exerts direct control over HDF as a director, substantial contributor and president, and indirectly through his and his associates' influence over Highland Dallas' supported organization representatives on the HDF Board of Directors and the Dallas Foundation itself.

146. The Seyfarth Letter also provided the IRS with background on Holdco as HDF is a Participating Shareholder of Holdco, and ergo, Mr Dondero's attempts to control Holdco could have impacted HDF financially.

147. Having appreciated the precarious situation DAF and the DAF Structure had been placed in as a result of the conduct of Mr Dondero both generally and in exercising control over the structure, I immediately took the following actions to protect and mitigate against what I would characterise as "Dondero-recommended transactions":

(a)   I hired independent law firms (law firms that had not been previously engaged by Mr Dondero) to negotiate with Mr Dondero's investment professionals and counterparty lawyers on every transaction. This is something which, to the best of my knowledge and belief, Mr Scott never did during the decade he acted as the Control Person.

(b)   In order to verify any potential investment was properly underwritten, I hired and consulted with investment analysts such as ValueScope to make independent judgments before agreeing to a transaction. I believe that Mr Scott did not take steps to independently verify the potential investment opportunities presented to DAF by Mr Dondero. The ValueScope Report demonstrates the increased value and performance of DAF after I assumed the role of Control Person and retained investment analysts such as ValueScope to negotiate the financial terms for proposed transactions (see *Historical Performance*, ValueScope Report, **MP1/ page 310**). In particular the ValueScope Report notes that *"Under Mark Patrick's leadership, the DAF has delivered higher returns on bridge lending deals to NexPoint DSTs, all*

*while managing risks more effectively than in transactions executed before Mark took over".*

(c)    DAF retained Paul Murphy as an independent director of Holdco and other DAF entities.

(d)    We adopted institutional grade investment committee guidelines.

(e)    We formed an investment committee to advise on investments with best-in-class managers, including the former Head of Harvard's fixed income portfolio.

(f)    By terminating Skyview Group's servicing contract, the DAF saved US $1 million annually in service fees.

148.  I took these steps knowing that the IRS would look favourably on any and all attempts made by the DAF to maintain its independence from Mr Dondero under the circumstances.

149.  However, I realized that, despite the protocols I had established early in 2021, as the variety of litigation against the DAF was filed (including also DAF's litigation against a Guernsey entity, HCLOF referred to above at [x]), that a common theme and refrain was clear: the DAF was regarded as Mr Dondero's alter ego regardless of my legitimate actions to establish systems and protocols to attenuate that conclusion.

150.  Additionally, I followed the various legal actions by UBS against Dondero relating to the Sentinel Fraud (as defined below), and I realized by early 2023 that both the Kirschner complaint against the DAF and potentially a future and significant claim to be brought by UBS (which eventually materialized) could jeopardize the DAF's assets and expose them to Mr Dondero's creditors and adversaries.

151.  It is important to ensure the Court is appraised on the prior business dealings of Mr Dondero insofar as they demonstrate that in conducting his business affairs, Mr Dondero has previously placed himself in positions of influence and control for the

purposes of personal gain through unlawful transaction. This is demonstrated by the adverse rulings that were made against Mr Dondero (amongst others) during the course of the bankruptcy of Sentinel (a Cayman Islands based reinsurance company which is ultimately owned by Mr Dondero and Mr Ellington).

152. In summary, UBS Securities LLC and UBS AG London Branch (**UBS Entities**) alleged that the specific transfers of assets to Sentinel during 2017 (set out and defined below as the **2017 Transfers**) were executed after the UBS Entities obtained an order for summary judgment against Highland and other entities owned or otherwise affiliated with Mr Dondero. I refer to case *UBS Secs. LLC v Highland Cap. Mgmt. , L.P. ,* (index No. 650097/2009) (Supreme Court of the State of New York, New York County) (the **Underlying Action**).

