# **Exhibit 2**



**Deponent:** Paul Murphy
**No:** First
**Party:** Management Shareholder
**Exhibit:** PM-1
**Date:** 4th June 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO.: FSD 116 of 2025 (JAJ)**

**IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

### FIRST AFFIDAVIT OF PAUL MURPHY

---

I, **PAUL MURPHY**, of GK Management Limited, 45 Beckz Close, George Town, Grand Cayman, Cayman Islands KY1-1007 make oath and say as follows:

## I. INTRODUCTION

1. I am a registered director of Charitable DAF Holdco ("**Holdco**" or the "**Company**").

2. I make this affidavit on behalf of Mr Mark Patrick (**"Mr Patrick"**) as "management shareholder" of the Company, within the scope and meaning of regulation 11 of the Company's Articles dated 21 February 2025 (the "**Management Shareholder**"), in particular:

   2.1 in my capacity as director of the Company having been appointed by ordinary resolution passed by the Management Shareholder pursuant to regulation 64 of the Company's Articles of Association; and

1

2.2 to assist the Court in determining an application I understand was filed by Margot MacInnis and Sandipan Bhowmik as Official Liquidators of the Company on 22 May 2025 for sanction under paragraph 11 of Part Schedule of the Companies Act (2023) to engage (a) Johnstone Law as their Cayman Islands attorneys and (b) Reed Smith LLP as their US attorneys (the "**Sanction Application**").

3. The contents of this affidavit are, save where the contrary is indicated, within my own knowledge and are true. Where I refer to matters of information and/or belief I refer to the source of such matters and confirm that they are true. In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

4. There is now produced and shown to me a paginated bundle of documents marked "**PM-1**." References to pages in PM-1 are in the form "[**PM-1/page number**]."

5. I am aware that Mr Patrick will also be giving evidence (a) on behalf of the majority Participating Shareholder of the Company, DFW (the "**DFW Affidavit**") and (b) on behalf of himself as Management Shareholder (the "**Patrick MS Affidavit**").

6. This affidavit is arranged into the following sections:

   6.1. **Section II**: sets out my background;

   6.2. **Section III**: addresses the circumstances in which I was appointed by the Management Shareholder as an independent director with oversight responsibilities in the Company as well as the true nature of the Company's purpose and position in the associated structure that included Chartiable DAF Fund LP (the "**DAF**") which was established for charitable purposes (the "**DAF Structure**");

   6.3. **Section IV**: addresses some of the key issues that were impacting the Company and the DAF Structure, most notably their vulnerabilities to disputes concerning an individual named Mr James Dondero ("**Mr Dondero**") and his influences;

**Page 3 of 58**

6.4.   **Section V**: addresses some of the key aspects leading to:

6.4.1   the interposition of a Delaware limited liability corporation, CDMCFAD, LLC ("**CDM**") between the Company and the DAF (the "**CDM Issue**");

6.4.2   the issue of new Participating Shares in the Company to a new charitable foundation, DFW Charitable Foundation ("**DFW**") (the "**DFW Share Issue**"); and

6.4.3   the redemption of the Company's interest in CDM (the "**Redemption Issue**").

(together the "**DAF Restructuring**").

6.5.   **Section VI**: addresses the voluntary liquidation of the Company together with its unopposed conversion to a supervised liquidation;

6.6.   **Section VII**: addresses dealings with the JOLs following their appointment and why I do not believe (i) it is appropriate for lawyers previously acting for parties connected with Mr Dondero, who have taken the apparent intractable position that the DAF Restructuring was somehow fraudulent, and/or (ii) it is appropriate to sanction the engagement of United States (**"U.S."**) attorneys at this stage of the liquidation; and

6.7.   **Section VIII**: concludes.

7.   I understand that the appearance of the Sanction Application suggests that the issue to which it gives rise is simple. I agree that in conventional liquidations, the identity of the JOLs' lawyers is ordinarily uncontroversial because, as disinterested officers of the court (in the sense that as long as the lawyers are not conflicted, do not impair the appearance of impartiality and are sufficiently skilled and resourced), JOLs do not insist on a particular firm of attorneys.

8.   For the reasons I explain in this affidavit and for the reasons given by Mr Patrick in his evidence, I believe the JOLs' continued insistence on instructing Johnstone Law is inappropriate and objectively unjustifiable. I also believe it has caused unnecessary delay and animosity at the very outset of the liquidation.

3

9. This is especially in circumstances where counsel for DFW recorded that it would object to the JOLs' appointment of Johnstone Law at the court supervision application on 6 May 2025 (the **"Court Supervision Application"**). I understand that the Court concluded at that hearing that any sanction application for the engagement of Cayman Islands counsel had to be made in the "proper" or "normal" manner. Yet despite being on notice of DFW's objection and the Court's comment regarding the same, the JOLs proceeded to execute an engagement letter with Johnstone Law the following day having made no sanction application and having not given any of the 'non-Petitioner' contributories notice of their intention to do so knowing that it was a contentious issue. I discuss the ensuing correspondence with the JOLs around Johnstone Law's involvement which exacerbated matters later in this affidavit.

10. In conventional scenarios and based on my experience and understanding which I set out more fully below, objections to particular firms or professional service providers are dealt with much quicker and more cost effectively by the JOLs simply engaging an alternative firm and then getting on with the real work they are appointed by the Court to perform.

11. However, in this case, the engagement of Johnstone Law is directly related to the central contentious issue of the DAF Restructuring and allegations of fraud made by Johnstone Law on behalf of Highland Dallas Foundation, Inc, Highland Kansas City Foundation, Inc, Highland Santa Barbara Foundation, Inc, and the HCMLP Charitable Fund (the "**Highland Foundations**").

12. With the exception of HCMLP Charitable Fund, Mr Dondero established and retains a position on each of the directing boards of the Highland Foundations and is also the President and the Individual Member (an owner) of each of them. The word "Highland" derives from Mr Dondero's web of similarly named entities, including in particular his former ownership and control of Highland Capital Management, L.P. ("**HCM**"), which has been in Chapter 11 bankruptcy since October 2019 and is at the heart of several longstanding pieces of litigation in the U.S. (see for example para 26 Special Turnover Petition filed by UBS against Mr Dondero on 8 February 2023 **[MPMS-1/3-92]** (the "**UBS Special Turnover Petition**").

13. Mr Dondero is a serial litigant. He has been found in contempt of Court for interfering with the affairs of independent professionals and officeholders appointed to manage his former businesses. As I explain in further detail below his approach of seeking to influence independent professionals through interference and if that is unsuccessful through litigation is, I believe characteristic of Mr Dondero.

14. Accordingly, given Mr Dondero's *modus operandi* which I discuss in this affidavit, I believe that Johnstone Law's baseless allegations of fraud on behalf of the Highland Foundations will have been made on the ultimate instruction or encouragement of Mr Dondero or his associates. The JOLs have associated themselves with these allegations by characterising Johnstone Law's prior engagement by the Highland Foundations as "helpful" to their role. This view also seems to be allied to the approach Johnstone Law adopted at the Court Supervision Application in seeking broad directions to directly attack the DAF Structure, as well as by engaging Reed Smith, without sanction, to execute on the Mr Dondero's and the Highland Foundations' preconceived strategy. For the reasons I develop in this affidavit, the JOLs seem to have adopted this strategy without having considered the position and evidence of the directors and Management Shareholder of the Company.

15. I want to make clear that I have no issue with the JOLs carefully and closely scrutinizing the implementation of the DAF Restructuring and that they should have the benefit of legal advice when doing so. As I describe more fully below in Section VII, I strongly advocated that neither DFW nor the Management Shareholder should object to the voluntary liquidation coming under court supervision nor should they object to the appointment of Grant Thornton as the joint official liquidators.

16. My view was informed by the fact that the DAF Restructuring would ultimately be carefully examined by a judicial process, and I had faith that Grant Thornton would conduct themselves in balanced and impartial manner. I am still hopeful they are capable of doing so with the benefit of disconnected lawyers.

17. If upon concluding such analysis and taking genuinely independent legal advice, the JOLs remain concerned about the DAF Restructuring then so be it, and no doubt I will be required to address any criticisms made of management in its implementation.

**Page 6 of 58**

18. However, I believe that if the JOLs properly and carefully examine all of the relevant facts they will not reach that conclusion.

19. As the detailed chronology in this affidavit will show, I immediately engaged with the JOLs the day after their appointment on 7 May 2025 and, as of close of business on 9 May 2025, I had delivered access to a significant quantity of relevant documents containing thousands of pages of books, records, expert advice, correspondence and materials concerning relevant litigation. This was characterised as "paper thin" by Johnstone Law at a directions hearing on 23rd May 2025 and Ms MacInnis in MacInnis 3 stated that "*the JOLs have not received anything more than minimal meaningful books and records from the former advisors of the Company*".

20. I disagree with this assertion. The provision of documents was not an unruly "data dump" but a carefully compiled set of relevant documents. At first impression it might be challenging to the JOLs to understand why information relating to Mr Dondero and the various proceedings in which he and his businesses are involved was relevant to the liquidation of the Company. But this is exactly why I was anxious to meet with the JOLs quickly so as to help orientate them. However, once the opaque involvement of Johnstone Law surfaced, I became concerned that Mr Dondero's strategy and influences had already started to emerge. Unfortunately, this was the start of the deterioration in communications with the JOLs.

21. On 7 May 2025 I emailed the JOLs setting out the "Proceedings to Date" and "Brief Synopsis of Managements' Position" which I had hoped would begin to set the tone for a productive engagement with the JOLs. The email is exhibited at **[PM-1/440-442]**.

22. It was only in circumstances where, having made the JOLs aware in Court on 6 May 2025 that DFW, and now the Management Shareholder, would object to Johnstone Law as attorneys to the JOLs, and then learning that Johnstone Law had attended a meeting with Mr Douglas Mancino (**"Mr Mancino"**), the Company's former US tax and non-profit attorney, on 12 May 2025, that I took the conscious decision to cancel my meeting with the JOLs on 14th May 2025 whilst my concerns about Johnstone Law were resolved.

6

23. My concern is that I do not believe the JOLs can conduct an independent investigation whilst being advised by a law firm which represented the Highland Foundations and other entities I believe were associated with Mr Dondero who have made allegations that the DAF Restructuring was unlawful and worse, fraudulent. Those allegations have not been withdrawn. I find it even more concerning that the JOLs have become so entrenched within such a short period of their appointment as to their choice of law firm, especially in circumstances where the JOLs', and Johnstone Law's, fees are being funded by Mr Dondero.

24. As I have alluded to above, the practical solution here would have been for the JOLs to choose another law firm. Even if the Company had any substantive claim to the assets held in the DAF Structure (which it does not), there is no risk of disposal of those assets other than in accordance with its ordinary charitable and operating purposes. Had the JOLs engaged an alternative law firm, I expect they would have been able to progress their investigations and legal analysis substantially already.

25. To illustrate the point, I asked Kobre & Kim to contact a range of alternative law firms purely to run conflict checks. The only communication between Kobre & Kim and these law firms was by email which is exhibited at **[MPMS-1/271-285]**. To be clear, I am aware that Mourant called Kobre & Kim and spoke with Kamarya James, an Analyst, but she immediately tried to transfer the call and ultimately no conversation took place. Accordingly, as can be seen Harneys, Mourant, Bedell Cristin and Claritas, are all available to act for the JOLs in this case and are free of conflicts or any prior involvement.

26. Subject to what Mr Patrick says in his Management Shareholder Affidavit, as an alternative to engaging an entirely disconnected law firm, Maples would be another option, not to act as the JOLs conflict attorneys, but as sole Cayman Islands attorneys for the JOLs. Reed Smith may also be appropriate if there becomes any need for the JOLs to engage U.S. lawyers, however in circumstances where the Company has no entitlement to the DAF's assets, I do not believe there is any need to do so at this stage. I expand on this later in this affidavit.

7

**Page 8 of 58**

27. I believe that the appropriate way to deal with the contentious issues surrounding the DAF Restructuring effectively is through a form of *inter partes* proceeding which would entail the disputed positions between DFW and the Management Shareholder on the one hand, and the Highland Foundations and Mr Dondero on the other being ventilated and resolved in Court through pleadings, discovery, evidence and trial.

**II. My Background & Experience**

28. I was called to the bar of England & Wales in 2004 by the Honourable Society of Gray's Inn. I was in self-employed practice at chambers on the Northern Circuit between 2004 and 2012 where I developed a mixed common law practice.

29. I moved to the Cayman Islands in 2012 when I joined Stuarts Walker Hersant where my practice focused on commercial litigation and restructuring and insolvency proceedings before the Financial Services Division of the Grand Court. In 2016 I joined the litigation team at Ogier where I focused on complex cross-border litigation and insolvency cases and obtained significant experience in just and equitable winding-up petitions. In 2018 I accepted an offer to become the general counsel at a BNY Mellon-backed Cayman Islands reinsurance company focusing on the reinsurance of long duration US liabilities and associated asset management strategies with US based asset management companies including Insight Asset Management and Barings.

