# EXHIBIT 1



**Our ref:** CJM/JRN/858403-000001/84203385
**Direct tel:** +1 345 814 5245 / +1 345 814 5497
**Email:** caroline.moran@maples.com / justin.naidu@maples.com

**By Email**

Baker & Partners
PO Box 636
Buckingham Square
720 West Bay Road
Grand Cayman
KY1-1107
Cayman Islands

Attn: Jennifer Colegate and Nia Statham

5 September 2025

Dear Counsel

**In the Matter of Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "Company")**

**FSD Cause No: 116 of 2025 (JAJ)**

1    We refer to your client's application made by way of a summons dated 19 August 2025 seeking to remove our clients as joint official liquidators of the Company (the "**Application**"). In this letter, defined terms in the Application have the same meaning herein.

2    While the Court will ultimately determine the Application in due course should your client seek to pursue it, our clients consider it prudent to identify now its fatal deficiencies and the improper motives underpinning it. In short, the Application is misconceived, vexatious, and destined to fail, and the costs should not be borne by the charitable structure to which the Company is asserting a proprietary claim.

The circumstances in which DFW became a shareholder

3    Your client's standing derives solely from the 7 February 2025 issue of 318 participating shares — an issue engineered to dilute the then-existing shareholders and manufacture economic rights for DFW. Contemporary documents obtained from the Company's former attorneys, Walkers (Cayman) LLP, are unequivocal. We note, amongst other things, the following:

3.1    On 26 November 2024, Mr Murphy wrote that the issuance would "*weaken any petition based on the just and equitable grounds*" but warned that "*we must be careful that they don't point to this as [a] ground to wind up i.e. the existing foundations say we're artificially*

*trying to weaken their position by diluted them therefore the company should be wound up or an order made for change of management / revocation of the share issuances*"

3.2 On 30 January 2025, Mr Brandon Schaller sent an email to (amongst others) Mark Patrick and Paul Murphy under the subject "DAF – Potential Dilution" proposing the issuance.

3.3 On 7 February 2025, the Company resolved to issue 318 Participating Shares (giving DFW 51.04% of the Company's Participating Shares).

3.4 On 2 April 2025, the Company's directors recommended to Mark Patrick (being the sole holder of voting shares in the Company) that the Company be placed into voluntary liquidation. Without notice to the Company's existing participating shareholder, the Company was placed into voluntary liquidation later that day.

4 By that time, the sole asset of the Company had already been transferred to CDMCFAD LLC ("**CDM**"). The only conceivable purpose of the share issue was, therefore, to confer on Mr Patrick — acting through DFW—rights that he would not otherwise have had in his capacity as a director or management shareholder of the Company, namely (i) standing to resist any winding-up petition or (ii) a platform to disrupt the liquidation of the Company. That is a fundamental breach of the proper-purpose rule by Mr Patrick and Mr Murphy.[1] Indeed, the proper-purpose rule can prevent even the honest exercise of a discretionary power by a director. This position has been made plain in the Company's pleadings in the FSD Proceedings.

5 As DFW's shareholding in the Company is clearly tainted, the Court is likely to give its views negligible weight when assessing whether the JOLs should be replaced. This is before one considers the motive for, and merits of, the Application itself.

<u>Motive for the removal application</u>

6 The Application appears to be a tactical device designed by Mr Patrick (through DFW) to derail the FSD Proceedings, which the JOLs are pursuing against him, Mr Murphy, CDM, and related entities. The JOLs took independent advice, obtained Court sanction, and are duty-bound to advance those claims. The fact that the defendants dislike being sued is not a ground to replace court-appointed officeholders.

7 The bar for removing court-appointed liquidators is exceedingly high. The following principles (amongst others) are particularly relevant in the present case:

7.1 The Court will only remove a liquidator if satisfied that (i) there is a real risk that he or she will not carry out his or her duties fairly and impartially, or (ii) his or her continuance would jeopardise the liquidation.[2] The applicant bears a heavy burden; bare assertion is insufficient. The scant authority on point in the Cayman Islands is indicative of how rare such applications are, perhaps unsurprisingly given the exceedingly high threshold required to be successful.

---

[1] *Howard Smith Ltd v Ampol Petroleum* [1974] AC 821.

