**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | ) | Case No. 25-11376 (BLS) |
| Debtor in a foreign proceeding. | ) | **Re: Docket No. 3** |

**CDM PARTIES' OBJECTION TO THE VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

The CDM Parties[2] hereby file this objection (the "**Objection**") to the *Verified Petition For (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code* [Docket No. 3] (the "**Verified Petition**") and recognition of the liquidation proceeding (the "**Cayman Proceeding**") of Charitable DAF Holdco, Ltd (In Official Liquidation) ("**DAF Holdco**" or the "**Debtor**"), a company under the

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] The CDM Parties are: CDMCFAD, LLC, a Delaware limited liability company ("**CDM**"); CDH GP, Ltd., a Cayman Islands exempted limited company ("**CDH**"); Charitable DAF Fund, LP, a Cayman Islands limited partnership (the "**DAF**"); CLO HoldCo, Ltd., a Cayman Islands exempted limited company ("**CLO Holdco**"); Liberty CLO HoldCo, Ltd., a Cayman Islands exempted limited company; HCT Holdco 2, Ltd., a Cayman Islands exempted limited company; MGM Studios Holdco, Ltd., a Cayman Islands exempted limited company; CLO HoldCo, LLC, a Delaware limited liability company; Beacon Mountain, LLC, a Delaware limited liability company; Liberty CLO HoldCo, LLC, a Delaware limited liability company; Liberty Sub, Ltd., a Cayman Islands exempted limited company; Charitable DAF Holdings Corp., a Delaware corporation; Rand Advisors, LLC, a Delaware limited liability company; DST Investco, LLC, a Delaware limited liability company; Allanon Capital Management LLC, a Texas limited liability company; CDHC Royse City Land, LLC, a Texas limited liability company; Royse City Land Company, LLC, a Texas limited liability company; CDHC Assets, LLC, a Texas limited liability company; CDHC Fort Worth Land, LLC, a Texas limited liability company; CDHC Stewart Creek, LLC, a Texas limited liability company; BVP Property, LLC, a Delaware limited liability company; Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"); Rand PE Fund Management, LLC, a Delaware limited liability company; and Atlas IDF GP, LLC, a Delaware limited liability company (collectively, the "**CDM Entities**"), Mark Patrick, an individual residing in the State of Texas, and Paul Murphy, an individual residing in the Cayman Islands.

supervision of the Grand Court of the Cayman Islands Financial Services Division (the "**Cayman Court**"). In support of this Objection, the CDM Parties submit the Declaration of Mark Patrick (the "**Patrick Declaration**") and the Declaration of Paul Murphy (the "**Murphy Declaration**" and, together with the Patrick Declaration, the "**Declarations**"), each filed contemporaneously herewith, and respectfully represent as follows:

## PRELIMINARY STATEMENT

1. It is an understatement to say that this is not a typical Chapter 15 recognition proceeding. When this case originally filed in July 2025, it was just one step in a carefully planned legal siege orchestrated by vexatious litigant James Dondero, through the Highland Foundations[3] who petitioned the Cayman Court to appoint the JOLs in the Cayman Proceeding. By this Chapter 15 Case, the JOLs initially sought to accomplish two things. First, they hoped that the Cayman Court would grant a then pending proprietary injunction in their favor that they then would seek to domesticate through recognition, instead of traditional means in non-insolvency litigation. Second, they sought broad discovery under U.S. law that goes far beyond what they are entitled to under Cayman Islands law.

2. On February 10, 2026, after a two-day evidentiary hearing held in December 2025, the Cayman Court issued a 56-page opinion (the "**Cayman Opinion**")[4] that denied the proprietary injunction. The Cayman Opinion finds for the CDM Parties on nearly every critical factual and legal issue and torpedoes the JOLs' strategy here and undermines their ultimate case.[5] Now, with

---

3 Capitalized terms not otherwise defined in this Introduction are defined *infra* in the "Background" section.

4 A copy of the Cayman Opinion is attached to the Patrick Declaration as Exhibit 5 thereto.

5 The JOLs have appealed the Cayman Opinion. The appeal is scheduled for hearing in September – *i.e.*, after this Court's recognition hearing. The CDM Parties asked the JOLs if they intended to adjourn the recognition hearing until after the appeal, given the obvious waste of judicial resources and putting the cart before the horse. The JOLs declined to do so.

no injunction to recognize, and with an adverse ruling from the Cayman Court calling into question every factual and legal assertion made by the JOLs, this Chapter 15 Case, and hearing recognition before disposition of the appeal, makes even less sense than when it started.

3. It is crucial to understand that the JOLs are not pursuing any bankruptcy or insolvency activities; the sole activity in the Cayman Islands has been litigating against the CDM Parties, and that activity has resulted in the Cayman Opinion which destroys the JOLs strategy. The reason that there has been no bankruptcy or insolvency activities is obvious: on the Petition Date, the JOLs took the position that DAF Holdco was solvent.[6] It was only after the filing of the Cayman Proceeding that DAF Holdco became insolvent because of the JOLs' actions leading to post-petition debts and "expenses in liquidation".[7] There are almost no pre-petition creditors, and the only significant expenses in the liquidation are those of DFW and Mr. Patrick due to the June 24, 2025 order of the Cayman Court requiring the estate to pay significant fees to them under prevailing party litigation rules in the Cayman Islands.[8] It is undisputed that DAF Holdco's few (if any) *pre-petition* creditors would have been paid in full but for the JOLs being ordered to pay litigation costs; now, the only creditors who might or might not get paid in full are Messers. Patrick and Murphy and the other corporate defendants, such as the CDM Parties and DFW. Yet, in a dystopian irony, the JOLs purport to need Chapter 15 relief in aid not of insolvency efforts

6 *See Declaration of Caroline Moran as Cayman Islands Counsel to the Debtor in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code to the Honorable United States Bankruptcy Judge* [Docket No. 5] ("**Moran Decl.**"), ¶ 57; Verified Petition at ¶ 66.

7 Cayman Islands law draws a distinction between pre-petition debts and post-petition debts. Holders of the former are deemed to be creditors (or, in some instances, contingent creditors) while post-petition debts are viewed as "expenses in the liquidation."

8 Messers. Patrick and Murphy also each filed "proofs of debt" against DAF Holdco related to contractual indemnification for defending the proceedings before the Cayman Court.

generally, but of their litigation against the CDM Parties. That makes this case the posterchild of an improper two-party dispute.

4. Chapter 15 cases are not meant as a vehicle for entities which claim to be solvent to advance a two-party dispute through the auspices of a U.S. Bankruptcy Court proceeding. Rather, Chapter 15 expressly states its "purpose": "to provide an effective mechanism for dealing with cases of cross-border *insolvency*". 11 U.S.C. § 1501(a) (emphasis supplied). Where, as here, the purported foreign proceeding is not "specifically oriented toward creditors" but instead "was commenced by concerned shareholders that say they seek to benefit the company by seeking relief and a recovery of funds that allegedly have been dissipated or improperly transferred due to an alleged fraud and other fiduciary breaches by management and/or board members",[9] bankruptcy courts have denied recognition. *See, e.g., In re Global Cord Blood Corp.*, No. 22-11347 (DSJ), 2022 WL 17478530, at *8 (Bankr. S.D.N.Y. Dec. 5, 2022).

5. Moreover, this isn't just any two-party dispute. The real party in interest, and the person funding this case, is James Dondero, the serial vexatious litigant behind Highland Capital Management, LP ("**Highland**"), which has its own Chapter 11 proceedings in the United States Bankruptcy Court for the Northern District of Texas. Mr. Dondero has been held in contempt by the Texas Bankruptcy Court more than once, and that court has described him as '"transparently vexatious' and litigious." *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *1 (5th Cir. Apr. 16, 2025) (internal quotation omitted). As will be explained below, the corporate actions taken by Messrs. Patrick and Murphy (two of the CDM Parties) that are at the heart of the proceedings before the Cayman Court and this Chapter 15 Case were designed to ensure that Mr. Dondero could not, *inter alia*, (i) damage the tax status of the DAF Structure and (ii) take control

---

[9] *See MacInnis Decl.*, Ex 67, Petition for Court Supervision of a Voluntary Liquidation, ¶ 14 (the "**Supervision Application**").

of the DAF Structure, thereby opening up the assets within the DAF Structure to a veil piercing suit that UBS is pursuing against Mr. Dondero and certain of his affiliated entities to collect on a more than $1 billion judgment against other Dondero entities. Mr. Dondero does not like the fact that Messrs. Patrick and Murphy took these actions, so he decided to have the Highland Foundations petition the Cayman Court to appoint JOLs to sue them, and to become the sole finance source for the JOLs. The litigation in the Cayman Islands – not payment of creditors – is the entire point of the Chapter 15 strategy here, including (i) the JOLs' attempt to obtain a prejudgment attachment order that is anathema to U.S. litigation; and (ii) the request for what the JOLs themselves characterize as "broad" bankruptcy court discovery, even though they already have filed a lawsuit.

6. The Court should deny recognition. First, the Cayman Court determined that the JOLs' legal theories lack serious merit when it denied the injunction they sought. Second, Chapter 15 was not meant for companies that have few, if any, creditors as of the date that the foreign proceeding was initiated, that are not attempting to adjust their debts, and whose fiduciaries contend they are solvent. Nor is it meant for two-party disputes. There are only two possibilities here. Either the JOLs' admission that the Debtor is solvent is accurate, in which case there is no basis to grant recognition of a Chapter 15 case under the statute and caselaw; or it is inaccurate precisely and only because the CDM Parties are owed so much under the fee shifting order (and potentially larger fee shifting orders which may be made in future), in which case the Debtor still was solvent at the relevant time – the dates of the filing of the foreign proceeding and this Chapter 15 Case. Either way, there is no basis to recognize the Cayman Proceeding.

7. For these reasons and the ones set forth below, the request for recognition should be denied.

## BACKGROUND

8. The joint official liquidators (the "**JOLs**") appointed in the Cayman Proceeding paint this chapter 15 proceeding as a simple dispute beginning in 2024. That omits more than twenty years of critical history, including numerous litigations, two bankruptcy filings, more than 50 objections and appeals filed by Mr. Dondero or his affiliates in the bankruptcies, and a governance history that brings into focus the true nature of this proceeding: a two-party governance dispute funded by one of the most vexatious litigants ever seen, Mr. Dondero. This Chapter 15 Case simply does not make any sense until one understands (i) what the parties are fighting over: charitable entities whose purpose is to make *charitable* donations, (ii) who Mr. Dondero is and his penchant to vexatiously litigate, (iii) the litigations that led to Highland's chapter 11 filing, and (iv) the governance of the Debtor, both pre and post confirmation of Highland's chapter 11 plan, and how Mr. Dondero's actions threatened it on many levels. The recent Cayman Opinion, which denied DAF Holdco's request for an injunction against the CDM Parties and is discussed in Section A*, infra*, delves into some but not all of these issues.

9. The full history of Mr. Dondero, Highland and his affiliates involves hundreds of thousands of pages of material; we attempt to provide below a summary to put this dispute into context. While that *background* is voluminous, the facts surrounding the corporate restructuring transaction itself in early 2025 (the "**DAF Restructuring**") actually are few and largely undisputed. Even without that lengthy background, the Court could simply rule that Chapter 15 relief is inappropriate because the JOLs are taking the position that the Debtor is solvent, and if they are wrong, it is only because certain CDM Parties that they want to sue are owed a substantial amount of money because of the JOLs' actions; either way, this case has nothing to do with the adjustment of even a single creditor's debts. Those facts are found, *infra*, at Section Q.

Understanding that the history set forth below is lengthy, the Court could, if it desires, skip directly to Section Q to review those facts after considering the Cayman Opinion in Section A.

## THE CAYMAN OPINION

### A. The Statement of Claim and the Injunction Application

10. On July 4, 2025, the JOLs applied to the Cayman Court on an *ex parte* basis to commence litigation by filing a draft Writ and Statement of Claim (the "**Statement of Claim**") against Mr. Patrick, Mr. Murphy, CDM, DFW, CDH and CLO Holdco (the "**Cayman Defendants**"). The Statement of Claim principally seeks monetary relief. *See Declaration of Margot MacInnis in Support of Chapter 15 Petition and for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 4] (the "**MacInnis Decl**.") Ex. 59; Cayman Opinion at ¶¶ 213, 219 & 257.

11. Having received sanction (*i.e.*, permission of the Cayman Court) to commence the proceedings, the JOLs issued the Statement of Claim. They also filed an application seeking injunctive relief (the "**Injunction Application**"), and these were served on the Cayman Defendants on July 15, 2025. The JOLs subsequently sought an urgent listing (*i.e.*, emergency hearing) of the Injunction Application, which was subsequently scheduled to be heard on July 31, 2025 (the "**July 31 Hearing**").

12. The Injunction Application sought broad and restrictive relief akin to prejudgment attachment. *See MacInnis Decl*. Ex. 82. However, given the 'urgency' with which the Injunction Application was filed, served and scheduled, the Cayman Defendants were not provided with adequate notice as required under the rules of the Cayman Court, and the JOLs' proposed to proceed with the Injunction Application on an *ex parte* basis. Prior to the July 31 Hearing, the

JOLs and the Cayman Defendants reached agreement on a financial reporting and asset preservation protocol (the "**Asset Protocol**") which was similar to previous protocols the CDM Parties had offered to enter into with the JOLs from as far back as May 16, 2025 (only 10 days after the JOLs appointment), as well the agreements reached in the Texas Business Court (as defined herein) and this Court, thereby mooting the need for a hearing on an emergency basis.

