**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | ) | Case No. 25-11376 (BLS) |
| Debtor in a foreign proceeding. | ) | **Re: Docket No. 46** |

**DECLARATION OF MARK PATRICK IN SUPPORT OF CDM PARTIES' OBJECTION TO THE VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Mark Eric Patrick, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a registered director, president, and sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation ("**DFW**"). DFW is the majority Participating Shareholder of Charitable DAF Holdco, Ltd. (the "**Debtor**" or "**Holdco**") of which I am both a director and the sole Management Shareholder. In addition, I am also the sole director of CDH GP Ltd. ("**GP**"), a Cayman Islands exempted limited company, which is the general partner of Charitable DAF Fund, LP (the "**DAF**").

2. I submit this declaration (the "**Declaration**") in support of the *CDM Parties' Objection to the Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

"**Objection**"),[2] filed contemporaneously herewith. In addition, Mr. Murphy has submitted the declaration of *Paul Murphy in Support of CDM Parties' Objection to the Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**Murphy Declaration**"), filed contemporaneously herewith. I've reviewed the contents of the Murphy Declaration, as well as the affidavit appended thereto, and incorporate those documents herein by reference.

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon, (i) my personal knowledge and experience, (ii) my review of relevant documents, including but not limited to the Debtor's books and records, as well as the books and records of the entities within the DAF Structure, (iii) my discussions and interactions with the JOLs, the Highland Foundations and Mr. Dondero, his associates and his affiliated entities, and (iv) my opinion based upon my experience and knowledge related to the Debtor's operations, business, and financial condition, as well as the operations, business, and financial conditions concerning the Debtor's former affiliates within the DAF Structure. If I am called upon to testify, I would testify competently to the facts set forth herein.

**<u>Qualifications and Experience</u>**

4. I am a U.S. tax attorney and practiced as U.S. tax counsel from 1998 until 2008. I hold a bachelors degree in finance from the University of Miami Herbert Business School, a Juris Doctor from Boston University, and an LLM in Taxation from the New York University School of Law.

---

[2] Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to such terms in the Objection.

**A. Highland and Skyview**

5. From January 2008 to February 2021, I worked at Highland as "tax counsel". Although titled as tax counsel at Highland, I worked in the tax department as a tax professional and provided tax consulting advice to Highland. I did not work in the legal department, and I did not provide legal advice to Mr. Dondero or Highland. Where Highland required tax law guidance, I coordinated Highland's engagement of outside tax lawyers to provide legal advice to Highland relating to the management of its tax liabilities and the ability to make use of tax efficient structures. Where Mr. Dondero or a Highland entity required tax law guidance, external counsel fulfilled that role.

6. After confirmation of the Highland Plan, I then worked at Skyview from March 2021 through October 2024. Skyview, a Dondero affiliated entity, is a back-office service provider to NexPoint, an investment manager that Mr. Dondero established after confirmation of the Highland Plan.

**B. Control Person**

7. In March 2021, I assumed the role of the Control Person for the DAF Structure, taking over for Mr. Scott, by becoming the sole holder of Management Shares in DAF Holdco and the sole member and managing member of the Original GP. One of my first decisions as Control Person was appointing Mr. Murphy, a well-respected independent director in the Cayman Islands community, as an additional independent director at DAF Holdco and at entities within the DAF Structure. When I assumed the role of Control Person, I understood that the DAF Structure needed to be independent from Mr. Dondero's control; otherwise, there was a significant risk that Mr. Dondero would cause the DAF structure to violate U.S. tax law. I further understood that the

Control Person role was designed to safeguard the DAF Structure's independence and compliance with U.S. tax law.

8. In the three years since taking control of the DAF Structure, Mr. Murphy and I discovered that my predecessor in the DAF Structure, Mr. Scott, approved a series of transactions for the benefit of Mr. Dondero and his affiliates–transactions that should not have been approved because they were inconsistent with applicable U.S. tax law or transactions that should have at least been closely scrutinized. In addition, by early 2023, our concerns grew significantly as the UBS Action and the Kirschner Proceeding continued to develop. Finally, in 2024, Mr. Dondero requested that entities within the DAF Structure engage in transactions to their detriment and Mr. Dondero improperly pressured me to approve these transactions or otherwise resign from my role as Control Person, which I declined. As a result of these discoveries, observations and my interactions with Mr. Dondero and the Highland Foundations, I believed that the DAF Structure was at significant risk of adverse tax consequences, increased regulatory oversight and investigation, and having its assets made available to satisfy Mr. Dondero's creditors, all to the detriment of its charitable mission.

