**Exhibit 3**

**Partick 4th DFW Aff.**

Fourth Affidavit
Mark Eric Patrick
On behalf of DFW Charitable Foundation
Sworn on 19 August 2025
Exhibit MP4

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO.: FSD 116 of 2025 (JAJ)**

**IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**FOURTH AFFIDAVIT OF MARK ERIC PATRICK**

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1. I am duly authorized to provide this fourth affidavit in these proceedings on behalf of DFW Charitable Foundation (**DFW**).

2. I am the same Mark Patrick who swore and filed my first affidavit for and on behalf of DFW in these proceedings of on 4 June 2025 (**DFW Affidavit**) made in support of DFW's position at the sanction hearing heard by the Grand Court on 24 June 2025 (**Sanction Hearing**).

3. As set out in the DFW Affidavit, I am the registered director and sole shareholder of DFW which is the majority Participating Shareholder of Holdco.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

4. The contents of this affidavit are, save where stated otherwise, within my own knowledge and are true. Where the statements made in this affidavit are not within my own knowledge, they are true to the best of my belief, and I have indicated the source of my information. In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

5. There is now produced and shown to me a paginated bundle of documents marked "**MP4**". References in this affidavit are to pages in MP4 are in the form [**MP4/Tab [xx]/page [xx]**].

6. I address herein certain facts and matters that have taken place during the conduct of the liquidation and in light of the events described in Ms MacInnis' Fifth Affidavit filed on 15 July 2025 (**MacInnis 5**), Ms MacInnis' Sixth Affidavit sworn on 11 July 2025 (**McInnis 6**), the First Affidavit of Ms MacInnis filed in the FSD Proceedings (as defined below) and sworn on 15 July 2025 (**FSD Affidavit 1**) and Second Affidavit of Ms MacInnis filed in the FSD Proceedings, sworn on 24 July 2025 (**FSD Affidavit 2**).

7. DFW reserves the right to provide further evidence to supplement the issues canvassed in this affidavit in support of the application for removal of the Current JOLs.

8. This affidavit proceeds as follows:

    (a) Introduction and Background

    (b) Dondero Control and Influence over the Highland Foundations

    (c) JOLs lack the requisite impartiality and independence:

        (i) Misuse of *ex parte* jurisdiction of the Court

(ii) Advancement of the interests of the Highland Foundations / Mr Dondero

(iii) Funding Arrangements:

1. Misleading representations

2. Inappropriate in all the circumstances

(iv) Leveraging of the Cayman liquidation and profligate litigation

(d) Appointment of Replacement JOLs

(e) Conclusion

## A. INTRODUCTION AND BACKGROUND

9. This affidavit is made in support of a summons dated and filed on [] August 2025 (**Removal Summons**) which seeks the removal and replacement of the current joint official liquidators Ms Margot MacInnis and Mr Sandipan Bhowmik (**Current JOLs or JOLs**) of Grant Thornton Specialist Services (Cayman) Limited on the terms set out in the Removal Summons. As set out in paragraph 1 of the Removal Summons and paragraphs 187 to 193 below, on seeking the removal of the Current JOLs DFW nominates Mr Jeffrey Stower and Ms Neema Griffin as replacement JOLs (**Replacement JOLs)**. Their qualifications are set forth in paragraphs 189 to 190 below.

10. In connection with these matters and for the reasons I set out herein, DFW is of the view that the JOLs have failed to conduct the liquidation of the Company with the requisite independence such that there is a complete breakdown of trust and confidence between the Court's officers and DFW.

11. For the reasons I depose to herein, it is my belief that the conduct of the Current JOLs is such that a fair-minded, objective stakeholder would reasonably conclude

that the Current JOLs are lacking the impartiality and independence required for the office such that they should be removed. I provide further detail in respect of these matters in **Section C** below but in summary, the JOLs have:

a. Persistently and without proper cause invoked the Courts jurisdiction *ex parte*

b. Failed to provide full and frank disclosure on making applications on an *ex parte* basis

c. Adopted and pursued the agenda of the Highland Foundations / Mr Dondero to the prejudice of DFW

d. Failed to engage meaningfully with proposed terms of a Protocol

e. Made misleading representations regarding the Funding of the JOLs and their advisors

f. Failed to safeguard the Cayman liquidation process and prevent profligate litigation

g. Failed to disclose relevant US claims pending against Mr Dondero and Mr Ellington

h. Operated the liquidation of the Company to the advantage of the Highland Foundations / Mr Dondero

12. The conduct of the JOLs since their appointment has demonstrated not a circumspect attitude as to the DAF Restructuring and all relevant parties but a biased, concluded view that the transactions comprising the DAF Restructuring were improper exercises by myself and My Murphy of the powers and authority vested in us as directors of the Company. This is compounded by the fact that in the same breath that the Current JOLs purported to be investigating the DAF Transactions as referred to in their First Report to Contributories as of 2 July 2025

(**First Report**), they had prepared and would imminently seek leave to commence the FSD Proceedings (as defined and addressed in the following paragraph 13.f.i). In all the circumstances, it is my honest belief that a fair-minded objective stakeholder would reasonably consider the Current JOLs to lack the requisite impartiality and independence to effectively fulfil the duties conferred on them by their office.

13. I have given three affidavits in these liquidation proceedings and note that, since my third affidavit was filed the following procedural developments that are relevant to the conduct of the Company's liquidation have occurred:

(a) **24 June 2025:**

(i) Without setting out the legal basis on which they had any interest in the proceedings, the JOLs sought to intervene in a settlement agreement in the Dallas Bankruptcy Court which is accretive to the asset base in the DAF Structure by asking the Dallas Bankruptcy Judge to adjourn the settlement hearing for 45 days and that the judge "*may consider whether a brief adjournment of the Settlement Motion Hearing would be appropriate to afford the JOLs additional time to progress their investigation of the HMIT Entities.*" I exhibit at **MP4/Tab 1/Pages 1 to 3** a copy of that correspondence issued by the JOLs and referred to as the **HMIT Adjournment Letter**.

(ii) This application was made in circumstances where Mr Dondero, on behalf of his family trust – The Dugaboy Trust - had made an identical application on 9 June 2025 which was refused (discuss this further at paragraph 53.f herein).

(iii) The JOLs request was heavily relied on by The Dugaboy Trust in opposing the settlement application but was rightly ignored by

the Dallas Bankruptcy Court and the settlement agreement was approved.

(b) **2 July 2025:**

(i) The Current JOLs issued the First Report

(ii) the Highland Foundations issued a Petition in the Dallas Business Court seeking temporary restraining orders (TRO) and temporary injunction (TRI) and the emergency appointment of a receiver (**TRO Proceedings**).

(iii) The Dallas Business Court heard the TRO Proceedings and declined to make the orders sought by the Highland Foundations and those proceedings remain pending.

(c) **4 July 2025:** the Current JOLs prepared an *ex parte* application seeking leave of the Court to commence proceedings on the (**FSD Sanction**) in the form set out in the Writ of Summons subsequently filed on 15 July 2025 (**Writ**) and supported by the fifth affidavit of Ms MacInnis (**MacInnis 5**).

(d) **9 July 2025:** the JOLs convened and conducted the First Meeting of Contributories and constituted a Liquidation Committee.

(e) **11 July 2025:** the Current JOLs issued an *ex parte* Summons seeking sanction for the JOLs to enter into a funding agreement with a Cayman incorporated LLC by the name of Crossvine Litigation Funding LLC (**Crossvine**) (**Funding Application**), which is supported by the sixth affidavit of Ms MacInnes (**MacInnis 6**).

(f) **15 July 2025:** the Current JOLs:

(i) Filed the Writ, supported by two Affidavits of Ms MacInnis and exhibits (respectively, **FSD Affidavit 1** and **FSD Affidavit 2**; **FSD Exhibit 1** and **FSD Exhibit 2**) (exhibited at **MP4/Tab 2, Tab 3, Tab 4** and **Tab 5 at pages 4 to 1617**) and referred to herein as the **FSD Proceedings**);

(ii) Made an application for an injunction in support of the FSD Proceedings pursuant to a Summons (**Cayman Injunction**).

(g) **21 July 2025:**

(i) The Current JOLs filed a Petition seeking Chapter 15 Recognition of their appointment as liquidators of the Company.

(ii) The CDM Entities, as defendants to the FSD Proceedings, issued a Summons for Directions in respect of the Cayman Injunction.

(h) **31 July 2025**: The Parties to the FSD Proceedings presented a Consent Order to the Hon. Justice Parker providing a procedural timetable for the hearing of the Cayman Injunction along with the summons issued by DFW on 9 June 2025, and the Summons issued by the CDM Entities dated 12 July 2025[1].

14. I repeat **sections B, C** and **D** of the **DFW Affidavit** and refer this Honourable Court to **paragraphs 18 to 22, 29, 87 to 96** of the **DFW Affidavit** for background concerning the DAF Restructuring. My evidence canvassing the nature of the dispute relating to the DAF Restructuring can be found at **paragraphs 38, 46, 56, 61** to **62** of **DFW Affidavit**.

---

[1] At the time of swearing this affidavit, the Cayman Injunction has not been listed but the Court has been asked to list the matter for 11-12 November 2025.

15. Furthermore, the validity of the Assignment Agreement (as defined and described further at paragraphs 71 to 73 of Mr Paul Murphy's First Affidavit sworn and filed on 4 June 2025 (**Murphy 1**)) is also in dispute.

16. I also exhibit at **MP4/Tab 6/pages 1618 to 1620** an opinion obtained by CDMCFAD, LLC (**CDM**) from a tax, assurance an advisory firm called Weaver dated 30 May 2025 (**Weaver Opinion**). The Weaver Opinion considers the fairness of the redemption proceeds paid to the Highland Foundations in their capacity as Participating Shareholders following the Company's redemption of its Limited Partnership interest.

17. The Weaver Opinion concurs with both the ValueScope and FTI conclusions mentioned in **FSD Affidavit 1**. The Weaver Opinion goes further and indicates that the redemption payments made to the Participation Shareholders in the amount of US $1.6 million to the Participating Shareholders (other than DFW), was fair consideration for the Company's redemption of its limited partnership interest in DAF LP (see **MP4/Tab 6/page 1620**).

18. A copy of the Weaver Opinion was provided to the Current JOLs on 1 July 2025 when it was uploaded to a data room hosted by US attorneys, Shields, and which the Current JOLs have access to. The Current JOLs have had the benefit of the Weaver Opinion for some 4 weeks but fail to make any mention of this in their First Report, creating substantial doubt over the assertions made by the Current JOLs in the FSD Proceedings. Further I note that in the evidence for leave to bring the Injunction Application, no mention is made of the Weaver Opinion notwithstanding its relevance to the veracity of the claims that are asserted in the Writ which the Injunction Application has been brought to protect.

19. In essence, the dispute at the core of the liquidation of the Company centres on the validity of the DAF Restructuring, which has been mischaracterised as invalid or void and it is wrongfully allegedly by the Current JOLs to be part of a scheme to

defraud the Highland Foundations of their alleged interests in the DAF Structure (see **paragraph 14, Diaz 2**).

20. The JOLs have, in certain material instances, simply parroted the complaints expressed by the Highland Foundations in the just and equitable Petition filed on 10 April 2025 - under the influence of Mr Dondero - without properly engaging with the evidence. For example, at **paragraphs 20 and 23, MacInnis 5**, it is asserted that the DAF Restructuring deprived the Highland Foundations, as the Indirect Charitable Owners of *"their interests in the Charitable DAF Fund LP (**Fund**)"* and that the Highland Foundations were the *"ultimate beneficial owners of the Fund and its substantial investment assets"*. These allegations are lifted from the Highland Foundations allegations set out in the just and equitable petition dated 10 April 2025 which was supported by Dondero 1 and Diaz 1. However, the assertions made in MacInnis 5 do not take into account the evidence outlined in Murphy 1 and the DFW Affidavit which the JOLs have had the benefit of since 4 June and which outline in clear terms (i) that the assets of DAF LP were neither the assets of either the Company nor the Highland Foundations; and (ii) that Dondero was also fully aware that assets and investments held through DAF LP were not the assets or property of the Highland Foundations.

21. Furthermore, at **paragraph 49.1, MacInnis 5**, Ms MacInnis refers to the directors' remuneration of US $600,000 per annum. This again mirrors Ms Diaz's summary of the position (see **paragraph 32(a)** of Diaz 1 which, in turn, is copied directly from Mr Dondero's expense report). Mr Dondero has wrongfully sought to contrast my remuneration described at **paragraph 49.2, MacInnis 5**, with Mr Scott's remuneration (see paragraph 15 of Dondero's 1) in a misplaced attempt to establish that I pose a risk to the Company's assets. The Current JOLs have since adopted that position too, for example, at paragraph 169 of the Writ and Statement of Claim where it is expressly averred that *"[b]y contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000"*. Neither Mr Dondero nor the JOLs have offered any objective evidence to support

the inference that Mr Scott was reasonably remunerated during his tenure. In fact, and contrary to the statements of Ms MacInnis, email correspondence between Mr Dondero and Highland Capital Management's General Counsel J.P Sevilla on 31 July 2014 illustrates the arbitrary manner in which Mr Scott's renumeration was determined by Mr Dondero (see **MP4/Tab 7/Pages 1621 to 1622**). This correspondence also suggests that Mr Scott may have been paid from DAF LP's assets for services rendered to unrelated companies such as the Get Good Trust and other trusts. It also fails to take into account the engagement and payment of supposedly third-party service providers, like Highland Consulting Group, Inc. d/b/a Skyview Group (**Skyview**). Skyview – an entity controlled and managed by Scott Ellington, charged baseline fee of US $250,000 but incurred actual costs for administrative services which averaged US $1.5m a year. The engagement was terminated on 2 October 2024. I exhibit at **MP4/Tab 8 and Tab 9/pages 1623 to 1640** Skyview's Service Agreement and Termination Agreement. These are only two of several examples where DAF LP and its subsidiaries have been treated as a bank account by Dondero to pay the bonuses and salaries of individuals not employed by the Company or by the Fund or where entities affiliated or controlled by Mr Dondero and/or Mr Ellington were only too happy to charge large administrative fees as long as it ultimately inured to their personal benefit.

22. Similarly, there is no objective evidence to show that my compensation is unreasonable despite the allegations to the contrary. The only independent evidence on this point is outlined below in the following paragraph, which for reasons known only to the Current JOLs, they have chosen to disregard arbitrarily finding that my defences and justifications on this point not to be "*availing or credible.*"[2].

23. I have responded to the allegations in respect of my remuneration in detail (see, for example, **paragraph 173, DFW Affidavit**) and outlined how I followed best

[2] See Footnote 8 of the Chapter 15 Verified Affidavit.

practice by commissioning an independent, third-party assessment of the appropriate compensation for my role, which Mr Murphy then reviewed. A report prepared by Heidi Jensen O'Brien of Mercer, a firm which specializes in preparing reports for charitable organisations and are regularly commissioned by advisers and the Internal Revenue Service (**IRS**), is exhibited to **MM-5, pages 555 to 574** and **FSD Exhibit 1, MP4/ Tab 4/pages 1068 to 1087** (**Mercer Report**). At **paragraph 66, MacInnis 5**, Ms MacInnis does not engage with the substance of the report or its methodology, instead she finds cause to query the timing of the report primarily and the fact that *"the effect of the transactions pursued in reliance on the…Report resulted in a significant cash outflow from the Company."* This is a conclusory, pejorative statement that fails to stand up to scrutiny nor is it based on expert independent US evidence.

