**Exhibit 4**

**Patrick CDM Aff.**

**Mark E. Patrick**
**First Affidavit**
**September 2025**
**Exhibit MP-1**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

1) **MARK ERIC PATRICK**
2) **PAUL MURPHY**
3) **CDMCFAD, LLC**
4) **DFW CHARITABLE FOUNDATION**
5) **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**
6) **CLO HOLDCO, LTD.**

Defendants

---

**FIRST AFFIDAVIT OF MARK ERIC PATRICK**

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, **MAKE OATH AND SAY** as follows:

1. I am a former director and the sole holder of the management shares (the "**Management Shareholder**") of Charitable DAF Holdco, Ltd (the "**Company**"). I am also:

   (a) The manager of CDMCFAD, LLC ("**CDM**") (the Third Defendant), a limited liability company formed in Delaware on 12 December 2024;

This **AFFIDAVIT** is filed by Campbells LLP, Attorneys for Charitable DAF Fund, LP, whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, Cayman Islands KY1-9010 (Ref: MGM/ROD/18955-44959).

(b) The sole director and sole shareholder of CDH GP, Ltd (the "**GP**") (the Fifth Defendant), a Cayman Islands exempted limited company incorporated on 27 February 2024, which is the general partner of Charitable DAF Fund, LP (the "**Fund**");

(c) A director of CLO Holdco, Ltd ("**CLO**") (the Sixth Defendant), a Cayman Islands exempted limited company incorporated on 13 December 2010, and whose sole shareholder is the Fund; and

(collectively with myself, the "**CDM Defendants**")

(d) A director, the president and the sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation ("**DFW**") (the Fourth Defendant) incorporated in Delaware on 9 December 2024, which is organized under the General Corporation Law of the State of Delaware exclusively for charitable purposes. DFW is the majority Participating Shareholder of the Company.

2 The Company was placed into voluntary liquidation on 2 April 2025 and Mitchell Mansfield and William Clarke were appointed joint voluntary liquidators (the "**JVLs**").

3 Following the appointment of the JVLs, on 28 April 2025, the Highland Dallas Foundation, Inc., the Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc (the "**Highland Foundations**"), each the holders of 100 'Participating Shares' in the Company,[1] presented a petition seeking to have the liquidation of the Company continue under the supervision of the Court (the "**Supervision Application**") pursuant to section 131 of the Cayman Islands Companies Act (2025 Revision) (the "**Act**"). Mr Justice Asif KC determined the Supervision Application and, by an order dated 6 May 2025 (the "**Appointment Order**"), directed that Margot MacInnis and Sandipan Bhowmilk of Grant Thornton Specialist Services (Cayman) Limited be appointed as joint official liquidators of the Company (the "**JOLs**"). The Supervision Application was not opposed by DFW or me, in my capacity as the sole Management Shareholder of the Company.

4 The facts and matters in this affidavit are based on my personal knowledge and are true and correct. Where the facts and matters in this affidavit are not within my own knowledge I state

---

[1] The remaining Participating Shares were held by the Community Foundation of North Texas (5 Participating Shares) and DFW (318 Participating Shares).

the source of such facts and matters and confirm that they are true to the best of my knowledge, information and belief. Where I refer in this affidavit to legal advice received by the CDM Defendants and/or related entities, I do not intend to and do not waive privilege in that advice.

5 There is now produced and shown to me a paginated bundle of true copy documents marked "Exhibit MEP-1" to which I refer in this affidavit. Page references below are to pages of Exhibit MEP-1, unless otherwise stated.

6 I make this affidavit on behalf of the CDM Defendants in support of the summons dated 12 September 2025 (the "**Summons**"). By the Summons, the CDM Defendants seek, *inter alia*, an order that the Company, acting by the JOLs, provide security for the CDM Defendants' costs of these proceedings in the sum of US$6,123,580.00, or in such sum as the Court thinks just, pursuant to section 74 of the Act.

