**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARITABLE DAF HOLDCO, LTD. (In Official Liquidation),[1]<br><br>Debtor in a foreign proceeding. | Chapter 15<br><br>Case No. 25-11376 (BLS)<br><br>**Re: D.I. 21, 22, 23, 25, 27** |

**DECLARATION OF MARGOT MACINNIS IN SUPPORT OF REPLY TO CDM ENTITIES' OBJECTION TO VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Margot MacInnis, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1. My colleague, Sandipan Bhowmik, and I (the "Petitioners" or "JOLs") are the duly appointed Joint Official Liquidators of Charitable DAF HoldCo, Ltd (in Official Liquidation) ("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"), which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division (the "Cayman Court") by an order dated May 6, 2025 (Cause No. FSD 116 of 2025)(JAJ) (the "Supervision Order").[2]

2. I respectfully submit this declaration (the "Declaration") in support of the *Petitioners' Reply in Support of Verified Petition for (I) Recognition of Foreign Main Proceeding,*

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 263805. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] The Supervision Order is attached as Exhibit 1 to the Declaration of Margot MacInnis, executed on July 21, 2025 [D.I. 4] (the "First MacInnis Declaration").

*(II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code*, filed concurrently herewith (the "Reply"), and in further support of the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 3] (the "Verified Petition"),[3] seeking the United States Bankruptcy Court for the District of Delaware's (this "Court") (a) recognition of the Cayman Proceeding as a "foreign main proceeding" pursuant to 11 U.S.C. § 1517(b)(1) of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") or in the alternative as a "foreign nonmain proceeding" pursuant to section 1517(b)(2) of the Bankruptcy Code; (b) recognition of the Petitioners as "foreign representatives" of HoldCo, pursuant to sections 1509 and 1517 of the Bankruptcy Code; and (c) granting relief pursuant to sections 105(a), 1502, 1507, 1510, 1520 and 1521 of the Bankruptcy Code.

3. I incorporate by reference the First MacInnis Declaration, including all exhibits attached thereto. The facts and statements set forth in the First MacInnis Declaration remain true and correct. Except as otherwise noted, the exhibits referenced herein are attached hereto as true and correct copies.

4. I am Managing Director of Grant Thornton Specialist Services (Cayman) Limited ("Grant Thornton"). I am one of the JOLs of HoldCo, alongside Mr. Bhowmik also of Grant Thornton. Mr. Bhowmik and I were appointed as JOLs of HoldCo by the Supervision Order.

5. I am duly authorized to make this Declaration on behalf of the JOLs. I am fully familiar with the facts of this matter and have read the *CDM Parties' Objection to the Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign*

[3] Capitalized terms used but not specifically defined herein shall have the meaning given to such terms in the Reply or the Verified Petition, as context requires.

*Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 46] (the "Objection"), *Declaration of Mark Patrick in Support of CDM Parties' Objection to the Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 47], and *Declaration of Paul Murphy in Support of CDM Parties' Objection to the Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 48]. Unless otherwise indicated, all statements contained herein are true to the best of my knowledge and based upon my personal knowledge of HoldCo's operations and financial condition, my review of relevant documents and my conversations with relevant personnel. I am over the age of 18 and, if called to testify, would testify competently about the facts set forth in this declaration (the "Declaration"). The facts and matters contained in this Declaration are true and correct to the best of my information, knowledge and belief.

**A. Developments in the Cayman Proceeding**

**i. Removal Application – Independence of the JOLs and the Supporting Organizations**

6. The JOLs are officers of the Cayman Court. Our duties and obligations arise under Part V of the Companies Act (2025 Revision) of the Cayman Islands (the "Companies Act"),[4] the Supervision Order, and the Insolvency Practitioners' Regulations (2023 Consolidation) and Insolvency Practitioners' (Amendment) Regulations, 2024 (collectively, the "IPR").[5] We owe fiduciary duties to the Cayman Court and to HoldCo's estate. We do not owe duties to, and do not

[4] The relevant provisions of the Companies Act are attached as Exhibit 1 to the Declaration of Caroline Moran, executed on July 21, 2025 [D.I. 5] (the "First Moran Decl.").

