# EXHIBIT 2

Joint Official Liquidators
M MacInnis
Eighth Affidavit
Sworn 1 June 2026
Exhibit MM-8

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 107 OF THE COMPANIES ACT (2026 REVISION)**

**AND IN THE MATTER OF ORDER 5 OF THE COMPANIES WINDING UP RULES (2023 CONSOLIDATED)**

**IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**EIGHTH AFFIDAVIT OF MARGOT MACINNIS**

---

I, **MARGOT MACINNIS**, of Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands **MAKE OATH AND SAY** as follows:

**Introduction**

1 I am the Managing Director of Grant Thornton Specialist Services (Cayman) Limited ("**Grant Thornton**"). I am one of the joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**") alongside Sandipan Bhowmik, also of Grant Thornton.

FILED by Maples and Calder (Cayman) LLP, attorneys for the JOLs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/MCL/TQR/858403.01).

Mr Bhowmik and I were appointed as JOLs of the Company by an order of the Court dated 6 May 2025.

2 I make this affidavit based on matters within my own personal knowledge, and I believe that the information contained in this affidavit is true and accurate in all respects. When I use "our" or "we" in this affidavit, I am referring to Mr Bhowmik and myself in our capacity as the JOLs of the Company. I am duly authorised by Mr Bhowmik to make this affidavit in relation to the application that DFW Charitable Foundation ("**DFW**") has brought seeking our removal and replacement as the JOLs of the Company (the "**Removal Application**"). We have also read the fourth affidavit of Mark Patrick sworn on 19 August 2025 and filed by DFW in support of the Removal Application ("**Patrick 4**").

3 As officers of the Court, we are conscious of the need to maintain neutrality in respect of the Removal Application in relation to the ultimate question as to the identity of the joint official liquidators of the Company. However, Mr Patrick has stated that we are not impartial or independent, and Patrick 4 contains various serious but unfounded allegations that seek to impugn our professionalism and integrity (the "**Impropriety Allegations**").[1] These allegations are of an unusually serious nature and we are not neutral in relation to these allegations (and we are not required to be). Mr Patrick has also incorrectly asserted that we failed to obtain expert advice on the purported federal tax concerns that Mr Patrick has relied on to justify the series of unlawful transactions (the "**DAF Restructuring**") being challenged in Grand Court proceedings FSD 201 of 2025 (RPJ) (the "**FSD Proceedings**"). Accordingly, this affidavit:

3.1 explains the relationship between the Removal Application and the FSD Proceedings;

[1] In general, see Patrick 4 at paragraphs 11, 12, 28, 54, and 56-57.

3.2 responds to the assertion that Mr Patrick and Paul Murphy (together, the "**Directors**") implemented the DAF Restructuring due to federal tax concerns; and

3.3 responds to the Impropriety Allegations, namely that we have allegedly:

(a) misused the *ex parte* jurisdiction of this Court;

(b) failed to provide full and frank disclosure on making applications on an *ex parte* basis;

(c) undermined our ability to remain fair and impartial because we have entered a funding arrangement that has allegedly granted Mr Dondero effective control over our actions;

(d) failed to meaningfully engage with the transaction reporting protocol proposed by the CDM defendants (the "**Proposed CDM Protocol**");

(e) been leveraging the liquidation proceedings to advance the interests of the Highland Foundations and Mr Dondero to the prejudice of DFW;

(f) conducted inadequate investigations; and

(g) elected to present a misleading account of the roles fulfilled by Mr Patrick and Mr Grant Scott, the director from whom Mr Patrick took over the control position; and

3.4 provides our response to DFW's recent proposed adjournment of the Removal Application.

4 Patrick 4 includes various allegations regarding the purported control that Mr Dondero exercises over the Supporting Organisations. I understand that the Supporting Organisations intend to file evidence in response to Patrick 4 to address Mr Patrick's mischaracterisation of their relationship with Mr Dondero and his role in respect of each of those organisations. To the extent that I do not address those allegations in this affidavit, it does not constitute our acceptance or concession of the assertions contained in Patrick 4.

5 There is now produced and shown to me a paginated exhibit marked "**MM-[8]**" containing true copies of certain documents to which I refer in this affidavit. References in this affidavit to page numbers are references to the paginated contents of that exhibit unless specified otherwise.

**THE RELATIONSHIP BETWEEN THE REMOVAL APPLICATION AND THE FSD PROCEEDINGS**

6 After receiving sanction from the Court, we commenced the FSD Proceedings on behalf of the Company on 15 July 2025. The FSD Proceedings relate to claims arising from the DAF Restructuring, and those claims represent a value of approximately US$292 million (the "**Claims**").[2] The defendants in the FSD Proceedings are the Directors, DFW, and several other defendants controlled by Mr Patrick (the "**FSD Defendants**"). DFW was made a shareholder of the Company as a part of the DAF Restructuring. DFW's status as a contributory is therefore a live issue in dispute in the FSD Proceedings and it would be removed as a shareholder of the Company in the event that the Company succeeds in the FSD Proceedings.

7 Around a month after the commencement of the FSD Proceedings, DFW filed the Removal Application on 19 August 2025 based on its status as a shareholder of the Company. However, it appears that the Removal Application has been brought as a collateral attack on the FSD Proceedings by removing us from office and preventing us from continuing to prosecute the

[2] Mr Patrick has stated in his first affidavit sworn on 24 March 2026 in relation to the Appeal that as at 31 December 2025, the Fund's net asset value was approximately US$292.1 million. This is the value that we have seen reflected in the 31 December 2025 balance sheet of the Fund and its subsidiaries received pursuant to the terms of the FSD Consent Order.

FSD Proceedings. If this is the true motivation behind the Removal Application, as seems to be the case based on statements contained in Patrick 4, the application would be inappropriate. Legal submissions will be developed on this at the appropriate time.

8 While Parker J dismissed the Company's application for interim injunctive relief pending trial in his judgment dated 10 February 2026 (the "**Judgment**"), His Lordship concluded that:

8.1 *"the Company and JOLs have a case which the Directors need to answer in relation to the divestiture of the Company's limited partnership interest in the Fund which does withstand a reverse summary judgment application"*; and

8.2 *"there is a serious issue to be tried as to whether the Directors acted in breach of duty in undertaking the restructuring"*.

9 We considered that there were several grounds for appealing the Judgment, unrelated to Parker J's clear conclusion that the FSD Proceedings disclosed a case to answer that needed to be tried, and we accordingly filed a Notice of Appeal with the Cayman Islands Court of Appeal ("**CICA**") on 24 February 2026 (the "**Appeal**"). A Memorandum of Grounds of Appeal was subsequently filed on 3 March 2026 along with applications for a special sitting of the Appeal and interim injunctive relief pending the Appeal (the "**CICA Interim Injunction Application**"). The CICA heard the CICA Interim Injunction Application on 27 March 2026, and it granted the Company interim relief pending the Appeal on 31 March 2026.

10 Importantly, the CICA provided its written reasons on 15 May 2026 in relation to the CICA Interim Injunction Application. The CICA concluded that the Appeal is seriously arguable and it would have granted leave to appeal if leave had been required. The CICA reached this conclusion because it found, *inter alia*, that "*in the light of Aquapoint LP (in Official Liquidation) v Fan [2025] UKPC 56, it is arguable that the Company was entitled to injunctive relief to*

*preserve the value of its partnership interest in the Fund even if it has no direct legal or beneficial interest in its underlying assets*".

