# EXHIBIT 4

Joint Official Liquidators
M MacInnis
Solvency Affidavit
15 May 2026
Exhibit MM-A

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 116 OF 2025 (JAJ)**

**IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**AFFIDAVIT OF MARGOT MACINNIS REGARDING SOLVENCY DETERMINATIONS**

---

I, **MARGOT MACINNIS**, of Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands **MAKE OATH AND SAY** as follows:

**INTRODUCTION**

1 I am the Managing Director of Grant Thornton Specialist Services (Cayman) Limited ("**GTSS**"). I am one of the joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**") alongside Sandipan Bhowmik, also of GTSS. Mr Bhowmik and I were appointed as JOLs of the Company by an order of this Honourable Court dated 6 May 2025.

FILED by Maples and Calder (Cayman) LLP, attorneys for the JOLs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/MCL/TQR/858403.01).

2 I make this affidavit based on matters within my own personal knowledge, and I believe that the information contained in this affidavit is true and accurate in all respects. When I use "our" or "we" in this affidavit, I am referring to Mr Bhowmik and myself in our capacity as the JOLs of the Company. I am duly authorised by Mr Bhowmik to make this affidavit on our behalf to set out the rationale for our determination that the Company be treated as solvent for the purposes of section 110 of the Companies Act (As Revised) and Orders 8 and 9 of the Companies Winding Up Rules (the "**CWR**").

3 In particular, this affidavit discusses:

3.1 the background to our appointment;

3.2 the impact the lack of cooperation and availability of records has had on the solvency determinations;

3.3 the initial solvency determination that we made on 2 June 2025 (the "**Initial Solvency Determination**");

3.4 our re-evaluation of the Initial Solvency Determination after obtaining sanction on 14 July 2025 to commence proceedings on behalf of the Company (the "**FSD Proceedings**") in respect of claims arising from a series of unlawful transactions (the "**DAF Restructuring**") that were implemented by the Company's former directors, Mark Patrick and Paul Murphy (the "**Directors**") and represent a value of approximately US$269 million (the "**Claims**");

3.5 our re-evaluation of the solvency determination following receipt of a proof of debt ("**Proof of Debt**") from Mr Patrick on 31 October 2025 ("**Mr Patrick's POD**"), an interim costs certificate on 31 October 2025 (the "**Interim Costs Certificate**"), and final costs

FILED by Maples and Calder (Cayman) LLP, attorneys for the JOLs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/MCL/TQR/858403.01).

certificates on 23 November 2025 and 9 February 2026 (the "**Final Costs Certificates**");

3.6 our re-evaluation of the solvency determination following the release of the judgment of the Honourable Mr Justice Parker dated 10 February 2026 (the "**Judgment**") in the FSD Proceedings refusing the Company's application for interim proprietary injunctive relief pending trial (the "**Injunction Application**") and the appeal of the Judgment (the "**Appeal**") to the Cayman Islands Court of Appeal (the "**CICA**");

3.7 the relevance of the settlement agreement between UBS Securities LLC and UBS AG London Branch (the "**UBS Parties**") and CLO HoldCo Ltd. ("**CLO HoldCo**") that had been executed on 19 September 2025 in relation to a fraudulent conveyance claim arising from a promissory note issued by CLO HoldCo on 23 December 2010 for $32,801,593 plus interest (the "**UBS Settlement Agreement**"); and

3.8 the assets and liabilities of the Company at 31 March 2026, and our current solvency determination based on that information (the "**Current Solvency Determination**").

4 This affidavit is made in response to a request from DFW Charitable Foundation ("**DFW**") for an explanation of our solvency determination. As agreed with DFW, this affidavit does not address, or set out the details of, the assessment of the merits of the Claims in the FSD Proceedings, or prospects of any potential enforcement action. For the avoidance of doubt, nothing in this affidavit constitutes a waiver of privilege.

5 There is now produced and shown to me a paginated exhibit marked "**MM-A**" containing true copies of certain documents to which I refer in this affidavit. References in this affidavit to page numbers are references to the paginated contents of that exhibit.

**BACKGROUND TO OUR APPOINTMENT**

6 On 2 April 2025, the Directors (Mr Patrick and Mr Murphy) recommended to Mr Patrick, in his capacity as the sole voting shareholder of the Company, that the Company be placed into voluntary liquidation. Mr Patrick then passed a written resolution later that day that placed the Company into voluntary liquidation and appointed Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd ("**Kroll**") as joint voluntary liquidators ("**JVLs**") of the Company. The Directors also signed a declaration of solvency on the same day confirming that the Company would be able to pay its debts in full, together with interest at the prescribed rate within a period of 12 months from the commencement of the winding up (the "**Directors' Solvency Declaration**"). These steps were taken without notice to the Company's existing participating shareholders—Highland Dallas Foundation Inc., Highland Kansas City Foundation Inc., the Highland Santa Barbara Foundation Inc., and the HCMLP Charitable Fund (together the "**Participating Shareholders**").

7 The Participating Shareholders subsequently petitioned the Court for a supervision order to bring the voluntary liquidation under the supervision of the Court (the "**Supervision Petition**"). The supervision order was granted on 6 May 2025, and the JVLs were replaced by Mr Bhowmik and me, as the JOLs of the Company (the "**Supervision Order**"). The primary purpose of the Supervision Petition (and consequently the Supervision Order) was to allow us to conduct a proper investigation of the affairs of the Company and conduct an orderly winding up of the Company for the benefit of all stakeholders under the supervision of the Court. We have accordingly conducted the liquidation of the Company on a supervisory and investigative footing at all times.

