# EXHIBIT 6

**NEUTRAL CITATION NUMBER: [2026] CIGC (FSD) 9**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**B E T W E E N:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

**Plaintiff/Applicant**

**- AND -**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD**

**Defendants/Respondents**

| | |
|---|---|
| **Before:** | The Hon. Raj Parker |
| **Heard:** | 15 and 16 December 2025 |
| **Appearances:** | Andrew Ayres KC with Caroline Moran, Luke Armitage and Alasdair Munro of Maples and Calder (Cayman) LLP on behalf of the Company |
| | Andrew Scott KC with Mark Goodman, Ronan O’Doherty and George Connolly of Campbells LLP on behalf of the 1st, 3rd, 5th and 6th Defendants |
| | David Quest KC with Peter Tyers-Smith and Daniel Mills of Kobre & Kim (Cayman) on behalf of the 2nd Defendant |
| | Jennifer Colegate with Fleur O’Driscoll and Nia Statham of Baker & Partners (Cayman) Limited on behalf of the 4th Defendant |

**Draft judgment circulated:** 28 January 2026

**Judgment delivered:** 10 February 2026

*Proprietary injunction - jurisdiction - s.11 of the Grand Court Act (2015 Revision) - O.29, r.1 and r.2 of the Grand Court Rules - test for grant of injunction - serious issue to be tried - nature of proprietary interest - discretion - cross undertaking in damages - fortification - charitable fund structure - Cayman Islands exempted limited company in structure to make charitable distributions for US tax reasons to US charities - reorganisation by directors of fund structure - transference of limited partnership interest without notification to supporting organisations - claims of improper purpose to gain control - claims of excessive remuneration against directors - alleged transactions at undervalue.*

*Introduction*

1. Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "Company") is a Cayman Islands exempted company. It applies[1] for a proprietary injunction restraining the disposal of and dealing with assets over which the Company asserts a proprietary claim.

2. The application arises from transactions procured by the First and Second Defendants (Mr Mark Patrick and Mr Paul Murphy, collectively "the Directors" and D1 and D2) in alleged breach of fiduciary duties owed to the Company.

3. Four parties addressed the Court over a two-day hearing. Mr Andrew Ayres KC represented the Company, Mr Andrew Scott KC represented D1, D3, D5 and D6 (the "CDM Defendants" or "CDM Entities"), Mr David Quest KC represented D2 ("Mr Murphy"), and Ms Jennifer Colegate represented D4 ("DFW").

4. All of the Defendants contested the application on various grounds. The affidavits and exhibits submitted on the application are voluminous.[2]

5. In a nutshell the Company's claim alleges that unlawful steps were taken by the Directors to divest the Company of its sole asset, which is a limited partnership interest (the "Partnership

---

[1] *By summons dated 15 July 2025 as amended on 4 December 2025.*
[2] *Including: First Affidavit of Margot MacInnis; Third Affidavit of Margot MacInnis; Second Affidavit of Mark Eric Patrick; Third Affidavit of Mark Eric Patrick; First Affidavit of Paul Murphy; First Affidavit of Alexander L. Reid; First Affidavit of Douglas Mancino; First Affidavit of Marvin Bradford Bedingfield.*

Interest") in a Cayman Islands exempted limited partnership, Charitable DAF Fund, LP (the "Fund").

6. The Company alleges that control of the Partnership Interest of the Company was transferred to D3 and/or D4, entities under Mr Patrick's sole control and ownership, for a gross undervalue of c.US$ 1.6 million in March 2025.

7. The Company points to the fact that the Fund's net asset value was estimated at c.US$ 270 million in September 2024.

8. The joint official liquidators ("JOLs")[3], who bring the claim on behalf of the Company, are concerned that the Directors remain in control of the relevant assets and that the Company has been divested of its control of the Fund. They are concerned that value has been lost and will continue to be lost while the Directors enrich themselves by paying themselves what the JOLs say are 'vast and unjustifiable' fees and by the expenditure of large sums under the guise of 'ordinary business expenses'.

*Factual Background*

*The Fund*

9. The factual background to the Fund's establishment and the transfer of the Partnership Interest is explained in the First Affidavit of Margot MacInnis sworn 15 July 2025 ("MacInnis 1"). The following is a summary of the relevant structures and transactions which show how this worked.

10. The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the US.

11. The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "ARLPA").

12. The Fund was formed in 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland Capital Management, L.P. ("Highland"), to enable certain assets to be donated to those registered charitable organisations.

---

[3] *Appointed on 6 May 2025.*

13. The Fund's sole asset is or was its single share, comprising 100% of the issued share capital in CLO HoldCo, Ltd (D6).

*The Company*

14. The Company, until recently the Fund's sole limited partner, and owner of the 99% Partnership Interest, was incorporated in the Cayman Islands on 7 November 2011.

15. The Company's share capital is divided into Participating Shares and Management Shares[4]:

(1) The entirety of the Participating Shares were, from 2011 to 2024, held by four non-profit U.S. companies[5] (the "Original Participating Shareholders") that act as "Supporting Organisations" to US charities (the "Charities").[6] Each is a charitable entity exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code of 1986 (the "IR Code"). Mr Dondero was (and remains) involved at board level with these Supporting Organisations, but according to Ms MacInnis he does not control them. The Defendants say that he does own and in effect controls them.

(2) The Management Shares were initially held by a Mr Grant Scott, but were transferred to Mr Patrick on 25 March 2021, on which date Mr Patrick was also appointed to replace Mr Scott as sole director of the Company.

16. On 22 April 2021, Mr Patrick, as Management Shareholder, appointed Mr Murphy as a director of the Company. Mr Murphy is resident in the Cayman Islands.

17. The Company's Memorandum and Articles of Association[7] provide that Management Shareholders had the right to receive notice of, and to attend, to speak at and to vote at, any general meeting of the Company, but no right to participate in the profits or assets of the Company (Article 11).

---

[4] *Authorised share capital of US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.*
[5] *Highland Dallas Foundation, Inc, Highland Santa Barbara Foundation Inc, Highland Kansas City Foundation Inc (together the "Highland Foundations"), and subsequently Community Foundation of North Texas ("CFNT").*
[6] *Save that CFNT an underlying charity, has no "Supporting Organisation" and holds its shares in the Company directly.*
[7] *The memorandum and articles of association dated 27 October 2011; and the amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.*

18. The Participating Shareholders have no right to vote at Company meetings, but did have rights in a winding up or repayment of capital and the right to participate in the profits or assets of the Company by way of dividend in accordance with Article 12.

19. The Participating Shareholders therefore have the economic interest in the Company, whereas the Management Shareholders have the control rights.

20. The Company was placed into voluntary liquidation by directors' resolution on 2 April 2025.

*The General Partner of the Fund*

21. Under the ARLPA, sole control over the management and distribution of the Fund's assets was granted to the Fund's general partner. From its formation until 7 March 2024, the Fund's General Partner was Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands (the "Original GP"). On 25 March 2021, the same date he appointed Mr Patrick sole director of the Company, and transferred his 100 Management Shares to him, Mr Scott also transferred to Mr Patrick the entire issued share capital in the Original GP. On 7 March 2024, the Original GP was replaced by CDH GP, Ltd, a Cayman Islands incorporated company (D5 and the "New GP"), of which Mr Patrick is sole shareholder and director.

*Charitable Purpose and Tax Considerations*

*The Fund's Purpose*

22. The purpose of the Fund was to make investments for the ultimate benefit of the Charities which the Supporting Organisations supported.

23. The Charities are the following four U.S. charitable or non-profit organisations:

(1) *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over US$1 billion in grants and manages over US$500 million in assets.

(2) *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over US$7 billion in grants and manages over US$6 billion held in charitable funds.

(3) *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over US$800 million.

(4) *North Texas Community Foundation*: which manages assets totalling US$513 million and donated US$38.9 million to local non-profits in 2023.

*The Tax Structure*[8]

24. As a matter of US tax law, in order for the Charities to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore 'corporate blocker', i.e. the Company.

25. Section 501(c)(3) of the IR Code provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that they receive income classified as unrelated business taxable income ("UBTI").

26. Section 509 of the IR Code defines the term "supporting organisation" as a tax-exempt entity that must be organised and then operate exclusively either (i) for the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of, one or more supported organisations (the Charities). The supported organisations must also be s501(c)(3) entities.

27. Both the Charities and the Supporting Organisations apparently meet the criteria of s501(c)(3), and are therefore exempt from US state and federal taxes save to the extent that they receive UBTI.

28. Apparently as a matter of US tax law, some income received directly from the Fund by the Charities would likely be considered UBTI.

29. In order to 'insulate' the Charities from UBTI, instead of holding their interest in the Fund directly, the Supporting Organisations hold their interest through an 'offshore corporate blocker' structure, i.e. the Company.

30. The purpose of inserting the Company into the structure was that any tax that was due from these investments would be paid at the Company level, and the proceeds would then be distributed to the Supporting Organisations and then to the Charities free of any tax liability.

[8] *See affidavit of Marvin Bradford Bedingfield.*

*Company Submission on this Structure*

31. The Company argues that:

(1) The Supporting Organisations (the four non-profit US companies who were the original Participating Shareholders) and the Charities hold or ultimately hold the real economic interest in the Fund;

(2) They are not merely discretionary beneficiaries whom the Fund may or may not choose to confer a benefit on, but the ultimate owners of the Fund, albeit through the Company as a tax filter, and with the Fund having its own discretion as to how to manage its investments; and

(3) The fact that the GP had a discretion as to whether to make any distribution to any of the Participating Shareholders does not change this analysis.

*Relationship between Supporting Organisations and the Charities*

32. As to the relationship between the Supporting Organisations and the Charities:

(1) The Supported Organisations (Charities) are said to control the Supporting Organisations (Participating Shareholders) through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations (Participating Shareholders);

(2) The Supporting Organisations (Participating Shareholders) support the Supported Organisations (Charities) by way of paying fees (i.e. making grants) to them from time to time from their assets, including any dividends received from the Company;

(3) The Supporting Organisations (Participating Shareholders) have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to their relevant Charity in furtherance of their charitable purposes; and

(4) Whilst Mr Dondero sits on the board of the Supporting Organisations (Participating Shareholders), he does not control them, as a supermajority of the votes are always held by the respective Charity.

33. As described above, the structure was set up to make discretionary distributions to qualifying tax exempt organisations under Section 501(c)(3) of the IR Code. US tax rules apparently require donors to cede 'dominion and control' over contributed assets and for donees to be genuinely independent from donor influence.[9]

*Mr Patrick's Role*

34. Mr Patrick is a US attorney and was employed as tax counsel by Highland from 2008 to 2021, and as tax counsel by Highland Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024. Highland is a group of companies set up by Mr Dondero. Mr Patrick was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore 'blocker' company.

