**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARITABLE DAF HOLDCO, LTD. (In Official Liquidation),[1]<br><br>Debtor in a foreign proceeding. | Chapter 15<br>Case No. 25-11376 (BLS) |

**DECLARATION OF CAROLINE MORAN IN SUPPORT OF THE REPLY TO THE OBJECTION TO THE VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF**

I, Caroline Moran, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

## I. INTRODUCTION

1. I am an attorney-at-law duly permitted to practice in the Cayman Islands and the Global Head of the Dispute Resolution, Insolvency and Restructuring team at the law firm Maples and Calder (Cayman) LLP ("Maples"). My professional address is Ugland House, South Church Street, Grand Cayman KY1-1104, Cayman Islands. I am duly admitted to practice in the Cayman Islands.

2. Maples is acting as Cayman Islands counsel to Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited, who on May 6, 2025, were appointed by the Grand Court of the Cayman Islands (the "Cayman Court") as joint official liquidators (in such capacity, the "JOLs") of Charitable DAF Holdco, Ltd, an exempted company incorporated under the laws of the Cayman Islands ("HoldCo" or the "Debtor"). HoldCo is the

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 263805. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

subject of a liquidation proceeding before the Cayman Court entitled *In the matter of section 131 of the Companies Act (2025 Revision) and in the matter of Charitable DAF Holdco Ltd* FSD 116 of 2025 (JAJ) (the "Cayman Proceeding"). The JOLs have been appointed as foreign representatives in the Cayman Proceeding for the purpose of seeking Chapter 15 relief. I am the partner at Maples primarily responsible for handling the Cayman Proceeding.

3. I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (this "Declaration"). The facts and matters contained in this Declaration are true and correct to the best of my information, knowledge and belief.

4. I submit this Declaration in support of the Petitioners' *Reply in Support of the Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Reply").[2]

5. In preparing this Declaration, I reviewed the *CDM Parties' Objection to the Verified Petition for (i) Recognition of Foreign Main Proceeding, (ii) Recognition of Foreign Representative, and (iii) Related Relief Under Chapter 15 of the Bankruptcy Code*. I also reviewed the final form drafts of (a) the Declaration of Margot MacInnis in Support of the Reply (the "MacInnis Declaration"), filed contemporaneously herewith; (b) the documents prepared and/or filed in connection with the Cayman Proceeding; and (c) relevant provisions of the Cayman Islands Companies Act (2025 Revision) (the "Companies Act"), the Companies Winding Up Rules (2023 Consolidation) (the "CWR"), the Insolvency Practitioners' Regulations (2023 Consolidation) and Insolvency Practitioners' (Amendment) Regulations, 2024 (collectively, the "IPR"), the Grand Court Rules of the Cayman Islands (2023 Revision), the Grand Court Law of the Cayman Islands (2015 Revision), and other provisions of Cayman Islands law as they relate to chapter 15 of title

[2] Capitalized terms that are used but not defined in this Declaration shall have the meanings given to them in the Reply.

11 of the United States Code (the "Bankruptcy Code") and other aspects of U.S. bankruptcy law referred to in this Declaration.

6. HoldCo is a Cayman Islands exempted company, incorporated on October 27, 2011, and was, between November 2011 and December 18, 2024, the sole limited partner of the Charitable DAF Fund, LP (the "Fund"),[3] a Cayman Islands exempted limited partnership formed on October 28, 2011, to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organizations in the U.S.

7. This Declaration comprises matters that are statements of my view of Cayman law or statements of fact. Where the matters stated in this Declaration are statements regarding Cayman law, such statements represent my view of Cayman law as an attorney admitted and authorized to practice in the Cayman Islands. Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, I believe them to be true. Where the matters stated in this Declaration are statements of fact that are not within my personal knowledge, they are derived, as appropriate, from documents maintained by the Cayman Islands Registrar of Companies, from the records maintained by Maples as a result of advising the JOLs in connection with the Cayman Proceeding, and/or from information supplied to me by or on behalf of the JOLs and are true to the best of my knowledge, information, and belief. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

[3] The term DAF stands for *Donor Advised Fund*, a vehicle defined by reference to s.4966(d)(2) of the US Internal Revenue Code of 1986, which grants certain tax benefits and the reasonable expectation of advisory privileges to the donor of assets to a DAF as regards the distribution or investment of amounts, provided their donation is irrevocable and beyond the donor's control.

## II. STATEMENTS OF CAYMAN LAW AND PRACTICE

### A. The Collective Nature of the Cayman Proceeding

8. I understand that the Patrick Entities have challenged whether the Cayman Proceeding is a collective proceeding as that term is used in the definition of "foreign proceeding" in section 101(23) of the Bankruptcy Code. I understand, and have been advised by U.S. counsel, that courts in the United States have interpreted a collective proceeding to mean one that considers the rights and obligations of creditors generally, rather than the rights of a single creditor or a single class of creditors. I further understand, and have been advised by U.S. counsel, that courts in the United States have found that the hallmarks of a collective proceeding include adequate notice to creditors, provisions for the distribution of assets in accordance with statutory priorities and a mechanism for creditors to seek court review of developments.

9. The JOLs were appointed as official liquidators of HoldCo pursuant to an order of the Cayman Court dated May 6, 2025, which ordered, among other things, that (i) the voluntary liquidation of HoldCo be continued under the supervision of the Cayman Court pursuant to section 131 of the Companies Act and (ii) Ms. MacInnis and Mr. Bhowmik be appointed as the joint official liquidators of HoldCo.

