**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-11376 (BLS) |
| | **Re: Docket Nos. 3, 46, 50, 51 & 52** |
| Debtor in a foreign proceeding. | |

**DECLARATION OF MARK GOODMAN IN SUPPORT OF CDM PARTIES' OBJECTION TO THE VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Mark Goodman, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief.

1. I am a partner of Campbells LLP ("**Campbells**"), a Cayman Islands law firm. Campbells advises financial, institutional and business clients worldwide of the laws of the Cayman Islands, Hong Kong and the British Virgin Islands. I practice law in the Cayman Islands, and I advise on the laws of the Cayman Islands.

2. My practice in the Cayman Islands primarily involves contentious and non-contentious insolvency and restructuring, with a focus on the financial services sector and international groups of companies. I have considerable experience in the liquidation of Cayman Islands companies. I am a member of INSOL International, the American Bankruptcy Institute and the International Insolvency Institute.

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

3. I was admitted as a solicitor of the Supreme Court of England and Wales in 2004. I have been admitted as an attorney at law in the Cayman Islands since 2008 and a solicitor of the British Virgin Islands since 2014. I hold higher rights of audience in the superior courts of England and Wales and am an accredited mediator.

4. I have acted for official liquidators of numerous Cayman Islands companies and frequently appear as an advocate before the Grand Court of the Cayman Islands in insolvency proceedings. As a practicing Cayman Islands attorney, I am competent to testify with respect to the Cayman legal matters discussed herein, which are well within my experience. I have previously provided expert evidence of Cayman Islands insolvency law to the United States Bankruptcy Court for the District of Delaware, among other courts.

5. Campbells represents Mark Patrick, Paul Murphy, CDMCFAD LLC ("**CDM**"), DFW Charitable Foundation ("**DFW**"), CDH GP Ltd (the "**GP**"), and CLO Holdco Ltd in the Cayman Islands proceedings before the Grand Court (Financial Services Division) (the "**Cayman Court**"), Case No. FSD 201 of 2025 (RPJ), and the related appeal (the "**Cayman Appeal**") before the Cayman Islands Court of Appeal (the "**Court of Appeal**" or "**CICA**"), CICA Civil Appeal No. 003 of 2026.[2] I am the lead partner at my firm dealing with the case.

6. I submit this declaration (this "**Declaration**") in further support of the CDM Parties' *Objection to the Verified Petition for (i) Recognition of Foreign Proceeding, (ii) Recognition of Foreign Representative, and (ii) Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 46] (the "**Objection**")[3] and specifically in response to the *Declaration of Margo MacInnis in Support of the Reply* [Docket No. 51] (the "**Accompanying MacInnis Decl.**"), and

[2] The Petitioners are the Joint Official Liquidators (the "**JOLs**") of Charitable DAF HoldCo Limited (the "**DAF HoldCo**") appointed under Section 92(d) of the Companies Act (2025 Revision) (the **"Companies Act"**).

[3] Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to such terms in the Objection or the Reply Declarations, as applicable.

the *Declaration of Caroline Moran in Support of the Reply* [Docket No. 52] (the "**Accompanying Moran Decl.**"; together with the Accompanying MacInnis Decl., the "**Reply Declarations**"), each filed August 17, 2026.

7. Except as otherwise indicated, this Declaration is based on facts and matters known to me personally, which are true to the best of my knowledge and belief. Where such facts and matters are not known to me personally, I identify the source of my information and belief and believe those facts and matters to be true. Nothing in this Declaration or its exhibits is intended to waive privilege in respect of any matter referred to.

8. I am over the age of 18 and, if called to testify, would testify competently to the facts set forth herein.

## I. The Interim Appellate Order and the Asset Protocol

9. In their Reply Declarations, the JOLs mischaracterize both the Court of Appeal's interim order dated March 31, 2026 (the "**Interim Appellate Order**") and the original consent order dated July 25, 2025 which approved the Asset Protocol (the "**July 2025 Consent Order**").