153. In the Turnover Petition (as defined below) the New York court accepted that the 2017 Transfers took place at a time when the named respondents in the Underlying Action anticipated a US $1.2 billion judgment against them. The judgment was awarded in UBS' favour in the Underlying Action, but since the entry of the judgment, UBS has only been able to collect a fraction of the interest (and none of the principal) on that judgment. The assets compromising the 2017 Transfers were transferred pursuant to an attendant Asset Purchase Agreement, as payment of the premium for an after-the-event insurance policy (the **ATE Policy**) to insure Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland CDO Holding Company against liability in the Underlying Action. It was also claimed that the ATE Policy was outside the usual course of business for Sentinel, as Sentinel had never previously issued this type of policy or one as large as the ATE Policy and would not have had the means to pay on the ATE Policy without the assets received following 2017 Transfers (the **Sentinel Fraud**).

154. In connection with the Sentinel Fraud, Stephanie Vitiello (author of the Vitiello memo) and other affiliates of Mr Dondero received an indemnity for their role in the Sentinel Fraud, a copy of which indemnity is attached at **MP1/ page 375 - 384**. It is my understanding that UBS's counsel also used this indemnity as evidence of

Stephanie Vitiello and other affiliates of Mr Dondero participating in the Sentinel Fraud.

155. In *UBS Securities LLC, UBS AG London Branch v. James Dondero, Scott Ellington, Highland COO Holding Company, Highland COO Opportunity Masters Fund, L.P., Highland Financial Partners, L.P., Highland Special Opportunities Holdings Company, CLO HoldCo, Ltd., Mainspring, Ltd., Motage Holdings, Ltd* (Index No. 6507 44/2023), the Supreme Court of the State of New York, New York County made a decision and order on 26 March 2025 (the **Turnover Petition**), finding that the Turnover Petition sufficiently alleged that:

(a) Mr Dondero and Mr Ellington undertook fraudulent conveyances under DCL 276, when they devised and implemented a scheme to move all the remaining assets of, but not limited to, Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland Financial Partners, L.P. that could be subject to an impending judgment to Sentinel (the **2017 Transfers**). To the extent that Mr Dondero and Mr Ellington sought to dismiss these claims, their motions were denied.

(b) Mr Dondero was the alter ego of another corporate vehicle called Mainspring, Ltd and that it was sufficiently alleged that Mr Dondero "*used Mainspring to enter into fake service agreements in order to pay HCM [Highland Capital Management, L.P.] insiders bonuses that they were otherwise ineligible to receive in HCM's bankruptcy*" and "*used Mainspring to reward HCM employees who were loyal to him*".

(c) Mr Dondero "*used his dominance over Mainspring "to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury*"*", with respect to allegations that Mr Dondero used his position as the ultimate beneficial owner of Mainspring, "*to compel Sentinel to issue dividends, thereby draining assets that would have otherwise been available for collection by UBS*".  To the extent that Mr Dondero pursued a motion to dismiss claims which sought to hold him liable as the alter ego of Mainspring, that motion was dismissed by the Court.

156. In 2022, at a hearing in the Bankruptcy Court for the Northern District of Texas, where the Sentinel fraud was discussed, Judge Stacey Jernigan (**Judge Jernigan**) noted that she may make a referral to the U.S. attorney given the criminal conduct by Mr Dondero, Mr Ellington, and others to fraudulently hide assets from UBS and lie about it. I exhibit at **MP1/ page 385 – 517,** HCMLP Motion to Withdraw, Case No. 19-34054-sgj-11, Adversary Proceeding 21-3020-sgj.

157. I am also aware that Mr Dondero has a hatred of Judge Jernigan, who has consistently ruled against Mr Dondero. I understand it has been reported that a SEC whistleblower complaint was made against Judge Jernigan and I believe Mr Dondero subsequently directed an employee of one of his entities, Lucy Bannon (who is also an officer of the Highland Dallas Foundation) to leak the SEC whistleblower complaint to the press so they would cover it (see **MP1/ page 670 – 677**).

158. The actions by UBS (which I anticipated) underscore the need for clear independence between Dondero, his entities and affiliates on the one hand, and the DAF, including Holdco on the other.

159. In the middle of 2023, DAF's exposure to Dondero owned and controlled investments exceeded US $100 million. I successfully worked to reduce this exposure throughout 2024. At the end of 2024, exposure was about US $8 million. It was my belief that this exposure posed a material risk to the DAF because it could be used as alter ego evidence.  This risk is also reflected in the ValueScope Report.

160. My actions to reduce the DAF's exposure to Dondero owned and controlled investments from US $100 million to US $8 million in the span of 18 months required DAF to turn down multiple deal proposals from Mr Dondero and his entities.  In turn this led to increasing frustration from Mr Dondero at the beginning and throughout this period.