30. In 2020, given the experience I had obtained in the preceding eight years I began working for GK Management Limited providing directorship and consulting services to Cayman Islands companies that needed independent directors with legal, financial services and asset management experience.

31. Since that time, I have been appointed to a number of boards of directors for companies requiring "hands on" fiduciaries with a familiarity with Cayman Islands law. There are two primary areas I focus on (i) companies managing complex legal challenges including insolvencies, restructurings or other commercial litigation, and (ii) "start-up" financial services companies that need assistance with structuring, managing regulators, asset management strategies and capital raises.

**Page 9 of 58**

32. I would say that my expertise under (i) is a similar offering to the kinds of directorships offered by firms like Calderwood and FFP, however the differentiating aspect of my experience derives from my practice as a disputes lawyer over the last 20 years and being able to bring that experience to bear in my role as a director.

33. In 2025, I helped launch the Cayman Islands offering of Stanbrook Prudhoe where I now once again practice as a Cayman Islands attorney focusing on commercial litigation, restructuring and insolvency.

**III. Company Purpose**

34. As for my appointment as a director of the Company and other entities with the DAF Structure, I was approached by Walkers Corporate Services in early April 2021 as they were aware of the kind of independent director services I was able to offer at GK Management. Walkers provided me with a broad overview of the proposed appointment. I was then required to participate in an interview with DAF's then onshore lawyers, Hunton Andres Kurth, and also discussed the terms and scope of the proposed engagement which led to me and the Company executing a director's services agreement on 21 April 2021. Upon execution of the 2021 DSA I was appointed as a director of the Company and other entities within the DAF Structure.

35. In essence, my introduction to the purpose and business activities of DAF and the Company covered the following matters:

35.1. the DAF Structure was established as a framework for the making of discretionary distributions for charitable purposes and in basic terms the role of the Company was to facilitate the making of discretionary cash distributions to qualifying Participating Shareholders, or charities, which would be drawn from the proceeds of investment returns made within asset holding entities within the DAF Structure;

35.2. the Company's position as sole limited partner of DAF was not based on an investment relationship as typically understood in the context of a Cayman Islands fund whose purpose is commonly understood to aggregate capital from investors in the expectation that invested capital will be managed in accordance with a well-

9

defined investment management strategy and provide returns to investors based on the success of that strategy;

35.3.    in other words, the Company (i) had not invested or committed capital to DAF, (ii) had no private placement memorandum, subscription agreement, investment management agreement or other offering documents, and (iii) had no fixed, proprietary or enduring rights to DAF's assets or to distributions and by extension, these provisions, or lack thereof, applied to the Company's Participating Shareholders who, before the DFW Share Issue, were entities within the DAF Structure established and controlled by and/or associated with Mr Dondero;

35.4.    having understood that the Company was not part of what I would categorise as a "standard" Cayman Islands investment vehicle I then turned to the issues the Company and DAF Structure was facing and how I could assist;

35.5.    the Company, and by extension the DAF Structure, was experiencing significant legal difficulties arising from various litigations in the U.S.; most pertinently I was made aware that the former Management Shareholder, Grant Scott, had transferred the management shares of the Company to Mr Patrick on 25 March 2021 after having owned them since 7 November 2011;

35.6.    whilst I was not privy to the precise circumstances in which the transfer from Mr Scott to Mr Patrick occurred, my understanding was that Mr Scott was experiencing significant pressure from the Chapter 11 bankruptcy proceedings in the U.S concerning HCM (the "**Highland Bankruptcy**" as context dictates), as well as other proceedings involving UBS Securities LLC and UBS AG London Branch (**"UBS"**), seeking to both bring and enforce very significant claims against Mr Dondero and other entities he was affiliated with or controlled;

35.7.    from subsequent discussions with Mr Patrick, I also understand that Mr Dondero made certain requests of Mr Scott with which he was unwilling to comply (as to which Mr Patrick speaks further in his evidence);

10

35.8. the claims brought by UBS arose from various transactions Mr Dondero and his affiliates entered into with UBS in 2007 in relation to complex securitization transactions involving collateralised debt obligations and collateralised loan obligations that bore significant loses as a result of the 2008 financial crisis;

35.9. in 2009, UBS filed a complaint against HCM and affiliates for losses of no less than $745,306,946.06 ("**UBS Litigation**"); I exhibit hereto UBS' complaint [**PM-1/1-14**];

35.10. the UBS Litigation was bifurcated into two stages described as Phase I and Phase II in 2018; Phase I focused on the causes of action relating to breach of contract claims and was heard before the Phase II actions which concerned fraudulent inducement, fraudulent conveyance and *alter ego* liability;

35.11. on 14 November 2019, after a 13 day bench trial, the court ruled in UBS's favour on the Phase I trial and, on 10 February 2020, entered judgment against Highland CDO Opportunity Master Fund, L.P. and Highland Special Opportunities Holding Company, both of which were HCM controlled entities, for US$1,042,391,031.79 (the "**UBS Judgment**"); I exhibit hereto the ruling of Justice Melissa Crane dated 27 July, 2022 which deals with certain *alter ego* issues and attorneys fees, sets out some of the relevant background around the UBS Litigation [**PM-1/15-25**].

35.12. HCM avoided the UBS Judgment because in October 2019, HCM filed for bankruptcy under Chapter 11 and Phase II of the UBS Litigation became subject to the automatic stay;

35.13. UBS subsequently settled with the remaining Phase II defendants with the exception of Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland Financial Partners, L.P.

35.14. whilst the following clearly post-dates my appointment, I draw the Court's attention to the very recent filing in the Supreme Court of the United States ("**Supreme Court**") on behalf of HCM as reorganised Chapter 11 debtor dated 27 May 2025 (the "**HCM Stay Application**" [**PM-1/623-662**]) for an emergency stay of mandate and judgment pending the filing and disposition of a petition for writ of certiorari and

11

request for immediate administrative stay against NexPoint Advisors, L.P. and NexPoint Asset Management, L.P.

35.15.   although a filing and not a judicial determination, I believe it is important in the context of the Sanction Application to demonstrate how Mr Dondero's approach to the Highland Bankruptcy and indeed to the independent professionals brought into manage the debtor's affairs has been habitually and accurately characterised over the years; Section B.1, reads as follows:

> "*Highland's path to bankruptcy was far from typical. It did not suffer a business calamity, have problems with its vendors or landlords, or default on payments to its lenders. App., infra, 78a-79a. Rather, Highland's Chapter 11 case was caused by "a myriad of massive, unrelated, business litigation claims that it faced * * * after a decade or more of contentious litigation in multiple forums all over the world" instigated by Dondero when he was Highland's CEO. App., infra, 79a. As the bankruptcy court found, Dondero is a "serial litigator" whose litigiousness caused Highland to file for bankruptcy and strapped it with more than a billion dollars in claims. See id. at 78a-79a.*
>
> *Highland filed for Chapter 11 bankruptcy on October 16, 2019. Skeptical of Dondero's ability to serve as an estate fiduciary, the U.S. Trustee moved to appoint a Chapter 11 trustee to manage the estate. But Highland—and Dondero—avoided the appointment of a trustee by entering into a settlement agreement with its creditors' committee (the "Governance Settlement"). That settlement—approved by the bankruptcy court—changed Highland's management and governance during the pendency of the bankruptcy case.*
>
> *The Governance Settlement removed Dondero from all control positions at Highland. It appointed three outside, independent directors to manage Highland and its reorganization. The bankruptcy court later approved one of Highland's independent directors, James P. Seery, Jr., to be Highland's new CEO and Chief Restructuring Officer ("CRO").*
>
> *...*
>
> *Once appointed, Seery and the other independent directors began to negotiate settlements with Highland's principal creditors, paving the way for approval of the resulting reorganization plan by creditors holding 99.8% in dollar amount of the claims against Highland. Highland's Chapter 11 plan is an "asset monetization plan" in which distributions to creditors will result from the orderly winddown and sale of Highland's holdings and other assets over the course of several years. App., infra, 75a. The bankruptcy court described this plan, and its overwhelming creditor support, as "nothing short of a miracle." Id. at 86a.*

**Page 13 of 58**

*Dondero, on the other hand, had advocated for a reorganization plan that would reinstall him as CEO of an ongoing enterprise. After Highland and other stakeholders rejected those proposals, Dondero threatened to "burn the place down." App., infra, 123a.*

*As the list of related proceedings in this application (pp. i-iv, supra) reflects, this was no idle threat. Dondero and entities under his control have attempted to frustrate Highland's reorganization at every turn by, among other things, objecting to nearly every settlement between Highland and its creditors, challenging nearly every motion, appealing nearly every order, obstructing Highland's trading activity, and threatening Highland's employees. These various obstructions have resulted in two contempt findings against Dondero and one against certain of his controlled entities, including one arising from an attempted meritless lawsuit against Seery in violation of the order appointing him CEO and CRO, and more than fifty appeals to the district court and Fifth Circuit.*

35.16.   on 29 May 2025 the Supreme Court granted the stay which effectively prevents Mr Dondero and his affiliates from pursuing litigation against HCM's employees and officers for their work during the reorganization **[PM-1/663]**;

35.17.   as described above, whilst this filing and recent decision in the Supreme Court post-dated my appointment by several years, it broadly reflects my understanding at that time that the Company and DAF Structure was involved in a series of complicated legal actions brought by a variety of parties that Mr Dondero was at the centre of;

35.18.   furthermore, the Company and DAF Structure needed an independent director to manage existing litigation and ensure that it acted independently of any influence of Mr Dondero which included being brought into any vexatious litigation;

35.19.   indeed, Mr Dondero has been found in contempt of court (see decision of the United States Court of Appeals Fifth Circuit Decision dated 1 July 2024 **[PM-1/666-675]**));

35.20.   he has also been restrained by a "gatekeeper" injunction from pursuing vexatious litigation against HCM's CRO in the restructuring (see United States Court of Appeals Fifth Circuit Decision dated 4 April 2024 **[PM-1/36-47]**); and

35.21.   again, these decisions post-date my appointment but the behaviour which gave rise to them predates or is contemporaneous with it and there are many more relevant

13

filings and decisions that anyone trying to make sense of the Company, and the DAF Structure would need to assimilate and understand.

36. In summary, it was this type of behaviour - overt and unrestrained attempts to exert improper influence and control over assets and structures Mr Dondero had no entitlement to which gave rise to the need for robust management of the Company and DAF Structure. It is through this lens that I approached both my appointment and continued tenure at the Company for the ensuing four years. It is also the context which I had hoped any properly informed Official Liquidator of the Company would see as critical to understanding its affairs, and not through the lens created by Mr Dondero and those he is liable to influence and control.

37. Notwithstanding the severely distressed position of the DAF and the Company, I considered the proposed appointment was a good fit for my skill set which, in the light of my experience referred to above, focused on directorships for companies facing significant legal issues and which needed assistance managing and navigating subsisting and future challenges.

38. I became a director of the Company on 21 April 2021. As I have mentioned above in paragraph 26.13, to give a real-time contemporaneous illustration of the acrimonious nature of the Highland Bankruptcy, by June 2021 (3 months after my appointment), Mr Dondero had been held in civil contempt of court by the presiding bankruptcy court for frustrating "*the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with* [HCM's] *management, threatening employees and cancelling trades between* [HCM] *and its clients.*" (See the opinion of the United States Court of Appeals Fifth Circuit dated 18 March 2025, which sets out some of the background and Mr Dondero's involvement **[PM-1/180-190]**). I understand that this decision vacated the bankruptcy court's finding of contempt but still provides critical background to the "gatekeeper" order Mr Seery obtained. In any event I also refer to the decision of the United States Court of Appeals Fifth Circuit Decision dated 1 July 2024 **[PM-1/666-675]**.

39. UBS has alleged that Mr Dondero arranged his and his business affairs to ensure that neither he nor the entities under his control had surplus liquidity or easily accessible assets. UBS alleges this financial manoeuvring was done over a decade to proactively plan to frustrate its assets to monetise a future judgment in the Phase 1 UBS Litigation (Special Turnover Motion

14

**Page 15 of 58**

at paragraph 3 **[MPMS-1/6]**). Despite establishing these various structures, and being bound by the rights and restrictions of having done so, my impression of Mr Dondero is that he is willing to subvert and seek to undo any lawful structure that he perceives is no longer serving his purposes.

40. One of the ways he appears to have sought to arrange his financial affairs was by establishing a U.S. domiciled charitable remainder trust (the "**Dondero CRT**") which he funded and received, as I understand it, the associated significant tax benefits of doing so. As Mr Patrick sets out in the Management Shareholder Affidavit, it was a legal requirement for the assets of the Dondero CRT to be donated for charitable purposes within a certain time. It was the Dondero CRT which transferred significant assets to CLO Holdco, Ltd. ("**CLO**"), one of the asset-holding vehicles now owned by DAF.