[2] *AMP Enterprises Ltd v Hoffman* [2002] BCC 966.

7.2    Conversely, the Court will be slow to appoint a liquidator who is the nominee of a person whose conduct is under investigation or against whom the company has potential claims.[3] Your client's position is precisely that.

8    We note that the legal costs of this Application appear to be met from funds ultimately traceable to the charitable foundation structure in which the Company formerly held an interest. Mr Patrick therefore litigates risk-free, using property subject to proprietary claims by the Company. That is an abuse which the Court will not overlook.

9    For the avoidance of doubt, the JOLs do not know, and have never met or spoken to, Mr Dondero. Allegations that the JOLs are biased toward him, or are otherwise doing his bidding, are baseless and pure supposition on the part of your client.

<u>Allegations</u>

10    The Application levels six headline allegations. All are either factually wrong, legally irrelevant, or both.

11    Turning to the specific allegations:

11.1    Use of *ex parte* proceedings:

(a)    Your client alleges that the JOLs have proceeded *ex parte*, not to preserve matters in the FSD Proceedings but "*to deprive DFW of the ability to participate in the intended proceedings and to obtain a tactical advantage by avoiding due process where possible.*"  You then point to the following applications in support of this allegation: sanction to commence the FSD Proceedings and Funding Agreement; sanction of legal counsel; and the Cayman Injunction.

*Sanction to commence FSD Proceedings and Funding Agreement*

(b)    The JOLs sought sealing orders and *ex parte* relief only where strictly necessary to protect confidentiality or prevent asset dissipation. The Court granted those orders in full knowledge of DFW's position (indeed, that was the reason for the relief being granted). In any event, DFW is conflicted: it cannot credibly suggest it should have been consulted in connection with proceedings brought against it.

(c)    It is entirely routine for sanction applications with respect to commencing proceedings and associated funding to be made *ex parte* and with sealing orders in circumstances where disclosing details might prejudice the claims or the recoveries to the liquidation estate. This need to preserve the confidentiality of those applications was clearly vindicated by the Honourable Judge in granting the sealing orders.

*Sanction of legal counsel*

(d)    There is, again, nothing to this point. The JOLs' sanction application for the engagement of counsel was first presented to the Court on an *ex parte* basis inviting the Court to make orders on the papers with a view to saving the Company's

---

[3] *Fielding v Seery* [2004] BCC 315.

liquidation estate expense. At the direction of the Honourable Judge, the application then proceeded *inter partes* and has since been determined.

*Cayman Injunction*

*(e)* The injunction application was filed and served on 15 July 2025.  On that same day, we wrote to the Court and to the parties to seek availability for a hearing of the application on 29, 30 or 31 July 2025 (i.e. in the days before the long Court recess). Both letters also set out the basis for the JOLs' request that the hearing be listed on those dates, namely the urgency in having the application determined before the Texas Rule 11 Agreement may have fallen away (as the defendants to the TRO Proceedings had filed a jurisdiction challenge to be heard at or around that time).

*(f)* In your email to the Court sent on 16 July 2025 at 9:41 am, you informed the Court that Ms Colegate was unavailable on the above dates and therefore requested if the Court could provide alternative dates.  In our response sent at 11:17 am, on the basis of the urgency described above, the JOLs informed the Court that should any of the Defendants not be available for the hearing on one of the above dates, the JOLs would proceed with the application on an *ex parte* on notice basis.  The Court acceded to the JOLs' request on that basis and listed the hearing for 31 July 2025.

(g) In the above circumstances, your client's allegation that it was somehow improper for the JOLs to seek a listing before the Court recess on an *ex parte* on notice basis after having: (i) explained the JOLs' case on urgency to the Court; and (ii) invited the Defendants to appear and participate on the dates proposed if they were available, is risible.  The Court decided to list the hearing accordingly.

11.2 Full and frank disclosure:

(a) Your client alleges that the JOLs have failed to provide full and frank disclosure on their *ex parte* applications.  As set out below, this is not correct.   In any event, if your client genuinely believes that the JOLs are in breach of their disclosure obligations, its remedy is to seek a discharge of the *ex parte* orders. No such applications have been made. This is because your client's real issue is not with disclosure, but with the JOLs' conclusions—yet another appeal on the merits of your client's (and Mr Patrick and Mr Murphy's) conduct dressed up as a disclosure complaint.