13. On December 15-16, 2025, the Cayman Court held a two-day evidentiary hearing to consider the Injunction Application. On February 10, 2026, the Cayman Court issued the Cayman Opinion, and on April 23, 2026, issued an order denying the Injunction Application, vindicating the CDM Parties and further ameliorating any need for this Chapter 15 Case.[10]

14. The Cayman Opinion speaks volumes. DAF Holdco (through the JOLs) sought a proprietary injunction against the DAF Structure asserting an alleged proprietary interest therein. Cayman Opinion ¶ 1. At its core, DAF Holdco alleged that Messers. Patrick and Murphy took unlawful steps to divest DAF Holdco's sole asset, which is a limited partnership interest in the DAF. *Id.* at ¶¶ 5-8. The Cayman Court carefully considered a voluminous record and determined that DAF Holdco did not hold a proprietary interest in the DAF Structure that could be protected by injunction. *Id. at* ¶ 130. Specifically, the Cayman Court noted that DAF Holdco's rights were limited, and the documents make clear that DAF Holdco was only entitled to be considered for *discretionary* distributions – *i.e.*, it only was entitled to distributions at the sole discretion of CDH (DAF Holdco's General Partner), and that, in any event, such distributions were not for DAF Holdco's own account, but the account of the appropriately qualified charities. *Id.* at ¶¶ 141-147. The Cayman Court also concluded that the DAF LPA (as defined herein) vested all managerial authority with CDH, an entity controlled by Mr. Patrick. *Id.* at ¶¶155-159. In addition, the

[10] A copy of the Cayman Court's order denying the Injunction Application (the "**Order Denying Injunction Application**") is attached to the Patrick Declaration as Exhibit 6 thereto.

Cayman Court concluded that under Section 6.14 of the DAF's LPA, DAF Holdco renounced its rights to any assets held by the DAF. *Id.* at ¶ 161. Further, the Cayman Court found that the independent valuation reports and fairness opinions provided by FTI, ValueScope and Weaver supported the conclusion that the Redemption Price (as defined herein) represented fair value for the Participating Shares in DAF Holdco, given that they conferred "no rights of legal or beneficial ownership, or indeed control with regard to the [DAF] and its assets". *Id.* at ¶¶185-89. And in conclusion, the Cayman Court noted that DAF Holdco "had no control or ownership rights" in the DAF and that its economic rights were satisfied in the DAF Restructuring, including upon receipt of the Redemption Price. *Id.* at ¶¶196-97.

15. The Cayman Court also determined that, even had it been persuaded that there was a serious issue to be tried that DAF Holdco had a proprietary interest capable of supporting the Injunction Application, it would not have granted an injunction because: (i) there was no good reason to believe that assets were in danger or would be adversely dealt with (*id.* at ¶¶239-40); (ii) the balance of convenience favored the CDM Parties as the effect of the relief sought by DAF Holdco would be to unjustifiably lock down the charitable activities of the DAF (*id.* at ¶243); (iii) the JOLs did not offer a secure cross-undertaking (*i.e.*, security/bond) in damages to compensate for the significant loss likely to be caused to the DAF and its charitable recipients if an injunction were granted and it later transpired that it should not have been (*id.* at ¶¶258-61); and (iv) DAF Holdco was unable to provide the necessary cross-undertaking in damages and was relying on its funder – an opaque bankruptcy remote special purpose vehicle controlled by Mr. Dondero whose funding for the Injunction Application had already been exhausted and about whom there was "scant material" before the Court. *Id.* ¶¶ 262-69.

16. Taken all together, the Cayman Court concluded that DAF Holdco holds no propriety interest in the DAF or its subsidiaries and has no seriously arguable proprietary claims against the CDM Parties. As noted above, the Cayman Court also determined that, irrespective of its determination in respect of the proprietary claims, the balance of convenience did not support the imposition of an injunction, and as a result the Cayman Court denied the Injunction Application. *Id.* at ¶¶ 200-01 (CDM/DFW), 213-15 (Mr. Patrick), 236-38 (Mr. Murphy) & 257. The JOLs made their case to the Cayman Court, and they conclusively lost.

17. On February 24, 2026, the JOLs filed a notice of appeal of the Cayman Court's dismissal of the Inunction Application (the "**Cayman Appeal**") with the Cayman Islands Court of Appeal (the "**Court of Appeal**") and simultaneously applied for urgent interim relief, including application and extension of relief similar to Asset Protocol – entered into by the CDM Parties prior to July 31 Hearing in order to avoid an uncontested *ex parte* hearing – pending the Cayman Appeal.

18. Prior to the JOLs' application for interim relief pending the Cayman Appeal, the CDM Parties confirmed to the Court of Appeal that they would continue to abide by the terms of the Rule 11 Agreement entered into before the Texas Business Court (each as defined herein), which restricts dealings with the DAF's assets outside the ordinary course of business.[11]

19. Following a hearing on March 27, 2026, the Court of Appeal granted limited interim relief, formalized that limited relief by order, dated April 22, 2026 (the "**Interim Appellate Order**"), and issued an opinion, dated May 15, 2026, providing the basis for the limited relief (the "**Interim Appellate Opinion**").[12] That order restrains the CDM Parties from dealing with assets

---

[11] *See* paragraphs 81-82, *infra*, for a discussion of the Texas Business Court and the Rule 11 Agreement.

[12] A copy of the Interim Appellate Opinion and the Interim Appellate Order are respectively attached to the Patrick Declaration as Exhibits 7 & 8 thereto.

outside the ordinary course of business, but permits charitable distributions of up to $200,000 per month. Interim Appellate Order at ¶¶ 2-3. In addition, the order does not continue the prior, burdensome financial reporting and disclosure obligations. Interim Appellate Opinion at ¶ 30.[13] The Court of Appeal is scheduled to hear the merits of the Cayman Appeal on September 3-4, 2026.

20. It certainly is true that, just like when a plaintiff loses a preliminary injunction application with a court finding no probability of success on the merits, the JOLs still may proceed to trial (whether or not they succeed in the Cayman Appeal).[14] However, given the conclusive findings in the Cayman Opinion, it is likely that the JOLs will need to reconsider many of the claims in the Cayman Proceedings as the underlying merits of their action, which at best are dubious in light of the Cayman Opinion, are for trial by another tribunal, not this Court. The JOLs know this, yet after losing before the Cayman Court – and while the Cayman Appeal remains pending – they continue to press forward with this needless and abusive Chapter 15 case.

21. With this background, it begs the question of why the JOLs are still pursuing a Chapter 15 case, which is meant to recognize foreign insolvency proceedings, when the underlying proceeding has nothing to do with a restructuring of debts and is not about insolvency, where the JOLs' main litigation legal theories have been debunked and there are no Cayman orders to

---

[13] Importantly, in reaching its decision, the Court of Appeal did not dispute any of the Cayman Court's conclusions. Instead, the Court of Appeal reasoned that the interim relief was necessary only because (i) the Asset Protocol was no longer operative by virtue of the Cayman Opinion and only the US based Rule 11 Agreement remained operative, (ii) the parties to the Rule 11 Agreement were not the exact same parties to the Cayman Proceeding, (iii) recoverability of donated proceeds could be an issue if JOLs prevailed in the Cayman Appeal, and (iv) the sequencing of certain hearings before the Texas Business Court and Cayman Court may affect the Cayman Proceedings. *Id*. at ¶¶ 19-28.

[14] That is, the JOLs can do so if and only if they can explain to the Cayman Court why it is appropriate to proceed when they will have no source of funding and might owe as much as over $10 million under fee shifting orders to the parties they are suing.

recognize. The history of Mr. Dondero and the more complete history of this two-party dispute bring the reason into focus: Mr. Dondero engages in lawfare to illicitly punish his adversaries.

## THE PARTIES AND THE DAF STRUCTURE

### B. Mr. James Dondero

22. The antagonist in this two-party dispute is Mr. Dondero, who has lost not only Highland, his crown jewel, but also control over the DAF, which includes interests in a variety of subsidiaries with assets and/or operating businesses (the "**DAF Structure**"), as a result of his improper relationship with the structure.

23. Mr. Dondero is no ordinary litigant. Mr. Dondero has a penchant for vexatiously litigating if he does not get his way. Indeed, Mr. Dondero has spent the last twenty-plus years engaged in "astonishingly contentious[,]" "protracted, and unpleasant" litigation concerning Highland in many courts. *See In re Acis Cap. Mgmt., L.P.*, No. 18-30264-sgj11, 2019 WL 417149, at *2 (Bankr. N.D. Tex. Jan. 31, 2019); *see also In re Highland Cap. Mgmt., L.P.*, No. 19-34054-sgj11, at *1 (Bankr. N.D. Tex. June 7, 2021), *aff'd sub nom. Matter of Highland Cap. Mgmt., L.P.*, 105 F.4th 830 (5th Cir. 2024); *In re Highland Cap. Mgmt. L.P.*, No. Adv. No. 24-03073-sgj, 2025 WL 97738, at *3 (Bankr. N.D. Tex. Jan. 14, 2025). United States Bankruptcy Judge Stacy G.C. Jernigan has described Mr. Dondero as "transparently vexatious and litigious." *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *1 (5th Cir. Apr. 16, 2025) (internal quotation omitted). When Mr. Dondero stands to lose, he takes actions to frustrate judgement creditors and interfere with his adversaries' operations. Mr. Dondero has even tried to deploy those in government to help him in misusing the judicial process. *In re Highland Cap. Mgmt.*, No. 19-34054-sgj11, 2025 WL 2047279, at *1 (Bankr. N.D. Tex. July 21, 2025).

### C. The Highland Foundations and Their Status as Supporting Organizations

24. Historically, the discretionary charitable distributions made by DAF Holdco were for the benefit of (i) the Dallas Foundation, (ii) the Greater Kansas City Community Foundation and (iii) the Santa Barbara Foundation (collectively, the "**Supported Organizations**"). The Supported Organizations are supported by (i) Highland Dallas Foundation, Inc. ("**Highland Dallas**"), Highland Kansas City Foundation, Inc. ("**Highland Kansas City**"), and Highland Santa Barbara Foundation, Inc. ("**Highland Santa Barbara**" and, together with Highland Dallas and Highland Kansas City, collectively, the "**Highland Foundations**"), each of which Mr. Dondero established in November 2011. Mr. Dondero is the president, sole member and one of the three directors for each of the Highland Foundations. As a result, Mr. Dondero holds substantial influence with the Highland Foundations.

25. The Highland Foundations are classified as "Type I Supporting Organizations" under section 509(a)(3) of the Internal Revenue Code ("**Supporting Organizations**"), meaning that they are section 501(c)(3) charitable organizations that are legally controlled by other section 501(c)(3) public charities called "Supported Organizations". The Highland Foundations provide grants and other financial support to the Supported Organizations. The Highland Foundations and their Supported Organizations are legally distinct entities.

26. Under section 509(a)(3) of the Internal Revenue Code, a "**Disqualified Person**" cannot control a Supporting Organization. A Disqualified Person is a person who is a substantial contributor or who has direct or indirect influence over the supporting organization, *i.e.* an insider. As discussed below, Mr. Dondero was the original donor to HCMPC Trust (as defined herein), which provided the seed donations for the Highland Foundations. And Mr. Dondero is on the board and is the president of each of the Highland Foundations. As such, there is significant risk

that Mr. Dondero is a Disqualified Person. If a Disqualified Person exercises substantial influence over a Supporting Organization, then the Supporting Organization would be subject to private foundation rules, which involve greater scrutiny and a significant tax burden. In light of this risk, DAF Holdco's Articles of Association provide that if the Directors become aware that any shares in DAF Holdco are held by a "Restricted Person", the Directors may require the transfer of such shares.[15]

27. To skirt these problems while simultaneously keeping maximum influence, Mr. Dondero originally had a crony, rather than himself, be the Control Person (as defined herein) of the DAF Structure: Mr. Grant Scott ("**Mr. Scott**"), Mr. Dondero's once best friend, the best man at his wedding, and his college roommate.

**D. Mr. Patrick, Mr. Murphy and DFW**

28. In early 2021, Mr. Scott and Mr. Dondero had a falling out because Mr. Scott declined to take directions from Mr. Dondero that would have breached his fiduciary duties. (The circumstances of that incident are described *infra* at ¶¶ 51-52). As a result, Mr. Scott resigned, and the DAF Structure needed a new Control Person. Mr. Patrick became that Control Person in March 2021.

29. From 2008 until February 2021, Mr. Patrick was employed by Highland. Cayman Opinion at ¶ 34. Starting in March 2021, Mr. Patrick became employed by Skyview, another

[15] "**Restricted Person**" means any Person holding Participating Shares (a) in breach of the law or requirements of any country or governmental authority; (b) that is not an entity or organization exempt from taxation under Section 501(c)(3) of the Code or an entity or organization all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or (c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered. *See MacInnis Decl*. Ex. 5 (the "**Articles of Association**"), ¶ 1; *see also id.* ¶ 21.

Dondero affiliated entity. *Id.* At all times since his appointment as the Control Person, Mr. Patrick has faithfully executed his duties in furtherance of the DAF Structure's charitable missions.

30. As the Control Person, Mr. Patrick appointed Mr. Murphy as an independent director of DAF Holdco, providing a further layer of independence within the DAF Structure and insulating the structure from Mr. Dondero's undue influence.

31. As set forth in the Patrick Declaration, in December 2024, in contemplation of the restructuring described below, Mr. Patrick caused the formation of the DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation ("**DFW**"), which later, after the DAF Restructuring, became the majority Participating Shareholder (as defined herein) of DAF Holdco. Today, DFW continues the charitable mission of the DAF Structure without the influence of Mr. Dondero.

**E. The DAF Restructuring**

32. No one disputes that the DAF Restructuring occurred. It did. The parties dispute the *purpose* of the DAF Restructuring. As explained in detail below, Messrs. Patrick and Murphy uncovered Mr. Dondero's improper use of the DAF Structure, experienced his aggressive and inappropriate tactics first-hand, and evaluated and determined that litigation involving Mr. Dondero exposed the assets within the DAF Structure to the Highland entities' judgment creditors and to adverse tax consequences. Thus, Messrs. Patrick and Murphy took reasonable and appropriate action to protect the DAF Structure and its charitable mission by removing Mr. Dondero's undue and inappropriate influence through the DAF Restructuring. The DAF Restructuring had the following key steps, resulting in the removal of DAF Holdco and Mr. Dondero's influence from the DAF Structure and replacing DAF Holdco with CDM:

a. In October 2024, Mr. Patrick terminated the Skyview Contract (as defined herein);

b. On December 9, 2024, DFW was formed and, on December 12, 2024, CDM was formed;

c. On December 18, 2024, DAF Holdco transferred its interest in the DAF to CDM;

d. On February 7, 2025, DAF Holdco issued 318 Participating Shares to DFW;

e. On March 27, 2025, DFW was admitted to CDM for a capital contribution of $1,637,192 and CDM redeemed DAF Holdco's shares in CDM for $1,637,192 (the "**Redemption Price**"); and

f. On April 2, 2025, DAF Holdco caused the distribution of the Redemption Price to the Highland Foundations, in their capacity as Participating Shareholders.