9. In response to these risks, Mr. Murphy and I implemented the DAF Restructuring to isolate Mr. Dondero, and his influence through the Highland Foundations, from the DAF Structure to preserve the DAF's charitable mission through DFW. In connection with the DAF Restructuring, I resigned from my role with Skyview in October 2024. On December 9, 2024, I assumed my current role as the registered director, president, and sole member of DFW.

10. At all times since my appointment as Control Person, I have thoughtfully and faithfully executed my fiduciary duties in furtherance of the DAF Structure's charitable mission, including the implementation of the DAF Restructuring. In connection with taking material

actions, Mr. Murphy and I received the advice of sophisticated counsel and advisors, including with respect to each step of the DAF Restructuring and my remuneration.

**Patrick Affidavits in the Cayman Proceeding**

11. As described in the Objection, in April 2025, as part of the DAF Restructuring, Mr. Murphy and I caused the commencement of the Debtor's voluntary liquidation, which was subsequently brought under the supervision of the Cayman Court on May 6, 2025. In connection with the various proceedings before the Cayman Court, Mr. Murphy and I have submitted several affidavits explaining the events giving rise to the instant dispute between the JOLs, the Highland Foundations and Mr. Dondero, on one hand, and the CDM Parties, on the other hand, and the reasons for the DAF Restructuring. The following affidavits that we previously filed in the Caymans proceedings, are referenced in and support the Objection, and are attached hereto:

a. The *First Affidavit of Mark Eric Patrick*, dated June 4, 2025 (FSD 116) (the "**Patrick DFW Aff.**"), submitted with the Cayman Court on June 4, 2025. A copy of the Patrick DFW Aff. is attached hereto as **Exhibit 1**.

b. The *First Affidavit of Mark Eric Patrick as Sole Holder of the Management Share*, dated June 4, 2025 (FSD 6) (the "**Patrick Mgmt. Aff.**"), submitted with the Cayman Court on June 4, 2025. A copy of the Patrick Mgmt. Aff. is attached hereto as **Exhibit 2**.

c. The *Fourth Affidavit of Mark Eric Patrick*, dated August 19, 2025 (FSD 116) (the "**Partick 4th DFW Aff.**"), submitted with the Cayman Court on August 19, 2025. A copy of the Partick 4th DFW Aff. is attached hereto as **Exhibit 3**.

d. The *First Affidavit of Mark Eric Patrick,* dated September 12, 2025 (FSD 201) (the "**Patrick CDM Aff**." and, together with the Patrick DFW Aff., Patrick Mgmt. Aff., and the Patrick 4th DWF Aff., collectively, the "**Patrick Affidavits**"), submitted with the Cayman Court on September 12, 2025. A copy of the Patrick CDM Aff. is attached hereto as **Exhibit 4**.

Because the Patrick Affidavits already are lengthy, I incorporate them herein by reference rather than repeating their testimony herein.

**<u>The DAF and DFW</u>**

12. In addition to the factual background provided in the Patrick Affidavits, it is important to understand that this dispute is not about misappropriated charitable funds. Indeed, DFW continues the DAF Structure's charitable mission today. Instead, this is simply a two-party governance dispute between the JOLs, the Highland Foundations, and Mr. Dondero, on one hand, and the CDM Parties on the other hand. Mr. Dondero and I have had repeated disagreements regarding the DAF Structure since 2024, and those governance disputes continue to this day in this proceeding, the Cayman Proceeding, and the Texas Business Court. At bottom, Mr. Dondero is upset that he has lost control over the DAF Structure–control that was impermissible and contravenes U.S. tax law–and that I continue the DAF Structure's charitable mission through DFW, without his ability to interfere. It is also important to understand that the DAF is not a fund, but a vehicle designed to structure certain investments for tax efficiency purposes.

13. Mr. Dondero's use of the Highland Foundations was part of tax strategy to minimize U.S. federal income taxes. The key tax benefit of Type I Supporting Organizations (*i.e.*, the Highland Foundations) is that they are not classified as private foundations. Private foundations are subject to certain excise taxes that would frustrate the special purposes for which Mr. Dondero established the Highland Foundations. In particular, private foundations are prohibited from self-dealing and excess business holdings. *See §§* 509(a)(3) and 4940-4946 of the Internal Revenue Code. Type 1 Supporting Organizations are not.