24. The Writ misrepresents my compensation position when compared with the role that was assumed by Mr Scott. As is deposed to in the DFW Affidavit, Mr Scott's role and activities in respect of the Company were limited and his remuneration reflected this limitation. When I assumed the role of Control Person, which included but was not limited to being the registered director of the Company, I took on the responsibility of managing the DAF asset investments; administering the structure and managing significant litigation which had been instigated or induced by the conduct of Mr Dondero (I outline the extensive litigation in the **DFW Affidavit** (**paragraphs 123-141**, and at **paragraphs 35.6, 35.8-3.17**).

25. In contrast, and as set out in the Mercer Report, which is exhibited at **MM-5, pages 555 to 574**, during Mr Scott's tenure these functions were performed by Highland Capital Management (a Mr Dondero related entity) and then Skyview (which was also under the *de facto* control of Mr Dondero). The Company paid some US $28.5 million over the course of 2014 to 2020. I exhibit at **MP4/Tab 10/page 1641** a summary of fees paid from the DAF Structure to Highland Capital Management / Skyview. As addressed in the Mercer Report, my rate of compensation reflects not only my role as Director to the Company but also the wider investment

management functions I undertook which Mr Scott never assumed (but rather outsourced to Highland Capital Management to the ultimate benefit of Mr Dondero). Specifically, the Mercer Report acknowledged "*the complexity of my role*" at page 3 of their report, in that I held the following roles with the Company:

(a) Chief Executive Officer (which involved managing the Company's operational issues, managing the DAF corporate structure and determining charitable disbursements);

(b) Chief Investment Officer (which involved complex fund management and investment strategy);

(c) Legal (which involved handling complex and contentious litigation and asset recovery); and

(d) Compliance (which involved navigating regulations internationally and across multiple states domestically).

26. Conversely, Mr Scott did not devote his full time and attention to the role of Management Shareholder or General Partner. Mr Scott was and still is to the best of my knowledge, a practicing patent attorney. This was not a full-time job for him and during the same period, Mr Scott also functioned as trustee for some of Mr Dondero's personal trusts, notably the Get Good Trust as reflected in **MP4/Tab 7/page 1621**.

27. Mr Scott was also not involved in active investment management. My understanding is that Mr Scott's duties consisted primarily of approving wires sent for his sign off by Mr Dondero's assistants. I refer to the potential liabilities for the Company and the DAF Structure which I believed were created by Mr Scott's inability to maintain independence from Mr Dondero by virtue of simply authorizing transactions and investments proposed by Mr Dondero at **paragraphs 110 to 143, DFW Affidavit**.

28. On a proper and impartial consideration of the Mercer Report and upon a more meaningful and fuller investigation, the differences in roles this would be apparent to the Current JOLs. It is my belief that they have elected:

(a) to present a misleading account of the very different roles fulfilled by myself and Mr Scott and suggest incorrectly that these roles were in fact the same. I infer that the purpose of this approach is to sustain the allegation that during my management and supervision significant value has been taken out of the DAF Structure, which is in fact contrary to the evidence before the Court (**DFW Affidavit at paragraph 181**); and

(b) not to have regard to the evidence, diligence, and professional judgment by Mercer in issuing its report. Instead, they cite the US $60,000 paid to Mr Scott (and arbitrarily determined by Mr Dondero) as if it carries more evidential weight than the Mercer Report which was produced independently and featured heavily in the Company's authorisation process.

29. Separately, Mr Dondero's written evidence in **Dondero 1** regarding the manner in which Mr Scott came to leave his role as control person directly contradicts his sworn oral evidence given during his deposition in separate proceedings (see **paragraph 109 of the DFW Affidavit** sworn on 4 June 2025). And yet, the Current JOLs have not seen cause to stop and consider what weight (if any) should be given to the information provided by the Highland Foundations / Mr Dondero. I pause here to note that not only has Mr Dondero provided inconsistent evidence and testimony, as explained further at **paragraph 35.15-35.20, Murphy 1**, he has been described as a vexatious litigant, held in contempt of court, and e restrained by a gatekeeper injunction to prevent vexatious litigation, a matter which he appealed all the way to the U.S. Supreme Court.

30. In truth, and as deposed to in the DFW Affidavit and Murphy 1, the steps taken to implement the DAF Restructuring were necessary to (i) protect assets diverted from the charitable structure to the satisfaction of Mr Dondero's personal creditors; and (ii) ensure the assets of the structure could be applied in accordance with the terms of the ARLPA insofar as discretionary distributions were made to entities that were "*Indirect Charitable Owners"* providing those persons fulfilled the qualifying criteria of being eligible to receive distributions from the DAF Structure.

31. As stated in the Company's Memorandum and Articles of Association, dated 20 February 2025 (Article 21) "*If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles*." (see **Exhibit MP1/page 99**). It is my honest belief that had Mr Murphy and I sought to procure the voluntary transfer of the shares held by the Highland Foundations notwithstanding there was a basis and need for us to do so, that request would have been refused. This would further have exposed Mr Murphy and me to retaliatory action from the conduits of Mr Dondero's wishes, and placed us in the position of needing to take action outside of the control and influence of the Highland Foundations in order to fulfil our fiduciary obligations to the Company.

32. A "*Restricted Person*" within the Articles means ".... *any Person holding Participating Shares….which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered*." Specifically, the "*Restricted Person*" clause (b) also requires each Participating Shareholder to be an entity or organization exempt from taxation under Section 501(c)(3) of the Code. With leave of the Court I make reference to **FSD Affidavit Mancino 1** (exhibited at **MP4Tab 11/Pages 1642 to 1687**) at paragraphs 42 to 46,148 to 149 and 151 to 152 below which illustrates the real and immediate concerns which required implementation of the DAF

Restructuring and further highlights how the Current JOLs are unable to consider the DAF Restructuring from an independent and unbiased perspective.

33. As is deposed to in the DFW Affidavit and Murphy 1, the information and advice with which I and Mr Murphy were presented at the relevant time indicated that the Highland Foundations came within the meaning of "*Restricted Persons*" which disqualified them from being entitled to receive distributions from the DAF Structure, due to their associations with Mr Dondero which in turn placed the Company at risk of penalties and liabilities. These were not concerns limited to the Supporting Organisations but of material concern to the Company of which Mr Murphy and I were directors, for example:

    (a) The actions previously taken by Mr Dondero and the Highland Foundations could expose the Company, and its now former directors, to potential breaches of US tax laws and regulations especially where Mr Dondero was seeking to exert *"dominion and control"* over the DAF Assets (**paragraph 46.1, Murphy 1**);

    (b) I believe that Mr Dondero evaluated the prospects of the DAF Structure financing his current and future projects in a way which was contrary to Mr Dondero relinquishing dominion and control in respect of that structure (**paragraph 81, DFW Affidavit**);

    (c) The Company had received advice from Carrington Coleman that "*there was a significantly heightened risk that the IRS could severely penalize and /or revoke the tax-exempt status of one or more*" of the Supporting Organizations which would in turn imperil the assets of the DAF (**paragraph 82, DFW Affidavit**);

    (d) Mr Dondero has an inappropriate donor relationship with the representatives of the Dallas Foundation, which is the Supported Organization of the Highland Dallas Foundation (which is a tax-

exempt community foundation under US-tax law, and whose president is Julie Diaz), which potentially jeopardizes the tax-exempt status of the Highland Dallas Foundation (**paragraph 145, DFW Affidavit**).

## B. DONDERO CONTROL AND INFLUENCE OF THE HIGHLAND FOUNDATIONS

### Governance and structure

34. I set out in **paragraphs 17, 22, 29, 32,** of the **DFW Affidavit** the relationship between Mr Dondero and the Highland Foundations. In response to the **FSD Affidavit 1** sworn by Ms MacInnis, I set out herein how the Highland Foundations should be regarded more factually as an instrument of Mr Dondero in the context of this liquidation and the FSD Proceedings, and I identify the inaccuracies in the JOLs' evidence.

35. As I explain at **paragraph 17 of the DFW Affidavit**, Mr Dondero controls the Highland Foundations. Ms MacInnis attempts to sanitize this relationship in **paragraphs 13-22, FSD Affidavit 1** (see **MP4/Tab 2/page 8 to 13**) to state that Mr Dondero has only 1 of 3 of the board of directors' voting rights for each of the Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc. However, in doing so Ms MacInnis ignores that Mr Dondero is also the President of each of the Highland Foundations, as also deposed to at **paragraph 17, DFW Affidavit**.

36. Under the By-laws governing the Highland Foundations which are exhibited to the FSD Affidavit 1 and referred at **FSD Affidavit 1, Paragraph 18.1 and 18.6** (see **MP4/Tab 2/page 9 and 11**), the President is also the Chief Executive Officer of each of the Highland Foundations and has all powers that are delegated by the Board of Directors. Publicly available information confirms this. My understanding, based on advice of Delaware counsel, is that under the governing law of the Highland Foundations an officer including the President may generally

cause a corporation (including the Highland Foundations) to take a wide variety of actions, including bringing lawsuits. It is striking that in the FSD Proceedings, the Current JOLs (see **paragraphs 13-22, FSD Affidavit 1** at **MP4/Tab 2/page 8 to 13**) contest at length that Mr Dondero has control over the Highland Foundations due to being only one of three Directors on each of their respective Boards but fail to address the matters which I raise immediately above.

37. It is also my belief that Mr Dondero has leveraged his influence as a donor to the Highland Foundations and President of those foundations to procure both proceedings before the Grand Court and the Dallas Business Courts with a view to taking control over the assets held in the DAF Structure to (i) bring an end to litigation which Mr Murphy and I have properly instituted against Mr Dondero and entities related to him; and (ii) access assets of value to meet potentially significant liabilities accruing to Mr Dondero, not least in the Turnover Petition proceedings instigated by UBS. I refer the Court to **paragraphs 123-127, DFW Affidavit** for a summary of those proceedings.

38. Structurally, the Highland Foundations are the conduits through which specific charitable foundations were supported. For example, the Highland Dallas Foundation provides donations to the Dallas Foundation. To the best of my knowledge, Mr Dondero does not have direct *de jure* control over the Dallas Foundation but in my experience, he is able to exert significant influence over the charitable foundations who previously received distributions from the DAF, through his control of the Highland Foundations. On several occasions, I witnessed Mr Dondero promising additional financial donations to the Highland Foundations in order to extract favors from them, including tax write-offs that benefited him personally like the NHT put option of US $9,285,000 described below at paragraph 41. It is immaterial whether Mr Dondero in fact controls the underlying charities, as my concerns as the Company's director stemmed from the extent to which Mr Dondero wielded control and tried to influence to cycle the value of his settling

donation from Trust #2 out of the DAF structure and back to businesses and transactions which were either related to or of benefit to him.

39. While FSD Affidavit 1 may give the appearance, at first blush, that the Highland Foundations are independent, in reality and far from keeping it a secret, Mr Dondero's control of the Highland Foundations is public knowledge and seemingly accepted by the Current JOLs. For example, in Highland Dallas Foundation's 2019 and 2020 tax filings, it listed *"300 Crescent Court, Suite 700, Dallas, Texas"*, which was the same address as Highland Capital Management while under Mr Dondero's control and is the newest address for NexPoint, Mr Dondero's current investment group.

40. The JOLs also confirm at **paragraph 11.2 and in footnote 4, FSD Affidavit 1** (see **MP4/Tab 2/Pages 7 and 15**), that NexPoint is an investment management firm of which Mr Dondero is the President, and that Mr Dondero caused the Highland Dallas Foundation to assume the name *"NexPoint Philanthropies Dallas Inc."* in June 2024, rather than do business under the 'Highland' name. This was previously deposed to at **paragraph 66, DFW Affidavit**.

41. The Current JOLs also ignore my evidence at **paragraphs 194 to 199**, of the **DFW Affidavit**, where I set out how Highland Dallas Foundation, Inc. has failed to request US $9,285,000 owed to them by Mr Dondero's personal trust, at a time when, according to Ms MacInnis at **paragraphs 53 to 59,** of the **FSD Affidavit 1** (see **MP4/Tab 2/Pages 31 to 34**), there are holes in the charities balance sheets and they are unable to pay their overheads.

**No economic interest justification**

42. In response to Ms MacInnis' sworn evidence in the FSD Affidavit 1, and so far as her evidence relates to matters of U.S. non-profit corporation and tax law, and the U.S. Internal Revenue Code (the **Code**), Mr Mancino of Seyfarth Shaw LLP (**Seyfarth**), who is considered to be one of the United States' most pre-eminent tax

attorneys, swore an affidavit in the FSD proceedings on 30 July 2025 exhibited at **MP4/Tab 11/Pages 1642 to 1687 (FSD Affidavit Mancino 1**).

43. A copy of Mr Mancino's Curriculum Vitae is exhibited at **DM-1, pages 1 to 12**, filed in these liquidation proceedings.

44. In Mancino 1, he seeks to correct material factual errors and overstatements, and legal errors or distortions of U.S. tax and nonprofit corporation law made throughout FSD Affidavit 1.

45. Such corrections include:

    (a) Each Supporting Organisation was incorporated as a "nonprofit nonstock" corporation under the Delaware General Corporation Law (**DGCL**) in order to meet the organisational requirements for eligibility to be a charitable organisation for U.S. Federal income tax purposes under section 501(a) of the Code (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1645**).

    (b) Nonstock corporations are not authorized to issue capital stock. And, under section 114(d)(3) of the DGCL, a nonprofit nonstock corporation does not have membership interests, which means that the Supporting Organisations, being the Dallas Foundation, the Greater Kansas City Community Foundation and the Santa Barbara Foundation do not have any right to share in the profits and losses of their respective Supporting Organisation, and no Supported Organisation has a right to receive distributions of the Supporting Organisation's assets (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1645**).

46. Holland & Knight LLP expressly acknowledged on a call with Mr Mancino in November 2024 that the then Participating Shareholders of the Company such as the Highland Foundations had no rights (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Pages 1647**). I also note at **paragraphs 64 to 66, Murphy 1** that similar

comments were made by representatives of Holland & Knight to Mr Murphy at a presentation he delivered by video conference to Michael Stockham (a litigation partner) and David Rosenberg (non-profit tax partner) on 11 December 2024, who attended on behalf of the Highland Foundations. Mr Stockham commented that he had read the constitutional documents of the Company and anticipated that Walkers (the Company's former Cayman counsel) would tell him that the Highland Foundations essentially had no rights in the Company.