**The Company's financial position and inability to pay current liabilities**

*The DAF Structure*

7 A detailed history of the Company, the structure comprised of the Fund and its associated entities (the "**DAF Structure**"), and the nature of the Highland Foundations' interest in them, is set out in the affidavits dated 4 June 2025 sworn by myself ("**Patrick 1**" on behalf of DFW (pages 1 to 64) and "**Patrick 2**" in my capacity as the Management Shareholder (pages 65 to 84)) and Mr Paul Murphy ("**Murphy 1**") (pages 85 to 142), the other former director of the Company, in the liquidation proceedings [FSD Cause No. 116 of 2025 (JAJ)] (the "**Liquidation Proceedings**"). The relevant history will be elaborated on and explained in detail at the appropriate time, including when responding to the JOLs' evidence for the JOLs' summons dated 15 July 2025 (the "**Injunction Application**").

*The nature of the Highland Foundations interest in the DAF Structure*

8 As the Highland Foundations held Participating Shares only, they held no real economic interest in the Company, and their rights were limited to the repayment of capital (which they did not contribute) and the right to participate in the profits of the Company in accordance with its Articles of Association (pages 143 to 179, see in particular Article 12 at page 154). However, the directors at all times retained absolute discretion as to whether any dividends should be

declared or payable (see Article 104 at page 168). Walkers (Cayman) LLP conducted an analysis of, and prepared slides addressing, the rights of the Participating Shareholders and the Directors of the Company which are at pages 180 to 199 (the "**Walkers Slides**"). As is clear from the Walkers Slides, the Participating Shareholders did not have the right to: (i) cause or vote on distributions, (ii) pro rata distributions based on their shareholding, or (iii) annual or timed distributions and, as noted, the directors at all times retained absolute discretion in this regard.

9 While I understand from legal counsel that the issue was not strictly before the Court, the discretionary nature of the interest held by the Participating Shareholders was commented upon by Mr Justice Asif KC at the hearing of the JOLs' 24 June 2025 sanction application seeking leave to appoint Cayman Islands and US legal counsel (the "**June Sanction Application**") (transcript at pages 200 to 288). His Lordship likened the Company to a discretionary trust and observed that it could have been established as a foundation company (see pages 213 and 214). I consider this to be an astute observation. The purpose of the Fund since its inception has always been to make discretionary charitable distributions to qualifying non-profit organizations and all of the steps undertaken by me in my capacity as 'Control Person' of the DAF Structure, including the DAF Restructuring (see below), were aimed at ensuring this purpose was maintained.

*The DAF Restructuring*

10 In or around October 2024, Mr Murphy and I began the process of restructuring the Company ("**DAF Restructuring**"). The DAF Restructuring was designed to, *inter alia*, (i) safeguard the assets of the Fund from improper interference by Mr James Dondero[2] ("**Mr Dondero**") and related entities, (ii) ensure compliance with applicable legal and tax requirements, and (iii) comply with the DAF Structure's charitable purposes.

11 The steps undertaken as part of the DAF Restructuring, and the rationale for them, are explained in detail at paragraphs 46 to 97 of Murphy 1 (pages 100 to 113). In summary, the DAF Restructuring involved:

(a) the allotment of 318 Participating Shares in the Company to DFW which constituted DFW as the single majority Participating Shareholder of the Company;

---

[2] Mr Dondero owns and / or controls each of the Highland Foundations and acts as the President, Individual Member and Director of each.

(b) the formation of CDM and the redemption of the Company's interest in CDM; and

(c) distributing the proceeds of the aforementioned redemption to the Participating Shareholders (other than DFW).

12 The above steps were taken in accordance with the Company's constitutional documents and on the advice of professional advisers, including Cayman Islands and US legal counsel, King's Counsel, and independent valuation experts. Mr Murphy and I anticipated that the DAF Restructuring would be objected to by Mr Dondero due to his propensity to litigate matters perceived to undermine his personal interests (as explained in detail in Patrick 1, Patrick 2, and Murphy 1) and, for this reason, we sought the advice of independent legal and professional advisers over many months to guide all aspects of the DAF Restructuring.

13 Following the DAF Restructuring, the Company was placed into voluntary liquidation by way of a directors' resolution. As noted, the subsequent appointment of the JOLs as official liquidators under the supervision of the Court was not opposed by DFW, or myself or Mr Murphy, who welcomed a fair and independent investigation into our conduct and the DAF Restructuring.

*The JOLs' First Report to Contributories*

14 The JOLs' First Report to Contributories is dated 2 July 2025 (the "**First Report**"). A copy of the First Report appears at pages 289 to 309.