[5] The relevant provisions of the IPR are attached as Exhibit 3 to the First Moran Decl.

take direction from, any funder (*e.g.*, Crossvine Litigation Funding, LLC), shareholder, or other outside party.

7. On August 19, 2025, DFW Charitable Foundation ("DFW") filed a summons seeking the removal and replacement of the JOLs (the "Removal Summons").[6]

8. In the Removal Summons, DFW alleged that the JOLs lacked independence, specifically because they: (a) persistently invoked the Cayman Court's jurisdiction *ex parte* without proper cause; (b) failed to provide full and frank disclosure on *ex parte* applications; (c) adopted an agenda of the Supporting Organizations and James Dondero ("Mr. Dondero") to DFW's prejudice; (d) failed to engage meaningfully with the proposed protocol; (e) made misleading representations regarding funding; (f) failed to safeguard HoldCo and prevent profligate litigation; (g) failed to discuss relevant U.S. claims against Mr. Dondero; and (h) operated the liquidation to the advantage of the Supporting Organizations and Mr. Dondero.[7]

9. On June 1, 2026, the JOLs filed the Eighth Affidavit of Margot MacInnis in response to the Removal Summons (the "Removal Response").[8] The Removal Response addressed each of DFW's allegations and confirmed, among other things, that: (1) the JOLs used *ex parte* procedure only where there was a legitimate reason—cost minimization, protection of confidentiality, mitigation of asset-dissipation risk, or urgency—and that the Cayman Court made no finding of misuse and DFW never sought to challenge any *ex parte* order; (2) the JOLs provided full and frank disclosure on their applications, addressing each specific instance DFW raised; (3) neither JOL has any affiliation with Mr. Dondero, and neither Crossvine nor Mr. Dondero has any control or influence over the JOLs' conduct, the Cayman Court having sanctioned the Funding

[6] Ex. 1, Removal Summons.

[7] *Id*.

[8] Ex. 2, Removal Response.

Agreement (as defined below) only after scrutinizing its terms and satisfying itself that it conferred no such control; (4) the JOLs did engage with the Patrick Entities' proposed reporting protocol but secured, through the FSD Consent Order, materially more robust asset-preservation and reporting protections than any version of that protocol offered; (5) the JOLs conducted a proper investigation, obtaining legal advice before commencing the Cayman Litigation, while the Directors withheld the Company's books and records, declined to be interviewed, and provided no statement of affairs; and (6) neither JOL has ever been subject to professional or regulatory censure of any kind. The Removal Response also noted that the threshold for removing a liquidator is exceedingly high and that the Cayman Court is slow to appoint replacement liquidators nominated by a person whose conduct is under investigation.[9] The Supporting Organizations opposed the Removal Summons, filing affidavit evidence confirming that their interactions with the JOLs have been professional and at arm's length. On June 3, 2026, DFW sought to adjourn the hearing of the Removal Summons until after the appeal from the Injunction Judgment (as defined below); the JOLs and the Supporting Organizations opposed, and on June 12, 2026, the Cayman Court denied DFW's request. By consent order dated June 23, 2026, the Removal Summons was dismissed (the "Consent Order").[10] The Consent Order records DFW's acceptance that there was no cause for the JOLs' removal and requires DFW to pay the JOLs' costs of $225,000 and the Supporting Organizations' costs of $75,000.

**ii. Supporting Organizations**

10. The JOLs' investigation and the evidence obtained in the Cayman Proceeding indicates that each of the Supporting Organizations is independently managed.

[9] *Id*.

[10] Ex. 3, Consent Order.

11. Each of the Supporting Organizations—Highland Dallas Foundation, Highland Kansas City Foundation, and Highland Santa Barbara Foundation—is a Type I Supporting Organization under Section 509(a)(3) of the Internal Revenue Code. Each is legally controlled by its respective Supported Organization, not by Mr. Dondero.