**THE DIRECTORS' ALLEGED FEDERAL TAX CONCERNS**

11 At subparagraph (f) (on page 62) and paragraph 82 of Patrick 4, Mr Patrick has stated that the DAF Restructuring and the voluntary liquidation of the Company occurred because the tax exemption risks to the Highland Foundations were real, materially high, and not speculative. Further, at paragraph 47 of Patrick 4, Mr Patrick suggests that it is unclear to what extent we obtained any specialist tax advice and to what extent investigations into the purported justifications were made.

12 However, during our investigations into the affairs of the Company, we have in fact considered the purported justifications that the Directors have offered in relation to the DAF Restructuring in detail. Without any waiver of privilege, we have taken US tax law advice where relevant from our US counsel, Reed Smith. Following these investigations, we concluded that any allegation that Highland Dallas Foundation's loss of exempt status was imminent and could somehow imperil the Company's charitable mission was unfounded as a matter of US tax law. In other words, there were no real or materially high tax exemption risks that justified the DAF Restructuring.

13 This is discussed in my fifth affidavit sworn on 10 July 2025 ("**MacInnis 5**") in support of our application for sanction to commence the FSD Proceedings (the "**FSD Sanction Application**"). Accordingly, the Court was taken to our analysis and consideration of the tax justifications put forward for the DAF Restructuring. Certain aspects of MacInnis 5, along with the exhibit, have been sealed pursuant to an order of the Court under CWR O.24, r. 6. However, redacted copies of MacInnis 5 and the exhibit thereto were provided to DFW on 23 July 2025.

14 In light of MacInnis 5 having been sealed, we subsequently also obtained an expert opinion affidavit from Marvin Bradford Bedingfield of Hemenway & Barnes LLP (the "**Bedingfield Opinion**") for the purposes of the Company's Interim Injunction Application. The Bedingfield Opinion was filed in the FSD Proceedings. Mr Bedingfield's practice is concentrated on the areas of charitable giving and representing nonprofit organisations, and his expert opinion addresses matters of US tax law relevant to the purported tax concerns relied upon by Mr Patrick to justify the DAF Restructuring. I have read the Bedingfield Opinion and note that, among other things, Mr Bedingfield reached the following conclusions (at paragraphs 41 and 42):

> *"… Were the Supporting Organizations to lose their supporting organization status and become private foundations, they would still be 501(c)(3) private foundations (as is the DFW Foundation), and that would have no negative US tax consequences to the Company itself. Even if the IRS were to revoke entirely the 501(c)(3) status of one or more of the Supporting Organizations, that would not by itself result in liabilities or material negative consequences to the Company under US tax law – the Supporting Organization that lost its 501(c)(3) status might be forced to dissolve, and under its governing documents would be required to transfer its remaining assets to its Supported Organization (the community foundation that controls it), which could continue holding the participating shares. If for some reason the Supporting Organization were to find itself in receivership, the receiver would at most step into the shoes of the Supporting Organization as participating shareholder, but would not by virtue of such receivership have any more rights to access the underlying assets of the Company than did the Supporting Organization as participating shareholder.*
>
> *Regardless of the potential result of the filing of the Form 13909 by Mr. Mancino on the potential public charity or 501(c)(3) status of the Highland Dallas Foundation, I do not see any material risk under US tax law to the underlying assets of the Company arising from any potential change in the tax-exempt status of one or more of the Supporting Organizations"*

## RESPONSES TO THE IMPROPRIETY ALLEGATIONS

15 The Impropriety Allegations in Patrick 4 are serious, and they would amount to professional misconduct if they were true, which they are not. We take the Impropriety Allegations against us extremely seriously and reject them in the strongest possible terms. We are licensed insolvency practitioners with significant experience in company liquidations and investigations. We take our professional duties as independent officers of the Court with the utmost seriousness and integrity. We have never been subject to any professional or regulatory censure of any kind. Our specific responses to the Impropriety Allegations are set out below.

### Alleged misuse of the Court's *ex parte* jurisdiction

16 At paragraphs 55 and 56 of Patrick 4, Mr Patrick has alleged that we have deliberately misused the Court's *ex parte* jurisdiction. He has characterised our use of *ex parte* proceedings as *"persistent and unnecessary"*, and he has stated that he believes that we *"have proceeded ex parte not for the preservation of the matters in the FSD Proceedings but to deprive DFW of the ability to participate in the proceedings that are envisaged and to obtain a tactical advantage by avoiding due process where possible"*. To support this position, Mr Patrick has pointed to:

16.1 our application for sanction to engage legal counsel (the "**Counsel Sanction Application**");

16.2 the FSD Sanction Application;

16.3 our application for sanction to enter the funding agreement (the "**Funding Agreement**") with Crossvine Litigation Funding, LLC ("**Crossvine**" and the "**Funding Sanction Application**"); and

16.4 the Interim Relief Application.

17 Contrary to Mr Patrick's assertion, we have not used *ex parte* proceedings to avoid due process at any time. Whenever we have used, or attempted to use, *ex parte* processes, there has been a legitimate reason. In the case of the Counsel Sanction Application, we originally invited the Court on an *ex parte* basis to make orders on the papers because we wanted to minimise cost to the Company's liquidation estate. While the Court ultimately directed the Counsel Sanction Application to proceed on an *inter partes* basis on that occasion, limiting costs to the estate was a legitimate motivation. In this respect, the Court made no finding of inappropriate conduct or misuse of the Court process by the JOLs when directing that the Counsel Sanction Application should proceed on an *inter partes* basis.

18 In relation to the FSD Sanction Application and the Funding Sanction Application, we only sought sealing orders and *ex parte* relief where it was strictly necessary to protect confidentiality and/or limit the risk of potential asset dissipation. The orders were granted by the Court with full knowledge of DFW's position, and it would have been inappropriate to consult DFW in relation to the commencement of the FSD Proceedings when it was (at that stage) an envisaged defendant. I also note that it is routine for sanction applications regarding the commencement of proceedings and associated funding to be made *ex parte* and with sealing orders in circumstances where disclosing details might prejudice the claims or the recoveries to the liquidation estate.

19 Similarly, while the Interim Relief Application ultimately did not proceed on an *ex parte* basis following the FSD Defendants' decision to provide the interim undertakings in a consent order agreed on 31 July 2025 pending the Grand Court's hearing of the Interim Relief Application (the "**FSD Consent Order**"), our initial request to have that application heard on an *ex parte* on notice basis was justified:

19.1 The Interim Relief Application was filed and served on 15 July 2025, and we wrote to the Court and the parties on the same day to seek availability for a hearing of the Interim

Relief Application on 29, 30, or 31 July 2025 (i.e., the days before the long Court recess). Our letters to the parties and the Court set out the basis for our request for the hearing to be listed on those dates (see pages 25 to 39). The urgency related to having the Interim Relief Application determined before the Texas Rule 11 Agreement may have fallen away (as the defendants to the TRO Proceedings had filed a jurisdiction challenge to be heard at or around that time).

19.2 In an email to the Court sent on 16 July 2025 at 9:41 am (see pages 43 and 44), Baker and Partners ("**Bakers**") informed the Court that Ms Colegate was unavailable on the above dates and therefore requested whether the Court could provide alternative dates. Maples and Calder ("**Maples**") responded at 11:17 am, on the basis of the urgency described above, to inform the Court that should any of the defendants not be available for the hearing on one of the above dates, we would proceed with the application on an *ex parte* on notice basis. The Court agreed with our request on this basis and listed the hearing for 31 July 2025.