FILED by Maples and Calder (Cayman) LLP, attorneys for the JOLs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/MCL/TQR/858403.01).

## THE IMPACT OF THE LACK OF COOPERATION AND AVAILABILITY OF RECORDS

8 From the outset of our appointment, we have encountered material difficulties in obtaining cooperation from the Directors as well as third party service providers. Despite making formal requests to the Directors under our statutory powers, the Directors have not delivered up a complete set of the Company's books and records, have not attended interviews with us, and have not completed or provided a Statement of Affairs ("**SOA**"). We have a pending Chapter 15 recognition application that is due to be heard in the Delaware Courts in August 2026 (the "**Recognition Proceedings**"). If this application is successful, it will provide us with a platform to continue the exercise of gathering the books and records of the Company.

9 Following the commencement of contested litigation shortly after our appointment, including applications opposing our engagement of legal advisers, any realistic prospect of voluntary cooperation unfortunately became remote. As a result, we have had to reconstruct the Company's financial and operational position using information obtained:

9.1 from third-party sources, including former professional advisers and counterparties; and

9.2 by way of compulsory process, including discovery obtained in foreign proceedings and consent orders made by the Cayman Court.

10 While substantial progress has been made, the books and records in our possession still remain incomplete. The solvency determinations have therefore necessarily been undertaken on the basis of the best information reasonably available to us at the relevant times, and we have had to make appropriate allowances for gaps, uncertainties, and contingent outcomes.

## THE INITIAL SOLVENCY DETERMINATION

11 We made our Initial Solvency Determination on 2 June 2025 shortly after our appointment. The Initial Solvency Determination was that the Company should be treated as solvent. This assessment was undertaken on a balance-sheet basis, having regard to the proper treatment of contingent and prospective assets and liabilities. It was not limited to the Company's immediate cash position. We have taken the same approach when we have considered whether certain subsequent developments have required the determination to be re-evaluated.

12 In assessing the most accurate determination, we evaluated the financial position of the Company based on the information that was available to us at that time. We did not have the benefit of a balance sheet from the management of the Company, nor a SOA from either of the Directors at the time we made the Initial Solvency Determination.

### The Company's assets at the time of the Initial Solvency Determination

*Summary of the estimated values of the Company's assets*

13 Based on the information available to us as at 2 June 2025, we concluded that the Company's primary assets were comprised of:

13.1 the value of the Company's interest in Charitable DAF HoldCo Fund, L.P. (the "**Fund**"), which had been held via a 100% shareholding in the Fund's parent, CDMCFAD LLC ("**CDM**"); and

13.2 a surplus retainer held by the Company's former US attorneys, Hueston Hennigan LLP ("**Hueston**" and the "**Hueston Retainer**").

14 We then calculated estimated value ranges for these two assets by considering competing positions. In summary, we estimated that the value of the Company's interest in the Fund had

a potential value as low as US$0 and as high as US$269 million. Meanwhile, we estimated that the Hueston retainer had a value as low as US$58,731 and as high as US$150,000. Accordingly, we concluded that the Company had a total asset value as low as US$58,731 and as high as US$269,150,000. The low and high estimate rationales for each of the assets are discussed below.

*Estimated values of the Company's indirect investment in the Fund*

15 In essence, the low estimated value of the Company's interest in the Fund was based on the assumption that the DAF Restructuring had been legitimate. By the time we were appointed as the JOLs of the Company, the DAF Restructuring had occurred, and the Company no longer directly held its interest in the Fund (barring the Claims). Walkers (Cayman) LLP ("**Walkers**") had been the Company's former legal counsel during the voluntary liquidation, and they provided us with information about the Company and the DAF Restructuring. Based on this information, it appeared that the Company's indirect investment in the Fund, a 100% membership interest in CDM, had purportedly been redeemed by CDM on 27 March 2025 (the "**Redemption**"). While we had questions over the legitimacy of the Redemption and the DAF Restructuring more generally, we assumed that the lowest potential value of the Company's interest in the Fund was zero.

16 The alternative point of view, based on our initial review of the evidence we had at that time, was that the DAF Restructuring or at least certain transactions, had not occurred legitimately. We were alive to this potential issue given the statements contained in the Supervision Petition and our discussions with third parties. The Supervision Petition also referred to another petition that had been filed by the Participating Shareholders on 10 April 2025 seeking the winding up of the Company on just and equitable grounds (the "**J&E Petition**"). The J&E Petition stated that the primary purpose of the Fund was for the benefit of the Participating Shareholders. In particular, the J&E Petition stated that:

> *"The Fund was formed to make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code... for the economic benefit of the Limited Partner [i.e. the Company] and its Indirect Charitable Owners [i.e. the Participating Shareholders]."*

17 The information obtained from Walkers indicated that the Company had been divested of its interest in the Fund, such that the Participating Shareholders could no longer derive any economic benefit from the Fund, which includes the Company and the Fund's underlying assets. It was therefore unclear to us how the Participating Shareholders and the associated charities could sustain themselves without the Fund and the beneficial distributions these charities previously received. This contradicted the primary business activity of the group and indicated that the Company may have potential Claims.