35. From March 2021, Mr Patrick was the sole director of the Company, and holder of the 100 Management Shares in it, and the sole director and shareholder in the Fund's general partner (as at March 2021, the Original GP). Mr Patrick occupied a position informally termed "the Control Position", the effect of which was that Mr Patrick was in effective sole control of the limited partner (i.e. the Company), the general partner (the Original GP), and was therefore in effective sole control of the Fund and all its assets, albeit, according to the Company, with no economic, residual, beneficial or winding up interest in either the Company or the Original GP.

*Directors' Fees and Expenditure*

36. The Company says that the Fund's annual expenses showed increases in expenditure which show:

(1) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 and increased further to around US$2.25 million in the first half of 2024; and

(2) Expenses overall for the first half of 2024 were around US$18.3 million, almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

---

[9] *Patrick 2 section D, Reid 1 and Mancino 1.*

37. As is explained in MacInnis 1,[10] in October 2024, Mr Patrick executed an employment agreement, under which he was entitled to receive a base salary of US$850,000; a long-term incentive plan payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and is eligible for both annual and discretionary bonuses as determined at the sole and absolute discretion of the Directors.

38. The Company points to Mr Grant Scott's salary during his previous tenure which, by contrast, was approximately US$60,000 per annum, and says Mr Patrick's remuneration and benefits are 'grossly excessive'.

*The Divestiture of the Company's Limited Partnership Interest in the Fund*

*Supporting Organisations' Concerns*

39. In late October 2024, as a result of concerns arising from the expenditure by the Directors on fees and expenses, the Supporting Organisations asked for financial information from Mr Patrick.

40. On 11 November 2024, Holland and Knight, U.S. attorneys for the Supporting Organisations, sent a letter to Mr Murphy advising that they no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations.

41. On 26 November 2024, Mr Patrick sought advice from Walkers (Cayman) LLP ("Walkers"), then Cayman attorneys to the Company, as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations and insert a new member able to oppose a potential winding up petition brought by the Supporting Organisations on just and equitable grounds.

42. On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition would be taken into consideration and would likely help any efforts Mr Patrick might make to resist such a winding up.

---

[10] *At §49.*

*The Reorganisation*

43. The Company relies on the following steps taken by the Defendants, each without informing the Supporting Organisations or the Charities.

*CDM*

44. On 18 December 2024, the Directors passed a resolution (the "18 December Resolution"), under which:

> "*In connection with a corporate restructure of the Company's group, the Company proposes to transfer, convey, assign or otherwise contribute to CDMCFAD, LLC, a Delaware limited liability company (the "Transferee"), 100% of the Company's interests in CHARITABLE DAF FUND, LP, an exempted limited partnership established in the Cayman Islands (the "Partnership") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liability company interests in the Transferee (the "Transfer"*).

45. The 18 December Resolution also provided that (based apparently on US tax advice) the proposed assignment of the Partnership Interest to D3, CDM (the "CDM Assignment"):

> *"… would help insulate the DAF from exposure to [Dondero] and his entities … who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the participating shareholders/supporting organizations, which could imperil the assets of the DAF";* and that

> *"The IRS would look favorably upon any and all attempts for DAF to maintain its influence from 'what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement'".*

46. This resolution was given effect by way of a Deed of Assignment and Assumption of the same date which was executed by Mr Patrick on behalf of each of: (i) the Company, in his capacity as Director; (ii) CDM, in his capacity as Manager; and (iii) the New GP, in his capacity as Director (a position which the Company says gives rise to an irreconcilable conflict of interest).

47. CDM is a Delaware limited liability company. Its Certificate of Formation, dated 12 December 2024, is signed by Mr Patrick, who is CDM's sole member.

48. Also on 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "LLC Agreement").

49. The LLC Agreement provides that:

> "*Fair Market Value shall have the meaning set forth in Section 6.9(b).*
>
> *...*
>
> *The initial Manager shall be Mark Patrick.*
>
> *...*
>
> *6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; <u>provided</u>, <u>however</u>, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*
>
> *...*
>
> *6.9 Valuation of Company Assets.*
>
> *(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*
>
> *(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*
>
> *...*
>
> *7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal*

*amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion."*

50. The Company says the effect of these changes was that:

(1) CDM was inserted into the corporate structure and as a subsidiary of the Company and would hold the Partnership Interest (previously held by the Company);

(2) The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been the Partnership Interest, was exchanged for its membership of CDM (the "Company's CDM Membership"); and

(3) The Company's CDM Membership was inherently fragile as it was held in a company that (by a combination of Delaware law and the LLC Agreement) was owed no fiduciary duties by its manager, Mr Patrick; and subject to redemption at any time of Mr Patrick's choosing, and for any price of Mr Patrick's choosing, subject to the 'good faith' proviso at paragraph 6.9(a) of the LLC Agreement.

*New Shares to DFW*

51. In February 2025, the Directors again sought advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders, *"in light of a possible just and equitable winding up petition"* being filed by one of the Supporting Organisations.

52. On 7 February 2025, the Company's board passed a resolution (the "Share Issuance Resolution") approving a proposed share issue of 318 Participating Shares, of a nominal or par value of US$0.01 each as fully paid up, to D4, DFW. Paragraph 5.2 of the Share Issuance Resolution noted that "*following the Share Issuance, DFW shall own 51.04% of the issued Participating Shares of the Company*."

53. DFW is, according to its Certificate of Incorporation, a Delaware non-profit non-stock corporation. It is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes, incorporated on 9 December 2024, and was incorporated by Mr Douglas Mancino, then a partner at Seyfarth Shaw, a U.S. law firm apparently engaged by the Fund. The sole member of DFW is Mr Patrick.

54. The Share Issuance Resolution stated that the Directors believed the issuance of shares to DFW was justified as a means of protecting the Company, because:

(1) There was a heightened risk that the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company;

(2) Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero; and

(3) The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

55. The Company says the effect of the Share Issuance Resolution was to remove the majority that was held by the Original Participating Shareholders, and to dilute their shareholding into a minority stake. DFW (D4) now holds 51% of the Participating Shares.

*The Admission and Redemption*

56. On 27 March 2025, the Company entered into a letter agreement with CDM, pursuant to which it was agreed that CDM would redeem the Company's CDM Membership, and CDM would admit DFW to membership of CDM, with DFW obtaining membership in it.

57. On 27 March 2025, Mr Patrick executed:

(1) Admission and Amendment No.1 Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(2) Admission and Amendment No.2 Agreement under which CDM redeemed (the "Redemption") the Company's CDM Membership for the same sum of US$1,637,192 (the "Redemption Sum").

58. On the same day, Mr Patrick executed a written consent (the "Manager Consent") to the Admission and Redemption, on behalf of CDM, under which the Admission and Redemption was justified by reference to Participating Shareholders allegedly posing a material risk to the Company, due to:

"*among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii).*"

59. The Company says that the substantive financial effect of the Redemption, under which DFW paid the Redemption Sum to CDM, and the Company's CDM Membership was redeemed for the Redemption Sum, was that the Company's CDM Membership was purchased by or otherwise transferred to DFW for the Redemption Sum.

*Effect of the Reorganisation*

60. The Company says that the result of these transactions, all done 'in secret', is that:

(1) The Company realised its interest in the Fund, which it says had a Net Asset Value ("NAV") of c.US$269.1m, for only US$1.6m;

(2) The Company made a distribution to Participating Shareholders (c.US$1.6m);

(3) The Supporting Organisations and the Charities were divested of their indirect interest in the Fund, and the assets underlying the Fund; and

(4) The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

*The Issue of Control*

61. The Company argues that:

(1) the Company, in its role as tax blocker and which formerly held a very valuable interest in the Fund, no longer has that interest or anything like proper value in exchange for it;

(2) the Charities have been completely disconnected from the Fund and structure which was set up to produce capital and income for their activities; and

(3) Mr Patrick remains in control of the Fund and its assets but in a way and pursuant to a structure which has no supervision by the Charities or the Supporting Organisations, and nor do they have any economic interest in it.[11]

62. The Defendants in answer broadly say that:

(1) It is because of Mr Dondero's historic intermeddling and wrongdoing that the Control Person for the DAF structure, D1 (Mr Patrick), acted to reorganise the DAF structure to protect it from Mr Dondero's predations and the risks these posed to its assets and charitable mission, in the sole service of which the Company existed;

(2) Mr Patrick took this protective restructuring action together with the other director of the Company, D2 (Mr Murphy), in good faith, believing it to be in the best interest of the Company, and acting with the benefit of legal and tax advice from an array of respected advisors in this jurisdiction and in the US;[12] and

(3) CDM redeemed the Company's membership interest for fair market value, and the Company paid dividends with the proceeds to its Participating Shareholders.

63. Mr Patrick and Mr Murphy vehemently deny, for the reasons set out in detail in their affidavit evidence, that the restructuring was done in breach of their fiduciary duties to the Company or that they are in any other way in breach as alleged by the Company.

64. Mr Ayres KC for the Company described the reason given for the restructuring as a bogus reason. It has never been properly explained how the assets of the Fund might be imperilled by Mr Dondero.

---

[11] *The claims are pleaded in the Statement of Claim dated 15 July 2025 and amended on 15 October 2025.*
[12] *Including Walkers (Cayman) LLP ("Walkers"), Maples & Calder (Cayman) LLP ("Maples") and Campbells LLP in the Cayman Islands, Shields Legal Group, Carrington Coleman & Sloman & Blumenthal, L.L.P, Dorsey & Whitney and others in the US, and Tony Beswetherick KC in the UK.*

*The Interim Undertakings and Disclosure*

65. The JOLs originally requested urgent injunctive relief last year and the application was listed for 31 July 2025, the last day of term. In the event there was a compromise, the hearing was adjourned and a series of undertakings (the "Interim Undertakings") were given by the Defendants pending the determination of this application.

66. In outline, the effect of the Interim Undertakings was as follows:

(1) Pending the determination of this application, the Defendants and the CDM Entities undertook not to deal with or dispose of any assets of the CDM Entities other than in the ordinary course of business;

(2) The Defendants undertook not to dispose of or diminish the value of their, or any, interest in the Fund other than in the ordinary course of business;

(3) The Defendants and the CDM Entities were not prohibited from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with these proceedings or the official liquidation of Charitable DAF HoldCo, Ltd (in Official Liquidation) FSD 116 of 2025 (JAJ) (the "Liquidation Proceedings"), or the related Chapter 15 recognition application commenced by the JOLs; and

(4) The Defendants were to provide a retrospective notification of transactions below US$50,000, and agreed to give 7 days' notice of any transactions above US$50,000.

*The JOLs' Continuing Concerns about the Interim Undertakings*

67. The JOLs say that the Interim Undertakings, although not adequate for the long-term because there is no ability to prevent any inappropriate or suspicious transactions, were agreed out of a desire for a pragmatic compromise to adjourn a hearing on the last day of the summer term.