10. Section 131 of the Companies Act empowers the Cayman Court to order a voluntary liquidation be continued under the supervision of the Cayman Court if (i) the company is or is likely to become insolvent; or (ii) the supervision of the Cayman Court "will facilitate a more effective, economic or expeditious liquidation of the company in the interests of the creditors and contributories." If the Cayman Court makes a supervision order under section 131 of the Companies Act, at the same time, it must make an order for the appointment of one or more qualified insolvency practitioners as official liquidator of the company under CWR order 5, rule 1(2).

11. That same rule, CWR order 5, rule 1(2), also requires the Cayman Court to appoint official liquidators at the same time it makes a winding up order under section 92 of the Companies Act, for example a winding up order on just and equitable grounds.

12. Accordingly, there are two routes from which official liquidators can be appointed (i) following a supervision order or (ii) following a winding up order. Regardless of the route by which the official liquidators are appointed and the company goes into official liquidation, section 133 of the Companies Act expressly provides that the liquidation process is the same (save for necessary exceptions to reflect the date the liquidation commenced and the acts of a voluntary liquidator prior to the appointment of official liquidators. This has been confirmed by the Cayman Court in *In re Asia Private Credit Fund Ltd* [2020] 1 CILR 134 in which the Cayman Court stated, at paragraph 10 of the Injunction Judgment that "[u]nder s.133, a supervision order takes effect for all purposes as if it were an order that the company be wound up by the court, except as regards the commencement of the liquidation under s.117 and the prior acts of the voluntary liquidator are valid and binding upon the company and its official liquidator."

13. The Cayman Court has also confirmed that "there is no difference in substantive outcome in the powers of the official liquidators that will result from making an order on a petition for a supervision order or making an order on the basis of a just and equitable winding-up petition: see section 133 of the Companies Act" (paragraph 26 of *re Atlas Capital Markets LLC* [2026] CIGC (FSD) 19).

14. An official liquidator is an officer of the Court (section 108(2) of the Companies Act, CWR O.18, rule 1).

15. Section 110 (1) of the Companies Act provides that it is the function of an official liquidator "(a) to collect, realise and distribute the assets of the company to its creditors and, if

there is a surplus, to the persons entitled to it; and (b) to report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up."

16. The key functions of realization and distribution is reflected in CWR order 18, rule 1 which empowers the official liquidator, "as agent of the company, to collect, take possession, retain, manage and realise the company's property."

17. To perform these functions, an official liquidator has a broad range of available statutory powers, which are set out in Schedule 3 of the Companies Act (section 110(2) of the Companies Act):

a. Part I of Schedule 3 provides that an official liquidator may only exercise the following powers with sanction of the Cayman Court:

    i. Bring or defend legal proceedings on behalf of the company (requires sanction).

    ii. Carry on the business of the company so far as may be necessary for its beneficial winding up.

    iii. Dispose of any property of the company to a person who is or was related to the company.

    iv. Pay any class of creditors in full.

    v. Make any compromise or arrangement with creditors.

    vi. Compromise debts and liability.

    vii. Deal with all questions in any way relating to or affecting the assets of the winding up of the company.

    viii. Take security for the discharge of any such call, debt, liability or claim and to give complete discharge in respect of it.

ix. Sell any of the company's property.

x. Raise and borrow money and grant securities over property of the company.

xi. Engage staff, attorneys and other professionally qualified persons to assist the official liquidator in the performance of their functions.

b. Part II of Schedule 3 provides that an official liquidator may exercise the following powers without sanction of the Cayman Court:

i. Take possession of, collect and get in property of the company and for that purpose to take all such proceedings as the official liquidator considers necessary.

ii. Do all acts and execute on behalf of the company all deeds, receipts and documents.

iii. Prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against that person's estate and receive dividends in the same in respect of that balance.

iv. Draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the company.

v. Promote a scheme of arrangement.

vi. Convene meetings of creditors and contributories.

vii. Do all other things incidental to the exercise of the official liquidator's powers.

18. The exercise of these powers by an official liquidator "is subject to the control of the Court . . ." (section 110(3) of the Companies Act).

19. Where sanction is required for the exercise of a power, the official liquidator must apply for and obtain sanction from the Cayman Court before exercising the power (the power may also be sanctioned by the Cayman Court in the winding-up or supervision order). In authorizing the exercise of Part I powers, the Cayman Court will not give blanket authority to exercise any and all of the Part I powers without further reference to the Cayman Court, and the Cayman Court will not authorize a liquidator to exercise all Part I powers simply on the basis that it might become appropriate to exercise such powers (*UCF Fund Limited* 2011 (1) CILR 305 at paragraph 20, *GTI Holdings Ltd* 2022 (1) CILR 472, *Ourgame International Holdings Limited* [2026] CIGC (FSD) 16). An application for sanction needs to be based on specific circumstances on which the exercise of the relevant power is appropriate and needs to be supported by relevant evidence (*GTI Holdings Ltd* 2022 (1) CILR 472).

20. Any sanction application must be served on each member of the liquidation committee.

21. The Cayman Court may direct that, when a sanction application gives rise to an issue in respect of the substantive rights as between the company and any creditor or contributory or any class thereof, it shall be adjudicated as an *inter partes* proceeding as between the impacted parties (CWR order 11, rule 3(3)).