10. The sole purpose of Interim Appellate Order is to maintain the *status quo* pending the outcome of the Cayman Appeal. At the March 27th hearing on the JOL's Interim Appeal Injunction Request (the "**March 27th Hearing**"), the Court of Appeal indicated that it would be unable to accommodate the JOLs' request for an emergency hearing of the Cayman Appeal, and that it was unlikely to be able to hear the appeal until August or September 2026. As a result of this scheduling conflict, the Court of Appeal entered the Interim Appellate Order to preserve the *status quo* while the Cayman Appeal remains pending. The Court of Appeal's finding was limited to holding that the Cayman Appeal was *"arguable"* — the lowest threshold for the continuation of an appeal in the Cayman Islands. At the March 27th Hearing, the CDM Parties confirmed to the

Court of Appeal that they were already bound by the Rule 11 Agreement in the Texas Business Court and would continue to abide by its terms. The CDM Parties did, however, oppose the entry of an order that included broad disclosure and financial reporting obligations, because of the risk that such an order would be weaponized by third parties adverse to the CDM Parties — a concern the Court of Appeal acknowledged when declining to impose the broader relief sought by the JOLs in the Interim Appeal Injunction Request.[4]

11. Critically, the Court of Appeal declined to order the broad disclosure and financial reporting obligations sought by the JOLs. The Court of Appeal was unwilling to impose such obligations on the CDM Parties absent the JOLs' or their funder's, Crossvine Litigation Funding LLC's ("**Crossvine**"), agreement to secure cross-undertaking in damages (*i.e.*, security/bond). Instead, the Court of Appeal granted relief similar to the existing Rule 11 Agreement, with only minor modifications — an agreement by which the CDM Parties were already bound. Accordingly, it is incorrect to characterize the Interim Appellate Order as any indication as to the strength of the merits of the Cayman Appeal.

12. As to the July 2025 Consent Order, the JOLs filed the Statement of Claim and the Injunction Application in July 2025. The JOLs unilaterally sought an urgent listing (*i.e.*, emergency hearing) on July 31, 2025. In spite of the CDM Parties not being afforded the required time under the Cayman procedural rules to file evidence in reply to the Injunction Application, as well as certain of the CDM Parties' counsel being unavailable, the JOLs indicated that they would proceed on an *ex parte* basis, meaning the CDM Parties would not have an opportunity to participate at the hearing. In those circumstances, the CDM Parties reluctantly agreed to the Asset Protocol. The July 2025 Consent Order approved the agreed Asset Protocol.

---

[4] *See* Interim Appellate Opinion at ¶ 32, a copy of which is attached to the Patrick Declaration as Exhibit 7 thereto.

## II. <u>The Removal and Solvency Summonses</u>

13. The JOLs do not accurately characterize and do not present the background to the consent order dated June 23, 2026 (the "**June 2026 Consent Order**") which approved the dismissal of DFW's summons seeking the removal of the JOLs and the summons challenging the JOLs' assessment of the Company's solvency. The June 2026 Consent Order does not make any finding on the merits of either application and should not be interpreted as a binding finding on the merits.[5]

14. The withdrawal was a matter of commercial pragmatism and should not be characterized as a concession by DFW on the merits of the applications. As acknowledged in the Reply Declarations, applications for the removal of official liquidators in the Cayman Islands have an exceedingly high threshold for success. Given the significance of the Cayman Appeal to the JOLs' entire legal strategy, the CDM Parties requested that the Removal Summons be adjourned until after the appeal was determined — on the basis that, if the appeal succeeded, the removal application would likely become unnecessary, and if it failed, the application could be pursued with the benefit of the Appellate Court's findings. The JOLs and the Highland Foundations opposed the adjournment. Following a contested application, the presiding judge declined to adjourn the Removal Summons, finding that it was unsatisfactory for the application to have remained unresolved since August 2025. Rather than proceed with a hearing that was premature in circumstances where the Cayman Appeal — the outcome of which will have a significant impact on the future conduct of the liquidation given that the liquidation essentially involves these claims — was imminent, DFW made the pragmatic decision to dismiss the summons. To be clear, the summons can be refiled at any point. A further consideration was that, had the removal application

[5] *See* June 2026 Consent Order, a copy of which is attached to the Accompanying MacInnis Decl. as <u>Exhibit 3</u> thereto.

succeeded, new or additional officeholders would have needed to come into office and determine how to proceed with the substantive litigation. That process would in all likelihood have required the Cayman Appeal to be vacated from its current listing, thereby delaying its determination and extending the period during which the CDM Parties remained subject to the Interim Appellate Order. In those circumstances, dismissal was clearly the course most consistent with the efficient resolution of the substantive dispute.