161. I managed the DAF while balancing (i) the legal and compliance need to reduce exposure (based on advice of Mr Alex McGeoch and Mr Mancino) to Mr Dondero owned and controlled investments and (ii) avoiding upsetting Mr Dondero and his

affiliates as I was acutely aware of Mr Dondero's litigious nature and believed that Mr Dondero would stop paying amounts due on DAF investments if a clean break between Mr Dondero and DAF was implemented.

162. These concerns were clearly well founded. Immediately following my resignation from Skyview (which was made on advice (privilege in which is not waived) and in order to assert more independence from Mr Dondero to better protect the best interests of the DAF) Mr Dondero directed the entities he controlled to cease all payments to DAF, including US $8 million Mr Dondero owed on a deal called Small Bay II (referred above).  In the following months, DAF sent letters attempting collection on three other investments. Mr Dondero has not met any of his obligations under them, requiring DAF to commence three lawsuits against Mr Dondero's entities for payment, each of which are ongoing.

163. Mr Dondero has, several times, commenced extensive, harassive litigation and/or engaged in other misconduct against his former employees and business partners. At **MP1/ page 553**, in the "Plaintiff Highland Employee Retention Assets LLC First Amended Complaint" records that Mr Dondero engaged in similar behavior against Joshua Terry, examples of Dondero and his affiliates' behavior is shown, which includes lying, fraud, and other types of misconduct and/or vexatious litigation against his former business partners Joshua Terry and Patrick Daugherty.

164. For the reasons set out herein, the background leading to the DAF restructuring is both factually and legally complex, as I understand counsel for DWF advanced at the Supervision Hearing.

## E.  RESPONSES TO FIRST AFFIDAVITS OF MS DIAZ

165. Save where already covered above, I address inaccuracies in Diaz 1 below. Paragraph references in this section are to paragraphs in Diaz 1.

166. With respect to Ms Diaz's evidence, she is wrong to describe and refer to DAF as a Fund for the reasons set our section x to above.

167. With respect to **paragraph 27 of Diaz 1**, this statement is inaccurate and misleading. I had informed several people affiliated with Highland Dallas Foundation, including Lucy Bannon and Lauren Short (NexPoint employees involved in personal relationships and charitable giving) that my daughter had formed this charity and I had asked whether they could donate US $5,000. Furthermore, no director or officer of Creative HEARTS TX has received or will receive any compensation, as these roles are strictly voluntary.

168. I understand that Ms Bannon and Ms Short approached Mr Dondero and obtained his approval. Creative HEARTS TX was then added to the approved list of charities of the Highland Dallas Foundation, which I had not requested. However, these facts may not have been known to Ms Diaz at the time she swore Diaz 1 and I have done nothing ethically and legally wrong and/or inappropriate as Ms Diaz suggests.

169. With respect to paragraph 28, Fortaris is owned by Kevin Cronin, a private investigator used by Mr Dondero and a trusted advisor of Mr Dondero. As I explain further in this affidavit, Mr Dondero determined my compensation whilst I worked at Skyview. After I assumed the role of Control Person of DAF I performed my functions as an employee of Skyview and as Control Person simultaneously. Accordingly, I was concerned that Mr Dondero would attempt to exert influence over my actions at DAF by controlling my compensation received from Skyview.

170. My concerns were well founded in this regard. As mentioned above, the Court found that it was sufficiently alleged in the Turnover Petition that Mr Dondero had rewarded those who were loyal to him, which was suggestive that Mr Dondero had controlled remuneration as a means of leverage. I also exhibit at **,MP1/ page 708** a confidential update with respect to Mr Dondero's negotiations with the Santa Barbara Foundation (**SB Foundation**) which illustrates how Mr Dondero threatened to withdraw US $1 million of funding to the SB Foundation because it elected to reject channeling funds to causes identified by Mr Dondero in favour of community causes. In response to the threat of having funding withdrawn, SB Foundation

agreed that a full slate of grants would be presented that were desirable to Mr Dondero, and would be allocated to the US $1 million funding.