41. As Mr Patrick speaks to in paragraph 74 of the DFW Affidavit, once the Dondero CRT had transferred its assets to CLO, the Company gifted 300 participating shares to Dondero CRT and I understand that these shares were then gifted to the Highland Foundations. As is clear, this type of arrangement is materially different to an investor subscribing for shares or contributing capital as part of acquiring limited partnership interests in an exempted limited partnership.

42. Furthermore, as Mr Patrick also sets out in the DFW Affidavit, deriving the long-term tax benefits associated with a charitable structure like the DAF was heavily dependent on maintaining what Mr Patrick refers to as relinquishment of "dominion and control" by Mr Dondero. As I understand it, not only is this requirement critical from a U.S. taxation perspective, but any ongoing direct or indirect attempts by Mr Dondero or his associates to access or control the DAF risk exposing its assets (the assets that should be used to generate income for charitable purposes) to *alter ego* or subsequent transferee type claims that UBS are pursuing in the UBS Litigation.

15

43. The UBS Special Turnover Petition **[PM-1/8]** at paragraph 10 pleads:

> "*CLO HoldCo is a wholly owned subsidiary of Charitable DAF Fund, L.P. (the "DAF"), which **Dondero indirectly controls and has funded from his personal assets, his family trusts, and HCM**.*" (emphasis added)

44. For the aforementioned reasons, there were two underlying principles I have applied when approaching any issues with the Company and DAF Structure (1) ensure that the Company and DAF Structure are insulated from any interference, perceived or otherwise, from Mr Dondero and his affiliates, and (2) to protect and preserve the Company's and DAF Structure's charitable purpose. This is considering the various litigations the Company and DAF Structure may encounter and the serious legal and regulatory standards that must be followed whenever issues of charitable giving in the U.S. are encountered.

45. Far from the DAF Restructuring amounting to a purported fraudulent misappropriation of the Company's assets, it was a process formulated based on extensive advice to attenuate the negative and damaging impacts of Mr Dondero's behaviour and critically to maintain the DAF's charitable purpose through DFW as a completely unconnected entity. I now turn to explain the DAF Restructuring in further detail.

## V. The DAF Restructuring

46. The restructuring of the Company and DAF Structure was a conscious decision made by me and Mr Patrick to protect the assets of the DAF from anticipated and now actual actions to attempt to bring the DAF's assets within control of Mr Dondero and entities affiliated to him. There were four primary motivations for this:

46.1    any actions taken by Mr Dondero and the Highland Foundations could expose the Company, myself and Mr Patrick to potential breaches of various U.S. tax laws and regulations especially where Mr Dondero was seeking to exert "dominion and control" over the DAF's assets (see Doug Mancino letter to IRS dated 20 March 2025 **[PM-1/191-208]**);

16

46.2 any actions taken by Mr Dondero and the Highland Foundations in relation to the DAF's assets would significantly increase the likelihood of UBS and other parties to pursue claims that the Company and DAF's asset holding companies are "alter egos" of Mr Dondero (which, ironically based on our independent management, they are not);

46.3 Mr Patrick and I believed, and continue to believe that Mr Dondero is seeking to obtain access to the DAF's assets via the Company based on a flawed and counterintuitive factual and legal narrative around the Company's true purpose/status within the DAF Structure in order to (i) help satisfy a potential judgment debt in the UBS Litigation and other claims against him, (ii) bring to an end actions we have commenced against NexPoint entities that have defaulted in their obligations to DAF's subsidiaries including a recent settlement agreement in the Highland Bankruptcy that we believe Mr Dondero believes he is entitled to; and

46.4 the demanded misuse the DAF's assets to make investments into Mr Dondero's and NexPoint's asset management strategies which we have previously rejected as being inappropriate.

(the **"Dondero Concerns"**)

47. We started to formulate the protective measures in or around June 2024 based on concerns that the Highland Foundations would be used by Mr Dondero to indirectly exert control over the DAF. We hoped that the Highland Foundations would demonstrate their impartiality and not seek to "overreach" on behalf of Mr Dondero, however, based on my knowledge of how Mr Dondero has conducted himself throughout the UBS Litigation and Highland Bankruptcy, it would not have been prudent to proceed without a plan in place.

48. The DAF Restructuring contained four main phases:

48.1 Mr Patrick would resign his position at Skyview Group, an entity connected with Mr Dondero and his associated Mr Ellington and the Company would terminate its services agreement with Skyview Group, thereby creating independence between Mr Patrick and Skyview Group;

17

**Page 18 of 58**

48.2 formation of CDM which "sat" between the Company and DAF as of 18 December 2024 until 27 March 2025 (the **"CDM Restructuring"**);

48.3 issuance of Participating Shares to DFW on 7 February 2025 such that DFW became holder of 51% of the Participating Shares (**"DFW Share Issuance"**); and

48.4 redemption of the Company's interest in CDM for fair market value, final distribution to the Highland Foundations and putting the Company into voluntary liquidation (the **"Voluntary Liquidation"**).

(the **"DAF Restructuring Measures"**)

49. Our experience of Mr Dondero's *modus operandi* is that he will unwaveringly attempt influence or if that doesn't work sue anyone who opposes him, no matter how frivolous or vexatious and he will do so undeterred by findings of contempt. Literally anyone appointed to serve independent professional roles in any entity associated with him harbours the same well-founded apprehension. For example, in the Highland Bankruptcy, the reorganized HCM needed an independent board and CRO. The only way anyone was prepared to assume such positions was on the basis of prospective releases as found by the bankruptcy court: "*none of the independent directors would have taken on the role*" due to the "*litigation culture that enveloped Highland historically*" and "*[I]t was not * * * easy to get such highly qualified persons to serve as independent board members*" because of Highland's "*culture of constant litigation.*" and because they "*were worried about getting sued **no matter how defensible their efforts***" (HCM Stay Application p.7 **[PM-1/638]**, emphasis added).

50. Accordingly, we knew the DAF Restructuring Measures would inevitably be contested by Mr Dondero and the Highland Foundations at his direction, not because they were unlawful or improper but because of Mr Dondero's "*constant culture of litigation*" when he encounters anything he considers to be adverse to his personal interests.

51. At each step of the way, Mr Patrick and I as directors of the Company and other entities within the DAF Structure, were advised by experienced, highly competent and independent advisors over the course of several months and, upon advice of these advisors, I believed the DAF Restructuring Measures were in the best interests of the Company and DAF's asset holding

18

entities. I further believe that implementing the DAF Restructuring Measures were a lawful and proper exercise of my powers as a director. Needless to say, I reject any assertion that they was fraudulent or dishonest as Johnstone Law has alleged and I welcome scrutiny of the DAF Restructuring by independent professionals, free from any taint or control by Mr Dondero, actual or perceived, and indeed by this Honourable Court.

52. I now turn to the components of the DAF Restructuring Measures, except Mr Patrick's resignation from Skyview Group and termination of the Skyview Group services agreement, which is outlined in his evidence.

*(i)* *CDM Restructuring*

53. Following the break from Skyview on 2 October 2024, Mr Patrick and I suspected that Mr Dondero would seek retribution through attempting to exert improper control and influence over the Company and the DAF Structure which may include an attempt to bring the DAF's assets under his control whether directly or indirectly. This suspicion derives from the fact that Mr Dondero often attempted to use the arrangement with Skyview as a means of accessing the DAF via Mr Patrick.

54. A chronology of the most relevant actions taken against the DAF Structure by Mr Dondero, his affiliates and parties he controls, which includes the Highland Foundations, is summarised in an advice the Company received from Carrington Coleman dated 25 March 2025 (**"Carrington Coleman Advice"**) which was provided to the JOLs on 9 May 2025 **[PM-1/209-225]**).

55. To assist the Court, below I extract a summary of the relevant events from the Carrington Coleman Advice which led to the formation of CDM on 12 December 2024.The Carrington Coleman Advice and chronology was prepared on the basis of instructions from myself, Mr Patrick and the Company's then U.S. attorneys, Shields Legal, and is a true and accurate summary of the events to the best of my knowledge and belief:

55.1.   *"October 3-October 24, 2024: Chris Rice (a Skyview Group employee and a NexPoint employee) reaches out to SEI and convinces SEI to provide financial information relating to the DAF"*

19

**Page 20 of 58**

55.2.  "*October 10, 2024*:

*Mark Patrick meets with Julie Diaz of the Highland Dallas Foundation, Inc.*

*Mark Patrick has a telephone call with Debbie Wilkerson, the CEO of Highland Kansas City Foundation, Inc.*"

55.3  "*October 10, 2024: NexPoint ceases payments to DAF that NexPoint is contractually obligated to make regarding Small Bay II*"

55.4  "*October 14, 2024: Doug Mancino talks to Tammy Sims Johnson of the Highland Santa Barbara Foundation, Inc.*"

55.5  "*October 3-November 11, 2024: Supporting organizations hire H&K (including a litigator) to represent them*"

55.6  "*November 8, 2024: DAF effectively declines TCAL transaction proposed to Mark Patrick by Dondero because the economics were unfavorable for DAF*"

55.7  *November 11, 2024: Supporting organizations sign letter addressed to Paul Murphy, conspicuously not signed by Dondero. This letter is the first indication to DAF, Mark Patrick, Paul Murphy, and Doug Mancino that the supporting organizations have any issues, despite* (sic)[1]

55.8  *November 20, 2024: ValueScope and Doug Mancino make presentation to H&K, counsel to the supporting organizations*

56. Mr Patrick instructed ValueScope and Mr Mancino to make a presentation to the Highland Foundations on 20 November 2024. We had hoped they would recognise the damage being caused to the Company's and the DAF's charitable purpose by Mr Dondero's overreach, both in terms of exposure to Mr Dondero's investment propositions that we had turned down,

---

[1] This letter was not received by me until 6 December 2024. To the best of my knowledge and belief, neither the Company nor Mr Patrick had received a copy of this letter before 6 December 2024.

20

managing litigation the Company was exposed to and the tax implications for the Highland Foundations.

57. The ValueScope Reports **[PM-1/226-374]** was provided to the JOLs on 9 May 2025 and contains details of the Company's financial status and other relevant information (see screen shot of the data room **[MPMS-1/293-295]**).

58. In addition, I am aware that on 22 November 2024, Ashcroft Sutton Reyes LLC, a U.S. law firm that represents Mr Dondero and several of his trusts, reached out to the Company's U.S. attorneys, Carrington Coleman, to express purported concerns about the alleged mismanagement of the Company.

59. During this call, Ashcroft Sutton Reyes LLC indicated that Mr Dondero would provide Mr Patrick with an "exit ramp with significant comp and releases" and that Mr Dondero wanted to move quickly. I exhibit hereto a letter from Carrington Coleman confirming that such a proposal was made **[PM-1/209-225]**. Such an approach is characteristic of Mr Dondero's *modus operandi*; it was wholly inappropriate for someone who, having settled the Dondero CRT and derived significant tax benefits from relinquishing "dominion and control" over the assets ultimately transferred to the DAF Structure to be effectively trying to do the exact opposite. It is important to note that, to the best of my knowledge and belief, Ashcroft Sutton Reyes LLC does not act for the Highland Foundations, they represent Mr Dondero's personal and family interests.

60. The chronology in the Carrington Coleman Advice continues:

> "*December 6, 2024: Supporting organizations' letter received by Brian Shaw, counsel to DAF/Mark Patrick, who forwards it to Paul Murphy, who confirms he had not previously received it.*"

61. On 6 December 2024 I was forwarded a letter by the Company's U.S. attorneys purportedly signed by the Highland Foundations, dated 11 November 2024. It was addressed to me and expressed various concerns about the corporate governance of the Company and requested that the DAF Structure be equitably wound up (the **"Highland No Confidence Letter" [PM-1/682]**). It is important to note the Highland No Confidence Letter was dated 3 days after we had refused to participate in the TCAL transaction. Again, I see this as no coincidence.

21

62. Having received the Highland No Confidence Letter I formed the view that, in circumstances where we had commissioned the independent third-party report from ValueScope, delivered the presentation prepared by ValueScope and Mr Mancino and had declined to participate in the TCAL Transaction (as to which see the DFW Affidavit), it was important to attempt to impress upon the Highland Foundations my independent oversight of the Company and present to them as soon as possible.

63. The chronology in the Carrington Coleman Advice continues:

> "*December 11, 2024: DAF holds presentation with Paul Murphy re: corporate governance and investments. Walkers (Cayman counsel) also joins. H&K declines to hear from Walkers re: participation share rights.*"

64. I attach the slides I prepared for the presentation to Holland & Knight, the Highland Foundations' U.S. attorneys, on 11 December 2024 as **[PM-1/49-57]** (the **"PM Presentation Slides"**). The PM Presentation Slides were provided to the JOLs on 9 May 2025. The PM Presentation Slides are split into four sections dealing with Legacy Issues (pre-2021), Resolution of Legacy Issues, Issues Currently Facing the DAF and Future of the DAF.  In addition, Walkers also prepared presentation slides which addressed, *inter alia*, the rights of the Participating Shareholders and powers of the Directors. These slides are exhibited as **[PM-1/83-102]** (the **"Walkers Slides"**).