(b) As to the specific allegations:

*DFW Summons*

(i) Your client alleges that, in seeking Court sanction to commence the FSD Proceedings and seek the Cayman Injunction, the JOLs failed to mention the Summons filed by DFW seeking directions and orders from the Court to provide that the JOLs enter into a Protocol with the CDM entities and that an inter partes proceeding be established in the liquidation for the validity of the DAF Restructuring. As you acknowledge, the existence of the DFW Summons was properly raised by Ms Moran at the hearing of the sanction application, and the Honourable Judge said that he would deal with the DFW Summons in due course if necessary.  Accordingly, there was no

4

failure to disclose this fact.  Further, the Court was already aware of the DFW Summons (with your client's Leading Counsel labouring the point at the hearing of the application to sanction the engagement of counsel).

*Andrew Ayres KC*

(ii)    Your client alleges that the JOLs redacted Andrew Ayres KC's name in MacInnis 5, as being the leading counsel who provided advice in respect of the commencement of the FSD Proceedings. This allegation is factually incorrect.  We have already confirmed that: (i) the King's Counsel engaged to provide our clients with a merits opinion in respect of the FSD Proceedings was not Mr Ayres KC; and (ii) that aspect of the evidence is sealed. That ought to be sufficient for your client. Maples has engaged Mr Ayres KC in the FSD Proceedings and he acts on the instructions of Maples. Of course, should your client wish to make allegations of conflict against a senior member of the English Bar (and an admitted Cayman Islands attorney), that is entirely a matter for your firm and for him, but you will undoubtedly be aware that this is a very serious matter.

(iii)    Separately, we do not follow the statement in Mr Patrick's evidence that "… *no notice of Mr Ayers [sic] KC's engagement was provided despite requirements to do so under this Court's practice directions*." If this is a reference to limited admission applications with respect to Leading Counsel, this clearly does not apply to Mr Ayres KC as he is generally admitted in the Cayman Islands.

*Weaver Opinion*

(iv)    Your client alleges that, in seeking sanction to commence FSD Proceedings, the JOLs failed to disclose the Weaver Opinion (which opined that the proceeds paid to the Highland Foundations in their capacity as Participating Shareholders following the DAF Restructuring were fair). It is worth remembering that, in opposition to the JOLs' sanction application with respect to the engagement of counsel, your client, Mr Patrick, and Mr Murphy produced three voluminous affidavits (running to 142 pages of text and 1,699 pages of exhibits) outlining their justifications for the transactions in issue, all of which were sworn very shortly after the date of the Weaver Opinion. It is telling that in the volume of evidence filed, the Weaver Opinion was not mentioned once. Clearly that indicates that neither your client (nor Mr Patrick nor Mr Murphy) considers it material. We agree.

(v)    Your client's recent reliance on the Weaver Opinion (obtained after the date of the JOLs' appointment) completely misses the point. The interposition of CDM between the Company and its interest in the Fund was part of the overall scheme that removed the Company's interest in the Fund from its economic stakeholders. The fact that CDM has managed to obtain a fairness opinion with respect to CDM's redemption of the Company does not answer the question of the propriety of interposing CDM between the Company and the Fund in the first place (or the broader transactions).

5

*Mercer Report*

(vi)  Your client alleges that the JOLs failed to bring to the Court's attention the recommendations of the Mercer Report which deals with the level of compensation paid to Mr Patrick. Again, this allegation is factually incorrect. Paragraph 52 of Ms MacInnis's Fifth Affidavit specifically states that Mr Patrick relies on the Mercer Report to support his remuneration increases and draws the Court's attention to the fact that the Mercer Report was commissioned three years after Mr Patrick commenced his role as a director of the Company and purports to justify three years of back-pay (plus bonuses). The Mercer Report is also exhibited to Ms MacInnis's affidavit.