## F. Charitable DAF Holdco and Its Governance

33. The history of the DAF Structure begins in 2006 when Mr. Dondero established the Highland Capital Management Partners Charitable Trust #2 ("**HCMPC Trust**"), a remainder trust in which the assets donated thereto were required to have been irrevocably donated by a date certain. *First Affidavit of Mark Eric Patrick*, dated June 4, 2025 (FSD 116) (the "**Patrick DFW Aff.**"), at ¶ 74.[16] In December 2010, HCMPC Trust placed all of its assets into CLO Holdco in exchange for 100% of the equity in CLO Holdco. *Id*.

34. In October 2011, Mr. Dondero caused the formation of the DAF, as a Cayman Islands exempted limited partnership, to control the DAF Structure, and DAF Holdco. *Id.* at ¶ 75. In tandem, HCMPC Trust contributed its equity in CLO Holdco to DAF Holdco, in exchange for 300 Participating Shares (as defined herein) in DAF Holdco, and DAF Holdco contributed its equity in CLO Holdco to the DAF. *Id.* at ¶ 74. In November 2011, HCMPC Trust then gifted the

[16] A copy of the *Patrick DFW Aff.* is attached to the Patrick Declaration as Exhibit 1 thereto.

300 Participating Shares in DAF Holdco to Highland Dallas, Highland Kansas City, and Highland Santa Barbara. *Id.*[17] As a result of these transactions, CLO Holdco is a wholly owned subsidiary of the DAF. *First Affidavit of Paul Murphy*, dated June 6, 2025 (FSD 116) (the "**First Murphy Aff.**") at ¶ 40.[18]

35. As set forth in the Patrick Declaration, ceding dominion and control over donated assets is critical to obtaining the tax benefits Mr. Dondero desired. To address the control issue, DAF Holdco was originally the sole limited partner of the DAF, with the DAF sitting atop the DAF Structure as a limited partnership. For its governance, DAF Holdco issued two types of shares: participating shares (the "**Participating Shares**") and management shares (the "**Management Shares**"). Cayman Opinion at ¶ 15; *Patrick DFW Aff.* at ¶ 92. The holder of the Management Shares did not participate in the capital of DAF Holdco but had the right to receive notice, attend and vote at the general meetings of DAF Holdco. Cayman Opinion at ¶ 17; *Patrick DFW Aff.* at ¶ 93. The holder of the Management Shares controls operations for DAF Holdco.

36. In contrast, holders of the Participating Shares are not entitled to vote nor to receive any notices. Cayman Opinion at ¶ 15; *Patrick DFW Aff.* at ¶ 94. *See* Articles of Association, ¶ 12 ("Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company . . .."). Moreover, the Articles of Association provide that the "rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not . . . be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares . . .." Articles of Association, ¶ 14. Thus, holders of Participating Shares were on notice of the fact that

---

17 In 2015, HCMLP Charitable Fund received 5 Participating Shares. *Id.*

18 A copy of the *First Murphy Aff.* is attached to the Murphy Declaration as Exhibit 1 thereto.

they could be diluted at any time through the issuance of new Participating Shares, including to DFW. And the holders of Participating Shares knew and agreed that they had no notice or voting rights with respect to actions taken by DAF Holdco. Holders of Participating Shares were purely passive.[19]

37. Because the DAF is a limited partnership, it was controlled by its general partner, which was Charitable DAF GP, LLC (the "**Original GP**") from 2011 to the early 2025. *Patrick DFW Aff*. at ¶ 88. From October 2011 until March 2021, Mr. Scott, Mr. Dondero's once best friend, was the managing member and sole member of the Original GP and held the Management Shares issued by DAF Holdco, which were the only voting shares issued. *Id.* at ¶¶ 101-02. Thus, at its inception, Mr. Scott was the single point of control (the "**Control Person**") for the DAF Structure by virtue of his position at the Original GP and as the holder of DAF Holdco's Management Shares. *Id.* The Control Person structure facially satisfied the requirement that Mr. Dondero cede dominion and control over donated assets while in effect allowing him to retain control over donated assets through his once best friend Mr. Scott, as the Control Person.

**G. DAF's Second Amended & Restated Partnership Agreement**

38. As a former limited partner in the DAF, DAF Holdco's relationship with the DAF and the Original GP (now CDH) is governed by that certain *Second Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP*, dated March 11, 2024 (the "**LPA**"). The LPA contains a key provision that prohibits the relief sought in the Cayman Proceeding, the Texas Proceeding (as defined herein) and this Chapter 15 Case. Section 6.14 of the LPA provides that all partners:

---

19 This passive structure caused some potential charities to decline acquiring Participating Shares. *See Patrick DFW Aff*. at ¶ 98 (noting that El Paso Foundation and the Miami Foundation rejected the gift of Participating Shares.); Cayman Opinion at ¶ 186.

> specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

LPA § 6.14.

39. Thus, Section 6.14 of the LPA clearly provides that no limited partner (*i.e.*, DAF Holdco and by extension the Highland Foundations as Participating Shareholders), may bring an action relating to the property of the DAF. The Cayman Court recognized this. Cayman Opinion ¶ 161. Accordingly, the JOLs pursuit of the DAF Structure is foreclosed by the LPA.

## THE HISTORY OF HIGHLAND, ITS LITIGATIONS AND ITS CHAPTER 11 CASE

### H. Highland Capital Management, L.P.

40. Highland was a multibillion-dollar global alternative investment manager founded in 1993 by Mr. Dondero and Mark Okada ("**Mr. Okada**"). As of its bankruptcy filing, Highland was a Delaware limited partnership. 0.5% of the interests were collectively held by Mr. Dondero, his family trust, Dugaboy Investment Trust ("**Dugaboy**") and another founder, and 99.5% of the limited partnership interests were held by a subsidiary in the DAF Structure, HMIT, now controlled by Mr. Patrick.

### I. Highland Litigation

41. Despite Highland's investment success, Highland became ensnared in three significant litigations as the result of botched business deals and personal fallouts starting as early as 2000. When these litigations began to look unfavorable, Mr. Dondero made a habit of taking actions to frustrate judgment creditors.

**1. UBS**

42. In 2007, UBS Securities LLC and UBS AG, London Branch (together, "**UBS**") sued Highland and certain affiliates for breach of contract in New York state court (the "**UBS Action**"). Fearing an adverse judgment, in 2010, Mr. Dondero began moving assets outside the reach of UBS, including through a scheme involving a Cayman Islands reinsurance company, Sentinel Reinsurance, Ltd. ("**Sentinel**"), controlled by Mr. Dondero and his close associate Mr. Scott Ellington ("**Mr. Ellington**"). In 2019, UBS won a judgment in excess of $ 1 billion. After learning of the Sentinel scheme in Highland's Bankruptcy, discussed below, UBS commenced a special turnover proceeding (the "**Turnover Proceeding**") against Mr. Dondero personally. This litigation remains pending. If UBS is successful in the Turnover Proceeding, Mr. Dondero will become *personally liable for a judgment in excess of $1 billion*.

**2. Acis**

43. In 2016, Joshua Terry ("**Mr. Terry**"), obtained an arbitration award against Acis Capital Management, L.P. (together with its general partner, Acis Capital Management GP, L.P., "**Acis**"). In response, Mr. Dondero stripped Acis' assets, and Mr. Terry commenced an involuntary chapter 7 petition against Acis in the Bankruptcy Court for the Northern District of Texas (the "**Texas Bankruptcy Court**"), which was converted to a chapter 11 case (the "**Acis Bankruptcy**") where a chapter 11 trustee was appointed. Under the confirmed chapter 11 plan, Mr. Terry received ownership of Acis. *See Highland Cap. Mgmt., L.P. v. Phelan (In re Acis Cap. Mgmt. LP)*, 604 B.R. 484, 505 (N.D. Tex. 2019).

**3. Crusader**

44. In July 2016, a committee of redeemers (the "**Redeemer Committee**") commenced an arbitration against Highland for breach of its fiduciary duties in managing a Bermudian

investment fund. The Redeemer Committee obtained a $189 million award against Highland, but prior to enforcement of the award, Highland filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Highland Bankruptcy**") in this Court (the "**Delaware Bankruptcy Court**").

### J. Highland's Bankruptcy

45. Shortly after its appointment, the creditors' committee (the "**Creditors' Committee**")[20] moved to transfer the Highland Bankruptcy to the Texas Bankruptcy Court where Judge Jernigan had previously dealt with the Acis Bankruptcy. On December 4, 2019, the Delaware Bankruptcy Court entered an order transferring the Highland Bankruptcy to the Texas Bankruptcy Court.

46. To avoid appointment of a chapter 11 trustee, Mr. Dondero, Highland and the Creditors' Committee entered into a settlement (the "**Governance Settlement**") whereby, among other things, Mr. Dondero was removed from all control positions at Highland, and an independent board (the "**Independent Board**") was appointed to manage Highland. *In re Highland Cap. Mgmt., L.P.*, No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *2 (Bankr. N.D. Tex. June 7, 2021). At the time of the Governance Settlement, the parties believed that there could be value in keeping Mr. Dondero at Highland in a supervised capacity, subject to the Independent Board's oversight. *Id.* Unfortunately, that turned out to be incorrect. *Id.* at *3.

47. During the summer of 2020, Mr. Dondero proposed several plans of reorganization, each of which the Creditors' Committee and the Independent Board opposed. *Id.* at 426. Mr. Dondero responded with a series of actions adverse to Highland (despite still being a fiduciary to Highland). *See Highland Cap. Mgmt., L.P.*, 2021 WL 2326350, at *3. As a result of these actions,

---

[20] UBS, Acis and the Redeemer Committee were members of the Creditors' Committee.

the Independent Board demanded that Mr. Dondero resign, and he did so on October 9, 2020. *Id.* at *6.

48. After resigning, Mr. Dondero continued to take actions adverse to Highland. In response, Highland obtained a temporary restraining order (the "**TRO**") against Mr. Dondero. *See id.* at *1. Mr. Dondero ignored the TRO, and the Texas Bankruptcy Court held Mr. Dondero in contempt of court.

49. On February 22, 2021, the Texas Bankruptcy Court confirmed Highland's chapter 11 plan (the "**Highland Plan**"). To protect parties from Mr. Dondero's vexatious wrath, the Highland Plan contained a gatekeeper provision (the "**Gatekeeper Provision**") that required Mr. Dondero, among others, to seek permission from the Texas Bankruptcy Court prior to pursuing any claims against certain protected parties. *Highland Cap. Mgmt. L.P.*, 2025 WL 97738, at *3; *see also In re Highland Cap. Mgmt., L.P.*, No. 19-34054-sgj-11, 2021 WL 3418657, at *15 (Bankr. N.D. Tex. Aug. 3, 2021). That didn't matter either. On April 12, 2021, the Texas Bankruptcy Court held Mr. Dondero (for a second time) in contempt and awarded damages for violating the Gatekeeper Provision. *In re Highland Cap. Mgmt., L.P.*, No. 19-34054-sgj-11, 2021 WL 3418657, at *14 (Bankr. N.D. Tex. Aug. 4, 2021). On August 11, 2021, the Highland Plan became effective.

**<u>POST-CONFIRMATION: PRE-DAF RESTRUCTURING</u>**

**K. NexPoint and Skyview**

50. Following Highland's confirmation hearing, Mr. Dondero established a new investment manager, NexPoint. *Patrick DFW Aff.* at ¶ 66. Mr. Dondero also caused the formation of Skyview Group ("**Skyview**") to provide back-office services to NexPoint and its managed funds. *Id.* The chief executive officer and owner of Skyview is Mr. Ellington, a longtime business associate of Mr. Dondero and former general counsel of Highland. *Id.* Skyview had a servicing

contract with DAF, in which DAF paid annual fees of $1 million to Skyview (the "**Skyview Contract**"). *Id.* at ¶147(f).

### L. Messrs. Patrick and Murphy Assume Control of the DAF Structure

51. Prior to 2021, Mr. Scott and Mr. Dondero were best friends. *Id.* at ¶ 102. In the midst of confirmation proceedings during the Highland Bankruptcy, though, Mr. Dondero and Mr. Scott suffered a falling out because Mr. Scott declined to take actions that would benefit Mr. Dondero but that Mr. Scott believed would violate his fiduciary duties. *Id.* at ¶ 104. In addition, Mr. Dondero believed that Mr. Scott's actions benefited Mr. Seery, Mr. Dondero's replacement in the Highland Bankruptcy. *Id.* at ¶ 105.

52. In March 2021, Mr. Patrick approached Mr. Scott about assuming Mr. Scott's role as the Control Person of the DAF Structure due to his historical knowledge of the DAF Structure. *Id.* at ¶ 103. On March 25, 2021, Mr. Scott transitioned the Control Person role to Mr. Patrick. *Id.* at ¶ 108. Due to the independence of the Control Person role, Mr. Dondero did not have a say in the decision. *Id.* at ¶¶ 105-108.

53. In April 2021, Mr. Patrick appointed Mr. Murphy as an independent director of DAF Holdco, as an additional layer of independence. *First Murphy Aff.* at ¶ 34.

54. Mr. Patrick also assumed the controlling roles at certain entities in the DAF structure, including HMIT, which as discussed above was the holder of 99.5% of the partnership interests in Highland and the holder of an interest with priority over Dugaboy's interest under the Highland Plan. *Id.* at ¶ 74. Mr. Patrick's control of HMIT has served as a flashpoint for Mr. Dondero.