**A. The DAF Is Not a "Donor Advised Fund"**

14. The JOLs make much of the fact the DAF is purportedly a charitable donor advised fund. And although DAF Holdco and the DAF both include "DAF" within their names, that is a misnomer. Neither is a donor advised fund, which is a particular type of charitable structure. A donor advised fund is a mechanism permitted under U.S. tax law whereby a donor gives money or property to a charity which invests the funds on a tax-free basis and uses the proceeds to make grants to third party charities. Donors to a donor advised fund do not control the fund, and the fund is not a separate legal entity. A donor advised fund is merely a fund within a larger charitable entity called a "sponsoring organization" that is the legal owner of the money or property given by the donor. The sponsoring organization tracks funds separately for each donor in the fund. Donors may provide sponsoring organizations with investment recommendations, but such recommendations are not binding on the donor advised fund. The sponsoring organization has its own board of directors and officers, each of whom has a fiduciary duty to administer the donor advised fund consistent with applicable law. A donor advised fund facilitates charitable investment by allowing donors to take a current charitable contribution deduction on their personal income tax return and allows the gift to grow tax free in the donor advised fund. Using a donor advised fund is generally more cost effective than forming a private foundation. In addition, donor advised funds have fewer legal restrictions than private foundations because donors do not have legal control over the fund, which is merely an account in a larger public charity.

15. DAF has none of the hallmarks of a donor advised fund. To start, DAF is a separate legal entity. It is not a fund within a separate sponsoring organization, and no sponsoring organization tracks the donations or investments for multiple funds. Second, DAF was never an investment fund. Among other things, DAF (i) did not solicit capital from investors, (ii) did not

have subscription rights, (iii) had no rights to make capital calls, (iv) does not have a registered investment advisor and (v) provides its limited partners (*i.e.*, DAF Holdco when it was a limited partner) with limited rights. Instead, the DAF was a vehicle for providing discretionary charitable contributions that came with certain tax benefits for Mr. Dondero.

16. The DAF Structure was created to restructure certain Dondero-backed investments and to provide a permanent capital offshore structure that would manage assets on a long-term basis, during which it would make discretionary charitable distributions. The reason that this structure was chosen is that it provides several tax benefits.

17. First, DAF Holdco is a Cayman Islands entity which is not subject to income tax. As discussed below, prior to the DAF Restructuring, DAF Holdco was the sole limited partner of the DAF, which held 100% of the interests in CLO Holdco, which owned the subsidiaries within the DAF Structure. As such, corporate tax within the DAF Structure would stop at, and be paid by, DAF Holdco, as the sole limited partner in the DAF, and since it is a Caymans entity, that tax is $0. In essence, DAF Holdco is a corporate tax blocker. It is not a fund, donor advised fund or any similar type of investment.

18. The second benefit prevents unrelated business taxable income ("**UBTI**") from being applied to the Highland Foundations. While most tax-exempt organizations are exempt from most types of taxable income, they must nevertheless pay UBTI. For example, if a tax-exempt organization actively engages in businesses unrelated to its charitable mission, income received from such businesses may be subject to UBTI. However, if the income derived from such businesses is passive, for example through dividends paid by an intermediary corporation or limited partnership (*i.e.*, DAF Holdco when it was still a limited partner), the passive income can avoid UBTI, resulting in tax savings.

19. Together, under the DAF Structure, income generated within the DAF Structure would be subject to tax at the Debtor level in the Cayman Islands (which is $0), and discretionary distributions to the Highland Foundations would be shielded from UBTI, significantly limiting tax exposure of Dondero backed investments. Further, by using Type I Supporting Organizations, Mr. Dondero could avoid private foundation status for the Highland Foundations, further compounding the tax benefits employed by the DAF Structure. And finally, Mr. Dondero took charitable tax deductions for donations to the DAF Structure.