(a) Each Participating Shareholder, upon agreeing to accept the gift of Participating Shares, relinquished any right it might have to any or any specific amount of dividends, any access to information absent a decision of the Directors to exercise discretion to provide information, any right to inspect any of the Company's books and records, any right to compel an audit, and other items enumerated above and otherwise contained in the Amended and Restated Memorandum and Articles of Association (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1644**).

(b) DFW Charitable Foundation is a U.S. tax-exempt organisation classified as a private non-operating (i.e., grant-making) foundation. It played a stewardship role as a controller of the assets formerly held by the Company and disseminating them for proper charitable purposes (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1652**).

(c) My status as sole member is a common practice with U.S. private foundations. This was disclosed to the IRS multiple times in the application for recognition of its section 501(c)(3) exemption filed with the IRS (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1652**).

(d) Mr Mancino also lists out the various restrictions placed on private foundations which represent serious guardrails which debunk the Current JOLs' assertions that DFW is little more than a "creature

company" of mine (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Pages 1652 to 1653**).

47. It is unclear at present what U.S. tax and non-profit corporation advice the Current JOLs have obtained and from whom when the FSD Proceedings were conceived, as there is no mention in the FSD Affidavit 1 affidavit of any specialist tax advice being obtained. However, a thorough investigation should have made these points apparent to the Current JOLs.

48. The original allegations of "bad acts" attested to by Mr Dondero have been thoroughly refuted in evidence submitted in the DFW Affidavit. Mr Dondero testified under oath that "*we took all the bad acts and all the investigations and we gave them to the [Highland Foundations].*"[3] The DFW Affidavit addresses and refutes these allegations.

49. Mr Dondero testifies that he (together with, I understand, his employees at NexPoint and his affiliates at Skyview Group) built a case and facilitated investigations and provided this case to the Highland Foundations. From the outset, before any of the correspondence between myself and DAF, on the one hand, and the Highland Foundations, on the other, Mr Dondero admits and seems to take pride in convincing the Highland Foundations to institute, winding up proceedings without first discussing with me. I described this at **paragraph 185,** of the **DFW Affidavit** and extensively in my **First Affidavit as Sole Holder of the Management Share** sworn on 4 June 2025.

**Hunter Mountain Claim**

50. The control and influence of Mr Dondero over the Highland Foundations is not simply a matter of conjecture and supposition but a matter of factual evidence arising from depositions and sworn testimony of Ms Diaz and Mr Dondero

[3] See Highland Capital bankruptcy hearing transcript at pg. 198 lines 10-12 and 22-23.

conducted on 22 and 25 June 2025, respectively. These depositions were held in connection with a settlement agreement entered into between HMIT and the Highland Capital Trustee in Bankruptcy in May 2025 (**Hunter Mountain Settlement**). In proceedings titled *In Re Highland Capital Management, L.P,* (case number Case No. 19-34054-sgj11) (**Hunter Mountain Claim**). HMIT's sole beneficiary is an entity called Beacon Mountain, LLC, which is a subsidiary within the DAF Structure. A copy of the Hunter Mountain Settlement is exhibited at **MP4/Tab 12/Pages 1688 to 1699**.

51. Under the terms of the Hunter Mountain Settlement, the DAF Structure will receive:

(a) a cash payment in the amount of US $500,000.00

(b) the rights to a promissory note payable by Dugaboy (being the personal family trust of Mr Dondero (**DFW Affidavit, paragraph 119(b)**) in an original principal amount of US $24,268,621.69;

(c) future cash payments as provided therein; and

(d) the assignment of approximately US $300 million in legal claims to pursue matters covered in the Amended Kirschner Complaint, including actions against Mr Dondero, Mr Ellington and entities owned or controlled or affiliated with Mr Dondero and Mr Ellington.

52. Mr Dondero has repeatedly sought, both directly and indirectly, to prevent and delay the consummation of the Hunter Mountain Settlement:

(a) As deposed to at **paragraphs 75-80**, **Murphy 1**, in November 2024 HCLOM (being an affiliate / controlled party of Mr Dondero) sought to intervene in the Highland Capital Bankruptcy so as to dilute the recoveries of HMIT from Highland Capital, by asserting a claim under a disputed promissory note in the amount of US $12.6 million. It is my

belief that the dilution of these recoveries was attempted in bad faith in order that Mr Dondero could place HMIT under financial pressure so as to limit its ability to contest arbitral proceedings commenced by Dugaboy in respect of a promissory note in the amount of US $62.6 million.

(b) On 9 June 2025, Dugaboy sought from the Dallas Bankruptcy Court an adjournment to the Hunter Mountain Settlement Hearing for a period of 90 days. Justice Jernigan rightly denied this request for the reason that Dugaboy / Mr Dondero had *'de minimis'* status in the Highland Capital Bankruptcy to be heard in respect of the Hunter Mountain Settlement.

(c) On 9 June 2025, the Dallas Foundation also filed an objection to the Hunter Mountain Settlement (**DF Objection**) (**see MP4/Tab 13/Pages 1700 to 1714**). During the course of her deposition on 22 June 2025, Ms Diaz, as President and Chief Executive Officer, was questioned in respect of the reasons for the objection it became apparent that there was no basis for the DF Objection to be sustained:

(d) Ms Diaz knew of no lawful basis on which the objection to the Hunter Mountain Settlement could be asserted by Highland Dallas Foundation.

(e) Ms Diaz, who admitted to approving the filing of the DF Objection also admitted to not having read the Hunter Mountain Settlement to which the DF Objection related.

(f) In the DF Objection, Ms Diaz referred to the ability of the JOLs (*"Cayman Court-appointed fiduciary"*) to scrutinise the transactions which comprise the DAF Restructuring and claw-back or bring avoidance actions. However, it transpired during deposition that Ms

Diaz has no expertise or understanding in respect of the potential claw-back or avoidance actions or of Cayman law and what would be required.

(g) Ms Diaz had no basis for the assertion made in the DF Objection that Mr Patrick was acting outside the scope of his authority when entering into the Hunter Mountain Settlement.

(h) Ms Diaz was questioned in a deposition she gave in the proceedings with Case No. 19-34054-sgj11 (**Highland Bankruptcy Proceedings**) on 22 June 2025 (see **MP4/Tab 14/Pages 1715 to 1815**) with respect to the allegations that I disclosed material non-public information as set out in Diaz 1 filed in support of the Petition for winding up the Company dated 9 April 2025, **paragraphs 28 to 30, Diaz 1**. I vigorously refute those allegations (see **paragraphs 176-177, DFW Affidavit**) and it is the case that Ms Diaz had no basis for making this allegation but was following the instructions of Mr Dondero in making such an assertion (see **MP4/Tab 14/Page 1791**):

> "*I'll just tell you the quote he gave us, which was Jim Dondero's spiraling out of control and you need to do this because nothing appears to be what it is" and "I don't know [my basis for alleging material nonpublic information]*."

(i) As deposed to at paragraph 13 (a)(i) above, on 24 June 2025 the JOLs issued the HMIT Adjournment Letter on 24 June 2025 in which they sought to intervening in the Highland Bankruptcy Proceedings. This interference was without the JOLs having any legal basis for doing so and presented in terms that reflected the previously failed attempts by Dugaboy and the DF Objection to prevent the Hunter Mountain Settlement.

53. As a result of the deposition of Ms Diaz, the DF Objection was withdrawn. The Hunter Mountain Settlement was approved by Justice Jernigan on 30 June 2025.

(a) Following the withdrawal of the DF Objection, at the hearing to approve the settlement before Justice Jernigan on 25 June 2025, Mr Dondero gave clear evidence demonstrating the extent to which he can control the Foundations (see **MP4 Tab 15/Pages 1816 to 2081**, for example:

(b) As to the question of why the other Foundations had not filed objections to the Hunter Mountain Settlement in line with the DF Objection, Mr Dondero stated: *"[Ms. Diaz] got bludgeoned in depositions over the weekend and it happened last night and nobody was aware of it*". In other words, the only reason why the objection was withdrawn by the Dallas Foundation was because it had acted independently of Mr Dondero's influence and control, and at the time to his knowledge the DF Objection was to stand such that the other Foundations would not need to also object.

(c) Mr Dondero was questioned specifically in relation to the withdrawal of the DF Objection and stated that:

"*we only had six hours' notice that [Dallas Foundation withdrew its objection]" and "if we had more time…[Highland Foundations] probably would object.*"

(d) In other words, had Mr Dondero had an opportunity to speak with the Highland Foundations, he believes he could have successfully persuaded them to file similarly meritless objections to the Hunter Mountain Settlement Agreement.

(e) The efforts of Mr Dondero to stymie the Hunter Mountain Settlement have not abated, and on 17 July 2025 Dugaboy issued a motion to delay

the implementation of this settlement for a period of 90 days (**Dugaboy Stay**, exhibited at **MP4/ Tab 16/Pages 2082 to 2177**) "*so that it and other parties can investigate the allegations made in the recently filed request for a stay of all Highland bankruptcy proceedings made by the Texas Attorney General, and the complaint (the "JOL Petition") the Joint Official Liquidators ("JOL") of Charitable DAF HoldCo LTD ("Holdco") filed on July 15, 2025, by. That Petition, annexed hereto as Exhibit A, outlines a massive fraudulent scheme*".

(f) On 21 July 2025, Justice Jernigan denied the request to stay the Highland Bankruptcy proceedings based on this objection.

## C. PARTIALITY AND LACK OF INDEPENDENCE

54. DFW harbours serious concerns regarding the Current JOLs' objectivity and independence which has culminated in a complete collapse of DFW's trust and confidence in the Current JOLs, arising in particular from the following conduct:

a) Persistent and unnecessary use of *ex parte* proceedings

b) Failure to provide full and frank disclosure

c) Funding Arrangements:

  a) Terms of the Funding Agreement

  b) Crossvine is James Dondero

  c) JOLs failure to disclose source of funding

  d) Conflict of Interest in Dondero funding liquidation

  e) Involvement of Scott Ellington

d) Lack of engagement with Proposed CDM Protocol

e) Leveraging of the Cayman liquidation & Advancement of Dondero interests:

a) Failure to Sanction Highland Foundations

b) Solvency determination

c) Avoidance of the DFW Summons

d) Interference in Texas Bankruptcy Proceedings

f) Inadequate or incomplete investigations:

a) Limited Interviews

b) No investigations into US Federal Tax status concerns

c) No investigation into Dondero related litigation

d) Utilisation of the DAF LP structure for benefit of Dondero

*e)* ***<u>Persistent and unnecessary use of ex parte proceedings</u>***

55. To the best of my knowledge and belief, since their appointment on 6 May 2025 the Current JOLs have made at least two and perhaps three *ex parte* applications to the Court. In those instances, the circumstances either did not warrant the application in the first place, or did not warrant that the application be made on an *ex parte* basis.

56. It is my view that the Current JOLs have proceeded *ex parte* not for the preservation of matters in the FSD Proceedings but to deprive DFW of the ability to participate in the proceedings that are envisaged and to obtain a tactical advantage by avoiding due process where possible. From my familiarity with Dondero's litigation strategy (or that of Dondero related entities) this is consistent with his modus operandi.

i. *Sanction of legal counsel:* I address the sequence of events surrounding the proposed sanctioning of Johnstone Law as legal counsel to the Current JOLs in the **paragraphs 23 to 51, DFW Affidavit**. I do not propose to repeat those events in detail and will leave counsel to make submissions from the facts, but it is important to note that the procedural conduct deployed by Johnstone Law on the instructions of the JOLs demonstrated from the outset a biased disposition to the position of the Highland Foundations at the expense (literally and figuratively) of DFW. In particular it is relevant to note that:

a. As of 6 May 2025, Johnstone Law had consulted with the Dondero-controlled Highland Foundations and Current JOLs to settle and agree the engagement of Johnstone Law as legal counsel to the Current JOLs. The terms of the consent provided to Johnstone Law from the Highland Foundations did not permit Johnstone Law to disclose to the Current JOLs confidential information which Johnstone Law came into by reason of their prior engagement by the Highland Foundations. This is deposed to in Johnstone 1.

b. As of 6 May 2025, the proposed engagement of Johnstone Law by the Current JOLs was not shared with DFW nor the Court, notwithstanding that the JOLs had attempted to obtain the blanket power to engage legal counsel by the terms of the Supervision Order without providing terms to the Court or disclosing in pleadings which firm/firms were to be engaged.

c. The Current JOLs, through the Letter Application (defined in **paragraph 50, Johnstone 1**) sought to have the Court sanction the engagement of Johnstone Law as legal counsel to the Current JOLs on an *ex parte* without notice basis (at least to DFW and myself as Management Shareholder), and without a hearing in circumstances

where they knew the consent of DFW would not be forthcoming for reason of the submissions made by DFW at the Supervision Hearing, as subsequently committed to writing in correspondence dated 14 May 2025 issued to Johnstone Law by Baker & Partners (I refer the Court to the **paragraph 48, DFW Affidavit**).

d. DFW only became aware that the current JOLs had sought to sanction the engagement of Johnstone Law in the manner described immediately above when, by an email sent on 21 May 2025 from Johnstone Law to DFW's Cayman Islands' legal counsel seeking to agree to directions for a hearing which had been directed by His Honourable Justice Asif KC to consider the sanction of legal counsel. I infer from his Lordship's direction that the Letter Application was not procedurally appropriate in the circumstances, and in my view indicative of an attempt to undermine the position of DFW by denying the procedural fairness which DFW as a stakeholder in the liquidation of the Company would be entitled to.

e. Despite requesting a copy of correspondence between Johnstone Law and the Grand Court regarding the proposed sanction application (I refer to **paragraph 50, DFW Affidavit**), DFW was not provided with a copy of the Letter Application. In fact, legal counsel to DFW was only able to consider the Letter Application when served with the hearing bundles for the Sanction Hearing of 24 June by Maples (the now sole Cayman attorneys to the JOLs). Clearly Maples had been provided with a copy but I do not believe that counsel to any other stakeholder was so provided. I would invite the JOLs to confirm if the Highland Foundations were provided with a copy of the Letter Application prior to service of the hearing bundles by Maples.

f. When I was finally able to consider the Letter Application, I was struck by how similar the substance of that correspondence was to the Second Affidavit of Ms MacInnis, suggesting that the evidence of the Current JOLs was heavily if not entirely drawn from the Letter Application which was prepared by legal counsel which DFW maintains is conflicted having first been engaged by the Highland Foundations, who I know to operate under the significant influence of Mr Dondero, and which is deposed to at **paragraphs 56.i and57.ii herein**.

g. Although the JOLs eventually resiled from seeking sanction for the engagement of Johnstone Law on the business day before the Sanction Hearing (24 June), it is my belief that the manner in which the Current JOLs sought to obtain sanction for the engagement of Johnstone Law on an *ex parte* basis in the face of known opposition is indicative of conduct which lacks the requisite independence and impartiality.

ii. *Sanction of FSD Proceedings*

a. The JOLs again applied *ex parte* without notice for the Court's sanction to commence the FSD Proceedings (***ex parte*** **Application 2**). On 22 July 2025 Maples provided a heavily redacted note of the remote hearing for *ex parte* Application 2 (***ex parte*** **Note**). A copy of that note is **exhibited at MP4/Tab 17/Pages 2182 to 2185**, along with a substantially redacted copy of MacInnis 5 which was sworn in support of that application (**Tab 17/Pages 2186 to 2234)**.