15 The First Report relevantly stated that, as at 2 July 2025:

(a) the JOLs had identified assets in the amount of US$155,788.96 and two creditors of the Company whose claims amounted to US$33,889.15 (see page 294);

(b) the JOLs' fees and disbursements for the period 6 May to 31 May 2025 amounted to US$458,071.68 and US$3,073.43, respectively (see page 302);

(c) the JOLs' legal costs incurred in the period 6 May to 31 May 2025 amounted to US$978,916 (see page 302); and

(d) there were insufficient assets with which to meet the fees and expenses of the liquidation (see page 302).

I understand from reading the First Report that the Company's financial standing is significantly compromised. Indeed, on the basis of the Company's current assets and liabilities as set out in the First Report, it appears that the Company is unable to pay its liabilities and is therefore insolvent. The CDM Defendants therefore have significant concerns regarding the Company's financial status, which are heightened by, *inter alia*: (i) the contents of the First Report, and (ii) the indemnity costs order made against the JOLs in respect of the significant costs which were incurred in respect of the June Sanction Application.

*<u>Substantial costs already incurred in the proceedings</u>*

16 As recorded in the First Report, significant sums are being expended by the JOLs in the Liquidation Proceedings, with almost US$1 million spent on legal fees in May 2025 alone. I am informed by legal counsel that it is likely that a large proportion of those fees relate to the JOL's attempts to appoint Johnstone Law as their Cayman Islands legal counsel, the primary issue which was to be determined at the June Sanction Hearing. The JOLs' engagement of Johnstone Law was contested by myself and Mr Murphy owing to his previous representation of the Highland Foundations in a just and equitable winding up petition - filed when the Company was already in voluntarily liquidation - in which allegations of fraud were made against me and repeated in subsequent legal submissions by Mr Johnstone.

17 On the eve of the June Sanction Hearing on 24 June 20025, more than two weeks after Patrick 1, Patrick 2 and Murphy 1 were filed in opposition to the JOLs' sanction application, the JOLs abandoned their application to engage Johnstone Law and instead proposed that Maples be appointed as sole Cayman Islands legal counsel (something which had been repeatedly suggested by my attorneys in inter partes correspondence). The JOLs' change in approach took place after significant costs were incurred by all parties. I understand that the JOLs' conduct in this regard was one of the considerations which resulted in an indemnity costs order being made against them. Given the Company's financial position as outlined in the First Report, the CDM Defendants have serious and justifiable concerns that the Company will not be able to meet that indemnity costs award, let alone any further costs award made in these proceedings.

18 The CDM Defendants, who appeared at the June Sanction Application in an observational capacity, have also incurred substantial costs in the Liquidation Proceedings, primarily as they were forced to bring a summons seeking to vary certain provisions of the Appointment Order

which permitted the JOLs to take steps against the Fund "*if so advised*" without seeking sanction from the Court (described in the First Report as the 'Fund Summons' at page 301).

19 As regards the costs of the current proceedings, the JOLs appeared on an *ex parte* basis before Mr Justice Asif KC in the Liquidation Proceedings on 14 July 2025 and were granted leave to issue the Injunction Application and the associated writ of summons (the "**Writ**")[3]. At the same time as serving the Injunction Application, I am advised by legal counsel that the JOLs requested it be listed before the summer vacation and without reference to the CDM Defendants' (or any of the Defendants') availability. The JOLs obtained a return date for the Injunction Application of 31 July 2025. However, for reasons which were explained in detail in *inter partes* correspondence, the CDM Defendants proposed that the Injunction Application should be adjourned until after the summer vacation, subject to the provision of asset preservation undertakings to the Court and the implementation of a financial reporting protocol (the "**Protocol**").

20 Various draft versions of the Protocol had been offered to the JOLs from as early as 16 May 2025, not as a recognition of any claim (proprietary or otherwise), but as a means of satisfying the JOLs that the assets would be preserved whilst the central issues were resolved between the relevant parties (who the CDM Defendants believe to be DFW and the Highland Foundations). In spite of this, rather than meaningfully engaging with the CDM Defendants on an acceptable form of Protocol, the JOLs filed the Injunction Application and pressed for it to be heard on 31 July 2025 on an *ex parte* on notice basis.[4]

21 Eventually, and in a similar pattern to their behavior ahead of the June Sanctions Application, on the eve of the hearing the JOLs agreed a form of Protocol which was formalized in a consent order dated 31 July 2025 (the "**Consent Order**") (pages 310 to 325). I am advised by legal counsel that, as a result of the JOLs' refusal to meaningfully or constructively engage with the CDM Defendants offer of a Protocol in timely manner, all parties expended significant expenses in preparation for the hearing scheduled for 31 July 2025. This included the preparation by all parties of skeleton arguments and hearing bundles, both of which were ultimately rendered nugatory by the subsequent Consent Order.