12. The governance structure of each Supporting Organization provides that two of the three board seats (the "Institutional Directors") are appointed by the parent Charity (TDF, GKCCF, and SBF, respectively), while Mr. Dondero occupies one seat as the Individual Director. Each parent Charity thus holds a 2:1 supermajority on each board, and this supermajority cannot be altered without the unanimous vote of both members.

13. Mr. Dondero occupies his seat, and provides input on investment and grant matters, in his capacity as the donor whose contributions funded the establishment of the Supporting Organizations. Federal tax law recognizes this as the standard and expected role of a donor to a donor-advised structure. Under 26 U.S.C. § 4966(d)(2)(A)(ii) and (iii), a donor-advised fund is defined, in part, by the donor's retained "advisory privileges" with respect to the distribution or investment of fund assets, by reason of the donor's status as donor, a role that carries no ownership or control. Mr. Dondero's provision of recommendations to each Board is consistent with this recognized and ordinary donor function. It confers no decision-making authority, which remains vested exclusively in the Institutional Directors.

14. Although Mr. Dondero holds the title of President of each Supporting Organization, the by-laws provide that the President's authority is exercised "subject to the control vested in the Board of Directors." The President carries out the decisions of the Board; he does not make them in his own right. The Board may remove the President at any time, with or without cause.

15. The parent Charities—TDF, GKCCF, and SBF—are substantial, independently governed American public charities. TDF was established in 1929, holds approximately $600 million in charitable assets, and in 2024 distributed approximately $93 million in grants. GKCCF distributed approximately $676.7 million in grants in 2024. SBF was established in 1928, holds approximately US$947 million in charitable assets and distributed approximately $109 million in grants in 2024. Mr. Dondero has never been a member of any parent Charity's board and has no role in their governance.

16. The dismissal of the Removal Summons by consent, with DFW acknowledging that it had no grounds to question the JOLs' independence, confirmed the JOLs' position.[11]

**iii. <u>Solvency Summons</u>**

17. The Companies Act provides for the liquidation of both solvent and insolvent companies and affords various rights to creditors or contributories, as applicable, depending on whether the company is solvent, insolvent, or of doubtful solvency.[12] Liquidators may determine from time to time whether a company is solvent, insolvent, or of doubtful solvency, subject to evaluation and re-evaluation as facts and circumstances evolve.[13] The JOLs remain under a continuing duty to review HoldCo's solvency position based on the circumstances known to them.

18. The JOLs determined that HoldCo is solvent for purposes of the Companies Act, applying a balance-sheet test. The JOLs determined that HoldCo's most valuable assets are the claims arising from the facts and circumstances that the JOLs are pursuing against the Named

[11] Ex. 3, Consent Order.

[12] *See* Companies Act § 110(3) and (4); Accompanying Moran Decl. ¶ 36.

[13] If a company is solvent, such an application may only be made by a contributory, and the creditors have no right to be heard. If a company is insolvent, such an application may only be made by a creditor, and the contributories have no right to be heard. And if a company is of doubtful solvency, both creditors and contributories have a right to be heard. *Id*.

Defendants in proceedings in the Cayman Court, and the JOLs believe that they are likely to succeed on the merits of those claims. In making that determination, the JOLs assumed that HoldCo's assets included reinstatement and recovery of its ownership interest in the Fund (the "Fund Partnership Interest"), valued in excess of $290 million, which the JOLs allege was wrongly transferred by the Named Defendants.

19. Taking the position that the JOLs will recover the assets wrongly diverted by the Relevant Transactions, the liabilities and proofs of debt lodged against HoldCo's estate are substantially smaller than the value the JOLs expect to recover. On this basis, the JOLs are acting in the interest of the class holding the largest economic interest in the outcome of the Cayman Litigation, namely HoldCo's shareholders and, ultimately, the charities for whose benefit HoldCo was established, rather than the small number of creditors whose claims are already comfortably covered.