19.3 Given the fact we explained our case on urgency to the Court and invited the defendants to appear and participate on the dates proposed if they were available, it was not improper for us to seek a listing before the Court recess on an *ex parte* on notice basis. Again, in circumstances where urgent injunctive relief is being sought to preserve assets it is common practice for the application to be heard on an *ex parte* basis.

20 Despite the concerns asserted in Patrick 4, it is notable that DFW has not attempted to challenge any of the *ex parte* orders. Had the *ex parte* procedure truly been misused, there would have been a compelling basis for doing so.

FILED by Maples and Calder (Cayman) LLP, attorneys for the JOLs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/MCL/TQR/858403.01).

**Alleged failure to provide full and frank disclosure in relation to applications made on an *ex parte* basis**

21 At paragraph 57 of Patrick 4, Mr Patrick has stated that we have *"failed to provide full and frank disclosure on seeking ex parte relief from the Court as [we] have failed to bring pertinent evidence which is available to [us] to the attention of the supervising Judge"*. In support of this general allegation, Mr Patrick has alleged specific instances where he says we have not provided full and frank disclosure. We deny Mr Patrick's full and frank disclosure allegations entirely, and I address each of his specific allegations below.

*The DFW Summons*

22 At paragraph 57(i)(b) of Patrick 4, Mr Patrick has alleged that we failed in our evidence filed in relation to the FSD Sanction Application and the Interim Relief Application to mention the summons filed by DFW on 9 June 2025 (the "**DFW Summons**") seeking directions and orders from the Court to provide that: (i) we enter into a protocol with the CDM entities in the FSD Proceedings; and (ii) an *inter partes* proceeding be established in the liquidation for the validity of the DAF Restructuring.

23 However, as Mr Patrick goes on to acknowledge at paragraph 57(i)(d) of Patrick 4, our counsel, Ms Moran, disclosed the existence of the DFW Summons to the Court during the *ex parte* hearing of the FSD Sanction Application. This was recorded in a hearing note that was provided to DFW subject to redactions (see page 50). When Ms Moran raised the DFW Summons at that hearing, the Court said that it would deal with the DFW Summons in due course, if necessary. The Court was also already aware of the DFW Summons because DFW's counsel had raised it during the hearing of the Counsel Sanction Application. In these circumstances, we do not believe that we failed to provide full and frank disclosure.

*Andrew Ayres KC*

24 At paragraphs 57(ii)(a) and (d) of Patrick 4, Mr Patrick has alleged that we redacted Andrew Ayres KC's name in MacInnis 5, as being the leading counsel who provided advice in respect of the commencement of the FSD Proceedings. This is factually incorrect. We have already confirmed to DFW, in a letter Maples sent to Bakers dated 15 August 2025 (see page 54), that the King's Counsel engaged to provide our clients with a merits opinion in respect of the FSD Proceedings was not Mr Ayres KC. That aspect of MacInnis 5 was sealed under the terms of a Court order. Pursuant to the terms of a consent order dated 12 May 2026 (the "**Redaction Application Consent Order**"), DFW was provided with a copy of MacInnis 5 with the name of the relevant leading counsel, being Matthew Bradley KC, unredacted. As previously confirmed to DFW in correspondence, Maples has engaged Mr Ayres KC in the FSD Proceedings, and he acts on the instructions of Maples.

*The Weaver Opinion*

25 At paragraph 57(iii)(a) of Patrick 4, Mr Patrick has alleged that we failed to disclose during the FSD Sanction Application the report that CDM obtained from the tax, assurance and advisory firm, Weaver & Tidwell LLP, dated 30 May 2025 (the "**Weaver Opinion**"). The Weaver Opinion opined that the proceeds paid to the Highland Foundations in their capacity as Participating Shareholders following the DAF Restructuring were fair. However, we did not consider the Weaver Opinion to be material to the FSD Sanction Application. In this respect, the interposition of CDM CFAD, LLC ("**CDM**") in the structure between the Company and its interest in the Fund was part of the overall scheme that removed the Company's interest in the Fund from its economic stakeholders. Importantly, the Weaver Opinion was obtained in May 2025, approximately two months after the DAF Restructuring had occurred earlier that year in March 2025. The Weaver Opinion is therefore not a contemporaneous document. The fact that CDM subsequently obtained a fairness opinion with respect to CDM's redemption of the

Company's shares does not address the propriety of interposing CDM between the Company and the Fund in the first place (or the broader transactions). For the avoidance of doubt, if we had considered that opinion to be material to the FSD Sanction Application, we would have brought it to the Court's attention.

26 Our conclusion on the materiality of the Weaver Opinion aligns with the Directors' treatment of that opinion. In their opposition to the Counsel Sanction Application, the Directors produced three affidavits (running to 142 pages of text and 1,699 pages of exhibits) that outlined their justifications for the DAF Restructuring. All of these affidavits were sworn very shortly after the date of the Weaver Opinion, but the Directors chose not to put that opinion before the Court or to make any reference to it in the course of the Counsel Sanction Application hearing.

*Mercer Report*

27 At paragraph 57(iv)(b) of Patrick 4, Mr Patrick has similarly alleged that we failed to bring the recommendations contained in the Mercer Report to the Court's attention. The recommendations in the Mercer Report deal with the level of compensation paid to Mr Patrick. However, this allegation is factually incorrect. I referred to and discussed the contents of the Mercer Report in MacInnis 5, and I exhibited the Mercer Report to that affidavit. I stated in paragraph 52 of MacInnis 5 that Mr Patrick has relied on the Mercer Report to support his remuneration increases, and I drew the Court's attention to the fact that the Mercer Report was commissioned three years after Mr Patrick commenced his role as a director of the Company and the report purports to justify three years of back-pay (plus bonuses).

*Nature of DAF LP Business*

28 At paragraph 57(v)(c) of Patrick 4, Mr Patrick criticises our characterisation of DAF LP as "passive". It is unclear to us how we have failed in our duty of full and frank disclosure by way

of a reference to the Fund as "passive". If Mr Patrick is referring to paragraph 27 of my first affidavit filed in the FSD Proceedings, the Interim Relief Application has now proceeded on an *inter partes* basis, and I understand that no full and frank duty accordingly arises. In any event, there has been no failure of candour. I also note that the statement at paragraph 27 of my first affidavit, to which Mr Patrick appears to be referring, was qualified as being on the basis of our understanding at that time, which it was.