18 We ultimately concluded that if the Company's interest in the Fund was recovered, that interest would attribute a value of approximately US$269 million back to the Company via the value of the Fund's subsidiaries. In respect of the value of the Fund, we noted:

18.1 CLO HoldCo's expense summary as at 30 June 2024, which stated that CLO HoldCo had net assets of $270 million (see page 1); and

18.2 ValueScope's valuation report dated 7 January 2025, which stated that the Company had a net asset value of $269 million as of 30 September 2024 (see page 28).

19 As at the date of the Initial Solvency Determination, we intended to conduct further investigations to understand whether the divestment of the Company's interest in the Fund, via the Redemption, could be reversed.

*Estimated values of the Hueston Retainer*

20 Following enquiries, we became aware that Hueston held a $150,000 retainer for their engagement with the Company, as per their engagement letter dated 26 January 2024 (see

pages 60 to 70). However, we also understood that Hueston had provided a breakdown and copy of their invoices totalling US$91,268.50 over four separate invoices between 18 June 2024 and 19 September 2024 (see pages 71 to 84).

21 As at the date of the Initial Solvency Determination, Hueston had not returned the retainer funds, and there was a possibility that Hueston might seek to net off these fees (US$91,268.50) against the US$150,000 retainer, with only US$58,731.50 being returned to the liquidation estate. Against this, we had engaged in correspondence with Hueston which suggested that the full US$150,000 retainer would be returned. We accordingly estimated a low value of US$58,731 and a high value of US$150,000 for the Hueston Retainer with a view to monitoring the situation.[1]

**The Company's liabilities at the time of the Initial Solvency Determination**

*Summary of the Company's liabilities*

22 As at 2 June 2025, we had limited information on the liabilities of the Company and expected claims in the liquidation. The Company's existing and potential liabilities were comprised of:

22.1 invoices that had been issued by the Company's previous Cayman Islands attorneys (the "**Campbells Invoices**");

22.2 an indemnity claim issued by one of the Company's former directors, Mr Grant Scott ("**Mr Scott's Indemnity Claim**");

[1] The Hueston Retainer was subsequently transferred in full to Reed Smith's client account. These funds are being held on trust for the purposes of settling legal costs which rank in priority, under the CWR, to our remuneration and the taxed adverse costs in favour of DFW and Mr Patrick.

22.3 a potential claim by Kroll for fees and disbursements arising from the provision of professional services in relation to the voluntary liquidation of the Company (the "**Kroll Costs**"); and

22.4 potential claims by Participating Shareholders for unpaid distributions.

23 These are discussed in more detail below.

*The Campbells Invoices*

24 On 13 May 2025, we received a copy of the engagement letter between Campbells LLP ("**Campbells**") and the Company dated 7 July 2021 and copies of four of the Campbells Invoices (see pages 88 to 103). However, as at 2 June 2025, no POD was received in relation to the Campbells Invoices. The value of the four invoices totalled US$15,103.79, and our understanding was that Campbells had provided corporate and litigation advice to the Company, as well as acted as the registered office for the Company.

25 Following a review of Campbells' time incurred in relation to the debt, we understood that the majority of the work was completed by a partner in the corporate team. In this respect, some of the time related to the DAF Restructuring. This included time relating to the changing of the Fund's general partner and the issuance of shares to the new participating shareholder, DFW.

26 As at the date of the Initial Solvency Determination, Campbells had informed us that, upon further internal review, certain invoices previously provided to us appeared to include time entries which did not relate to their engagement with the Company. Campbells indicated that amended copies of the Campbells Invoices would be prepared prior to the submission of any

POD. However, as at the date of the Initial Solvency Determination, Campbells had not submitted any POD in respect of the Campbells Invoices.[2]

*Mr Scott's Indemnity Claim*

27 On 16 May 2025, we received a POD from Mr Scott for the value of US$18,785.36 (see pages 104 to 105). Mr Scott described his Indemnity Claim as "*unreimbursed legal fees from late 2024 – stemming from the ACIS litigation*". The POD included a list of supporting documentation that was received in support of Mr Scott's Indemnity Claim. These were the legal counsels' invoices, payment details, and email correspondence confirming unreimbursed amounts.

28 Mr Scott's Indemnity Claim for reimbursement arose from an Acknowledgement and Ratification Agreement dated 1 July 2024 (the "**A&R Agreement**"), entered into between Mr Scott and each of the Company, the Fund, and Charitable DAF GP, LLC (the "**GP**"). Mr Scott is a former director of the Company, having resigned in early 2021. Under the A&R Agreement, the Company, the Fund, and the GP acknowledged and ratified existing indemnification provisions pursuant to which Mr Scott was entitled to seek reimbursement for expenses he incurred in connection with two historic litigation matters arising from his former roles, subject to the terms and conditions of that agreement.

29 For the purposes of assessing the Company's solvency as at the date of the Initial Solvency Determination, and based on the information and documentation available to us at that time, we treated Mr Scott's Indemnity Claim in the amount of US$18,785.36 as a provisionally

[2] [2] As at the date of this affidavit, Campbells have still not submitted any POD, and they have not sought payment of the amounts previously invoiced to the Company. In the absence of any POD, no liability in respect of the Campbells Invoices has been taken into account for the purposes of any of the solvency assessments.

admitted liability, on the basis that treatment was applied solely for the purposes of the solvency analysis.

30 In August 2025, Mr Scott informed us that subsequent developments following the submission of his POD had resulted in a reduction of the amount claimed. In particular, following discussions with the Friedman & Feiger law firm, Mr Scott confirmed that a sum of US$13,500, which had originally formed part of his POD, had been credited back to the Company and that his original US$15,000 retainer had been refunded to him. On that basis, and with Mr Scott's confirmation, the amount of Mr Scott's Indemnity Claim was reduced from US$18,785.36 to US$5,285.36.