68. They say that the Interim Undertakings were expressed to apply only until the determination of the present application (as opposed to through to trial), and the Defendants expressly agreed as part of the Interim Undertakings that the issue of whether they are permitted to use funds that

derive directly or indirectly from the Partnership Interest to pay their legal fees and other service providers will be determined as part of this application.

69. The JOLs are also concerned that the 'ordinary course of business' exception to the prohibition contained in the Interim Undertakings is susceptible to exploitation by Mr Patrick and Mr Murphy because they are likely to say that their 'exorbitant' fees are paid in the ordinary course of business, and are also concerned that the legal fees that have been incurred by the Defendants so far are excessive.[13]

*JOLs' Legal Fees - Funding Agreement*

70. In July 2025, the JOLs filed an *ex parte* sanction application in the Liquidation Proceedings seeking approval to enter a funding agreement (the "Funding Agreement") with an entity named Crossvine Litigation Funding LLC ("Crossvine"), a special purpose vehicle whose managers are Mr Scott Ellington and Mr Michael McDonald. Mr Ellington is apparently a longtime business associate of Mr Dondero.

71. On 5 September 2025, the JOLs notified DFW (D4) (but apparently none of the other Defendants) that they had exhausted the litigation funding provided by Crossvine.

72. Crossvine is apparently:

> "*incorporated for the purpose of ultimately Mr Dondero … funding the liquidation of the Company and the JOLs pursuing the Proposed Proceedings*"[14]

73. As to the arrangements with Crossvine, the CDM Defendants maintain that through the Company, the JOLs are asserting proprietary claims over assets of the CDM Entities that include causes of action and litigation receivables which would inure to the benefit of the liquidation estate, and those causes of action and litigation receivables are, in many cases, directly adverse to the interests of Messrs Dondero and Ellington.

74. The CDM Defendants believe this constitutes an unacceptable conflict of interest, as does the profit Mr Dondero stands to make on any sums advanced under the Funding Agreement.

*Disclosure*

---

[13] *Amounting to, as far as the JOLs are aware, at least US$4,256,882 (MacInnis 3, §111).*
[14] *MacInnis 6, §11.*

75. The JOLs also complain that the disclosure provided by the Defendants under the Interim Undertakings has been deficient. The disclosure deficiencies are described in the detailed chronology referred to at §106 of MacInnis 3. It is not necessary to set them out. They are denied by the Defendants.

76. The JOLs are of the view that no exercise has been undertaken to determine where the assets of the Fund and each of its subsidiaries are held, which raises a wider question about how Mr Patrick has performed his duties to manage the Fund, receiving large fees for doing so, without proper information concerning the Fund's assets. This again is denied by the Defendants, particularly the CDM Defendants.

77. The JOLs say Mr Patrick's attempt to justify his approach at Patrick 2 §151, is cursory and unconvincing.[15]

78. The JOLs argue that the objection is not that consolidated balance sheets were provided, but that there was a failure to provide more detailed, entity-by-entity disclosure that would provide the JOLs with proper visibility into the Fund's asset position.

79. The CDM Defendants respond that the DAF structure historically produced consolidated balance sheets and accompanying quarterly valuation materials. That was always what was provided to the Supporting Organisations and was given to the JOLs immediately following entry into the Interim Undertakings on 31 July 2025.[16]

*The Relevant Law*

*Proprietary Injunction*

80. It is important to emphasise that this is an application for a proprietary injunction. It is not an application for *Mareva* style relief which would require a risk of dissipation and which would normally include an ordinary course of business exception. A proprietary injunction would not usually provide such an exception.

---

[15] *"...as the DAF Structure prepares consolidated financial materials in the ordinary course, I believe that these allegations are incorrect".*

[16] *They add that once the JOLs requested entity specific financials (which go beyond the existing consolidated records), the CDM Defendants engaged an external accounting firm, Armanino LLC, to prepare entity-level financial information at year-end 31 December 2024, and subsequently as at 30 June 2025.*

*Jurisdiction*

81. The Court's power to grant such relief arises under s.11 of the Grand Court Act (2015 Revision) in conjunction with O.29, r.1 and r.2 of the Grand Court Rules (2023 Revision) ("GCR").

*"Section 11.*

*(1) The Court shall be a superior court of record and, in addition to any jurisdiction heretofore exercised by the Court or conferred by this or any other law for the time being in force in the Islands, shall possess and exercise, subject to this and any other law, the like jurisdiction within the Islands which is vested in or capable of being exercised in England by-*

*(a) Her Majesty's High Court of Justice; and*
*(b) the Divisional Courts of that Court, as constituted by the Senior Courts Act, 1981, and any Act of the Parliament of the United Kingdom amending or replacing that Act.*

*Application for injunction (O.29, r.1)*

*1. (1) An application for the grant of an injunction may be made by any party to a cause or matter before or after the trial of the cause or matter, whether or not a claim for the injunction was included in that party's writ, originating summons, counterclaim or third party notice, as the case may be.*

*(2) Where the applicant is the plaintiff and the case is one of urgency such application may be ex parte on affidavit but, except as aforesaid, such application must be made by motion or summons."*

82. A key feature of the jurisdiction is that a proprietary injunction is only available where the plaintiff can maintain a *prima facie* proprietary claim to the assets which are the subject of the injunction.

§28-199 of Grant and Mumford on Civil Fraud (1st ed) ("Civil Fraud") states:

*"Accordingly, where a claimant asserts a claim in specie to relevant property that claimant can apply to the court for an interim injunction aimed at preserving in the hands of the defendant that property on the basis that at trial the claimant will seek a*

> *remedy which involves the return of that property to the claimant. The term "proprietary injunction" is used to describe the type of injunction issued by the court in response to such a claim."*

*Test*

83. In deciding whether to grant a proprietary injunction, the Court applies the principles of *American Cyanamid v Ethicon Ltd [1975] AC 396.*[17]

84. In applying those principles, the applicant must establish three general matters:

(1) There is a serious issue to be tried on the merits;

(2) The balance of convenience is in favour of the grant of an injunction; and

(3) It is just and convenient to grant the injunction.

85. This Court, in *In Frabran Holdings Limited and Ors. -v- Daventree Trustees Limited and Ors,*[18] ("*Daventree Trustees*") confirmed the application of the *American Cyanamid* principles to proprietary injunctions, and stated at §154:

> *"In applications for proprietary injunctions, the matter is one for the discretion of the court. On ordinary principles, a plaintiff beneficiary would have to show:*
>
> *a) a prima facie case the property is his,*
>
> *b) a serious issue to be tried that the trust property is in danger pending the hearing of his claim,*
>
> *c) that damages would not be an adequate remedy,*
>
> *d) that the balance of convenience favours the grant of an injunction,*

---

*[17] Polly Peck International plc v Nadir [1992] 4 All ER 769 at 784G-H.; In Ascentra Holdings Inc (in OL) v Yoshida [2024 (1) CILR 409] at §96 (Parker J).*
*[18] Parker J (Unreported, 17 January 2024).*

> e) *and that it is just and convenient to order an injunction.*"[19]

86. In a recent case Ramsay-Hale CJ helpfully set out the scope of the Court's power to order proprietary injunctions[20] at §29:

> *"The scope of the Court's power to make property preservation orders pursuant to GCR O.29, r.2(1) is usefully summarized in the White Book:*
>
> *i. the source of the Court's power is the inherent jurisdiction of the Court to secure by orders the just and proper trial of the issues: see White Book note 29/8A/2;*
>
> *ii. the Court may only make an order in relation to property "which is the subject-matter of the cause or matter or as to which any question may arise therein." The property must be bona fide the subject-matter of the action: see note 29/8A/7;*
>
> *iii. the order may be granted even where the party against whom it is sought has a proprietary interest in it. An order should not be refused merely because the defendant claims that he has a discretionary power to determine whether or not the property should be preserved and how it should be preserved, when one of the issues in the case is whether or not the power is untrammelled by a duty to the plaintiff to preserve the property: Johnson v Tobacco Leaf Marketing Board [1967] VR 427."*

*Serious Issue to be Tried*

87. The Company must show a serious issue to be tried that it has a specific proprietary interest in the asset under consideration i.e. the Partnership Interest. The test is whether the claim has a real (as opposed to a fanciful) prospect of success which would withstand a reverse summary judgment application.

88. As the Court said in *Ascentra*:[21]

---

*[19] See also Smellie CJ in Classroom Investments Inc v China Hospitals Inc [2015] (1) CILR 451 at §§50-57.*
*[20] Lakeshore Biopharma Co Ltd [2025] CIGC (FSD) 24 ("Lakeshore") Ramsay-Hale CJ.*
*[21] Ascentra Holdings, Inc (in official liquidation) v Yoshida [2024 (1) CILR 409] Parker J.*

> "97. *The company must show a serious issue to be tried, i.e., that there is a "real, as opposed to a fanciful, prospect of success on the claim." This is lower than the "good arguable case" threshold that applies in freezing injunction cases. A serious issue to be tried has to be shown on the evidence, not by mere assertion or allegation.*
>
> 98. *Further, it follows from the nature of a proprietary injunction that the serious issue to be tried should be in respect of facts which, if proven, would afford the claimant a proprietary remedy."*

*Balance of Convenience*

89. If a properly arguable claim to a proprietary interest is established, it may well be the case that damages will not be an adequate remedy if the property is dealt with pending trial, and so the balance of convenience will generally be in favour of the applicant.[22]

90. As Flaux J said in *Madoff Securities v Raven [2011] EHWC 3102 (Comm)* at §140, once a sufficiently arguable proprietary case has been established, arguments by respondents that '"*it would be frightfully inconvenient to tell you what I've done with your money or to be prevented from continuing to use it" when, on this hypothesis [the respondent] should not have had the money in the first place, do not cut much ice".*

91. Whilst the Court will not enquire too closely into the merits at this stage, where the scales are evenly balanced in relation to the balance of convenience, the Court can take into account the relative strengths of the parties' cases.[23]

92. As to the exercise of discretion, the court said in *Ascentra* at §124:

> *"The question in relation to this issue is which course is likely to involve the least risk of injustice or irremediable prejudice to one party or the other. The analysis will include the prejudice to the company if no injunction is granted, or to the defendants if it is, the likelihood of such prejudice actually occurring, the extent to which it may be compensated by an award of damages or enforcement of the cross-undertaking, the likelihood of either party being able to satisfy such an award, and the likelihood that the injunction will turn out to have been wrongly granted or withheld."*

[22] *Grant and Mumford (eds), Civil Fraud: Law, Practice, & Procedure ("Civil Fraud") at 28-206.*
[23] *Polly Peck International plc v Nadir [1992] 4 All ER 769 at 784G–784H.*

93. For the Court to exercise its discretion in all the circumstances of the case, the effect of the injunction must be examined to ensure that it is in the interests of justice overall and does not work unfairly, oppressively or is granted without good cause. The court must assess whether granting or refusing to grant an injunction is more likely to produce a just result.