22. Any creditor or contributory can apply to the Cayman Court "with respect to the exercise or proposed exercise of" the powers conferred on official liquidators in Schedule 3 of the Companies Act (section 110(3) of the Companies Act). Creditors or contributories (depending on whether the company is insolvent or solvent) can also make a sanction application to the Cayman Court, asking that the Cayman Court order the liquidators exercise a power conferred upon them (section 110(4) of the Companies Act).

23. The official liquidators are required to convene the first meeting of creditors or contributories (depending on whether the company is declared to be insolvent or solvent) within 28 days from the date of the appointment. From that date, the official liquidators are obligated to convene meetings of creditors or contributories at least once a year (CWR order 8, rule 2).

24. There are various notice requirements imposed on official liquidators, including:

a. The official liquidator must give notice of the official liquidators' appointment to all creditors and contributories of the company of whom the official liquidator is aware within 28 days of the appointment. This notice must be published in the Cayman Islands Gazette and whatever newspaper the supervision petition was advertised (CWR order 5, rule 3).

b. The official liquidator must give notice of the official liquidator's intention to declare and distribute a dividend (CWR order 18, rule 2(2)) and, where the official liquidator has declared a dividend, shall give 21 days' notice of it to the creditors with specified particulars (CWR order 18, rule 2(3)). An official liquidator must also give notice in respect of the final distribution (CWR order 18, rule 7).

c. When the affairs of the company have been wound up, the official liquidator shall apply to the Cayman Court for an order that the company be dissolved. The official liquidator shall publish a notice of the hearing of the application to dissolve the company in one or more newspapers circulating in a country or countries in which the company appears most likely to have creditors and such notice shall be published at least 14 days before the date of the hearing (CWR order 22, rule 1).

25. An official liquidator must also prepare reports and accounts with respect to the official liquidators' conduct of the liquidation and the state of the company's affairs. The official

liquidator must report to the liquidation committee, the contributories (if the company is determined to be solvent) and the Court. An official liquidators' report must detail, among other things, the steps taken in the liquidation since the last report, and the accounts must include details of (among other things) the nature and estimated realizable value of the company's assets, the nature and amount of any liabilities (including future or contingent), the expenses of the liquidation and the liquidators' remuneration. The official liquidators' report and accounts shall be filed in Court and sent to the company's creditors and contributories (CWR order 10).

26. Any person stating themselves in writing to be a creditor or contributory of the company shall have the right to inspect the Cayman Court file in respect of the liquidation proceeding and take copies of any filed documents (CWR order 26, rule 4).

27. The property of the company shall be applied by the liquidator in satisfaction of its liabilities *pari passu* and subject thereto shall be distributed amongst the members according to their rights and interests in the company (section 140(1) of the Companies Act). CWR order 16, rule 1 provides that, where a solvent company is being wound up, the official liquidator shall pay the debts owing to its creditors in the ordinary course. CWR order 18, rule 2 provides for the distribution of the company's assets by the official liquidator which can be done when "the official liquidator has sufficient funds in hand for the purpose the official liquidator shall, subject to the retention of such sums as may be necessary for the expenses of the winding up, declare and distribute dividends among the creditors in respect of the debts which they have respectively proved." The expenses of the liquidation are payable by the official liquidators out of the assets of the company pursuant to the statutory order of priorities set out in CWR order 20, rule 1.

28. I understand that the Patrick Entities have analogized the JOLs' role in the Cayman Proceeding to the role that the joint provisional liquidators played in the joint provisional

liquidation of Global Cord Blood Corporation ("Global Cord"). As a matter of Cayman Law, there are significant differences between the authority granted to the joint provisional liquidators of Global Cord and the authority granted to the JOLs in the Cayman Proceeding.

29. Provisional liquidators are typically appointed to protect the assets of a company as an interim measure pending the hearing of a winding up petition. If the Grand Court subsequently decides at the hearing of the winding up petition that it is appropriate to make a winding up order, it will appoint official liquidators to wind up the company. Under s. 104(2) of the Companies Act, the Grand Court may appoint a provisional liquidator to a company when there is a *prima facie* case for making a winding up order, and the appointment of a provisional liquidator is necessary to prevent (i) the dissipation or misuse of the company's assets; (ii) the oppression of minority shareholders; or (iii) mismanagement or misconduct on the part of the company's directors. If a provisional liquidator is appointed, they are only permitted to carry out the specific functions conferred on them by the Grand Court. A provisional liquidator's powers are also limited to the powers contained in the court order appointing them.

30. In *Global Cord*, the joint provisional liquidators were appointed to prevent (1) potential mismanagement or misconduct by Global Cord's directors and (2) the potential dissipation and/or misuse of Global Cord's assets pending the hearing of the winding up petition (*see In the matter of Global Cord Blood Corporation* FSD 108 of 2022 (IKJ) unreported, 22 September 2022 at [20] to [26]). The joint provisional liquidators were not appointed to wind up Global Cord, and they did not have the power to do so. Unlike HoldCo in this case, Global Cord was not being wound up at the time the US Bankruptcy Court considered the joint provisional liquidators' recognition petition (*see In re Global Cord Blood Corp.,* No. 22-11347 (DSJ), at section 2).

31. In contrast, official liquidators are appointed to wind up companies. As set out above, the functions of an official liquidator under s 110 of the Companies Act are to:

a. collect, realize, and distribute the assets of the company to its creditors and, if there is a surplus, to the persons entitled to it; and

b. report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up.