15. The costs order in favor of the JOLs approved by the June 2026 Consent Order was a function of the Cayman "deeming provisions" — under Cayman procedural rules, where an applicant withdraws or discontinues an application, costs are awarded against that applicant unless the court orders otherwise.[6] This is entirely mechanical and carries no implications as to the merits of such application.

16. A similar analysis applies to the Solvency Summons. As Ms. MacInnis acknowledges in the Accompanying MacInnis Decl., the JOLs agreed to provide an explanatory affidavit setting out the basis for their solvency determination. Having reviewed that affidavit, DFW concluded that it was not necessary to proceed with the contested application at that juncture and dismissed the Solvency Summons. Again, the decision to dismiss the application is not a concession on the merits. DFW's acceptance that, as at the date of the consent order, there was no cause to dispute the solvency determination was expressly without prejudice.

17. In sum, the withdrawal was a strategic choice made by DFW without any merits findings, costs were only applied as a function of Cayman law, and the JOLs have significantly overstated the impact of the withdrawal.

[6] See Grand Court Rules, Order 62.

## III. Discovery Powers Under Cayman Law

18. The JOLs also overstate the discovery powers available to Cayman Islands liquidators. Under Cayman law, section 103 of the Companies Act is a cooperation and examination power directed at defined "relevant persons" — including current or former directors, officers, professional service providers, and persons concerned in the promotion or management of the company. Under section 103(3)(b), the Court may order a relevant person to "transfer or deliver up to the liquidator any property or documents belonging to the company." Section 103 is therefore proprietary in nature and is confined to documents belonging to the company. Section 138 is a broader "getting in" power that applies to any person (not just relevant persons) who has in their possession "any property or documents to which the company appears to be entitled." Section 138 therefore captures documents to which the company has a proprietary right but also documents to which it has a contractual or other apparent entitlement — the test is one of apparent entitlement, not ownership. Neither section provides a general discovery power nor entitles a liquidator to documents that merely relate to the company.[7]

19. The Cayman Court specifically held in the Cayman Opinion that DAF HoldCo has no proprietary interest in the DAF's assets. *See* Cayman Opinion, at ¶¶ 131-140. As a result of such finding, it follows that the JOLs have no power under section 138 of the Companies Act to compel production of documents belonging to DAF or entities within the DAF Structure. Those rights are held by the GP under section 16(1) of the Exempted Limited Partnership Act. They are not the property of DAF Holdco.

---

[7] Companies Act (2025 Revision), ss. 103, 138.

20. The Privy Council confirmed in *Singularis Holdings Ltd v PricewaterhouseCoopers* [2014] UKPC 36 that Cayman Islands liquidators are not entitled to greater relief in foreign jurisdictions than they would receive under their own domestic law.

21. The JOLs suggest in their Reply Declarations that the Privy Council's decision in *Singularis* is not authoritative in these proceedings. That submission is incorrect as a matter of Cayman law. The Privy Council is the final appellate court for the Cayman Islands, and its decisions are binding on all Cayman courts and on all officers of those courts, including official liquidators appointed by them. *Singularis* is a decision concerning the powers of Cayman Islands liquidators seeking relief in a foreign jurisdiction, and its findings — that such liquidators are not entitled to obtain in a foreign court greater relief than they would be entitled to under their own domestic law — is binding on the JOLs as officers of the Cayman Court. The JOLs are bound by *Singularis* as a matter of their own duties and obligations under Cayman law, and they should not be permitted to circumvent those limitations by the expedient of seeking relief in the United States that the Cayman Court would not grant them.

22. It also is important to note that discovery in the Cayman Proceeding will not commence until after the Cayman Appeal is resolved. Accordingly, I believe it will be at a minimum several months before discovery commences in the Cayman Proceeding.

## IV. <u>The Funding Agreement, Mr. Dondero's Involvement, and the ATE Policy</u>

23. The JOLs' Funding Agreement with Crossvine was sanctioned by the Cayman Court on an *ex parte* basis at a very early stage of the proceedings without adequate adversarial testing. That notwithstanding, it is clear that Cayman Court, with the benefit of full adversarial argument on the injunction application, appreciated the issues with Mr. Dondero related to the Funding Agreement. The Cayman Court observed that "Mr. Dondero and his affiliates have a long

history of contention with Mr. Patrick and the Fund" and, based on the JOLs own admissions, that the JOLs funding from Crossvine ultimately comes from Mr. Dondero.