171. This emerging pattern of coercing others through financial control compounds my concerns that Mr Dondero may leverage the private funding which he is providing to run this liquidation, as a means of influencing the direction of the liquidation itself. He could do so by threatening to withhold funding (which the JOLs and their counsel depend on to cover their costs and expenses) from the JOLs and/or their counsel, thereby placing undue pressure on the JOLs and/or their counsel, which may affect the JOLs and/or their counsel's ability to conduct themselves impartially in this liquidation.

172. As previously mentioned, I had identified that it was imperative that DAF was and was seen to be operated independently from Mr Dondero. Given my employment at Skyview it was my view that I should be paid from DAF in respect of services I provided to DAF and its related entities as the Control Person. Not only would the compensation need to be provided independently of Skyview but the level of compensation would need to be based on an objective third party compensation valuation. An independent compensation review was provided for the role as Control Person. This was then independently verified by Mr Murphy.

173. Given my concerns that the influence and control that was being asserted by Mr Dondero over DAF may have given was giving rise to allegations of DAF being an alter ego of Mr Dondero, I sought to consider ways in which my remuneration in respect of DAF could properly be paid without being subject to Mr Dondero's oversight, precisely because of the alter ego risk. I recall having two brief telephone conversations with Mr Cronin, as I explored whether my compensation (which would be paid by DAF) could be routed through Fortaris. I believed that, given historical payments by Mr Dondero's entities to Mr Cronin and Fortaris, payments by DAF to Fortaris would not raise suspicion with the Skyview employees monitoring DAF's finances. I shared with Mr Cronin an organisational chart and legal advice from Alex McGeoch, a tax expert at Hunton Andrews Kurth LLP, asserting that DAF can independently compensate me.

**Page 55 of 64**

174. My intention in raising this suggested compensation structure with Mr Cronin was to insulate DAF from potentially significant tax liabilities if the charitable structure of DAF was not operated separately from Mr Dondero.  In any event, this arrangement did not come to fruition because Mr Cronin told Mr Dondero about my proposal. However, any actions I took in relation to Mr Cronin were taken in good faith.

175. I may have flippantly said something similar to Dondero 1 where Mr Cronin said "*you can't steal from yourself*". The context was that I was speaking to Mr Cronin and attempting to describe that, in my capacity as DAF's control person, I would be authorizing paying myself and that I was not "stealing" funds from anywhere. The basis for that statement was the written legal advice from Alex McGeoch (long-time DAF counsel) that I provided to Mr Cronin and attached at **MP1/ page 645**.

176. With respect to **paragraphs 29 to 30 of Diaz 1**, I believe that Mr Mancino did not mention material non-public information in his conversation with Mr Rosenberg and only mentioned the share price of NHT, which was public information of a public company. This did not constitute a MNPI and I note that Ms Diaz only says that it "could have" been.  Counsel at Eversheds Sutherland, a respected firm with securities law expertise, concluded that the material shared was not MNPI and did not constitute a breach of Skyview's policies and procedures, a copy of which is attached at **MP1/ page 647 - 650**.

177. With respect to paragraphs 31 to 35, Mr Mancino sent Holland & Knight a letter on February 14, 2025 informing them the numbers, specifically that "millions in director fees", were incorrect. He also said that the legal fees (the vast majority were DAF expenses) did not exceed US $10 million in 2024 and that they would continue to fall in 2025 and 2026.

178. My compensation was based on my role as CEO, CIO, and GC of DAF, and not my sole role as a director. As such these fees have been misclassified as "Director fees". It was also calculated based on a third-party independent report which took into account compensation packages for similar roles and responsibilities. The

final decision to approve my compensation was reviewed by Mr Murphy, in his capacity as an independent director, following his consultation with the third party expert. My compensation was only made after Mr Murphy executed written resolutions taking into account all of the relevant matters.

179. Both Mr Dondero and Ms Diaz make much of my "irresponsible management" of DAF by spending too much on expenses. However, US $6 million of the alleged US $18.3 million in expenses are not in fact expenses. Rather, Mr Dondero purposefully omitted that there was also US $6.1 million in income from a NexPoint-led transaction that more than offset the US $6 million in expenses, so Mr Dondero falsely inflated the expense number by omitting the offsetting income and the net gain to DAF from the transaction and those expenses.  These are lease payments a DAF subsidiary receives in connection with an investment led by Mr Dondero called Skorpios (also known as NexPoint Life Science III).  DAF is both lessee and lessor and generates around US $6.1 million per year from the arrangement.  As such, DAF nets a profit each year (US $127,937 in 2024 and US $131,775 is anticipated in 2025, increasing substantially each year and maxing out at $364,815 in year 14), which is reflected in the spreadsheet attached at **MP1/ page 651 - 669** and provided by NexPoint.