65. The meeting on 11 December 2024 was attended by me and the Company's legal representatives, namely Mr Mancino (as the US Company's tax and compliance attorney) and Barnaby Gowrie and Geoffry Sykes from Walkers as the Company's Cayman attorneys. For the Highland Foundations, Michael Stockham (litigation partner at Holland & Knight) and David Rosenberg (non-profit tax partner at Holland & Knight) attended. It was a video conference.

66. I would classify the presentation on 11 December 2024 as productive in so far as when I had concluded my aspect of the presentation, including fielding questions from Mr Stockham, Mr Stockham commented that he had read the constitutional documents of the Company and anticipated that Walkers would tell him that the Highland Foundations essentially had no rights. I would say that he had correctly anticipated the true legal position, however, again I

22

must emphasise that the Company was never an investor in the DAF; it was an entity through which discretionary charitable donations were made. Mr Stockham stated that if he was correct in that assumption, he suggested that we end the presentation on a "good" or "high" note and invited me to consider making the same presentation to the Dondero Foundations directly which I was happy to do.

67. Despite the meeting on 11 December 2024, Mr Patrick and I continued with our strategy of "hope for the best but plan for the worst" the "worst" in this case being an inappropriate attempt by the Highland Foundations to take control of the Company and the DAF's assets as per the Dondero Concerns.

68. I was satisfied that all Participating Shareholders of the Company had few, if any, legal rights in relation under the constitutional documents of the Company. I was also satisfied that their "economic rights" were consistent with their positions as recipients of discretionary charitable distributions. However, I am very familiar with the just and equitable winding up provisions of the Cayman Islands Companies Act and raised this with the Company's U.S. and Cayman Islands legal advisors as a potential avenue that Mr Dondero, through the Highland Foundations, could seek to misuse. Before the meeting on 11 December 2024, we had engaged Dorsey & Whitney LLP as Delaware counsel on the implications of forming an LLC in the State of Delaware to facilitate the protection of the DAF from attacks from Mr Dondero.

69. Despite what seemed to be a positive meeting on 11 December 2024, Mr Patrick and I considered it would be in the best interests of the DAF Structure (and by this, I mean in the best interests of preserving its assets and charitable purpose) to form CDM as a preemptive means of guarding against improper overreach by Mr Dondero. As I have referred to above in paragraph 35.1, taking prophylactic steps has been necessary and common place over the last 4 years when it comes to Mr Dondero due to his propensity to pursue vexatious claims. A copy of the Dorsey & Whitney advice is exhibited at **[PM-1/48]**.

70. On 12 December 2024, CDM was formed.

**Page 24 of 58**

71. Below I extract a summary of the relevant events from the Carrington Coleman Advice which led to execution of a Deed of Assignment and Assumption dated 18 December 2024 (**"Deed of Assignment and Assumption"**) executed by Holdco, CDM and GP:

   71.1. *"December 13, 2024: Doug Mancino emails H&K requesting withdrawal of the November 11 letter and proposing a path forward."*

   71.2. *"December 18, 2024: Doug Mancino follows up on his December 13, 2024, email."*

72. Having received no response from Holland & Knight in relation to the withdrawal of the Highland No Confidence Letter, on 18 December 2024 the Company, CDM and GP executed a Deed of Assignment and Assumption which I exhibit at **[PM-1/58-63]**.

73. The effect of the Deed of Assignment and Assumption was that the Company transferred the entirety of its interest in DAF to CDM. It is important to note that, at that time of the transfer, the Company continued to hold an indirect interest in the DAF Structure and in essence continued to serve as the channel through which any charitable distributions would be made.

74. Despite not being aware of this matter at the time, for reasons that will be explained below, I am now aware that on 18 December 2024, in a complicated matter arising from the Highland Bankruptcy, there was an issue being resolved before the Texas Bankruptcy Court in relation to Hunter Mountain Investment Trust (**"HMIT"** and the **"HMIT Hearing"**). Mr Patrick is the sole administrator of HMIT, and I believe this issue is relevant to the Dondero Concerns and the Highland Foundations approach during this period because it is an example of actions being taken that are adverse to Mr Dondero which in turn provoke a reaction.

75. The HMIT Hearing is a complex matter, but I will try and summarise the issues as simply as possible to demonstrate their interconnection with the uptick in Mr Dondero's focus on the DAF. During the Highland Bankruptcy, Highland CLO Management, Ltd (**"HCLOM"**), an affiliate/controlled party by Mr Dondero, asserted its right to a $12.6m receivable from the Highland Bankruptcy estate. Due to the genesis of HCLOM's claim, HCM (as controlled by James Seery, the Trustee in Bankruptcy in the Highland Bankruptcy) objected to the HCLOM claim and, on 21 November 2024, went as far as filing a "*Motion for (A) Bad Faith Finding*

24

*and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with the HCLOM Claims*" (the **"Bad Faith Motion"**).

76. On 18 December 2024, a hearing was conducted in the Bankruptcy Court where the court was tasked with resolving the Bad Faith Motion. The issue was resolved by attorneys for HCLOM seeking to settle the claim (thereby avoiding a bad faith finding) by agreeing that HCLOM would not form part of the Class 8 and Class 9 creditor classes but would form part of the Class 10 class. The issue was that HMIT, administered by Mr Patrick, formed part of Class 10. Any attempt by HCLOM to interpose its claim into Class 10 for the amount of the HCLOM claim would accordingly dilute HMIT's recoveries from the Highland Bankruptcy. HCLOM as an entity associated with Mr Dondero was a Class 11 creditor).

77. The Bankruptcy Judge was alive to this fact and asked attorneys appearing for HCLOM whether HMIT's consent, amongst other parties, would be required to finalise the settlement. Attorneys acting for HCLOM represented that no consent from HMIT was necessary. The order which was eventually made was that HCLOM's claim would be converted to a Class 10 interest in the amount of $10,140,633.26 which had the effect of diluting the HMIT interests in Class 10 interests by that amount (the **"HMIT Bankruptcy Issue"**).

78. The chronology in the Carrington Coleman Advice continues:

> "*December 19, 2024: David Rosenberg of H&K refuses to withdraw letter and discusses a presentation by Paul Murphy to the foundations.*"

79. As of the end of 2024, I continued to hope that the Highland Foundations would be persuaded to desist in their aggressive posturing and the Company could simply continue to facilitate the charitable purposes of the DAF such that distributions could continue to be made to the Highland Foundations. However, this hope was balanced with what I consider to be well-founded scepticism based on Mr Dondero's history of vexatious litigation.

80. I understand that Mr Patrick became aware of the HMIT Bankruptcy Issue towards the end of December 2024. For the remainder of 2024 and beginning of 2025, the HMIT Bankruptcy Issue was sought to be resolved with alternative counsel for HCLOM given the broad allegations that counsel for HCLOM had misrepresented and purported to consent to the entry

of HCLOM as a Class 10 interest on behalf of HMIT. It is important to remember that HCLOM was a party controlled by and affiliated with Mr Dondero. I return to the HMIT Bankruptcy Issue below.

*(ii) The DFW Share Issuance*

81. On 6 January 2025, I am aware that Carrington Coleman received an email from Ashcroft Sutton Reyes LLC stating that the "Charities", defined as Highland Dallas Foundation, Highland Kansas City Foundation and Highland Santa Barbara Foundation, had lost "confidence in the management and governance of the Charitable DAF" **[PM-1/64-65]**. This is despite the presentation I had made last year and my desire to present to the Highland Foundations directly.

82. Again, it is important to underscore that Ashcroft Sutton Reyes LLC, to the best of my knowledge and belief, does not represent the Highland Foundations and only represents Mr Dondero and his trusts. Therefore, the message that was being conveyed appeared to represent the position of Mr Dondero.

83. I formed the view that this was continuing evidence that Mr Dondero was driving the Highland Foundations' position and he was seeking to exert improper control and influence in order to claw back the assets which had been mandatorily received into the DAF Structure back in 2011 for charitable purposes.

84. Turning once again to the HMIT Bankruptcy Issue, on 10 January 2025, after threatening that HMIT would seek reconsideration of the Stipulation Order made as a result of the misrepresentations made at hearing on 18 December 2024, HCLOM was forced to agree that:

84.1   HMIT would pay 5% of any proceeds received on account of its Class 10 interests to HCLOM; and

84.2   NREA SB II Holdings, together with its successors and assigns (**"NexPoint Small Bay"**) would immediately pay $8,265,050.72 to Charitable DAF Holdings Corp. (**"DAF Corp"**) and Liberty CLO HoldCo, Ltd. (**"Liberty CLO"**), which are DAF subsidiaries.

26

**Page 27 of 58**

85. To be clear, NexPoint Small Bay had withheld payment of the aforementioned amount from DAF Corp and Liberty CLO, and both NexPoint Small Bay and HCLOM were entities controlled by Mr Dondero. Both Mr Patrick and I suspected that forcing NexPoint Small Bay to make this payment to DAF Corp and Liberty CLO would, in itself, infuriate Mr Dondero and would result in him taking some form of retaliatory action. We expected this would exacerbate the dubious allegations that were being made about the management of the Company and the DAF. We expected retaliation from his personal U.S. attorneys, the Highland Foundations and their attorneys.

86. As a result of this and the growing Dondero Concerns, Mr Patrick and I decided to put in motion the DFW Share Issuance and potential Participating Share valuation that would further serve as a legitimate means of protecting the DAF's assets and its charitable purposes.

87. On 21 January 2025, Mr Rosenberg emailed to canvass dates that I could potentially make a presentation to the Highland Foundations **[PM-1/66-69]**.

88. On 23 January 2025, Ms Diaz then sent an email, referred to and exhibited below, which was sent to an email address that Mr Patrick no longer used.

89. On 28 January 2025, Mr Patrick and I received the above-mentioned email from Julie Diaz (because she copied in-use email addresses) which is exhibited **[PM-1/75-76]**. This was in circumstances when attempts were still being made by Mr Mancino and Mr Rosenberg for me to make a presentation to the Highland Foundations.

90. Ms Diaz' email reiterates that we should 'wind up' the Company and 'distribute the assets.' This in and of itself is a misnomer as it appears to be premised upon the Company having assets to distribute. As Mr Patrick states in his Management Shareholder affidavit, as long ago as 2014, there was absolutely no misunderstanding about the Highland Foundations and therefore the Company having no proprietary interests in the DAF's assets and at most had an interest in being considered for discretionary charitable distributions from time to time.

91. I responded to Ms Diaz's email on 30 January 2025 a copy of which is exhibited at **[PM-1/72-75]**. Within that email I alluded to the fact that Mr Rosenburg had, as recently as 21 January 2025, confirmed that a Zoom conference call would be an effective way to address her concerns

27

**Page 28 of 58**

and move forward in a cooperative manner. In addition, I again invited her to withdraw the unfounded allegations made in the Highland No Confidence Letter and her email dated 28 January 2025.

92. On 31 January 2025, I received an email from Michael Stockham expressing that he was "appalled" by my response to Ms Diaz and reiterating previously voiced allegations **[PM-1/70-77]**.

93. I responded on 4 February 2025 outlining my own disbelief at why Mr Rosenberg had continued to progress my proposed presentation to the Highland Foundations on 21 January 2025 but, before anything could be timetabled, we then received the Ms Diaz email dated 23 January 2025. It struck me that there was a clear disconnect and potentially a deliberate one which involved an apparent strategy to build a record of making the same unfounded allegations repeatedly in the hope that they would start to gather momentum notwithstanding the fact that we had agreed a path forward to addressing any genuine concerns. Unfortunately, this had the hallmarks of the type of strategy Mr Dondero would formulate.

94. Given the position of Ms Diaz and Michael Stockham, I formed the view that the Highland Foundations had no genuine interest in seeking to resolve their perceived and unfounded grievances and Mr Patrick and I proceeded to execute the DFW Share Issuance.

95. The Company issued 318 Participating Shares to DFW on 7 February 2025. I exhibit copies of the Unanimous Written Resolutions of the Board of Directors of the Company **[PM-1/78-102]** which set out in detail:

95.1     The "Recent Developments" behind the reasons for the DFW Share Issuance.

95.2     US Counsel Tax Advice, which states that:

   i.   *"there is a significantly heightened risk that the Internal Revenue Service of the United States could severely penalize and/or revoke the tax-exempt status of one or more of the current Participating Shareholders, which could imperil the status and assets of the Company"; and*

   ii.  *"Increasing the number of Participating Shareholders would mitigate*

28

**Page 29 of 58**

*considerations of undue influence/private inureiment/private beneift and broaden the scope of DAF's charitable reach to the public; and*

iii. *"The IRS will look favorably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by James Dondero and the entities controled by him to use DAF for his private benefit and private inurement."*

95.3    Cayman Counsel's legal advice.

96. On the same day I received another email from Michael Stockham, a copy of which is at **[PM-1/103-112]**. This email again reiterates the perceived complaints by the Highland Foundations.

97. It was decided that it would be inappropriate for me to directly correspond with Michael Stockham and Mr Mancino subsequently wrote to Mr Stockham. A copy of that letter is exhibited at **[PM-1/166-167]**.