*Nature of DAF LP Business*

(vii)  Your client takes issue with the JOLs' characterisation in their evidence of DAF LP as "passive". It is unclear how, you say, our clients have failed in their duty of full and frank disclosure by way of a reference to the Fund as "passive". If you are referring to paragraph 27 of Ms MacInnis's first affidavit filed in the FSD Proceedings, that application is now proceeding inter partes; plainly no full and frank duty arises. In any event, the statement to which your client is presumably referring was qualified as being on the basis of the JOLs' understanding.

*Failure to disclose DFW responses filed in FSD 116 of 2025 (JAJ)*

(viii)  Your client alleges that the JOLs failed to detail in the JOLs' skeleton argument for the *ex parte* on notice hearing of the Cayman Injunction DFW's responses to the JOLs' allegations in respect of the increase in the Fund's annual expenses. This allegation is again factually incorrect. The thrust of this complaint appears to be that the JOLs failed to disclose a point made in one paragraph of the affidavit of Mark Patrick sworn 4 June 2025 and filed in FSD 116 of 2025 (JAJ).  However, that affidavit, together with all other affidavits filed in the liquidation proceedings, was included in the bundle for the hearing on 31 July 2025. In any event, the point in the paragraph in question is not of any material relevance to the issues raised for determination on the injunction application.

*Liquidation Committee*

(ix)  Your client alleges that there is a discrepancy in MacInnis 5 and MacInnis 6 as to the timing of the establishment of a Liquidation Committee.  Again, there is nothing to this allegation. MacInnis 5 was provided to the Court in approved but unsworn form on 4 July 2025 (i.e., before the Liquidation Committee was formed) and then sworn on 10 July 2025. As you identify, the point was made clear in MacInnis 6 and before the sanction applications were determined by the Court.

(x)  Mr Patrick (on behalf of DFW) states in his evidence that he is "… *advised…that no minutes of that meeting have been circulated*.". This allegation (made on advice presumably from your firm) is incorrect. Mr Michael Aquino (on behalf of our clients) circulated the minutes of the

6

meeting in an email to (amongst others) Ms Jennifer Colegate of your firm on 1 August 2025.

11.3    Funding arrangements:

(a)    This allegation again misses the point. It appears that the complaint is two-fold: that Crossvine or Mr Dondero purportedly has control over the JOLs' actions and that the JOLs obtained sanction to enter into the Funding Agreement *ex parte* (the latter of which has already been addressed above).

(b)    In respect of the allegation that the JOLs are allowing Mr Dondero to control the litigation as a result of the Funding Agreement, this is obviously wrong. As you should be well aware, the threshold question for sanction of a funding arrangement is that the funder cannot control the litigation or the actions of the JOLs more generally.[4] The Court sanctioned the Funding Agreement with Crossvine after scrutinising the terms and concluding that Crossvine had no such control. The fact that the JOLs obtained sanction is dispositive of this allegation.

(c)    Separately, what Mr Dondero might have said with respect to prospective funding arrangements is not a matter for the JOLs. The JOLs are experienced professionals who sought, and obtained, sanction of the Court to enter into the Funding Agreement. To suggest that the JOLs, as court-appointed officers, would allow a third party to control the direction of a liquidation (either directly or indirectly), is a baseless affront to the JOLs' integrity and professionalism. We assume that this allegation is simply your client's own misplaced views, which was made contrary to the advice from your firm, but we would welcome confirmation from you on the point.

(d)    As to there being no reference to the Funding Agreement at the Company's meeting of contributories on 9 July 2025, there is plainly nothing improper about this. As outlined above, the JOLs appropriately (as accepted by the Court) sought sanction to commence the FSD Proceedings and enter into the Funding Agreement on an *ex parte* basis.

(e)    In any event, the initial funding provided by Crossvine has been exhausted. Now that the JOLs have developed the claims in the FSD Proceedings, they are able to obtain funding from third-party litigation funders. The JOLs are in advanced discussions with several third-party funders to obtain funding through to the completion of the FSD Proceedings. The JOLs anticipate that this process will be completed within the coming weeks (subject, of course, to obtaining the sanction of the Court).