### M. The HMIT Litigation and Settlement

55. On October 15, 2021, following a detailed investigation, Mr. Kirschner, the trustee of the Sub-Litigation Trust under the Highland Plan, commenced an adversary proceeding, Case No. 19-34054-sgj11, Adv. Pro. No. 21-03076-sgj, against Mr. Dondero and numerous affiliates, including NexPoint, Dugaboy, HMIT, Mr. Ellington, the DAF, DAF Holdco, and CLO Holdco asserting 36 causes of action (the "**Kirschner Claims**"). On May 19, 2025, Mr. Kirschner and HMIT, by then under the control of Mr. Patrick, entered into a settlement (the "**HMIT Settlement**") resulting in the dismissal of the action against HMIT and the other CDM Parties and the assignment of the remaining Kirschner Claims to HMIT. On June 30, 2025, the Texas Bankruptcy Court entered an order (the "**HMIT Settlement Order**") approving the HMIT Settlement.[21]

56. As of today, the only defendants remaining in the Kirschner Proceeding are Mr. Dondero and his affiliates. HMIT, an entity in the DAF Structure, owns all of the Kirschner Claims and has asserted those claims against Mr. Dondero and his affiliates. And frustratingly for Mr. Dondero, Mr. Patrick – the Control Person for DAF – administers HMIT.

---

21 On July 14, 2025, Dugaboy appealed the HMIT Settlement Order (the "**HMIT Appeal**"). On February 9, 2026, Dugaboy filed a motion to vacate the HMIT Settlement Order (the "**Motion to Vacate**") with the Texas Bankruptcy Court. On June 15, 2026, the Texas Bankruptcy Court entered an order denying the Motion to Vacate (the "**Rule 60(b) Order**"). On June 29, 2026, Dugaboy (i) filed a motion to reconsider the Rule 60(b) Order with the Texas Bankruptcy Court (the "**Motion to Reconsider**") and (ii) appealed the Rule 60(b) Order (the "**Rule 60(b) Appeal**"). On July 10, 2026, the Texas Bankruptcy Court denied the Motion to Reconsider. As of today, the HMIT Appeal and the Rule 60(b) Appeal remain pending. Notably, in the hearings on the Motion to Vacate, Margot MacInnis – one of the JOLs – voluntarily appeared and testified as a witness for Dugaboy (Mr. Dondero's family trust), even though Dugaboy's litigation position is directly adverse to the economic interests of DAF Holdco.

**POST-CONFIRMATION: EXECUTING THE DAF RESTRUCTURING**

**N. Post-Confirmation Charitable DAF Holdco**

**1. Messrs. Patrick and Murphy**

57. After becoming the Control Person of the DAF Structure, Mr. Patrick learned that Mr. Scott had created potential liabilities for the DAF and the DAF Structure by failing to manage the DAF and its assets independently of Mr. Dondero. *Patrick DFW Aff.* at ¶ 110. In certain instances, Mr. Patrick believed that Mr. Scott had simply been authorizing investments proposed by Mr. Dondero without any due diligence. *Id.* Mr. Patrick uncovered that Mr. Scott had approved *every* transaction ever proposed by Mr. Dondero. *Id. at* ¶ 114. Several of these transactions should have been, at a minimum, closely scrutinized. *See id.* at ¶¶ 115-17. Further, Mr. Patrick became aware that Mr. Dondero determined Mr. Scott's compensation without consulting any compensation study or expert advice. *Id. at* ¶ 112. Taken all together, Mr. Patrick determined that for the decade of 2011 to March 2021, Mr. Dondero used DAF through influencing Mr. Scott as Control Person to (i) generate income for Mr. Dondero's commercial gain, (ii) provide liquidity to Mr. Dondero and his affiliates, and (iii) take high risk positions for the benefit of himself and his affiliates and to continue to enjoy significant personal tax benefits. *Id.* at ¶ 114-17.

58. By early 2023, Mr. Patrick became concerned with Mr. Dondero's relationship with the DAF as a result of the Kirschner Proceeding and the developments in the UBS Action. *Id.* at ¶ 150. As a result, starting in the middle of 2023, Mr. Patrick began to reduce exposure to Dondero-backed investments and diligence Dondero-backed deals, leading Mr. Patrick to turn down multiple proposals – something Mr. Scott had never done – which led to Mr. Dondero's increasing frustrations. *Id.* at ¶¶ 150-60.

59. In November 2023, Mr. Dondero asked Mr. Patrick to transfer $1.5 million in DAF funds – funds that were to be deployed in furtherance of the DAF Structure's charitable mission – to Mr. Dondero's offshore entities, which Mr. Murphy believed to be Sentinel, the entity Mr. Dondero previously used to thwart UBS' recoveries in the UBS Action. *First Affidavit of Mark Eric Patrick as Sole Holder of the Management Share* (the "**Patrick Mgmt. Aff**") at ¶ 46.[22] Mr. Patrick further understood that Skyview intended to issue an invoice in the amount of $1.5 million to DAF, even though Skyview provided no service to DAF in connection with the invoice. *Id.*

60. After engaging in discussions regarding Mr. Dondero's actions and the developments that occurred since their appointments, Messrs. Patrick and Murphy believed that they needed to take decisive action to protect the DAF and its assets. They had four primary motivations: (1) actions taken by Mr. Dondero or the Highland Foundations could expose the DAF, Mr. Patrick or Mr. Murphy to violations of various U.S. tax laws, (2) actions taken by Mr. Dondero and the Highland Foundations could increase the risk that UBS could recover from entities within the DAF Structure as the alter ego of Mr. Dondero, (3) Mr. Dondero's actions suggested that he sought to use the DAF assets to satisfy his or his entities' creditors, including UBS, rather than for charitable purposes, and (4) Mr. Dondero repeatedly demanded that the DAF assets be misused to make investments for NexPoint. *First Murphy Aff.* at ¶ 46.

### 2. The DAF Restructuring

#### i. Step One: Terminating the Skyview Contract

61. In or around June 2024, Messrs. Patrick and Murphy began to contemplate the DAF Restructuring, as a protective measure against the risks described in the previous paragraph. *Id.* at ¶ 47. They envisioned four phases. *Id.* at ¶ 48. First, Mr. Patrick would resign from Skyview and

[22] A copy of the *Patrick Mgmt. Aff.* is attached to the Patrick Declaration as Exhibit 2 thereto.

would terminate the Skyview Agreement. *Id.* Second, a new Delaware limited liability company, CDM, would be formed and DAF Holdco would contribute the DAF to CDM. *Id.* Third, DAF Holdco would issue Participating Shares to DFW. *Id.* And fourth and finally, DFW would be admitted to CDM, CDM would redeem DAF Holdco's interest in CDM for fair market value, DAF Holdco would make a final distribution to the Highland Foundations and Messrs. Patrick and Murphy would place DAF Holdco in voluntary liquidation in the Cayman Islands. *Id.* At each step of the restructuring, Messrs. Patrick and Murphy sought the advice of counsel and independent advisors. *Id.* at ¶ 51.

62. The relationship between Mr. Dondero, and Messrs. Patrick and Murphy soured quickly in the second half of 2024. In August 2024, DAF diligenced and declined a preferred dividend financing requested by NexPoint. Then, in September 2024, DAF diligenced and declined a Dondero-backed real property transaction. This formed the background for the implementation of the first step in the DAF Restructuring: in October 2024, Mr. Patrick resigned from Skyview and terminated the Skyview Contract. *Id.* at ¶ 52.

**ii. Step Two: Forming CDM**

63. With frustration mounting in November 2024, Mr. Dondero, through his attorneys, offered Mr. Patrick a Caribbean island and large sums of money if Mr. Patrick agreed to resign as the Control Person. *Patrick DFW Aff.* at ¶ 185. Mr. Patrick understood this offer to have also been made on behalf of the Highland Foundations in an attempt to buy him off. *Id.* Mr. Patrick declined this buyout. *Id.*

64. On November 11, 2024, the Highland Foundations (all of whom share significant ties with Mr. Dondero) sent a no confidence letter (the "**No Confidence Letter**"), expressing governance concerns and requesting an equitable wind-up. *First Murphy Aff.* at ¶ 55.

65. On November 20, 2024, ValueScope, an independent valuation firm, and tax counsel for DAF Holdco, made a presentation to counsel for the Highland Foundations, and on December 11, 2024, there was a meeting with the Highland Foundations, Mr. Murphy and counsel to discuss governance and related rights. *Id.* at ¶¶ 55-66. While Mr. Murphy viewed these meetings as productive, Messrs. Patrick and Murphy still believed that the DAF Restructuring might be necessary. Thus, on December 12, 2024, CDM was formed, implementing part of the second step of the DAF Restructuring. *Id.* at ¶ 70.

66. On December 13 and 18, 2024, DAF Holdco's tax counsel emailed counsel for the Highland Foundations requesting that the No Confidence Letter be withdrawn, which the Highland Foundations ignored. Thus, on December 18, 2024, DAF Holdco, CDM and the Original GP executed a Deed of Assignment and Assumption (the "**Deed**"). *Id.* at ¶ 72. The effect of the Deed was that DAF Holdco transferred the entirety of its interest in the DAF to CDM. *Id.* at ¶ 73. After the execution and delivery of the Deed, CDM held 100% interest in the DAF and DAF Holdco maintained an indirect interest through which the Highland Foundations continued to hold their indirect interests. *Id.* This completed the second step of the DAF Restructuring.

**iii. Step Three: DFW Participating Share Issuance**

67. By early 2025, Messrs. Patrick and Murphy understandably had significant concerns with Mr. Dondero and his continued actions taken to the detriment of the DAF. In addition, the Highland Foundations claimed to have suddenly become displeased with the state of management of the DAF Structure, although they never made indication of such displeasure at any of the meetings held in November and December 2024. As a result, Messrs. Patrick and Murphy committed to fully implementing the DAF Restructuring. *Id.* at ¶ 94.

68. On February 7, 2025, (i) CDH was formed as the replacement general partner for DAF Holdco, and (ii) DAF Holdco issued 318 Participating Shares to DFW.[23] The result of the issuance was that DFW became the majority Participating Shareholder of DAF Holdco. This completed the third step in the DAF Restructuring.

**iv. Step Four: The Share Redemption**

69. On February 12, 2025, Andrew Johnstone of Johnstone Law in the Cayman Islands contacted Mr. Murphy, purporting to represent "Charitable DAF Fund 2 LP" ("**DAF 2**"). *First Murphy Aff.* at ¶ 98. Mr. Murphy forwarded the inquiry to counsel, who determined that DAF 2 did not exist. *Id.* at ¶ 101. Mr. Patrick suspected that the misrepresented inquiry was an effort by Mr. Dondero to gain access to the DAF and its assets. *Patrick DFW Aff.* at ¶ 189. To protect against future skullduggery, Messrs. Patrick and Murphy caused DAF 2 to actually be formed as an exempted limited partnership under their control. *First Murphy Aff.* at ¶ 102.

70. On March 27, 2025, Mr. Patrick, as manager of CDM, executed a written consent that (i) added DFW as a new 50% member of CDM for $1,637,192, and (2) redeemed DAF Holdco's membership interest in CDM, for $1,637,192. *First Murphy Aff.* at ¶ 116. Then, on April 2, 2025, wires were sent to the Highland Foundations for their *pro rata* share of $1,637,192. *Id.* at ¶ 122. This completed the fourth and final step in the DAF Restructuring. As a result of the DAF Restructuring, CDM became the limited partner of the DAF, DAF Holdco's limited partnership interest in the DAF was redeemed at fair value, and it was removed from the DAF Structure, with the Highland Foundations remaining as its Participating Shareholders. *Id.* at ¶ 116.

[23] CDH was formed to provide additional independence from Mr. Dondero and to comply with applicable Cayman Islands law regarding the domicile for a general partner of an exempted limed partnership formed under Cayman Islands law. *See Patrick DFW Aff.* at ¶ 183.

71. Prior to executing the final step in the DAF Restructuring, Messrs. Patrick and Murphy obtained several independent valuations of the limited partnership interest DAF Holdco held in CDM. *Id.* at ¶ 117; *Fourth Affidavit of Mark Eric Patrick*, dated August 19, 2025 (FSD 116) (the "**Partick 4th DFW Aff.**") at ¶¶16-17 (citing FTI and ValueScope valuation and Weaver fairness opinions); Cayman Opinion at ¶¶ 188-89 (concluding that there was no good reason to impugn valuations conducted by FTI, ValueScope and Weaver).[24] The Redemption Price was based on these valuations. Cayman Opinion at ¶¶ 188-89. Once the redemption of DAF Holdco's interest in CDM was complete, Messrs. Patrick and Murphy began the process of putting DAF Holdco into voluntary liquidation in the Cayman Islands.

### 3. Mr. Patrick's Remuneration Is a Red Herring

72. The JOLs make much of Mr. Patrick's remuneration for his role as the Control Person. The JOLs assert that because Mr. Patrick caused the DAF Restructuring and because he increased his remuneration compared to that of Mr. Scott, that somehow conclusively shows that Mr. Patrick's actions were inappropriate. This is wrong. The history described above demonstrates that Mr. Patrick had a panoply of reasons to cause the DAF Restructuring. And Mr. Patrick's pay was increased after obtaining independent compensation studies, studies that Mr. Scott never conducted for his remuneration for the same job. Moreover, Mr. Scott's role as Control Person (in which he did little more than rubber stamp 100% of Mr. Dondero's requests) was not his main job and he obtained compensation from other sources. Thus, the JOLs' assertion that Mr. Patrick's increased pay is problematic is a red herring that bears nothing on the DAF Restructuring or Mr. Patrick's actions. The Cayman Court saw right through the JOLs' assertion and rejected it. *See* Cayman Opinion at ¶ 206 ("Having reviewed the affidavit evidence on this question including

[24] A copy of the Patrick *4th DFW Aff.* is attached to the Patrick Declaration as Exhibit 3 thereto.

the detailed report dated 26 August 2024 from Mercer, the court finds that there is no serious issue to be tried that this remuneration was excessive and in breach of his duty to the Company").