20. In an attempt to ensure that the DAF Structure was facially compliant with applicable law, DAF Holdco and DAF had to be and were structured to prevent Mr. Dondero from exercising dominion and control over the assets within the DAF Structure. If Mr. Dondero were to exercise dominion and control over donated assets, that would violate tax laws, the Highland Foundations could be exposed to adverse tax consequences and the assets within the DAF Structure could be consolidated with Mr. Dondero's assets, exposing all parties involved to significant risks and potential litigation costs. In addition, DAF Holdco itself could be subject to regulatory scrutiny and litigation. In light of these risks, DAF Holdco's Articles of Association provide that if the Directors become aware that any shares in DAF Holdco are held by a "Restricted Person", the Directors may require the transfer of such shares. As set forth in the Objection and the Patrick Affidavits, Mr. Murphy and I became aware that Mr. Dondero was very likely a "Restricted Person" and that his actions imperiled the DAF Structure and its charitable mission.

**B. DFW's Charitable Mission**

21. To protect the DAF Structure, Mr. Murphy and I implemented the DAF Restructuring, one component of which was the formation of DFW to continue the DAF Structure's charitable mission. DFW is not organized for private gain but for the purpose of

distributing charitable discretionary donations from CDM. DFW is a private foundation that is subject to applicable private foundation regulations–regulations that are far more stringent than those applied to a donor advised fund. Key among those regulations is a prohibition against anyone, including myself, misusing DFW. DFW's charitable missions focus on charitable uses for (i) education, (ii) healthcare, (iii) veterans, (iv) socio economic causes, (v) animal welfare, and (vi) churches. Since June 2025, DFW has made approximately 68 donations to charitable organizations, with an average donation size of $10,000 and the largest donation being approximately $157,000. DFW's charitable mission remains ongoing today.

**The Cayman Opinion**

22. As discussed in the Objection, in connection with the Cayman Proceeding, the JOLs filed a Statement of Claim against certain CDM Parties as well as an Injunction Application. On December 15-16, 2025, the Cayman Court convened a two-day evidentiary hearing on the Injunction Application. On February 10, 2026, the Cayman Court issued the Cayman Opinion and on April 23, 2026, issued an order denying the Injunction Application and vindicating myself, Mr. Murphy and the other CDM Parties. A copy of the Cayman Opinion is attached hereto as **Exhibit 5**, and a copy of the Order Denying Injunction Application is attached hereto as **Exhibit 6**.

**The Cayman Appeal**

23. As discussed in the Objection, on February 24, 2026, the JOLs filed the Cayman Appeal, which is now pending before the Court of Appeal. The JOLs also sought urgent interim relief from the Court of Appeal pending determination of the Cayman Appeal. Prior to that application being determined, the CDM Parties confirmed to the Court of Appeal that they would continue to abide by the Rule 11 Agreement provided in the Texas Business Court and conduct themselves in the ordinary course of business pending the Court's determination of the interim

relief application. Following a hearing on March 27, 2026, the Court of Appeal granted limited interim relief on March 31, 2026 (with the Interim Appellate Order, dated April 22, 2026, and full reasons issued in the Interim Appellate Opinion, dated May 15, 2026). The interim relief broadly reflects the terms of the Rule 11 Agreement, restraining dealings with assets of the DAF Structure outside the ordinary course of business, but permitting charitable distributions of up to US$200,000 per month and declining to impose any of the broader disclosure obligations sought by the JOLs. The Cayman Appeal is currently scheduled to be heard on September 3-4, 2026. A copy of the Interim Appellate Opinion is attached hereto as **Exhibit 7**, and a copy of the Interim Appellate Order is attached hereto as **Exhibit 8**.

## Additional Documents

24. In addition, the following additional documents are appended hereto:

a. A copy of the Renumeration Report is attached hereto as **Exhibit 9**.

b. A copy of the Costs Application attached hereto as **Exhibit 10**.

c. A copy of the June 24 Transcript is attached hereto as **Exhibit 11.**

d. A copy of the Indemnity Costs Award is attached hereto as **Exhibit 12**.

e. A copy of the Sixth MacInnis Aff., including the Funding Agreement, is attached hereto as **Exhibit 13**.

## Conclusion

25. Based on the foregoing and the Patrick Affidavits, I believe that the request for recognition is not appropriate for those reasons set forth in the Objection. Accordingly, I believe that the Court should sustain the Objection and deny the relief requested by the Verified Petition.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 27, 2026
Dallas, Texas

*/s/ Mark Eric Patrick*
Mark Eric Patrick