b. The extent to which the *ex parte* Note has been redacted makes it incomprehensible such that I cannot ascertain the documents and information that were provided to the Court to obtain leave; the specific leave sought and relief granted by the Court. The Note refers

to *"a new affidavit of Michael Murillo"* but which has also not been served on or otherwise provided to DFW. Finally, DFW has not been provided with a copy of the 4 July Summons by which *ex parte* Application 2 was brought nor a copy of the Order as made. I am informed by DFW's Cayman Islands legal counsel to DFW that those documents have been made the subject of confidentiality orders.

c. On 20 July 2025 DFW, through Baker and Partners, specifically raised a query with Maples as to whether the Highland Foundations were put on notice of the JOLs' *ex parte* sanction application, which went unanswered in Maples' response received on 22 July 2025 (see **MP4/Tab 18/Pages 2235 to 2240**). While I note that **paragraph 9 of MacInnis 5** states *"For the following reasons, the JOLs have brought this Application ex parte and respectfully request that is it not appropriate for any of the Company's shareholders to be on notice of the Application"*, it is not apparent what directions were given in this respect, nor if the Highland Foundations were otherwise made aware of *ex parte* Application 2.

d. Also at **paragraph 9, MacInnis 5** seeks to justify proceeding *ex parte* for leave to commence the FSD Proceedings as to *"Communicate the substance of this application, together with evidence and submissions which addresses its merits would seriously undermine the proper course of the Proposed Proceedings in the event that they are sanction"*. No explanation for this position is given in this regard and, in circumstances where the DFW Summons had been filed with the Court more than a month before, the preparation of the FSD Proceedings (which had clearly been in progress for some time) are unnecessary and in my view a clear attempt of Dondero – through the JOLS - to procure costly litigation that enable an application for an injunction to be made.

e. I understand that *ex parte* Application 2 was granted on 14 July 2025 and on 15 July 2025 the Current JOLs commenced the FSD Proceedings which are:

(i) outside of the liquidation proceedings;

(ii) before a new judge who is unfamiliar with the context of the Current JOLs' appointment and the Company's history or liquidation generally;

(iii) has none of the evidence before him which is already before His Honourable Justice Asif KC;

(iv) with respect to the Cayman Injunction, it is expressly stated by Maples in their correspondence to the Court sent on 15 July 2025 (see **MP4/Tab 19/Pages 2241 to 2244**) to coincide with the timetable of litigation commenced by the Highland Foundation in the Dallas Business Court, which I discuss further below.

iii. *Sanction of Funding Agreement*

a. At paragraphs 58 to 89 below, I address the Current JOLs' conduct with regard to the question of how the liquidation of the Company has been funded, will be funded and by whom.

b. That the Current JOLs would need to secure funding for the liquidation is not a controversial or new point. Since the Highland Foundations issued the just & equitable winding up Petition, the spectre of Mr Dondero as a funder to those proceedings has been present. In Dondero 1, Mr Dondero himself stated that he would personally provide the funding to the Highland Foundations to pursue the winding up of the Company. As set out in paragraph 68 below, the fact that Mr Dondero has been financing the legal actions of the Highland Foundations

recently commenced in respect of the DAF Restructuring was confirmed by Ms Diaz under oath on 22 June 2025. The transcript of the Diaz Deposition was included in a Supplemental Bundle filed by DFW with the Court prior to the Sanction Hearing of 24 June and was at the same time provided to the Current JOLs.

c. I understand from the terms of MacInnis 6 that *an ex parte* application was also made for the purpose of sanctioning the Funding Agreement. I also understand from the terms of MacInnis 6 that the Funding Agreement is structured in such a way that Mr Dondero is ultimately funding the liquidation and the FSD Proceedings (see **paragraph 11, MacInnis 6**).

d. The *ex parte* Note which relates to *ex parte* Application 2 does not, so far as it is possible to discern, address the Funding Agreement. At the date of swearing this affidavit it does not appear that Maples have provided a Summons, Order or note relating to the sanction of the Funding Agreement.

e. Prior to the Funding Agreement being Sanctioned it was also confirmed by Ms Diaz in US proceedings under oath that Dondero is funding the Highland Foundations in the proceedings which have been instituted in connection with the DAF assets and investments. The funding of the liquidation and FSD Proceedings by Dondero directly or indirectly, is a matter of controversy and a situation which DFW would vehemently contest. By proceeding to obtain sanction of the Funding Agreement on an *ex parte* basis the JOLs, have wrongfully deprived DFW of the procedural right to dispute the fact or terms of the Funding Agreement, including the identity of the funding party.

f. Given the paucity of information provided by the JOLs and their legal counsel as regards the application to sanction the Funding Agreement,

I am unable to discern whether the JOLs disclosed to the Court the fact that Dondero had been (and is likely to continue to be) funding the Highland Foundations. This fact which seems material to the propriety of the Funding Agreement is not addressed in the terms of MacInnis 6.

iv. *Attempt to seek Cayman Injunction ex parte*

a. The Current JOLS were initially seeking to have the hearing of the Cayman Injunction listed for a date less than 2 weeks from the date on which the Cayman Injunction and FSD Proceedings were filed and served on the parties, including DFW.

b. It is apparent from Maples' letter to Court dated 15 July 2025 which seeks a listing of the Cayman Injunction that the Current JOLs were willing to proceed on an *ex parte* basis, to do so regardless of the defendants' ability to attend and that the urgency was in part justified to align that hearing with a hearing in the TRO Proceedings issued by the Highland Foundations.

c. For the reasons explained in paragraphs 98 to 100, in light of both the voluntary Rule 11 Agreement which DFW and the CDM Entities had provided in the TRO Proceedings as of 2 July 2025 and the ongoing willingness of the CDM Entities to enter into a protocol with the Current JOLs, there was simply no basis for the Cayman Injunction to be issued nor to be treated as an urgent application.

d. On 21 July 2025 the CDM Entities filed a Summons seeking directions in response to the Cayman Injunction which provided *inter alia* undertakings on behalf of DFW and the CDM Entities to the JOLs and preserved the Rule 11 Agreement (discussed at paragraph 57.1.c herein) and provided that under correspondence of the same dated to Maples (a copy of the CDM letter dated 21 July 2025 is **exhibited at**

**MP4/Tab 20/Pages 2245 to 2257**). This correspondence from Campbells to Maples highlighted in particular the comments made by the Dallas Business Court at the hearing of the TRO Proceedings that he was *"struggling to find evidence in the record that there is an immediate threat of irreparable harm"*.

e. As observed in the letter from Campbells on behalf of the CDM Entities dated 21 July 2025 the only inference which could be drawn was that *"the unsustainable assertions of urgency are made in the hope of gaining a perceived strategic advantage in the contemplated litigation"*.

f. As matters transpired, the Current JOLs and defendants to the FSD Proceedings and Cayman Injunction entered into a Consent Order approved by Parker J in the FSD Proceedings on 31 July 2025 **exhibited at MP4/Tab 21/Pages 2258 to 2273**. I exhibit at **MP4/Tab 22 to Tab 24/Pages 2274 to 2296** relevant correspondence between Campbells and Maples dated 21, 23, 24 and 27 July 2025.

***b) Lack of full and frank disclosure***

57. The JOLs have failed to provide full and frank disclosure on seeking *ex parte* relief from the Court as they have failed to bring pertinent evidence which is available to them to the attention of the supervising Judge.

***i. DFW Summons***

a. As the Court will be aware, on 9 June 2025 DFW issued a Summons (**DFW Summons**) which sought directions and orders from the Court to provide that (i) the JOLs enter into a Protocol with the CDM Entities and

(ii) that an inter partes proceeding be established in the liquidation for the validity of the DAF Restructuring to be determined.

b. Neither the evidence filed in support of the Current JOLs leave to commence the FSD Proceedings nor the evidence in support of the Cayman Injunction make no mention of the DFW Summons. The substantially redacted note of the Hearing as provided by Maples to Baker & Partners on 22 July 2025 does show that scant reference was made to the filing of the DFW Summons and correctly refers to the fact that that Summons as not yet been listed.

c. The JOLs only disclosed the existence of the DFW Summons in the FSD Proceedings in FSD Affidavit 2. That evidence was sworn on 24 July 2025 following a Summons for Direction filed by the CDM Entities on 21 July 2025 (**CDM Directions**), and only after sanction for the FSD Proceedings and Cayman Injunction to be commenced had been granted.

d. The *ex parte* Note provided by Maples shows that Ms Moran of Maples did make mention of the DFW Summons during the ex parge hearing, despite the evidence failing to bring this to the attention of the Court. Ms Moran goes on to dismiss the DFW Summons on the basis that *"this matter is not suitable to be argued inter partes. Rather there is public interest in allowing the JOLs to ensure that a Cayman Islands vehicle has not been used as a vehicle of fraud"*. I find this ironic in light of the Current JOLs apparent failure to investigate Mr Dondero's misuse of the DAF assets and the federal tax concerns which caused myself and Mr Murphy to implement the DAF Restructuring as has previously been explained to this Court.

e. A further reason cited for the FSD Proceedings being issued despite the DFW Summons being extant is that *"North Texas Fund – who is not yet participating, and their rights would not be protected in an inter partes*

*between defendants and the Supporting Organisations"*. In respect of these matters, the Note discloses that the honourable Asif J KC stated he *"will deal with that when it comes up in due course"*.

f. While it is properly for counsel to develop argument, the very question of the correct procedural vehicle to determine the validity of the DAF Restructuring ought to be determined is a matter which required argument on an inter partes basis before the FSD Proceedings were commenced, and this appears to have been obfuscated in the presentation of matters in *ex parte* Application 2.

***ii. Prior engagement of Leading Counsel***

a. On 22 July 2025, and along with the *ex parte* Note, Maples provided to DFW a copy of the MacInnis 5 affidavit in the heavily redacted form exhibited at [**MP4/Tab 17/pages 2186 to 2234**]. Quite clearly certain of the redactions applied by the Current JOLs' by their legal counsel relate to references to professionals who the Current JOLs have obtained advice in seeking to commence the FSD Proceedings. While I understand that the Current JOLs seek to redact information which may be relevant to the FSD Proceedings of which DFW and myself personally are (amongst others) defendants, I do not consider that there is a justifiable basis to redact the name of legal counsel who advise the Current JOLs in connection with of the liquidation proceedings or the FSD Proceedings.

b. On 30 July 2025 DFW was notified from Maples' correspondence to the Court exhibited at [**MP4/Tab 25/page 2297**] that Mr Andrew Ayers KC would be attending the hearing of the Injunction Summons on behalf of the Current JOLs. I am advised, without waiving privilege to that advice, that no notice of Mr Ayers KC's engagement was provided despite requirements to do so under this Court's practice directions.

c. Mr Ayers KC acted for the Petitioners in these liquidation proceedings and was in attendance at the Supervision Hearing along with Johnstone Law. I also understand that on or around 12 May 2025 Johnstone Law filed an application for the general admission of Mr Ayers KC to the Grand Court, that application being granted on or around 27 May 2025 having been sponsored and supported by Johnstone Law. In circumstances where the engagement of Johnstone Law was resisted because there was a conflict of interest resulting the prior engagement of Johnstone Law by the Highland Foundations (and financial backing of Mr Dondero), Mr Ayres KC equally stands in a position of conflict in these matters and is not in a position to provide the JOLs with independent advice in either the FSD Proceedings or these liquidation proceedings.

d. I invite the JOLs and their legal counsel to provide an account of the decision to deliberately conceal the engagement of Mr Ayres KC which appears to be because they knew or were concerned that DFW would object to the engagement of Mr Ayres KC, as would be its right as a stakeholder in the Company's liquidation. This development comes barely a month after Johnstone Law was stood down as counsel for the Current JOLs, the Current JOLs having spent the first almost 2 months of their appointment and in excess of US $1.4 million in trying to justify the engagement of counsel who were clearly inappropriate in all the circumstances.

e. On 13 August Baker & Partners wrote to Maples to raise that question of Mr Ayres engagement directly. A copy of the letter from Baker & Partners issued on 13 August 2025 is **exhibited at MP4/Tab 26/pages 2298 to 301**. Maples responded for the JOLs in defensive terms on 15 August 2025 and have failed to address the enquiries of DFW as set out in the 13 August correspondence. A copy of Maples letter dated 15 August 2025 is exhibited at **MP4/Tab 27/pages 2302 to 2302**.

*iii.* ***Weaver Opinion***

a. On 1 July 2025 the JOLs were provided with the Weaver Opinion (detailed at paragraph 16 to 18 above). Weaver opined that the proceeds paid to the Highland Foundations in their capacity as Participating Shareholders following the DAF Restructuring was fair. However, in seeking to obtain injunctive relief in the FSD Proceedings and in seeking leave to bring those proceedings, the Current JOLs failed to disclose the existence and terms of the Weaver Opinion.

*iv.* ***Mercer Report***

a. Notwithstanding that the Current JOLs have the Mercer Report and make reference to that report, they fail to draw the Court's attention to the recommendations of Mercer which demonstrates that the level of compensation afforded to me is in line with market standards for the roles I have assumed, as **exhibited at MP4/Tab 4/pages 1068 to 1087**.

*v.* ***Nature of DAF LP business***

a. The JOLs also mischaracterised DAF LP as passive, whereas I explain at paragraphs 185 to 186 how this is not the case. Looking upward, towards distribution, the Company would act as a conduit of funds that were declared by the Directors to be dividends and distributable as charitable donations. Looking downwards, DAF LP has a number of investments in real estate projects, litigation and securities which require active management.

b. Once again, the diverse portfolio of duties that I assumed when taking on the role of 'Control Person' is recognized in the Mercer Report and reflected in my compensation. It is not simply a case of holding office and paying out distributions as the Current JOLs suggest.

***vi. Failure to disclose DFW responses filed in FSD 116 of 2025 (JAJ)***

a. On a review of the JOLs' skeleton argument filed in the FSD Proceedings with respect to the Cayman Injunction (see **MP4/Tab 28/Pages 2304 to 2362**) (the hearing of which was adjourned by way of a Consent Order made on 31 July 2025, exhibited at **MP4/Tab 21/Pages 2258 to 2273**), I note that it was advanced on behalf of the JOLs at paragraph 25 (see **MP4/Tab 28/Pages 2310 to 2311**) that:

*Although the Company does not yet have full details of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows (and without prejudice to any further facts and matters relating to directors' fees or expenses):*

*[…]*

*(2) Expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).*

b. The drafting of sub-paragraph 2 closely resembles the drafting of paragraph 31(b) of the Highland Foundations' Winding Up Petition filed on 23 April 2025 in these liquidation proceedings. I further note that the JOLs completely omitted to disclose to the Court in the FSD Proceedings what DFW's response to that allegation was.

c. In summary, at **paragraph 179, DFW Affidavit**, I explained that US $6 million of the US $18.3 million which are alleged to be expenses are not in fact expenses. Rather, Mr Dondero / the Highland Foundations and now the JOLs, have failed to take into consideration that there was also US $6.1 million in income from the same NexPoint-led transaction that more than offset the US $6 million in expenses. Omitting the income and net gain to

DAF LP from that transaction which offsets the amount now claimed by the JOLs to a considerable degree, falsely inflates the expense number.

d. A full explanation can be found at **paragraph 179, DFW Affidavit**, but there is no indication in either FSD Affidavit 1 or FSD Affidavit 2 that the JOLs have investigated DFW's response to this claim which was also alleged in these liquidation proceedings by the Highland Foundations. The absence of any response to DFW's evidence, in addition to their failure to disclose DFW's response to an identical allegation made in these liquidation proceedings as part of the JOLs' full and frank obligations in the FSD Proceedings, suggests to me that the JOLs' have not investigated DFW's response to this allegation. In fact, as the JOLs' closely repeat what was advanced in the Highland Foundations' Winding Up Petition, I also believe this suggests a lack of objectivity and partiality on the JOLs' part.