---

[3] Although it remains unclear what was said to Mr Justice Asif KC in order to obtain sanction to issue the Writ.

[4] The JOLs engaged with the CDM Defendants' offer of a Protocol for the first time on 19 June 2025 - i.e. more than one month after it was first offered – and did not make any further effort to agree a suitable Protocol before issuing the Injunction Application.

**The Company's funding arrangements**

22 By letter dated 23 July 2025, Campbells LLP, on behalf of the CDM Defendants, wrote to the JOLs (the "**Campbells' Letter**") regarding the inadequacy of the proposed cross-undertaking in damages in the Injunction Application (the "**Proposed Cross- Undertaking**"). The Proposed Cross Undertaking was provided for at Schedule B to the draft order accompanying the Injunction Application (page 344) and proposed that the Company would pay the reasonable costs of any third parties but would not pay the costs of any Defendant. I am advised that the Proposed Cross-Undertaking is wholly inadequate as it provides no protection for the CDM Defendants and related entities if the injunction is granted and it later transpires that it should not have been.

23 Campbells' Letter articulated the CDM Defendants' concerns regarding the JOLs ability to provide an acceptable cross-undertaking in circumstances where, *inter alia*: (i) the JOLs' were official liquidators of a company in which no assets have been identified in the liquidation other than the alleged claim in the Writ (which is denied), (ii) substantial costs orders have already been made against the liquidation estate, and (iii) the JOLs had failed to confirm the identity of the party providing the cross-undertaking and the quantum thereof. Accordingly, Campbells' letter sought fortification of the Proposed Cross-Undertaking.

24 Further, in light of the CDM Defendants' serious concerns regarding the Company's financial position and its ability to provide an acceptable cross-undertaking, Campbells' Letter also requested the JOLs' proposals regarding security for costs given that the Company had no identified assets and there is a real risk that any costs order in the CDM Defendants' favor would not be satisfied. The Campbells Letter therefore sought confirmation: (i) that the JOLs were prepared to provide security for the CDM Defendants' costs of responding to the Injunction Application, and (ii) regarding the form and amount in of security the JOLs were willing to offer. A copy of Campbells' Letter is at pages 326 to 329.

25 On 25 July 2025, Campbells received a response from Maples and Calder (Cayman) LLP ("**Maples**") on behalf of the JOLs (the "**Maples' Letter**"). A copy of this letter is at pages 346 to 348. The letter revealed that the JOLs had entered into a funding agreement dated 11 July 2025 (the "**Funding Agreement**") with Crossvine Litigation Funding, LLC ("**Crossvine**") and provided a redacted copy of the JOL's application for sanction of the Funding Agreement. A redacted copy of Ms MacInnis' sixth affidavit in support of the application for sanction of the Funding Agreement

("**MacInnis 6**") is at pages 349 to 357 and a redacted copy of the Funding Agreement is at pages 359 to 372. As noted at clause 7 of the Funding Agreement (page 366), Crossvine agrees to meet the reasonable costs of any innocent third parties affected by the Injunction Application, as well as to provide security for any cross-undertaking ordered by the Court.

26 At paragraph 11 of MacInnis 6, the JOLs describe Crossvine as not being "*a traditional third-party funder, but rather…a special purpose vehicle incorporated for the purpose of ultimately Mr Dondero…funding the liquidation of the Company and the JOLs pursuing the Proposed Proceedings*". MacInnis 6 explains that one of Crossvine's two managers is Mr Scott Ellington. As explained at paragraph 123 of Patrick 1 (page 42) and paragraphs 55 to 58 (pages 77 and 78) of Patrick 2, UBS Securities LLC ("**UBS**") are currently awaiting oral argument in the USA in respect of a claim which seeks summary judgment against Mr Ellington, Mr Dondero, and entities related to them, in the sum of approximately US$1.2 billion.