20. When the JOLs made their initial solvency determination on June 2, 2025, shortly after the commencement of the Cayman Proceeding and their appointment, they determined that HoldCo should be treated as solvent for the purposes of the Companies Winding Up Rules (2023 Consolidation) (the "CWR") order 8, rule 1. Although HoldCo has no material assets aside from its claims, this determination reflects the position that, if HoldCo is successful in its Claims, HoldCo will recover significant assets that would be more than sufficient to repay all existing and anticipated creditor claims, so the parties with the economic interest in the liquidation will be the shareholders. *See* Decl. of Caroline Moran in Support of the Reply (the "Accompanying Moran Decl.") ¶ 40.

21. Additionally, the JOLs noted that the value of HoldCo's Fund Partnership Interest ranged from zero to $270 million, depending on whether the Named Defendants consummated the

Relevant Transactions legitimately or illegitimately. Taking into account a proof of debt[14] filed against the estate in the amount of $18,785.36, invoices provided by the firm holding the retainer in the amount of $91,268.50, and ascribing no value to HoldCo's interest in the Fund, the JOLs determined that HoldCo was solvent for balance-sheet purposes because it maintained a net surplus of $39,946.[15] This determination by the JOLs did not consider a cash-flow analysis.

22. Shortly thereafter, the JOLs determined that there were strong grounds to allege that the Relevant Transactions undertaken by the Named Defendants were illegitimate and improper, and sought the sanction of the Cayman Court to commence litigation against the Named Defendants in the Cayman Court (the "Cayman Litigation"), which the JOLs did on July 15, 2025. It is undisputed that the effect of the Relevant Transactions was to dispose of all of HoldCo's liquid assets other than the $150,000 held in a law firm retainer account. The JOLs did not conclude (and would never conclude) that $150,000, much less $39,946, was sufficient cash on hand to enable HoldCo to be considered solvent on a cash flow basis given the costs and expenses it would need to incur to recover is most valuable asset through litigation. While solvent on a balance sheet basis, HoldCo was insolvent on a cash flow basis when the Cayman Proceeding commenced.

23. On February 12, 2026, DFW filed a summons (the "Solvency Summons").[16] DFW asserted that HoldCo was "insolvent or of doubtful solvency," relying on: (1) the dismissal of HoldCo's contingent claims to the Fund's assets by the February 10, 2026 judgment of the Cayman Court (the "Injunction Judgment");[17] (2) the accrual of more than $1 million in costs orders; (3) the exhaustion of the Funding Agreement; and (4) the absence of further third-party funding.

[14] In total, the JOLs have received two proofs of debt.

[15] Ex. 4, Explanatory Affidavit.

[16] Ex. 5, Solvency Summons.

[17] Ex. 6, Injunction Judgment.

24. On May 22, 2026, the JOLs agreed to file an explanatory affidavit regarding their solvency determination together with a remuneration report (the "Explanatory Affidavit"),[18] with residual issues to be addressed at a hearing on June 23 and 24, 2026. The JOLs reaffirmed their determination that HoldCo is solvent for purposes of the Companies Act, applying a balance sheet test. The JOLs determined that HoldCo's most valuable assets are the claims arising from the facts and circumstances that the JOLs are pursuing against the Named Defendants in the Cayman Litigation, and the JOLs believe that they are likely to succeed on the merits of those claims. Accordingly, in determining that HoldCo is solvent for purposes of the Companies Act, the JOLs have assumed that HoldCo's assets include the reinstatement and recovery of its ownership interest in the Fund (valued in excess of $290 million), which the JOLs allege was wrongly transferred by the Named Defendants.[19]

25. DFW subsequently withdrew the Solvency Summons, and it was dismissed under the Consent Order,[20] with costs awarded to the JOLs. The Consent Order records DFW's acceptance that, as at the date of the Consent Order, there is no cause for the solvency of HoldCo's estate to be disputed. DFW's acceptance was made without prejudice to the merits and the parties' assessment of the merits of the claims asserted in the Cayman Proceeding and the value conferred on the liquidation estate by those claims.[21]

**iv. Funding**

26. Due to limited available assets upon the JOLs' appointment, on July 11, 2025, the JOLs entered into a Court-sanctioned $5,000,000 funding agreement (the "Funding Agreement")

[18] Ex. 4, Explanatory Affidavit.