*Failure to disclose DFW responses filed in FSD 116 of 2025 (JAJ) (the "**Liquidation Proceedings**")*

29 At paragraph 57(vi)(b) of Patrick 4, Mr Patrick has alleged that we failed to detail in our skeleton argument for the *ex parte* on notice hearing of the Interim Relief Application (which ultimately proceeded on an *inter partes* basis) the responses that DFW has raised in the context of the Liquidation Proceedings to our allegations in respect of the increase in the Fund's annual expenses. It appears that this complaint has arisen from our failure to disclose a point made in paragraph 179 of the first affidavit of Mark Patrick sworn on 4 June 2025 and filed in the Liquidation Proceedings ("**Patrick 1**"), namely that US$6 million of the Fund's expenses was allegedly offset by income of US$6.1 million generated from lease arrangements (under which the Fund is both lessee and lessor) (the "**Skorpios Lease Arrangements**"). However, as acknowledged by Mr Patrick, our skeleton argument prefaced the relevant submissions by noting that "*the Company does not yet have full details of the Fund's annual expenses*". Further, I note that Patrick 1, together with all other affidavits filed in the Liquidation Proceedings, was included in the bundle for the *ex parte* on notice hearing on 31 July 2025 (which did not go ahead following the agreement of the FSD Consent Order). Further, taking into account the nature of the Skorpios Lease Arrangements, and the amount of income they generated *vis-à-vis* the value of the overall Fund structure (then US$270 million), we concluded that the point was not material to the Interim Relief Application. The Company was seeking a proprietary injunction and ancillary relief, and the focus of the Interim Relief Application was on

whether there was a serious issue to be tried that the Company had a proprietary interest in the Partnership Interest in the Fund and the Fund's underlying assets. Where a matter is as complex and document heavy as this one, it is not realistic to suggest that every single point raised in the underlying proceedings can be raised on an application for an injunction. There is an obvious need to distinguish between material and immaterial points, and we properly did this in accordance with our duty to the Court. We note that neither Mr Patrick nor DFW made reference to the Skorpios Lease Arrangements in their submissions to the Court in the course of the Interim Relief Application.

*Liquidation Committee*

30 At paragraph 57(v)(d) of Patrick 4, Mr Patrick has alleged that there is a discrepancy in MacInnis 5 and my sixth affidavit sworn on 11 July 2025 ("**MacInnis 6**") as to the timing of the establishment of the Company's liquidation committee (the "**Liquidation Committee**"). MacInnis 5 confirmed that no liquidation committee had yet been formed, and MacInnis 5 was provided to the Court in approved but unsworn form on 4 July 2025 (i.e., 5 days before the Liquidation Committee was formed) and then sworn on 10 July 2025 (i.e., the day after the Liquidation Committee had been formed). This was self-evidently a minor oversight that caused no conceivable prejudice to anyone. In any event, the date on which the Liquidation Committee was established was clarified the very next day on the swearing of MacInnis 6 on 11 July 2025 and before the sanction applications were determined by the Court. Mr Patrick (on behalf of DFW) has also stated in Patrick 4 that he has been *"advised… that no minutes of [the Liquidation Committee meeting held on 9 July 2025] have been circulated"*. This is factually incorrect. Mr Michael Aquino circulated the minutes of the meeting in an email to (amongst others) Ms Jennifer Colegate of Bakers, being DFW's Cayman Islands attorneys, on 1 August 2025 (see pages 56 to 61).

**Alleged impact of funding arrangements on our ability to remain fair and impartial**

31 At paragraph 65 of Patrick 4, Mr Patrick appears to criticise the fact that the Funding Sanction Application was filed on an *ex parte* basis. I have addressed the rationale and justification for this approach in paragraph 18 above.

32 At paragraph 73 of Patrick 4, Mr Patrick has stated that the Funding Agreement we entered into with Crossvine has granted Mr Dondero *"significant and improper control over [us]"* because Crossvine may default on its funding commitments under the Funding Agreement if we *"do not aggressively allege fraud and wrongdoing"* against the defendants in the FSD Proceedings. In effect, Mr Patrick has stated that because Crossvine is a special purpose vehicle incorporated for the purpose of Mr Dondero ultimately funding the liquidation of the Company and our pursuit of the FSD Proceedings, we cannot be considered to remain fair and impartial if we accept funding from Crossvine.

33 Mr Patrick's allegations of partiality and bias are entirely baseless, and they are an affront to our integrity and professionalism. We reject these assertions in the strongest possible terms. Neither Crossvine nor Mr Dondero has any control over our actions, and we would not have made the Funding Sanction Application if we thought that there was scope for the Funding Agreement to compromise our impartiality or integrity. As court-appointed officers, we would never allow a third-party to directly or indirectly control the direction of a liquidation or conduct of litigation proceedings. We also note that the Court granted the Funding Sanction Application after it scrutinised the terms of the Funding Agreement in accordance with well-established principles and concluded that the Funding Agreement gave Crossvine no such control or influence. I understand that the Court would not have granted sanction to enter into the Funding Agreement if it was not satisfied that this was the case, or if the Court considered the commercial terms (including information rights) to be inappropriate.

34 At paragraph 78 of Patrick 4, Mr Patrick accuses us of making statements in our First Report dated 2 July 2025 that were "*false, misleading and calculated to avoid transparency*". This accusation is based on a statement contained in our First Report which confirmed that:

> *"[we] are currently exploring third party funding options….*
>
> *Should any third party be interested in funding the liquidation, expressions of interest may be sent to CDAF.Core@uk.gt.com."*

35 Mr Patrick appears to suggest that the fact that we did not directly approach any other funders for quotes prior to entering into the Funding Agreement with Crossvine means that the above statement was untrue or misleading and intentionally so. We reject that accusation. We had not entered into the Funding Agreement at the date of the First Report, and we were open to receiving funding proposals from any third parties, as confirmed by the statement contained in the First Report. On no ordinary use of language can the phrase "*exploring funding options*" be construed as meaning only that direct approaches had necessarily been made to multiple funders for quotes. Its meaning obviously includes discussions with a single potential funder about the funding options that they are willing to offer. At the time the First Report was released, we were actively seeking to compile a list of potential third-party funders that may be interested in funding the liquidation and the FSD Proceedings and discussing potential funding terms with Crossvine. At all times, we acted transparently and in good faith and there was no intention to mislead or misrepresent the position in any respect.

**Alleged failure to meaningfully engage with the Proposed CDM Protocol**

36 At paragraph 107 of Patrick 4, Mr Patrick has criticised us for not agreeing to the Proposed CDM Protocol when it *"offered voluntary reporting mechanisms that would have delivered many of the same safeguards [we have sought] in the FSD Proceedings, without incurring the considerable costs now being borne by the liquidation estate"*. In total, we were presented with

three marginally different versions of the Proposed CDM Protocol. However, all of them failed to preserve the Company's position in any meaningful way.

37 The inadequacies of the three versions of the Proposed CDM Protocol were explained in letters from Maples to Campbells dated 19 June 2025 and 27 July 2025 (see pages 62 to 72). Accordingly, the allegation that we failed to meaningfully engage with the Proposed CDM Protocol is simply wrong. At most, Mr Patrick's criticism is that, following engagement, we did not accept the terms proposed by him. There were good reasons for this. The FSD Consent Order was ultimately far more favourable than any version of the Proposed CDM Protocol. If the Proposed CDM Protocol had the same terms as the FSD Consent Order, it is likely that we would have agreed to it. In particular, I note that the versions of the Proposed CDM Protocol had the following issues:

37.1 Despite multiple requests from us, the Proposed CDM Protocol did not include any asset preservation undertakings. That was a fundamental inadequacy because the preservation of the assets to which the Company's Claims relate would have been the clear overarching purpose of any protocol we were prepared to agree to and it was the main form of relief that would be sought on any injunction application. The Proposed CDM Protocol allowed the defendants to take any action with the assets they pleased if they considered it reasonably necessary to comply with their legal obligations. There were no checks and balances on this right, which was said to apply "*notwithstanding anything to the contrary in this Protocol*". This was, in essence, the exact opposite of asset preservation undertakings. In contrast, the FSD Consent Order contained robust asset preservation undertakings.