*The Kroll Costs*

31 The Company had entered into an engagement letter with Kroll dated 29 March 2025 in connection with the voluntary liquidation of the Company (the "**Kroll Engagement Letter**") (see pages 106 to 110). The Kroll Engagement Letter contemplated a fixed fee of US$18,000 (exclusive of disbursements) and estimated disbursements not exceeding US$2,000, on the basis of a *'non-contentious and straightforward'* voluntary liquidation. On 9 April 2025, the Company transferred $25,000 to Kroll in relation to the voluntary liquidation of the Company.

32 The Supervision Order required Kroll to prepare a final report and accounts from the commencement of the voluntary liquidation until the date of the Order, to be delivered to us within 28 days from the date of the Order. We considered that this would arguably fall outside the scope of the services listed in the Kroll Engagement Letter, which provided that any material expansion of scope would be the subject of a further fee arrangement. We therefore considered that Kroll might seek to submit a POD for time-costs spent preparing the report. However, based on conversations that took place between us and Kroll around the time of our

appointment, it was our understanding as at the date of the Initial Solvency Determination that Kroll did not intend to submit a claim, and it would absorb the cost of preparing the report.[3]

*Potential claims by Participating Shareholders for unpaid distributions*

33 The Supervision Petition states that the Participating Shareholders:

> *"...are non-profit charitable entities... [and] are entitled under the Company's Amended and Restated Memorandum and Articles of Association dated 20 February 2025 (Articles [see Appendix [X]]) to participate in the profits or assets of the Company but are not entitled to attend, to speak at, or to vote at general meetings. By contrast holders of Management Shares are entitled to attend, to speak at and to vote at any general meeting, but have no right to participate in the profits or assets of the Company."*

34 On that basis and given that the Court appointed us having considered the Supervision Petition, our view was that the Participating Shareholders may be entitled to the proceeds of the Redemption. The books and records recovered at this preliminary stage were insufficient to confirm receipt of the Redemption proceeds by the Participating Shareholders.

35 As at the date of the Initial Solvency Determination, we determined that we would assess the merits of any redemption claim submitted by the Participating Shareholders with legal counsel as and when any such claim was submitted. However, as at that date, the Participating Shareholders had not submitted a claim. For completeness, I note that it later transpired that the Participating Shareholders had received the Redemption proceeds.

[3] As at the date of this affidavit, Kroll has not asserted any unpaid fees or expenses as liabilities of the Company. Conversely, following the making of the Supervision Order and the handover of the liquidation from the JVLs to the JOLs, Kroll transferred funds in the amount of US$5,789, being surplus monies retained for the purposes of the voluntary liquidation. Those funds were received by the JOLs and treated as a cash asset of the Company.

**Additional costs outside of the liquidation estate**

36 As at the date of the Initial Solvency Determination, we had not been paid for our time-costs in relation to the official liquidation.

37 In this respect, we had entered into discussions regarding the provision of third-party litigation funding. The purpose of this funding was to support the conduct of the liquidation and the investigation and the pursuit of the Claims. These funding discussions ultimately resulted in us entering into a funding agreement with Crossvine Litigation Funding, LLC ("**Crossvine**") on 11 July 2025 (the "**Funding Agreement**"). The Funding Agreement was sanctioned by the Court on 15 July 2025.[4]

38 The funding subsequently made available under the Funding Agreement was provided on a limited-recourse and purpose-specific basis. The funding was restricted to the payment of defined categories of costs, including our remuneration and legal fees and the costs incurred in connection with the investigation and pursuit of the Claims and was sufficient to cover all costs incurred as at the date of the Initial Solvency Determination. As a result, no weight was given to professional fees in connection with the Initial Solvency Determination. The funding does not constitute an asset of the Company. Any obligation to repay amounts advanced by Crossvine, together with any contractual return, arises insofar as recoveries are achieved in the FSD Proceedings.

**The competing cases for the different solvency determinations**

39 Taking the assets and liabilities above into account, we carefully considered what the proper solvency determination should be. This involved us considering the different cases for solvent,

[4] Certain documents created in relation to the application for Court sanction of the Funding Agreement (including sections of the agreement itself) were sealed pursuant to Court order. A redacted copy of the Funding Agreement was provided to DFW in a redacted copy of exhibit MM-6 to the sixth affidavit of Margot MacInnis sworn on 11 July 2025.

insolvent, or doubtful solvency determinations by reference to the applicable principles. Each of these cases is discussed below.

*The case for a solvency determination*

40 We concluded that the following factors strongly supported a conclusion that the Company was solvent:

40.1 First, the Directors' Solvency Declaration was made on 2 April 2025 shortly after the Company was placed into voluntary liquidation. The Directors' Solvency Declaration is a statutory document that was filed with the Registrar of Companies and provided confirmation of the Directors' views of the Company's solvency. Further, making a false declaration without reasonable grounds is an offence punishable by fine and/or imprisonment. While we are actively pursuing the Claims in the FSD Proceedings against the Directors, we recognise that those Directors had an independent statutory obligation to not make the Directors' Solvency Declaration if it was false or not supported by reasonable grounds. At present, we have not seen any evidence to suggest that the Directors breached their duties in relation to the making of that declaration.

40.2 Accordingly, we determined that weight should be placed on the fact that the Directors' Solvency Declaration had been completed.