94. As Lord Hoffmann said as to the purpose and effect of interim injunctions:

> *"It is often said that the purpose of an interlocutory injunction is to preserve the status quo, but it is of course impossible to stop the world pending trial. The court may order a defendant to do something or not to do something else, but such restrictions on the defendant's freedom of action will have consequences, for him and for others, which a court has to take into account. The purpose of such an injunction is to improve the chances of the court being able to do justice after a determination of the merits at the trial. At the interlocutory stage, the court must therefore assess whether granting or withholding an injunction is more likely to produce a just result…that means that if damages will be an adequate remedy for the plaintiff, there are no grounds for interference with the defendant's freedom of action by the grant of an injunction..."*[24]

*Just and Convenient*

95. Generally speaking where the Court finds that the balance of convenience favours the grant of the injunction, it would be unlikely that the Court found that it was not just and convenient to grant the injunction.[25]

*Use of Funds for Ordinary Course Business Purposes*

96. In *Polly Peck International plc v Nadir,* Scott LJ commented that a proprietary injunction "*would not be subject to provisos enabling the use of the money for normal business purposes, or for the payment of legal fees, or the like*".[26]

97. The rationale for this is that the applicant has established that the particular asset in question arguably belongs to him and so the question is whether the respondent should be permitted to use assets which may turn out to be the applicant's for any of those purposes.

---

[24] *National Commercial Bank of Jamaica v Olint Corp Ltd [2009] UKPC 16, at §16.*
[25] *Ascentra ibid, §150.*
[26] *Page 784.*

98. Therefore, in the case of a proprietary injunction, if ordered, whilst there is no presumption in favour of the exceptions for such payments being included in a proprietary order, the defendants may show (and the burden is on them) that it is nonetheless appropriate for any expenditure from the injuncted assets to be permitted.[27]

99. This issue was further examined in *Marino v FM Capital Partners [2016] EWCA Civ 1301* per Sales LJ at §23:

> "*Lewison J (as he then was) in Independent Trustee Services Ltd v GP Noble Trustees Ltd [2009] EWHC 161 (Ch) helpfully summarised the proper approach at para. [6] by setting out the four questions which should be addressed: (1) does the claimant have an arguable proprietary claim to the funds in issue? (2) if yes, does the defendant have arguable grounds for denying that claim? (3) if yes, has the defendant demonstrated that without the release of the funds in issue he cannot effectively defend the proceedings (or, it may be added, meet his legitimate living expenses)? (4) if yes, where does the balance of justice lie as between, on the one hand, permitting the defendant to expend funds which might belong to the claimant and, on the other hand, refusing to allow the defendant to expend funds which might belong to it?"*

*Legal Expenses*

100. Similarly, if there is an argument that provision for legal expenses is to be carved out from the injunction, the defendants will need to satisfy the court that they have no other source of funding available apart from the disputed funds, and that the balance of prejudice comes down in their favour.[28]

101. Further, Miles J in *AB v CD [2023] EWHC 2419 (Ch)* at §43 noted that the balancing exercise must be carried out in relation to "*all relevant circumstances",* and that *'[t]he court will "act cautiously so as to ensure that the funds are not wasted", which may be achieved by "limiting the amount ...even if that may cause a defendant to reassess how to pursue her case or to consider alternative funding models*"'.

[27] *Civil Fraud ibid at 32-059 to 32-060.*
[28] *Ascentra ibid, §151.*

*Ancillary Disclosure*

102. Ancillary to freezing and proprietary jurisdiction, it is well established that the Court has jurisdiction to require respondents to provide disclosure.

103. In the context of proprietary injunctions, it is legitimate for such disclosure orders to be aimed at establishing the whereabouts of missing funds, as opposed to merely policing the terms of the order.

104. As the editors of Civil Fraud point out at 29-028 to 29-029:

> "*The court's approach is epitomised in the famous dictum of Templeman LJ in Mediterranea Raffineria Siciliana Petroli SpA v Mabanaft GmbH:*
>
> > *"A court of equity has never hesitated to use the strongest powers to protect and preserve a trust fund in interlocutory proceedings on the basis that, if the trust fund disappears by the time the action comes to trial, equity will have been invoked in vain."*
>
> *The disclosure typically ordered in such a case is categorically different to a normal asset disclosure order. What the court is here doing is requiring the respondent to identify the current location and status of assets, or their proceeds, to which the claimant lays claim, even if they are no longer in the possession of the respondent and regardless of whether the respondent himself claims ownership of the assets…*"

*Cross-Undertakings and Fortification*

105. The court will normally require a cross undertaking in damages as the price for interfering with the defendant's freedom before they have been found liable for anything and to indemnify the defendants for any damage found wrongfully to have been caused to them by the injunction, if they ultimately prevailed at trial.[29]

[29] *Kelly v Fujigmo Limited [2012] (2) CILR 222 Smellie CJ at §13; JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2015] EWCA 139 at §68.*

106. This would be the usual order to achieve justice at the trial.[30] There are rare exceptions where the court has waived or limited the size of the cross undertaking required, but there would have to be a good reason not to make the usual order, for example where the applicant's inability to provide the undertaking has been caused by the wrongful conduct of the defendants or where there is no practical possibility of damage being suffered. The mere fact that the claim is being brought by liquidators of an insolvent company does not lead to the conclusion that a cross undertaking should be capped.[31]

*Fortification*

107. Assuming that the defendants can show:

(1) on a good arguable case basis, that the injunction will cause them loss; and

(2) that the party offering the cross undertaking will not be good for the money absent fortification,[32]

the approach is for the Court to make an intelligent estimate of the likely amount of any loss which might be suffered by the applicant for fortification by reason of making the interim order, and assess whether the making of the interim order is or was a cause without which the relevant loss would not be or would not have been suffered.[33]

*D1, D3, D5 and D6 (CDM Defendants) Arguments in Outline*

108. The following represents a summary of the points Mr Andrew Scott KC made on behalf of the CDM Defendants:

(1) Mr Patrick and Mr Murphy vehemently deny that there has been any breach of their fiduciary duties to the Company for the reasons set out in their affidavit evidence;

---

[30] *Hoffmann-La Roche & Co. A.G. v Trade & Indus. [1975] AC 295 at §361 (Lord Diplock), cited by the Cayman Islands Court of Appeal in Ennismore Fund Management Ltd v Fenris Consulting Limited [2020] (2) CILR 147 at §37.*
[31] *Re IAHP Group Holdings Limited; Bucknall v Rizvi [2025] EWHC 2069 (Ch) per Mellor J at §87.*
[32] *Omni Bridgeway (Fund 5) Cayman Invt Limited v Bugsby Property LLC & Anor [2024] Costs LR 405 per Jacobs J at §9.*
[33] *Daventree Trustees at §162.*

(2) The proprietary injunction sought, in respect of the limited partnership interest (the Partnership Interest) held by CDM is too wide and would restrain dealings with partnership assets of the Fund to which the Company has no pleaded proprietary claim;

(3) There is no legal basis for such a claim under the Exempted Limited Partnership Act (as amended) ("ELP Act") or the ARLPA;[34]

(4) The relevant assets are held by the general partner on statutory trust for the partnership and not by or for any limited partner;

(5) Even if there were a proprietary interest in the limited partnership, it is of no economic value to the Company, being a right to be considered by the general partner for discretionary charitable distributions for the benefit of qualifying Indirect Charitable Owners, and so any loss would fall on those owners, not the Company, and being financial in nature it could be adequately compensated in damages;

(6) The effect of the relief sought would be to 'lock down' the Fund and the CDM Entities and place their operations under the control of the JOLs, which is not justified. It would restrain the CDM Defendants from conducting their lawful business operations in the ordinary course, impairing their ability to make distributions to charitable causes;

(7) The Company's only rights as the former limited partner of the Fund were to be considered for discretionary distributions at the sole discretion of the general partner[35], and there is no justification for the JOLs taking such control;

(8) The Company's purpose and role within the DAF structure was to facilitate charitable distributions to qualifying non-profit organisations. It did not exist to operate or transact business as a commercial entity or to benefit its Participating Shareholders;[36]

---

*[34] The limited partnership interest is a bundle of contractual and /or statutory rights not a proprietary interest in the Fund's assets.*
*[35] See Article 4.2 of the ARLPA. The ARLPA also confirms that: (i) the General Partner has full, exclusive and complete discretion to manage the DAF's affairs and assets (Article 1.6(a)); (ii) Limited Partners do not participate in management and have no power to bind the DAF (Article 1.6(b)); (iii) distributions are at the General Partner's discretion (Article 4.2(a)); and (iv) partners renounce any right to partition partnership property (Article 6.14).*
*[36] See Asif J's comments at the June 2024 sanction hearing in the Liquidation Proceedings: "this structure is unlike the majority of funds in that there is no right to receive dividends. So it's purely discretionary, it's almost like a discretionary trust" and "could, for example, be set up as a foundation company."*

(9) The JOLs are being funded by Mr Dondero (who allegedly has a history of dishonesty and vexatious litigation) through a funding vehicle, Crossvine, established for his benefit, which has opaque financial standing;

(10) The reason Mr Patrick acted in late 2024 and 2025 to restructure was to protect the Fund from Mr Dondero's predations and the risks[37] that these posed to its assets and charitable mission;

(11) Both Mr Patrick and Mr Murphy carried out the restructuring in good faith believing it to be in the best interests of the Company having taken legal and tax advice from respected advisers in this jurisdiction and in the US;[38]

(12) When Mr Patrick and Mr Murphy caused the Company to assign the Partnership Interest as part of the DAF restructuring, they did so in good faith, in the best interests of the Company, and for valuable consideration in the form of the Company's CDM Membership. They likewise acted when the Company's CDM Membership was redeemed. The Company was paid US$1,637,192 upon redemption, a fair market valuation supported at the time by two independent valuation exercises (by ValueScope and FTI) and subsequently confirmed by a third independent firm, Weaver & Tidwell LLP ("Weaver").[39] Having received the fair market value of its CDM membership interest, the Company immediately distributed those proceeds to the Original Participating Shareholders;

(13) Having carried out the restructuring, there is no realistic risk that CDM will dispose of or diminish the value of the Partnership Interest now that it has been put beyond Mr Dondero's reach;