32. To perform these functions, an official liquidator has a broad range of available statutory powers, some of which require sanction of the Cayman Court (as discussed above). The JOLs have been appointed as official liquidators to conduct an orderly winding up of HoldCo for the benefit of all its stakeholders (contributories and creditors) under the supervision of the Grand Court. As part of the winding up, the JOLs are also empowered to conduct an investigation into the affairs of HoldCo. This is fundamentally different to the situation regarding the provisional liquidation of Global Cord.

**B. Discovery and the Cayman Proceeding**

33. As I noted in my first declaration, the duties of joint official liquidators under the Companies Act are to (a) collect, realize and distribute the assets of the company to its creditors and, if there is a surplus, to equity holders and (b) report to the company's creditors and other stakeholders upon the affairs of the company and the manner in which it is being wound up. In addition, the Companies Act empowers and requires the JOLs to investigate (i) the causes for the failure of HoldCo's business and (ii) generally, the promotion, business dealings and affairs of HoldCo.

34. The main investigative tools available to the JOLs in the Cayman Islands are contained in sections 101, 102, 103 and 138 of the Companies Act. Under these sections, official liquidators may, among other things:

a. compel the company's current and former directors, officers, employees (during the year prior to the commencement of the winding up or appointment of a provisional liquidator), and professional service providers to provide a statement of affairs (section 101);

b. compel relevant persons (including any current or former directors and any other person who has been concerned with the promotion or management of the company) to be subjected to an oral or written examination and/or turn over property to the official liquidator (section 103); and

c. seek an order compelling any person holding property or documents which appear to belong to the company to turn the property or documents over to the official liquidator (section 138).

35. In Section 5 of the Supervision Order, the Cayman Court expressly granted sanction to the JOLs to exercise "the power to commence legal proceedings in the name and on behalf of HoldCo to obtain the provision of information and or documents and/or the examination of individuals in the Cayman Islands or the United States."

36. Accordingly, it is consistent with the JOLs' statutory duties under the Companies Act, the express authority granted by the Cayman Court in the Supervision Order, and the fiduciary duties arising from their appointment, to seek authority to use discovery tools that are available to assist foreign representatives under Chapter 15 upon the recognition of a foreign proceeding as a foreign main or foreign non-main proceeding. Requesting authority to use such discovery tools is expressly consistent with the authority granted to the JOLs by the Cayman Court in the Cayman Proceeding and not contrary to public policy in the Cayman Islands in any way. As clarified by the Court of Appeal of the Cayman Islands in *Lyxor Asset Management S.A. v Phoenix Meridian*

*Equity Limited* [2009 CILR 553] at [14], [52], [57], and [58], where a party has a right to avail itself of a legitimate foreign process, it should be able to do so unless there is a compelling reason not to. Compelling reasons include when to do so would be acting oppressively or vexatiously. However, it is not oppressive or vexatious for an official liquidator in the Cayman Islands to use foreign discovery tools to compel overseas persons to turn over property or documents belonging to the company or to obtain broader discovery of documents relevant to the company where a liquidator has received sanction of the Cayman Islands Court to do so.

**C. Solvency Classification Under Cayman Law**

37. The Companies Act provides for the liquidation of both solvent and insolvent companies and affords various rights to creditors and contributories, as applicable, depending on whether the company is solvent, insolvent, or of doubtful solvency. *See, e.g.*, Companies Act § 110(3) and (4) (affording creditors or contributories, as applicable, the right to apply to the Cayman Court with respect to the exercise or proposed exercise of a liquidator's powers). If a company is solvent, such an application may only be made by a contributory, and the creditors have no right to be heard. If a company is insolvent, such an application may only be made by a creditor, and the contributories have no right to be heard. And if a company is of doubtful solvency, both creditors and contributories have a right to be heard.

38. Within 28 days of the winding up order, for the purpose of convening meetings and establishing a liquidation committee, the official liquidators must determine whether the company is solvent, insolvent or of doubtful solvency and file the determination with the Court (CWR order 8, rule 1(1) and (3)). The determination is binding upon the creditors and contributories of the company unless and until it is changed by the official liquidator as permitted by this rule (CWR order 8, rule 1(1)). If and when the official liquidator considers that the official liquidator's initial determination of solvency may no longer be justified, the official liquidator may re-consider the

determination and change the determination if appropriate to do so. This changed determination will then be binding on the company's creditors and contributories (CWR order 8, rule 1(2)).

39. In *In the Matter of Herald Fund SPC* FSD 27 of 2013, 28 January 2014 the Cayman Court summarised the purpose of the solvency determination and factors that liquidators should consider when making the determination:

a. "CWR Order 8, rule 1 provides that the official liquidator shall summarily determine whether or not a company should be treated as solvent, insolvent or of doubtful solvency for the limited purpose of determining the composition of the liquidation committee and the composition of the meetings by which the committee is elected" (paragraph 3).

b. "[T]he liquidator must keep his initial determination under review" (paragraph 3).

c. "The policy underlying these rules is clear. If, and so long as, a company in liquidation is properly considered to be insolvent in the sense that the amount of its liabilities is thought to be greater than the realizable value of its assets, its shareholders have no financial interest and therefore should not be allowed to influence the conduct of the company's liquidation as members of its liquidation committee. Conversely, ordinary creditors should be excluded from participation when a company is properly considered to be solvent in the sense that they will be paid in full in any event (though not necessarily on the date when their debts fall due) because the realizable value of the company's assets is properly considered to be greater than the amount of its liabilities" (paragraph 4).

d. Liquidators "have to ask themselves whether [the company] is, or is likely to become, solvent or insolvent, applying a balance sheet test, and making reasonable

assumptions about assets and liabilities which are contingent or contingent in amount" (paragraph 5).

e. In making a solvency determination, the liquidators "have to make reasonable assumptions about the most likely outcomes of the various contingencies, based upon the relevant circumstances as they presently exist" (paragraph 5).