24. Under the terms of the Funding Agreement, Crossvine stands to receive an uplift of up to 30% of amounts advanced if recoveries exceed US$270 million. Neither Mr. Dondero nor Mr. Ellington (who stand behind Crossvine) has offered any cross-undertaking in damages or fortification thereof. This is significant because it exposes the CDM Parties to a material shortfall in cost recovery (which is required under Cayman law) given the inadequacy of the after-the-event ("**ATE**") insurance policy obtained by the JOLs, which provides a single aggregate limit of US$7 million to cover the costs of all six respondents across the entirety of the Cayman Court proceedings and any appeals — a sum that is plainly insufficient given the costs already incurred. The JOLs have been the subject of adverse costs orders for approaching a year which remain unpaid. Their ATE insurance is clearly insufficient to cover costs to trial. They nevertheless have convened a special sitting of the Court of Appeal without providing for the costs orders already made against them or increasing the ATE policy limit.

25. The insufficient ATE policy limit coupled with the JOLs' request for discovery prior to the start of discovery in the Cayman Proceeding raises procedural fairness issues under Cayman law. There is an already pending proceeding in the Cayamn Court and, under Cayman law, the JOLs are responsible for the CDM Parties' costs should their claims fail. But by seeking discovery in the United States where the "American rule" provides that each party pays its own counsel's fees, the JOLs may skirt Cayman rules requiring that they pay the CDM Parties' costs. This is concerning especially where the funds under the Funding Agreement have been exhausted and the JOLs have not yet paid adverse costs orders entered against them and in favor of the CDM Parties. In addition, granting discovery relief in this chapter 15 proceeding would bring forward

discovery in the Cayman Proceeding for the JOLs but not for the CDM Parties, further compounding prejudice on the CDM Parties.

## V. The "Serious Issues" Standard and Related Mischaracterizations

26. The JOLs place inappropriate weight on the finding at paragraph 254 of the Cayman Opinion that "there is a serious issue to be tried as to whether the Directors acted in breach of duty in undertaking the restructuring." That finding does not signify any endorsement of the merits of DAF HoldCo's claims. Indeed, the Cayman Opinion makes clear at paragraph 255 that "[t]he Court expresses no view as to whether that case is likely to succeed or not at this stage, merely that it has cleared the relatively low bar of having a real, as opposed to a fanciful, prospect of success at trial." This is the lowest standard in Cayman civil litigation — a threshold that is satisfied by any claim that is not wholly without merit.[8]

27. Moreover, and critically, the Cayman Court found no serious issue to be tried on the following points: (a) DAF HoldCo has no arguable proprietary interest in the Fund's underlying assets (Cayman Opinion at ¶¶ 131–140); (b) the remuneration paid to Mr. Patrick was not excessive and did not constitute a breach of duty (Cayman Opinion at ¶ 206); (c) No constructive trust arises absent a proprietary interest (Cayman Opinion at ¶ 200); and (d) the transactions were not at an undervalue (Cayman Opinion at ¶¶ 187–189).

28. These are the foundational claims in the JOLs' Statement of Claim. Only the breach of fiduciary duty question — relating to the propriety of the DAF Restructuring, not to any proprietary claim over assets — was held to clear the "relatively low bar."

[8] *See* Cayman Opinion at ¶ 255, a copy of which is attached to the Patrick Declaration as Exhibit 5.

## VI. The Cayman Opinion

29. The JOLs seek to diminish the significance of the Cayman Opinion. In my opinion, this characterization is wrong as a matter of Cayman law and misrepresents the nature and status of the Cayman Opinion.

30. The Cayman Opinion is the operative determination under Cayman Islands law unless it is overturned on appeal. It is a fully reasoned, 56-page judgment following a two-day *inter partes* (contested) hearing at which the Cayman Court considered hundreds of pages of written evidence, referencing thousands of pages of documentary exhibits, heard submissions from experienced counsel for all parties, and delivered a reserved judgment addressing each argument in detail.