180. I also met with Ms Diaz and Torrey Littleton on October 10, 2024 and Ms Diaz did not raise any concerns with respect to those now raised in Diaz 1. At that meeting, I also suggested that I would like audited financials of DAF (which had never been provided before) within the next two years and I had hired a third party accounting service provider for that purpose.  On the same day, I also had a phone call with Debbie Wilkerson, the CEO of the Highland Kansas City Foundation, Inc. who similarly did not raise any concerns with me. Furthermore, on November 20, 2024, ValueScope and Mr Mancino spent several hours presenting to Holland & Knight (counsel to the Highland Foundations) on the finances of DAF, its investments, and its outlook which I understand from discussing with ValueScope and Mr Mancino afterward was received very positively by Holland & Knight.

181. The next communication from the Highland Foundations that I received was the No Confidence Letter (as defined in Diaz 1) which was not actually received until December 2024 and left me in disbelief given that no questions or concerns had been raised with me previously. I was left confused why they had not voiced any concerns with me directly despite repeated affirmative outreach. Regardless, following the No Confidence Letter, on December 11, 2024, Mr Murphy presented to Holland & Knight regarding the DAF's corporate governance and investments, and which I understand was so well received, that Mr Murphy was invited by Michael Stockham, a partner at Holland & Knight, to provide the same presentation directly to the Highland foundation CEOs. The ValueScope Report also shows that the DAF had outperformed the S&P 500 during my tenure at DAF, and the Highland Foundations had been receiving quarterly financial updates from ValueScope for years.

182. With respect to paragraph 38, Ms Diaz had received an asset list via the ValueScope DAF quarterly financial update on January 7, 2025 and I found her request for the same information again on 23 January 2025 to feel quite orchestrated. Historically, these reports were the only information the Highland Foundations received and, in any event, exceeds what they are entitled to under the organizational documents given their status as passive discretionary holders.

183. With respect to paragraphs 46 to 49, the Highland Foundations were not entitled to notice but this change was done to use a Cayman (instead of Delaware) General Partner and to create more independence from Mr Dondero, for all the reasons above. I understand that under Cayman Islands law, a general partner of an exempted limited partnership must be a Cayman-registered entity whether as an exempted company or a company registered under Part IX of the Companies Act.

184. With respect to **paragraphs 50 to 52 of Diaz 1**, Ms Diaz omits to explain Highland Foundations' role in opening the Texas AG (as defined in Diaz 1) investigation but in any event, the Texas AG has taken no action outside of sending an initial letter to request that certain DAF entities preserve documents. I believe the Highland Foundations and Mr Dondero reached out to the Texas AG to open an investigation

and use that as a data point in this matter. Mr Dondero's propensity to abuse a "complaint" filing is well known. As an example, refer to the SEC whistleblower complaint against Judge Jernigan described at **MP1/ page 670 - 677**.  DAF is actively attempting to cooperate with Texas AG, but the Texas AG has been non-responsive to repeated requests to meet with me and my advisors.

185.  As such, there is no dispute between myself and Mr Dondero, but simply a dispute between Mr Dondero and the assets under DAF's management which he seeks to control. To illustrate that point, in November 2024, I was offered through Mr Dondero's attorneys at the Ashcroft Law Firm (and its partner Johnny Sutton), a Caribbean Island and large sums of money if I agreed to step down from the DAF during a call on 22 November 2024**.**  It was also intimated to me by Ashcroft that this offer was also made on behalf of the Highland Foundations.  I believe Mr Dondero's intention in causing his attorneys to propose this was to remove me and insert someone who would not second guess his investment recommendations and would permit Mr Dondero to again use DAF (as was the case under Mr Scott's tenure as Control Person) for Mr Dondero's personal benefit. Needless to say, I turned down Mr Dondero's offer.

186.  For these reasons, it is vitally important that the JOLs obtain independent counsel to ensure they are properly and impartially advised. The central issues in this liquidation concern the actions I took, with Mr Muphy's oversight, to attenuate direct and indirect influences from Mr Dondero, including through his control of the Highland Foundations whom Johnstone Law previously represented.

187.  Furthermore, I understand that Mr Andrew Johnstone of Johnstone Law contacted My Murphy on February 12, 2025, purporting to represent *"Charitable DAF Fund 2 LP (**DAF 2**)."* .  I understand that Mr Murphy referred this enquiry to Walkers, who were legal counsel to Holdco and DAF at the relevant time.

188.  The purpose of this unsolicited outreach was unclear but it is evident that Johnstone Law as DAF 2 lawyers wanted to discuss DAF's assets. Why they wanted to do so and to what end has never been revealed. Critically, even assuming DAF 2

was a legitimate entity (presumably another exempted limited partnership), there is nothing in Johnstone Law's email to indicate (a) who the general partner of DAF 2 was (b) who the limited partners of DAF 2 were and (c) what possible interest any of them would have in confidential information concerning the assets of DAF. As if these concerns were not concerning enough, it subsequently transpired that DAF 2 does not even exist.

189. Following an entity search, Walkers determined that DAF 2 did not exist. I understand that Walkers followed up with Johnstone Law to clarify which entity they represented and where it was domiciled. Johnstone failed to respond to repeated follow ups and failed to provide context. It is my belief that through Johnstone Law, as was the case with Ashcroft, Mr Dondero was seeking to access Mr Murphy as a director of Holdco with a view to exercising control over DAF and its assets.

## F.   RESPONSES TO FIRST AFFIDAVIT OF MR DONERO

190. With each section that to the extent I do not specifically respond to the assertions made in Dondero 1 above, I wish to address the inaccuracies of that evidence below. Paragraph references in this section are to references in Dondero 1.

191. With respect to **paragraph 13 of Dondero 1**, there are no restrictions in the organizational documents of DAF that prevent the admission of additional charitable beneficiaries. Furthermore, DAF exists to benefit charities, not only the Highland Foundations.

192. With respect to **paragraphs 29 to 30 of Dondero 1**, I own shares in Holdco in my personal capacity, and any reference to me owning the DAF would be a reference to my ownership of the GP and the HoldCo Management Shares. However, it is completely inaccurate to say that I could pay myself however I pleased; that represents a fundamental misunderstanding of exempted limited partnerships generally but also misunderstands the nature of the DAF structure. I expressed to Mr Dondero that DAF needs to independently determine the value of my services without Mr Dondero's input, or input from an entity controlled by Mr Dondero. My

reasons for this were to reduce any susceptibility to coercion from Mr Dondero (both directly and indirectly), which could have been exercised by interfering with my compensation, and create independence for DAF.

193. In relation to **paragraph 31 of Dondero 1**, it is highly unlikely that the expense summary could have been produced in June 2024 because, due to a lag in reporting times, June numbers would not have been available until later in the year. I received June 2024 numbers in October 2024.

194. With respect to **paragraph 35 of Donder 1**, the Vitiello memo **referred to in Dondero 1** correctly concludes that I did not engage in insider trading under U.S. securities laws. This is in relation to a put option that was not exercised under a contract.   Failure to exercise the put option jeopardizes Highland Dallas Foundation's tax-exempt status and, according to the Seyfarth Letter at **MP1/ page 361**, may have been an attempt to protect Mr Dondero from having to address the precipitous fall in fair market value shortly after the gift was made, as there would have been a requirement to file Form 8282 "*Donee Information return*" that would have revealed this information.

195. By way of background with respect to the Put Option, and as explained in the Seyfarth Letter at **MP1/ page 360**:

> *Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.*
>
> *One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").*

*Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on , December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026...*

196. The Seyfarth Letter concluded that based on public filings with the U.S. Securities and Exchange Commission, REIT had approximately 29,353,66- Units, of which 82.52% were owned by entities affiliated or controlled by Mr Dondero. Furthermore, I understand that the REIT is to be dissolved which means that if the Put Option is not exercised before that point, then, according to the Seyfarth Letter, this will result in a US $9 million "*inappropriate windfall to both Dugaboy and Mr Dondero*".

197. As explained in the Seyfarth Letter at **MP1/ page 360**:

"*The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,505,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy.*"

198. It was public information that NHT had declined from a price per unit of $7.67 in December 2019 (when the donation occurred) to $0.20 in August 2024, representing a 99.7% decline. In fact, whilst the figures quoted in the Seyfarth Letter vary slightly, it was calculated that as of 22 November 2024, 1,500,000 Units were only worth $22,500, which is less than 1% of the Put Option value of US $9,285,000. Additionally, NHT disclosed on August 2, 2024 (26 days before I spoke with the Dallas Foundation) in a document titled "Management's Discussion and Analysis

of Financial Condition and Results of Operations that there was "a potential risk about [its] ability to continue as a going concern and, therefore, realize its assets and discharge its liabilities in the normal course of business." A copy of the NHT disclosure is attached at **MP1/ page 678 - 707**. Therefore, the information I disclosed was not "material" or "non-public" and would not have resulted in a violation of U.S. securities laws even if traded upon by Highland Dallas Foundation. This is also confirmed by the Eversheds Memo exhibited at **MP1/ page 647 - 650**.

199. Furthermore, and with reference to the Seyfarth Letter, it is important to not lose sight of the fact that the Put Option was in effect an interest free loan of US$9,285,000 for Mr Dondero and Dugaboy while the Put Option remains outstanding and unexercised.

200. For the purpose of responding to the JOLs' sanctions applications, I do not expand here on the factual inconsistencies which I have identified between the Vitiello memo and Dondero 1 and Diaz 1, but reserve all my rights to do so during the course of these liquidation proceedings.

201. With respect to **paragraph 36 of Dondero 1**, my resignation was not abrupt. It was the culmination of actions I had been working toward to create independence between the DAF and Mr Dondero for almost two years. I was not aware of any investigation or any accusation of wrongdoing on my part. The Vitiello memo was finalized after my resignation, not before.

202. With respect to **paragraph 37 of Dondero 1**, the Skyview services agreement required 180 days' notice to terminate, and was not terminated effective until March 31, 2025. Whilst I have 4 years of investment management experience, DAF also has a wealth of other investment advisors, including:

   (a)    Investment committee

   (b)    Investment advisors

   (c)    Investment houses and banks with investment functions

Case 25-11376-BLS    Doc 27-1    Filed 09/04/25    Page 64 of 65

(d)    Real estate advisors

(e)    Security and portfolio monitoring

203.    With respect to **paragraphs 38 to 39 of Dondero 1**, Hunter Mountain's interest was sold to a DAF subsidiary based on an independent third-party valuation report and because it was sold to a DAF subsidiary, there was no dissipation of assets.

204.    Furthermore, Mr Dondero's proposal that he is a potential buyer of Hunter Mountain is misleading. Mr Dondero's attorneys (Ms Dietsch-Perez at Stinson) have argued that Hunter Mountain owes Dugaboy and other trusts US $65 million in debt obligations. These debt obligations were released by the plain language of a settlement agreement entered into in 2022, although I understand that Mr Dondero disputes this. Given this dispute, it is doubtful whether Mr Dondero would have paid any meaningful amount for Hunter Mountain, outside of credit bidding the debt he believes he is owed.

205.    As mentioned above, a valuation study was performed on the Hunter Mountain interests, and the purchase price is in accordance with this valuation study. The seller made an attempt to find other buyers by contacting distressed asset buyers, but there was little interest given that there was a contingent claim in the Highland Bankruptcy that would not be paid out until litigation ceased.

206.    For the purpose of responding to the JOLs' sanctions applications, I do not expand further on the issue here but I again reserve all my rights to do so during the course of these liquidation proceedings.

**Page 64 of 64**

**CONCLUSION**

207. For the reasons stated above, I respectfully request that the JOLs' sanction application is denied.

| | | | | |
|---|---|---|---|---|
| **SWORN** to at | Wise | Texas | ) | |
| on this | 4th | day of | June | 2025 | ) |
| | | | | ) | MARK   ERIC   PATRICK |

BEFORE ME: _Shannara Franzel_   132662714
08/27/2028

NOTARY PUBLIC

Shannara Franzel
ID NUMBER
132662714
COMMISSION EXPIRES
August 27, 2028

Electronically signed and notarized online using the Proof platform.