## VI. The Voluntary Liquidation

98. On 12 February 2025, I received an email from Johnstone Law where Mr Johnstone stated that he acted for "Charitable DAF Fund 2 LP" and inviting me to attend an urgent in person meeting **[PM-1/170]**. I was troubled by this email. I had no idea about the existence, purpose, ownership or management of a "Charitable DAF Fund 2 LP" ("**DAF 2**") not least as there was no such entity anywhere within the DAF Structure. I certainly had no understanding of how such an entity knew about the DAF, CLO Holdco and its assets and/or that I was a director.

99. I am aware that under Cayman Islands law, an exempted limited partnership is controlled and managed by its general partner who carries unlimited liability for the debts and obligations of the partnership. Mr Johnstone's email did not disclose the identity of DAF 2's general partner and said nothing about its purpose, management or assuming it was an investment fund, its investors.

100. I was also highly suspicious of the naming convention because I did not recall receiving any notice from the registry about the establishment of an exempted limited partnership which had such a similar name to the DAF. I hasten to add that, because Johnstone Law is a Cayman

Islands law firm, I assumed he was purporting to represent a Cayman Islands exempted limited partnership. In the light of the Dondero Concerns, I had a real sense of unease about this email.

101. I immediately forwarded the email to Walkers and asked them to conduct a registry search on DAF 2. My concerns were justified when it was found that DAF 2 did not exist on the register.

102. So that there could be no doubt in future, Mr Patrick and I caused "Charitable DAF Fund 2 LP" to be formed as an exempted limited partnership as of 13 February 2025 to safeguard against any person seeking to represent they acted for an entity which could be confused with DAF. I exhibit the relevant registration documents **[PM-1/113-119, 165]**.

103. I should also draw upon the existence of another dispute with Mr Dondero that had been developing since late 2024/early 2025 and resulted in the filing a claim against a Dondero-owned and controlled entity, NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC (**"NREP"**) on 13 February 2025.

104. The NREP filing was made on 13 February 2025, in case #25-BC01B-0004 before The Business Court of Texas, First Division, by Atlas IDF, LP, which is controlled by a DAF entity (its general partner). The NREP filing is exhibited at **[PM-1/120-164]**. The claim sought to collect on ~$13 million "on-demand notes" payable by and guaranteed by Dondero's family trust, The Dugaboy Investment Trust (the **"Dugaboy Trust"**).

105. Demand notes are as the name suggests payable upon demand, and NREP and Dugaboy failed to pay upon Atlas's demand. I discuss this case further below and how I believe it intersect with Mr Dondero and the Highland Foundations' retaliatory actions in respect of the Company and the DAF (**"NREP Litigation"**).

106. Walkers responded to Mr Johnstone on 14 February 2025 asking that all subsequent correspondence be sent to them. Mr Johnstone responded to Walkers on the same day seeking an in-person meeting **[PM-1/168]**. On 17 February 2025, Walkers sent an email to Mr Johnstone asking, *inter alia*:

1. *In which jurisdiction is DAF 2 registered;*

30

*2. When was DAF 2 registered;*

*3. What is DAF 2's primary business;*

*4. Who is DAF 2's ultimate beneficial owner;*

*5. Who are the individual/s who provide instructions to you on behalf of DAF 2;*

*6. What is DAF 2's relationship to Charitable DAF Fund LP; and*

*7. Please could you elaborate on the matters you wish to discuss, which we understand to be "matters related to DAF 1 and DAF 2" and "the current issues surrounding the Charitable DAF Foundation, LP".*

107. A copy of that correspondence is at **[PM-1/168]**.

108. No response was ever received from Johnstone Law.

109. I am aware the Kobre & Kim wrote to Johnstone Law on 20 May 2025 inviting them to confirm whether they have ever acted for Mr Dondero or any of his affiliates **[PM-1/608-609]**. Whilst Johnstone Law indicated on 22 May 2025 **[PM-1/617-619]** that they have not acted for *Mr Dondero* they have not confirmed whether that they have ever acted for any of his entities or affiliates.

110. To the extent I had any residual doubt in my mind about the Dondero Concerns and the overwhelming inference that Mr Dondero was seeking to improperly seize control of the Company and its assets, Mr Johnstone purporting to act for DAF 2, a partnership which seemingly does not exist was, in my opinion, an attempt to isolate me as an independent director; especially given that he failed to respond to Walkers' innocuous requests.

111. On 25 February 2025, in case #3:25-cv-477 before the United States District Court for the Northern District of Texas, Dallas Division, Liberty CLO, a company within the DAF Structure, filed a lawsuit seeking to collect on a ~$1 million debt following a breach of a promissory note from a Dondero-owned and controlled entity, Highland Capital Management Services, Inc. ("**HCMSI**"). I understand the broad allegations are that the breach of contract

31

occurred because Mr Dondero directed HCMSI to pay a close friend of Mr Dondero's the amount that would have been due to Liberty CLO so that Mr Dondero's close friend could pay his taxes.

112. To my mind, the preceding several months' interactions with Mr Dondero demonstrated (given his litigious *modus operandi*) there was a significant and tangible threat to the Company and the DAF Structure which had crystallised. This was reinforced by yet another letter from Michael Stockham on 27 February 2025 at **[PM-1/176]**.

113. Accordingly, Mr Patrick and I decided, after reviewing several options, that it was an appropriate course of action, for the Company and its relationship with the DAF Structure, to be terminated through Voluntary Liquidation. To be clear, this was not in any way to terminate the DAF's existence or overarching charitable purpose. On the contrary, it was to ensure its survival through DFW as a charitable foundation completely unconnected with Mr Dondero.

114. Before executing the voluntary liquidation, the staged process we conceived of is described below:

114.1 obtain two independent valuations for the interest the Company held in CDM; this inevitably meant carefully focusing on the true nature of the Company as well as the true nature of the Participating Shareholders' rights and interests in the Company;

114.2 redeem the Company's interest in CDM for fair market value;

114.3 distribute the fair market value of the Dondero Foundations' Participating Shares on a pro rata basis;

114.4 place the Company into voluntary liquidation and appoint independent liquidators to oversee the voluntary liquidation;

114.5 issue the equivalent of Participating Shares in CDM to DFW to preserve the DAF Structure's charitable purpose which would be thereafter executed through DFW as Indirect Beneficial Owner;

32

114.6    on all of the above actions, obtain legal advice from Cayman Islands counsel (including Kings Counsel's advice) and U.S. counsel on the legality of the proposed course of action.

115.    Throughout the course of March 2025, we executed the Voluntary Liquidation. Rather than set out the chronology in this affidavit, I believe that it would be more efficient to draw the Court's attention to the following documents  **[PM-1/389-429]**:

115.1    Written Consent of the Manager of CDMCFAD, LLC (27th March 2025) (**"Written Consent"**) which exhibits the following documents:

115.2    Admission Agreement – Admission of DFW as a new member of CDM (27th March 2025);

115.3    Redemption Agreement – Redemption of the Company for $1,637,192 (27th March 2025);

115.4    Seyfarth Shaw LLP Letter to IRS (20 March 2025);

115.5    Carrington Coleman Tax Advice (25 March 2025);

115.6    Vexatious Reply Brief;

115.7    Valuescope and FTI Consulting Valuations;

115.8    Directors' Resolutions re: voluntary liquidation (2nd April 2025);

115.9    Management Shareholder Resolution re: voluntary liquidation (2nd April 2025);

115.10    Declaration of Solvency (2nd April 2025);

115.11    Directors' Resolution re: dividend (2nd April 2025);

115.12    Liquidators' Consent to Act (2nd April 2025);

115.13    Kroll Engagement Letter (29th March 2025);

33

115.14    Letter Agreement re: undertakings (27th March 2025); and

115.15    Directors' Resolution re: Letter Agreement on undertakings (2nd April 2025).

(collectively, the **"Voluntary Liquidation Documents"**).

116. The Voluntary Liquidation Documents contain a large amount of information in relation to the Voluntary Liquidation that Mr Patrick and I executed. A summary of the Voluntary Liquidation Documents is as follows:

116.1    As of 27 March 2025, the sole member of CDM was the Company. CDM is governed by a Limited Liability Agreement dated 18 December 2024.

116.2    CDM determined, for reasons outlined in this Affidavit, the DFW and Management Shareholder Affidavits of Mark Patrick and as enunciated in recital 5 of the Written Consent, that:

> *"[T]he Manager* [Mr Patrick] *has formed the view that the Current Member* [the Company]*, by virtue of being a member of the Company* [CDM] *and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii);"*

116.3    Accordingly, on 27 March 2025, CDM admitted DFW as a new member entitled to 50% of the membership interests together with the Company for $1,637,192.

116.4    Immediately after admission of DFW as a new member, the Company's membership in CDM was redeemed for $1,637,192 and DFW was recorded as having 100% of the membership interests of CDM given that the Company's membership interests had been redeemed. The constitutional documents of the

Company do not provide that the Company had to consent or otherwise agree to the redemption.

117   The redemption of the Company's membership interests for $1,637,192 was based on two expert valuation reports by FTI Consulting and Valuescope which were prepared independently of each other.

118   The Company and CDM then executed a Letter Agreement whereby CDM undertook the obligations of various engagement agreements that the Company could possibly be liable for. It is important to note that to the best of my knowledge and belief the engagement agreements identified in the Letter Agreement had been discharged, however, as noted in the Letter Agreement, CDM would bear the responsibility for the agreements identified and any other contract that, in CDM's discretion, would achieve a solvent liquidation of the Company.

119   Thereafter, the Company executed an agreement with Kroll to undertake the voluntary liquidation of the Company on 29 March 2025 and, on 2 April 2025, executed the necessary directors' and management shareholder resolutions of the Company to put the Company into voluntary liquidation which included mine and Mr Patrick's declarations of solvency.

120   Neither Mr Patrick nor I had spoken to or otherwise communicated with Kroll before their appointment as voluntary liquidators. Kroll were recommended to us by Walkers who handled their engagement and cleared conflicts with them. The first contact I had with Kroll was 9 April 2025 when Walkers introduced them via email and, to the best of my knowledge and belief, neither the Company, Mr Patrick nor any other person associated with the Company had any contact with Kroll before 9 April 2025.

121   Although this may appear to be an innocuous observation, leading up to the voluntary liquidation, I had stressed two things to Mr Patrick and the Company's U.S. legal advisors. Firstly, it was important that independent voluntary liquidators come into the engagement with "fresh eyes" and free from any preconceived notions about the corporate actions we had undertaken in relation to the Company. Secondly, that Kroll were completely independent

35

and, although we would be able to explain how and why we had undertaken certain actions, Kroll could determine that those actions warranted greater scrutiny.

122   We did not provide notice of the Voluntary Liquidation to the Highland Foundations given the Dondero Concerns which, by reason of the Johnstone outreach on 12 February 2025 had become acute. Wires were sent out to the Highland Foundations for their pro rata share of $1,637,192 on 2 April 2025.

123   I understand that, upon their appointment, Kroll did not contact the Highland Foundations directly about the fact that the Company was in liquidation as of 2 April 2025. I am aware that Kroll put a notice in the Cayman Islands Gazette on 14 April 2025 and exhibit a copy at **[PM-1/433-434]**. I also understand that Kroll updated the Company's status on CAP, the Cayman Islands Corporate Administration Platform, on 3 April 2025, which would show to any person searching the portal that the Company was in voluntary liquidation. I understand that CAP may take several days to update and the status of the Company as being in voluntary liquidation may not have been updated as of 3 April 2025.

124   From 9 April 2025, when I was first introduced by email to Kroll, to 24 April 2025 when the Company's registered office received the just and equitable winding up petition and application for the appointment of provisional liquidators, Mr Patrick, I and the Company's legal advisors worked with Kroll to comply with all document and information requests.

## VII. Winding Up Petition, Joint Provisional Liquidation Application and Court Supervision Application.

125   On 24 April 2025, the Company's registered office was served with an application for the appointment of joint provisional liquidators (the **"JPL Application"**) and just and equitable winding up petition (the **"J&E Petition"**) by the Highland Foundations. The Highland Foundations were represented by Johnstone Law. The Highland Foundations had identified Margot MacInnis and Sandipan Bhowmik from Grant Thornton as proposed joint official liquidators. I appreciate that both Ms MacInnis and Mr Bhowmik accept their appointment in a personal capacity but, for the ease of convenience, I shall refer to them as **"Grant Thornton"** in the following paragraphs.

36

**Page 37 of 58**

126   The JPL Application and J&E Petition were supported by the affidavits of Julie Diaz and Mr Dondero, and I believe it is a fair characterisation of their evidence to say that it was premised on serious allegations of mismanagement and fraud in relation to the management of the Company. This came as no surprise given the actions of Mr Dondero, through his U.S. legal advisors outlined above, and the Highland Foundations, both directly and indirectly through their US legal advisors.

127   I add that it was also no surprise to discover that Johnstone Law had been appointed as the Highland Foundations' Cayman Islands attorneys given that they had purported to act for DAF 2 on 12th February 2025. My belief is that Mr Dondero is the common denominator behind Johnstone Law's engagement for both DAF 2 and the Highland Foundations given the surrounding circumstances I have outlined above.

128   Before the JPL Application and J&E Petition were served on 24 April 2025, Johnstone Law had emailed Walkers to ask if they were authorised to accept service of the aforementioned proceedings at 11.35am on 23 April 2025.

129   Walkers responded at 11.35am on 24 April 2025 to confirm the nature of the proceedings to be served. Johnstone Law responded at 11.46 am to state that, because of Walkers' failure to respond on 23 April 2025, they were in the course of serving proceedings at the Company's registered office. I received notification from Campbells, which was the Company's registered office, at 4.45pm that proceedings had been served.

130   On 25 April 2025, Walkers sent a letter to Johnstone Law which is exhibited at **[PM-1/435-436]**. In that letter, Walkers explained that:

130.1   the Company was already in voluntary liquidation as of 2 April 2025;

130.2   notice of the voluntary liquidation had been published in the Cayman Islands Gazette on 14 April 2025;

130.3   the only pre-action correspondence received were the emails outlined in the preceding paragraph as to service of proceedings; and

37

**Page 38 of 58**

130.4   given the Company was in voluntary liquidation, the JPL Application and J&E Petition should be withdrawn without delay and, if Johnstone Law's clients thought it appropriate, it was open to the Dondero Foundations to apply to put the voluntary liquidation under court supervision.

131   The JPL Application and J&E Petition were scheduled to be heard on 29 April 2025. On 27 April 2025, which was a Sunday, Mr Patrick sent an email to Mitchell Mansfield of Kroll as follows **[PM-1/439]**:

> "*Dear Voluntary Liquidators*
>
> *I write to you in my capacity as the management shareholder and director of the company. My fellow director, Paul Murphy, is copied to this email and agrees with its contents.*
>
> *Please note the following:*
>
> *The management shareholder of the company and its directors intend in providing cooperation to the voluntary liquidators in accordance with Cayman law.*
>
> *The management shareholder has no intention of taking any steps to remove the voluntary liquidators from office.*
>
> *Assuming the voluntary liquidators consider it appropriate having consulted with relevant stakeholders of the company, the management shareholder and the directors have no objections to the voluntary liquidators making the necessary court application to have the voluntary liquidation brought under the supervision of the Cayman Court.*
>
> *If you have any questions, please do not hesitate to contact me.*
>
> *Kind regards.*
>
> *Mark Patrick*
>
> *Management Shareholder*

132   Before I proceed to address the proceedings after 27 April 2025 it is important that I remind the Court of the NREP Litigation referred to in paragraph [99] above (claim for $13m filed on 13 February 2025 by DAF-owned entities against Mr Dondero-controlled entities). On 25 April 2025 at 1:46 pm, Stinson LLP acting for NREP and The Dugaboy Investment Trust sent an email to Carrington Coleman as follows (emphasis added):

38

**Page 39 of 58**

*"Dear all, I have just been informed that on April 29, 2025 there is a hearing in the Cayman Islands Grand Court for the appointment of joint provisional liquidators over the DAF Fund and its LP.* ***If the relief requested is granted, the existing powers of the management of these entities will be suspended pending final hearing, with the joint provisional liquidators assuming control of the Fund and with power to take control of its subsidiaries, including the Plaintiff here.*** *Could we move the status conference currently set for Monday April 28 at 9am to after the Cayman hearing so that it will be clear who is duly authorized to control Plaintiff?  Thanks very much, Deborah Deitsch-Perez"*

133   Stinson LLP acts for Mr Dondero and companies which he controls. To the best of my knowledge and belief, the Highland Foundations [are] only represented in the U.S. by Holland & Knight and were represented by Johnstone Law in the Cayman Islands. To my mind there is one of two explanations for Stinson's contemporaneous knowledge of Johnstone Law's filing of the PL Application and the J&E Petition. Firstly, that Stinson LLP has the capability and foresight to check Cayman Islands Court Registry filings on a seemingly daily basis for general purposes and came across the listed hearing for 29 April 2025. The second is that representatives or parties or law firms privy to discussions with the Highland Foundations told Stinson LLP about the filings and the hearing who then used this information in the NREP Litigation.

134   I believe this is a vivid illustration of using court processes for collateral purposes. NREP and The Dugaboy Investment Trust, two Dondero-entities, are clearly indebted to Atlas (a DAF-controlled entity) on the simple on-demand notes. Mr Dondero does not wish NREP and the Dugaboy Trust to satisfy their obligations to Atlas which gave rise to the litigation.

135   The court proceedings leading to the court supervision and appointment of Grant Thornton on 6 May 2025 are a matter of court record. However, I believe it is important that I outline my own position in respect of the JPL Application, J&E Petition, the making of the court supervision order and the discussions I had with Mr Patrick, DFW and the DAF Structure's various legal advisors (without waiving privilege).

136   I am familiar with Cayman Islands liquidations, the provisions of the Companies Winding Up Rules (**"CWR"**) and associated case law but defer to Kobre & Kim as my legal advisors on all matters of law.

39

137  My initial reaction to service of the JPL Application and J&E Petition was surprise given that neither Johnstone Law nor Grant Thornton had apparently checked the Cayman Islands Gazette or the CAPs portal before filing and serving the proceedings. Had they done so, I suspect Johnstone Law would have immediately reached out to Kroll given they were liquidators of the Company and had been since 2 April 2025.

138  The JPL Application seemed to be deficient because it failed to give at least 4 clear days' notice to the Company and did not contain any cross-undertaking in damages.

139  The J&E Petition also seemed to be deficient because it was not accompanied by a summons for directions.

140  The deficiencies seemed particularly relevant in this case because of the unusual nature of the dispute between DFW and the Management Shareholder on the one hand and the Highland Foundations and Mr Dondero on the other. The true nature of the claim was much closer to an *inter partes* dispute.

141  Despite these concerns and reservations, it seemed clear to me that the JPL Application and J&E Petition were redundant as highlighted by Walkers in their letter of 25 April 2025.

142  I did not attend the hearing on 29 April 2025.

143  I understand that the Court proceeded with the hearing and ordered that an application for court supervision and any attendant orders be made and heard on 6 May 2025. I have not seen a transcript of the hearing nor seen an order made at that hearing. Specifically, I was not made aware there was an order that any party wishing to file evidence had an opportunity to do so by 2 May 2025. This only came to my attention on 5 May 2025 when Bakers & Partners, attorneys for DFW, sent an email to Johnstone Law notifying them of their engagement and intention to appear at the hearing on 6 May 2025 and Bakers & Partners received an email from Johnstone Law on 5 May 2025 with the petition for court supervision (the **"Court Supervision Application"**) and associated documents.

40

**Page 41 of 58**

144   Unsurprisingly and non-contentiously, the Court Supervision Application sought orders that the voluntary liquidation be brought under supervision of the Court and Grant Thornton be appointed as joint official liquidators.

145   To the extent we were able, Mr Patrick and I conveyed to Walkers and Kroll that we had no objection to the voluntary liquidation being brought under court supervision or to the appointment of Grant Thornton.

146   This was not because I considered there to be any true or credible concerns over our management of the Company but because I knew that Mr Dondero was attempting to regain control of the DAF's assets and that having professional independent Court-supervised professionals analyse the genesis and long legacy of the Dondero Concerns as well as the DAF Restructuring would ultimately be a good thing.

147   After reviewing the Court Supervision Application I was, however, surprised to see the extent of the orders Johnstone Law and Grant Thornton were seeking from the Court. The J&E Petition sought orders that I understand to be as "standard" orders frequently made by the court upon appointment of official liquidators. The Court Supervision Application dramatically expanded on the orders sought in the J&E Petition, in particular, paragraphs 6 and 7 in the Court Supervision Application sought to empower Grant Thornton to commence a broad range of proceedings without further sanction of the Court and this included wide ranging powers in relation to the DAF Structure but without any accurate understanding of its operation or discretionary charitable purposes. I do not understand there to have been any submissions made as to the legal basis for including paragraphs 6 and 7 in the supervision order.

148   Mr Patrick and I spoke to both Walkers and Bakers & Partners about the orders sought and Mr Patrick, on behalf of DFW, instructed Bakers & Partners to object to expansive nature of the orders sought on the basis of the CWR and approach adopted by the Cayman Islands courts in assessing powers official liquidators would normally obtain at the first hearing of an official liquidation application which, I understand, are the statutory powers granted pursuant Schedule 3, Part II of the Companies Act with a view to extended the scope of those powers after the official liquidators have completed their initial investigations.

**2025-06-04**

149   Again, I highlight the fact that neither Mr Patrick nor I were aware of the order allowing any party to serve evidence by 2 May 2025. Had I known, I would have prepared an affidavit refuting the allegations in Mr Dondero and Ms Diaz's affidavits and broad grounds for doing so.

150   In addition, I would have noted that I would not have objected to the Court Supervision Application, the appointment of Grant Thornton and insofar as necessary would have proposed entering into a protocol with Grant Thornton, upon their appointment, to ensure they could take confidence that the DAF Structure's assets (in which the Company does not have an interest) would continue to be managed in the ordinary course of business which would include reporting on the DAF Structure's assets. I note that the proposal for a protocol has since been made to Grant Thornton by the DAF which is addressed later in this affidavit.

151   I finally comment that Mr Patrick and I had concerns that Grant Thornton may consider the appointment of Johnstone Law as their Cayman Islands attorneys. I am familiar with the Cayman Islands Code of Conduct and the provisions of Rule 8.04 which are as follows (emphasis added):

"*Rule 8.04*

***An attorney must not attack a person's reputation without good cause nor make any allegation of fraud or dishonesty unless he has clear instructions to do so and has satisfied himself that there is reasonably credible material supporting a prima facie case.***

*Commentary*

*(1) This rule applies equally both in court during the course of proceedings and out of court by inclusion of statements in documents which are to be filed in the court.*

*(2) An attorney should not be a party to the filing of a pleading or other court document containing an allegation of fraud, dishonesty, undue influence, duress **unless the attorney has first satisfied himself or herself that it is necessary relevant and material and that there is reasonably credible material to support the allegation**. For an attorney to allow such an allegation to be made, without the fullest investigation, could be an abuse of the protection which the law affords to the attorney in the drawing and filing of pleadings and other court documents.*

*(3) An attorney should not permit to be filed or used in proceedings or in evidence an affidavit or witness statement including any statements of fact other than those which he reasonably*

42

**Page 43 of 58**

*believes on his instructions would be given in evidence by the witness in live testimony or which are included in the affidavit subject to confirmation by the client as to its accuracy.*

152 As of 6 May 2025, it seemed to me that, in purporting to discharge their professional obligations pursuant to the Code of Conduct, Johnstone Law, and specifically Mr Johnstone, must have satisfied themselves there was "a prima facie case" on the basis of "reasonably credible material".

153 In those circumstances it seemed self-evident that it would be entirely inappropriate for Grant Thornton to engage Johnstone Law as their independent attorneys; Johnstone Law's independence had been compromised as soon as they had satisfied themselves there was a "prima facie" case to allege fraud Indeed, this was the basis upon which Johnstone Law presented the J&E Petition. I do not believe Johnstone Law can independently advise the JOLs on the DAF Restructuring because they have already advised and ethically committed themselves to allegations of fraud which have not been withdrawn. Whilst those allegations remain outstanding, Johnstone Law are conflicted from advising the JOLs that the DAF Restructuring may be entirely legitimate and the relevant facts surrounding it consistent with innocence rather than wrongdoing. As I understand it, Johnstone Law maintain after having been retained by the JOLs that the "*only reasonable inference*" is that the DAF Restructuring was fraudulent (see letter from Johnstone Law dated 22 May 2025 **[PM-1/617-619]**).

154 I understand that Bakers & Partners, in addition to objecting to certain terms of the order sought, also brought to the Court's attention that if Grant Thornton sought to appoint Johnstone Law, DFW would object. I further understand that Grant Thornton confirmed that, although Reed Smith had been identified as US counsel, no decision had yet been made as to Grant Thornton's Cayman Islands counsel.

155 The court supervision order was made on 6 May 2025 and Grant Thornton were appointed. Despite not being aware of this at the time, I note that Grant Thornton purported to enter into a letter of engagement with Johnstone Law, as their Cayman Islands attorneys, the following day, 7 May 2025, which was only disclosed 2 weeks later on 20 May 2025. I will now refer to Grant Thornton as the JOLs.

**VIII. Dealings with the JOLS, Johnstone Law and Reed Smith**

156  Starting at 7.59 pm on 6 May 2025, I received a number of emails attaching notices of the appointment of the JOLs in relation to the following entities:

> 156.1  HCT Holdco 2 Ltd. at 7.59 pm.
>
> 156.2  Liberty CLO HoldCo Ltd. at 7.59 pm.
>
> 156.3  Liberty Sub Ltd. at 7.59 pm.
>
> 156.4  MGM Studios Holdco Ltd. at 8.00 pm.
>
> 156.5  Charitable DAF Fund 2 LP at 8.00 pm.
>
> 156.6  CLO HoldCo, Ltd. at 8.00 pm.

157  I then received a notice of appointment of the JOLs for the Company at 9.21 pm which was followed by two subsequent emails contained notices of appointment for CDH GP Ltd. at 9.36 pm and Charitable DAF Fund, LP at 9.54 pm.

158  I make no comment in relation to the sequencing of these emails other than it seemed clear that the JOLs had prepared notices in relation to entities within the DAF Structure, the majority of which they chose to send before the notice of appointment in relation to the Company.

159  At 9.58 am on 7 May 2025, after reviewing the attachments and other associated requests in the JOLs emails, I sent an email to Michael Aquino from Grant Thornton and the Grant Thornton "CDAF Core" email group as follows (a copy is attached at **[PM-1/440]**:

*Hi Michael and Grant Thornton team,*

*Just confirming receipt of a number of letters received by email yesterday evening in relation to:*

*1.     Charitable DAF HoldCo, Ltd. (to the company and myself as director); and*

> 2.      *Charitable DAF Fund LP, CDH GP, CLO HoldCo, Charitable DAF Fund 2 LP, MGM Studios, Liberty Sub, Liberty CLO HoldCo and HCT Holdco 2 (not given full legal titles but should be able to identify).*

> *I'm reviewing the correspondence and should be in a position to respond more substantively during the course of the day but, for the time being, please be assured that I acknowledge appointment of the liquidators in relation to Charitable DAF HoldCo, Ltd. and my statutory duties pursuant to that appointment.*

> *Many thanks,*

> *Paul."*

160  In response to my email, Brad Graham wrote to me at 3.41 pm thanking me for my email and asking for my availability to have a call on 8 May 2025 at 12 pm or 9 May 2025 at 2.30 pm. At 4.26 pm, I responded to say that I would make myself available at either time, but I hoped to have a more comprehensive response to the JOLs' correspondence within the next few hours. At 9.21 pm I sent the email below which is exhibited with the entire email chain at **[PM-1/580]** but copied for ease of convenience below:

> *"Dear Grant Thornton Team,*

> *I'm writing on behalf of myself but copied Mark Patrick because it also reflects his position (please note that the email mark@charitabledaf.com is no longer in use and Mark's email copied should be used going forward). Also copied to this email is Peter Tyers-Smith (Kobre & Kim) who is in the process of being engaged to act for (i) Mark and me as former directors, and (ii) Mark in his capacity as Management Shareholder of Charitable DAF HoldCo, Ltd (the "Company"). Please kindly ensure Peter is copied on all correspondence moving forward.*

> ***Proceedings to date***

> *Since being served with the Just & Equitable Winding Up Petition and Application for Appointment of Provisional Liquidators on 24th May 2025, we have been reviewing the materials carefully and are preparing a detailed response to the allegations made by the Participating Shareholders Andrew Johnstone purports to represent. Our hesitation over exactly whose interests Mr Johnstone is advancing will be developed in due course but we wish to note that on 12 February 2025, we received an email from him indicating he represented "Charitable DAF Fund 2 LP" which we strongly suspect is a new Exempted Limited Partnership established by James Dondero. The allegations made, for the avoidance of doubt, are denied in their entirety and have no reasonable basis. We are aware that Andrew Johnstone has been aggressively pursuing his clients' case at the hearings on 29th May and 6th April 2025. Of concern is that we understand that former management of the Company were critcised by him for not providing any evidence at the hearing on 6th April.*

*To make our position clear, Andrew Johnstone wrote to Walkers on 23rd May 2025 to ascertain whether they would accept service of proceedings. When asked about the nature of the proceedings he did not respond. We also understand that Andrew Johnstone did not check the status of company on CORIS or the advertisement in the Cayman Islands Gazette before filing the Petition or JPL application (we understand that Kroll, as Voluntary Liquidators, did not view it as necessary to inform the Participating Shareholders of the fact the Company had been put into voluntary liquidation). Please see attached correspondence from Walkers to Andrew Johnstone dated 25th April 2025 ("Walkers' Letter") which confirms these points.*

*Having been served with the proceedings at Campbells, the Company's former registered office, our position, which primarily concerns Mark's status as Management Shareholder, is that we had no objection to the Company being put into Court Supervised liquidation. This was explicitly stated to Andrew Johnstone (see Walkers' Letter). In addition, it was later confirmed that Mark had no objection to the appointment of yourselves as joint official liquidators.*

*We had understood that, on the basis there was no objection to Court Supervised liquidation or appointment of GT as official liquidators, the only issue before the court was the nature of the directions sought. Neither Mark nor I were aware of the directions sought until 5th May 2025 when we also discovered there was a direction that any evidence in response to the Court Supervision application was to be filed and served by 2nd May 2025. Had we been aware of that direction we would have filed a short affidavit denying the allegations and welcoming a thorough investigation into what we believe is a complicated dispute.*

*The foregoing is largely moot but will hopefully explain why former management did not actively participate in the proceedings to date*

*<u>**Brief synopsis of former management's position**</u>*

*We are confident you will have conducted KYC on James Dondero who is funding the Participating Shareholders ("JD Participating Shareholders"). However, in our exercise of collecting in the Company's books and records, we will be sending a large amount of information from various legal proceedings involving Mr. Dondero but attached to this email are:*

*1.      A public complaint filed last year by Highland Employee Retention Assets LLC against Mr. Dondero et al. which contains a helpful summary of 5 cases Mr. Dondero is either facing or had determinations made against him (see page 36 onwards). These include fraud and asset stripping from parties he perceived had aggrieved him.*

*2.      An order by Hon. Melissa A. Crane from the Supreme Court of the State of New York dated 16th April 2025 in a case brought by UBS Securities LLC, UBS AG London Branch against Mr. Dondero et al. for a $1b fraud claim (n.b. this is a broad summary of the allegations made by UBS against Mr. Dondero). This case is likely to be*

46

*determined by Hon. Melissa A. Crane shortly after 14th May 2025 and may result in judgement against Mr. Dondero of c. $1b.*

*We draw this to your attention at an early stage because former management have been cognizant of these, and many other legal proceedings, affecting Mr. Dondero. The steps taken by former management have all been taken against a backdrop of well-founded evidence that the JD Participating Shareholders are being controlled by Mr. Dondero in an effort to misappropriate the Company's assets and undermine the Company's charitable purposes. In addition, it is important you are aware that entities within the former structure are pursuing claims against Mr. Dondero for $14m and Mr. Dondero's legal representatives have recently sought to undermine those claims on the basis that the Company is in liquidation.*

*Although these are some of the concerns driving former management's actions, there are many other instances of grievances by Mr. Dondero that have informed our views and decisions.*

*<u>Introductory Call</u>*

*Mark is unavailable on Friday, 9th May but can be available for a call on Thursday, 8th May.*

*I am available on either day and, being based in the Cayman Islands, can attend your offices in Cayman.*

*However, can I propose an alternative course of action? We have been pulling together what we consider are "key documents" which will go a long way to explaining the position and actions of former management. These materials are voluminous and contain detailed expert opinions on actions we undertook. We expect to have this material to you by no later than close of business on 9th May but hope to have it with you by close of business tomorrow.*

*You may find it more helpful to review these documents and schedule a call early next week when you have a better idea of what former management did and why. Suffice to say, any actions were not taken in a vacuum and were carefully considered in consultation with third party expert advisors.*

*Please let us know how you wish to proceed.*

*Kind regards,*

*Paul.*

161    Exhibited at **[PM-1/447-575]** are copies of the attachments sent to the JOLs.

162    I heard nothing from the JOLs until 9 May 2025, so I sent a chaser email in the following terms:

*"Dear Grant Thornton Team,*

*The documents referenced in my email will be with you shortly but please can you confirm you're ok with accepting them through share file?*

*In addition, please can you let me know about the proposed introduction call? I'm aware that yesterday's proposed time went by and would like to get something sorted as soon as you're able.*

*Many thanks,*
*Paul."*

163   Additional correspondence between myself and the JOLs on 9 May 2025 essentially confirmed that the JOLs were happy to have a meeting on 14 May 2025 and at 1.24 pm on the same day, Shields Legal, the Company's now former US attorneys in Texas, sent a Secure Docs link to the Grant Thornton team. Grant Thornton acknowledged they were able to access and log into the data site at 4.56 pm. I have already exhibited an inventory of the documents disclosed.

164   At 4.41 pm, Ms MacInnis sent a letter to me containing a number of information requests that I was requested to respond to by 14th May 2025. I responded at 5.21 pm on the same day in the following terms:

*"Thanks Margot,*

*We'll reasonable inference, I suspect these documents will fill in a lot of the blanks (or at least start to). Can I respectfully suggest that documents you may find useful as a starting point are:*

*1.   Tab 440.2.8 which is advice from Carrington Coleman that contains a chronology of events up to 25 March 2025; and*

*2.   Tab 440.2.21 which is a letter the Company's charitable tax attorney sent to the IRS re: James Dondero Participating Shareholders.*

*I've not provided any commentary but if I was approaching this to understand the motivations and drivers of former management I'd be grateful to have been pointed in this direction by way of a summary of some of the key events.*

*On the meeting, is there any chance you could do after 2.30pm? Pete has a conflict between 12 – 2.30 and I'd like him to attend. This is just so I don't have to provide him*

48

*feedback on the meeting and should not be construed as a defensive measure – nothing could be further from my intention.*

*Have a great weekend and let me know if there's anything else I can help with.*

*Kind regards,*

*Paul.*"

165   I am aware that the JOLs have criticised me for being uncooperative which includes the suggestion that I have provided only standard books and records and cancelling the meeting scheduled for 14 May 2025. I consider it important to explain my stance following events that transpired on 12 May 2025 and the meeting the JOLs arranged with Mr. Mancino.

166   My concern leading to the appointment of the JOLs was that Mr Dondero would take steps to assert control and influence over the liquidation, in particular I was concerned one of the ways this could be accomplished was by Johnstone Law attempting to be appointed as attorneys to the JOLs. This is why Mr Patrick caused Bakers & Partners to make representations at the Court Supervision Application in relation to any attempts to appoint them. Those concerns, as of 6 May 2025, were based on the following reasons:

166.1   Johnstone Law had purported to represent DAF 2, a seemingly non-existent limited partnership which. When challenged about his purported representation by Walkers he did not respond and, to this date, has not provided an answer as to who his purported client was. Against the backdrop of the Dondero Concerns, I feel justified in drawing the conclusion that it was an attempt to further Mr Dondero's agenda via an alternative avenue i.e. outside of the Highland Foundations. I further note that this was also brought to the attention of the JOLs on 7 May 2025 in my email to the JOLs;

166.2   In my opinion, there existed, and continues to exist, a clear and irreconcilable conflict based on the determinations Johnstone Law must have made pursuant to the Code of Conduct and his professional obligations, at that time, to the Highland Foundations, and his ability, perceived or otherwise, to now, independently, the JOLs; and

49

166.3   The orders sought by Johnstone Law in the Court Supervision Application were a vast extension of the powers originally sought in the J&E Petition. Based on the orders sought in the Court Supervision Application I formed the view that Johnstone Law had presented what I think of as a "pre-conceived" liquidation strategy. By that I mean that, rather than advising the JOLs to conduct an independent investigation of the Company and its affairs and then seek appropriate sanction, from the terms of the Court Supervision Application sought by Johnstone Law, there is a reasonable inference to draw that the agenda they were promoting was a swift and decisive attempt to have the JOLs adopt the position that the Company stood in a conventional investment position with the DAF and that its economic interests had somehow been mismanaged or misappropriated without having conducted anything like an independent investigation.

(the **"Johnstone Concerns"**)

167   As per Andrew Johnstone's representations in Court on 6 May 2025 that the JOLs had made no determination as to their Cayman Islands attorneys, which I understand was also based on instructions in Court from Mr Bhowmik, I was hopeful that the liquidation would be conducted in a fair and impartial manner and on the basis of a willingness to carefully and thoroughly analyse the Dondero Concerns.

168   However, I am aware that on 12 May 2025, the JOLs had arranged a video call with Mr Mancino, the Company's former U.S. tax and charitable attorney. During the course of the afternoon on 12 May 2025, I learned that Andrew Johnstone was also on that call. Upon further inquiry, I was told by U.S. counsel that they had been told by Mr Mancino that Andrew Johnstone had not been introduced in his capacity as counsel to the JOLs. I understand that there is a divergence of recollection between the JOLs, Andrew Johnstone and Mr Mancino in that the JOLs and Andrew Johnstone recollect introducing Mr Johnstone as attorneys for the JOLs and Mr Mancino shares no such recollection.

**Page 51 of 58**

169   I am now aware that Mr Mancino sent an email to the JOLs to establish who was on the call and Ms MacInnis responded that Andrew Johnstone had attended in his capacity at the JOLs' Cayman Islands attorney.

170   To my mind, for Mr Mancino, a well-respected U.S. tax and non-profit attorney of over 50 years, to send an email asking the JOLs seeking clarification as to who attended the call is perhaps telling in the circumstances. This was deeply concerning.

171   Having received no notice of a sanction application to appoint Johnstone Law, especially in circumstances where I understand that the Court commented that any application for the sanction to engage Cayman Islands counsel must be made in the proper manner, I was immediately concerned about the manner in which both Johnstone Law and the JOLs were conducting the liquidation.

172   I now turn to the events after 12th May 2025 which I hope to shorten given my understanding that the Court has been provided with copies of correspondence between Bakers & Partners, Kobre & Kim, Johnstone Law and the JOLs since that date.

173   To summarise that correspondence which is exhibited in full at **[PM-1/585-601]**:

173.1   14th May 2025 – Letter from Bakers & Partners to JOLs re: concerns regarding Andrew Johnstone's attendance at meeting on 12th May 2025.

173.2   14th May 2025 – Letter from Kobre & Kim to JOLs re: concerns regarding Andrew Johnstone's attendance at meeting on 12th May 2025 and postponing my meeting with the JOLs on 14th May 2025.

173.3   14th May 2025 – Letter from JOLs to Kobre & Kim re: my non-attendance at meeting with JOLs and requests for information.

173.4   14th May 2025 – Second letter from Kobre & Kim asking JOLs to answer question of in what capacity did Andrew Johnstone attend the meeting on 12th May 2025.

173.5   16th May 2025 – Letter from Kobre & Kim to JOLs asking for a response to their letter of 14th May 2025.

51

**Page 52 of 58**

173.6    17th May 2025 – email from Bakers & Partners chasing a response to their letter of 14th May 2025.

174    The Court may recall that 17 May 2025 was a Saturday and Monday 19th May 2025 was a public holiday in the Cayman Islands.

175    As of 7.37 am on Tuesday 20 May 2025, I still had no clear idea of the status of Johnstone Law's involvement. Mr Mancino had been told that Johnstone Law had been engaged by the JOLs as counsel to the JOLs. Bakers & Partners had been told the JOLs were seeking to engage Johnstone Law.

176    At 7.38 am on 20 May 2025, Bakers & Partners and Kobre & Kim then received an email from Johnstone Law attaching letter regarding a purported sanction application attached at **[PM-1/601-604]** (**"JL Sanction Letter"**).

177    Despite (i) raising concerns over Johnstone Laws' appointment at the Court Supervision Application, and (ii) the raft of correspondence from Bakers & Partners and Kobre & Kim following the meeting between Mr Mancino, the JOLs and Andrew Johnstone on 12th May 2025, it was disconcerting that Johnstone Law and the JOLs had seemingly seen fit to make an application "on the papers" and without notice to DFW or Mr Patrick, in his capacity as Management Shareholder, to sanction the appointment of Johnstone Law as attorney to the JOLs. It appears that the application was made by letter dated 13 May 2025. That has been withheld by Johnstone Law so I cannot comment on what the Court was being invited to do in that letter. It is however clear that on 14 May 2025 (the day after the Letter Application had been filed), Kobre & Kim had asked the JOLs, twice, for clarification about Johnstone Law. They asked again on 16 May 2025 (3 days after the Letter Application had been filed and the same day this Honourable Court directed service).

178    Of additional concern is that, despite the JOLs knowing that DFW would object to an attempt by the JOLs to appoint Johnstone Law on 6 May 2025, the JOLs saw fit to execute an engagement letter with Johnstone Law the following day on 7 May 2025 without any notice and seemingly without any enquiry as to whether any other independent law firm in the Cayman Islands was available to act.

179   Johnstone Law and the JOLs seek, in my opinion, to justify this by stating that the engagement letter was executed subject to sanction of the Court. There are no such provisions in the engagement letter. These issues are increasingly relevant in circumstances where the Learned Judge at the Court Sanction Application commented that any such application must be made in the "normal" or "proper" manner.

180   I now turn to the conduct of Johnstone Law and the JOLs after Andrew Johnstone's email of 7.38 am on 20 May 2025.

181   In the JL Sanction Letter, Johnstone Law had explained that the Learned Judge had directed that the sanction application be served on all parties and that the JOLs and all parties attempt to agree directions by 4pm on 21 May 2025. Having failed to send a copy of the sanction application or any evidence in support with the JL Sanction Letter, bearing in mind that the JOLs and Johnstone Law knew about the issues with their appointment, both Kobre & Kim and Bakers & Partners wrote to the JOLs and Johnstone Law respectively on 20 May 2025.

182   Copies of Kobre & Kim's letter to the Johnstone Law is attached at **[PM-1/608-609]**. Importantly both letters pointed out that, absent a copy of the sanction application and evidence, it would be futile to attempt to agree directions and that the JOLs and Johnstone Law should serve the application and evidence as soon as possible to try and adhere to the Court's direction.

183   On 21 May 2025, Kobre & Kim received a letter from the JOLs responding to Kobre & Kim's letter of 14 and 16 May 2025. To the extent the most pressing issue before the JOLs was arguably the agreement of directions for the hearing of the sanction application as per Kobre & Kim's letter dated 20 May 2025, they did not comment or engage on the directions. The focus of their letter was to request that the meeting cancelled by me on 14 May 2025 was urgently rescheduled.

184   Frankly, I regard that request as disingenuous. The JOLs have not once sought to address why on 14 May 2025 they did not simply reveal they had engaged Johnstone Law 7 days earlier or that they had filed an application for sanction on 13 May 2025.

53

185    I have no doubt that the JOLs will adopt the position that they were under no obligation to do so. With respect, if that is the position they adopt, then my confidence in their ability to conduct the liquidation on an even-handed and principled basis will dramatically decrease.

186    Remarkably, no response was received from the JOLs or Johnstone Law to the requests for copies of the sanction application or evidence in support by 3.45 pm on 21st May 2025. In those circumstances, Baker & Partners sent a letter to the Court to explain why it had been impossible to agree directions as well as other concerns about the sanction for the engagement of Johnstone Law.

187    At 4.32 pm, Johnstone Law responded to Baker & Partners letter to the Court. The text of that email reads as follows:

> "*Dear Ms Cox*
>
> *The writer is at a wedding in Greece (a time zone 8 hours ahead of Cayman) and unfortunately presently without a WiFi connection. We will be responding to the correspondence from Baker and Partners first thing tomorrow, and would respectfully ask that the honourable Judge (if minded to do so) reply only after we have had an opportunity to set out the JOLs' position.*
>
> *In addition, the letter from Baker and Partners repeats a number of baseless, unsubstantiated and inaccurate criticisms of Johnstone Law and the writer, to which we we* (sic) *would be grateful to have an opportunity to respond before any direction is given by the Court.*
>
> *Kind regards*
>
> *Andrew*"

188    I find this email surprising. Having been directed to serve the application on 16 May 2025, Johnstone Law did not do so until late in the afternoon on 22 May 2025. No effort was made to attempt to agree directions as directed by the Court and accordingly Baker & Partners and Kobre & Kim sought to do what they could in the absence of the application papers.

189    The Court is aware of the subsequent direction to attend a hearing for directions on 23 May 2025 and the orders made at that hearing but I do note, as the Court is aware, that Johnstone Law did not circulate a copy of the order even though representatives in Court confirmed they would do so that afternoon.

**Page 55 of 58**

190    Not only was there a failure to do that, Johnstone Law sent an order to Court on 27 May 2025 without previously circulating to Kobre & Kim or Bakers & Partners.

191    Finally, I outline my position in relation to the application for sanction of the JOLs to engage US counsel. As I have set out at Section II of this affidavit, I have no issue with the JOLs carefully and closely scrutinizing the implementation of the DAF Restructuring and that they should have the benefit of legal advice when doing so. Furthermore, I entirely welcome close scrutiny of the allegations of fraud, mismanagement and the DAF Restructuring by a judicial process.

192    In the circumstances of the present liquidation, I respectfully suggest that any actions taken by the JOLs must necessarily be informed only when a determination has been made in relation to Mr Dondero's and the Highland Foundations' allegations of fraud, mismanagement regarding DAF Restructuring (the **"Foundational Issues"**). The Foundational Issues will either be resolved against DFW and the Management Shareholder in which case the JOLs may well be advised by Cayman Islands counsel to engage US attorneys in order to recover assets. Alternatively, the Foundational Issues will, as I believe they will be, resolved in favour of DFW and Management Shareholder in which case the JOLs may be advised that it is appropriate to proceed to dissolve the Company.

193    No doubt, Mr Dondero, the Highland Foundations and Johnstone Law believe the Foundational Issues will be resolved in their favour. I do not. However the Foundational Issues are ultimately resolved, I am aware that Campbells, Cayman Islands attorneys for CDM, have written to the JOLs and Johnstone Law in the following terms (**PM/597**):

193.1    Letter to JOLs 16th May 2025:

> *"[in] an effort to assuage any concerns the JOLs may have regarding the commercial activities of the Fund and the risk of dissipation of assets outside of the ordinary course of business, the CDM Entities would be prepared to enter into a form of Protocol which provided for, amongst other necessary and appropriate terms, the reporting of material transactions on the basis that such information was held confidentially by the JOLs. We would be happy to discuss the terms of that Protocol in further detail."*

55

**Page 56 of 58**

193.2   Letter from Johnstone Law to Campbells 22nd May 2025. No response was received to the proposed protocol.

193.3   Letter from Johnstone Law to Campbells 30th May 2025. No response was received to the proposed protocol but Johnstone Law writes (emphasis added):

> "*In particular, it has come to our attention that your clients have, since the date of the Letter, sought approval of a transaction involving Hunter Mountain Investment Trust without consultation with the JOLs. **The JOLs assert proprietary claims over all assets held by the Fund and any transaction involving the Fund's assets must therefore be undertaken only on notice to the JOLs**.*"

194   Firstly, Johnstone Law make reference to a lawfully sanctioned application in relation to Hunter Mountain Investment Trust that is controlled by Mr Patrick and inures to the ultimate benefit of CDM and its charitable purposes. This is a transaction supported by the independent Trustee in Bankruptcy, James Seery, and the Bankruptcy Judge. It is unclear how Johnstone Law, as Cayman Islands attorneys, came to be aware of the proceedings in the Texas Bankruptcy Court but, given Mr Dondero has historically asserted an improper interest in Hunter Mountain Investment Trust, it is not perhaps surprising that this matter was brought to his attention.

195   Secondly, Johnstone Law, on behalf of the JOLs, is now positively asserting that the JOLs are asserting proprietary claims over <u>all</u> assets held by CDM.

196   This is a remarkable position to assert without having determined the Foundational Issues or, at the very least, having a clear legal basis to do so but it is, perhaps, the strongest evidence of Johnstone Law, and by proxy the JOLs, having predetermined the Foundational Issues without having made any proper independent inquiry into the affairs of the Company.

197   Despite Johnstone Law and the JOLs refusal to engage on the protocol, Campbells wrote to Johnstone Law on 30th May 2025 with a draft protocol for the JOLs consideration (**PM/664-665**). The summary of the draft protocol is as follows:

*(a) a report listing all transactions undertaken by the Fund, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000;*

*(b) a 'business plan' explaining the ordinary day to day business of the Fund;*

*(c) a monthly transactions report; and*

*(d) advance notice of any single transaction exceeding US$5,000,000, or any series of transactions in an aggregate amount exceeding US$5,000,000 (save for transactions in the ordinary course of business involving or related to the renumeration of employees, officers and directors, agents, advisors and / or service providers).*

(the **"Protocol"**)

198   No response has been received to this proposal or the detailed provisions of the protocol.

## VIII. Conclusion

199   I realise that this affidavit is lengthy and relatively detailed. However this has been necessary in order to expose the much deeper relevant factual background which is directly relevant to central contentious issues including (a) the true nature and purpose of the Company and the DAF Structure (b) the vast legacy of related litigation and strategic manoeuvring by Mr Dondero (c) the rapid deterioration in relations with Mr Dondero and ultimately the Highland Foundations and (d) the true motivations for and impact of the DAF Restructuring. All of these issues are, in my respectful opinion and experience of the Company inextricably linked to whether it is appropriate for Johnstone Law to represent this Honourable Court's officers. I strongly believe the JOLs should not be permitted to engage them.

200   This is particularly so in circumstances where there are viable alternatives, here Harneys, Mourant, Claritas, Bedell Cristin, or even, subject to the conflict issues and reservations of rights raised in Mr Patrick's evidence, Maples. For the reasons set out above, I do not believe it is appropriate to grant sanction to engage any U.S. counsel at this stage; there is no risk to the DAF's assets in circumstances where Campbells have offered a suitable policing protocol which the JOLs can monitor whilst the centrally disputed issues can be litigated by the interested parties.

201  I respectfully invite the Court to dismiss the Sanction Application.

**SWORN** to at _George Town_                              )

on this   04   day of  _June_     2025               )

                                                            )          **PAUL MURPHY**

**BEFORE ME:**

NOTARY PUBLIC

Ashley Mariah Wood
Notary Public, Cayman Islands
Commission Expires: 31 January _2026_