11.4    The protocol:

(a)    Your client states that the FSD Consent Order was unnecessary because CDM proposed a protocol to address similar concerns. The so-called "protocol" offered by CDM was cosmetic. It failed to preserve the Company's position in any meaningful way – most egregiously it included no asset preservation undertakings whatsoever. The FSD Consent Order now in place, obtained in response to the JOLs' application, is materially stronger (although still not to the level of protection

---

[4] *Re ICP Strategic Credit Income Fund Ltd* (Unreported, Grand Court, 4 April 2014, at paragraph 18, per Jones J).

7

that the JOLs will seek at the *inter partes* hearing, it was simply an interim preservation measure).

(b)    The inadequacies of the three versions of the "protocol" proposed by CDM, each of which only marginally differed from the last, were fulsomely explained in our letters to Campbells dated 19 June 2025 and 27 July 2025 (copies enclosed). One only needs to look at the differences between the protocol contained in Campbells' letter of 30 May as against the FSD Consent Order to identify the glaring issues with CDM's first protocol. By way of example:

(i)    As noted above, despite multiple requests from the JOLs, the CDM protocols included no asset preservation undertakings whatsoever.  That was a fundamental inadequacy given preserving the assets to which the Company has a proprietary claim was the clear overarching purpose of any protocol and the main form of relief that would be sought on any injunction application.  The FSD Consent Order contains robust asset preservation undertakings.

(ii)    CDM's protocols allowed the Defendants to take any action with the assets they pleased if they considered it reasonably necessary to comply with their legal obligations.  There were no checks and balances on this right, which was said to apply "*notwithstanding anything to the contrary in this Protocol*". This was, in essence, the exact opposite of asset preservation undertakings.

(iii)    CDM initially sought a value limit of US$5,000,000 on reportable transactions – reduced to all transactions of any value in the FSD Consent Order.

(iv)    CDM offered retrospective monthly transaction reporting in its draft protocols, whereas the FSD Consent Order provided for seven days' advance written notice to the JOLs of all transactions made by any of the Defendants or CDM Entities above US$50,000, in addition to a retrospective monthly transaction report of all transactions undertaken by the Defendants or CDM Entities of any value.  In addition, the FSD Consent Order gave the JOLs a right to seek and obtain further clarification from the Defendants of any particular transactions (not limited to whether those transactions were in the "ordinary course of business").

(v)    The FSD Consent Order provided that the individual Defendants (Mr Patrick and Mr Murphy) must give 7 days' advance notice of any transactions above US$100,000, whereas no such offer was made in the CDM protocols.

(vi)    The FSD Consent Order provided for recognition of the undertakings given by the Defendants in the United States through Chapter 15 proceedings, which was important given many of the Defendants are located in the United States and/or hold assets there.

(vii)    The FSD Consent Order preserved the JOLs' right to challenge, at the inter partes hearing, the Defendants' ability to use assets deriving directly or indirectly from the limited partner interest in the Fund to pay their legal fees.

8

(viii)    The FSD Consent Order requires the Defendants and CDM Entities to provide all balance sheets, financial statements and other records for each of them dating back to 30 June 2024 and on an ongoing monthly basis moving forward.  The CDM protocols at their highest offered only a balance sheet for the Fund on an ongoing monthly basis moving forward (not retrospectively and not in respect of the other Defendants and CDM Entities).

(c)    In light of the above, Mr Patrick's evidence on this issue is clearly misleading. That said, our clients will, of course, deal with the point in their responsive evidence should your client insist on pursuing the Application.

11.5    Leveraging the Liquidation Proceedings:

*Failure to sanction Highland Foundations*

(a)    With respect to the TRO Proceedings, the JOLs have consistently maintained that they will act in the best interests of the Company and will take steps should it be necessary to protect those interests. That position has not changed.

(b)    More to the point, as the JOLs understand the position, as things stand the TRO Proceedings are aimed at safeguarding the assets to which the Company is entitled, which is consistent with the objectives of the JOLs. Moreover, at this preliminary stage in the TRO Proceedings, the court is considering threshold procedural and jurisdictional issues, which have yet to be determined.  The JOLs will continue to monitor these proceedings and reserve their rights.

*Solvency declaration*

(c)    The solvency declaration issue has been ventilated at length with your firm. Given the one variable determining the appropriate solvency analysis in the liquidation context is the FSD Proceedings, and your client is a defendant to those proceedings, it is perhaps unsurprising that our respective clients do not agree on the prospects of success of those proceedings (and, by extension, the solvency determination). The JOLs have made a determination as to the solvency of the Company based on the JOLs' view of the facts and circumstances currently known.

*DFW Summons*

(d)    Your client complains that the JOLs ignored the DFW Summons, pursuant to which DFW proposed that an inter partes proceeding be established in the liquidation for the validity of the DAF Restructuring. The DFW Summons was an inappropriate way to resolve the matters in issue. While we understand your client's motivation for pursuing it—to stymie the JOLs' investigations—it sought to cut across the JOLs' investigative powers and was premised on the JOLs not pursuing Chapter 15 proceedings. The importance of the Chapter 15 proceedings, and by extension the inappropriateness of the DFW Summons, is most currently underscored by the fact that the Company's service providers (Valuescope, LLC, Carrington, Coleman, Sloman & Blumenthal, L.L.P. and Seyfarth Shaw LLP), all of which provided advice on which Mr Patrick and Mr Murphy are seeking to rely, have refused to provide the Company's property without Chapter 15 recognition. If obtaining U.S. court

(d) authority is allegedly required to enable service providers to share the Company's books and records, the JOLs would be foolish to assume that parties located in the United States would willingly return assets, should they be ordered to do so by the Cayman Court, without similar compulsion (or immediate threat of compulsion) by a U.S. court. Additionally, and separate from the Chapter 15 recognition, the Company's fourth shareholder prior to the share issuance to your client (CFNT) was not proposed to be included in those *inter partes* proceedings.

*Interference in the Highland Bankruptcy Proceedings*

(e) As to the letter the JOLs sent with respect to HMIT, there is, of course, nothing inappropriate about the JOLs, at the outset of the liquidation and pending their investigations, attempting to preserve the assets to which the Company might be entitled. The JOLs have not appeared in these proceedings. Correspondence between estate fiduciaries is plainly not "interference".

11.6   Investigations:

(a) Our clients, being responsible court officers, obtained the appropriate legal advice before commencing the Proceedings (as they needed to satisfy themselves, and the Court, of the prospects of success of the FSD Proceedings). This advice ranged from US legal advice with respect to tax and purported alter-ego risks, Cayman Islands legal advice in connection with the prospects of success of the Proceedings as well (with an independent opinion from King's Counsel). The reference to, and contents of, that advice are appropriately subject to sealing orders made by the Court.

(b) With respect to the complaint that neither Mr Patrick nor Mr Murphy was interviewed by the JOLs, as outlined above, in opposition to the JOLs' sanction application with respect to the engagement of counsel, your client, Mr Patrick, and Mr Murphy filed extensive evidence outlining their justifications for the transactions in issue.

(c) The JOLs were entitled to form the view—after considering that evidence and obtaining independent Cayman and US advice—that viable claims exist. This point was made clear to the Court in seeking sanction to commence the FSD Proceedings. The JOLs' investigations have been thorough; your client simply dislikes the outcome.

(d) Had your client (and Mr Patrick and Mr Murphy) not elected to put their case in evidence in opposition to the JOLs' sanction application, then interviews might have been appropriate. It is telling that neither your client, nor Mr Patrick nor Mr Murphy, has been able to articulate any meaningful additional facts to justify the transactions undertaken (such that an interview would have been warranted).

### Moving forward

12   As is clear from the above, the Application is fundamentally flawed and brought with an ulterior motive. It is particularly telling that, instead of contesting the FSD Proceedings on the merits (for example, to bring a summary judgment application in circumstances where you say that the claims have no merit), your client has elected to bring the Application.

13      In light of the above, we invite your client to withdraw the Application. If your client insists on pursuing it, our clients' position is that the Application is destined to fail and the adverse costs arising from the Application should not be paid by DFW from proceeds it receives from the Fund or elsewhere within the charitable structure. Should the Application be pursued, our clients anticipate seeking orders that costs be reserved for the purpose of adding Mr Patrick as a party to the Application and seeking an order for costs against him personally on the indemnity basis.

Yours faithfully

Maples and Calder (Cayman) LLP

cc      Sam Dawson and Nigel Smith, Carey Olsen

11