## POST-DAF RESTRUCTURING: CAYMANS AND TEXAS PROCEEDINGS

### O. The Cayman Proceeding

#### 1. Messrs. Patrick and Murphy Cause DAF Holdco to Commence Voluntary Liquidation

73. On April 2, 2025, DAF Holdco executed the necessary paperwork and declarations of solvency in order to commence DAF Holdco's voluntary liquidation. *First Murphy Aff.* at ¶ 119. On April 14, 2025, counsel for DAF Holdco published notice of the voluntary liquidation in the Cayman Islands Gazette. *Id.* at ¶ 123.

#### 2. The Highland Foundations File a Joint and Equitable Winding Up Petition

74. On April 24, 2025, *after* DAF Holdco already commenced a voluntary liquidation, the Highland Foundations, represented by Johnstone Law, served an application seeking to have DAF Holdco wound up on a just and equitable basis (the "**J&E Petition**"). *Id* at 125.[25] The J&E Petition made improper, unsubstantiated, and false allegations regarding Messers. Patrick and Murphy's management of the DAF Structure, and was supported by, *inter alia*, an affidavit from Mr. Dondero which confirmed that he had agreed to fund the action. As DAF Holdco was already in voluntary liquidation and the J&E Petition was redundant, the Highland Foundations then issued the Supervision Application seeking to have the liquidation of DAF Holdco continue under the supervision of the Cayman Court. The Supervision Application was scheduled for hearing on May 6, 2025. *Id.* at ¶ 143. Messrs. Patrick and Murphy did not oppose the voluntary liquidation being brought under Cayman court supervision. *Id.* at ¶ 145.

[25] While not a perfect analogy since, at the time, DAF Holdco had few if any creditors, this is somewhat akin to the filing of an involuntary bankruptcy petition after a debtor had already commenced a voluntary bankruptcy case.

75. Immediately after the Cayman Court entered the supervision order, Mr. Murphy began receiving emails indicating that the JOLs were demanding the turnover of records from entities within the DAF Structure that *did not* commence any proceeding (voluntary nor involuntary) before the Cayman Court, including CLO Holdco, the GP and the DAF and that the JOLs purported to act on behalf of such entities. *Id.* at ¶¶ 156-57.

76. On May 9, 2025, the JOLs sent Skyview a notice (the "**Skyview Notice**") seeking books and records regarding not just DAF Holdco, but also of other entities in the DAF Structure for which the JOLs had no authority to act. *Patrick DFW Aff.* at ¶ 42. In addition, the JOLs purported to act on behalf of certain of the entities in the DAF Structure – even though they had no authority to do so – which caused the freezing of operating accounts and interfered with the DAF's ordinary course of business. *Id.*

77. On May 20, 2025, Mr. Murphy became aware that the JOLs had engaged Johnstone Law as their attorneys. *Id.* Because Johnstone law represented the Highland Foundations in their filing of the J&E Petition and previously purported to represent the fictitious DAF 2 (*see supra* ¶¶ 69, 74), Messrs. Patrick and Murphy were concerned that there was a disabling conflict for Johnstone Law. The JOLs ignored repeated suggestions that they engage alternative counsel who did not have a clear conflict of interest and proceeded to seek sanction (*i.e.*, permission) from the Cayman Court to engage Johnstone Law (the "**Sanction Application**"). The Sanction Application was scheduled for June 24, 2025, and was opposed by DFW, and Messrs. Patrick and Murphy. The Sanction Application involved extensive briefing and affidavits. On the eve of the hearing of the Sanction Application, the JOLs conceded and decided to employ alternative Cayman counsel so that the Cayman Court would not rule on whether it was appropriate to seek to retain Johnstone Law. After this 11th hour decision which necessitated the incurrence of significant unnecessary

fees, the Cayman Court entered an indemnity costs award against DAF Holdco in favor of Mr. Patrick and DFW[26] – what in the U.S. would be called fee shifting.

### 3. The JOLS Accept Funding from Mr. Dondero

78. The JOLs have a sole source for their funding in the Cayman Proceeding: a July 11 Funding Agreement ("**Funding Agreement**") with Crossvine Liquidation Funding, LLC (the "**Funder**"). The JOLs have readily conceded to the Cayman Court that they "do not consider the Funder to be a traditional third-party lender, but rather understand that it is a special purpose vehicle incorporated ultimately for the purpose of Mr [sic] Dondero (through the structure outlined [earlier in the same affidavit] funding the liquidation and the JOLs pursuing the Proposed Proceedings".[27] Stated differently, Mr. Dondero is single handedly funding litigation against Messrs. Patrick and Murphy and several entities.[28] The reason is obvious given the history detailed above: this serial litigant is unhappy that these people and entities thwarted his attempt to control the DAF Structure and its assets himself, and since he cannot sue them personally, he is funding someone else's efforts to do it for him.

79. Most of the Funding Agreement is purposefully opaque: about one-quarter of the agreement, including most of its key terms, was redacted from the version filed with the Cayman Court, and the JOLs have refused to provide an unredacted version to the CDM Parties. That

---

[26] A copy of the Cayman Court's indemnity cost award (the "**Indemnity Costs Award**") is attached to the Patrick Declaration as Exhibit 12 thereto. The order was not made against the JOLs personally but rather against DAF Holdco. In light of DAF Holdco's failure to comply with the order and pay DFW's indemnity costs, DFW Mr. Patrick has issued an applications seeking to hold the JOLs (and the Funder) personally liable for costs.

[27] *See Sixth Affidavit of Margot MacInnis* (July 11, 2025) ("**Sixth MacInnis Aff.**"), ¶ 11. A copy of the *Sixth MacInnis Aff.*, including a copy of the Funding Agreement, is attached to the Patrick Declaration as Exhibit 13 thereto.

[28] To underscore Mr. Dondero's control, the confidentiality provisions of the Funding Agreement expressly permit the Funder to share confidential information it receives from the JOLs with "its Affiliate or its Affiliate's directors, officers, employees, advisers, agents, representatives and providers of finance…", which presumably includes Mr. Dondero. Funding Agreement, ¶ 10.2.

concept would be shocking in a case under the Bankruptcy Code; this Court would never approve a DIP financing motion if 25% of it, including things as basic as the amount, were filed under seal. As a result, the CDM Parties are unable to test the bald assertion in Ms. MacInnis's affidavit that "the Funder is not entitled to in any way control the conduct of the Proposed Proceedings (clause 8.5)."[29] Indeed, in the redacted version of the Funding Agreement that was filed and provided to the CDM Parties, there is no Section 8.5 – redacted or otherwise. To the extent that this is a mistaken reference to Section 9.5 of the Funding Agreement, that Section provides, in relevant part, that "The Funder agrees that *subject to the approval rights expressly granted to the Funder under this Agreement*, the JOLs are free to act as they see fit, …" (emphasis supplied). Because a quarter of the agreement is redacted, the CDM Parties do not know what "approval rights [have been] expressly granted to the Funder," but there must be some, otherwise the proviso would be unnecessary. The CDM Parties highly suspect that in fact the Funder, and therefore Mr. Dondero, have some veto rights over settlements.

80. The Cayman Opinion notes that this funding has been exhausted. Cayman Opinion at ¶¶ 71, 265. The JOLs cannot even pay the existing indemnity award in DFW and Mr. Patrick's favor following the Sanction Application, much less any future costs awards which the CDM Parties may be awarded under the 'loser pays' principle. *Id*. at ¶ 266 (noting that the existing indemnity costs orders made in favor of Mr. Patrick and DFW have not yet been paid). And in denying the Injunction Application, the Cayman Court further noted that in the absence of fortification (*i.e.*, security), Crossvine did not appear to be good for the money if the CDM Parties suffered damage from a wrongfully granted injunction. *Id*. at ¶ 267.[30]

---

[29] *Sixth MacInnis Aff.*, ¶ 9.8.

[30] On May 20, 2026, Mr. Patrick filed a Summons in the Cayman Proceeding seeking non-party costs orders against the JOLs and against the Funder, for payment of the outstanding $674,744.57 costs certificate owing to him in his capacity as the management shareholder of DAF Holdco following the Sanction Application, on the basis that the

**P. The Texas Proceeding**

81. In an effort to make this a multi-front war, on July 1, 2025, the Highland Foundations commenced an action (the "**Texas Proceeding**") against defendants Mark Patrick, DFW, CDM, CDH, and the Original GP (the "**TRO Defendants**") in the Texas Business Court, 1st Division (the "**Texas Business Court**") seeking, among other things, a temporary restraining order, temporary injunction and appointment of a receiver over CDM and DFW.

82. To moot the need for a TRO hearing, the Highland Foundations and the TRO Defendants entered into a "Rule 11 Agreement" under the Texas Rules of Civil Procedure (as amended, the "**Rule 11 Agreement**"). Under the Rule 11 Agreement, the TRO Defendants have agreed to certain restrictions on their actions, including but not limited to, certain restrictions (i) on the use of funds outside the ordinary course of business, (ii) on increasing employee compensation, (iii) on the sale of assets, (iv) regarding governance modification, and (v) regarding document destruction, pending the outcome of the Texas Proceeding.

**Q. Financial Status of Debtor**

83. It is indisputable that, as of the filing of the Cayman Proceeding, the Debtor was solvent. First (and dispositive in itself), the JOLs *concede* this in the Verified Petition and accompanying affidavit. Verified Petition at ¶ 66; *Moran Aff.* at ¶ 58. Second, a J&E Petition is predominantly used where there are governance disputes involving Cayman Island entities which are solvent (otherwise a regular winding up petition could be filed on the basis that the company is unable to pay its debts). Third, in commencing the underlying voluntary liquidation, Messers.

---

JOLs' funding arrangement with Crossvine has been improperly structured to avoid the usual rules governing the priority of payments in a liquidation. The JOLs have steadfastly refused to pay the outstanding costs certificate–which the applicable rules provide should be paid *pari passu* with the JOLS' costs–maintaining that DAF Holdco has insufficient funds to pay the adverse costs, all while continuing to incur exorbitant expenses pursuing speculative litigation. That application has been served on the JOLs and Crossvine, but as of the date of this Objection it has not been listed for hearing.

Patrick and Murphy executed declarations of solvency and no one has ever disputed their declarations. Indeed, when the Highland Foundations sought a supervision order and the JOLs' appointment, it was on the basis of a need for an investigation and allegations of misconduct (which are denied), not on the basis of insolvency. Fourth, as of the filing of the voluntary liquidation, Messers. Patrick and Murphy were not aware of the Debtor having any material prepetition creditors. Neither were the Highland Foundations when they made a similar averment regarding DAF Holdco's solvency in the Supervision Application.[31] And finally, the committee appointed in the Cayman Proceeding does not have any creditors – it is a committee of shareholders. *Sixth MacInnis Aff.* ¶ 6.

84. It is true that, under the JOLs' stewardship, the Debtor *now* has become equivalent to what, in a chapter 11 or 7 case, we would refer to as administratively insolvent because of post-petition debts. As discussed above, the JOLs suffered a large indemnity costs award, *i.e.*, fee shifting, for seeking to retain Johnstone Law as counsel in the Cayman Proceeding. *See supra* ¶ 80*; First Affidavit of Mark Eric Patrick,* dated September 12, 2025 (FSD 201) (the "**Patrick CDM Aff**.") at ¶ 17.[32] Messers. Patrick and Murphy's contractual indemnity claims together with existing (and any future) fee shifting orders comprise the bulk of post-petition creditor claims and expenses in the liquidation that are not owed to the JOLs themselves or their professionals or to the Funder, a Dondero affiliate. In addition, the JOLs have incurred millions of dollars of legal fees, almost all of which relate to their pursuit of claims against the CDM Parties, and those fees continue to mount. *Id.* at ¶¶ 16-17.[33] In light of this financial distress, and because of the loser

---

[31] *See MacInnis Decl*. Ex. 67, Supervision Application ¶ 14(d) ("[s]ave in respect of any claim the Supporting Organizations save (sic), there does not appear to be any creditors.").

[32] A copy of the *Patrick CDM Aff.* is attached the Patrick Declaration as Exhibit 4 thereto.

[33] *See Renumeration Report*, a copy of which is attached the Patrick Declaration as Exhibit 9.

pays principle in the Caymans, on September 12, 2025, the CDM Parties filed an application for security for costs seeking security, in the amount of $6,123,580, for any costs they incur in defending the Cayman Proceeding (the "**Costs Application**").[34]

85. Due to events that occurred *after* the filing of the Verified Petition, DAF Holdco is insolvent. That has nothing to do with the Court's analysis of whether this Verified Petition involves a solvent debtor. As is shown below, the key inquiry as to whether Chapter 15 recognition is appropriate is whether the foreign proceeding is being used to adjust debts. To state the obvious, the foreign proceeding was not commenced to adjust debts that had not yet been incurred – either the indemnity costs in favor of certain CDM Parties or the JOLs' own attorneys' fees. In their First Report to Contributories, dated July 2, 2025, only two creditors were identified holding claims in the cumulative amount of approximately $34,000 and the JOLs had identified assets in the amount of approximately $156,000. *Id.* at ¶ 15. The $34,000 of claims could easily have been paid in full and no adjustment is needed.

* * *

86. As the Court can see by comparing the foregoing to the description in the Verified Petition, the Court is confronted with two very different views of the facts giving rise to the two-party dispute. In determining which version of the facts makes more sense, the Court first should look to the Cayman Opinion, in which the Cayman Court adopted the CDM Parties' version of the facts nearly in full. It also should ask itself the following questions:

[34] The Costs Application remains pending. Should the CDM Parties prevail in the Cayman Appeal, the CDM Parties anticipate that they will seek additional costs. A copy of the Costs Application is attached to the Patrick Declaration as <u>Exhibit 10</u> thereto.

- If they were attempting to "hide" what they had done, why would Messrs. Patrick and Murphy have placed the Debtors into a voluntary liquidation and published notice of the liquidation *before* Mr. Dondero and his entities sought the appointment of the JOLs?
- If Messrs. Patrick and Murphy were attempting to avoid judicial oversight, why did they voluntarily agree that the liquidation that they commenced could be converted to an official liquidation with court oversight?
- What would Messrs. Patrick and Murphy have stood to gain by causing the steps of the corporate actions to occur and publicly acknowledging, in court pleadings and hearings, that they were doing so to protect the entities' *charitable* status? After all, unlike most defendants accused of fraud, they would not be able to use the funds for any personal purpose if they were publicly championing that the funds were to be used solely for charitable purposes.

## ARGUMENT

### A. The Court Should Deny Recognition

87. The principle of comity has never meant categorical deference to foreign proceedings. *In re Elpida Memory, Inc.*, 2012 WL 6090194, at *8 (Bankr. D. Del. Nov. 20, 2012). Thus, recognition under section 1517 of the Bankruptcy Code is not a "rubber stamp exercise." *In re Basis Yield Alpha Fund* (*Master*), 381 B.R. 37, 40 (Bankr. S.D.N.Y. 2008). To the contrary, the "recognition regime under chapter 15 is procedurally quite rigid." *Id.* at 46; *see also In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008) ("Recognition turns on the strict application of objective criteria."). The Court "must make an independent determination as to whether the [foreign proceeding] meets the definitional requirements of Sections 1502 and 1517 of the Bankruptcy Code, but 'the determination is a

formulaic one.'" *In re Ashapura Minechem Ltd.*, No. 11-14668 (JMP), 2011 WL 5855475, at *4 (Bankr. S.D.N.Y. Nov. 22, 2011) (quoting *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007)).

88. The foreign representative bears the burden of proof of each required element for recognition. *See Basis Yield Alpha Fund,* 381 B.R. at 52.

**1. The Cayman Proceeding Does Not Constitute a Foreign Proceeding Within the Meaning of 11 U.S.C. § 101(23)**

89. Chapter 15 recognition is only available for a "foreign main proceeding" or a "foreign nonmain proceeding." *See* 11 U.S.C. § 1517(a)(1). Both a foreign main proceeding and a foreign nonmain proceeding require the existence of a "foreign proceeding." "Foreign Proceeding" sounds, on the surface, like it could include all manner of judicial proceedings in foreign countries, including civil lawsuits between solvent companies. But keeping in mind that the "purpose" of Chapter 15 is "to provide an effective mechanism for dealing with cases of *cross border insolvency*, 11 U.S.C. § 1501(a) (emphasis supplied), the term "foreign proceeding" is a defined term with a specific meaning to align it with Chapter 15's purpose:

> [A] *collective judicial or administrative proceeding* in a foreign country, including an interim proceeding, *under a law relating to insolvency or adjustment of debt* in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23) (emphasis supplied). In short, the term "foreign proceeding" is specifically designed to be a "collective" proceeding "relating to insolvency or adjustment of debt".

90. Thus, in order to establish that the Cayman Proceeding is a "foreign proceeding," the JOLs carry the burden of proving each of the following seven criteria:

> "(i) [the existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted

> under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation." *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (quoting *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018). If the JOLs fail to meet their burden of proof *on any one* of these seven "definitional elements," then the Cayman Proceeding is not a "foreign proceeding" within the meaning of Chapter 15. *In re Ashapura*, 480 B.R. at 136.

*Global Cord*, 2022 WL 17478530, at *7 (emphasis supplied).

91. As demonstrated below, the JOLs cannot meet their burden on factors (iii), (v) and (vii) of this test, each of which is fatal to their requested relief.

**i. The Cayman Proceeding is Not a "Collective Proceeding"**

**a. The Cayman Proceeding Is Not for the Benefit of the Creditor Body**

92. The Cayman Proceeding is not "collective in nature" within the meaning of the statute and case law because the case law "typically speaks in terms of the proceeding's treatment of and potential benefit *to creditors*, as well as emphasizing that the proceeding must concern all interests or the interests *of a creditor body* as a whole, not just individuals." *Global Cord*, 2022 WL 17478530, at *7 (emphasis supplied); *see also Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.*), 480 B.R. 129, 140 (S.D.N.Y. 2012) (the prime trait of a collective proceeding is "whether all creditors' interests [are] considered in the proceeding."); *In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, 902 (Bankr. S.D. Fla. 2010) ("[f]or a proceeding to be collective within the meaning of section 101(23), it must be instituted for the benefit of creditors generally.").

93. This case is not about creditors; it is about a governance dispute and who should control assets meant for charitable purposes. The JOLs have repeatedly admitted that DAF Holdco

is solvent. *See* Verified Petition at ¶ 66, *MacInnis Decl.* at ¶ 65; *Moran Decl.* ¶57.[35] As a solvent company as of the date of the filing whose only business was facilitating the making of charitable contributions, it did not rack up debts; the JOLs' First Report to Contributories identifies no material creditors, and Messrs. Patrick and Murphy cannot conceive of any possible unpaid creditor as of the date that the voluntary liquidation was initiated. Indeed, as set forth above, the JOLs' own First Report to Contributories lists a total of $34,000 of claims against $156,000 of assets. *See supra* at ¶ 85. There has also been no indication that a claims process has been proposed, presumably because no one intends to adjust any debts; the *de minimis* creditors could have easily been paid in full on the commencement date. This case is clearly not about the collective creditor body.

94. Moreover, it was not creditors who moved for the appointment of the JOLs, but rather certain Participating Shareholders controlled by Mr. Dondero – *i.e.*, the Highland Foundations – who petitioned the Cayman Court under the Supervision Application. *Id.*[36] at ¶ 63. The committee that has been formed to advise the JOLs is not a creditors committee; it is a committee of stockholders (also known as "contributories" under Cayman law). *See Sixth MacInnis Aff.* at ¶ 6 ("On 9 July 2025, the first meeting of contributories of the Company was held and a liquidation committee has now been established with respect to the Company (the

---

35 As noted above, the Debtor *now* has become insolvent post-petition because of the JOLs' own actions and the fees that they have run up. *See supra* at ¶ 84. But its insolvency now, as a result of the very actions taken by and fees incurred by the JOLs post-petition, including most notably to DFW and Mr. Patrick in the fee shifting award, does not alter the Court's analysis under the "collective proceeding" or *Global Cord* tests given that (a) the test is measured by the financial situation at the time of filing; (b) irrespective of solvency or insolvency, no one is even pretending that this case is about the adjustment of debts, and (c) it is unclear how this case or the Cayman Proceeding could be used to adjust the debts of a Cayman Court order or the JOLs' professionals fees.

36 Ironically, if (counterfactually) the Court were to find that the Debtor was insolvent as of April 2, 2025, the parties that would stand to lose the most are the Highland Foundations, who would have received fraudulent transfer or preference payments on that day, when the Debtor wired them over $1.63 million.

"**Committee**"). The members of the Committee are each of the Participating Shareholders represented by authorized individuals" (emphasis supplied).

95. The court in *Global Cord* was faced with an extremely similar fact pattern in a request to grant Chapter 15 relief to a Cayman Islands proceeding of a solvent company.[37] The Court rejected the notion that the Caymans proceeding was a collective one, holding:

> The JPLs nevertheless maintain that the Cayman Proceeding is "collective," because it seeks to benefit the corporation as a whole and all of its constituencies, rather than constituting a receivership or other collection activity taken on behalf of Blue Ocean or some discrete subset of claimants to satisfy just their individual interests. They further contend that there has been no need to facilitate the submission of claims or a claim review process, because they hope that Global Cord Blood Corp. remains solvent and will be able to pay all its creditors and other stakeholders, such as holders of equity. *They point to no cases holding that "collective" action is present in cases involving action taken for the intended benefit of a corporation as a whole without specific reference to the existence or rights of "creditors*," but they argue that that characteristic was merely a factual indicator of "collective" action in other cases, and does not preclude finding an action to be "collective" so long as it seeks to benefit a company as a whole.... The JPLs' position has some logical appeal, but the Court declines to adopt it. *All relevant case law, including Ashapura, unequivocally and at length invokes a focus on and involvement of "creditors" as the main definitional hallmark of "collective" action within the meaning of section 101(23)*.

*Global Cord*, 2022 WL 17478530, at *8 (emphasis supplied).

96. Just like the case at bar, the *Global Cord* court also found that:

> As of now there is nothing about the Cayman Proceeding that is *specifically oriented toward creditors. Rather, the Cayman Proceeding was commenced by concerned shareholders that say they seek to benefit the company by seeking relief and a recovery of funds that allegedly have been dissipated or improperly transferred due to an alleged fraud and other fiduciary breaches by management and/or board members*.

[37] The JOLs are well aware of *Global Cord*, because one of the JOLs (and an affiant to the Petition before the Court), Ms. MacInnis, also was one of the JOLs in *Global Cord Blood Corp*.

*Id.* (emphasis supplied).

97. This ruling is not merely technical; it is grounded in the very purpose of Chapter 15. The *Global Cord* opinion reasoned that:

> Courts' consistent focus on the existence of creditor related proceedings abroad reflects the overall purpose and focus of Chapter 15, and *avoids expanding Chapter 15 to provide Bankruptcy Court assistance for any foreign proceeding aimed at counteracting corporate fraud and making victimized corporations or shareholders whole. The Bankruptcy Code unmistakably expresses the "purpose" of Chapter 15 as being to assist foreign courts dealing with "insolvency"*: "The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency ...." 11 U.S.C. § 1501(a). The Code further identifies as Chapter 15's first stated "objective[ ]" to be "cooperation between" U.S. courts and "the courts and other competent authorities of foreign countries involved in crossborder insolvency cases." 11 U.S.C. § 1501(a)(1). This overarching statutory emphasis on "insolvency" explains and confirms the case law's focus on the role of and impact on creditors in determining whether a proceeding is "collective" and thus a "foreign proceeding" that is eligible to trigger Chapter 15 processes.

*Id.* at *9 (emphasis supplied).

98. UNCITRAL's Guide to Enactment of the Model Law on Cross-Border Insolvency (as amended, the "**Enactment Guide**") emphasizes that Courts only should apply the model law (like Chapter 15) if creditors' claims are being addressed: "Nor is it intended that the Model Law serve as a tool for gathering up assets in a winding up or conservation proceeding that does not also include provision for addressing the claims of creditors." Enactment Guide, at 39.[38] That is exactly what the JOLs are attempting to do here.

99. In the Cayman proceeding underlying *Global Cord*, the Cayman Court appointed joint provisional liquidators (together, the "**JPLs**") "[i]n response to evidence suggesting that a

[38] A copy of the Enactment Guide is attached hereto as **Exhibit 1**.

company's board and/or officers caused or allowed an improper expenditure of more than $600 million of corporate funds[.]" *Global Cord*, 2022 WL 17478530, at *1. However, the JPLs had not identified any creditors of the debtor, and they confirmed that the foreign debtor remained solvent. *Id.* at *4.

100. The Court in *Global Cord* thus concluded that the proceeding in the Cayman Islands helmed by the JPLs:

> does not satisfy the definitional requirements of section 101(23) . . . because the Cayman Proceeding does not involve fixing or adjusting debts or creditors' rights, and instead serves the current purpose of investigating suspected misconduct, and locating and recovering corporate assets.

*Id.* at *12. The Court therefore found that the Cayman proceeding was not a "collective proceeding" and denied recognition on this basis. *Id.* at *9.

101. The same is true here. The Cayman Proceeding was commenced for the benefit of the Highland Foundations, who are the holders of passive, Participating Shares, in DAF Holdco, rather than to benefit creditors generally (or any creditors at all) or to achieve a restructuring for creditors. Indeed, DAF Holdco was solvent on the commencement date, so as of the date of the filing, the Highland Foundations would have been the only counterparty to the two-party dispute. *See* Verified Petition at ¶ 66; *Macinnis Decl.* at ¶ 65; *Moran Decl.* ¶ 57. Now, in the height of irony, the main beneficiaries of the insolvency proceeding would not be the Highland Foundations but rather those owed expenses in the liquidation, among the largest of which are Mr. Patrick and DFW as beneficiaries of the fee shifting order.[39]

[39] The others would be the JOLs themselves and their attorneys, which clearly is not a reason to pursue an 'insolvency proceeding, and contingent claims held by, among others, Messrs. Patrick and Murphy by virtue of the applicable statutory priority.

102. The JOLs' intent in filing this chapter 15 proceeding is the very same one rejected in *Global Cord*: to assist the JOLs of a solvent (at the time) entity in litigation against former fiduciaries in an attempt to recover what the JOLs (wrongly) argue to be fraudulently dissipated assets for the benefit of passive equity holders.[40] The attempt works no better here than it did in *Global Cord*. The Cayman Proceeding is not a "collective proceeding" within the meaning of Chapter 15 caselaw and recognition should be denied.

**b. The Cayman Proceeding Involves a Solvent Debtor**

103. As noted above, the JOLs have repeatedly admitted that the Debtor was solvent on the dates that the Cayman Proceeding and this Chapter 15 case were filed. *See supra* at ¶¶ 3, 6, & 83-85. Nor is there financial distress: the Debtor is not an operating business, but rather had the limited purpose described above, and in any event Messrs. Patrick and Murphy had voluntarily placed it into liquidation before the JOLs were appointed. So, there is no risk of deteriorating finances as there is an operating business.

104. In determining how the Debtor's admitted solvency figures into the Court's analysis, the Court should look to the Enactment Guide. In interpreting Chapter 15, courts must "consider its international origin, and the need to promote an application of [Chapter 15] that is consistent with similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508; *see also In re Fairfield Sentry Ltd.*, 714 F.3d 127, 136 (2d Cir. 2013) ("[W]e consider international sources to the extent they help us carry out the congressional purpose of achieving international uniformity in cross-border insolvency proceedings."). Congress has expressly directed courts to look to, among other sources, the Enactment Guide as a key source for interpretation of Chapter 15. *See*

---

[40] The Cayman Court has already determined that the Participating Shareholders have "no *prima facie* ownership interest in the relevant assets" Cayman Opinion at ¶179.

House Judiciary Committee, H.R. Doc. No. 109-31 at 106 n. 101, and at 110 (2005) (stating that courts should look to the Enactment Guide "for guidance as to the meaning and purpose of [Chapter 15's] provisions" and that these sources are "[n]ot only . . . persuasive, but they advance the crucial goal of uniformity of interpretation."); se*e also In re RSM Richter Inc. v. Aguilar (In re Ephedra Prods. Liab. Litig.)*, 349 B.R. 333, 336 (S.D.N.Y. 2006) ("[T]he House Judiciary Committee, in enacting Chapter 15, specifically indicated that the Guide 'should be consulted for guidance as to the meaning and purpose of [Chapter 15's] provisions.'") (quoting H.R. Rep. No. 109-31 at 106 n. 101) (alteration in original). Case law from foreign courts interpreting statutes enacting similar versions of the Model Law should also be considered as persuasive authority to promote uniform interpretation of Chapter 15 with the Model Law. *See, e.g., Tacon v. Petroquest Res. Inc. (In re Condor Ins. Ltd.)*, 601 F.3d 319 (5th Cir. 2010); *see also* H.R. Rep. No. 109-31 at 109-110.

105. The Enactment Guide provides:

> Acknowledging that different jurisdictions might have different notions of what falls within the term 'insolvency proceedings', the Model Law does not define the term 'insolvency'. However, as used in the Model Law, the word "insolvency" refers to various types of collective proceedings commenced with respect to debtors that are in severe financial distress or insolvent. The reason is that the Model Law … covers proceedings concerning different types of debtors and, among those proceedings, deals with proceedings aimed at liquidating or reorganizing the debtor as a commercial entity…. Where a proceeding serves several purposes, including the winding up of a solvent entity, it falls under [the definition of "foreign proceeding"] only if the debtor is insolvent or in severe financial distress.

Enactment Guide, ¶ 48 (emphasis supplied).

106. Relying on the Enactment Guide, a 2020 decision in England concluded that a just and equitable winding up proceeding in the Cayman Islands of a solvent debtor does not fall within the scope of a "foreign proceeding." *See Re Bailey and another (Sturgeon Central Asia Balanced*

*Fund Ltd.)*, [2020] EWHC 123 (Ch).[41] Notably, the English Court criticized *In re Betcorp Ltd.*, a 2009 Nevada decision recognizing an Australian solvent winding up proceeding under Chapter 15, noting that *Betcorp* was decided prior to the publication of the 2014 Enactment Guide, which likely would have changed the result.[42] Other foreign courts have concluded that Cayman Islands liquidation proceedings relating to solvent companies are not entitled to cross-border insolvency assistance. *See, e.g.*, *In re Seahawk China Dynamic Fund (in provisional Liquidation in the Cayman Islands)* [2022] HKCFI 1994 (citing *In Re Joint Liquidators of Supreme Tycoon Ltd* [2018] HKCFI 277; [2018] 1 HKLRD 1120 (decision from Hong Kong court reasoning that "if the foreign liquidation is a solvent liquidation (for instance, a members' voluntary liquidation), it would not fall within the principle of modified universalism. A foreign solvent liquidation is not a collective insolvency proceeding, and is more akin to [a] 'private arrangement.'")).[43]

107. Here, the JOLs concede, as they must, that DAF Holdco was solvent on the date that the Cayman Proceeding was commenced. Further, the Highland Foundations initially commenced a Section 92(e) J&E Petition – the section of the Companies Act which does not require insolvency. And when they sought to appoint the JOLs under the Supervision Application, they acknowledged that DAF Holdco did not have creditors. *See supra* at ¶ 83. This proceeding has nothing to do with insolvency and everything to do with a governance dispute between Mr.

---

41 A copy of *Re Bailey* is attached hereto as **Exhibit 2**.

42 After the Model Law's enactment in 1997, UNCITRAL's Working Group V (Insolvency Law) (the "**Working Group**") considered whether the Model Law should apply to solvent debtors. The Working Group convened multiple times and debated the Model Law's applicability to solvent debtors and concluded that the Model Law should not apply. *See* UNCITRAL, Report of the Working Group on Insolvency Law on the Work of Its Fortieth Session ¶ 14 (Nov. 21, 2011); *see also* UNCITRAL, *Report of the Working Group on Insolvency Law on the Work of Its Forty-Third Session*, ¶ 51 (Apr. 26, 2013). As a result, in 2014, the Enactment Guide was amended to reflect the Working Group's decision that the Model Law should only apply to proceedings involving insolvent or severely financially distressed debtors. *See supra* at ¶ 105 (reflecting amended language). Thus, the decision in *Betcorp* is distinguishable because the *Betcorp* Court did not have the benefit of the Enactment Guide.

43 A copy of *Seahawk China* is attached hereto as **Exhibit 3**. A copy of *Supreme Tycoon* is attached hereto as **Exhibit 4**.

Dondero, the Highland Foundations and the JOLs, on one hand, and CDM, and Messrs. Patrick and Murphy, on the other hand.

108. Accordingly, because the Cayman Proceeding involves a solvent entity that is not oriented toward benefitting a creditor body, the Cayman Proceeding is not a "collective proceeding" and, therefore, is not a recognizable "foreign proceeding".

**ii. The Cayman Proceeding Is Not for the Purpose of Reorganization or Liquidation**

109. The Enactment Guide makes clear that the Cayman Proceeding is not for the purpose of reorganization or liquidation. Specifically, the Enactment Guide provides that "[s]ome types of proceeding that may satisfy certain elements of the definition of foreign proceeding ... may nevertheless be ineligible for recognition because they are not for the stated purpose of reorganization or liquidation." Enactment Guide, ¶ 77; *Global Cord*, 2022 WL 17478530, at *12. Further, the Enactment Guide specifies that among the types of proceedings that might be ineligible are those proceedings like the Cayman Proceeding that are designed to prevent alleged dissipation and waste, as opposed to either liquidation or reorganization of an insolvent entity or proceedings designed to prevent detriment to investors rather than to all creditors. *Id*. Much like the order in *Global Cord*, the Cayman Order here does not pertain to liquidation or reorganization and instead addresses other issues, such as the JOLs' authority to investigate and allegedly preserve assets. *See Global Cord*, 2022 WL 17478530, at *12. Indeed, the Cayman Court here noted that a chapter 15 proceeding would be unnecessary if the parties agreed to the Asset Protocol (which they did). *See In the Matter of Charitable DAF Holdco, Ltd (In Official Liquidation)*, June 24, 2025 Hr'g Tr. Page 42:19-22 ("JUDGE: Well, no doubt, if there is agreement on a protocol, then

the [JOLs] won't need to pursue chapter 15 because they'll be confident that the assets are safeguarded.").[44]

110. The dispute at bar is plainly a governance dispute – who gets to control the assets in the DAF Structure and what they are used for – and has nothing to do with reorganization or liquidation. Indeed, by repeatedly arguing that the Debtor's only asset was transferred as part of the DAF Restructuring, the JOLs have effectively conceded that there is nothing to liquidate or reorganize.

### 2. The Bankruptcy Court Is an Improper Forum for a Two-Party Dispute

111. Two party disputes do not belong in a bankruptcy court. *In re Mazzocone*, 183 B.R. 402, 420 (Bankr. E.D. Pa. 1995) ("[Two-party] disputes do not belong in bankruptcy courts regardless of who brings them . . .[.]"). This Court, like bankruptcy courts across the country, has dismissed bankruptcy cases where they are, at their core, two party disputes that can proceed in a non-bankruptcy court. *See, e.g.*, *Primestone Inv. Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.)*, 272 B.R. 554, 557-58 (D. Del. 2002); *In re Scarborough-St. James Corp.*, No. 15-10625 (LSS), 2015 WL 5672628, at *2 (Bankr. D. Del. Sept. 24, 2015); *see also In re Mountain Dairies, Inc.*, 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007); *Efron v. Candelario (In re Efron)*, 529 B.R. 396, 406 (B.A.P. 1st Cir. 2015); *In re Traxcell Techs., LLC*, 657 B.R. 453, 466 (Bankr. W.D. Tex. 2024); *In re JKW Enters., LLC*, 660 B.R. 296, 302 (Bankr. N.D. Iowa 2024).

112. While the above caselaw has been in the context of Chapter 7 and 11 cases, the concept is, if anything, stronger in a Chapter 15 case. After all, in a Chapter 15 case, the burden

---

[44] A copy of the June 24 Transcript is attached to the Patrick Declaration as Exhibit 11. When the Cayman Court issued the Cayman Opinion, the Asset Protocol ceased to be effective. The Cayman Court also noted that there was no risk of asset dissipation. Cayman Opinion at ¶ 201. However, as noted at ¶ 19 *supra*, the Court of Appeal has subsequently granted interim relief which largely accords with the Rule 11 Agreement.

is on the foreign representative to prove that the foreign proceeding is a "collective proceeding." *See supra* Section (A)(1)(i). By definition, a two-party dispute is not a "collective proceeding." Thus, this Court's ample precedent dismissing cases that are really two-party disputes should apply per force in a Chapter 15 case.

113. This case is a classic two-party dispute. It is yet another front in Mr. Dondero's war against Messrs. Patrick and Murphy. It is certainly true that the JOLs are bringing the case, but Dondero entities put the JOLs in place and a different Dondero entity is their sole source of funding. The Dondero funder might even have blocking rights over a settlement. *See supra* Section O.3. As set forth in detail above, no debts are being adjusted, and creditors have nothing to do with the case. If any case should be dismissed because it is a two-party dispute, it is this one.

**3. The Court should Deny Recognition under 11 U.S.C. § 1506**

114. "Nothing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." *In re ABC Learning Centres Ltd.*, 728 F.3d 301, 309 3d Cir. 2013) (citing 11 U.S.C. § 1506). Recognizing this Chapter 15 case would violate fundamental U.S. policy because it would endorse the abuse of judicial process. As referenced above, it is clear that Mr. Dondero has had a personal vendetta against Mr. Patrick for years. In addition, Mr. Dondero has decades of experience as a serial litigator who utilizes domestic and foreign courts to vexatiously harass his adversaries. Here, Mr. Dondero, though an affiliated entity, has provided the sole source of funding to the JOLs so that they can pursue Mr. Patrick in the Cayman Islands and through this Court. Additionally, Mr. Dondero, through his affiliation with the Highland Foundations, is pursuing Mr. Patrick before the Texas Business Court. Mr. Dondero has multiple overlapping and pending proceedings against Mr. Patrick. Worse still, the Debtor has no funding to pay the large, court ordered debts already racked up in favor of Mr. Patrick and DFW and additional expenses in

the liquidation that may be ordered, yet to add insult to injury, they continue to want to pursue litigation claims against the CDM Parties.

115. Moreover, unlike other bad faith litigants who have tried to gain litigation advantages, which is bad enough, Mr. Dondero is not using this filing purely as a tactic to gain a litigation advantage but instead to cause damage directly to Mr. Patrick (and the other CDM Parties) for no other reason than vindictiveness. Recognizing this Chapter 15 case only rewards abusive and wasteful tactics and encourages abuse of judicial process in violation of 11 U.S.C. § 1506. This must stop, and the Court should deny recognition as manifestly contrary to public policy.

**4. The Request for Recognition Is Premature**

116. The JOLs had their day in court on the Injunction Application and they definitively lost. Thus, there is no order for the Court to recognize at this time. It is true that the JOLs have appealed the Cayman Opinion, but that appeal is not scheduled to be heard by the Court of Appeal until September 3-4, 2026 –after the recognition hearing in this Chapter 15 Case. So, at best, the posture of the JOLs' request for recognition now is backwards. There is no point in recognizing a proceeding whose central premise—the JOLs' proprietary injunction theory—has been rejected and the JOLs' theory rests on a not yet heard appeal. That is particularly the case where existing Cayman court orders already govern the preservation of the relevant assets pending that appeal. Recognizing this Chapter 15 Case now is a waste of valuable judicial resources. The Court should decline the invitation to do so.

**B. Injunctive Relief and Entrustment are Neither Necessary Nor Appropriate**

117. The JOLs have requested injunctive relief and entrustment over DAF Holdco's purported assets akin to prejudgment attachment, but such relief is not available for at least two

reasons. First, the Cayman Court clearly concluded that DAF Holdco did not have a proprietary interest in the DAF Structure. Therefore, there is no need for a prejudgment attachment and DAF Holdco is not entitled to any such remedy. Second, federal courts do not have the authority to grant injunctive relief supporting claims for solely money damages. *See Grupo Mexicano de Desarollo v. Alliance Bond Fund*, 527 U.S. 308 (1999). In *Grupo Mexicano*, the Supreme Court held that federal courts do not have the authority to issue a preliminary injunction (which is an equitable remedy) to prevent a defendant from disposing of assets pending adjudication of a claim for money damages. *Id.* at 333. The *Grupo Mexicano* court explained:

> The rule requiring a judgment was a product, not just of the procedural requirement that remedies at law had to be exhausted before equitable remedies could be pursued, but also of the substantive rule that a general creditor (one without a judgment) had no cognizable interest, either at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property.

*Id.* at 319-20

118. The face of the Statement of Claim makes clear that the JOLs seek primarily money damages under many (though certainly not all) of their theories of recovery. *See MacInnis Decl.* at Ex. 59 p. 76; Ex 82. The Cayman Court agreed, concluding that many of the claims asserted in the Statement of Claim could be reduced to money damages. Cayman Opinion at ¶¶ 213, 219, 257. Accordingly, the injunctive relief requested by the JOLs is neither necessary nor appropriate. They have no proprietary interest in the assets they seek to control and, even if they did (which they do not), many of their claims are for money damages. Therefore, the Court does not have the power to issue an injunction to prevent the CDM Parties from utilizing their assets.

### C. The JOLs Improperly Seek Discovery under 11 U.S.C § 1521(a)(4)

119. Discovery in this Chapter 15 Case is governed by 11 U.S.C. § 1521(a)(4). That statute authorizes discovery "concerning the debtor's assets, affairs, rights, obligations or

liabilities,"[45] but only if specified criteria are met: the requested discovery must be "necessary" to "effectuate the purpose of [chapter 15]" and "protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a)(4). Further, even where those requirements are met, the court "may grant" the requested relief "only if the interests of the creditors and other interested entities. . . are sufficiently protected." 11 U.S.C. § 1522(a). And finally, even if the moving party satisfies these three elements, any relief is nevertheless within the Court's discretion. *See*, *e.g.*, *In re Agrokor d.d.*, 591 B.R. 163, 186 (Bankr. S.D.N.Y. 2018) (noting that "relief [post-recognition] is largely discretionary") (alteration in original).

120. A foreign representative has the burden of "demonstrat[ing] that its requests meet the statute's criteria." *In re Glitnir banki hf.*, No. 08-14757 (SMB), 2011 WL 3652764, at *6 (Bankr. S.D.N.Y. Aug. 19, 2011). The JOLs fail to carry their burden on almost every aspect of the test described above. Instead, they seek discovery in the U.S. that is substantially broader than what is afforded in the Cayman Islands.

**1. The Requested Discovery Amounts to a Claims-Mining Exercise Against the CDM Parties**

121. The requested discovery is not "necessary to effectuate the purpose of" chapter 15. The primary purpose of chapter 15 is to facilitate "cooperation between" the "courts of the United States" and "the courts and other competent authorities of foreign countries involved in crossborder *insolvency* cases." 11 U.S.C. § 1501(a)(1) (emphasis supplied). As set forth in Section Q, *supra*, the Cayman Proceeding is not an insolvency case. Moreover, "the whole point of Chapter 15 is to avoid a multiplicity of international proceedings and instead focus most litigation

[45] Nothing in the statute authorizes discovery into *non-debtors'* assets, affairs, rights, obligations or liabilities, but the JOLs in fact have sought just that already in this case. 11 U.S.C. § 1521(a)(4) (explicitly limiting discovery to matters "concerning the *debtor's* assets, affairs, rights, obligations or liabilities") (emphasis added); *see, e.g., In re Petroforte Brasileiro de Petroleo Ltda.*, 542 B.R. 899, 903 (Bankr. S.D. Fla. 2015) (denying foreign representative's request to seek discovery of documents relating to third party non-debtors that did not relate to transactions with debtor entities).

in the foreign main proceeding." *In re Golden Sphinx Ltd.*, No. 2:22-bk-14320-NB, 2023 WL 2823391 at *3 (Bankr. C.D. Cal. Mar. 31, 2023); *see also In re Daewoo Logistics Corp.*, 461 B.R. 175, 178 (Bankr. S.D.N.Y. 2011) (observing "that principles of comity and cooperation with a domestic court's foreign counterparts should inform the extent to which that court makes post-recognition relief available to a foreign representative"). Ordinarily, discovery activities should take place in the jurisdiction of the main proceeding – not the Chapter 15 court. *See In re Golden Sphinx Ltd.*, No. 2:22-BK-14320-NB, 2023 WL 2823391, at *3 (Bankr. C.D. Cal. Mar. 31, 2023) (emphasizing that "discovery normally should take place in the foreign main proceeding, because Chapter 15 cases are intended to be ancillary proceedings that do not require bankruptcy courts to adjudicate claims or administer debtors' liquidations.").

122. As an adjunct to the foreign court in a chapter 15 proceeding, the bankruptcy court should rarely, if ever, order disclosure that would otherwise not be available in the foreign court. *See In re Bd. of Directors of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 586–87 (Bankr. S.D.N.Y. 2001). Indeed, courts in this district have deferred to foreign courts regarding the discovery of third parties in chapter 15 proceedings. *See In re Farfetch Ltd., (in Official Liquidation),* Case No. 24-11519 (CTG), Jan. 15, 2025 Hr'g Tr. 82:16-83:13.

123. Discovery practices in U.S. federal courts are substantially broader than those offered throughout the world. *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 594 (7th Cir. 2011) (discussing national and international discovery standards). In the Cayman Islands, a liquidator's statutory information gathering powers are limited to documents belonging to the company under section 301 of the Companies Act and documents to which the company appears to be entitled under section 138. As the Privy Counsel held in *Singularis Holdings Ltd. v.*

*PricewaterhouseCoopers* [2014] UKPC 36,[46] a Cayman court-appointed liquidator cannot seek through recognition any grater relief than the Grand Court of the Cayman Islands could itself have offered.[47] Thus, The JOLs' request for discovery under chapter 15 seeks to impermissibly utilize the boarder discover powers afforded in the United States to their benefit.

124. The JOLs' attempts to pursue extensive and expansive discovery through the chapter 15 proceeding encourages, rather than avoids, a multiplicity of proceedings. If the CDM Parties were refusing to provide discovery that was available to the JOLs in the Cayman Proceeding on some theory that the Cayman Court could not force them to provide discovery because they are located in the U.S., and the proposed recognition order merely recognized, within the U.S., discovery that has been permitted in the Cayman Islands, one could understand how this Court's requiring of discovery could "aid" the Cayman Proceeding. But none of that is true. The CDM Parties have never taken the position that they would refuse to comply with validly issued and proper discovery in the Cayman Islands.[48] Indeed, as set forth in the Patrick and Murphy Affidavits, CDM and Mr. Patrick have provided troves of information to the JOLs.

125. Instead, the discovery sought in the proposed recognition order goes substantially beyond discovery that is permitted in the Cayman Islands in both scope and timing. With respect to the latter, the CDM Parties do not expect discovery to commence in the Cayman litigation for many months given that (i) the JOLs have appealed the Cayman Opinion and (ii) there will likely

---

[46] A copy of Singularis is attached hereto as **Exhibit 5**.

[47] The Privy Council is the highest court of appeal for the Cayman Islands.

[48] As set forth at paragraph 84, *supra*, the CDM Parties filed a security for costs application in September 2025 seeking security for any costs they incur in defending the proceedings (including discovery). While the JOLs have notified the CDM Parties that they have obtained an ATE policy in the amount of $7M, the CDM Parties' costs exceed that amount. Further, the Litigation Funding has been exhausted. Thus, the JOLs may be unable to satisfy the CDM Parties' costs. Should the CDM Parties prevail in the Cayman Appeal, the CDM Parties anticipate that they will seek additional costs. Accordingly, the CDM Parties reserve all rights with respect costs and their participation in the Cayman Proceeding.

be several more interlocutory hearings before the substantive proceedings can be pursued (if the JOLs decide to pursue them at all in light of the conclusive findings in the Cayman Opinion); discovery in the Cayman Proceeding will not occur until the substantive proceedings commence. Ordering more discovery than is permitted in the Cayman Proceeding, and ordering it sooner than it commences in the Cayman Proceeding, is not a matter of promoting comity and cooperation between a U.S. court and its foreign counterpart; it is about using the auspices of this Court to obtain what would be unavailable in the Caymans Proceeding.

126. In addition, in pursuing litigation in the United States that should be conducted in the Cayman Islands, the JOLs may be able to avoid posting security for costs that may be required under Cayman law in furtherance of the "loser pays" principle. *See supra* at ¶84. Such a result is at odds with comity and cooperation.

127. Because the JOLs are attempting to use this Court to obtain more and earlier discovery than they could in the Cayman Islands, while also potentially avoiding responsibility for costs under Cayman law, the requested discovery creates, rather than avoids, a multiplicity of proceedings. That is not what chapter 15 is for.

#### 2. The Relief Sought Does Not Sufficiently Protect the CDM Parties' Interests

128. Even if the requested discovery was somehow necessary to effectuate the purpose of chapter 15, the JOLs make no effort to carry their burden to show that "the interests of the creditors and other interested entities . . . are sufficiently protected." 11 U.S.C. § 1522(a). Section 1522 creates "a balance between relief that may be granted to the foreign representative and the interests of the person that may be affected by such relief." *In re Rede Energia S.A.*, 515 B.R. 69, 90 (Bankr. S.D.N.Y. 2014); *see also In re ENNIA Caribe Holding N.V.*, 596 B.R. 316, 322 (Bankr. S.D.N.Y. 2019) ("A determination of sufficient protection requires a balancing of the respective

parties' interests.") (internal citation and quotation marks omitted). The JOLs do not strike (or even attempt to strike) the necessary balance.

129. To the contrary, the JOLs have not addressed the CDM Parties' concern that the JOLs' sharing of information with Mr. Dondero (which is expressly contemplated by the Funding Agreement – *see supra* note 28) would fuel Mr. Dondero's and the Highland Foundation's misguided campaign against the CDM Parties which is set forth in detail above.[49]

130. Moreover, allowing the requested discovery would do little more than duplicate the efforts that are already under way in the Cayman Islands and in the Texas Business Court, unfairly compounding the burden on the CDM Parties. As discussed above, the JOLs already have access to a trove of documents that facilitate their investigation. And Messrs. Patrick and Murphy have indicated that they will participate in the discovery process, if such discovery is validly issued and costs properly fortified, in the Cayman Proceedings if and when discovery commences therein, provided that they are granted certain assurances regarding the protection of shared documents and information from the predations of Mr. Dondero and his affiliates. Therefore, denying the requested relief would not hinder JOLs' positions. But granting the requested relief would prejudice the CDM Parties by exposing them to multiple discovery processes in different courts with different applicable rules for what seem to be the same requests (thereby multiplying the resources necessary to protect their rights in connection with such proceedings) and by potentially providing Mr. Dondero with access to documents to which he is not entitled. The JOLs are attempting to use this Chapter 15 Case to conduct a fishing expedition at the expense of the CDM Parties. They have wholly failed to show the balancing of interests or that the CDM Parties are sufficiently protected.

[49] Indeed, entities controlled by Mr. Dondero have already utilized the Asset Protocol to impair the rights of certain CDM Parties in business dealings outside of this Chapter 15 Case.

**D. The JOLS Improperly Seek Discovery under Bankruptcy Rule 2004.**

131. The JOLs also invoke Bankruptcy Rule 2004 in their broad request for relief. *See* Petition at ¶¶ 162-67. The Court should reject this effort in the absence of any showing as to why such relief is appropriate here. The decision to grant or deny a request for Rule 2004 discovery is within the discretion of the Court. *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 627 (Bankr. D. Del. 2016). In considering how to exercise this discretion, courts facing this issue have determined that requests for Rule 2004 discovery are not boundless. To the contrary, a court will deny a Rule 2004 request where the court perceives that a motive beyond routine discovery is at play.[50]

132. Courts routinely deny the use of Rule 2004 examinations where the purpose of the examination is to circumvent discovery limitations in related litigation. *See*, *e.g.*, *In re Cyber Litig. Inc.*, No. 20-12702 (CTG), 2021 WL 2655312, at *4 (Bankr. D. Del. June 28, 2021) (in the context of a parallel legal action, noting that "[o]nce such an action is brought, the party is entitled to make use of the tools of discovery, which then replace the use of Rule 2004 as the means to establish its case."); *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (denying Rule 2004 discovery where the circumstances of the request indicated that movants were trying to use Rule 2004 for discovery in a related securities class action where discovery had been stayed, rather than "for the purpose of asserting their rights as a party in interest in this bankruptcy case"); *Snyder v. Society Bank*, 181 B.R. 40, 42 (Bankr. S.D. Tex. 1994) (determining that movant's use of Rule 2004 "to further its case in state court constitutes an abuse of Rule 2004" and observing that

---

[50] Good cause is generally shown if the "examination is necessary to establish the claim of the party seeking the examination, or if the denial of such request would cause the proposed examiner undue hardship or injustice." *Millennium Lab Holdings II*, 562 B.R. at 627. The JOLs make no attempt to establish that their discovery requests are necessary to establish any claim they may be contemplating – especially since they already have initiated claims – and they provide no indication that denial would cause them undue hardship or injustice. The JOLs have not carried their burden to demonstrate good cause for their invocation of Rule 2004.

because movant sued the opposing party in state court, "he can use the discovery rules available under [state] law").

133. Courts will also deny Rule 2004 requests when it is apparent that the purpose of the request is to harass the opposing party. *See*, *e.g.*, *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991); *In re Mittco, Inc.*, 44 B.R. 35, 36 (Bankr. E.D. Wis. 1984).

134. The Court should reject the JOLs' premature attempt to insert limitless Rule 2004 discovery into this chapter 15 proceeding. The JOLs have had (and still have) ample opportunity to conduct discovery in the Cayman Proceeding and even potentially the Texas Business Court. If all that the JOLs were seeking was territorial enforcement within the U.S. of discovery ordered in the Cayman Proceeding, the request would be understandable. But it isn't. In addition, the CDM Parties have not refused to comply with Cayman ordered discovery on some theory that they or the documents are located in the U.S. Further, to the extent that the type of discovery contemplated by Rule 2004 is unavailable in the Cayman Proceeding, the request for such relief here is clearly designed to circumvent that limitation, which the Court should not allow. Finally, the JOLs are not engaging in reciprocal discovery in the Cayman Islands; the time for that discovery is many months away. It is inappropriate to use Rule 2004 to give one party to a litigation a leg up while the other side must wait and is hamstrung by compliance with local rules and procedure.

135. It is also clear that this request for Rule 2004 discovery is an abuse of judicial process. Seeking Rule 2004 discovery now, when there is no insolvency issue pending or being pursued, when the litigation theories have been rejected by the Cayman Court at least at the injunction stage, and when discovery will not commence in the Cayman Court for many months, shows that this is just part of Mr. Dondero's litigious history: this is an effort to drown the CDM

Parties in needless litigation simultaneously on domestic and international fronts. Rule 2004 cannot and should not be used for such a purpose.

**CONCLUSION**

WHEREFORE, the CDM Parties respectfully request that this Court deny the relief requested in the Verified Petition.

Dated: July 27, 2026
Wilmington, Delaware

*/s/ David T. Queroli*

**RICHARDS, LAYTON & FINGER, P.A.**
Russell C. Silberglied (No. 3462)
Amanda R. Steele (No. 5530)
David T. Queroli (No. 6318)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: silberglied@rlf.com
steele@rlf.com
queroli@rlf.com

*Counsel for the CDM Parties*