***vi. Non-disclosure of Liquidation Committee***

a. When Ms MacInnis swore her fifth affidavit on 10 July 2025 in support of *ex parte* Application 2, she stated at **paragraph 9.1, MacInnis 5** that "*A liquidation committee has not yet been established with respect to the Company*".

b. I am advised (without waiving privilege with respect to that advice) that MacInnis 5 runs contrary to the outcome of the Meeting of Contributors held on 9 July 2025 and that no minutes of that meeting have been circulated.

c. Ms MacInnis later confirms in her affidavit in support of the Funding Agreement at **paragraph 6, MacInnis 6**, that a Liquidation Committee had in fact been formed the day prior on 9 July 2025.

d. No explanation for the discrepancies between the statements made in MacInnis 5 and MacInnis 6 have been volunteered, and no correction was made to this misrepresentation in MacInnis 6.

**c. *Funding Arrangements***

58. Since their appointment, the Current JOLs had until recently refused to confirm how the liquidation is being funded. Counsel for myself acting as Management Shareholder, and counsel for DFW had repeatedly raised the significant question of how and by whom the Current JOLs were being funded. This was more recently pressed by both Campbells in their letter of 29 June 2025 and Baker & Partners' letter of 18 July 2025 (exhibited at **MP4/Tab 29** and **Tab 30/Pages 2363 to 2376**).

59. As mentioned above, on 4 July 2025, I understand that the Current JOLs issued *ex parte* Application 2, and did so without notice to at least DFW. I further understand that the JOLs filed an *ex parte* without notice Summons seeking the Court's sanction to enter into the Funding Agreement (**Funding Sanction Summons**). This application was again made without consultation with or notice to DFW. Even if it is accepted that sanction to commence the FSD Proceedings would be justified (which I do not as the disclosure of that application would in no way have negated the making of the application) I cannot see the proper basis on proceeding with the Funding Sanction Summons *ex parte*, other than for the Current JOLs to obtain sanction of a funding arrangement they knew would be open to justified challenge and opposition.

60. In support of the Funding Sanctions Summons, Ms McInnis filed partially redacted McInnis 6 and exhibit MM-6. **MM-6/pages 1 to 14** exhibit a significantly redacted funding agreement made between Crossvine and the JOLs, dated 11 July 2025 (the **Funding Agreement**). This appears to place the Current JOLs in a position of conflict of interest in respect of their obligations to Crossvine, Ellington and Dondero as the funding parties, and DFW as the majority stakeholder of the

purportedly solvent liquidation (or at least a significant stakeholder if the liquidation is in fact insolvent).

***i. Terms of the Funding Agreement***

61. In summary, and from what can be discerned from a review of the partially redacted MacInnis 6 and exhibit MM-6, the Funding Agreement provides that:

    (a) A lump sum will be provided to the Current JOLs by Crossvine for the purposes of funding the Company's liquidation (see **paragraph 11, MacInnis 6**) and the FSD Proceedings (see **paragraph 9.1, MacInnis 6**).

    (b) The amount of funding has been redacted and it is entirely unclear at present from MacInnis 6 and MM-6 whether the Current JOLs can afford to give a cross-undertaking in damages in the FSD Proceedings as required (see **paragraph 9.3, MacInnis 6**).

    (c) There are incremental increases in returns for Crossvine with respect to the amounts which will be paid to it should the Current JOLs make any successful recoveries in the Civil Proceedings. For example, **paragraph 9.7(b)(iii), MacInnis 6** states that were the Current JOLs recover in excess of US $270 million (which the JOLs claim are the Company's rights in the assets held by DAF LP), Crossvine will receive an additional 30% of the amount advanced.

62. The basis of the Funding Agreement which are discernible from the heavily redacted evidence that has been provided are markedly different from the terms Mr Dondero had initially agreed to sworn on oath as set out in Dondero 1.

63. In Mr Dondero's First Affidavit sworn on 9 April 2025 and filed on 16 April 2025 in the Liquidation Proceedings (see **pages 9 to 10, Dondero 1**), Mr Dondero swore with respect to his funding of the liquidation proceedings at paragraph 47 that:

"*I have not and will not at any time receive a benefit, not do I have control of these proceedings, because of this funding arrangement… My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support*". [emphasis added]

64. Notwithstanding this evidence, two days later the prospective uplift**,** three month avoidance period and terms of non-disclosure on the part of Crossvine were built into the Funding Agreement. In my view and based on my years of experience in managing businesses affected by Mr Dondero the ostensible altruism professed to by Mr Dondero in his affidavit of 9 April should be viewed as circumspect, and even more so having regard to the persistent refusal of the Mr Dondero-funded Current JOLs who had previously refused to enter into a protocol which does not assure that litigation against Mr Dondero is effectively desisted with.

***ii. Crossvine is James Dondero***

65. The Current JOLs confirm at **paragraph 11, MacInnis 6** that Crossvine "*is a special purpose vehicle incorporated for the purpose of ultimately Mr Dondero (through the structure outlines above) funding the liquidation of the Company and the JOLs pursuing the Proposed Proceedings*".

66. The Current JOLs also confirm at **paragraph 9.8, MacInnis 6** that the Funding Agreement grants certain information rights to Crossvine with respect to the progress of these proceedings, without detailing what those rights are.

67. This is highly concerning to DFW in light of the fact that Crossvine is another alter ego of Mr Dondero. Should these information rights extend to rights to view disclosure in these proceedings, DFW is firmly of the view that the disclosure information will be abused for collateral purposes by Mr Dondero in other jurisdictions in which he is litigating in. For a comprehensive summary of the litigation currently on foot, see paragraphs 153 to 182 below. Having known Mr

Dondero and Mr Ellington for more than ten years, I know that, should these proceedings move adversely to Mr Dondero and Mr Ellington's personal interests, they will not hesitate to default on their obligations to meet their funding commitments, which effectively means that if the JOLs do not aggressively allege fraud and wrongdoing, they will not be paid. This grants Mr Dondero and Mr Ellington significant and improper control over the Current JOLs, who cannot accept money from Mr Dondero and Mr Ellington and be considered to remain fair and impartial.

***iii. JOLs' failure to disclose knowledge of funding***

68. In Ms Diaz's deposition at **MP4/Tab 14/Pages 1736 to 1738 ,** Ms Diaz revealed that it has always been the agreement that Mr Dondero would fund the Company's liquidation on behalf of at least the Highland Dallas Foundation, and this decision was made prior to litigation in the Cayman Islands commencing:

> *"Q: Did you learn, when you read Mr. Dondero's declaration in the Cayman Islands, that he's actually funding that litigation on behalf of the supporting organizations?*
>
> *A. No, that's not when I learned that.*
>
> *Q. That's not when you learned it or -- withdrawn. Are you aware that he's funding that litigation?*
>
> *A. Yes.*
>
> *Q. When did you learn that he was funding that litigation?*
>
> *A. Before we got into litigation.*
>
> *Q. Is he funding this litigation on behalf of the Dallas Foundation?*
>
> *A. Yes, he is.*

*Q. And how much money did he provide for the funding of this litigation?*

*A. We have not agreed on an amount. As with any of our fundholders', legal expenses will get paid through by the fund. So that's a very common business practice. And it would go until the legal issues ceased.*

*Q. But he's made a commitment to fund -- to personally fund the expenses of the Dallas Foundation in connection with this litigation; is that right?*

*A. Yes."*

69. It should be noted at the outset that the Funding Agreement was executed 2 days after the first meeting of the Company's contributories which was held at the Current JOLs' offices and virtually on 9 July 2025, during which a Liquidation Committee was formed. DFW is represented on the Liquidation Committee by Ms Jennifer Colegate of Baker & Partners. A letter of authorisation given by DFW is exhibited at **MP4/Tab 31/Page 2377**.

70. Neither the existence of discussions concerning the negotiation of the Funding Agreement, nor copies of the draft Funding Agreement, were disclosed at that meeting. This suggests a deliberate attempt to avoid giving the Company's contributories, and in reality the only non-Dondero influenced and controlled contributories i.e. DFW and myself as Management Shareholder an opportunity to review and scrutinize the draft Funding Agreement, its terms and to consider in all the circumstances if the funding as proposed and from whom is appropriate.

71. In fact, the Current JOLs misled the Company's contributories in their First Report as at 2 July (and provided to DFW on 3 July, see **MP4/Tab32/Pages 2378 to 2398**), when they stated at page 13:

*"6.4.1 As there are insufficient assets with which to meet the fees and expenses of the liquidation, the JOLs are currently exploring third party funding options. The JOLs will seek sanction for any funding agreement*

*from the Court in due course…. Should any third party be interested in funding the liquidation, expressions of interest may be sent to CDAF.Core@uk.gt.com.*"

72. Furthermore, the JOLs confirmed at **paragraph 13.3, MacInnis 6** that they did not approach any other litigation funders for quotes, despite signalling that it was exploring more than one funding option (i.e. more than one source of funding). That representation is false, misleading and calculated to avoid transparency.

73. This intentional concealment of vital developments and key contractual documents which should be available to the Company's contributories for scrutiny in the liquidation severely undermines DFW's trust and confidence in the Current JOLs. As is clear from the terms of MacInnis 6 and the Funding Agreement, the ultimate identity of the funder has not changed since the Highland Foundations petitioned for the winding up of the Company. Just as Mr Dondero sits behind the legal proceedings instigated by the Highland Foundations in respect of the Company, Mr Dondero sits behind the JOLs in respect of the liquidation and associated litigation now commenced in the Cayman Island.

74. In light of the extensive litigation to which Mr Dondero is exposed to, the Current JOLs have wrongfully thought it prudent and in the best interests of the estate to accept funding from an inescapably conflicted financier, who has a track record of defaulting on financial obligations.

***iv. Conflict of Interest in Mr Dondero funding liquidation***

75. It is DFW's position in these liquidation proceedings that Mr Dondero was cycling the donations he made to the charitable enterprises through the Fund. There is evidence before this Court (**see paragraphs 110 to 120, 145 to 146, 170, 194 to 199, DFW Affidavit)** that Mr Dondero exerted a huge amount of control and influence over key personnel such as Ms Diaz, Mr Scott and staff at the Highland Dallas Foundation to direct how his donations were spent.

76. Abusing the charitable structure put the tax exempt status of the Highland Foundations at risk, which necessitated the DAF Restructure and the voluntary liquidation of the Company.

77. It is therefore notable that Mr Dondero, who previously swore in these proceedings that he would not seek any benefit from the funds recovered on the charities' behalf, now seeks through entities he controls a bounty fee for any recoveries in excess of US $50 million made by the Current JOLs in the FSD Proceedings.

78. If the Court is willing to grant the relief sought in DFW's Removal Summons and replace the JOLs, this will assist in ensuring that the liquidation is insulated to a significant extent from Mr Dondero's influence, on the understanding that the liquidation will be funded from the assets within the DAF Structure, which will ensure the Replacement JOLs' independence.

79. As previously deposed above, the Current JOLs were aware or at least on notice as of the 24 June 2025 that Dondero was funding the Highland Foundations legal actions as per the transcript of Ms Diaz's deposition in the US Bankruptcy Court proceedings which s included in the Supplementary Bundle by Cayman attorneys to DFW.

***v. Involvement of Scott Ellington***

80. I understand from **paragraph 10.1, MacInnis 6** that Mr Scott Ellington is one of the managers of Crossvine, and its sole shareholder is a Texas non-profit called Crossvine Foundation, which is also co-managed by Mr Ellington.

81. Ms MacInnis also confirms at **paragraph 11, MacInnis 6** that Crossvine has been established in order for Mr Dondero to fund the FSD Proceedings and these liquidation proceedings.

82. As stated at **paragraph 69, DFW Affidavit**, Scott Ellington is the Chief Executive Officer and owner of Skyview (Mr Patrick's former employer), the former General

Counsel of Highland and a long-standing business associate of Mr Dondero. Despite the appearance of Mr Ellington's ownership and control of Skyview, I deposed at **paragraph 69, DFW Affidavit** that it was in fact Mr Dondero who had actual control of Skyview and that it was he (rather than Mr Ellington) who determined the compensation of every Skyview employee with Skyview's Head of Human Resources.

83. Mr Ellington, together with Mr Dondero, also owns a Cayman Islands based reinsurance company called Sentinel Reinsurance, Ltd (**Sentinel**), and is personally embroiled in the Sentinel Fraud (as described below). As explained in detail at **paragraphs 151 to 156, DFW Affidavit**, UBS Securities LLC and UBS AG London Branch (**UBS Entities**) alleged that certain specific transfers of assets to Sentinel during 2017 were executed after the UBS Entities obtained an order for summary judgment against Highland and other entities owned or otherwise affiliated with Mr Dondero (**2017 Transfers**).

84. Evidence with respect to the Sentinel Fraud is already before this Court but in summary, a New York court made a preliminary finding that those transfers took place at a time when it was anticipated that a US $1.2 billion judgment would be made in UBS' favour. The assets compromising the 2017 Transfers were transferred pursuant to an attendant Asset Purchase Agreement, as payment of the premium for an after-the-event insurance policy (**ATE Policy**) to insure Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland CDO Holding Company against liability in the Underlying Action (as defined at **paragraph 123 in the DFW Affidavit**). The ATE Policy was outside the usual course of business for Sentinel, as Sentinel had never previously issued this type of policy or one as large as the ATE Policy and would not have had the means to pay on the ATE Policy without the assets received following the 2017 Transfers. This scheme has been termed the **Sentinel Fraud**.

85. Mr Ellington is named personally as a defendant in UBS Securities LLC, UBS AG London Branch v. James Dondero, Scott Ellington, Highland COO Holding Company, Highland COO Opportunity Masters Fund, L.P., Highland Financial Partners, L.P., Highland Special Opportunities Holdings Company, CLO HoldCo, Ltd., Mainspring, Ltd., Montage Holdings, Ltd (Index No. 6507 44/2023) (**Turnover Proceedings**). In those proceedings, the Supreme Court of the State of New York, New York County made a decision and order on 26 March 2025 finding that the petition sufficiently alleged that the 2017 Transfers undertaken by Mr Dondero and Mr Ellington were fraudulent conveyances to Sentinel. The New York Supreme Court also held that to the extent that Mr Dondero and Mr Ellington sought to dismiss these claims, their motions were denied, which allowed the US $1.1 billion UBS case to move forward against Mr Dondero and Mr Ellington personally and entities (including Cayman entities) they own and/or control.

86. The Sentinel Fraud was also discussed at a hearing in the Bankruptcy Court for the Northern District of Texas in 2022, where Judge Stacey Jernigan implied (after verbalizing certain various implicated criminal statutes) that she may make a referral to the U.S. attorney given the criminal conduct by Mr Dondero, Mr Ellington, and others to fraudulently hide assets from UBS and lie about it (see **paragraph 156, DFW Affidavit**).

87. I also deposed at **paragraph 117, DFW Affidavit** that Mr Ellington has previously received moneys from DAF LP (which is intended for charitable purposes) in the form of a bonus via the Tall Pine Group, at a time when Mr Ellington's ability to receive a bonus had been blocked by the US Courts in the Highland Bankruptcy (see an invoice issued by Tall Pine Group LLC issued on 3 April 2020 at **MP1/ page 171**). This bonus payment, which derived from US $1 million payment from DAF LP to the Tall Pine Group, had been flagged in the Highland bankruptcy proceedings as part of a larger US $17 million fraudulent transfer (see **MP1/ pages 172 to 305**).

88. DFW finds it extraordinary that the Current JOLs were satisfied with the due diligence performed on Mr Ellington, despite that allegations of fraud have been made and found against him, and being on notice by virtue of the evidence filed in these liquidation proceedings that he has a history of being unjustly enriched from the Funds' assets.

89. Taken all together, DFW has grave concerns that Crossvine is the alter ego of Mr Dondero, and has been established as a vehicle by Mr Dondero to fund (a) efforts to claw back a percentage of his own donations from DAF LP and/or entities affiliated with it; (b) efforts to prevent the implementation of the Hunter Mountain Settlement; and (c) efforts to regain control over the Fund, all through the JOLs and by harnessing the powers conferred to them by Appointment Order; and (d) obstruct, impede or prevent almost US $300 million in litigation claims against him and others arising from the Kirschner Complaint.

**d) Failure to meaningfully engage with a Protocol**

90. Since 16 May 2025, DFW's attorneys and the attorneys of CDMCFAD, LLC (**CDM**) (Campbells LLP) have been attempting to agree a protocol with the JOLs as noted in a letter from Campbells to Maples, dated 29 June 2025 at **MP4/Tab 29/pages 2363 to 2371**. It was CDM who first volunteered a transactional reporting protocol to the Current JOLs in an attempt to assure the JOLs that the businesses of CDM were being operated in an open and transparent way.

91. A few days after this draft protocol was proposed, I caused HMIT to enter into the Hunter Mountain Settlement (discussed further at paragraphs 50 to 53 above) which led to a Settlement Motion (defined and discussed at paragraphs 94 and 97 below) seeking the US Bankruptcy Court's approval of the Hunter Mountain Settlement Agreement.

92. No response was received by the Current JOLs to the protocol suggestion. Instead, they wasted time in seeking to justify the appointment of Johnstone Law

so that as of 24 June 2025 (the hearing of the Sanction Summons) no substantive response to the proposed protocol had been received from the JOLs.

93. As the Court observed at the Sanction Application on 24 June 2025 "*something along the lines of the protocol that is floating around seems a sensible way forward*". The Court further observed that "*if there is agreement on a protocol, then the liquidators won't need to pursue Chapter 15 because they'll be confident that the assets are safeguarded.*" A copy of the transcript may be found at **MP4/Tab 33/pages 2399 to 2487** and the specific extracts at **MP4/Tab 33/Page 2454**.

94. At around that time, a Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, Case No. 19-34054-sgj11 (Bankr. N.D.Tex.) [Dkt. 4216] (the **Settlement Motion**) was before the Texas Bankruptcy Court. I have set out above in this affidavit (paragraph 51 above) the clear benefits and advantages to the Company and its contributories and/or creditors by HMIT entering into the Hunter Mountain Settlement.

95. Incredulously, and immediately following the Sanction Hearing of 24 June 2025 rather than following the recommendation of his Honourable Justice Asif KC with respect to entering into a protocol with CDM, on that same day the Current JOLs instead issued the HMIT Adjournment Letter to the attorneys acting in Texas Bankruptcy proceedings and to the US Bankruptcy Trust of Highland Capital, Mr J Seery in connect with the Hunter Mountain Settlement. Notwithstanding that the Hunter Mountain Settlement would result in significant value returning to the DAF Structure the Current JOLs demanded that the Bankruptcy Court defer consideration of the Hunter Mountain Settlement for a period of 45 days to afford the JOLs an opportunity to continue its investigations. A copy of this correspondence is exhibited at **MP4/Tab 1/Pages 1 to 3**.

96. This request closely followed a failed attempt by Dugaboy to object to the approval of the Hunter Mountain Settlement, which was sanctioned by a Court Order dated 30 June 2025 and referred to as the **9019 Order**. Copies of this Objection and the 9019 Order are at **MP4/Tab 34 and Tab 35/Pages 2488 to 2499**. The making of the 9019 Order resulted in the assignment of approximately US $300 million in legal claims to pursue matters covered in the Amended Kirschner Complaint to HMIT and its affiliates. For the benefit of the Court, the 23 defendants to the Amended Kirschner Complaint include Mr Dondero; his long-standing business associate, Mr Ellington, NexPoint Advisors LP; Highland Dallas Foundation; Okada Family Trust; and Dugaboy. A copy of the Dugaboy Motion to Stay the 9019 Order is exhibited at **MP4/Tab 16/Pages 2082 to 2177**. Mr Dondero and Mr Ellington attempt now to use the office of the Current JOLs and these proceedings in the Cayman Islands to prevent the Kirschner claims from moving forward against them. This is a collateral attack with an improper purpose.

97. The stay sought by Dugaboy was not granted and following a review of the First Report at page 12 (see **MP4/Tab 32/Page 2390**) on 1 July 2025, the Highland Foundations (of which the supported organisation the Dallas Foundation had previously withdrawn its objection from the Settlement Motion to approve the Hunter Mountain Settlement independently of Mr Dondero) filed the **TRO Proceedings**. The matter came on for a hearing on 2 July 2025 at which the Highland Foundations failed to persuade the Texas Court that there was any real risk of irreparable harm or dissipation of assets with the Judge concluding that:

> "*I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone. Your concern is you don't want to move further [sic] away. But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that.*" [see **MP4/TAB 36/Page 2541**].

98. The relevant assets at issue are also further secured by the Rule 11 Agreement pursuant to which the parties named in the TRO Petition, including but not limited to DFW, CDM (and its affiliated entities) and myself personally, have voluntarily agreed to (i) operate in the ordinary course of business; (ii) ensure that the proceeds of any assets remain in the relevant entity (i.e., are not transferred to any other entity within or outside the group); and (iii) not engage in any corporate restructuring.

99. With respect to the Rule 11 Agreement mentioned above, it is pertinent to note that during hearing the TRO Petition the Judge of the Dallas Business Court accurately recognised that the complaints brought by the Highland Foundations related to the DAF Restructuring and transactions that had taken place. There was no evidence before the Honourable Judge in those proceeding that there would be a further restructuring. As the impetus for the DAF Restructuring in the first place is no longer hanging over the DAF Structure, I was comfortable providing the Rule 11 Agreement which includes an undertaking that there will not be a further restructuring of the DAF LP.

100. A hearing in the TRO Proceedings had been scheduled for 4 August 2025. As matters have transpired, the Dallas Business Court has received arguments on jurisdiction in respect of the TRO Proceedings and a ruling remains extant on that issue. There is no threat of immediate harm either there or here. Notwithstanding, legal counsel to CDM and its affiliates made consistent and concerted attempts to reach agreement in respect of the proposed protocol. As recorded in their letter on behalf of CDM to Maples dated 29 June 2025 (see **MP4/Tab 29/Pages 2363 to 2371**) the Current JOLs elected to make the without notice *ex parte* Application 2 to commence the FSD Proceedings, which were issued on 15 July 2025. Chapter 15 Petition Proceedings were subsequently filed on 21 July 2025 in the United States Bankruptcy Court, the District of Delaware (see **MP4/Tab 37/Pages 2578 to 2659**) (**Chapter 15 Petition Proceedings**), which would have been unnecessary

had the Current JOLs engaged meaningfully in discussions to settle a protocol with the CDM Entities.

101. In their Verified Petition of the Chapter 15 Petition Proceedings, the JOLs asserted that they act "*on behalf of the Highland Foundations*". The advancement of selective stakeholder interests raises serious questions as to the JOLs' independence, balanced against their prior reluctance to agree a protocol which offered voluntary reporting mechanisms that would have delivered many of the same safeguards the Current JOLs now seek in the FSD Proceedings, without incurring the considerable costs now being borne by the liquidation estate.

102. The terms of protocol as proposed between the JOLs and CDM did not include a stay on the pursuit of current or prospective claims against Mr Dondero and his affiliates that were assigned to HMIT by the terms of the Hunter Mountain Settlement. However, the recent legal actions in the form of the TRO Proceedings and the FSD Proceedings which have been taken by the JOLs at the instigation of the Highland Foundations (who are under the influence of Mr Dondero) do impede the conduct of proceedings against Mr Dondero and entities affiliated with him. I discuss the timing of these proceedings and the partiality of them at paragraphs 132 to 139 below.

103. For the avoidance of doubt, it is not the case that the parties reached an impasse following which the FSD Proceedings and the Chapter 15 Petition Proceedings became the only options available to the Current JOLs – they failed to reply to Campbells' letter dated 29 June 2025 which contained the most recent proposals as to how best safeguard the DAF assets pending the further investigations as demanded by the Current JOLs. Notably, at this point the representations of the Current JOLs were consistent with them continuing to investigate the DAF Restructuring, which I consider to be misleading and fundamentally different to the commencement of proceedings as set out in the FSD Proceedings.

104. The Current JOLs' apparent willingness to act in lockstep with the Highland Foundations evident in the alacrity of the FSD Proceedings being commenced is even more concerning given its obvious prejudice to DFW and the former directors of the Company by virtue of the serious nature of claims which the Current JOLs have issued having had less than 3 months in office to investigate the allegations of the Highland Foundations before those actions were issued.

105. As outlined in Campbells' letter dated 21 July 2025 (see **MP4/Tab 20/Pages 2245 to 2257**), Mr Murphy and I have made every effort to agree a protocol to preserve the relevant assets pending the outcome of the JOLs' intended investigations, and we have no intention to either dissipate assets and/or misappropriate assets regardless of the adoption of a protocol and/or the continuation of the Rule 11 Agreement.

106. The Current JOLs remained intransient on insisting on matters which would effectively deprive the defendants in the FSD Proceedings from defending those proceedings. As matters transpired, it was only late on 30 July 2025, and less than 24 hours before the Injunction Summons was to be heard by Parker J that counsel for the JOLs acceded to the terms of a Consent Order and undertaking (**FSD Consent Order**) in substantially the same terms as the Protocol which had been proposed by the CDM Entities in the months since the JOLS were first appointed. While the breadth of undertakings provided address additional procedural matters, such as the adjournment of the Chapter 15 application, the substantial terms and oversight of the operations of the DAF assets and investments as provided for in the FSD Consent Order could have been agreed between DFW, the CDM Entities and the Current JOLs much earlier and certainly before they had elected to incur the expense of the FSD Proceedings and Cayman Injunction.

**e) Leveraging of Liquidation Proceedings: Advancement of Dondero Interests**

***i. Failure to Sanction Highland Foundations***

107. It is notable that the Current JOLs will not challenge the Highland Foundations' proprietary claim in the TRO Proceedings (which competes with the Current JOLs' interests in the Company's assets) despite the clear advantages that the Hunter Mountain Settlement offers to the Company and the DAF Structure more generally (as discussed at paragraph 51above).

108. This failure is despite the correspondence sent from Baker & Partners on 8 July 2025 and 18 July 2025 on behalf of DFW, which sought to establish whether the Current JOLs' would seek to sanction the Highland Foundations from commencing litigation in Texas, in the United States to advance claims against assets which they regard as the Company's and which the JOLs ought, as officers of the Court and trustees of the liquidation process, to be defending. Copies of that correspondence are exhibited at **MP4/Tab 30 and Tab 38/Pages 2372 to 2376 and 2660 to 2661**.

109. Instead, the Current JOLs have launched the FSD Proceedings which are being openly brought to protect the Highland Foundations' alleged claims in the Company's assets in a coordinated manner, for example the Writ at paragraph 17 states: "*On 10 July 2025, the JOLs filed this claim and contemporaneously issued the Injunction Summons. The timing of the application was in part driven by the urgent need to preserve the Fund's assets, in circumstances where the Supporting Organisations had filed a TRO Motion in the Texas Proceedings, and a hearing on that motion was anticipated to take place on or around 29 July 2025*". The Current JOLs were also openly seeking a hearing date which coincides with a hearing in the TRO Proceedings in order to support the Highland Foundations' efforts to freeze the Fund's assets. I discuss this approach in more detail at paragraphs 132 to 139 below.

110. The FSD Proceedings have been launched despite what I regard inadequate investigations by the Current JOLs and without interviewing either myself or Mr Murphy before reaching a pre-determined view that the Funds' assets in fact belong to the Highland Foundations. Without interviewing myself or Mr Murphy and having interviewed the Highland Foundations, it is unclear to me how the Current JOLs could claim to be fair and independent.

111. This is another example of the Current JOLs lacking objectivity and adopting a course of conduct underpinned by disparity in the treatment between a contributory of the same class, which has completely compromised DFW's trust and confidence in the Current JOLs' ability to administer this liquidation in a fair and impartial manner.

***ii. Solvency determination***

112. On 18 July 2025, Baker & Partners wrote to the Current JOLs to raise concerns with respect to the JOLs' declaration in the First Report that the Company was solvent (see **MP4/Tab 30/Pages 2372 to 2376**). Baker & Partners noted that neither the reason or the basis for that determination had been provided, either in the JOLs' First Report or at the Meeting of Contributories held on 9 July 2025, in which Baker & Partners were in attendance.

113. Baker & Partners stated that they found the Current JOLs' determination "*highly questionable*" given the fact that the Current JOLs had stated at **paragraph 13, MacInnis 2**, that "*there no assets in the estate from which the JOLs may, with sanction, fund their investigations*" and at **page 13** that:

> "a. the JOLs and their staff have incurred fees and expenses in the aggregate of US$461,145.11; and
>
> b. legal costs and disbursements in the amount of US$978,916.00."

114. I understand from my prior dealings with the Company as a former director that the Highland Foundations are not creditors of the Company. This is further reflected in the Report of the Current JOLs. Accordingly, I understand from Cayman legal counsel that the Highland Foundations would have no entitlement to participate in the Liquidation Committee in the Company's insolvent liquidation.

115. For this reason, a declaration that the Company is still solvent confers a significant advantage to the Highland Foundations, whereas a declaration of insolvency would remove their ability to participate in these proceedings.

116. Maples responded substantively to Baker & Partners by a letter on 23 July 2025 (see **pages MP4/Tab 39/Pages 2662 to 2665)**, which stated that the solvency determination "*reflects the position that if the Company is successful in the Proceedings, the parties with the economic interest in the liquidation will be its participating shareholders*".

117. In other words, the JOLs have predetermined their claims to the Fund's assets before completing an adequate investigation and before waiting for the determination of the DFW Summons, in which DFW sought to have the validity of the DAF Restructuring (and therefore the scope of the Company's assets) determined in these liquidation proceedings.

118. The Current JOLs failed to substantively engage with the DFW Summons until the His Honourable Justice Asif KC expressly directed them to do so by email direction dated 16 June 2025 (**MP4/Tab 40 30/Page 2666**) From the timing of the various sanction applications and issuance of the FSD Proceedings, it is in my view apparent that the Current JOLs had no genuine intention in engaging with DFW to seek an economical and efficient resolution to any questions over the DAF Restructuring.

119. That omission is remarkable given the vigour with which the Current JOLs have pursued adverse proceedings against DFW, myself, Mr Murphy and affiliated parties in both Cayman and the United States.

***iii. JOLs' avoidance of DFW Summons***

120. At the Sanction Hearing on 24 June 2025, the transcripts of which is exhibited at **MP4/Tab 33/Pages 2399 to 2487** Leading Counsel for DFW addressed the rationale for the DFW Summons that DFW intended to provide an appropriate roadmap for the resolution of the key issues relating to this liquidation, namely: (i) the validity and efficacy of the DAF Restructuring; (ii) the security and safeguarding of the relevant assets, the DAF Assets; and (iii) the identification of which of the potential parties to the summons have an entitlement to the DAF Assets and the nature of that entitlement. The Current JOLs' FSD Proceedings cut across DFW Summons, the procedural vehicle which DFW put forward as a sensible way to resolve the central issues in this liquidation. This means that related issues which underpin the Current JOLs allegations of (including, but not limited to) unlawful means conspiracy, unconscionable receipt and unjust enrichment are now being side-stepped in this liquidation and are placed for determination before a new justice, who is unfamiliar with these proceedings or the relevant facts and evidence which is already before the Court, for determination.

121. Whilst the Current JOLs have repeatedly stated that they were at the investigation only stage, the speed with which they have commenced proceedings in the Cayman Islands and in Delaware, and attempted to interfere with the bankruptcy proceedings in Texas undermines the purpose of the DFW Summons and failing to agree to a protocol (which would have been the more cost efficient means of resolving the scope of the liquidation and any misconceived concerns around dissipation of potential assets) contradicts any assertion that the Current JOLs are acting disinterestedly or independently.

***iv. JOLs' interference in the Texas Bankruptcy Proceedings***

122. DFW is concerned that these liquidation proceedings are being leveraged by Mr Dondero (through the Highland Foundations) to circumvent obstacles that have arisen in overseas litigation which is not progressing in Mr Dondero's favour, or which Mr Dondero is unable to successfully oppose.

123. Specifically, in the Hunter Mountain Claim (referred to above at paragraph 50) I caused the HMIT and its affiliated entities (**HMIT Entities**) to enter into the Hunter Mountain Settlement.

124. On 24 June 2025, which was the eve of the Settlement Motion and the day of the Sanction Hearing, the Foundation Parties and HMIT Entities entered into a Settlement Term Sheet (**Term Sheet**) which was executed by Ms Diaz as the Chief Executive Officer of the Dallas Foundation (and who has filed evidence in these liquidation proceedings).

125. At the same time, and as mentioned above, the Current JOLs also wrote to the trustees of the Highland Capital Management L.P., on 24 June 2025 requesting an adjournment of the Settlement Motion to afford the Current JOLs additional time to progress their investigations of the HMIT Entities, or alternatively, that distributions were deferred to the HMIT Entities so that the Current JOLs could continue their investigations without risk of asset dissipation in connection with the protocol discussions (see **MP4/Tab 1/Pages 1 to 3**).

126. It is important to note that approval from the US Bankruptcy Court had been sought before entering into the settlement with HMIT became effective, and could in no way have constituted an attempt at asset dissipation under the supervision of a US Bankruptcy Court.

127. The DF Objection (mentioned at paragraphs 52 and 53 above) was withdrawn by virtue of the "*Stipulation Withdrawing Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Entry of an Order Pursuant to*

*Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorising Actions Consistent Therewith*" which was filed in the United States Bankruptcy Court For the Northern District of Texas, Dallas Division on 25 June 2025 (the **Stipulation**), exhibited at **MP4/Tab 41/Pages 2667 to 2677**.

128. The Stipulation was subsequently entered on 27 June 2025. As set out in correspondence from Kelly Hart Pitre to David Curry of Okin Adams Bartlett Curry LLP dated 11 July 2025 (see **MP4/Tab 42/Pages 2678 to 2681**, the **KHP Letter**), in accordance with the Term Sheet, the Foundation Parties had agreed to participate in an initial confidential settlement meeting which was scheduled for 2 July 2025.

129. The Term Sheet also provided that Mr Shawn Raver, the Company's former assistant general counsel and chief operating officer was required to:

(a) review the current "DAF" structure with the Dallas Foundation;

(b) provide a projected quarterly expense budget to the Foundation Parties (as defined therein);

(c) continue to provide expense reporting every forty-five (45) days, commencing 5 August 2025; and

(d) show and present a balance sheet for the DAF as of 30 September 2024, 31 December 2024, and 31 March 2025, including transfers of assets among entities within the DAF corporate structure.

130. As stated in the KHP Letter, Mr Raver prepared the balance sheets as required and prepared a May 2025 working balance sheet, which was beyond the scope of his requirements under the Term Sheet.

131. The Highland Dallas Foundation, together with The Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc. instead of

conducting the 2 July 2025 meeting as planned, filed the TRO Petition the day before the planned meeting and alleged, incredibly, a lack of transparency. Despite this showing of bad faith, the meeting scheduled for the morning of 2 July 2025 went ahead as scheduled with Ms Diaz appearing by Zoom, and Mr Raver presented all of the information discussed**.**

132. As mentioned above, the Current JOLs make no secret of the fact that they are timing the hearing of the Injunction Summons intentionally to coincide with the hearing of the TRO Petition. In Maples' letter to the covering letter Court when filing the Civil Proceedings, Maples (at **MP4/Tab 19/Pages 2241 to 2244**), say the following:

(a) **Page 2**: "*...we would be most grateful if you are able to confirm if the Honourable Justice Parker has availability to hear the Application on one of the above dates (with* <u>*our client's preference*</u> *being 28 or 29 July 2025* <u>*in light of the timetable in the Texas Proceedings*</u> *referred to below)*";

(b) **Page 2**: **"***The JOLs have recently become aware that the Supporting Organisations (being the holders of Participating Shares in the Company) issued: (i) a Petition against the First, Third, Fourth and Fifth Defendants to the Proceedings, and the original general partner of the Fund (the "***Texas Petition***" and the "***Texas Defendants***"); and (ii) an application for a temporary restraining order ("***TRO Motion***"), before the Texas Business Court…*"

(c) **Page 3:** "*In filing the Texas Petition and TRO Motion, the Supporting Organisations are acting independently of the JOLs. The JOLs were informed of the Texas Petition and TRO Motion only after they were filed by the Supporting Organisations*."

(d) **Page 3:** "*If the jurisdiction challenge is successful, the temporary restraints provided for in the Rule 11 Agreement will be revoked, and the Company will be left with no protection against dissipation of the Fund's assets by the Defendants…*"

(e) **Page 3:** "*Accordingly, if the Application is not determined until after the Court's summer recess ends in mid-September 2025, the Company would be significantly prejudiced because there is a real risk that the temporary (albeit incomplete protection provided by the Rule 11 Agreement will no longer be in place by then….The JOLs' therefore have grave concerns that without injunctions being granted by the Honourable Court pending trial, the Defendants may take steps to further dissipate or otherwise harm the value of those assets unjustifiably*."

133. It is remarkable that: (a) the Current JOLs first sought to interfere with the implementation of the Hunter Mountain Settlement Agreement, which can only be in the best interest of the Company; (b) have "tag-teamed" with the Highland Foundations' legal strategy to freeze the Fund's assets; (c) are co-ordinating the FSD Proceedings with the TRO Proceedings, despite the fact that they and the Highland Foundations are claiming to have competing proprietary interests in the same assets; and (d) the Current JOLs intervene to obstruct and/or prevent US $300 million in claims arising from the Kirschner Complaint to be alleged against their funders, Mr Dondero and Mr Ellington.

134. By adopting this co-ordinated buttressing litigation strategy, the Currrent JOLs have lost all objectivity with regards to their Court appointed duties, especially as a draft protocol has been in circulation since 16 May 2025 and no reasons for the failure to agree the last draft Protocol have been provided (see paragraphs 91 to 92 above).

135. The reasons for this co-ordinated approach with the Highland Foundations I understand stems from the Current JOLs' concerns that the Company's assets were removed to the detriment of the underlying charities (rather than to the detriment of the Company, which is where the JOLs' concerns should objectively lie (see **paragraph 42, MacInnis 5**)).

136. Indeed, Ms MacInnis in **DFW Affidavit 1** at **paragraphs** 52 to 59 (as set out below), goes into great detail with regards to the effects certain of the Company's transactions have had on the charities, and the resulting impacts these transactions will have on the balance sheets of the Supporting Organisations (see also **paragraphs 42 to 49, MacInnis 5**):

"*Impact on Charities*

*[53] The **JOLs continue to investigate the impact that the Relevant Transactions have on the Charities.** The Relevant Transactions have reduced the ability the Supporting Organisations and the Charities to meet their charitable objectives …*

*A Hole in the Charities' Balance Sheets*

*[57] The JOLs are also **concerned that the other Supporting Organisations and Charities will also have similar holes** in their balance sheet as a result of the Relevant Transactions.*

*[…]*

*[59] The **JOLs are, therefore, concerned that the Relevant Transactions (particularly the LP/LLC Exchange) will reduce the funds available to the Charities** to meet their obligations to the Supporting Organisations*. **[emphasis added]**"

137. Again, and with respect to Ms MacInnis and Grant Thornton, but I am advised (without waiving privilege in connection with that advice) that the Current JOLs'

focus should be on investigating whether the transactions had a detrimental effect on the Company; it is not for the JOLs to bring such claims on the Highland Foundations behalf.

138. The Current JOLs have demonstrated a clear partiality towards the Highland Foundations by bringing the FSD Proceedings and seeking to align the timetable in those Cayman proceedings with the timetable of the TRO Proceedings brought by the Highland Foundations.

139. In light of the strong suggestion that the JOLs are favouring and promoting the interests of one set of contributories over another, I repeat that DFW has lost all trust and confidence in the Current JOLs, and that they have lost their independence and objectivity with regards to the fair, efficient and proper administration of this liquidation.

**f) Inadequate or incomplete investigations**

***i. Absence of Interviews***

140. The Current JOLs have consistently refused to engage in any substantive dialogue with DFW or its representatives.

141. Contrary to **paragraph 24, MacInnis 5**, which states that the Current JOLs have "*conducted an extensive and detailed investigation into the Company's affairs, albeit those investigations are not complete"* DFW has never been invited to participate in any meeting with the Current JOLs.

142. Neither I nor Mr Murphy have been interviewed or asked to provide any information in connection with the Current JOLs' investigations. Whilst myself and Mr Murphy cancelled our initial meeting to speak with the JOLs, the issue of their' retention of Johnstone Law was a live one and the prospect that Johnstone Law would have attended that meeting was very real. However, since Johnstone

Law's engagement was terminated by the Current JOLs, the Current JOLs have not asked to meet with, or interview us.

143. This stands in stark contrast to the apparent depth of interaction between the Current JOLs and the Highland Foundations, as evidenced by the detail included in the Current JOLs' affidavit in support of the Injunction Summons and in the Statement of Claim in the Civil Proceedings which is outlined as follows.

(a) **Paragraph 11 of MacInnis 5**: states that the JOLs have discussions with Ms Julie Diaz, Mr Grant Scott and Mr Joe DePaolo of the Highland Foundations to understand the way in which the Company operated historically. However, how the Company operated and its connection with the DAF Structure is not something that the Highland Foundations as Participating Shareholders could have assisted with;

(b) **Paragraph 15.2 to 15.5 of MacInnis 5**: states that the JOLs have been provided with documents which are concerned with how an individual can establish a Supporting Organisation and the agreement governing the relationships between a Supporting Organisation and their respective charities. This is unrelated to the investigations they are meant to undertake with respect to the Company, but have collected, reviewed and exhibited documents which relate to the Supporting Organisations, such as:

(c) Certificates of incorporation;

(d) By-laws;

(e) Procedures for Establishment and Operation of Funds and Supporting Organisations;

(f) Internal Revenue Service correspondence confirming that the Supporting Organisations are exempt from federal income tax;

(g) The Internal Revenue Code 1986 (as amended);

(h) A Legal Relationship Agreement (as defined in MacInnis 5); and

(i) An Operating Agreement.

(j) It appears that the scope of the Current JOLs' investigations has gone well beyond the affairs of the Company itself and has extended to investigating the genesis of the Company's stakeholders which is unconnected with the liquidation. Furthermore, it also appears that the Current JOLs' have misdirected their investigations with regards to the tax exempt status of the Supporting Organisations, as it is the nature of the DAF Structure and the effects of the DAF Restructure which should determine the Supporting Organisations' treatment for tax purposes.

144. Moreover, the Current JOLs appear to have repurposed their investigatory powers under the Companies Act into a litigation-driven evidence-gathering exercise, and commenced proceedings in multiple jurisdictions within the space of a few weeks from their appointment.

***ii. No investigation into federal tax status concerns***

145. The Current JOLs' investigations have not touched at all upon whether the DAF Structure was indeed exposed to US federal tax laws, despite extensive evidence given in my affidavit. They brush this aside with reference to a Haynes & Boone memo that focuses on whether the DAF constitutes a "donor advised fund" under the U.S. Internal Revenue Code. As the Current JOLs admit, it is not; the Haynes & Boone memo misstated the facts (as the JOLs implicitly acknowledged) and addressed issues of no relevance given this is not a "donor advised fund." It is also unclear whether the Current JOLs have obtained their own independent tax advice with respect to these concerns.

146. If so, the Current JOLs have not disclosed this advice, or the identity of their advisor.

147. The Current JOLs have also not responded to the extensive evidence I gave with respect to this issue at **paragraphs 188 to 199, DFW Affidavit** and respectfully, Ms McInnis does not have the expertise to address matters on the tax laws of the United States.

148. Additionally, Mancino 1 exhibited at **MP4/Tab 11/Pages 1642 to 1687** corrects material factual errors and overstatements, and legal errors or distortions of U.S. tax and nonprofit corporation law made throughout FSD Affidavit 1.

149. Such corrections include:

a) All entities affiliated with Highland Foundations including not only the Company but also The Dallas Foundation are exposed to material risks and associated defence cost should the audit be commenced.

b) The Highland Foundations' failings Mr Mancino refers to in his evidence has in fact resulted in the inurement of its net earnings to Mr Dondero in violation of one of the most fundamental requirements of section 501(c)(3) of the Code.

c) The Highland Foundations are operating primarily to serve Mr Dondero's private personal interests, which is also a U.S. tax violation.

d) Myself and Mr Murphy held a reasonable belief that the Highland Foundations were no longer a section 501(c)(3) organisation due to the various dealings the Highland Foundations' had with Mr Dondero and his affiliated companies (**MP1 at pages 172 to 305**).

e) The real issue is not the possible imminent revocation of the Highland Foundations' tax exempt status occurring, but rather what a rationale

reasonable person would do today acting as a fiduciary in the exercise of his/her duty of care to mitigate future consequences of such a revocation.

f) It is demanded from myself and Mr Murphy as directors of the Company that we act in accordance with our fiduciary duties of care because we had present knowledge and advice of expert counsel that the tax exemption risks to Highland Foundation were real, materially high, and not speculative.

150. In other words, to have played an "audit lottery" would have run contrary to our obligations as directors.

151. Troublingly, the Current JOLs do not have appeared to address the contents of Mr Mancino's letter 20 March 2025 (and updated on 1 May 2025) to the IRS at all (the **IRS Letter**). Rather than treat concerns raised by an expert in this field as a focal point of their investigations, the Current JOLs have instead elected to dismiss the IRS Letter as simply a calculated tactic "*to manufacture grounds on which the Relevant Transactions could be justified after the fact*" (see **paragraph 76.2, FSD Affidavit 1**).

152. It would seem that the Current JOLs have lost their objectivity with respect to this aspect of the investigation, by dismissing leading expert advice on this matter and without seemingly obtaining independent tax advice of their own, as the Current JOLs not experts in U.S. tax law themselves. The Current JOLs (see e.g. Ms MacInnis 15 July Affidavit at paragraph71) also ignore valuable advice Mr Murphy and I received from other tax advisors to the extent it was not written and provided to them. While much of it was written, some of it was not; notably, Mr Mancino advised favourably on every step of the DAF Restructuring, yet his advice is not referred to at e.g. Ms MacInnis 15 July Affidavit at paragraph 71 because the Current JOLs have based their conclusions on written materials available to them and have not spoken with me or Mr Murphy to confirm that those written materials encompass all advice and context.

***iii. No investigations into Dondero related litigation***

153. As highlighted at **paragraphs 66, 120 to 143 of DFW Affidavit**, Mr Dondero is involved in extensive and various litigation. Indeed, Highland Capital Management, L.P submitted in *Highland Capital Management, L.P. v NexPoint Advisers, L.P. and NexPoint Asset Management, L.P.* before the Supreme Court of the United States that Mr Dondero and his entities are subject to multiple contempt findings and have filed more than fifty appeals to the district court and Fifth Circuit as 27 May 2025.

154. Furthermore, the Company (whether directly or indirectly) itself is involved with both value protective and value adding litigation as a result of Mr Dondero's prior conduct and breaches, which are summarised as follows:

**CLO Holdco Note**

155. CLO HoldCo, Ltd. (**CLOH**) is the obligor on a promissory note (the **CLOH Note**) currently valued at approximately US $40 million in principal and interest, with a maturity date in December 2025. The note was previously held by Sentinel Reinsurance Ltd. (**Sentinel**), a Cayman Islands reinsurance company owned by Mrs Dondero and Mr Ellington but was assigned to UBS Securities LLC (**UBS**) as part of a settlement whereby Sentinel received a US $10 million cash payment in exchange. CLOH has engaged legal counsel to assess its obligations and potential defences in relation to this claim. The underlying transaction forms part of the broader Sentinel Fraud allegations concerning fraudulent conveyances intended to shield assets from a US $1.2 billion judgment against Mr Dondero and his affiliates.

**Dondero Note Arbitration**

156. As mentioned above, Mr Dondero's personal trust, Dugaboy, filed an arbitration action alleging HMIT owes Mr Dondero's personal trust US $62.6 million pursuant

to a promissory note. Further details of this litigation can be found at paragraph 52(a) above.

**UBS New York State Court lawsuit**

157. As outlined in **paragraphs 123 to 127, DFW Affidavit**, UBS named CLOH as a co-defendant in the US $1.1 billion New York State Court action against Mr Dondero (amongst others).

158. CLOH is the only defendant to successfully obtain dismissal.

159. UBS is appealing that dismissal and may also amend its complaint to allege that CLOH is an alter ego of Mr Dondero, which could expose all DAF assets to collection by UBS in pursuit of its US $1.2 billion judgment.

160. It is therefore essential that the Highland Foundations are not controlled by Mr Dondero because it could lead to substantial harm to DAF's assets.

161. CLOH also believes UBS may amend its petition for leverage in the negotiations for payment on the CLOH Note.

**Defense of Highland Capital bankruptcy settlement**

162. HMIT and its affiliates entered into the Hunter Mountain Settlement Agreement in May 2025, details of which are described above at paragraphs 50 to 53.

163. The Hunter Mountain Settlement represents a massive victory for HMIT and DAF. I believe the Current JOLs either have lost all objectivity with respect to the benefits which will flow from this settlement. The JOLs should be in favour of such huge amounts of funds returning to the DAF Structure, rather than seeking to delay or interfere with it.

164. With respect to value-add litigation, the matters presently on foot are as follows:

**Kirschner Claims**

165. I understand from legal counsel engaged in this litigation that the Kirschner claims involve actions for damages in excess of US $300 million against entities related or affiliated with Mr Dondero and Mr Ellington. All DAF Entities were dismissed as defendants to this action. A copy of the Kirschner Complaint - Chapt 11 Highland Cap Mgmt v Dondero is exhibited at **MP4/Tab 43/Pages 2682 to 2815**.

166. Following approval of the Hunter Mountain Settlement Agreement, HMIT (an entity within the DAF structure) acquired these claims on 7 July 2025, which include a multitude of actions asserted against Mr Dondero, Mr Ellington and their affiliates for a variety of alleged fraudulent activities and schemes that siphoned assets from HCMLP to the pockets of Mr Dondero, Mr Ellington and others.

167. As an example, the Kirschner Complaint describes Mr Dondero's fraudulent activities with respect to Sentinel and by which Mr Dondero ultimately mislead the Cayman Islands Monetary Authority.

168. Highland (in its capacity as a debtor) temporarily stayed prosecution of these claims because Highland believed it had sufficient assets in the bankruptcy estate to pay all creditors at par.

169. I believe HMIT and DAF will receive substantial value from prosecuting these claims, which will benefit charitable causes.

**Atlas Demand Note Lawsuit**

170. I described this matter at **paragraphs 138 to 140, DFW Affidavit**. To reiterate, this is a lawsuit by Atlas IDF, LP (**Atlas**) against NexPoint Real Estate Partners, LLC (**NREP**) for US $13.9 million in promissory notes payable on demand.

171. NREP, a Mr Dondero-controlled entity, has refused to pay on the demand promissory notes despite a demand for payment. Atlas' counsel is actively suing to collect on the notes.

172. NREP has counterclaimed and sued myself and Mr Raver personally, who are indemnified in the matter by Atlas and certain DAF entities. It is important to note that by an order of the Business Court of Texas dated 14 August 2025 exhibited at **MP4/Tab 44/Pages 2816 to 2818**, the claims against myself and Mr Raver were dismissed in their entirety.

173. Dugaboy is also a guarantor of this debt obligation. While Atlas is not a DAF subsidiary, DAF is affected because Rand Advisors, LLC (**Rand Advisors**) manages DAF assets, and Charitable DAF Holdings Corp. owns and controls Atlas's general partner and receives investment management fees which benefit DAF.

**Liberty Lawsuit vs. HCMSI**

174. I described this matter at paragraph 141, DFW Affidavit.

175. Liberty CLO HoldCo, Ltd. (**Liberty**) sued Highland Capital Management Services, Inc. (**HCMSI**) for breach of a promissory note with a principal balance of approximately US $1.3 million.

176. HCMSI, a Mr Dondero-controlled entity, defaulted on its payment obligation under the note to Liberty. Liberty's counsel is actively suing to collect on the note.

**NexPoint Polo Glen**

177. This is a lawsuit by Liberty against NexPoint Polo Glen (**Polo Glen**) for breach of contract in the amount of approximately US $700,000.

178. Polo Glen, another Mr Dondero-controlled entity, has refused to satisfy its contractual obligations to repurchase Liberty's membership interest pursuant to a put option agreement.

179. Liberty's counsel is actively pursuing to collect on the breach of contract.

180. The Current JOLs have not adduced any evidence which reveals the existence of the litigation referenced above which represents significant gains for the Company and/or the DAF Structure. As a result, I have had to provide extensive evidence in this regard to appraise the Court. This should have been disclosed by the Current JOLs if they had conducted a thorough investigation.

181. Should the Highland Foundations be successful in the TRO Petition, then the ability for this litigation (the majority of which is against Mr Dondero) will be unable to proceed, to the detriment of the Company, the DAF Structure and ultimately the contributories or creditors of the Company. It is unclear whether the Current JOLs had an appreciation of this when they elected to file the FSD Proceedings.

182. If they did, then they arguably acted against the best interests of the minority of the Company's contributories rather than the Company. If they did not, then this confirms that they have conducted a wholly inadequate investigation and are failing in their duties to be fair and independent.

***iv. Use of DAF Structure for the benefit of Dondero***

183. Extensive evidence given by both myself at **paragraphs 111 to 115 and 151 to 156, DFW Affidavit** and the Current JOLs at **paragraph 29, FSD Affidavit 1** (see pages 82 to 83 and 94 to 96 of DFW 1) clearly suggests that the Fund, and more broadly, the charitable structure, was being used to cycle Mr Dondero's donations to purchase interests in businesses related to Mr Dondero or into transactions which lend more favourable commercial terms to entities related to Mr Dondero, whilst all under the shield of US federal tax exemptions.

184. It is also clear from a review of DFW Affidavit 1 that the JOLs have not questioned or sought to look behind these interests before filing the FSD Proceedings. Their investigations appear to extend only to identifying which interests DAF LP's fund structure has in connection with Mr Dondero's related businesses. They do not appear to have taken on board DFW's concerns raised in DFW Affidavit at all.

185. Furthermore, the Current JOLs incorrectly state at **paragraph 27, FSD Affidavit 1** that DAF LP relied on mostly passive investment vehicles which betrays that the Current JOLs' investigations are still embryonic and have not been sufficiently thorough. For example, wealth creation for DAF LP derives from an array of sources, including:

a) The Hunter Mountain Settlement Agreement secures rights in the Kirshner claims which has a value of up to US $300 million, which DAF LP and its related entities will benefit from.

b) Debt collection claims against Mr Dondero's companies also represents millions of dollars in returns for the Fund's related entities. ;

186. One of the Fund's related entities, Rand Advisors which operates as an investment management business, manages investor assets worth over US $100 million. These investors are unrelated to DAF LP or the parties in the FSD Proceedings. The management fees which are paid to Rand Advisors are redistributed to DAF LP.

## D. REPLACEMENT JOLs

187. For all the reasons set out above, DFW as a creditor in what it believes is the Company's insolvent liquidation, and as the Company's largest contributory has lost all trust and confidence in the Current JOLs' conduct of this liquidation, which requires them to act fairly, independently, impartially and in the best interests of the Company, rather than a class of the Company's minority contributories.

188. It is therefore proposed that Ms Neema Griffin and Mr Jeffrey Stower of Teneo (whose experience and qualifications are set out below) are appointed as Replacement JOLs as proposed in the terms of the draft Order which is being filed with this application.

189. Ms Griffin is a Managing Director with Teneo Cayman's Advisory business. She has over 18 years of financial advisory and insolvency experience with a specialism in contentious and complex insolvencies, involving high value litigation, fraud investigations and international asset tracing, personal bankruptcies and fund insolvencies. Her wider financial advisory experience includes solvency reviews, M&A mandates and regulatory advisory. Since moving to the Cayman Islands, her industry focus has been on financial services. Ms Griffin is an insolvency appointment taker in the Cayman Islands and is a UK licensed insolvency practitioner. Ms Griffin's sworn Consent to Act is exhibited at **MP4/Tab 45/Pages 2819 to 2823**.

190. Mr Stower is a Senior Managing Director with Teneo in the Cayman Islands. He has over 25 years of experience in Restructuring & Insolvency, the last 16 of which have been spent in the Cayman Islands with a focus primarily on the financial services industry. Mr Stower has a wealth of experience in both cross-border restructurings, inspectorships and insolvencies involving hedge funds, private equity funds, insurance companies, listed holding companies and a range of other offshore structures, acting in a variety of roles including appointments as official liquidator, provisional liquidator, voluntary liquidator and controller. He is a qualified insolvency practitioner in the Cayman Islands and is a Fellow of INSOL International. Mr Stower's sworn Consent to Act is exhibited at **MP4/Tab 46/Pages 2824 to 2428**.

191. Ms Griffin and Mr Stower's Consents to Act confirm that they:

   a. Are free of conflicts and clear to act;

b. Meet the requirements of independent under the Insolvency Practitioners' Regulations (**IPR**);

c. Meet the residency requirements of the IPR; and

d. Have the requisite experience to conduct the liquidation of the Company as evident by their resumes exhibited to their Consents to Act.

192. At paragraphs 58 to 89 above I address the concerns which I, as the sole director of DFW have in connection with the funding of the Current JOLs. I am aware and understand that the Company has limited assets from which the fees and expenses of the Replacement JOLs could be paid.

193. On their appointment, DFW would be in a position to fund the immediate costs of the Replacement JOLs but, in recognising that the Highland Foundations consider the Replacement JOLs to be under a conflict of interest if funded by DFW, I also recognise that the Replacement JOLs would be best serve by securing third-party funding for the necessary investigations. However, this is properly a matter for the Replacement JOLs to evaluate and seek sanction of in due course.

## E. CONCLUSION

194. For the avoidance of doubt, DFW objects to any proposal put forward by the JOLs that the costs awarded to DFW in connection with the Sanctions Summons should be offset against any possible recoveries the Current JOLs may make in the future. DFW is entitled to its costs pursuant to the terms of the Order made on 24 June 2025 in these proceedings, the terms of the Order do not provide that DFW's costs should be

contingent on speculative recoveries being made by the Current JOLs, or upon certain milestones in these proceedings being reached by the Current JOLs.

**SWORN** to at Galveston Texas )

on this 19th day of August 2025 )

)

MARK ERIC PATRICK BEFORE ME:

NOTARY PUBLIC

NOTARY PUBLIC STATE OF TEXAS

Kenneth Wyatt Lightfoot IV

ID NUMBER
13433248-0
COMMISSION EXPIRES
April 28, 2027

04/28/2027

Electronically signed and notarized online using the Proof platform.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)