27 There is no description of, or transparency relating to, the financial standing of Crossvine, which appears – from the description provided in MacInnis 6 – to have been structured so as to be a special purpose bankruptcy remote vehicle which, by their own admission, is not a traditional third-party funder and appears to have been incorporated solely to fund the Writ and Injunction Application.[5] The CDM Defendants therefore have well-founded and legitimate concerns about Crossvine's financial status, capacity, willingness, and ability to meet any adverse costs order (as explained further below).

28 Further, given the content of the Funding Agreement, I believe that Mr Dondero's evidence in the Liquidation Proceedings was misleading. Mr Dondero averred at paragraphs 47 and 48 of his first affidavit dated 16 April 2025 in the Liquidation Proceedings, that he would fund the liquidation of the Company and "*not at any time receive a benefit … because of this funding arrangement*." However, the terms of the Funding Agreement contradict this and provide Mr Dondero and Mr Ellington with a contingent upside in the liquidation should certain recoveries be made (page 366).

29 However, notwithstanding the concerns raised above (and below) in respect of Crossvine's funding, I am advised that it has recently come to light in correspondence sent by Maples in the

[5] Given the admissions in MacInnis 6 I believe it is unusual that the JOLs' written submissions for the adjourned 31 July 2025 hearing of the Injunction Application states that the JOLs "*observe that Crossvine is a substantial litigation funder*".

Liquidation Proceedings on 5 September 2025 that, per their letter: "*the initial funding provided by Crossvine has been exhausted*" and "*the JOLs are in advanced discussions with several third-party funders to obtain funding through to the completion of the FSD Proceedings*". I am advised that, if true, this is a significant and extremely concerning development, and one which requires immediate clarification. I believe there was no suggestion in MacInnis 6 or Maples' Letter that Crossvine were only providing preliminary or 'initial funding'. Clearly, the withdrawal of the Company's funding significantly increases the CDM Defendants' concerns that the Company will not be able to pay their costs if they successfully defend the proceedings and underscores the importance of this application.

**Cause of the Company's impecuniosity**

30 I understand from Maples' Letter that the JOLs will contend that the DAF Restructuring is the cause of the Company's impecuniosity and should weigh against the Court making an order for security for costs. However, this completely ignores the reality of the Company's former position within the DAF Structure. As explained in Patrick 1, the Company did not hold voting, control, or management rights in respect of the Fund. Rather, its sole purpose was to act as a 'blocker' for US tax purposes and a conduit through which discretionary, charitable donations would pass. The Company's specific role within the DAF Structure is alluded to in Ms MacInnis' first affidavit in support of the Injunction Application where she records this and notes that "*the Company was incorporated as a blocker for US tax purposes between the Supporting Organisations…and their interest in the* [Fund]".

31 Not only did the Company have no real economic interest in the Fund, but it did not hold any assets or cash reserves except for the discretionary distributions that passed through the Company to the Highland Foundations. Accordingly, I believe that the JOLs' contention regarding the DAF Restructuring being the "*cause of the Company's impecuniosity*" is misconceived and fails to take proper account of (i) the nature of the interest which the Company held in the Fund, and (ii) the reality of the Company's specialized role and function within the DAF Structure, which was to facilitate periodic discretionary charitable distributions, and not to hold assets or cash.

32 In addition, even taking the JOLs' arguments at their height, the root cause of the Company's impecuniosity is a disputed issue which, I am advised, cannot be determined at this stage of the

proceedings. As explained in detail in the various affidavits filed in the Liquidation Proceedings, the purpose of the DAF Restructuring was to avoid improper interference by Mr Dondero in the ongoing operation of the DAF Structure and to ensure that the Fund could continue pursuing its charitable mission, namely making distributions to qualifying non-profit organizations. Notwithstanding those explanations, and despite repeated offers by the CDM Defendants to enter into a Protocol designed to address any reasonable concerns the JOLs may have had regarding the Fund's commercial activities and the risk of dissipation outside the ordinary course of business, the JOLs have nevertheless chosen to incur significant costs by initiating these proceedings for urgent injunctive relief, thereby requiring the CDM Defendants to incur the expense of responding.

33 As I have attested in earlier affidavits in the Liquidation Proceedings, it was Mr Dondero's repeated attempts to improperly exert influence over the DAF Structure which necessitated the DAF Restructuring. Despite the representations referred to at paragraph 29 above regarding the cessation of Crossvine's funding, my current understanding is that Mr Dondero and Mr Ellington, are funding the liquidation of the Company and stand to benefit, both directly (through contingent uplifts provided for in the Funding Agreement) and indirectly (through the JOLs' efforts to interfere with the prosecution of valuable claims held by entities within the DAF Structure which are adverse to them personally, such as the Kirschner Claims described below). As such, I believe it is fair and reasonable that the Company, Crossvine, or some other funder, be required to provide security for the substantial costs that the CDM Defendants will incur in defending these proceedings.

**The Company's ability to meet an adverse costs order**

34 Given MacInnis 6 states that there is insufficient cash available in the liquidation estate to fund these proceedings or the liquidation of the Company, it is clear that the Company's ability to meet any potential adverse costs order is entirely dependent on its funder, which is - or was when the Injunction Application was commenced - Crossvine. As noted at paragraph 25 above and set out in Maples' Letter, the Funding Agreement includes a provision that Crossvine will meet any liability arising under a cross-undertaking in damages. However, Crossvine's financial position is unknown and the CDM Defendants have serious concerns about the reliability of this undertaking and the ability of Crossvine to meet any adverse costs award, particularly given its principals' exposure to several substantial outstanding judgments and proceedings which

establish a clear pattern of avoiding their obligations and liabilities.

35 Although Crossvine is a bankruptcy remote special purpose vehicle and limited information is publicly available regarding its operations, its principals, Mr Dondero and Mr Ellington, have been involved in several proceedings concerning the non-payment of debts and alleged misconduct in the United States. Certain of these matters have given rise to long-running and high-profile litigation. Details of some of these proceedings are provided at paragraphs 122 to 164 of Patrick 1 (pages 42 to 52). For the purposes of this affidavit, I set out below a list of ongoing claims in the United States against Mr Dondero, Mr Ellington, or entities they own or control, which I believe are relevant to the current application for security for costs.:

(a) a US$1.2 billion action by UBS against Mr Dondero and Mr Ellington personally (in addition to entities they own or control), as attested to at paragraphs 152 to 155 of Patrick 1 (page 49);

(b) c.US$300 million in claims pursuant to a complaint dated 15 October 2021 prepared by the Litigation Trustee in the bankruptcy of Highland Capital Management, L.P. (the "**Highland Bankruptcy**") (the "**Kirschner Claims**"), as attested to at paragraphs 165 to 169 of my fourth affidavit in the Liquidation Proceedings sworn on 19 August 2025 on behalf of DFW in support of its application for the removal of the JOLs ("**Patrick 4**") (page 445). Importantly, as noted in Patrick 4, entities within the DAF Structure have now acquired the benefit of the Kirschner Claims, which, if successful, could result in significant recoveries of up to US$300 million against Mr Dondero, Mr Ellington and others, and, as of 3 September 2025, these claimed have been unstayed and are proceeding;

(c) c.US$70 million in claims pursuant to the Highland Employee Retention Assets matter, in which Patrick Daugherty, a former business associate of Mr Dondero and Mr Ellington, is suing Mr Dondero and Mr Ellington, among others, for an amount that I understand to be approximately US$70 million, also described in paragraph 163 of Patrick 1 (page 52);

(d) a c.US$13 million lawsuit to collect on demand notes payable to Atlas IDF, LP (an entity controlled by the DAF Structure) by an entity owned or controlled by Mr Dondero and Mr Ellington, NexPoint Real Estate Partners, LLC, and Mr Dondero's family trust, The Dugaboy Investment Trust ("**Dugaboy**"), as attested to in paragraphs 138 to 140 of

Patrick 1;

(e) a c.US$1 million lawsuit to collect on a US$1 million debt obligation by Highland Capital Management Services, Inc., which Mr Dondero controls and caused to default on a US$1 million promissory note, as attested to in paragraph 141 of Patrick 1 (page 45); and

(f) a c.US$700,000 lawsuit to collect on a put option relating to NexPoint Polo Glen, as attested to in paragraphs 177 to 179 of Patrick 4 (pages 446 and 447).

36 I believe that Mr Dondero has also failed to satisfy obligations to the Highland Foundations. As described at paragraphs 195 to 199 of Patrick 1 (pages 60 to 62), Mr Dondero's family trust, Dugaboy, had a US$9,285,000 obligation to repurchase nearly worthless shares from the Highland Dallas Foundation and failed to do so, raising serious tax compliance issues as identified at paragraph 194 of Patrick 1 (page 60).

37 I am also aware that Mr Ellington is party to a divorce proceeding in Texas (Dallas County Court) in proceedings titled *Stephanie Archer v. Scott Ellington*, No. DF-25-10886, and that a hearing in that proceeding was scheduled for 10 September 2025 at which a temporary restraining order was being sought.[6] Given that Texas is a community property state, Mr Ellington's divorce is likely to create material liabilities for him and could result in an equal division of his property, which further calls into question his and / or Crossvine's ability to meet any costs award made against the Company.

38 As at the date of swearing this affidavit, the JOLs have not provided a revised cross undertaking in damages, nor fortification thereof. The financial risk to the CDM Defendants is therefore further underscored by (i) the JOLs' failure to provide a revised cross undertaking, and (ii) any, let alone the requested, fortification of any cross-undertaking in damages.

39 In summary, the Company's financial position is such that there is a real risk of non-payment of any adverse costs order, and any assurance of payment is dependent on the solvency and willingness of Crossvine, whose own financial position is not known. Further, in light of the recent correspondence referred to at paragraph 29 above, there are now question marks over Crossvine's continued funding of the proceedings. This places the CDM Defendants in an

[6] I understand from US counsel that the court docket records that a temporary restraining order was agreed to by Mr Ellington and his wife in order to avoid a hearing.

unenviable position whereby they are being forced to spend significant sums defending proceedings commenced by a company in official liquidation with no identifiable assets and, if Maples' recent letter is to be believed, no funding in place to pursue the proceedings or meet any adverse costs order.

**The CDM Defendants' estimated costs of the proceedings**

40 The CDM Defendants seek security for their costs in the sum of US$6,123,580, being an estimate of the reasonable costs and disbursements that they are likely to incur up to and including the trial of the proceedings.

41 This estimate is based on the schedule prepared, on my instruction, by Campbells which appears at pages 452 and 453. This schedule sets out incurred and anticipated costs, including anticipated workstreams, legal fees (broken down by seniority of fee earners with hourly rates), disbursements, and Leading Counsel's fees. The schedule sets out the estimated time required by Leading Counsel and attorneys for each stage of the proceedings. I am informed that it incorporates the anticipated hourly charge-out rate for Leading Counsel (US$1,000 per hour), and the capped rates provided for in Practice Direction 1 of 2024 (Guidelines Relating to the Taxation of Costs) for Partner (US$1,250 per hour), Counsel (US$850 per hour) and Associates (US$650 per hour).

42 As set out in the schedule, Campbells has estimated that the total time costs and disbursements likely to be incurred by the CDM Defendants in relation to the proceedings will amount to approximately US$6,123,580 (the "**Security Amount**"). Campbells have informed me that the complexity of the case, the likely volume of documents, and the anticipated length of the proceedings, have all been taken into account in the preparation of the schedule.

43 I believe that one of the causes of the CDM Defendants' increased costs in the proceedings to date has been the JOLs' conduct. As noted at paragraphs 16 to 21 above, these costs include (i) the significant costs incurred preparing for the scheduled hearing of the Injunction Application on 31 July 2025 which was ultimately adjourned when the parties agreed the Consent Order on the eve of trial, and (ii) the JOLs' insistence on engaging a conflicted law firm, Johnstone Law, and continuing with their application for sanction of that firm until the eve of the June Sanction Hearing.

**Risk of payment of security stifling claim**

44 The liquidation of the Company is in its early stages. I understand that this means there has only been limited time for the JOLs to conduct their investigations into the Company's apparent insolvency. This was acknowledged by the JOLs' counsel at the hearing of the June Sanction Application. There, the JOLs' counsel, when addressing the Court, noted that "*[t]he liquidators are not saying that there has been a fraud and they're not saying that the company definitely has a proprietary claim to any assets. They're saying that <u>there needs to be an investigation</u> because the facts are complicated, not straightforward and they need to be understood*" (at page 212, emphasis added). The JOLs subsequently sought leave to file the Writ and the Injunction Application on 4 July 2025 (i.e. 10 days after the June Sanction Application). Accordingly, it appears that the JOLs have commenced these proceedings in circumstances where their investigations are, as suggested by their counsel, incomplete.

45 In any event, notwithstanding the CDM Defendants' concerns regarding the financial status of the Company and its current funder, Crossvine, clause 7 of the Funding Agreement (page 366) provides that Crossvine shall, if required, provide "*any Cross Undertaking, and…if so ordered, …security for any such Cross Undertaking in the sum and on the terms ordered by the Court*". Accordingly, though the reliability of this clause 7 cannot be assessed, the existence of this assurance by the entity who provided the funding for the Company to commence these proceedings should provide the JOLs with adequate protection against any risk (should one exist) that the Company's claim against the CDM Defendants would be stifled by the provision of security.

46 Finally, the Security Amount sought by the CDM Defendants is modest in the context of the sums sought by the Company in the proceedings, such that the CDM Defendants do not see how the request for such security could impede any bona fide claims, should the JOLs identify and pursue any such claims.

**Form and timing of security**

*<u>Form of security</u>*

47 The CDM Defendants seek security in the form of a payment into Court or a bank guarantee from a first-class international bank.

48 The CDM Defendants do not consider an undertaking from Mr Dondero, Mr Ellington, Crossvine, or any entity associated with them, to be appropriate, given the lack of transparency and the ongoing proceedings and collection actions against Mr Dondero and Mr Ellington (including UBS' summary judgment motion in the amount of US$1.2 billion) and the absence of any evidence as to the financial standing of Crossvine.

49 The CDM Defendants consider that the form of security ought to be independent and reliable, and not dependent on the Company's backers or their affiliates.

*Timing of security*

50 Given the uncertainty regarding the Company's funding arrangements, and financial status of its current funder, Crossvine (particularly as regards its principals, Mr Dondero and Mr Ellington), the CDM Defendants seek that security be provided, either in an escrow account under the control of the this Honourable Court, or by way of a guarantee from a Class A bank carrying on business and regulated in the Cayman Islands, before any further (unsecured) costs are incurred. The CDM Defendants may seek further security in respect of additional costs as the case progresses.

**Conclusion**

51 For the reasons set out above, the CDM Defendants respectfully request that the Court order the Company, acting by the JOLs, to provide security for the CDM Defendants' costs in the sum of US$6,123,580, in a form satisfactory to the Court, and with liberty to apply for further security as appropriate.

Sworn at Travis, Texas )
This 12th day of September 2025 )
Before me: )
)
)

**Notary Public**

**Mark E. Patrick**

NOTARY PUBLIC STATE OF TEXAS
Jennifer Jo Thomas
ID NUMBER
133341819
COMMISSION EXPIRES
September 20, 2025

09/20/2025

#3318786v16

Electronically signed and notarized online using the Proof platform.

**Mark E. Patrick**
**First Affidavit**
**12 September 2025**
**Exhibit MP-1**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

1) **MARK ERIC PATRICK**
2) **PAUL MURPHY**
3) **CDMCFAD, LLC**
4) **DFW CHARITABLE FOUNDATION**
5) **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**
6) **CLO HOLDCO, LTD.**

Defandants

---

**EXHIBIT MP-1**

---

This is the exhibit MP-1 to the First Affidavit of Mark Patrick sworn on 12 September 2025

Before Me

See Attached Jurat
______________________________

Notary Public

Mark Patrick

Date of grant of Commission:

Commission Expiry Date:

This **AFFIDAVIT** is filed by Campbells LLP, Attorneys for Charitable DAF Fund, LP, whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, Cayman Islands KY1-9010 (Ref: MGM/ROD/18955-44959).

#3318786v16

**DESCRIPTION OF ATTACHED DOCUMENT**

Title or Type of Document: Jurat

Document Date: 09/12/2025

Number of Pages (including notarial certificate): 19

State of Texas

County of Travis

Sworn to and subscribed before me on 09/12/2025 by Mark Patrick.

NOTARY PUBLIC STATE OF TEXAS

Jennifer Jo Thomas

ID NUMBER
133341819
COMMISSION EXPIRES
September 20, 2025

Jennifer Jo Thomas

Jennifer Jo Thomas

Notary Public, State of Texas

Electronically signed and notarized online using the Proof platform.