[19] *Id.*

[20] Ex. 3, Consent Order.

[21] *Id.*

with Crossvine Litigation Funding, LLC ("Crossvine"), a special purpose vehicle incorporated by Mr. Dondero.

27. The Cayman Court sanctioned the Funding Agreement and was satisfied that it preserved the JOLs' independence. The amount provided under the Funding Agreement was exhausted in meeting the legal and professional costs of the liquidation, and the funds were solely used for liquidator and legal fees.

**v. Discovery and Investigations**

28. On September 10, 2025, the Court heard the JOLs' *Motion of Petitioners for Entry of Order Granting Provisional Relief Compelling Turnover of the Debtor's Books and Records Pursuant to Bankruptcy Code Sections 105(a), 542, 1519 and 1521* [D.I. 21] (the "Turnover Motion"), which sought turnover of the Debtor's books and records from various Turnover Targets to assess the alleged justifications for the Relevant Transactions and Remuneration Transactions. The JOLs were compelled to file the Turnover Motion seeking the compulsory turnover of books and records following the failure of certain parties to comply voluntarily with the JOLs' requests for information and documentation.

29. On September 18, 2025, this Court entered an order granting the Turnover Motion [D.I. 38] (the "Turnover Motion Order"). Since entry of the Turnover Motion Order, the Turnover Targets have produced documents, which the JOLs have diligently reviewed and assessed.

30. The JOLs have a duty to be diligent in their investigation of HoldCo's assets and to not unnecessarily delay administration of HoldCo's estate. They have continued their efforts to identify, secure, and recover HoldCo's books and records, including: (a) obtaining and reviewing books and records through various means; (b) organizing and maintaining the books and records obtained in a centralized data repository and undertaking a structured review to identify relevant

information and evidential gaps; (c) preparing analyses of key materials for the JOLs' investigations and engagement with legal advisers; and (d) identifying inconsistencies, gaps, and deficiencies in the books and records received and pursuing follow-up requests to address them.

31. While the JOLs have made material progress in obtaining documents relating to HoldCo's affairs, the books and records provided to date remain incomplete in a number of respects. Certain information has required repeated follow-up and, in some cases, formal processes before production has been forthcoming. Specifically, certain U.S.-based service providers and counterparties have refused to cooperate with the JOLs' requests for information. Continued failure to receive the requested information will harm the JOLs' ability to advance their pursuit of recovery.

32. Consistent with the purpose of official liquidation under Part V of the Companies Act, the JOLs are empowered to investigate: (a) the causes for the failure of HoldCo, as necessary and (b) generally, the promotion, business, dealings and financial affairs of HoldCo. *See* Companies Act, § 110(2).

33. To identify, secure, and recover HoldCo's books and records, the JOLs have: (a) issued formal correspondence to many dozens of parties, including directors, shareholders, banks, service providers, various third parties, and the prior appointed joint voluntary liquidators, notifying them of the JOLs' appointment and requesting books and records; and (b) held discussions with various parties to discuss the history and financial affairs of HoldCo.

34. Unfortunately, numerous service providers and counterparties including some located in the U.S. have refused to cooperate voluntarily with the JOLs' requests for information and documentation. Certain information has required repeated follow-up and, in some cases, formal processes before production has been forthcoming. The JOLs anticipate that further

recovery of books and records from certain third parties may require additional formal processes, including in the United States.

35. As reflected throughout the Verified Petition and Objection, the background of this case is complex. Given that cooperation from potential discovery targets has not been forthcoming, I believe it is necessary that the JOLs be afforded discovery rights and further believe that the failure to grant such relief would cause the JOLs undue harm in advancing their investigatory duties.

**vi. Description of Ordinary Course Activities as Liquidators under the Companies Act**

36. As part of the JOLs' duties under Cayman law, the JOLs are required to submit reports to the Liquidation Committee, which is comprised of representatives of Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation, CFNT, and DFW (generally, the "Liquidation Committee"). On September 2, 2025, the JOLs submitted their first and only report to the Liquidation Committee with respect to the liquidation and the state of HoldCo's affairs. No other formal report has been issued to Liquidation Committee, although the JOLs have delivered fee reports to them (which are delivered by electronic mail).

37. The JOLs have convened two Liquidation Committee meetings, with the latest being held on April 14, 2026. At those meetings, the JOLs presented updates on the progress of the liquidation and related recovery litigation and other workstreams.

38. Additionally, pursuant to the CWR, the JOLs are required to report to contributories annually. The first report to contributories was issued on July 2, 2025. A second report to contributories, covering the period between July 3, 2025, and June 30, 2026, was issued on July 31, 2026.

## B. Cayman Litigation

### i. Amended Statement of Claim

39. On October 15, 2025, HoldCo filed an Amended Writ of Summons (the "Amended Statement of Claim")[22] in the Cayman Litigation, which, among other things, provides detail regarding the dramatic increases in Mr. Murphy's remuneration from April 2021 to March 2025 (the "Remuneration Transactions"), which greatly dissipated HoldCo's assets. Specifically:

a. Mr. Murphy's initial salary was $60,000 per annum plus $500 per hour for any time spent providing services above 40 hours per quarter, subject to a cap of $125,000 total for any one year.

b. From April 2021 to December 2024, Mr. Murphy's remuneration increased to $200,000 per annum.

c. On December 16, 2024, Mr. Murphy was awarded a $250,000 discretionary bonus.

d. On March 27, 2025, Mr. Murphy's salary was further increased to $500,000.[23]

None of the Remuneration Transactions were disclosed to the Supporting Organizations.

40. Additionally, the Amended Statement of Claim provides detail regarding certain payments made to Mr. Patrick, Mr. Murphy, and Shawn Raver ("Mr. Raver") in 2024 (the "2024 Payments"). Mr. Raver served as Chief Operating Officer, Assistant General Counsel, and Assistant Chief Financial Officer of HoldCo. In total, payments in the amount of $11,590,673 were made to Mr. Patrick, Mr. Murphy, and Mr. Raver. A significant portion of these payments—approximately $10,500,000—were made by HoldCo's then indirect subsidiaries. Of the 2024 Payments, $10,548,778 were made to Mr. Patrick (the "Patrick 2024 Payments"), which the JOLs

[22] Ex. 7, Amended Statement of Claim.

[23] *Id.*

assert were used to: (1) purchase property at 4909 Minor Hill Road, Missouri, for consideration of approximately $1,664,500 (the "Missouri Property"); and (2) make a payment to Wells Fargo Bank, N.A. to fully repay a $300,000 loan and discharge a mortgage on Mr. Patrick's family home at 6716 Glenhurst Drive, Dallas, Texas (the "Texas Property," and collectively with the Missouri Property, the "Patrick Properties"). The Amended Statement of Claim pleads, among other things, that Mr. Patrick breached his duties to HoldCo by accepting the Patrick 2024 Payments, and that HoldCo is therefore entitled to trace its assets into the Patrick Properties and impose a constructive trust over such properties in HoldCo's favor. Alternatively, the JOLs request equitable liens on the Patrick Properties to secure amounts that Mr. Patrick used to acquire those properties from funds paid to him in breach of his duties to HoldCo.[24]

41. The outcome of the Cayman Proceeding will affect all stakeholders, creditors and contributories, in accordance with Cayman Law. If the JOLs are successful in pursuing their claim against the Named Defendants, they will restore value to HoldCo for the benefit of all of its stakeholders, creditors, and the Supporting Organizations and charities for whose benefit HoldCo was originally established before the Named Defendants divested it.

**ii. Status of Injunction Application**

42. On July 15, 2025, the JOLs filed an application (the "Injunction Application") seeking a proprietary injunction to prevent the Named Defendants from dealing with the assets of the Debtor, together with disclosure orders.

43. On July 31, 2025, the Cayman Court entered a Consent Order providing for interim asset-preservation undertakings (the "Asset Preservation Protocol") pending determination of the Injunction Application.

---

[24] *Id.*

44. On August 5, 2025, this Court entered an order granting Agreed Provisional Relief recognizing and enforcing the Cayman Consent Order and Asset Preservation Protocol in the United States [D.I. 19] (the "Agreed Provisional Relief Order").

45. On December 15–16, 2025, the Cayman Court held a two-day evidentiary hearing on the Injunction Application, reserving judgment.

46. On February 10, 2026, the Cayman Court issued the Injunction Judgment denying the Injunction Application.[25] The Cayman Court found that there was a serious issue to be tried as to whether Mr. Patrick and/or Mr. Murphy breached their fiduciary duties with respect to HoldCo's restructuring. The Court nevertheless denied the injunction for the following reasons:

a. HoldCo had no arguable proprietary interest in the Fund Partnership Interest;

b. there was no serious issue to be tried that HoldCo had a proprietary interest in the Fund Partnership Interest;

c. there was no serious issue to be tried that HoldCo had a proprietary interest in the Fund's underlying assets;

d. proprietary injunctive relief could not be granted where HoldCo neither pled nor had any direct proprietary interest in the Fund's underlying assets;

e. there was no serious issue to be tried in respect of HoldCo's proprietary interest in the membership interest in CDM held by DFW;

f. there was no serious issue to be tried as to whether the transfer of the Fund Partnership Interest to CDM and/or DFW was at an undervalue;

[25] Ex. 6, Injunction Judgment.

g. there was no serious issue to be tried in respect of the claim that Mr. Patrick and/or Mr. Murphy received excessive remuneration in breach of their duties to HoldCo; and

h. the balance of convenience favored the Named Defendants.[26]

47. As a result of entry of the Injunction Judgment, the Agreed Provisional Relief Order and the Asset Preservation Protocol were no longer effective.

48. On February 24, 2026, the JOLs filed a notice of appeal with the Cayman Islands Court of Appeal, appealing the Injunction Judgment (the "Injunction Judgment Appeal").[27]

49. Given that the Agreed Provisional Relief Order was no longer effective in light of the Injunction Judgment, on March 3, 2026, the JOLs filed a request for interim injunctive relief seeking further asset-preservation protocols pending the outcome of the Injunction Judgment Appeal (the "Interim Appeal Injunction Request").

50. On March 27, 2026, a three-judge panel of the Cayman Islands Court of Appeal heard the Interim Appeal Injunction Request. On March 31, 2026, the Court of Appeal granted interim relief pending the appeal (the "Interim Appellate Order").[28] The Interim Appellate Order restrains the Named Defendants from: (1) conducting business outside the ordinary course; (2) making increases to remuneration; (3) making alterations to the corporate governance of the Fund and related entities; and (4) taking dissolution or liquidation steps. It also ensures that books and records are preserved and imposes a monthly cap of $200,000 on distributions by DFW.[29]

---

[26] *Id.*

[27] Ex. 8, Injunction Judgment Appeal.

[28] Ex. 9, Interim Appellate Order.

[29] *Id.*

51. On May 21, 2026, the parties filed written submissions regarding costs with respect to the Injunction Application. On June 17, 2026, the Cayman Court determined that no immediate costs orders should be made and that costs should be reserved, noting that the merits of the Cayman Litigation can only be resolved at trial.

52. The JOLs are seeking recognition of the Interim Appellate Order in this Court. The Injunction Judgment Appeal is scheduled to be heard by the Cayman Islands Court of Appeal on September 3–4, 2026. The JOLs intend to return to this Court to seek recognition of any further orders, including any final judgment, after the Injunction Judgment Appeal is resolved.

**C. U.S. Proceedings**

**i. The Hunter Mountain Proceeding**

53. On May 19, 2025, Highland Capital Management, L.P. ("Highland") filed a motion in its bankruptcy case, *In re Highland Capital Management, L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.) (the "Highland Bankruptcy"), to approve a settlement with Hunter Mountain Investment Trust ("HMIT") and related entities (collectively, the "HMIT Entities"), which, among other things: (1) transferred various claims to the HMIT Entities; (2) made a lump sum payment to HMIT; and (3) resolved disputes between Highland and the HMIT Entities (the "HMIT Settlement").[30]

54. On June 30, 2025, the bankruptcy court in the Highland Bankruptcy entered an order approving the HMIT Settlement (the "HMIT Settlement Order").[31]

55. Prior to the Relevant Transactions, the JOLs believe that certain HMIT Entities were included in the assets and investments comprising the net asset value attributable to HoldCo.

[30] Ex. 10, HMIT Settlement.

[31] Ex. 11, HMIT Settlement Order.

Accordingly, the JOLs are actively assessing to what extent HoldCo has potential ongoing interests in the HMIT Entities and their assets.

56. On February 9, 2026, certain parties filed a motion to vacate the HMIT Settlement Order (the "HMIT Reconsideration Motion").

57. On May 11, 2026, and May 21, 2026, I testified as a fact witness in my capacity as one of the JOLs in support of the HMIT Reconsideration Motion, particularly with respect to HoldCo's potential interests in HMIT and related assets. The JOLs consider that a reversal of the HMIT Settlement Order would preserve the *status quo* and afford additional time to investigate and assess the potential impact of the settlement on assets in which HoldCo may have an interest.

58. On June 15, 2026, the HMIT Reconsideration Motion was denied.

**ii. The Texas Proceeding**

59. As set forth in the Verified Petition at paragraphs 96-99, on July 1, 2025, Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc. (collectively, the "Texas Plaintiffs") commenced an action against Mr. Patrick, DFW, CDMCFAD, Charitable DAF GP, LLC, and CDHGP (collectively, the "Texas Defendants") in the Business Court of Texas, 1st Division (the "Texas Court"), Cause No. 25-BC01B-0027 (the "TRO Action").[32] The parties to the TRO Action entered into the Rule 11 Agreement, the terms and background of which are set forth in the Verified Petition at paragraphs 96-99 and the First MacInnis Declaration at paragraphs 95–98.[33]

60. On July 14, 2025, the Texas Defendants filed a Motion to Dismiss, providing therein that U.S. courts regularly characterize Cayman liquidation proceedings as 'foreign main

[32] *See* Verified Petition at ¶¶ 96-99; First MacInnis Declaration at ¶¶ 95-98; Exhibits 59, 85, and 88-90 attached to First MacInnis Declaration.

[33] *Id*.

proceedings' deserving of recognition under chapter 15 of the United States Bankruptcy Code" and that "[t]he proceedings in the Cayman Islands culminated in the appointment of *independent* liquidators." *Defendants' Motion to Dismiss and Plea to the Jurisdiction*, at 36, 39–40.

61. On September 18, 2025, the Texas Court entered an order (the "Texas Order")[34] finding that the Texas Plaintiffs have constitutional standing to assert their claims because they allege injury to themselves. Additionally, the Texas Court found that it has jurisdiction under Texas Government Code Section 25A.004(b). The Texas Court, however, held that the JOLs are necessary parties to the TRO Action and that it cannot provide complete relief in their absence. In so doing, the Texas Court held that the TRO Action should be abated until the JOLs become parties to the TRO Action. The Rule 11 Agreement remains effective notwithstanding the abatement.

62. The Texas Plaintiffs filed a petition for mandamus to the Texas Court of Appeals challenging the Texas Order, which was denied on February 24, 2026.

[34] Ex. 12, Texas Order.

63. The JOLs continue to monitor the TRO Action. The JOLs do not believe that their participation in the TRO Action is necessary to protect HoldCo's interests at this time I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 17, 2026
Wilmington, Delaware

/s/ *Margot MacInnis*____________________
MARGOT MACINNIS

*Joint Official Liquidator of*
*Charitable DAF HoldCo, Ltd*
*(in Official Liquidation)*