37.2 CDM initially sought a US$5,000,000 threshold for transactions to be reported to us in the monthly transaction reports proposed under the Proposed CDM Protocol. In

contrast, the defendants agreed in the FSD Consent Order that, during the duration of that order, the third, fourth, fifth, and sixth defendants and the CDM entities would:

(a) *"give 7 days' written notice to [us] of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$50,000"*; and

(b) provide us with monthly reports that included *"a full listing of payments or other transactions undertaken by them below US$50,000 in the calendar month just passed"*.

37.3 In addition, the FSD Consent Order gave us a right to seek and obtain further clarification from the defendants of any particular transactions (not limited to whether those transactions were in the *"ordinary course of business"*).

37.4 The FSD Consent Order provided that the Directors must give 7 days' advance notice of any transactions above US$100,000, whereas no such offer was made in the Proposed CDM Protocol.

37.5 The FSD Consent Order provided for recognition of the undertakings given by the defendants in the United States through Chapter 15 proceedings, which was important given many of the defendants are located in the United States and/or hold assets there.

37.6 The FSD Consent Order preserved our right to challenge, at the *inter partes* hearing, the defendants' ability to use assets deriving directly or indirectly from the limited partner interest in the Fund to pay their legal fees.

37.7 The FSD Consent Order required the defendants and CDM entities to provide all balance sheets, financial statements, and other records for each of them dating back

to 30 June 2024 and on an ongoing monthly basis moving forward. The CDM Protocols at their highest offered only a balance sheet for the Fund on an ongoing monthly basis moving forward (not retrospectively and not in respect of the other defendants and CDM entities).

38 Given the material differences between the Proposed CDM Protocol and the FSD Consent Order, I do not consider the statement contained in paragraph 104 of Patrick 4 to be accurate.

**Alleged leveraging of the liquidation proceedings to advance the interests of the Highland Foundations and Mr Dondero**

39 Mr Patrick has also alleged that we have been leveraging the liquidation proceedings to advance the interests of the Highland Foundations and Mr Dondero. In support of this allegation, Mr Patrick has alleged at pages 50 to 58 of Patrick 4 that we have:

39.1 not challenged the petition that the Highland Foundations issued in the Dallas Business Court seeking temporary restraining orders, temporary injunctive relief, and the emergency appointment of a receiver (the "**TRO Proceedings**");

39.2 determined the Company to be solvent in order to confer *"a significant advantage to the Highland Foundations"* as a declaration of insolvency would remove their entitlement to participate in the Company's liquidation committee;

39.3 ignored and cut across the DFW Summons by commencing the FSD Proceedings; and

39.4 interfered in the Highland Bankruptcy Proceedings.

40 Again, as court-appointed officers who take our duties seriously, we deny Mr Patrick's allegations. We would never compromise our integrity and professionalism by taking actions

that illegitimately prioritise an individual stakeholder and are not in the best interests of the stakeholder body as a whole. Our responses to each of the above allegations are below.

*Alleged failure to seek sanction to challenge the TRO Proceedings*

41 With respect to the TRO Proceedings, the Highland Foundations have sought, *inter alia*, a temporary restraining order ("**TRO**") to obtain the immediate appointment of a receiver over DFW and CDM, the imposition of a constructive trust over all assets, interests, and property, and immediate injunctive relief to freeze all assets that were held in the Fund.

42 The Texas Business Court declined to grant the TRO and directed the parties to enter into a "Rule 11 Agreement" dated 11 July 2025 (see page 73). The Rule 11 Agreement placed restrictions on the Texas Defendants' use of the Fund assets, their ability to increase remuneration levels of employees, and prohibited changes to the Fund structure. We understand that the TRO Proceedings are currently abated pending us joining those proceedings.

43 We have consistently maintained that we will act in the best interests of the Company, and we will take steps should it be necessary to protect those interests. As things currently stand, our understanding is that the TRO Proceedings are aimed at safeguarding the assets to which the Company is entitled and this is consistent with our objectives as the Company's JOLs. The FSD Defendants also appear to agree that the TRO Proceedings protect these assets given the fact they have tried to rely on the Rule 11 Agreement before Parker J and the CICA to argue that the Interim Relief Application is unnecessary. We will continue to monitor the TRO Proceedings and consider the extent to which it would be in the interests of the estate to seek sanction to intervene, taking into account the legal costs of doing so.

*Alleged use of solvency determinations to confer an advantage on the Highland Foundations*

44 Contrary to the assertions contained in Patrick 4, we have never conducted our solvency determinations in respect of the Company with a view to maintaining the Highland Foundations' entitlement to participate in the Company's liquidation committee. We stress that the solvency determinations we have reached during the Company's liquidation have been based on our informed *bona fide* view of all of the available information in respect of the Company's financial position. Consistent with our duties as the JOLs of the Company, Mr Bhowmik and I (as is appropriate in the context of any liquidation) continue to review and consider the solvency determination of the Company based on the circumstances known to us. Our current view is that the Company has been appropriately determined as solvent.

45 In this respect, DFW sought to challenge our solvency determination and filed a summons dated 12 February 2026 (the "**Solvency Application**") seeking, among other things:

45.1 an affidavit "*to justify the current determination that the estate of the Company is solvent*"; and

45.2 the appointment of additional joint official liquidators for the purpose of determining the solvency of the Company's estate.

46 The hearing of the Solvency Application was adjourned pursuant to a consent order dated 25 May 2026 (the "**Solvency Application Consent Order**"). Under the Solvency Application Consent Order, we have provided DFW with an affidavit setting out the basis for our determination in detail at key stages during the liquidation (the "**Solvency Affidavit**"). As explained in the Solvency Affidavit, we have continued to assess the solvency position of the Company on a balance sheet basis taking into account the factors we consider to be relevant.

*Treatment of DFW Summons*

47 Mr Patrick has complained that we have ignored the DFW Summons, pursuant to which DFW proposed that an *inter partes* proceeding be established in the liquidation for the validity of the DAF Restructuring. However, we considered that the DFW Summons was an inappropriate way to resolve the matters in issue.

47.1 The DFW Summons sought to cut across our investigative powers, and it was premised on us not pursuing Chapter 15 proceedings. The importance of the Chapter 15 proceedings, and by extension the inappropriateness of the DFW Summons, is underscored by the fact that the Company's service providers (Valuescope, LLC; Carrington, Coleman, Sloman & Blumenthal, L.L.P.; and Seyfarth Shaw LLP), all of which provided advice on which Mr Patrick and Mr Murphy are seeking to rely, have refused to provide the Company's property without Chapter 15 recognition.

47.2 If obtaining U.S. court authority is allegedly required to enable service providers to share the Company's books and records, it would have been imprudent for us to assume that parties located in the United States would willingly return assets, should they be ordered to do so by the Cayman Court, without similar compulsion (or immediate threat of compulsion) by a U.S. court.

47.3 Additionally, and separate from the Chapter 15 recognition, the Company's fourth shareholder prior to the share issuance to DFW (CFNT) was not proposed to be included in those *inter partes* proceedings.

*Alleged interference in the Highland Bankruptcy Proceedings*

48 It appears based on page 54 of Patrick 4 that Mr Patrick is concerned with our decision to send a letter to the trustee of Highland Capital Management L.P in bankruptcy (the "**Highland**

**Capital Trustee**") on 24 June 2025 (the "**HMIT Adjournment Letter**"). Based on our investigations, we understand that several Hunter Mountain Investment Trust entities ("**HMIT**" and the "**HMIT Entities**") were included in the Company's assets and investments prior to the DAF Restructuring. Accordingly, any transaction concerning those entities is potentially relevant to the Company as it affects assets that the Company will recover if it is successful in the FSD Proceedings.

49 The HMIT Adjournment Letter was sent in relation to a settlement motion (the "**Settlement Motion**") seeking the United States Bankruptcy Court's approval of a settlement agreement entered into between the HMIT Entities and the Highland Capital Trustee (the "**Hunter Mountain Settlement**"). As Mr Patrick has acknowledged, he caused the HMIT Entities to enter into the Hunter Mountain Settlement. Based on the limited investigations that we had been able to conduct upon our appointment, we understood that the Hunter Mountain Settlement resulted in the HMIT Entities settling potential claims against the Highland Capital Trustee in exchange for assets of an uncertain value. We were made aware of the Hunter Mountain Settlement and Settlement Motion only very shortly after our appointment as the JOLs of the Company.

50 The HMIT Adjournment Letter requested:

50.1 a brief adjournment of the hearing to determine the Settlement Motion to afford us additional time to progress our investigations in relation to HMIT; or

50.2 the deferral of distributions to the HMIT Entities so we could continue our investigations without the risk of asset dissipation in connection with the protocol discussions.

51 Our view is that it was appropriate for us to send the HMIT Adjournment Letter. We were attempting at the outset of the liquidation, and pending our investigations, to preserve the

assets to which the Company might be entitled. As noted in the letter, the purpose of the requested adjournment was to allow us additional time to progress our investigations in relation to HMIT and to defer distributions until those investigations had been completed. Despite the HMIT Adjournment Letter, the Settlement Motion was granted by the United States Bankruptcy Court on 30 June 2025.

52 I was recently asked by the Dugaboy Trust to give evidence in relation to a motion to reverse the Hunter Mountain Settlement under Rule 60(b) of the Federal Rules of Civil Procedure (the "**Rule 60 Motion**"). I appeared and gave testimony as a witness of fact at the hearing of that motion on 11 and 21 May 2026. My testimony centred on the current status of the liquidation, the FSD Proceedings, and the Company's potential interests in the HMIT Entities and their assets. Transcript extracts containing my testimony are annexed at pages 77 to 231. I agreed to give evidence in respect of the motion on the basis that reversing the Hunter Mountain Settlement would be in the interests of the Company as it would reinstate the status quo that existed prior to the settlement, and thus allow further time for us to consider and assess its impact on the HMIT Entities to which we believe the Company is interested.

53 As at the date of this affidavit, we have not been in a position to evaluate fully the net effect of the Hunter Mountain Settlement on the Fund structure and how this will impact the potential recoveries of the Company should it be successful in the FSD Proceedings. However, we understand that under its terms, the DAF Structure is entitled to receive, among other things, the assignment of approximately US$300 million in legal claims to pursue actions against Mr Dondero, Mr Ellington, and entities owned or controlled by or affiliated with Mr Dondero and Mr Ellington (the "**Kirschner Claims**").

54 We have not been provided with any information on any assessment of the merits of the Kirschner Claims, or indeed confirmation that any such assessment has been undertaken. It is therefore presently unclear whether the Kirschner Claims have good prospects of success

and if there are likely to be any recoveries if those claims are pursued. However, we understand that there is extreme animosity between Mr Patrick and Mr Dondero which has resulted in multiple "nemesis claims" being litigated between them and their affiliates in various courts. Accordingly, we consider there to be a potential risk that funds, to which the Company has an interest, could be dissipated to further the pursuit of claims which may not result in any benefit to the DAF Structure and ultimately the Company. For the avoidance of doubt, we are not seeking to predetermine whether certain claims should or should not be commenced, but merely the opportunity to assess their viability and potential value to the Company.

**Alleged inadequacy of investigations**

55 At paragraph 116 of Patrick 4, Mr Patrick has alleged that we conducted inadequate investigations and launched the FSD Proceedings based on a pre-determined view that the Fund's assets belong to the Highland Foundations. In support of this allegation, Mr Patrick has alleged at pages 59 to 63 of Patrick 4 that there was an absence of interviews, no investigation into federal tax concerns, and no investigations into Dondero-related litigation.

56 We reject Mr Patrick's allegations. Upon our appointment, it became evident that the Company, which had approximately one-month prior held assets of approximately US$270 million, had no material assets as a consequence of the DAF Restructuring. Therefore, the circumstances of our appointment required that we gather as much information as we could to ensure that appropriate steps could be taken to preserve the Company's assets. Those investigations ultimately indicated that the Company's assets had been misappropriated illegitimately via the DAF Restructuring and that the Company had a number of claims as set out in the FSD Proceedings. As responsible court officers, we note (without waiver of privilege) that we obtained the appropriate legal advice before commencing the FSD Proceedings. We needed to satisfy ourselves, and the Court, of the prospects of success of the FSD

Proceedings. The reference to, and contents of, that advice are appropriately subject to sealing orders made by the Court.

57 With respect to the complaint that we did not interview either of the Directors, we note that from the outset of our appointment, we have encountered material difficulties in obtaining cooperation from the Directors as well as third party service providers. Despite making formal requests to the Directors under our statutory powers, the Directors have not delivered up a complete set of the Company's books and records, have not attended interviews with us, and have not completed or provided a Statement of Affairs. Copies of our correspondence with the Directors, including our requests for them to attend interviews with us, are annexed at pages 278 to 345.

58 Following the commencement of contested litigation shortly after our appointment, including applications opposing our engagement of legal advisers, any realistic prospect of voluntary cooperation unfortunately became remote. We also note that the Directors filed extensive evidence in relation to the Counsel Sanction Application which outlined their justifications for DAF Restructuring in great detail. As at the date of this affidavit, neither Mr Patrick nor Mr Murphy has offered to make themselves available for interviews or indicated that they possess additional relevant information that has not already been included in evidence.

**Alleged election to present misleading account of the role fulfilled by Mr Patrick and Mr Scott**

59 At paragraph 28 of Patrick 4, Mr Patrick states that he believes that we *"elected to present a misleading account of the very different roles fulfilled by [Mr Patrick] and Mr Scott and suggest incorrectly that these roles were in fact the same"* and similarly elected *"not to have regard to the evidence, diligence, and professional judgment by Mercer in issuing its report"*. We disagree with that characterisation of our conduct. Based on our investigations, our understanding is that Mr Patrick took over the control position from Mr Scott and performed

materially the same role. We also concluded that while Mr Scott had received remuneration of only $60,000 per annum for performing that role, Mr Patrick awarded himself an annual base salary of US$850,000 and, during 2024 and the first half of 2025, paid himself remuneration and bonuses of US$13,873,778. Mr Patrick has sought to justify the significant increase in remuneration by reference to the Mercer Report. We have considered the Mercer Report but concluded that it did not justify the increased remuneration because, among others:

59.1 the Mercer Report had been commissioned three years after Mr Patrick commenced his role as a director of the Company in the control position, and the report purports to justify three years of back-pay (plus bonuses);

59.2 the Mercer Report compared the Fund to a private equity fund with US$400 million to US$1 billion under management (in circumstances where the Fund is a charitable structure with assets of approximately US$270 million at the time);

59.3 the Mercer Report ignored Mr Patrick's lack of investment management experience; and

59.4 five of the six people interviewed for the Mercer Report were parties who were not independent because Mr Patrick was paying for their services.

**OPPOSITION TO ANY ADJOURNMENT OF THE REMOVAL APPLICATION**

60 On 26 May 2026, Bakers telephoned Maples and confirmed, amongst other things, that DFW would be seeking an adjournment of the hearing of the Removal Application because of "*recent developments*", including my testimony in the Highland Bankruptcy Proceedings.

61 On 27 May 2026, Bakers sent Maples a letter seeking our agreement to an adjournment of the Removal Application until after the Appeal has been heard, failing which DFW will make a formal application (page 232). Among other things, Bakers stated in the letter that:

> *"The Removal Application cannot be viewed in isolation and there are a number of ongoing aspects of this multifaceted litigation which impact on the liquidation estate and which raise points that are likely to be relevant to the Court's assessment of DFW's application to remove the incumbent liquidators. These include, but are certainly not limited to, the imminent Court of Appeal hearing of the Injunction Summons which requires finality before it would be appropriate to separately consider the objective conduct of the JOLs."*

62 On 29 May 2026, Bakers sent an email to the Court in relation to the Redaction Application and Solvency Application (page 377). In that email, Bakers informed the Court that, amongst other things, DFW had reviewed my Solvency Affidavit and intends to pursue further relief under the Solvency Application to be heard on the 23 and 24 June 2026 (being the Removal Application hearing date). Bakers also stated that, while full grounds of adjournment would be set out in an application, the Removal Application should be adjourned because the Solvency Summons will likely take more than a day to ventilate and there would then be insufficient time to address the Removal Summons.

63 Maples emailed the Court later that day in response to Bakers' email (see page 375). Maples' email to the Court confirmed our position on the matters raised in Bakers' email. This included among other things that: (i) DFW itself originally considered a half-day to be sufficient for the determination of all issues and relief sought in respect of the Solvency Summons, and the Solvency Summons was initially listed on that basis; (ii) the Removal Application should be heard in priority to the Solvency Application on the basis that the two day hearing on 23 and 24 June 2026 has been specifically listed for the purposes of the Removal Application; and (iii) any application for an adjournment would be opposed by us such that it is not suitable to be determined on the papers.

64 Maples also responded to Bakers' 27 May 2026 letter on 29 May 2026 (see page 367). In the letter, Maples noted, among other things, that: (i) DFW had not explained how the Appeal was sufficiently relevant to the Removal Application to justify an adjournment; (ii) an adjournment less than a month before the two day hearing of the Removal Application is scheduled to take place would be inappropriate; and (iii) we are already well advanced in our preparation for the hearing, including having fully briefed Leading Counsel. Maples' letter also notes that DFW's delay in arranging the listing of the Removal Application (which was filed in August 2025) has caused us material prejudice, while DFW had filed further misconceived applications in the Liquidation Proceedings. As such, we are entitled to have the Removal Application put before the Court and determined without further delay.

65 Unfortunately, DFW's impending application for an adjournment of the Removal Application appears to reflect an unfortunate pattern of DFW filing applications which are subsequently adjourned. By way of procedural background, the Removal Application was filed on 19 August 2025. Despite us providing our available dates in a timely manner, the application was not listed for hearing until 23 and 24 June 2026, some 10 months after the application had been filed. Copies of the relevant correspondence regarding the listing of the hearing are at pages 234 to 277. I also note that Maples sent Bakers a letter dated 5 September 2025 outlining the many inaccuracies in Patrick 4 and explaining why DFW should withdraw the Removal Application (see page 346). No substantive response to that letter has been received. In the meantime, DFW filed two further applications in the liquidation proceedings: (i) an application seeking the unsealing of documents in respect of the FSD Sanction Application and Funding Sanction Application (the "**Redaction Application**"); and (ii) the Solvency Application. Each of these applications contained unfounded allegations of misconduct and abuse of process by us. The Redaction Application and Solvency Application were both adjourned in the immediate run up to the hearings (via the Redaction Application Consent Order and the Solvency Application Consent Order). Under both consent orders, the issue of costs was left for

determination on the papers. While the determination of costs has been deferred, this does not negate the immediate and substantive impact of having been required to engage with and respond to the applications on their face. That burden is particularly acute in circumstances where all of the assets have been removed from the Company.

66 DFW has sought to take advantage of its status as a contributory to file multiple applications within the liquidation proceedings that have caused us to incur significant costs before DFW has then sought to adjourn those applications, and avoid any costs award, in the run up to the hearing. This pattern of behaviour has been extremely costly to the Company's estate given we have had to incur fees defending the applications and DFW has then sought to recover its costs (on an indemnity basis) based on its status as a contributory of the Company. This conduct has also resulted in significant legal fees being incurred by the entities controlled by Mr Patrick. In this respect, I note that the final costs certificates obtained by Mr Patrick and DFW in respect of the Counsel Sanction Application are in the amounts of US$674,744.57 and US$542,664.45 respectively. Further, Bakers indicated in a letter to Maples on 21 April 2026 that DFW had incurred costs of approximately US$109,400 in relation to the Redaction Application which DFW has sought to recover from the Company on an indemnity basis (see page 383).

67 As at the date of this affidavit there have been five separate applications filed within the Liquidation Proceedings by Mr Patrick and entities he controls. The latest application was filed by Mr Patrick on 19 May 2026, seeking non-party costs orders against Mr Bhowmik, myself, and Crossvine, and the disgorgement of our fees.

68 Between 9 April and 19 May 2026, we engaged in multiple rounds of correspondence with DFW in order to agree a timetable for the exchange of evidence and submissions in respect of the Removal Application (see pages 346 to 374). In this respect, we agreed to permit DFW to file and serve supplemental evidence, and a timetable was settled, save for the date for DFW's

reply evidence, on which the parties were only a day or two apart. Despite our repeated requests for DFW to confirm its position, DFW did not respond and only notified us of its intention to seek an adjournment on 26 May 2026, less than one month before the two day hearing, and less than seven days before our evidence in response is due and preparations for the hearing are well advanced (and Leading Counsel fully briefed).

69 While Bakers has referred to the Appeal as justification for an adjournment, Bakers has not explained how this is relevant to the Removal Application. It is not clear to us on what basis the outcome of the Appeal goes to the issue of our conduct. To the extent my recent testimony in the Highland Bankruptcy Proceedings is relied on by DFW in any adjournment application, DFW had ample opportunity to request a short extension of the 11 May 2026 deadline for service of its supplemental evidence upon becoming aware of my testimony. While the first day of my testimony occurred on 11 May 2026 (which Mr Patrick attended in person), I am informed by Reed Smith (without any waiver of privilege) that Mr Patrick would have been informed in advance of my appearance when the parties to the Rule 60 Motion filed their lists of witnesses on 8 May 2026. I note that DFW has never made a request for an extension of the deadline to file supplemental evidence.

70 In the circumstances, I do not believe that there is any justification for the adjournment of the Removal Application which would further delay the determination of an application which has been unresolved for approximately nine months. Not only would an adjournment result in significant wasted costs to the estate, but it would also prejudice the economic stakeholders' confidence in the liquidation proceedings on the basis that there would be continuing uncertainty regarding the identity of the liquidators. I believe that this is also a factor that any potential third-party funders are likely to consider, such that an adjournment would also prejudice our ongoing efforts to secure necessary funding. In my view, the FSD Defendants are well aware of the tactical advantage to be gained by maintaining the existence of the

Removal Application without it being determined. By advancing allegations that seek to impugn our credibility and to cast doubt on the firmness and continuity of our decisions, they create a continuing atmosphere of uncertainty which they are then able to exploit to their advantage. In substance, they obtain the maximum strategic benefit from the Removal Application by keeping it alive and unresolved.

**CONCLUSION**

71 In conclusion, we wish to repeat how seriously Mr Bhowmik and I take our duties as officers of the Court, and we reject the Impropriety Allegations in the strongest possible terms. We also oppose any application to adjourn the hearing of the Removal Application.

SWORN to at )

MUNICIPALITY CLARINGTON PROVINCE OF ONTARIO )

This 1 day of JUNE 2026 )

before me )

Margot MacInnis

Sworn (or Affirmed or Declared) remotely by Margot MacInnis stated as being located in Toronto, ON, Canada, before me in Municipality of Clarington, Canada, on June 1, 2026, in accordance with O. Reg 431/20, Administering Oath or Declaration Remotely.

Notary Public

Meaghan Kathryn Sutherland
NOTARY
PUBLIC
ONTARIO

Meaghan Kathryn Sutherland Licensed Paralegal & Notary Public Law Society of Ontario Licensee # P06858

FILED by Maples and Calder (Cayman) LLP, attorneys for the JOLs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/MCL/TQR/858403.01).

Contact NotaryPro for any questions about this document and refer to the Document Summary page of your documents for the electronic audit trail. Notary Pro - www.notarypro.ca - 1-888-313-0909 support@notarypro.ca

Joint Official Liquidators
M MacInnis
Eighth Affidavit
Sworn 1 June 2026
Exhibit MM-8

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 107 OF THE COMPANIES ACT (2026 REVISION)**

**AND IN THE MATTER OF ORDER 5 OF THE COMPANIES WINDING UP RULES (2023 CONSOLIDATED)**

**IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**EXHIBIT MM-8**

---

This is the Exhibit shown to me and marked MM-8 to the Eighth Affidavit of Margot MacInnis.

Sworn before me this 1 day of JUNE 2026.

Notary Public

Meaghan Kathryn Sutherland
NOTARY PUBLIC
ONTARIO

Exhibit MM-8 to the Affidavit of Margot MacInnis sworn/affirmed before me at Municipality of Clarington while the declarants were in Toronto, ON, Canada via secure online video conference on 2026-06-01 in accordance with O. Reg. 431/20.

Meaghan Kathryn Sutherland Licensed Paralegal & Notary Public Law Society of Ontario Licensee # P06858

**INDEX TO EXHIBIT MM-8**

**TO EIGHTH AFFIDAVIT OF MARGOT MACINNIS**

| NO | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 1 | Letter from Maples Group to Grand Court of the Cayman Islands regarding hearing of the Interim Relief Application | 15 July 2025 | 25-28 |
| 2 | Letter from Maples Group to Kobre & Kim regarding hearing of the Interim Relief Application | 15 July 2025 | 29-32 |
| 3 | Letter from Maples Group to Campbells LLP regarding hearing of the Interim Relief Application | 15 July 2025 | 33-35 |
| 4 | Letter from Maples Group to Baker & Partners regarding hearing of the Interim Relief Application | 15 July 2025 | 36-39 |
| 5 | Email chain containing email from Nia Stratham of Baker & Partners to Bridget Clare of Grand Court of the Cayman Islands | 16 July 2025 | 40-49 |
| 6 | Note of *ex parte* hearing of FSD Sanction Application (redacted) | 14 July 2025 | 50-53 |
| 7 | Letter from Maples Group to Baker & Partners regarding Mr Ayres KC | 15 August 2025 | 54-55 |
| 8 | Email from Michael Aquino of Grant Thornton to Jennifer Coleman enclosing the minutes of first contributories meeting | 1 August 2025 | 56 |
| 9 | Minutes of First Contributories Meeting | 1 August 2025 | 57-61 |
| 10 | Letter from Maples Group to Campbells LLP regarding Proposed CDM Protocol | 19 June 2025 | 62-65 |

| NO | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 11 | Letter from Maples Group to Campbells LLP Proposed CDM Protocol | 27 July 2025 | 66-72 |
| 12 | The Rule 11 Agreement | 11 July 2025 | 73-76 |
| 13 | Transcript extract containing testimony of Margot MacInnis in relation to motion to reverse Hunter Mountain Settlement | 11 May 2026 | 77-212 |
| 14 | Transcript extract containing testimony of Margot MacInnis in relation to motion to reverse Hunter Mountain Settlement | 21 May 2026 | 213-231 |
| 15 | Letter from Baker & Partners to Maples Group seeking agreement to adjournment | 27 May 2026 | 232-233 |
| 16 | First email chain regarding listing of Removal Application hearing | 18 October 2025 | 234-245 |
| 17 | Letter from Baker & Partners to Maples Group including comments on listing of Removal Application hearing | 17 February 2026 | 246-249 |
| 18 | Letter from Baker & Partners to Maples Group and Carey Olsen regarding listing of DFW's applications | 23 February 2026 | 250-253 |
| 19 | Letter from Maples Group to Baker & Partners regarding DFW's application | 27 February 2026 | 254-260 |
| 20 | Second email chain regarding listing of Removal Application hearing | 27 August 2025 to 18 October 2025 | 261-277 |
| 21 | Emails between Grant Thornton and Mr Murphy in relation to arranging meeting | 6 May 2025 to 9 May 2025 | 278-286 |
| 22 | Letter from Grant Thornton to Mr Patrick regarding notice of liquidation and appointment | 6 May 2025 | 287-306 |
| 23 | Letter from Grant Thornton to Mr Murphy regarding notice of liquidation and appointment | 6 May 2025 | 307-326 |
| 24 | Emails between Ms MacInnis and Mr Murphy regarding interview and attaching letter | 9 May 2025 | 327-328 |

| NO | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 25 | Letter from Grant Thornton to Mr Patrick and Mr Murphy | 9 May 2025 | 329-332 |
| 26 | Letter from Kobre & Kim to Grant Thornton | 14 May 2025 | 333-335 |
| 27 | Letter from Grant Thornton to Kobre & Kim | 14 May 2025 | 336-337 |
| 28 | Further letter from Kobre & Kim to Grant Thornton | 14 May 2025 | 338-340 |
| 29 | Letter from Grant Thornton to Kobre & Kim | 21 May 2025 | 341-342 |
| 30 | Letter from Maples Group to Kobre & Kim | 11 June 2025 | 343-345 |
| 31 | Letter from Maples Group to Baker & Partners re Removal Application | 5 September 2025 | 346-356 |
| 32 | Letter from Baker & Partners to Maples Group proposing timetable for Removal Application | 9 April 2026 | 357-358 |
| 33 | Letter from Maples Group to Baker & Partners proposing timetable for Removal Application | 16 April 2026 | 359-360 |
| 34 | Letter from Maples Group to Baker & Partners regarding timetable for Removal Application | 19 May 2026 | 361 |
| 35 | Letter from Baker & Partners to Maples Group regarding timetable for Removal Application | 24 April 2026 | 362-363 |
| 36 | Letter from Maples Group to Baker & Partners regarding timetable for Removal Application | 28 April 2026 | 364-365 |
| 37 | Letter from Maples Group to Baker & Partners regarding timetable for Removal Application | 19 May 2026 | 366 |
| 38 | Letter from Maples Group to Baker & Partners regarding timetable for Removal Application (with enclosures) | 29 May 2026 | 367-374 |
| 39 | Baker and Partners and Maples Group emails to Court regarding Solvency Application and Removal Application | 29 May 2026 | 375-382 |

| NO | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 40 | Baker & Partners letter to Maples Group | 21 April 2026 | 383-384 |