40.3 Secondly, there was a possibility that the Redemption could be reversed and the Company's interest in the Fund could be recovered by prosecuting the Claims. As at the date of the Initial Solvency Determination, we had concluded that, subject to further investigation, there was a reasonable prospect that we would pursue a reversal of the Redemption and a recovery of the Company's interest in the Fund. As discussed

above, if this action was successful, this could result in the reversal of the Fund's divestment and a return of US$269 million of net asset value to the Company.[5]

*The case for an insolvent determination*

41 On the other hand, we considered that there were factors which might support a determination that the Company was insolvent:

41.1 First, neither of the Directors had returned an SOA confirming the financial position of the Company, which limited visibility over the Company's net asset position.

41.2 Secondly, it was uncertain at the date of the Initial Solvency Determination whether Hueston would return the Hueston Retainer, and if so in what amount.

41.3 Thirdly, apart from the potential Claims, the Company had no material assets. This was indicated by the correspondence received from Walkers, and we had not recovered any material assets to the liquidation estate.

41.4 Fourthly, we had received a creditor claim from Mr Scott. However, the status of the Company's liabilities was itself uncertain, as no formal adjudication of any creditor claims, including those submitted by Mr Scott, had taken place.

*The case for a doubtful solvency determination*

42 Finally, we also considered whether there was a degree of uncertainty identified in the matters raised above which warranted a determination that the Company was of doubtful solvency. In doing so, we assessed whether the available information indicated that the Company was no

[5] However, no final decision had been made and discussions with our legal counsel were ongoing. We considered that further legal advice and investigations into the affairs of the Company leading up to the divestment would be required before any assets would be legally returned to the Company.

more or less likely to be solvent than insolvent, having regard to the likely resolution of some particular contingency or the likely outcome of a combination of unrelated contingencies. On this basis, we concluded that a determination of doubtful solvency was not appropriate, as the information available to us did not support a position of equipoise between solvency and insolvency.

**The Initial Solvency Determination we reached**

43 Based on the available information received in respect of the Company, we ultimately determined that the Company was solvent as at the date of the Initial Solvency Determination with net assets of US$39,946. This was because we:

43.1 expected to receive the Hueston Retainer, with either US$58,731 or US$150,000 at best, being returned to the liquidation estate;

43.2 had only received one creditor claim from Mr Scott in the amount of US$18,785 as at that date, noting that no POD had been submitted by Campbells;

43.3 we did not include any provision for claims by the Participating Shareholders, as no such claims had been asserted and, on the information then available, further liabilities of that nature appeared unlikely; and

43.4 we did not attribute any value to professional fees, as the Funding Agreement was sufficient to cover such costs on a limited-recourse basis up to the Initial Solvency Determination.

44 We calculated net assets of US$39,946 by taking the conservative estimates for the Company's assets and subtracting the single creditor claim we had received at the time of the Initial Solvency Determination. This is depicted in the table below.

| Balance Sheet Item | Estimated Value (as at 2 June 2025) US$ |
|---|---|
| **Assets** | |
| Value of the Company | 0.00 |
| Hueston Retainer | 58,731 |
| **Liabilities** | |
| Creditor Claims | (18,785) |
| Participating Shareholders | 0 |
| **Net Surplus (balance-sheet basis)** | |
| Total assets less total liabilities | **39,946** |

45 For completeness, even if Campbells had submitted a POD in respect of the four invoices totalling US$15,103.79, the Company's net asset position would nonetheless have remained positive as at the date of the Initial Solvency Determination.

**RE-EVALUATION OF THE INITIAL SOLVENCY DETERMINATION AFTER OBTAINING SANCTION TO COMMENCE THE FSD PROCEEDINGS**

46 On 11 July 2025, just over a month after the Initial Solvency Determination, we applied for sanction to commence the FSD Proceedings on behalf of the Company. This was sanctioned by the Court on 14 July 2025. The Claims were then filed on 15 July 2025, and they are set to ultimately be determined by Parker J in FSD 201 of 2025 (RPJ). The Claims include, among others, claims for damages or equitable compensation, orders for restitution or disgorgement, accounts of profit, as well as restoration of the Company's property.

47 Our assessment of the Company's solvency is ongoing, and the Claims represent contingent assets which have become a material consideration in our monitoring and re-evaluation of the appropriate solvency determination. This is due to the fact that, if the Company's Claims are successful:

47.1 the Company will recover significant assets, with an approximate value as at the date of this affidavit of over US$269 million, that will be more than sufficient to repay all existing and anticipated creditor claims; and

47.2 the economic interest in the liquidation would lie with the Participating Shareholders.

48 We would not have commenced the FSD Proceedings (nor sought sanction of the Court to do so), unless we were satisfied that the Claims had reasonable prospects of success. In our view, the viability of the Claims was reflected in the Court's decision to sanction the commencement of the FSD Proceedings, which further supported a determination that the Company was solvent on a balance sheet basis at the time that the FSD Proceedings were commenced.

49 Since the commencement of the FSD Proceedings, we have treated the Claims as a contingent asset for balance sheet purposes. In valuing that contingent asset, we have had regard to the net asset value of the Fund, based on the financial information available to us from time to time. That information has indicated a net asset value in the range of approximately US$269 million to US$292 million. Our valuation reflects a genuine and fair estimation of the probability of the Claims being successful and the scale of any potential recovery. We also note that the Claims are not limited to proprietary relief in respect of the Fund, but also include claims in damages which, if successfully made out, would similarly be sufficient to satisfy the Company's creditors.

50 Upon obtaining sanction to commence the FSD Proceedings on 14 July 2025, we were aware of the following assets:

50.1 The Hueston Retainer, which had been recovered in full, totalling US$150,000.

50.2 A cash balance of US$5,789 transferred to the Company by the JVLs on handover of the liquidation, representing surplus funds remaining from the voluntary liquidation.

50.3 The Claims pursued in the FSD Proceedings, as described above.

51 The assets identified above were considered in the context of our ongoing review of the Company's financial position following the commencement of the FSD Proceedings. While the realised cash assets were nominal, the Claims represented a potentially substantial source of value. Those matters were therefore taken into account in our subsequent assessment of the Company's balance-sheet position.

52 Over the same period, the Company's pre-appointment liability position had not changed from that considered at the time of the Initial Solvency Determination.

53 The Company did incur post-appointment liabilities arising from the conduct of the liquidation and commencement of the FSD Proceedings. These comprised our fees and disbursements (principally legal fees), which were to be paid from funds provided under the Funding Agreement.

54 Taking those matters together, and applying a balance-sheet test, distinguishing between: (i) the assets and liabilities of the estate; and (ii) those liabilities to be settled from funds outside of the estate, we concluded that the Company remained solvent following the commencement of the FSD Proceedings, with a substantial net surplus once the contingent value of the Claims was taken into account.

55 As noted above in paragraph 30,30 there was a change in the Company's pre-appointment liability position. Following further correspondence with Mr Scott, the amount of his pre-appointment claim was reduced from US$18,785.36 to US$5,285.36. That reduction was recorded in the liquidation records and taken into account in the Company's solvency position on an ongoing basis.

**SOLVENCY RE-EVALUATION FOLLOWING MR PATRICK'S POD, THE INTERIM COSTS CERTIFICATE, AND THE FINAL COSTS CERTIFICATES**

56 Mr Patrick submitted a POD dated 31 October 2025 asserting a claim in the amount of US$741,981.12 (plus contingent interest) in respect of alleged indemnification and advancement obligations under the Company's Articles of Association and an executive employment agreement. We have not assessed that claim yet, and we have instead taken it at face value for the purposes of solvency assessment.

57 The Interim and Final Costs Certificates we received in October and November 2025 and February 2026 arose from the sanction summons hearing held on 24 June 2025 in respect of the appointment of our legal counsel (the "**Counsel Summons**"). Following that hearing, the Court ordered that the costs of DFW and Mark Patrick (in his capacity as the management shareholder of the Company) arising out of and in connection with the Counsel Summons up to and including 20 June 2025 be paid out of the assets of the Company as an expense of the liquidation, to be taxed on the indemnity basis if not agreed with the JOLs.

58 During the subsequent taxation process:

58.1 the Interim Costs Certificate with respect to DFW's bill of costs in the amount of US$135,350.25 was made and served on the JOLs on 31 October 2025;

58.2 a final costs certificate with respect to Mark Patrick's bill of costs in the amount of US$674,744.57 was provided to the JOLs on 23 November 2025; and

58.3 a final costs certificate with respect to DFW's bill of costs in the amount of US$542,664.45 (inclusive of the US$135,350.25 awarded by way of the interim costs certificate) was made in respect of DFW's costs and served on the JOLs on 9 February 2026.

59 Consistent with our duties as JOLs, we reviewed and re-evaluated the Initial Solvency Determination based on these new circumstances as they arose.

60 In carrying out those reassessments, we noted that the Company's asset position had not changed from that previously identified, notwithstanding any change in the Fund's underlying assets. In particular, the Claims continued to represent the Company's principal potential source of value, alongside the limited cash assets already recovered. Over the same period, following the reduction of Mr Scott's Indemnity Claim in August 2025, the Company's pre-appointment liability position remained otherwise unchanged.

61 The Interim and Final Costs Certificates represented the crystallisation of post-appointment liabilities arising from the conduct of the liquidation, properly characterised as expenses of the liquidation. Although the amounts reflected in the certificates are substantial, taken together with the professional fees and costs in conducting the liquidation, they were considered in the context of the Company's overall financial position, including the continued existence and contingent value of the Claims.

62 Taking these assets and liabilities into account, we concluded that the appropriate solvency determination remained that of solvent. Again, this reflected the position that if the Company's Claims in the FSD Proceedings are successful:

62.1 the Company will recover significant assets that will be more than sufficient to repay all liabilities and creditor claims, including the Final Costs Certificates; and

62.2 the parties with the economic interest in the liquidation will be the Company's Participating Shareholders.

**SOLVENCY RE-EVALUATION FOLLOWING THE DELIVERY AND APPEAL OF THE JUDGMENT**

63 The Judgment was formally issued on 10 February 2026. The order arising from the Judgment was subsequently issued on 23 April 2026. While the Learned Judge declined the Injunction Application, he found, among other things, that there is a serious issue to be tried in respect of whether the Directors acted in breach of their fiduciary duties in carrying out the DAF Restructuring. For the reasons discussed below, while the Judgment prompted us to reconsider the contingent asset value we had attributed to the Claims (and in turn the Company's solvency determination), the Judgment ultimately did not change our view.

64 Following delivery of the Judgment, and as part of our ongoing review of the Company's solvency, we considered the Company's assets and liabilities as they then stood. In doing so, we noted that the Company continued to have limited realised cash assets and that the Claims continued to be treated as a contingent asset for balance-sheet purposes. Over the same period, no new pre-appointment creditor claims had arisen, and the Company's liability position continued to comprise pre-appointment creditor claims (as previously adjusted) together with outstanding post-appointment costs incurred in the conduct of the liquidation, including professional fees and costs, together with the Interim and Final Costs Certificates.

65 We continued to value the Claims at their full value based on our genuine and fair estimation of the probability and timing of the Claims being successful. In this respect we considered the following factors (among others):

65.1 The Judgment was in respect of the Injunction Application and not a final determination of the merits of the Claims. The Judgment was made based on affidavit evidence and limited expert evidence rather than live witness evidence, and the proprietary claims would be fully ventilated at trial. Additionally, even if the Company's proprietary claims were not made out, it would still have claims against the defendants in the underlying FSD Proceedings for damages.

65.2 We considered the Judgment to be appealable on several grounds. Accordingly, we filed a Notice of Appeal in respect of the Judgment on 24 February 2026.[6] A Memorandum of Grounds of Appeal was subsequently filed on 3 March 2026 along with applications for a special sitting of the Appeal and interim injunctive relief pending the Appeal (the "**Interim Injunction Application**").

65.3 The CICA heard the Interim Injunction Application on 27 March 2026, and it granted the Company interim relief pending the Appeal on 31 March 2026.

66 In this respect, and without waiver of privilege, we consider that the Appeal and the Claims in the underlying substantive FSD Proceedings have at least reasonable prospects of success. Our view is supported by the CICA's decision on 31 March 2026 to grant the Company interim relief pending the Appeal. We understand that the CICA would not have granted the Company's Interim Injunction Application if it had concluded that the Appeal did not have a real prospect of success. Further, the CICA also indicated during the hearing of the Interim Injunction Application that, while the Company had a right of appeal in respect of the Judgment, it would have granted the Company leave to appeal if leave had been required because there was a seriously arguable case for the Appeal.

[6] The Appeal is scheduled to be heard on 3 and 4 September 2026 during the Summer Session.

67 Our current assessment of the assets and liabilities of the Company is addressed below, starting at paragraph 70.

**RELEVANCE OF THE UBS SETTLEMENT AGREEMENT TO THE SOLVENCY DETERMINATION**

68 DFW has specifically asked us to confirm whether our solvency determination accounted for the UBS Settlement Agreement (specifically paragraph 3(c)). We confirm that we have considered the UBS Settlement Agreement and its relevance to the solvency determination. Based on our assessment of the available information, we concluded that it was not a material factor. In reaching this conclusion we considered the following factors (among others):

68.1 Paragraph 3(c) of the UBS Settlement Agreement stated that the CLO HoldCo related parties being released under the UBS Settlement Agreement did not include the Company. Accordingly, the Company is not subject to the protections afforded under the UBS Settlement Agreement.

68.2 To the best of our knowledge, the UBS Parties have never threatened or asserted any claim against the Company, and there is no reason to believe that they will do so.

68.3 We understand that any claim against the Company, if made, would likely have to rely on an alter ego argument in circumstances where James Dondero is clearly not in control of the Company, nor to the best of our knowledge has he ever been.

68.4 The Directors (who include Mr Patrick) would have known about the UBS claims and did not have any such concerns when they made the Directors' Solvency Declaration on 2 April 2025 upon placing the Company into voluntary liquidation. While we may be able to secure further books and records in respect of the Company depending on the outcome of the Recognition Proceedings, we are not aware of any events or material

changes in circumstances that would render the Directors' assessment incorrect or change the conclusion.

69 Accordingly, based on a genuine and fair estimation of the probability and timing of any potential claims by the UBS Parties (a "**Potential UBS Claim**"), we have not ascribed any value as a contingent liability in the Company's balance sheet. However, if a claim was ever asserted or made against the Company, we would consider all of the relevant circumstances and factor that into our ongoing assessment of the Company's solvency determination.

**CURRENT ASSETS AND LIABILITIES, AND THE CURRENT SOLVENCY DETERMINATION**

70 Since the commencement of the liquidation of the Company, we have issued:

70.1 the First Report dated 2 July 2025 for the period of 6 May 2025 to 30 June 2025; and

70.2 our Second Report to the Company's Contributories dated 30 September 2025 for the period of 1 July 2025 to 31 August 2025.

71 Our Third Report to the Company's Contributories is due to be issued by 9 July 2026. However, for the purposes of this affidavit, we have summarised the assets and liability position of the Company as at 31 March 2026 based on the information obtained to date and the circumstances I have discussed in this affidavit. Again, outcome ranges have been presented for some items to reflect uncertainty as to realisation and quantum.

**The current asset position of the Company**

72 The categories of assets potentially available to the Company's liquidation estate are:

72.1 the Company's interest in the Fund and its associated Claims in the FSD Proceedings, with a contingent asset value of between approximately US$269 million and US$292 million;

72.2 the Hueston Retainer with an estimated value of US$150,000; and

72.3 surplus proceeds from the voluntary liquidation of the Company that were recovered by the former JVLs with an estimated value of US$5,789.

**The current liability position of the Company**

73 The Company's current liabilities fall into two groups—pre-appointment liabilities and liquidation driven post-appointment liabilities. The Company's prima facie pre-appointment liabilities are:

73.1 Mr Scott's Indemnity Claim for reimbursement with an agreed value of US$5,285.36; and

73.2 Mr Patrick's alleged indemnity and advancement of legal fees with an approximate prima facie value of US$741,981.12.

74 As before, we have not included the Campbells Invoices, the Kroll Costs, or any Potential UBS Claim as liabilities of the Company for the purposes of our solvency determination.[7]

75 Turning to post-appointment liabilities, these are outstanding costs that have been solely incurred as a consequence of the Supervision Order and the conduct of the official liquidation. At the end of March 2026, these liabilities were:

---

[7] However, we note that even if these items were to be included, they would not alter the solvency position on a balance-sheet basis and the Company would still have more than sufficient assets to satisfy its liabilities.

75.1 the JOLs' remuneration and disbursements, totalling approximately US$2.25 million;

75.2 Cayman legal fees and costs, including ATE insurance, totalling approximately US$5.51 million;

75.3 foreign legal fees and costs, totalling approximately US$1.45 million;

75.4 taxed adverse costs in favour of DFW totalling approximately US$540,000; and

75.5 taxed adverse costs in favour of Mr Patrick totalling approximately US$670,000.

76 Our intention is that our remuneration, legal fees, and costs incurred in connection with the investigation and pursuit of the Claims will be funded on similar terms to the Funding Agreement (i.e., on a purpose-specific basis where the funder's recourse will be limited to recoveries made upon the Claims being successful). Accordingly, while these costs have been incurred, they have not been taken into account for the purpose of our solvency determination. For the avoidance of doubt, I confirm that even if these amounts were included in the balance sheet for the purposes of the solvency determination, they would not change the outcome.

77 Without any waiver of privilege, we have also considered estimated costs through to trial. However, it is intended that these costs will be similarly funded on a limited-recourse and purpose-specific basis. This means that we have also not taken these costs into account for the purposes of our solvency determination. Again, for the avoidance of doubt, I confirm that even if these amounts were included in the balance sheet for the purposes of the solvency determination, they would not change the outcome.

**The Current Solvency Determination**

78 Taking the current and contingent asset and liability positions together, we still consider that the Company is solvent on a balance-sheet basis. The Company has a substantive contingent

asset arising from the sanctioned litigation, the potential value of which is measured by reference to the current net asset value of the Fund (approximately US$292 million).[8] Against this, we have received two PODs totalling US$741,981.12, which are considered as being valid solely for the purposes of solvency assessment. Post-appointment costs and exposures arise solely from the conduct of the official liquidation and FSD Proceedings and are funded on a limited-recourse basis pursuant to a Court-sanctioned arrangement. It is intended that further funding will be obtained on materially similar terms to cover the ongoing costs and expenses.

79 In these circumstances and having regard to the proper treatment of contingent assets and liabilities, we are satisfied that the Company should properly be treated as solvent. This position is depicted in the table below:

| Balance Sheet Item | Estimated Value (as at 31 March 2026) US$ |
|---|---|
| **Assets** | |
| Company's Interest in the Fund, and the Claims | 292,000,000 |
| Hueston Retainer | 150,000 |
| Cash surplus from voluntary liquidation | 5,789 |
| **Subtotal (assets)** | **292,155,789** |
| **Pre-appointment liabilities** | |
| Mr Scott's Indemnity Claim | (5,285) |
| Mr Patrick's alleged indemnity (POD not yet adjudicated) | (741,981) |

[8] First affidavit of Mark Eric Patrick sworn on 24 March 2026 in relation to CICA No.3 of 2026 at paragraph 60.

| | |
|---|---|
| **Subtotal (pre-appointment liabilities)** | **(747,266)** |
| **Post-appointment liabilities** | |
| Adverse costs (DFW) | (540,000) |
| Adverse costs (Mr Patrick) | (670,000) |
| **Subtotal (post-appointment liabilities)** | **(1,210,000)** |
| **Net surplus (balance-sheet basis)** | |
| **Total assets less total pre-appointment and post-appointment liabilities** | **290,198,523** |

**Closing comments**

80 Mr Bhowmik and I have read the seventh affidavit of Mark Eric Patrick sworn on 12 February 2026. It contains a series of serious and unprecedented accusations against us which, if true, would amount to professional misconduct. These allegations were first advanced within weeks of our appointment and have been the subject of detailed and robust responses from us and objected to in the strongest possible terms. Notwithstanding those responses, Mr Patrick persists in repeating them. We take such accusations extremely seriously and reject them in the strongest possible terms. While I do not propose to address in this affidavit each of the accusations or issues raised by Mr Patrick, I emphasise that we are licensed insolvency practitioners with significant experience in company liquidations. We take our professional duties as independent officers of the Court with the utmost seriousness and integrity. We have never been subject to any professional or regulatory censure of any kind. We have no affiliation with Mr Dondero, the Participating Shareholders, or any other stakeholders beyond our role as independent JOLs of the Company. We stress that the solvency determination we have

reached is based on our informed *bona fide* view of all of the available information in respect of the Company's financial position.

81 Consistent with our duties as the JOLs of the Company, Mr Bhowmik and I will (as is appropriate in the context of any liquidation) continue to review and consider the solvency determination of the Company based on the circumstances known to us. Our current view is that the Company has been appropriately determined as solvent.

SWORN to at Ugland House, )

George Town, Grand Cayman )

This 15th day of May 2026 )

before me )

Margot MacInnis

Marcia Evans

Notary Public – Cayman Islands

Commission expires on 31 January 2027



FILED by Maples and Calder (Cayman) LLP, attorneys for the JOLs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/MCL/TQR/858403.01).