---

*[37] An illustration of that exposure is, according to the CDM Defendants, the litigation that UBS pursued in the US Courts against Mr Dondero and entities with which he was affiliated or controlled (the "UBS Litigation"). On 8 February 2023, UBS filed a Special Turnover Petition whereby, apparently, it sought to challenge as fraudulent certain transactions by which attempts were made to put assets beyond UBS's reach and to affix liability to the entities involved on the basis that they were the "alter egos" of Mr Dondero. One such transaction involved D6 ("CLO HoldCo"), one of the holding companies within the DAF Structure, which was joined as a defendant to the petition. UBS alleged that "CLO HoldCo is a wholly owned subsidiary of [the DAF] which Dondero indirectly controls and has funded from personal assets, his family trusts, and HCM". Mr Patrick and Mr Murphy were able to settle UBS's claims and secure broad releases for the benefit of CLO HoldCo and other CDM Entities. The CDM Defendants say that UBS were willing to settle and provide releases as they were satisfied that CLO HoldCo and the CDM Entities were no longer aligned with Mr Dondero.*
*[38] The decision-making is recorded in the Company board resolutions dated 18 December 2024,7 February 2025 and 2 April 2025.*
*[39] See Patrick 2 at §81.*

(14) The relief sought would risk causing irremediable harm to the Fund, the CDM Entities, and their ongoing businesses, impairing the charitable mission they support by US$126.7 million[40]. The JOLs are unwilling or unable to offer a properly fortified cross undertaking in damages in respect of this risk and so the balance of convenience weighs decisively against granting the injunctive relief;

(15) The imposition of an injunction stands to benefit Mr Dondero, and Mr Ellington personally. For example, it would prevent the CDM Entities from pursuing valuable litigation claims which are adverse to their interests (claims which, taking the JOLs' pleaded case at its height, would otherwise inure to the benefit of the liquidation estate); and

(16) There is no basis for a proprietary injunction against Mr Patrick in respect of his properly incurred, approved and documented salary and bonus payments or the two pieces of US real estate referred to in the pleaded case, as he was paid by other entities within the structure, not the Company, and it has no pleaded proprietary claim to those assets or any *prima facie* case that they belong to it.[41]

*Constructive Trust*

109. The CDM Defendants also argue that there is also no arguable proprietary case available to the JOLs that:

(1) CDM holds its limited partnership interest in the Fund on constructive trust for the Company; or

(2) DFW holds the Participating Shares issued to it on constructive trust for the Company; or

(3) DFW holds its membership interest in CDM on constructive trust for the Company.

---

[40] *As set out in the Damages Report from ValueScope.*
[41] *Mr Patrick is a US citizen who lawfully purchased these assets with remuneration received from his employment by US entities.*

*No Assets at Risk*

110. The CDM Defendants argue that even if any of the proprietary claims were sustainable, they would not support the extraordinary relief sought, where the JOLs have had the benefit of the Interim Undertakings, which have 'held the ring' in a manner that is just and convenient and which has allowed the Fund and the CDM Entities to further their charitable mission in the ordinary course of their business.

111. The CDM Defendants say that the criticisms the JOLs advance[42] are not a fair reflection of how they have worked in practice and that there has been no exploitation of the ordinary course of business exception as alleged. The CDM Defendants also say the JOLs have had ample opportunity to police and if required prevent suspicious transactions of which there have been none.

*Remuneration*

112. They strongly refute the criticisms regarding the alleged excessive remuneration received by Mr Patrick and Mr Murphy[43] and rely, in respect of Mr Patrick's remuneration, on the compensation benchmarking work done by Mercer, a global consulting firm, and by the remuneration/compensation committee.

113. They also rely on the fact that the JOLs have not filed expert evidence which challenges Mercer's recommendations. They point out that the comparisons the JOLs make with Mr Grant Scott's historical remuneration are inappropriate for a number of reasons, not least that Mr Scott's role was fundamentally different in scope, complexity and exposure to Mr Patrick's. They say that Mr Scott only passively managed the structure, outsourcing management of the assets and investment decisions to entities owned or controlled by Mr Dondero, who then charged significant investment management and advisory fees.[44]

*Modified Undertakings*

114. The CDM Defendants refer to the modified set of undertakings that they offered on 24 November 2025, to last until the determination of the trial, subject to the provision of appropriate fortification of the cross undertaking, which the JOLs refused.

---

*[42] See MacInnis 3.*
*[43] See in detail Patrick 2 and Murphy 1.*
*[44] Estimated at approximately US$30 million between 2014 and 2020, Patrick 2 at §137.*

115. As to the modified undertakings offered, Mr Ayres KC explained the objection taken by the JOLs, in particular to the suggestions which now said that the CDM Entities would only be obliged to give 7 days' notice of transactions above US$100,000 (as opposed to US$50,000) and that no disclosure was required of payments made by the CDM Entities to Mr Patrick and Mr Murphy above US$50,000 where the payments were contractual salary or bonus entitlements accrued in the ordinary course.

116. Mr Andrew Scott KC argued that if the Court were minded to grant some form of injunctive relief, it should be the minimum necessary to maintain the *status quo* pending trial and any order should be modelled on these undertakings.

117. He argued that the JOLs' criticisms regarding the Interim Undertakings' apparent 'inadequacies' and lack of protection are overblown. He submitted that the JOLs have not shown any irreparable harm to the Company or that there is any real risk that the assets would be adversely dealt with.

*Texas Proceedings*

118. Reference was made to Texas proceedings which it is necessary to briefly describe.

119. The Highland Foundations applied in July 2025 to obtain a Temporary Restraining Order that would have 'locked down' the DAF structure.

120. In the Texas Petition, the Highland Foundations sought (among other things) the imposition of a constructive trust over all assets, interests, and property of, and immediate injunctive relief to freeze all assets held in, the Fund. The Highland Foundations alleged that Mr Patrick owed them fiduciary duties which were breached in the restructuring that he organised.

121. The CDM Defendants point out that the Judge in the Texas proceedings observed to the Highland Foundations at the hearing that:

> "*I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone. Your concern is you don't want to confirm it away. But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that".*

122. The matter was settled (by the Rule 11 Agreement) upon the CDM Entities giving undertakings on 11 July 2025.

123. Mr Scott KC invited the Court to endorse the Texas court's recognition that there was no risk of irremediable harm. Particularly in the light of the Rule 11 Agreement in Texas where undertakings were given not to make payments other than in the ordinary course of business, for investments and monies to be kept in the entities which they currently resided in, and for there to be no further change in the corporate structure. Subject to that the Fund and its assets could be operated in the ordinary course.

124. Mr Ayres KC pointed out that these proceedings did not concern the Company, the relief sought was not refused and the agreement made was outside the JOLs' control.

125. Mr Scott KC urged the Court to have regard to the effect of an injunction which would:

(1) cause serious and irreversible prejudice to the CDM Defendants by restraining them from conducting their lawful business operations and impairing their ability to make distributions to charitable causes; and

(2) benefit Mr Dondero and Mr Ellington personally. It would, he said, prevent the CDM Entities from pursuing valuable litigation claims which were adverse to their personal interests which would be otherwise for the benefit of the liquidation estate, and it would also benefit them personally as they would gain from any uplift of sums advanced under the funding agreement.

*Legal Fees*

126. The CDM Defendants argue that the JOLs' criticism of the amount of legal fees expended was misplaced because such fees were caused by the JOLs' litigation tactics in the U.S. and Cayman, for example their conduct of the sanction application in June 2025 which resulted in indemnity costs of *circa* US$1m being awarded against them in favour of DFW and Mr Patrick.

*D2 Submissions in Outline*

127. Mr David Quest KC's submissions included the following points on behalf of Mr Murphy:

(1) There is no adequately pleaded case or serious issue to be tried on the evidence that the payment of remuneration to Mr Murphy amounted to a breach of fiduciary duty;

(2) There is no tracing claim that money paid to him by way of remuneration would justify a proprietary, as opposed to a personal, claim against him;

(3) If there were any such case, the proper plaintiff would be the corporate entity that made the payment and the Company did not make any payment. The Company does not have and never has had its own source of liquidity given its purpose as a blocker for UBTI;[45]

(4) The Company has no proprietary claim to the assets of the Fund and less so to the assets held by subsidiaries of the Fund because its limited partnership interest only gave it an entitlement to be considered for discretionary charitable distributions, not for its own account but for the account of the appropriately qualified charities;

(5) The Terms of the ARLPA[46] made clear that the Company had no entitlement to remain an object of the charitable purposes of the Fund and, unlike a shareholder, never had any right to exercise managerial control over the Fund assets;

(6) Pursuant to section 16(1) of the ELP Act, the general partner of the Fund held its sole asset (the shares in CLO HoldCo) on trust for the Fund in accordance with the ARLPA;[47]

(7) Damages would be an adequate remedy if liability were established at trial and so the balance of convenience is against any proprietary injunctive relief;

(8) If an injunction were granted against Mr Murphy, the assets in question would have a maximum value of US$900,000[48] which is insignificant compared to the value of the overall claim (c.US$270m); and

[45] *Patrick 1, §30-31.*
[46] *LPA 2011 cl.4.3 and LPA 2024 cl.16.*
[47] *Section 16: "(1) Any rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof that is conveyed to or vested in or held on behalf of any one or more of the general partners or which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner and if more than one then by the general partners jointly, upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement".*
[48] *Although he has been spending money on outgoings: Murphy 1, §§84-87.*

(9) An injunction would be highly invasive and prejudicial to Mr Murphy as it would freeze most of his liquid assets and the bank accounts into which his salary and bonus were paid.

*DFW (being the majority Participating Shareholder of the Company) (D4) Submissions in Outline*

128. The only liquid assets which DFW holds are the discretionary distributions it receives through its limited partnership membership in CDM (the "CDM Interest"). It also has 51% of the Participating Shares of DFW in the Company.

129. Ms Jennifer Colegate's submissions included the following points:

(1) The property in the hands of DFW was not property which could be followed or traced from the Company to DFW, and as such cannot be the subject of a constructive trust;

(2) There is no basis for restitution as between DFW and the Company in respect of the CDM Interest because the interest conferred on DFW has not been done so at the expense of the Company - it was redeemed for value;

(3) Damages would be an adequate remedy if the redemption was found at trial to be for insufficient consideration;

(4) There is no serious issue to be tried as to the Company having a proprietary interest under Cayman law in the CDM Interest and it is not pleaded how agreements governed by the laws of Delaware would support the imposition of a proprietary injunction;

(5) The Company does not and cannot as a matter of law hold title to its own shares and cannot assert a constructive trust over shares it has issued;

(6) There is no risk of DFW disposing of any assets and DFW has no intention to do so;

(7) An injunction would prevent DFW from making charitable distributions to charities in accordance with the Fund's charitable purposes; and

(8) DFW should be allowed to defray necessary legal costs from funds available to it via CDM.

***Decision***

*Is there a serious issue to be tried that the Company has a proprietary interest in the asset(s) over which an injunction is sought to be imposed?*

130. The Court has carefully considered whether the Company, as a limited partner in the Fund, has a proprietary interest as a limited partner which would entitle it to be protected by way of the injunction sought and/or an indirect beneficial interest in the underlying assets of the Fund.

131. The Court answers both of these questions in the negative.

132. Taking a step back, wide interim proprietary injunctive relief with similarly broad orders for asset disclosure are sought by the Company which would require (among other things) each Defendant to:

> *"preserve and… not in any way dispose of, deal with, encumber, transfer or diminish the value of… any interest… in Charitable DAF Fund, LP… the Fund Entities… and/or any assets of the Fund",*

with no exceptions for ordinary course dealings.

133. The Court accepts the Defendants' submissions that it would restrain dealings with partnership assets of the Fund to which the Company has no pleaded proprietary claim which may be because, under Cayman law, the assets are held by the general partner on statutory trust for the partnership and not by or for any limited partner.

134. An Exempted Limited Partnership ("ELP") under Cayman law is different from an ordinary partnership and a registered company. It has no legal personality.

135. The property and rights of an ELP are held on trust by the general partner as an asset of the partnership in accordance with the terms of the partnership agreement.[49]

136. The limited partners do not own those assets, whether legally or beneficially. They instead have contractual rights under the ARLPA and statutory rights under the ELP Act. Those rights do not in the Court's view found a seriously arguable proprietary claim to partnership assets.

---

[49] *Section 16(1) of the ELP Act.*

137. Notwithstanding this, a limited partner may be said to have a 'proprietary interest' in the partnership assets,[50] a concept which Mr Ayres KC relied upon.

138. However, in the same way beneficiaries under a discretionary trust may have a 'proprietary interest' in the trust assets and their interests are to be considered.

139. The limited partnership interest in this case is not a proprietary interest in the assets themselves but the right to be considered for potential distributions[51] which the Company then passes on to the Charities.

140. The Court is not satisfied in this case that there is a real prospect of showing that the Company has a legitimate proprietary claim to legal or beneficial ownership of the assets it seeks to injunct.

141. The Court has examined the particular features of the legal structure of the ELP and the terms of the relevant partnership agreement to ascertain the extent and nature of any proprietary claim and entitlement of the limited partner.[52]

142. The recitals to the ARLPA provide that the purpose of the Fund was to:

> "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of* ***the Limited Partner and its Indirect Charitable Owners****…"*. (emphasis added)

143. Clause 1.3 of the ARLPA provides that:

> "*… the Partnership may make investments in other types of securities, investment vehicles and instruments* ***in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners".*** (emphasis added)

---

*[50] Aquapoint LP (in Official Liquidation) v Fan [2025] UKPC 56 per Lord Richards at §48: this view was expressed in the context of a winding up petition appeal, not a proprietary injunction case.*
*[51] Y v R [2018] 1 CILR 1 Mangatal J at §59 and §§66-68 and JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA) [2016] 1 WLR 160.*
*[52] The legal interest of the limited partner is expressed in the partnership agreement to be an ownership interest equal to each limited partner's opening capital account: clause 4.1 of the ARLPA.*

144. "*Indirect Charitable Owners"* is defined in clause 1.12 of the ARLPA as:

> "***the indirect equity owners of the Limited Partners****, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code."* (emphasis added)

145. Clause 4.2(a) of the ARLPA provides that:

> "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash* ***and the needs of the Indirect Charitable Owners of the Limited Partner*** *for funds to cover their administrative and operating expenses…*". (emphasis added)

146. The particular position and purpose of the Company in the structure gives it no proprietary claim to the assets of the Fund or the assets held by the subsidiaries of the Fund.

147. The Company's limited partnership interest only gave it an entitlement to be considered for discretionary distributions, not for its own account, but for the account of the appropriately qualified charities.

148. It is true that the Original Participating Shareholders had the right to be considered for a dividend from the Company (Article 12), but the purpose of the Fund was to make charitable distributions to the relevant Charities through the Company which was given no ownership rights and, in the Court's view, was not entitled to be an object of the charitable purposes of the Fund.

149. Mr Ayres KC submitted that clause 4.2 of the ARLPA is expressed in mandatory terms with regard to distributions, but reading the clause as a whole, together with the ARLPA, it is clear that discretion was left to the general partner after first taking into consideration available cash and the needs of the Indirect Charitable Owners.

150. It also appears from Mr Patrick's evidence[53] that the distributions which the Company made to each of the Supporting Organisations were not linked to the number of Participating Shares

[53] *Patrick 2, §§66-67.*

held by each organisation, but on a predetermined formula primarily linked to the Company's NAV. This is set out by Mr Patrick in an excel spreadsheet.

151. The Participating Shareholders did not receive a *pro rata* distribution or dividend from the Company and instead their annual distribution was dependent on the contractual terms which governed the relationship between each of these Supporting Organisations and their underlying Charities which are, as an average, set out in Mr Patrick's evidence:

> "§68 *These distributions were, on average, c.US$160,000 per annum for Highland Kansas City, c.US$280,000 per annum for Highland Dallas, and c.US$60,000 per annum for Highland Santa Barbara. In addition, CFNT was paid $100,000 per year annually in the fourth quarter of each year."*

152. This is further support for the Court's view, on a proper analysis, that the Company has no legal or beneficial claim to own assets of the Fund or the CDM Entities.

153. This also accords with the Mission Statement adopted by the Company and its objects.

154. The Mission Statement, adopted by the Company by way of written resolution of the Directors on 3 December 2024, stated:

> *'1. ADOPTION OF COMPANY MISSION STATEMENT.*
> *1.1 NOTED THAT:*
> *(a) The Company wishes to adopt a mission statement to clearly outline the purpose and objectives of the Company.*
>
> *(b) Based on the Company's operating history (which includes significant donations to various charities) and the reason for establishing the Company, the Company wishes to adopt the following mission statement:*
>
> *"Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference." ("Mission Statement")'*

155. The Court finds that this accords with the purpose of the Fund structure, which is to support the Fund's charitable mission, and that the assets are assets of the Fund which are held by the general partner on statutory trust in accordance with the ELP Act and the ARLPA.

156. Moreover, by clause 4.3 of the ARLPA, the general partner can terminate the limited partner's interest in its sole discretion and apparently at will. The limited partner has no entrenched rights.

157. Clause 4.3 of the ARLPA provides that:

> "*The General Partner may require the withdrawal of all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.*"

158. The following clauses also make clear that the Company is to be considered for distributions at the general partner's sole discretion, not for its own account, but for the benefit of the Supporting Organisations insofar as they qualified as Indirect Charitable Owners.

159. As the Court has found, that is not a proprietary right to the Fund's assets, but is a limited right consistent with the role of the Company to act as a tax blocker and conduit for charitable distributions.

160. Clause 1.6 (GP powers) of the ARLPA provides that:

> *(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs* ***and fulfill the purposes of the Partnership****;*[54] *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner. (emphasis added)*

[54] *i.e. principally to benefit the Indirect Charitable Owners.*

> (b) *Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement."*

161. In addition, in keeping with the limited rights afforded, Clause 6.14 of the ARLPA provides that all Partners:

> "*renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek to bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held*".

*Koza[55],Gill and Kaur, and Bourlakova*

162. Mr Ayres KC sought to rely on the English Court of Appeal's decision in *Koza* and the subsequent decisions which considered *Koza* to persuade the Court that a proprietary claim was justified in this case. The Court has carefully considered these decisions and the helpful submissions of both Mr Ayres KC and Mr Scott KC.

163. The Court has concluded that there is good reason not to follow each of these decisions in the way that Mr Ayres KC suggested the Court should. To explain why the court has decided not to follow them in the way Mr Ayres KC suggested, it is necessary to give short explanations and analysis.

164. The *Koza* case was principally concerned with the *Mareva* jurisdiction (freezing orders) of the English court, not the proprietary injunction jurisdiction.

165. One of the issues considered by the Court of Appeal was whether the court had jurisdiction to make the injunction regardless of whether there had been a breach of an undertaking given to

[55] *[2020] EWCA Civ 1018.*

the court. The Court of Appeal decided that there was such jurisdiction and Lord Justice Popplewell gave the leading judgment:

> *"67 Although at first sight it might seem surprising that the jurisdiction to make ancillary orders to enforce or render effective undertakings can be invoked when it is not, and never will be, definitively established that the threatened conduct is a breach of the undertaking, and there is no decided case revealed by counsel's researches in which it has been exercised in such circumstances, it seems to me that it is consistent with established principle and practice that such jurisdiction exists and can be exercised in such circumstances.*
>
> *68 The starting point is that where the court has by injunction restrained conduct in general terms, the ancillary jurisdiction permits the grant of a further injunction to restrain something specific which is within the scope of the general restraint.* ***This is a common feature of freezing orders****."*(emphasis added)

166. Popplewell LJ made the distinction between the freezing order jurisdiction and a proprietary claim to assets which he described as founding a principled basis for preserving those assets pending trial:[56]

> *"82 I would also accept the existence of this alternative jurisdictional basis for the injunction granted by the judge. Where there is a dispute over control of a company the court may make interim orders,* ***including freezing orders, whose purpose is to preserve the value of the company in favour of a party who has a legitimate interest in preserving its value.*** *(emphasis added)*
>
> *83 Section 37(1) of the Senior Courts Act 1981 is in very wide terms. ... Where a claimant has a proprietary claim to assets, there is obviously a principled basis for preserving those assets pending trial, and a proprietary freezing order is commonly granted in such circumstances.* ***In the present case Koza Altin has no proprietary claim as such to the assets in question: the funding will be from assets owned by its subsidiary, Koza Ltd. However, a parent company does have an interest in the use by its subsidiary of the latter's assets because such use affects the value of its shareholding in the subsidiary, and such***

[56] *§§82-83.*

> ***interest is proprietary in nature because the shareholding is a species of property.*** *It is, therefore, in accordance with principle that the court's wide jurisdiction under section 37 should be exercisable to protect such a proprietary interest in appropriate circumstances.* ***Koza Altin's proprietary interest in preserving the value of Koza Ltd's assets, and the consequent value of its own shareholding, is a legitimate interest which is capable of justifying protection by the grant of a freezing order****. It is a separate question whether the circumstances justify the grant of such an injunction in any particular case; but the existence of a power to grant it is consistent with principle."* (emphasis added)

167. As to the freezing order jurisdiction, the court needed to determine whether there was a real risk that the alleged expenditure at issue in breach of undertaking would be an unjustified dissipation of assets otherwise than in the ordinary and proper course of Koza Ltd's business.

168. In the Court's view, the *Koza* decision does not assist Mr Ayres KC in relation to the jurisdiction to grant the proprietary injunction in this case, where the facts are very different.

*Gill and Kaur*[57]

169. In this case the respondents to the injunctions did not appear and were unrepresented. Bryan J had heard no opposition to the injunctions and said, purporting to apply *Koza,* at § 40:

> "*In order to obtain a proprietary injunction, it is not necessary for the applicant to have a direct proprietary claim to the assets themselves."*

170. The Court finds this to be unpersuasive authority in the circumstances in which the Judge made that comment, against the jurisprudence to the contrary which requires a proprietary claim to the assets themselves.

[57] *[2025] EWHC 156 (Comm).*

*Bourlakova*[58]

171. This, unlike *Koza* and *Gill and Kaur, was* a proprietary injunction case where the claimant sought injunctions to restrain dealings with the company's assets pending trial. The claimants claimed to be shareholders of the relevant companies.

172. However, the judge in that case, Smith J, was not being asked to order an injunction which would prevent the companies from continuing in the ordinary course of their business. That is unusual for a proprietary injunction case, which unlike the freezing order jurisdiction, does not require a real risk of dissipation of assets and would normally not allow an ordinary course of business exception because the assets themselves are claimed to be owned by the applicant.

173. Smith J took *Koza* to establish that a proprietary injunction could be made to restrain the company from dealing with assets without the need for any proprietary claim and without the need to show any risk of unjustified dissipation.[59]

174. With respect to the Judge, this Court does not accept that the analysis he makes of Popplewell LJ's judgment in *Koza* is correct.

175. Popplewell LJ found on the particular facts of that case that the parent had an interest in the use by its subsidiary of the subsidiary's assets, even though it did not have a proprietary claim to those assets, because he found that such use affected the value of its shareholding in the subsidiary, and such an interest is proprietary in nature because the shareholding was a species of property.

176. Popplewell LJ, however, was dealing with a freezing order which could still be made provided its requirements were met in relation to a real risk of dissipation.

177. In any event, *Bourlakova* can also be distinguished on the facts.

178. An ordinary course exception is applied for in this case which concerns a limited partner interest in a Fund, not a shareholder's interest in a Company.

---

[58] *[2025] EWHC 1792 (Ch).*
[59] *§§140-144.*

*Lakeshore*[60]

179. Even if it could be said that the rights of the Company in this case, as a limited partner in the Fund, are somehow analogous to a shareholder's rights in the above three cases (which the Court doubts), the Court could not grant a proprietary injunction if there is no *prima facie* ownership interest in the relevant assets sought to be injuncted.

180. This issue was considered by the Chief Justice in *Lakeshore.* In that case a displaced shareholder sought a proprietary injunction against a company in respect of the company's assets. This was refused on the basis that there was no good claim to beneficial ownership of those assets and the shareholder rights asserted in that case did not found a basis for proprietary injunctive relief.

181. The Court held that a proprietary claim is one where the claimant asserts a legal or beneficial interest in an asset and that the asset must be specific and ascertained, citing Gee Commercial Injunctions (7th Ed.) at 2-026.[61]

182. The Court noted that a company's shareholders have no proprietary interest in its assets.

183. This Court accepts the reasoning in that case and applies it to this application.

*Valuation Issues*

184. The Court has also reviewed the detailed advice of Mr Beswetherick KC who advised the Company that the Company's objects, revised in line with the Mission Statement, could not realistically be challenged by the Participating Shareholders.[62]

185. The Court has concluded that the Fund structure in this case gave the Company and its Participating Shareholders no rights of legal or beneficial ownership or indeed control with regard to the Fund and its assets.

186. There is evidence that other charitable entities were unwilling to accept 'a gift of Participating Shares' on this basis:

---

[60] *[2025] CIGC (FSD) 24.*
[61] *§61 and see §§62-69.*
[62] *See §§56-60.*

> *"[t]hese charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point".*[63]

187. As borne out by the valuations conducted in this case, this outcome was of more limited economic value to the Company as a limited partner in the Fund than an asset valuation of the Fund's assets.

188. Having considered the Company's arguments and evidence, the Court takes the view that there is no good reason to impugn ValueScope's assessments of the CDM Interest,[64] or to second guess the FTI report[65] (which considered appropriate discounts in relation to the Participating Shares), and/or the Weaver fairness opinion.

189. The Court is unpersuaded on this application that the transactions undertaken were at an undervalue. The JOLs have adduced no valuation evidence.

*What Rights did the Company have as a Limited Partner in the Fund?*

190. The Court accepts Mr Scott KC's submissions that the Company's rights as a limited partner in this structure were not typical of those in a commercial Cayman investment fund. The Fund was not an investment vehicle for limited partners on commercial terms as is usually the case.[66]

191. Unlike a limited partnership agreement used for commercial investment purposes, the ARLPA did not have the usual provisions relating to, for example: the limited partners' capital commitments; investment objectives; carried interest and distributions; and investment periods. The Fund did not solicit capital from investors. There are no subscription agreements through which interests are taken up as the Supporting Organisations did not make any capital commitments. The Fund was not able to make capital calls against the Supporting Organisations or against the Company.[67]

---

[63] *Patrick Liquidation 1 at §96.*
[64] *7 January and 26 March 2025.*
[65] *27 March 2025.*
[66] *Patrick 1, §§89-99.*
[67] *Patrick 2, §63(d).*

192. Rather, the ARLPA reflects the charitable purpose of the Fund which was to benefit a defined class of qualifying beneficiaries, namely the Indirect Charitable Owners.[68]

193. As stated above, the Court agrees with the Defendants' submissions that the Company only had the right to be considered for discretionary distributions by the general partner at the partnership level and by the Directors at the Company level (by way of dividend).[69]

194. As a matter of US tax law, in order for the Charities to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore 'corporate blocker', i.e. the Company. The Company was constituted in a form to facilitate the surrender of ownership and control.

195. It did not hold any assets or cash reserves.[70]

196. It is clear having reviewed the Memorandum and Articles of the Company that the Participating Shareholders (who paid no money for their shares) had no control or ownership rights in the Fund's assets.

197. The Court accepts Mr Scott KC's submission that any economic rights that the Company may have had[71] were satisfied when the Company was voluntarily wound up after the restructuring had taken place.

*The Company's Pleaded Proprietary Claims against CDM and DFW*

198. The claims are in respect of:

(1) the limited partnership interest held by CDM;

(2) the participating shares held by DFW; and

(3) the membership interest in CDM also held by DFW.

199. They are all pleaded to arise from the restructuring on the basis of a constructive trust.

---

[68] *Murphy 1, §28.*
[69] *That is the basis on which ValueScope, FTI and Weaver produced the US$1.6 million valuation.*
[70] *Patrick 1, §31.*
[71] *Under Article 12 "The participating shares shall confer upon the shareholders rights in a winding up of repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles."*

200. The Court, consistent with its findings in relation to the proprietary injunction analysis, finds that those claims raise no serious issue to be tried. The Court finds that there is no seriously arguable case that the Participating Shares held by DFW and the CDM Interest also held by DFW were assets owned legally or beneficially by the Company. No constructive trust arises absent a proprietary interest.[72]

201. The Court is also unpersuaded that there is a real risk that those assets will be diminished or otherwise unlawfully dealt with (see below).

*The Injunction against Mr Patrick*

*The Corporate Entity which made the Remuneration Payments*

202. The Court has reviewed the relevant evidence and the pleadings. The Court takes the provisional view that the sums paid to Mr Patrick as remuneration for his work did not come from Company funds or assets.

203. Whilst there are Company board resolutions in respect of the payments, other companies in the structure actually paid Mr Patrick on behalf of the Company.[73] This may give rise to a proprietary tracing claim by the Company, but there is no seriously arguable case that the payments represent assets which belong to the Company.

*Excessive Remuneration*

204. The Company says in contrast to Mr Scott, who was paid US$60,000 per annum, Mr Patrick awarded himself sums comprising a base salary of US$850,000, a bonus of 2.5 times that base salary, and a long-term incentive ("LTI") payment of US$975,000. For the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000.

205. From disclosure provided pursuant to the Interim Undertakings, the JOLs say that Mr Patrick received, by way of director's fees, a total of US$10,548,778 in 2024 and US$3,325,000 in the first six months of 2025.[74]

---

[72] *Foskett v McKeown [2001] 1 AC 102.*
[73] *They seem to have been paid by Liberty CLO HoldCo, Ltd, CLO HoldCo Ltd, and Charitable DAF Holdings Corp.*
[74] *MacInnis 3, §52.*

206. Having reviewed the affidavit evidence on this question including the detailed report dated 26 August 2024 from Mercer, the Court finds that there is no serious issue to be tried that this remuneration was excessive and in breach of his duty to the Company.

207. If there were any such irregularity in Mr Patrick's remuneration, the Articles contain an indemnity for officers for conduct short of bad faith.

208. The remuneration levels were the subject of professional advice. Mercer undertook benchmarking and market research which considered the complexity of Mr Patrick's role and the value of the Fund's assets and holdings.

209. The JOLs and the Company have not provided any expert evidence to gainsay Mercer's view.

210. In addition, the remuneration was structured in accordance with legal advice including the establishment of a remuneration committee.

211. Mr Patrick's second affidavit and Mr Murphy's first affidavit set out in some detail the demands of the role of being a Director, their own expertise, and the level of risk involved, particularly in relation to the extensive litigation involving the Fund. Apparently, Mr Murphy was unable to obtain directors and officers insurance given the history of claims made by Mr Dondero.

212. It may be said that as a matter of common sense the Court should objectively assess whether the amounts paid were excessive.

213. Even if there was a seriously arguable case that these amounts were excessive from that point of view and Mr Patrick acted in breach of duty (in bad faith) in relation to his remuneration, the Court finds that this is not a proprietary claim of the Company and is a claim for which damages would be an adequate remedy.

214. The court finds that there is no serious issue to be tried that a proprietary claim lies against the Texas and Missouri properties such that would justify a proprietary injunction restraining the disposition of these properties. The Court accepts Mr Scott KC's submission that there is no pleaded proprietary claim to these specific properties and there is no *prima facie* case that the Company owns those properties or that they are the traceable proceeds of anything belonging to it.

215. There is insufficient evidence that the alleged excess remuneration was used to purchase these properties.

*The Injunction against Mr Murphy*

216. Mr Ayres KC made clear that as Mr Murphy still plays a role in the Fund and the Company, the JOLs apply to injunct him in respect of all the Fund entities.

217. However, it is undisputed, on the evidence before the court, that Mr Murphy does not hold any interest in the Fund or in its limited or general partner and has no shareholding or any other interest in any of the companies connected with the Fund.

218. The Company's proprietary claim concerns only money that was paid to him as remuneration under his director's service agreements.

219. The Court takes the view that the damages and compensation claimed based on his participation in the restructuring are not proprietary claims in nature.

220. Having reviewed Mr Murphy's affidavit evidence,[75] the levels of remuneration he received (which is not contradicted) do not seem to the Court to be excessive in the circumstances. They are within the margin of appreciation in respect of commercial decisions such as risk and reward relating to remuneration.

221. In 2024, Mr Murphy was paid a total of US$466,667[76] including a bonus of US$250,000 in recognition of his:

> "*contribution to the increased independence of the Company"* and *"input in responding to the Supporting Organisations' behaviour in November/December*".

222. The Company says that this appears to be a reward for Mr Murphy's actions in supporting the restructuring and therefore the Company claims to recover this sum.

223. Mr Murphy was also paid US$500,000[77] in fees payable in monthly instalments and backdated to 1 January 2025, to be paid in advance:

---

[75] *Murphy 1, §§48-78.*
[76] *MacInnis 3, §§64-66, §74.*
[77] *On or after 12 May 2025: Murphy 1, §72.*

"*in circumstances where the Companies may have an inability to discharge their financial obligations to [Mr Murphy], for example, where freezing injunctions or temporary restraining orders may be sought against the Companies*".

224. The Court accepts that the comparison made by the Company with the salary paid to Mr Grant Scott is not apposite given the complex and contentious issues that Mr Murphy had to deal with and the professional services he provided.

225. Moreover Mr Patrick, and not Mr Murphy, replaced Mr Scott. Mr Scott had been the sole Management Shareholder of the Company. Mr Murphy's role was newly created.

226. A second director was appointed because entities in the Fund had become involved in US Chapter 11 proceedings (including proceedings for contempt of court) and proceedings brought by UBS in respect of a judgment exceeding US$1 billion. It was considered that there was an urgent need to appoint a robust independent director with litigation experience.[78]

227. Mr Grant Scott was a close personal friend of Mr Dondero, and was:

"*a patent lawyer with no experience in finance or running charitable organisations, who was Mr. Dondero's long-time friend, college housemate and best man at his wedding".*[79]

228. Mr Dondero's deposition evidence in the Highland Capital Chapter 11 bankruptcy proceedings (in Texas) given on 1 June 2021 shows that Mr Scott was not fulfilling a serious role and reveals the difficulties in identifying anyone prepared to take on his position without sufficient protections.

229. Mr Quest KC emphasised that Mr Murphy is a professional independent director with (by 2021) 17 years of relevant legal, financial services, and asset-management experience.

230. The Court is not persuaded that the payment of his remuneration gave rise to an actionable breach of fiduciary duty.

231. Moreover, there is no pleaded case of fraud or wilful default against him or any deliberate decision by him to act in breach of his fiduciary duty. There is also no evidence that would

---

[78] *Murphy 1, §35.6.*
[79] *As noted by Judge Jernigan in the US civil contempt proceedings.*

support an allegation of fraud or wilful default against Mr Murphy, or which would support any allegation of relevant actual knowledge.

232. The Court does not however agree with Mr Quest KC that there is no evidence to support the suggestion that Mr Murphy was paid in return for his agreement to the course of action that Mr Patrick took in relation to the restructuring.[80] The timing of the payment of US$250,000 and the reason given for it, raise a plausible inference.

233. However, the Court is of the view that in the light of the *'Directors liability and indemnity'* provisions of his service agreement,[81] there is no serious issue to be tried.

234. The Court accepts Mr Ayres KC's point that he does not need in his pleading to anticipate defences which may or may not be run. However, the evidence does not show a serious issue to be tried against the liability and indemnity protection.

235. In addition, the Company did not pay Mr Murphy. The Court is not persuaded that the Company owned the funds that were paid to Mr Murphy or that it had a proprietary interest in the remuneration paid by CLO HoldCo (D6) to Mr Murphy. The Company as a limited partner had no control over CLO HoldCo (D6).

236. The balance of convenience is firmly against granting a proprietary injunction against Mr Murphy. The injunction sought against him is not against any identifiable fund over which any proprietary claim by the Company could be made. Even if there were such an identifiable fund, if the injunction were to be granted, it would give Mr Murphy a difficult task to comply with.

237. The remuneration was paid into Mr Murphy's bank accounts. If an order was made against him, he would be left having to work out which monies he still had (and from a proportion of his remuneration said to be excessive over 4 ½ years) or which may be received from any assets of the Fund, at the risk of committal for breach. No tracing claim is pleaded. This ambiguity would be a reason as a matter of discretion to refuse to make the injunction against him.[82]

238. The Court accepts Mr Quest KC's cogent submissions that it is hard to see any benefit to the Company and the JOLs in the injunction application against Mr Murphy not to diminish assets, and there is real potential oppression to Mr Murphy in seeking to comply with the injunction sought.

---

[80] *Company written argument, §128.*
[81] *See clause 6 of the April 2021 Directors Services Agreement.*
[82] *Vestey Foods UK Ltd v Cox [2018] EWHC 3466 (Ch).*

*The Balance of Convenience Generally*

*Assets in Danger*

239. Had the Court been persuaded that there was a serious issue to be tried in relation to the proprietary interest of the Company and there was a legitimate juridical basis to grant a proprietary injunction, it would not have granted the injunction against any of the Defendants because it is not persuaded that there is a real risk that the assets are in danger.

240. There is no good reason to believe that the relevant assets will be adversely dealt with given the evidence that the Court has considered on this application, and following the undertakings in July 2025 and suggested in November 2025, as well as the Texas Rule 11 Agreement.

241. Having considered the affidavit evidence and submissions made, the Court is unpersuaded that the ordinary course of business exception poses any real risk to the Fund or to the Company.

242. The Court has concluded that the course which is likely to involve the least risk of injustice is not to grant the injunction.

*Lock Down and Transference of Control to JOLs*

243. The balance of convenience would also come down firmly in favour of the Defendants because the effect of the relief if granted would be to lock down the charitable activities of the Fund and place it under the control of the JOLs, which the Court regards as unjustified at this interlocutory stage.

244. The Court is not persuaded that the carve outs for specific projects proposed by the JOLs remedy the issue.

245. There is on the other hand no real risk of irremediable prejudice to the Company and the JOLs if the injunction is refused.

*Serious Issue to be Tried on the Restructuring*

246. The question whether the allegations made against the Directors are true or not will be properly investigated at trial. The principal allegation is a serious one, namely that they have stripped

the Company of its only asset so as to seize control and enrich themselves without the scrutiny of the Supporting Organisations.

247. They each vehemently deny these allegations and give reasons for the reorganisation which will need to be investigated at trial. There is a mass of contemporaneous documentary material to consider including legal and professional advice provided at the time. The Defendants say that it is inherently improbable that all of these advisers were wrong and that the restructuring was invalid or illegal and that the Directors knew this to be the case at the time.

248. No doubt the allegations the Defendants make that the Highland Foundations, which Mr Dondero controlled as Participating Shareholders, were used as vehicles to exert influence over the assets and operations of the Fund, inconsistently with its purpose and exposing it and its assets to litigation in which he was personally involved, will also be examined in detail at trial.[83]

249. All of the evidence will be properly tested at trial against the contemporaneous material so that a conclusion may be drawn as to whether the Directors took the decisions they did because they believed them to be in the best interests of the Company, as they say, or whether they are in breach of fiduciary duty as the JOLs and the Company say.

250. It is clear that Mr Dondero and his affiliates have a long history of contention with Mr Patrick and the Fund. The Court also notes that the Defendants say that Mr Dondero is the primary stakeholder in the liquidation, is funding it, and has a considerable personal stake in the claims being advanced by the Company, as well as the standing to benefit from any recoveries made pursuant to the funding agreement with Crossvine.

251. The Court has carefully considered the actions taken by the Directors, the advice sought and given, and the justifications put forward for the actions that were undertaken. The time when these actions were undertaken coincides with when the Supporting Organisations (Participating Shareholders) were getting increasingly concerned about the conduct of the Directors.

252. The Court has also taken into account the Company's point that these complex transactions were undertaken in secret without notifying the Original Participating Shareholders (Supporting Organisations) and in effect presented them with a *fait accompli*.

[83] *Patrick 1 Liquidation, §§101-164 and Patrick 2, §§26-43*

253. The Court has been persuaded that the Company and JOLs have a case which the Directors need to answer in relation to the divestiture of the Company's limited partner interest in the Fund which does withstand a reverse summary judgment application.

254. Weighing all of these points at this stage with a necessarily incomplete picture, the Court is persuaded that there is a serious issue to be tried as to whether the Directors acted in breach of duty in undertaking the restructuring.

255. The Court expresses no view as to whether that case is likely to succeed or not at this stage, merely that it has cleared the relatively low bar of having a real, as opposed to a fanciful, prospect of success at trial.

256. That finding does not change the analysis or outcome on this application and in particular does not affect the Court's view on the balance of convenience and the exercise of its discretion generally.

257. The Company's interest at stake is not proprietary, is of no economic value to the Company which has not already been reimbursed, and was a right to be considered by the general partner for discretionary charitable distributions for the Indirect Charitable Owners. Any loss would be felt by those owners and could be compensated by an award of damages which could be met from the Fund's assets.

*Cross Undertaking*

258. There is a further important reason why the Court, even had it been persuaded that there was a juridical basis to grant a proprietary injunction, would not have done so.

259. Given the wide nature of the injunction applied for and the significant costs which the Defendants would need to spend to comply with it, the absence of a secure cross undertaking is a good reason to not grant the injunction.

260. The default position is that an applicant for an interim injunction is required to give a cross undertaking in damages. This is not a case where it would be right to waive the cross undertaking required.

261. The Court has concluded that if the injunction were granted, significant loss would be likely to be caused to the Fund and its charitable recipients. There might also be business related and reputational impacts on individuals, including most obviously the Directors, which may be hard to quantify.

*Fortification*

262. The Court has also concluded in its discretion that this is a proper case for fortification. The JOLs themselves are not offering a cross undertaking and yet ask for wide ranging relief and further disclosure orders.

263. The Court is not persuaded that Crossvine, which is put forward to provide a cross undertaking, would be good to make up the likely loss sustained if it was to be found that the injunction had been wrongly granted.

264. The Defendants say Crossvine is controlled by Messrs Dondero and Ellington, both of whom are involved in the UBS Litigation in the US where it is alleged that Mr Dondero has an outstanding judgment against him of more than US$1.2 billion.

265. There is scant material on this application as to the nature, extent and location of Crossvine's assets. Apparently, the original funding Crossvine agreed has been exhausted.

266. The Defendants point out that an indemnity costs order[84] that was made against the Company as part of a June sanction application in the Liquidation Proceedings has not been complied with.

267. The Defendants have a good arguable case that there is a real risk that Crossvine, on the present evidence available, will not be good for the money.

268. Mr Ayres KC argued that the evidence from ValueScope suggesting potential damage to the Fund of c.US$127m if the injunction is granted is flawed because they had been involved in justifying the redemption of the Company's interest in CDM and so were not able to provide objective and independent evidence to the Court by way of the Damages Report. The Court does not agree.

---

[84] *Said to be circa US$1 million.*

269. An intelligent estimate of the loss is, in the Court's view, in the region of the ValueScope Damages Report. There is a real need for fortification in this case and none is offered. That in itself is a powerful factor against the granting of the proprietary injunction sought on the balance of convenience.

*Conclusion*

270. For these reasons, the Court refuses to make an order in the terms of the amended injunction summons filed on 4 December 2025.



**THE HON. JUSTICE RAJ PARKER**
**JUDGE OF THE GRAND COURT**