40. In *In the Matter of Herald Fund SPC*, the Cayman Court also made it clear that a determination of doubtful solvency should not be used as a default position by liquidators in cases that are difficult or uncertain. A determination of doubtful solvency is a "provisional determination which will hold good so long as the circumstances prevent a liquidator from expressing a firm opinion about the most likely final outcome" (paragraph 3). In that case, the official liquidators had made a determination of doubtful solvency and the Cayman Court explained that,

> [i]nstead of asking themselves whether [the company] is, or is likely to become solvent or insolvent on a balance sheet test, making reasonable assumptions about the various contingencies based upon the circumstances known to them at the time, they appear to have regarded "doubtful solvency" as the default position which can be adopted in any case of difficult or uncertainty. This was the wrong approach. The [liquidators] appear to have thought that it was unnecessary for them to take any view about the most likely outcome of [the company's] claim[s] . . . . If they had done so, it seems to me that they may well have concluded that it would be reasonable to assume that BLMIS is a net debtor.
>
> . . .
> For these reasons the Court will direct the [liquidators] to reconsider their determination of "doubtful solvency . . . .

(Paragraphs 9(3) to (6)).

41. On June 2, 2025, the JOLs determined that HoldCo should be treated as solvent for the purposes of CWR order 8, rule 1. Although HoldCo has no material assets aside from its claims, this determination reflects the position that, if HoldCo is successful in its claims, HoldCo will

recover significant assets that would be more than sufficient to repay all existing and anticipated creditor claims, so the parties with the economic interest in the liquidation will be the shareholders.

42. The JOLs continue to monitor and re-evaluate the solvency determination as the claims progress. In making this determination, the JOLs did not base their decision on whether HoldCo was solvent on a cash flow basis, but rather on a balance sheet basis as they are required to do so.

## III. DEVELOPMENTS IN THE CAYMAN PROCEEDING

### A. Solvency Summons

43. On February 12, 2026, DFW filed a summons challenging the JOLs' determination that HoldCo's estate is solvent (the "Solvency Summons"). DFW asserted that HoldCo is "insolvent or of doubtful solvency, at best," relying on the alleged (1) dismissal of HoldCo's contingent claims to the Fund's assets by the Injunction Judgment; (2) accrual of significant liabilities, including in excess of US$1 million in unsatisfied costs orders; (3) exhaustion of the Funding Agreement (defined below); and (4) absence of further third-party funding. (see Baker & Partners letter to the Cayman Court dated February 12, 2026).

44. The JOLs agreed to file an explanatory affidavit in respect of their solvency determination together with a remuneration report, with residual issues to be addressed at a hearing on June 23 and 24, 2026. The JOLs reaffirmed their determination that HoldCo is solvent, on a balance sheet basis, for purposes of the Companies Act. Although HoldCo continues to have limited realized cash assets, the JOLs consider that HoldCo's most valuable asset is HoldCo's interest in the Fund and the associated Statement of Claim arising from the facts and circumstances that the JOLs are pursuing against the Named Defendants in the Cayman Litigation, which if successful, would result in the reinstatement and recovery of its ownership interest in the Fund which the JOLs allege was wrongly transferred by DFW and Mr. Patrick (together with all of the

parties identified in footnote 2 of the Objection, the "Patrick Entities") to themselves, The JOLs continue to treat the Statement of Claim as a contingent asset for balance sheet purposes and continue to value the Statement of Claim at full value based on the JOLs' genuine and fair estimation of the likely success of the Statement of Claim. Accordingly, in determining that HoldCo is solvent on a balance sheet basis for purposes of the Companies Act, the JOLs consider that HoldCo has a substantive contingent asset arising from the Statement of Claim, the potential value of which is measured by reference to the current net asset value of the Fund (valued in excess of $290 million).

45. DFW subsequently withdrew the Solvency Summons, and it was dismissed under a consent order dated June 23, 2026, (the "Consent Order"), with costs awarded to the JOLs. The Consent Order records DFW's acceptance that, as at the date of the Consent Order, there is no cause for the solvency of HoldCo's estate to be disputed. DFW's acceptance was made without prejudice to the merits and the parties' assessment of the merits of the claims asserted in the Cayman Proceeding and the value conferred on the liquidation estate by those claims. As discussed below, DFW's removal application was also dismissed under the Consent Order. DFW agreed in the Consent Order to pay the JOLs' costs in the agreed sum of US$225,000 in respect of the Redaction Summons, the Removal Summons, and the Adjournment Summons. It also agreed to pay the Supporting Organization's costs in the agreed sum of US$75,000 in respect of the Removal Summons and the Adjournment Summons.

**B. Removal Application**

46. In addition to official liquidators' principal duties under the Companies Act (set out at paragraph 32 above), official liquidators owe various common law and equitable duties. For a general discussion of these duties see *McPherson & Keay's Law of Company Liquidation* (5th ed., Sweet & Maxwell, 2021) at [8-047]-[8-060]). Several of these duties arise from the fiduciary

position that an official liquidator occupies in relation to the company, its creditors, and its contributories. An official liquidator's fiduciary duties include duties to not profit from their office (other than the receipt of authorized remuneration), to avoid conflicts of interest, to act impartially, and to act in good faith and for proper purposes. Official liquidators also have a duty to exercise reasonable care and skill in performing their functions in line with what a reasonably careful officeholder would do. Official liquidators primarily owe their duties to the company. However, the duty to the company requires the official liquidators to have regard to the interests of the creditors and/or contributories.

47. On August 19, 2025, DFW filed a summons seeking the removal of the JOLs as liquidators in the Cayman Proceeding and their replacement by Jeffery Stower and Neema Griffin of Teneo (Cayman) Ltd. (the "Removal Summons"). In support, DFW alleged that the JOLs lacked independence and were subject to undue influence from Mr. Dondero and the vehicles funding the Cayman Proceeding. Specifically, DFW asserted that the conduct of the JOLs is "lacking the impartiality and independence" required because the JOLs, among other things, had allegedly:

a. Invoked the Cayman Court's jurisdiction *ex parte* persistently and without proper cause;

b. Failed to provide full and frank disclosure on making applications on an *ex parte* basis;

c. Undermined their ability to remain fair and impartial because they had entered a funding arrangement that had allegedly granted Mr. Dondero effective control over their actions;

d. Adopted and pursued the agenda of the Supporting Organizations and Mr. Dondero to the prejudice of DFW;

e. Failed to engage meaningfully with proposed terms of a transaction reporting protocol that would assure the JOLs that the business of CDM was being operated in an open and transparent manner;

f. Conducted inadequate investigations;

g. Made misleading representations regarding the funding of the JOLs and their advisors;

h. Failed to safeguard the Cayman liquidation process and prevent profligate litigation;

i. Failed to discuss relevant U.S. claims pending against Mr. Dondero and Scott Ellington;

j. Operated the liquidation of HoldCo to the advantage of the Supporting Organizations and Mr. Dondero.

48. On June 1, 2026, the JOLs responded to the Removal Summons. The JOLs rejected DFW's allegations. Among other things, the JOLs confirmed that: (1) they have no affiliation with Mr. Dondero or any stakeholder beyond their role as independent officers of the Cayman Court; (2) they have never been subject to professional or regulatory censure; (3) their solvency determinations have been based on their informed, good faith view of HoldCo's financial position; and (4) the Cayman Court sanctioned both the Funding Agreement (defined below) and the commencement of the Cayman Proceeding with full knowledge of DFW's position.

49. The JOLs' response noted that the threshold for removing a court-appointed liquidator is exceedingly high and that the Cayman Court will be slow to appoint replacement liquidators nominated by a person whose conduct is under investigation, which is the position of DFW and Mr. Patrick. The Highland Dallas Foundation, Inc., Highland Kansas City Foundation,

Inc., and Highland Santa Barbara Foundation, Inc. (collectively, the "Supporting Organizations") also opposed the Removal Summons, filing affidavit evidence confirming that their interactions with the JOLs have been professional and at arm's length.

50. On June 3, 2026, DFW sought to adjourn the hearing on the Removal Summons until after the Injunction Judgment Appeal (defined below) (the "Adjournment Summons"). The JOLs and Supporting Organizations opposed the adjournment, and on June 12, 2026, the Cayman Court denied DFW's request. *See id.* Among other things, the Cayman Court concluded that it was "unsatisfactory that the removal summons [had been] issued as long ago as August 2025 and [had] still not been determined," and the Cayman Court was "not persuaded that the imminent hearing of the [Injunction Judgment Appeal] provide[d] a good reason for an adjournment." (*See* the Cayman Court's reasons for decision, set out in an email to the parties dated June 12, 2026).

51. The Removal Summons was subsequently dismissed on June 23, 2026, under the Consent Order. The Consent Order records DFW's acceptance that, as at the date of the Consent Order, there is no cause for the JOLs' removal, and it requires DFW to pay the JOLs' costs in the agreed sum of US$225,000 and the Supporting Organization's costs in the agreed sum of US$75,000.

**C. Sanction of the Crossvine Funding Agreement**

52. An official liquidator can enter into a funding agreement with a third-party to fund the pursuit of a litigation claim. Entry into a funding agreement that provides for the assignment of a percentage of the proceeds of the litigation claim (if any) would be an exercise of the official liquidators' statutory power to sell the company's property which, as above at paragraph 17, is a power that requires the sanction of the Court (paragraph 8 of Part 1, Schedule 3 of the Companies Act) (see *Re ICP Strategic Credit Income Fund Ltd*).

53. The Cayman Court's approach to the sanction of an official liquidator entering into a litigation funding agreement was set out by Jones J in *Re ICP Strategic Credit Income Fund Ltd* [2014 (1) CILR 314] at paragraph 18 as follows:

> [A]n assignment of a percentage of the proceeds of a cause of action pursuant to a litigation funding agreement is a valid exercise of the official liquidator's statutory power to sell the company's property, provided that the funder is given no right to control or interfere with the conduct of the litigation. It follows that where this court is asked to sanction a litigation funding agreement, its terms will be carefully scrutinized to ensure that it does not directly confer upon the funder any right to interfere in the conduct of the litigation or indirectly put the funder in a position in which it will be able, as a practical matter to exert undue influence or control over the litigation . . . .

54. Therefore, any litigation funding agreement that the JOLs seek to enter into must be considered by and sanctioned (i.e. authorized) by the Cayman Court and, in determining whether to sanction entry into a funding agreement, the Court will ensure that the funding agreement does not provide the funder with the right to control, or exercise undue influence over, the litigation.

55. Due to the limited liquid assets available to HoldCo's estate, the JOLs sought the sanction of the Cayman Court to enter into a funding agreement (the "Funding Agreement") with Crossvine Litigation Funding LLC ("Crossvine").

56. On July 14, 2025, the JOLs applied to the Cayman Court for sanction of the Funding Agreement (the "Funding Sanction Application"). On July 15, 2025, following review of the Funding Agreement and the evidence and submissions in support, the Cayman Court ordered that the JOLs are authorized to enter into the Funding Agreement.

57. Relevantly, the Funding Agreement between the JOLs and Crossvine expressly provides, among other things at clause 9.5, that Crossvine "agrees that subject to approval rights expressly granted to [Crossvine] under this Agreement, the JOLs are free to act as they see fit, provided that such conduct is not inconsistent with their legal and statutory duties, <u>and the JOLs are under no obligation to take or refrain from taking any action requested by [Crossvine] relating to the [Statement of] Claim or any further Investigations or Litigation</u>" (underline added).

58. Where a creditor or contributory in the liquidation is also a defendant to litigation that is being funded, there will be commercial sensitivity around providing the full commercial terms of the funding agreement to that defendant. In such circumstances, although the creditor or contributory would ordinarily be entitled to the evidence filed with the Cayman Court in respect of the application for sanction, the Cayman Court may order that all, or portions, of the funding agreement be sealed so as not to disclose the commercially sensitive information to the defendant.

59. In respect of the JOLs' Funding Sanction Application, the Cayman Court ordered the sealing (by way of redaction) of specific aspects of the Funding Agreement and the evidence in support. Most of the Funding Agreement and evidence remained unredacted, including the clause referred to in paragraph 56 above which provides that the JOLs do not have to take or refrain from any action requested by Crossvine.

60. On July 16, 2025, the redacted version of the evidence was filed on the Cayman Court liquidation file, which is available to be viewed by the contributories of HoldCo, including DFW.

61. Following a subsequent process and agreement between the JOLs and DFW, on May 12, 2026, DFW was provided with a full, unredacted version of the Funding Agreement.

## IV. STATUS OF CAYMAN LITIGATION

### A. The Proprietary Injunction Application

62. On July 15, 2025, simultaneously with the filing of the Writ and Statement of Claim (the "Statement of Claim") in the Cayman Litigation, the JOLs filed an application for a proprietary injunction (the "Injunction Application").

63. The purpose of the Injunction Application was (a) to preserve assets over which the Debtor asserted a proprietary claim pending trial of the Cayman Litigation and (b) to obtain disclosure to enable the JOLs to police compliance with any injunctive relief.

64. On September 12, 2025, the Named Defendants applied for security for costs. They sought security in the sum of approximately US$6.1 million and a stay of the Cayman Litigation pending provision of such security. Although the application has not been withdrawn, the Named Defendants have not had the application listed for a hearing. The Court therefore has not made any timetabling directions or determinations in respect of the application. The JOLs procured an after-the-event insurance policy on November 7, 2025, that provides US$7 million cover in respect of potential adverse costs arising from the Cayman Litigation.

65. On December 15 and 16, 2025, the Cayman Court heard the Injunction Application over a two-day hearing, with all parties represented by counsel. There was no live witness evidence at the hearing of the Injunction Application, and the Injunction Application was considered based on affidavit evidence and limited expert evidence alone. The Cayman Court reserved its judgment.

66. On February 10, 2026, the Cayman Court delivered its judgment denying the Injunction Application (the "Injunction Judgment"). The Cayman Court was "persuaded that [HoldCo] and [the] JOLs have a case which the Directors need to answer in relation to divestiture of HoldCo's limited partner interest in the Fund which does withstand a reverse summary judgment application" (Injunction Judgment at [253]) and "that there is a serious issue to be tried

as to whether the Directors acted in breach of fiduciary duty in undertaking the restructuring (Injunction Judgment at [254]). The Cayman Court expressed "no view as to whether that case is likely to succeed or not at this stage" (Injunction Judgment at [255]), and it denied the Injunction Application for the following reasons:

a. There was no serious issue to be tried that HoldCo had a proprietary interest in the Fund Partnership Interest;

b. There was no serious issue to be tried that HoldCo had a proprietary interest in the Fund's underlying assets;

c. Proprietary injunctive relief could not be granted where HoldCo neither pled nor had any direct proprietary interest in the Fund's underlying assets;

d. There was no serious issue to be tried in respect of HoldCo's proprietary interest in the membership interest in CDM held by DFW;

e. There was no serious issue to be tried as to whether the transfer of the Fund Partnership interest to CDM and/or DFW was at an undervalue;

f. There was no serious issue to be tried in respect of the claim that Mr. Patrick and/or Mr. Murphy received excessive remuneration in breach of their duties to HoldCo; and

g. The balance of convenience favored the Named Defendants.

67. The JOLs respectfully disagree with the Injunction Judgment and are appealing the Cayman Court's decision to the Court of Appeal. The essence of the appeal is that the Cayman Court should have concluded that there is a serious issue to be tried in respect of HoldCo's claim to a proprietary interest in the limited partnership interest that it held prior to the Relevant Transactions. The Cayman Court found that there was a serious issue to be tried in respect of

whether the Fund Partnership Interest had been transferred in breach of duty (Injunction Judgment at [254]). However, the Cayman Court failed to acknowledge that HoldCo has a proprietary interest in the Fund Partnership Interest. This was despite the fact HoldCo was the legal and beneficial owner of the Fund Partnership Interest prior to the Relevant Transactions, and the Fund Partnership Interest provided HoldCo economic rights against the Fund.

68. It is important to emphasize that the Injunction Judgment was *not* a merits decision:

a. The Statement of Claim, initiated by the filing of the Writ and Statement of Claim, is HoldCo's substantive claim in the Cayman Islands. The Statement of Claim was issued against the former directors of HoldCo and entities controlled by them, alleging breach of fiduciary duty, unlawful means conspiracy and knowing receipt in respect of a series of purported transactions whereby the sole asset of HoldCo (being a limited partnership interest valued at around US$270 million) was transferred by the directors into a new structure controlled solely by Mr Patrick and DFW at a gross undervalue of around US$1.6 million.

b. In contrast, the Injunction Application is an interlocutory application which seeks to protect the assets which are the subject of the Statement of Claim. The purpose of the injunction is to preserve the status quo and improve the chances of the Court being able to do justice after a determination of the merits at the trial in respect of the Statement of Claim.

c. The Injunction Judgment is not a determination on the merits of the Statement of Claim and does not mean that HoldCo cannot be successful in the Statement of Claim. It simply means that HoldCo was not granted interim relief to protect the

assets that are the subject of the Statement of Claim pending the hearing on the Statement of Claim.

d. As the Cayman Court stated in the Injunction Judgment, "the question whether the allegations made against the Directors are true or not will be properly investigated at trial" (paragraph 246 of the Injunction Judgment).

e. Although it is not a determination on the merits, it is noted that, notwithstanding the dismissal of the Injunction Application, the Cayman Court was "persuaded that [HoldCo] and the JOLs have a case which the Directors need to answer in relation to the divesture of [HoldCo's] limited partner interest in the Fund which does withstand a reverse summary judgment application," (paragraph 253), and found that "there is a serious issue to be tried as to whether the Directors acted in breach of duty in undertaking the restructuring" (paragraph 254).

69. I understand that the Patrick Entities have sought to characterise section 6.14 of the Fund's Second Amended and Restated Exempted Limited Partnership Agreement dated March 11, 2024 (the "Fund LPA"), as foreclosing HoldCo's right to bring any action relating to the property of the DAF. I further understand that the Patrick Entities have suggested that the Cayman Islands Court has accepted this interpretation. These propositions are incorrect. Section 6.14 of the Fund LPA is an anti-partition clause, which prevents partners in the Fund from bringing claims for the specific remedy of partition, namely the division and / or forced sale of jointly held property. It is not a bar or waiver on a partner's right to bring any, and all, claims in relation to property of the Fund. Moreover, the Cayman Islands Court did not accept the interpretation of section 6.14 contended for by the Patrick Entities in these proceedings. The Cayman Islands Court referred to

section 6.14 as being consistent with its finding that HoldCo had limited rights as a limited partner in the DAF. In any event, that decision is the subject of HoldCo's appeal (discussed below).

70. The Statement of Claim, including determination of whether the directors breached their fiduciary duties and, if so, what relief should be ordered, has not yet been determined and will be determined following a full trial by the Cayman Court.

71. As to when the Statement of Claim will be tried and determined, the trial date has not yet been set by the Cayman Court. The Statement of Claim is at an early stage. The defendants have filed acknowledgements of service, but pleadings remain open. The parties have agreed to extend the date for the defendants' statement of defense to the date that is 21 days after an order on the Appeal. The Grand Court has not made any further timetabling directions in respect of the Statement of Claim.

**B. The Injunction Judgment Appeal and Interim Appellate Relief**

72. On February 24, 2026, the JOLs filed a notice of appeal with the Cayman Islands Court of Appeal (the "Court of Appeal"), appealing the Injunction Judgment (the "Injunction Judgment Appeal").

73. On March 3, 2026, the JOLs filed a request for interim injunctive relief, which sought further asset preservation protocols pending the outcome of the Injunction Judgment Appeal (the "Interim Appeal Injunction Request").

74. On March 27, 2026, a three-judge panel heard the Interim Appeal Injunction Request. On March 31, 2026, by way of oral judgment, the Cayman Islands Court of Appeal granted interim injunctive relief pending the Injunction Judgment Appeal (the "Interim Appellate Order"), which prohibits the Named Defendants from (1) conducting business outside of the ordinary course; (2) making increases to remuneration; (3) making alterations to the corporate governance of the Fund and related entities; and (4) taking certain dissolution or liquidation steps.

Additionally, the Interim Appellate Order requires the Named Defendants to preserve books and records and imposes a monthly cap of $200,000 on charitable distributions made by DFW.

75. On May 15, 2026, the Cayman Islands Court of Appeal delivered its written reasons in respect of the Interim Appeal Injunction Request. The Cayman Islands Court of Appeal concluded that HoldCo has a “seriously arguable appeal” because, “in the light of *Aquapoint LP (in Off. Liquidation) v. Fan* [2025] UKPC 56, [48], it is arguable that [HoldCo] was entitled to injunctive relief to preserve the value of its partnership interest in the Fund even if it has no direct legal or beneficial interest in its underlying assets” (paragraph 18).

76. The Injunction Judgment Appeal is scheduled to be heard by the Cayman Islands Court of Appeal on September 3–4, 2026.

## V. CONCLUSION

77. Based on the foregoing, I respectfully submit this Declaration in support of the Reply filed contemporaneously herewith.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

Dated: August 17, 2026

*/s/ Caroline Moran*
Caroline Moran