31. The Judgment was not merely a procedural decision. Its key holdings include that (a) DAF HoldCo has no arguable proprietary interest in the DAF's assets (Cayman Opinion at ¶¶ 131–140); (b) DAF HoldCo's interest as a limited partner was limited to an entitlement to be considered for discretionary distributions, not for its own account, but for the account of appropriately qualified charities (Cayman Opinion at ¶ 147); (c) the assets of the DAF are held by the GP on statutory trust under section 16(1) of the Exempted Limited Partnership Act. A limited partner (*i.e.*, DAF HoldCo) does not legally or beneficially own those assets (Cayman Opinion at ¶¶ 134–135); (d) the transactions by which CDM acquired the Partnership Interest were not at an undervalue (Cayman Opinion at ¶¶ 187–189); and (e) the balance of convenience was firmly against the grant of the proprietary injunction sought by the JOLs (Cayman Opinion at ¶ 239).

32. The holding at paragraphs 134–135 of the Cayman Opinion reflects established Cayman law. Under the Exempted Limited Partnership Act (2025 Revision), section 16(1), all property of an exempted limited partnership (*i.e.*, the DAF) is held on trust by the general partner

(*i.e.*, the GP). A limited partner has no legal or beneficial ownership of those assets during the subsistence of the partnership. This statutory trust structure is the bedrock of Cayman limited partnership law and was correctly applied by the Cayman Court.

33. It is incorrect for the JOLs to suggest that the Cayman Opinion was of limited significance because it was merely “interlocutory”. While the application before the Cayman Court was for interlocutory relief, the legal analysis undertaken by the Cayman Court was substantive and binding. The Cayman Court’s findings on the law of limited partnerships, the statutory trust, and the nature of a limited partner’s interest are applicable and binding on the JOLs unless overturned on appeal.

## VII. <u>The Global Cord Blood Distinction</u>

34. The JOLs attempt to distinguish *In re Global Cord Blood Corporation*, No. 22-11347 (DSJ), 2022 WL 17478530 (Bankr. S.D.N.Y. Dec. 5, 2022) (the **“Global Cord Blood”** decision) by focusing on what a JOL can do in theory (*i.e.*, the statutory powers available to a liquidator), rather than on what these JOLs are actually doing in practice. In my opinion as a Cayman Islands attorney, this distinction is misplaced.

35. When considering not what powers are theoretically available to Cayman Islands liquidators as a class but rather what these particular JOLs are actually doing with respect to this particular company, one sees that the Cayman Proceeding is, in substance, functionally identical to the situation in *Global Cord Blood* for several reasons.

36. First, the JOLs are not conducting a traditional liquidation. They are not selling assets, not distributing to creditors, and not winding up DAF HoldCo in any ordinary sense. Second, the JOLs are pursuing a single contested litigation claim, and this contested claim is the only “meaningful” asset that DAF HoldCo allegedly has. Third, there is no meaningful creditor

claims process being conducted — DAF HoldCo is, on the JOLs' own statement, solvent. As of the date of the JOLs' Second Report to Contributories dated July 31, 2026, only two proofs of debt have been received: one from Mr. Patrick in the amount of US$741,981.12 (in respect of contractual indemnification) and one from Grant Scott in the amount of US$5,285.36. No other creditor claims have been submitted. And fourth, there has been no distribution to contributories and no prospect of any distribution unless the contested litigation succeeds.

37. The fact that the Cayman Proceeding is an "official liquidation" as opposed to a "provisional liquidation" does not change the functional reality of what is occurring. In *Global Cord Blood*, the court looked beyond the formal label to the substance of the proceeding and found that it was really a shareholder dispute, not a collective insolvency proceeding. That same analysis applies here.

38. A Cayman Islands official liquidation is commenced by the making of a winding up order under section 92 of the Companies Act. Such an order does not, in itself, change the character of the underlying dispute. Where, as here, the sole activity of the liquidators is the prosecution of contested claims, the proceeding is not being conducted as a "collective" proceeding in any meaningful sense.

39. Accordingly, the purported distinction between *Global Cord Blood* and the present case — based on the formal designation of the proceeding as an "official liquidation" — is not relevant to the analysis under Cayman law.

IN WITNESS WHEREOF, I have executed this Declaration pursuant to Section 1746 of Title 28 of the United States Code, under penalty of perjury under the laws of the United States of America this 25th day of August, 2026.

By: */s/ Mark Goodman*
Mark Goodman
Partner
Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands